# EXHIBIT 1

**B&B**

## BALCH & BINGHAM LLP

Alabama • Mississippi • Washington, DC

Riley W. Roby
(334) 269-3120

Attorneys and Counselors
The Winter Building
2 Dexter Avenue
P.O. Box 78 (36101-0078)
Montgomery, Alabama 36104-3515
(334) 834-6500
(334) 269-3115 Fax
www.balch.com
(877) 453-6422 (direct fax)
rroby@balch.com

September 29, 2004



<u>BY HAND DELIVERY</u>

Mr. Walter Thomas
Secretary
Alabama Public Service Commission
RSA Union Building
8th Floor
100 N. Union Street
Montgomery, Alabama 36104

Re:   Petition of Momentum Telecom, Inc., ITC^DeltaCom Communications, Inc. to
Establish a Generic Proceeding to Establish "Just, Reasonable and
Nondiscriminatory" Pricing for BellSouth Telecommunciations Inc.'s Section 271
Unbundled Network Elements.   DOCKET #29543

Dear Mr. Thomas:

Enclosed for filing are the original and ten copies of the Petition of Momentum Telecom,
Inc. and ITC^DeltaCom in the above-referenced matter.

Sincerely,

Riley W. Roby

RWR:th
Enclosures

cc:   Francis B. Semmes, Esq.

PLAINTIFF'S
EXHIBIT
1

**BEFORE THE**
**ALABAMA PUBLIC SERVICE COMMISSION**

| | | |
|---|---|---|
| In Re:  Petition of Momentum Telecom, | ) | |
| Inc.and ITC^DeltaCom Communications, | ) | |
| Inc. to Establish a Generic Proceeding to | ) | Docket No. _____ |
| Establish "Just, Reasonable and | ) | |
| Nondiscriminatory" Pricing for BellSouth | ) | |
| Telecommunications Inc.'s Section 271 | ) | |
| Unbundled Network Elements. | ) | |

Alabama corporations, Momentum Telecom, Inc. and ITC^DeltaCom Communications, Inc. ("Petitioners") file this Petition requesting that the Alabama Public Service Commission ("Commission") establish a generic proceeding to establish "just, reasonable and nondiscriminatory" pricing for BellSouth Telecommunications Inc.'s ("BST") Unbundled Network Elements ("UNEs") to apply in any circumstances where switching is not required to be offered under Section 251 of the Act.

## PRELIMINARY STATEMENT

1.     On September 20, 1995, the Commission entered its Local Competition and Price Regulation Order ("Local Competition Order") in Docket Nos. 24499, 24472, 24030 and 24865. The Commission's objectives in enacting that Order included creation of "an environment in which fair and effective local competition flourishes." (Local Competition Order at 3). It specified that the Commission would develop "[n]on-discriminatory interconnection charges… which are just, reasonable, and support the Commission's objective to create an environment in which fair and effective local competition flourishes." (Id. at 20.06). The Local Competition Order mandated that BST "at a minimum, unbundle [its] local networks into the following four basic network functions:  1) local loop; 2) local switching; 3) local interoffice facilities; and 4)

signaling." (Id. at ¶ 21.01). The following year, the federal Act became law. The Act's specific purpose is "to give aspiring competitors every incentive to enter local retail telephone markets, short of confiscating the incumbents' property." Verizon Communications v. FCC, 535 U.S., 467, 489 (2002) ("Verizon"). This Petition is filed for the purpose of ensuring the objectives of this Commission and the Act are fulfilled.

**Recent Developments Requiring Commission Action**

2.    Recently, the mandate of the District of Columbia Circuit Court of Appeals in United States Telecom Association v. FCC, No. 00-1012 (D.C. Cir. March 2, 2004) ("USTA II") became effective, vacating certain unbundling rules adopted by the Federal Communications Commission in its Triennial Review Order. This ruling has created a vacuum of uncertainty surrounding BST's unbundling obligations under Section 251 of the Act, potentially jeopardizing the competitive environment that the Commission relied upon in endorsing BST's 271 authority and when it adopted its price cap regulatory plan.

3.    Fortunately, in Alabama, the Commission can take immediate steps to ensure that the competitive gains made possible by the Local Competition Order and the Act are preserved by establishing the just, reasonable and nondiscriminatory terms for those network elements that must be offered for BST, both to comply with section 271 of the Act, as well as the Commission's Local Competition and Price Regulation Order.[1]

4.    There is no question that BST voluntarily agreed to open its network by accepting the terms of the social contract offered in Section 271 and by embracing the flexibility afforded it as part of the Local Competition and Price Regulation Order. There are, however, open questions that the Commission must resolve to translate these obligations into concrete offerings.

---

[1]        September 20, 1995.

By taking this step, the Commission will determine the baseline offerings that will be available no matter <u>when</u> and <u>how</u> the issues involving the ongoing litigation concerning section 251 are ultimately resolved.

     5.     Petitioners urge the Commission to exercise its clear responsibility to arbitrate access and interconnection disputes in order to prevent a competitive crisis.  As explained below:

- Each of the key network elements required by CLECs to compete are specifically enumerated in section 271, forming an independent obligation unrelated to the necessary and impairment issues in section 251.

- Section 271 offerings must be implemented through interconnection agreements approved according to section 252.

- The Commission squarely requires full unbundling as a key component of its Local Competition and Price Regulation Order.

- Section 252 provides that the Commission is responsible for arbitrating disputes, including those disputes concerning the offering of elements required under section 271.[2]

- There is an immediate need for the Commission to address ongoing prices for those network elements affected by <u>USTA II</u>, as well as to define BST's obligation to provide nondiscriminatory access to UNE arrangements that include UNEs under both section 271 and section 251.

     6.     BST voluntarily accepted section 271's obligations in return for the right to provide in-region long distance service. (271 Order).  As everyone in the telecommunications industry expected when the Act passed, BST's ability to bundle local and long distance would be the most powerful force in post-divestiture telecommunications.  Today BST provides local and long distance service to over 5 million lines (in contrast to the 2.9 million UNE-P lines earned by

---

[2]     Although the FCC has the authority to enforce section 271 through actions that include, for instance, the withdrawal of an RBOC's interLATA authority, that enforcement authority does not diminish, in any way, the Commission's obligation to arbitrate interconnection agreements required by section 271, including the establishment of rates for items required by the competitive checklist.

local competitors and 0.3 million lines served through unbundled loops).  BST is rapidly coming to dominate the market for bundled services and, as a result, the interexchange market as well.[3]

7.    Until now, it was unnecessary to define with precision the exact terms, conditions and prices applicable to items required by section 271's competitive checklist and the Commission's Local Competition Order because such obligations largely duplicated parallel obligations incorporated in the regulations implementing section 251.  It is now time, however, for the Commission to make sure that these separate obligations credibly enable bundled-services competition by translating the obligations of section 271 and the Local Competition and Price Regulation Order into clear requirements that can easily be incorporated into interconnection agreements by BST and its CLEC competitors.  In the absence of such decisions, BST has made it clear that it will unilaterally impose anticompetitive wholesale rate increases, and competitive carriers will be forced to abandon existing and additional markets.  The competitive vision embraced by the Commission when it adopted the Local Competition and Price Regulation Order and by Congress when it passed the Act will be lost.

## Section 271 Requires Ongoing Access to Loops, Switching, Transport and Signaling at Rates and Terms that are Just, Reasonable and Nondiscriminatory

8.    Congress well understood that legislatively "un-doing" the AT&T Divestiture and permitting the RBOCs to offer in-region long distance services carried great risk.  Consequently, in crafting the additional voluntary obligations that an RBOC must accept in order to offer in-region long distance service, Congress made sure that each of the core elements of the local network – loops, transport, switching and signaling – would be available to competitive entrants

---

[3]    In the first state RBOC long distance entry was allowed (New York) the RBOC has already achieved 61% long distance market share, just shy of the share AT&T had when it was still considered a dominant, and fully-regulated, long distance carrier. The only counterbalance to the RBOCs achieving complete dominance offering bundled services is the local competition made possible by access to network elements.

in any state where the RBOC was permitted to offer long distance service, without the need for any additional findings by the FCC. As the FCC recognized:

> These additional requirements [the unbundling obligations in the competitive checklist] reflect Congress' concern, repeatedly recognized by the Commission and courts, with balancing the BOCs' entry into the long distance market with increased presence of competitors in the local market.... The protection of the interexchange market is reflected in the fact that section 271 primarily places in each BOC's hands the ability to determine if and when it will enter the long distance market. If the BOC is unwilling to open its local telecommunications markets to competition or apply for relief, the interexchange market remains protected because the BOC will not receive section 271 authorization.[4]

9.    The voluntary social contract contained in section 271 is both simple and powerful: In exchange for opening its _entire_ network to competitors, BST is permitted to provide long distance services to its local customers (and others).[5] The following elements of the competitive checklist are here most relevant:

> (B)    COMPETITIVE CHECKLIST - Access or interconnection provided or generally offered by a Bell operating company to other telecommunications carriers meets the requirements of this subparagraph if such access and interconnection includes each of the following: . . .
>
> > (iv)    Local loop transmission from the central office to the customer's premises, unbundled from local switching or other services.
> >
> > (v)    Local transport from the trunk side of a wireline local exchange carrier switch unbundled from switching or other services.

---

[4]    _In the Matter of Review of Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers_, CC Docket No. 01-338, _Implementation of the Local Competition Provisions of the Telecommunications Act of 1996_, CC Docket No. 96-98, _Deployment of Wireline Services Offering Advanced Telecommunications Capability_, CC Docket No. 98-147, "Report and Order and Order on Remand and Further Notice of Proposed Rulemaking," FCC 03-36, released August 21, 2003 ("TRO"), ¶ 655.

[5]    As a practical matter, the RBOCs generally have chosen to focus their long distance offerings on their own local customers and have not engaged in out-of-region entry to any meaningful degree.

> (vi)   Local switching unbundled from transport, local
>        loop transmission, or other services.
>
> (x)    Nondiscriminatory   access   to   databases   and
>        associated signaling necessary for call routing and
>        completion.[6]

This provision reflects Congress's full understanding that local competition would require broad

access to the incumbent network, particularly where permitting the RBOCs to offer long distance

services could lead to the reemergence of vertical monopolies that the nation had spent decades

to dismantle.[7]

## Section 271 Disputes are Subject to State Arbitration Under Section 252

10.    There is consensus that BST must offer each of the elements listed in section 271.

There is less or no agreement as to what that actually means and, equally important, by exactly

who and how disputes are resolved.  The Act, however, is not uncertain – each section 271

network element <u>must</u> be offered through interconnection agreements/SGATs that are subject to

the section 252 review process.

11.    Section  271(c)(2)(A)  clearly  links  BST's  obligations  under  the  competitive

checklist to its providing that access through an interconnection agreement or SGAT:

> (A)    AGREEMENT REQUIRED - A Bell operating company
>        meets the requirements of this paragraph if, within the State
>        for which the authorization is sought--
>
>        (i)(I)   such company is providing access and
>                 interconnection pursuant to one or more agreements

---

[6]        Section 271(c)(2)(B).

[7]        As the Supreme Court recognized in <u>Verizon</u>, Senator Breaux, a "leading backer of the Act in the
Senate," told the BOCs: "'Now, this legislation says you will not control much of anything.  You will have to allow
for nondiscriminatory access on an unbundled basis to the network functions and service of the Bell operating
companies that is at least equal in type, quality, and price to the access [a] Bell operating company affords to itself.'"
<u>Verizon</u> at 488 (<u>quoting</u> 141 Cong. Rec. 15572 (1995)).  Senator Breaux then read the items from the section 271
checklist that specifically require BOCs providing long-distance service to lease the platform of network elements to
new entrants.

> described in paragraph (1)(A) [Interconnection Agreement], or
>
> (II)  such company is generally offering access and interconnection pursuant to a statement described in paragraph (1)(B) [an SGAT], and
>
> (ii)  such access and interconnection meets the requirements of subparagraph (B) of this paragraph [the competitive checklist].

This section makes clear the specific interconnection obligations of section 271's competitive checklist (item ii) must be provided pursuant to the "agreements" described in section 271(c)(1)(A) or the SGATs described in section 271(c)(1)(B). By directly referencing section 271(c)(1)(A) and (B), the Act explicitly ties compliance with the competitive checklist to the review process described in section 252. As section 271(c)(1) states:

> (1)  AGREEMENT OR STATEMENT- A Bell operating company meets the requirements of this paragraph if it meets the requirements of subparagraph (A) or subparagraph (B) of this paragraph for each State for which the authorization is sought.
>
> (A)  PRESENCE OF A FACILITIES-BASED COMPETITOR- A Bell operating company meets the requirements of this subparagraph if it has entered into one or more binding <u>agreements that have been approved under section 252</u> specifying the terms and conditions under which the Bell operating company is providing access and interconnection to its network facilities for the network facilities of one or more unaffiliated competing providers of telephone exchange service (as defined in section 3(47)(A), but excluding exchange access) to residential and business subscribers.[8]

---

[8]    47 U.S.C. § 271(c)(1)(A) (emphasis added). Because a BOC could only comply with the requirements of section 271 through a statement of generally available terms and conditions (SGAT) if it had not received a request for access or interconnection with 10 months of the Act's passage, the remaining discussion focuses solely on the interconnection agreements described in section 271(c)(1)(A).

12.    The Act could not be clearer that section 271 network elements must be offered pursuant to the same review process as other (i.e. section 251) network elements.[9]  One of the central goals of the Act is to prevent discrimination, and the principal mechanisms to detect and prevent discrimination are the state-review and opt-in provisions of section 252.

13.    The FCC has already addressed RBOC attempts to evade the disclosure, review and opt-in protections of section 252.  Qwest attempted to end-run section 252 by requesting from the FCC a declaratory ruling that (among other findings) section 271 network elements were not required to be provided in filed interconnection agreements.[10]  The FCC rejected Qwest's request, determining section 252 creates a broad obligation to file agreements, subject to specific narrow exceptions that do not exempt section 271 elements.  In the Qwest Declaratory Ruling, the FCC made clear that any agreement addressing ongoing obligations pertaining to unbundled network elements – and the access and unbundling obligations of section 271 fall squarely within that definition – must be filed in interconnection agreements subject to 252 and, to the extent any question remains regarding those obligations, that the state commissions are to decide the issue.[11]

14.    The requirement that §271 network elements must be offered through interconnection agreements that states are responsible for arbitrating was recently confirmed by a

---

[9]    Although the section is written with reference to a BOC's initial application for in-region, interLATA authority, these are continuing obligations that must be satisfied in order for the BOC to remain in compliance with section 271 and continue to enjoy the opportunity to offer long distance services.

[10]    Qwest Communications International Inc. Petition for Declaratory Ruling on the Scope of the Duty to File and Obtain Prior Approval of Negotiated Contractual Arrangements under Section 252(a)(1), WC Docket No. 02-89, Memorandum Opinion and Order, 17 FCC Rcd 19337 (2002) ("Qwest Declaratory Ruling").

[11]    For a full discussion of the Qwest Declaratory Ruling and subsequent Notice of Apparent Liability for Forfeiture, see "The Continuing Path to Local Competition: The Importance of Section 252 to Achieving Just and Reasonable Terms, Conditions and Prices for UNE-P," PACE White Paper, April 2004, available at: www.pacecoalition.org.

federal judge reviewing Qwest's obligations in Minnesota. In discussing Qwest's obligations to file all of its agreements, the judge noted:

> For example, §271 includes a comprehensive checklist of items that must be included in ICAs before an ILEC may receive authority to provide regional long distance service. This list reveals that any agreement containing a checklist term must be filed as an ICA under the Act.[12]

Therefore, there should be no question that the Commission has authority to adjudicate this issue as the arbiter of interconnection agreements.

## BST is Separately Obligated Under the Terms of the Local Competition and Price Regulation Order to Fully Unbundle its Network

15.    The Alabama Commission also included an unbundling obligation as part of BST's price cap plan, in effect preconditioning the relaxed regulation of BST on development of competitive alternatives.

> 21.01 The LECs will, at a minimum, unbundle their local networks into the following four basic network functions:
>
> 1) local loop;
> 2) local switching;
> 3) local interoffice facilities; and,
> 4) signaling.[13]

With BST regulated under a price cap regime, the only consumer protection from the incumbent earning unreasonably high profits is competition.    That was the case when the Commission

---

[12]    Memorandum Opinion and Order, Civil No. 03-3476, *Qwest Corporation v. the Minnesota Public Utilities Commission*, et. al., August 25, 2004.

[13]    Local Competition and Price Regulation Order, September 20, 1995, emphasis added.

adopted price cap regulation, and it is just as true today.  Moreover, the Commission recently

reiterated its commitment to competition, noting that:

> The Commission fully understands that without the continued availability
> of local switching and, therefore, UNE-P, the continued development of
> local competition in Alabama will likely sustain a serious blow.  It is for
> that reason that we will closely monitor the proceedings of the FCC with
> respect to UNE-P, and in particular, local switching. *For that same
> reason, we hereby affirm our previous policies requiring that local
> switching be provide as an unbundled network element.*[14]

16.    The Commission has already put BST on notice that it is expected to fully support

local competition, both to meet its section 271 obligations and in accordance with the

Commission's price regulation policies and it is now time for the Commission to make sure these

promises are met.

## Unbundled Elements Must Be Offered on Just, Reasonable, and Nondiscriminatory Terms and Provide Entrants Meaningful Access to Compete.

17.    The FCC determined in the TRO that the additional obligations of the competitive

checklist must comply with a potentially more liberal pricing standard than the standard that

applies to elements offered under section 251 of the Act (a conclusion upheld in USTA II).[15]

Network elements offered solely in order to comply with section 271 must be just, reasonable,

nondiscriminatory and provide meaningful access:

> Thus, the pricing of checklist network elements that do not satisfy
> the unbundling standards in section 251(d)(2) are reviewed

---

[14]    Order, Generic Proceeding to Establish Prices for Interconnection Services and Unbundled
Network Elements, Docket 27821, December 31, 2002, emphasis added.

[15]    The fact that the FCC has adopted a pricing standard applicable to section 271 UNEs that is
potentially more lax than its TELRIC rules does not necessarily mean that existing prices should be changed
significantly, if at all.  TELRIC-based UNE rates are just and reasonable in themselves and it is a fact-based
economic question as to whether price levels different than the existing just and reasonable rates are appropriate.

> utilizing the basic just, reasonable, and nondiscriminatory rate
> standard of sections 201 and 202 that is fundamental to common
> carrier regulation that has historically been applied under most
> federal and state statutes, including (for interstate services) the
> Communications Act. Application of the just and reasonable and
> nondiscriminatory pricing standard of sections 201 and 202
> advances Congress's intent that Bell companies provide
> meaningful access to network elements.[16]

18.     It is important to understand that the FCC did <u>not</u> conclude in the above paragraph

that section 271 network elements were directly subject to sections 201 and 202 of the Act

(which applies, as the FCC notes, to <u>interstate</u> services).[17]  Rather, the FCC adopted the just and

reasonable rate <u>standard</u> that "has historically been applied under most federal and state statutes,"

and noted that sections 201 and 202 are an embodiment of that traditional standard. The

paragraph is not a statement of jurisdiction – <u>i.e.</u>, the paragraph does not say that section 271

network elements are <u>interstate</u> services subject to 201 and 202.  Rather, the passage describes

the appropriate standard of review.[18]

19.     Just as the FCC adopted the TELRIC pricing standard to apply to section 251

UNEs, the FCC has here adopted a potentially more liberal "just and reasonable" standard to be

applied to section 271 network elements, and notes that the section 271 pricing standard is the

same as is commonly found in a variety of pre-Act statutes (including sections 201 and 202).

Adopting a different pricing <u>standard</u>, however, does not change the <u>process</u> used to resolve

pricing disputes, nor does it modify the division of pricing responsibility contained in the Act

---

[16]     TRO, ¶ 663, footnotes omitted.

[17]     As a practical matter, network elements are predominately used to provide intrastate services (intrastate usage is commonly more than 90%) and, as a result, sections 201 and 202 would almost never govern rates if the traditional separation of regulatory jurisdiction applied.

[18]     Moreover, when the FCC concluded that the pricing standard of section 252(d)(1) did not apply to section 271, that conclusion did not excuse the applicability of the remaining provisions in 252. Significantly, section 271 was ambiguous as to whether the pricing standard of 252 applied to the specifically enumerated network elements (i.e., loops, switching, transport and signaling), and the FCC resolved that ambiguity by determining that it did not. No such ambiguity exists with respect to the obligation to offer each checklist item through agreements approved according through section 252.

(which provides that the FCC may define, through rulemaking, a general methodology – in this instance, by adopting the just and reasonable standard -- while <u>it is the states' responsibility to actually establish the rate</u>).[19]  The adjudicatory process required by section 271 of the Act is no different than the process required by section 251 -- through the arbitration and approval of interconnection agreements in accordance with section 252.[20]

### The Immediate Need for Commission Action: Establishing the Terms, Conditions and Pricing of Section 271 UNEs

20.     As explained above, BST is obligated, in order to comply with the voluntarily accepted obligations of section 271 and the Commission's Local Competition and Price Regulation Order, to offer specifically enumerated UNEs through state-approved interconnection agreements at just, reasonable and nondiscriminatory terms, conditions and prices.  By the Commission resolving critical open issues in this area, the Commission can restore a certain "baseline" to the competitive local market.  Two pressing issues are: (1) establishing the prices for any element no longer required under section 251; and (2) defining <u>precisely</u> BST's obligations to provide existing loop/switching/transport combinations, as well establishing new connections for customers.

21.     As to pricing, it is important to understand two facts:  the first is legal, the second economic.  First, although the FCC has directed states to apply a "just and reasonable" standard to resolve pricing disputes involving section 271 network elements, the TELRIC-based rates that

---

[19]     The United States Supreme Court affirmed this division of responsibility in <u>AT&T Corp. v. Iowa Utilities Bd.</u>, 525 U.S. 366, at 384 (1999), emphasis added:

> " ...252(c)(2) entrusts the task of <u>establishing rates</u> to the state commissions .... The FCC's prescription, through rulemaking, of a requisite pricing methodology no more prevents the States from establishing rates than do the statutory 'Pricing standards' set forth in 252(d).  <u>It is the States that will apply those standards and implement that methodology, determining the concrete result in particular circumstances.</u>"

[20]     Indeed, we are aware that a number of states (for instance, Tennessee and Georgia) are already addressing the pricing of unbundled local switching being offered under section 271 in arbitrations.

the Commission has already established must (by law) satisfy the just and reasonable criteria. In other words, as the states begin the task of defining the basic parameters of just and reasonable rates – and then deciding the specific rate to be applied – the "range" of just and reasonable rates must include the existing TELRIC-based rates.[21]  Although section 252(d)(1) does not <u>automatically</u> apply to section 271 network elements, the existing UNE rates should still inform state commissions as to what should be considered just and reasonable because the <u>range</u> of just and reasonable results must encompass the existing rates.

22.    The economic issues that surround TELRIC pricing are, for the most part, unrelated to how the prices for local switching and transport have been established.  The principal RBOC objection to TELRIC pricing is the claim that it is not "…rooted in the real-world attributes of the existing network, rather than the speculative attributes of a purely hypothetical network."[22]  However, this concern principally relates to how certain <u>loop</u> charges are estimated, not the rates for local switching or transport.[23]  For instance, the "actual network

---

[21]    The Act itself requires that rates for section 251 network elements (which the FCC has interpreted to require compliance with the TELRIC standard) must be "just and reasonable." Specifically, section 252(d) PRICING STANDARDS requires:

(1)    INTERCONNECTION AND NETWORK ELEMENT CHARGES-

Determinations by a State commission of the just and reasonable rate for the interconnection of facilities and equipment for purposes of subsection (c)(2) of section 251, and <u>the just and reasonable rate for network elements</u> for purposes of subsection (c)(3) of such section--

   (A) shall be--

   (i)   based on the cost (determined without reference to a rate-of-return or other rate-based proceeding) of providing the interconnection or network element (whichever is applicable), and

   (ii)  nondiscriminatory, and

(B) may include a reasonable profit.

[22]    See, <u>Notice of Proposed Rulemaking</u>, WC Docket 03-173, September 15, 2003 ("<u>TELRIC NPRM</u>"), ¶ 4.

[23]    By this statement, Petitioners do not agree with the claim that the FCC's TELRIC rules understate relevant loop costs; rather, the point is that the claim itself does not generally even <u>apply</u> to switching, irrespective of its merit.

149422.1

13

topology" is already a feature of the TELRIC process for local switching because the number of wire centers (and, therefore, the number and location of switches) is fixed in the TELRIC model.

23.    This view – that the TELRIC rules do not impact how switching and transport costs are calculated – is shared by BST, which has testified to very same point:

> It is important to note that even though the fundamental cost methodologies (i.e., TSLRIC and TELRIC methodologies are similar ... it is the additional constraints currently mandated by the FCC that the incumbent local exchange carriers (ILECs) object to with respect to TELRIC-based rates. The use of a hypothetical network and most efficient, least-cost provider requirements have distorted the TELRIC results and normally understate the true forward-looking costs of the ILEC.

> These distortions, however, are most evident in the calculation of unbundled loop elements, and they are less evident in the switching and transport network elements that make up switched access.[24]

Both because the FCC's TELRIC rules "must produce rates that are just, reasonable and nondiscriminatory"[25] -- and because the more controversial aspects of the TELRIC methodology do not generally apply to how switching and transport costs are calculated -- the Commission should not expect a "just and reasonable rate" for local switching to depart significantly from the existing TELRIC-based rate. As a result, BST should be prohibited from unilaterally imposing higher rates on competitors until the Commission has reviewed its pricing proposals here.

24.    Finally, the Commission should assure that BST does not impose discriminatory policies affecting the entrants' ability to use combinations of (or combine) UNEs obtained under section 271 with UNEs obtained under section 251 (sometimes called 'commingling").[26]    The

---

[24]    Direct Testimony on Robert McKnight on behalf of BST, Public Service Commission of South Carolina (McKnight Direct), Docket No. 1977-239-C, filed December 31, 2003, pages 7, 9.

[25]    TELRIC NPRM, ¶ 4.

[26]    When section 251 UNEs are combined with other elements (such as section 271 UNEs or tariffed services), these elements are referred to as "commingled." (TRO ¶ 597, emphasis added):

nation has once experienced efforts by incumbent LECs to impose discriminatory operational processes (such as unnecessary collocation requirements or threats of circuit sabotage) to disrupt the competitive process in ways that the Supreme Court has held are anticompetitive.[27]  We respectfully remind the Commission of BST's reactions to the temporary uncertainty created when the Eighth Circuit (in an action later reversed by the Supreme Court) vacated the FCC's rules relating to combinations.  We fully expect that BST will propose similar abuses here and the Commission will need to take corrective actions as they arbitrate the RBOC's nondiscrimination obligations.

**Conclusion**

25.    The current uncertainty as to the intent and obligations of section 251 can be greatly reduced by the Commission acting immediately to fill the gap, clearly defining BST's parallel obligations under section 271 and its own Local Competition and Price Regulation Order to offer the most critical elements to local competition – loops, transport, switching and signaling. The time is now to begin that process.

26.    In the interim, BST should be required to continue to offer each of the network elements required by section 271 and the Local Competition and Price Regulation Order at existing (which is to say, cost-based) rates as such rates are the only rates that the Commission has found to be just and reasonable.  While other rates may also satisfy the potentially more liberal "just and reasonable" standard that has traditionally been used in establishing regulated

---

By commingling, we mean the connecting, attaching, or otherwise linking of a UNE, or a UNE combination, to one or more facilities or services that a requesting carrier has obtained at wholesale from an incumbent LEC pursuant to any method other than unbundling under section 251(c)(3) of the Act, or the combining of a UNE or UNE combination with one or more such wholesale services.

[27]    As the Supreme Court recently concluded in Iowa Util. Bd., 525 U.S. 366, 395 (1999), preventing the ILEC from sabotaging combinations is justified as "...ensuring against an anticompetitive practice."

rates, until the Commission has an opportunity to review such proposals, BST should not be permitted to impose unilateral increases on competitors.

WHEREFORE, PREMISES CONSIDERED, Petitioners respectfully request that the Commission establish a generic proceeding to establish "just, reasonable and nondiscriminatory," pricing for BST's UNEs to apply in any circumstances where switching is not required to be offered under Section 251 of the Act.

Respectfully submitted this 29th day of September, 2004.

Riley W. Roby (ROB137)
One of the Attorneys for Momentum Telecom, Inc. and ITC^DeltaCom Communications, Inc.

OF COUNSEL:
Robin G. Laurie (LAU006)
Paul A. Clark (CLA076)
Balch & Bingham LLP
P. O. Box 78
Montgomery, Alabama 36101
(334) 834-6500

149422.1                                16

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon the following by U.S.

Mail, properly addressed and postage prepaid, on this the 29th day of September, 2004:

Francis B. Semmes, Esq.
General Counsel - Alabama
BellSouth
Suite 28A2
600 North 19th Street
Birmingham, Alabama 35203

Of Counsel