# EXHIBIT 3



## STATE OF ALABAMA
ALABAMA PUBLIC SERVICE COMMISSION
P.O. BOX 304260
MONTGOMERY, ALABAMA 36130-4260

JIM SULLIVAN, PRESIDENT

JAN COOK, ASSOCIATE COMMISSIONER

GEORGE C. WALLACE, JR., ASSOCIATE COMMISSIONER

WALTER . THOMAS, JR.
SECRETAF /

MOMENTUM TELECOM, INC.; ITC^DELTACOM COMMUNICATIONS, INC.; and BELLSOUTH TELECOMMUNICATIONS, INC.,

**Joint Petitioners**

IN RE: Petition Regardi g the Establishment of a Generic Prc ceeding on Change of Law and Nondiscriminatory Pricing for UN Es.

DOCKET 29543

### FINAL ORDER RESOLVING DISPUTED ISSUES

BY THE COMMISSION:

### I.    INTRODUCTION AND BACKGROUND

The proceedings in this cause are the result of a Joint Petition filed by Momentum Tele om, Inc. ("Momentum") and ITC^DeltaCom Communications, Inc. ("ITC^DeltaCom") on September 29, 2 04, and a separate Petition filed by BellSouth Telecommunications, Inc. ("BellSouth") on November 2, 2004. In general, Momentum, ITC^DeltaCom and BellSouth sought the establishment of this generic pr ceeding for purposes of clarifying issues related to the legal and regulatory changes that resulted from th  Federal Communications Commission's ("FCC's") issuance of the *Triennial Review Order*, the decision o  the U.S. Court of Appeals for the D. C. Circuit in *USTA II*[1] and the FCC's *Triennial Review Remand Order*[2] entered in response to the *USTA II* decision.

The Commission voted to establish this cause at its meeting of December 13, 20 4.  The Commission's jurisdiction over this matter is derived from the provisions of §§ 251 and 2! 2 of the

[1] Report and Order on Remand and Further Notice of Proposed Rulemaking, *Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, 18 FCC Rcd. 16978 (2003) ("*Triennial Review Order*" or "*TRO*") *vacated and remanded in part, aff'd in part, United States Telecom Ass'n v. FCC*, 359 F.3d 554 (D.C. Cir. 2004) ("*USTA II*"), *cert. denied, NARUC v. United States Telecom Ass'n*, 125 S. Ct. 313 (2004).
[2] Order on Remand, *Unbundled Access to Network Elements; Review of the Section 251 Unbundling Ob. gations of Incumbent Local Exchange Carriers*, WC Docket No. 04-313, CC Docket No. 01-338, FCC 04-290 (FCC rel. Feb. 4, 2005) ("*Triennial Review Remand Order*" or "*TRRO*").


**PLAINTIFF'S EXHIBIT 3**

DOCKET 29543 - #2

Telecommunications Act of 1996[3] as well as the general jurisdictional authority set forth in the *Code of Alabama* 1975, § 37-2-1(*et seq.*).

By Joint Motion filed on May 27, 2005, the Competitive Carriers of the South, Inc. ("CompSouth")[4] and BellSouth urged the Commission to adopt the procedural schedule jointly agreed to by those parties. Said Motion was granted pursuant to Commission Order entered in this cause on June 15, 2005.

In addition to the foregoing parties, Centurytel of Alabama, LLC and Sprint Communications Company, LP petitioned to intervene in the proceedings in this cause. Both of those petitions were granted.

Pursuant to the procedural schedule established in the Commission's June 15, 2005 Order in this cause, a hearing was held on October 6, 2005. Following said hearing, both BellSouth and CompSouth submitted Post Hearing briefs that were considered by the Commission. The Commission herein addresses the specific issues that remain in dispute between the parties.

II.    <u>FINDINGS AND CONCLUSIONS REGARDING DISPUTED ISSUES</u>

A.    **271 Related Issues (Issues 8, 14, 17, 18 and 22)**

1.    **Issue 8.    Does the Commission have the authority to require BellSouth to include in its interconnection agreements entered into pursuant to § 252, network elements under either state law, or pursuant to § 271 or any other federal law other than § 271?**

a.    **The Position of BellSouth**

BellSouth argues that the Commission does not have the requisite authority to require it to offer de-listed unbundled network elements ("UNEs") at rates, terms and conditions found just and

---

[3] The Telecommunications Act of 1996, Pub. L. 104-104, 110 Stat. 56, Codified at 47 U.S.C. § 151 *et seq.* the "*Act*"). The frequent cites herein to §§ 251, 252 and 271 are cites to the "Act" at Title 47 of the *United States Code*
[4] CompSouth's members participating in this docket include the following companies: Access Point, Inc., Cinergy Communications Company, Dialog Telecommunications, DIECA Communications, Inc., d/b/a Covad Communications Company, IDS Telecom, LLC, InLine, ITC^DeltaCom, LecStar Telecom, Inc., MCImetro Access Transmission Services, LLC ("MCI"), Momentum Business Solutions, Inc., Navigator Telecommunications, LLC, Network Telephone Corp., NuVox Communications, Inc., Supra Telecom, Talk America, Trinsic Communications, Inc., and Xspedius Communications, LLC.

DOCKET 29543 - #3

reasonable under § 271 or under state law. With regard to state law, BellSouth points out that no CLEC presented testimony supporting the contention that BellSouth has state law unbundling obligations that are different from federal unbundling obligations.[5] BellSouth also notes that the Commission has already recognized that it may not invoke state law to require additional unbundling beyond that required under federal law by virtue of *Code of Alabama* 1975, § 37-2(A)-4(b)(1) which precludes the Commission from imposing unbundling requirements that differ in degree or kind from those imposed by the FCC.[6]

With respect to federal law, BellSouth argues that there is no legal basis for a state commission to force BellSouth to include § 271 network elements in a § 252 interconnection agreement because § 252 limits state commission authority to the consideration of § 251 elements. BellSouth indeed argues that the FCC has exclusive authority over the enforcement of all § 271 related matters including § 271 elements.[7]

b.    **The Position of CompSouth**

CompSouth contends that the Commission may require the inclusion of § 271 elements in interconnection agreements pursuant to state law authority, but does not request that the Commission exercise such authority.[8] CompSouth instead contends that there is ample federal authority for requiring BellSouth to include in its § 252 interconnection

---

[5] BellSouth Post Hearing Brief at p. 8.
[6] *Id., citing Order Dissolving Temporary Standstill Order and Granting in Part and Denying in Part Petitions for Emergency Relief*, Docket No. 29393 (May 25, 2005), p. 18.
[7] BellSouth Post Hearing Brief at pp. 12-23.
[8] CompSouth Post Hearing Brief at p. 34.

DOCKET 29543 - #4

agreements the availability and pricing of network elements under § 271.[9]

According to CompSouth, the language of § 271 itself points to the § 252 process as a means to implement BellSouth's § 271 unbundling obligations. CompSouth asserts that just as state commissions have the authority to arbitrate and approve rates for § 251 network element unbundling in the § 252 process, state commissions also have the authority to arbitrate and approve just and reasonable rates for § 271 unbundled network elements.[10] CompSouth further contends that the Commission's approval of rates, terms and conditions for § 271 checklist elements does not constitute "enforcement" of BellSouth's § 271 obligations.[11]

c.    **The Findings and Conclusions of the Commission**

In *USTA II*, the U.S. Court of Appeals for the D.C. Circuit specifically addressed the FCC's analysis in the *TRO* as to whether the § 271 checklist items specifically at issue in this cause independently incorporate the unbundling requirements imposed by §§ 251 and 252. Indeed, the *USTA II* Court specifically upheld the FCC's determination that § § 271(c)(2)(B)(iv), (v), (vi), and (x)[12] do not incorporate the requirements of §§ 251 and 252 that are made applicable to other items in the § 271 checklist by specific reference.[13] Given the fact that the Commission's sole authority to review interconnection agreements is

---

[9] *Id.* at p. 35.
[10] *Id.* at pp. 35-36.
[11] *Id.* at pp. 41-44.
[12] These checklist items are commonly referred to as checklist items 4, 5, 6 and 10 – loop, transport, switching and call related databases/signaling.

DOCKET 29543 - #5

derived from § 252 and the interplay between §§ 251 and 25:, it does not appear that the Commission has the requisite jurisdiction to compel the inclusion of the § 271 elements in dispute in this proceeding in interconnection agreements that are submitted to the Commiss on for its review pursuant to § 252. Further, there appears to be no e cress or implied obligation on the part of BellSouth to negotiate the terms and conditions regarding § 271 elements.[14]

2.   **Issue 14.   What is the scope of commingling allowed under the FCC's rules and orders and what language should be included in interconnection agreements to implement commingling (including rates)?**

a.       **The Position of BellSouth**

BellSouth asserts that the Commission must reject out of hand any CompSouth suggestion that § 271 services must be commingled with other UNEs because the FCC alone has § 271 authority.[15] Even if the Commission had § 271 authority, BellSouth asserts that a careful review of the evolution of the FCC's commingling requirements clearly indicates that BellSouth has no obligation to commingle § 251 services with § 271 services.[16] BellSouth's argument in this regard is largely based on its contention that the FCC only requires commingling of loops or loop-transport combinations with "wholesale services" which BellSouth contends the FCC has interpreted to exclusively mean "tariffed services."[17]

---

[13] *See TRO* at ¶¶ 656-654 and *USTA II* at pp. 588-590.
[14] The Commission's findings and conclusions regarding this issue moot further consideration of Issues 8(ɔ) and 8(c) that were contingently submitted by the parties.
[15] BellSouth Post Hearing Brief at p. 43.

**b. The Position of CompSouth**

CompSouth asserts that the FCC authorized commingling in the *TRO* in 2003 and required Incumbent Local Exchange Carriers ("ILECs") like BellSouth to permit commingling of UNEs and UNE combinations with other wholesale facilities and services. CompSouth maintains that "wholesale services" as defined by the FCC include elements unbundled pursuant to § 271, tariffed services offered by BellSouth and resold services.[18] CompSouth urges the Commission to review the FCC orders as they were written and affirm that the commingling obligations established by the FCC do not exclude the commingling of wholesale facilities and services offered pursuant to the § 271 competitive checklist.[19]

**c. Findings and Conclusions of the Commission**

The TRO obligates BellSouth to, upon request, "perform the functions necessary to commingle a UNE or a UNE combination with one or more facilities or services that a requesting carrier has obtained at wholesale from an incumbent LEC pursuant to a method other than unbundling under § 251(c)(3) of the Act."[20] Further, the FCC implemented 47 C.F.R. § 51.309(f) which specifies that "upon request, an incumbent LEC shall perform the functions necessary to commingle an unbundled network element or a combination of unbundled network elements with one or more facilities or services that a requesting

---

[16] *Id.*
[17] *Id* at p. 47.
[18] CompSouth Post Hearing Brief at p. 70.
[19] *Id.*
[20] *See TRO* at ¶579.

DOCKET 29543 - #7

telecommunications carrier has obtained at wholesale from an incumbent LEC."

Based on the foregoing and our review of the other prevailing orders of the FCC as discussed in detail in the pleadings, we herein reject BellSouth's contention that the FCC narrowly interprets "wholesale services" as being limited to "tarriffed services." We thus find that BellSouth should be required to perform the functions necessary to commingle § 251(c)(3) UNEs with other wholesale services including § 271 elements.

As recognized by the Commission previously, however, we do not dispute that the *TRO* does not require BellSouth to combine two § 271 elements.[21] Further, the Commission is not herein attempting to establish the terms and conditions for the commingling of § 271 elements as that duty is recognized herein. To do so would be counter to the § 271 jurisdictional limitations outlined in our findings and conclusions regarding Issue 8(a).

3.  **Issue 17** **Is BellSouth obligated pursuant to the Telecommunications Act of 996 and FCC orders to provide line sharing to new CLEC customers after October 1, 2004?**

    **Issue 18** **If the answer to Issue 17 is negative, what is the appropriate language for transitioning all of the CLECs' line sharing arrangements?**

    a.  **The Position of BellSouth**

        BellSouth argues that the FCC has made it quite clear that BellSouth has no obligation to provide new line sharing arrangements after October 1, 2004. In an effort to avoid implementing the FCC's

---

[21] *See Order Dissolving Part and Denying in Part Petitions on Emergency Relief,* Docket No. 29393, May 2  2005.

DOCKET 29543 - #8

conclusions in this regard, however, BellSouth asserts that CLECs contend that line sharing is a § 271 obligation pursuant to item 4 of the § 271 checklist.[22] Said checklist provision requires BellSouth to offer "local loop transmission, unbundled from local switching and other services."[23]

BellSouth represents that it meets its checklist item 4 obligations by offering access to unbundled loops and the "transmission" capability on those facilities. BellSouth argues that the high frequency portion of the loop utilized to provide line sharing does not constitute the entire "transmission path" which BellSouth is required to provide pursuant to item 4 of the § 271 checklist.[24]

BellSouth further asserts that CompSouth's § 271 claim with regard to line sharing is defeated by the FCC's decision in the *Broadband Forbearance Order*[25] and the concurring statement of FCC Chairman (then Commissioner) Martin attached thereto. Even if line sharing could be construed as a § 271 network element, BellSouth contends that the Commission has no authority to require BellSouth to include such a § 271 element in a § 252 interconnection agreement.[26]

a.    **The Position of CompSouth**

CompSouth asserts that line sharing is indeed a § 271 checklist network element that BellSouth remains obligated to provide. Interestingly, CompSouth also cites the FCC's *Broadband Forbearance*

---

[22] BellSouth Post Hearing Brief at p. 51.
[23] 47 USC § 271(c)(2)(B)(iv)
[24] BellSouth Post Hearing Brief at p. 51.
[25] *Petitions for Forbearance of Verizon, SBC, Qwest and BellSouth*, W.C. Docket No. 01-338, *et seq.*, Memorandum Opinion and Order (Rel. October 27, 2004) ("*Broadband Forbearance Order*").

DOCKET 29543 - #9

*Order* as support for its position.  CompSouth particularly asserts that the statement of then Chairman Powell that was subsequently included as part of that order made it clear that line sharing is a § 271 element for which the FCC has not granted forbearance relief to BellSouth.[2]

c.     **The Findings and Conclusions of the Commission**

In assessing this issue, it appears to the Commission that the high frequency portion of the loop is just that, a portion of the loop that does not comport to the plain reading of a "local loop" as defined by the FCC and checklist item 4 of § 271.  It further appears to the Commission that although there are "dueling statements" from FCC Commissioners regarding the impact of the *Broadband Forbearance Order* on the line sharing obligations of BellSouth and the other petitioning Regional Bell Operating Companies, the legal arguments set forth in the statement of Commissioner Martin and asserted in this cause by BellSouth are the most legally sound.  It further appears to the Commission that the position set forth by Commissioner Martin in his statement is most consistent with the overall competitive policies established by the FCC.

Based on the foregoing, the Commission is of the opinion that under the existing status of the law and the regulations of the FCC, BellSouth has no obligation to add new line sharing arrangements after October 1, 2004.  In order to properly transition existing line sharing arrangements, we are of the opinion that those CLECs with line sharing customers should amend their interconnection agreements to incorporate both the line sharing transition plan contained in the FCC's

---

[26] BellSouth Post Hearing Brief at p. 52.

DOCKET 29543 - #10

rules at 47 C.F.R. § 51.319(a)(1)(i) and language that requires CLECs to pay the stand-alone loop rate for line sharing arrangements ac led after October 1, 2004.[28]

2.  **Issue 22.  What is the appropriate interconnection language, if any, to address access to call related data bases?**

a.    **The Position of BellSouth**

BellSouth asserts that since CLECs no longer have access to unbundled switching pursuant to the holdings of the FCC and the D.C. Circuit in *USTA II*, CLECs have no unbundled access to call related databases. BellSouth maintains that its legal obligation is expressly limited to providing databases only in connection with switching provided pursuant to the FCC's transition plan.[29]

BellSouth further asserts that the CompSouth reliance on § 271 to obtain access to call related databases is misplaced. BellSouth maintains that it is patently unreasonable to assume that the FCC and the D.C. Circuit eliminated unbundling requirements for databases only to have such obligations resurrected pursuant to § 271. BellSouth also points out that the Commission has no authority over § 271 elements.[30]

b.    **The Position of CompSouth**

CompSouth asserts that checklist item 10 of § 271 requires BellSouth to provide "[n]nondiscriminatory access to databases and

---

[27] CompSouth Post Hearing Brief at pp. 86-88.
[28] We must, however, note that our conclusions regarding line sharing are subject to further clarification from the FCC. Should the FCC indeed clarify with certainty that line sharing is a § 271 element for which BellSouth has not been granted forbearance relief, that decision would obviously control.
[29] BellSouth Post Hearing Brief at p. 62.
[30] *Id.* at pp. 62-63.

DOCKET 29543 - #11

associated signaling necessary for call routing and completion."[31] CompSouth therefore contends that BellSouth must continue to make call related databases available at just and reasonable rates, terms and conditions[32]

### c.    The Findings and Conclusion of the Commission

The FCC held in the *TRO* that competitive carriers that deploy their own switches are not impaired in any market without access to ILEC call related databases with the exception of 911 and E-911 databases.[33]    In such instances where switching remains a UNE, however, the FCC held that competing carriers purchasing the switching UNE will have access to signaling and the call related databases that the signaling network permits carriers to access.[34]    The FCC's holdings in this regard are codified at 47 C.F.R. § 51.319(b)(4)(i)(B) and have been upheld by the D.C. Circuit in the *USTA II* decision.[35]    The cited FCC rule shall accordingly control with respect to this issue.[36]

### B.    Transitional Issues (Issues 2, 3, 4, 5, 9, 10, 11 and 32)

1. **Issue 2.**    *TRRO Transition Plan - What is the appropriate language to implement the FCC's transition plan for (1) switching, (2) high capacity loops and (3) dedicated transport as detailed in the FCC's TRRO, issued February 4, 2005?*

**Issue 11.**    *UNEs That Are Not Converted: What rates, terms and conditions, if any, should apply to UNEs that are not converted on or before March 11, 2006, and what impact, if any, should the conduct of the parties have upon the determination of the applicable rates, terms, and conditions that apply in such circumstances?*

---

[31] 47 USC § 271(c)(2)(B)(x)
[32] CompSouth Brief at p. 90.
[33] *TRO* at ¶ 5.
[34] *Id.*
[35] *See USTA II* at pp. 587-588.
[36] We note, however, that our conclusion herein is subject to any further § 271 obligations the FCC may impose in the future on Regional Bell Operating Companies regarding call related databases as pure § 271 elements.

DOCKET 29543 - #12

a.   **The Position of BellSouth**

BellSouth asserts that the Commission should impose contract language that allows for an orderly transition of switching, high capacity loops and dedicated transport and makes clear that CLECs are not entitled to UNE rates after they have migrated from § 251 UNEs to other serving arrangements. BellSouth predictably objects to the inclusion of any contract language that would allow CLECs to transition from UNEs to state regulated § 271 services due to the fact that the Commission has no authority to dictate the rates, terms and conditions of BellSouth's § 271 obligations.[37]

b.   **The Position of CompSouth**

CompSouth argues that contrary to the assertions of BellSouth, the Commission should adopt provisions requiring an orderly transition to § 271 checklist elements that must remain available even where § 251 (c)(3) UNEs have been de-listed by the FCC.[38] Further, CompSouth asserts that the FCC has made clear that CLECs may submit their conversion orders at any time prior to March 11 and/or September 11, 2006, and thus obtain the FCC established transitional rates for the duration of the applicable transition periods established in the *TRRO*. CompSouth also asserts that BellSouth is not entitled to a ruling that all conversions must be completed by the end of the FCC prescribed transition periods.[39]

---

[37] BellSouth Post Hearing Brief at pp. 63-64.
[38] CompSouth Post Hearing Brief at p. 5.

DOCKET 29543 - #13

    c.    **The Findings and Conclusions of the Commission**

At this late juncture, CLECs should have already submitted conversion orders for local circuit switching and high capacity loops and transport as the transition period for such elements has expired. CLECs should now strive to identify their embedded customer base of dark fiber loops and transport and submit conversion orders prior to the expiration of the FCC established transition period of September 10, 2006. For CLECs that failed to identify their embedded base by March 10, 2006 (for local circuit switching, high capacity loops and transport) and, fail to do so by September 10, 2006 (for dark fiber loops and transport), BellSouth will be permitted to identify and convert such arrangements itself and assess CLECs the "switch as is" charge discussed below. BellSouth will further be allowed to assess such CLECs the applicable recurring resale or wholesale tariffed rate for the affected services beginning with the aforementioned conversions. Pursuant to the *TRRO* however, the "transitional rates" discussed below are (or were) applicable through March 10, 2006 (for local circuit switching, and high capacity loops and transport), and September 10, 2006 (for dark fiber loops and transport) regardless of when those arrangements were or are converted.

As established in the *TRRO,* the transitional rates are the higher of the rate the CLEC paid for the element or combination of elements in question on June 15, 2004, or, if applicable, the rate the Commission ordered for that element or combination of elements between June 16, 2004 and March 11, 2005, plus the established additive of

---

[39] *Id.* at pp. 5-7.

DOCKET 29543 - #14

$1.00 for local circuit switching and 15% for high capacity loops and transport and dark fiber. The transition rate for DSO level capacity switching for customers subject to the 4 or more line carve out is the rate in existing contracts. The *TRRO* transitional rates for de-listed UNEs shall be effective at the time of interconnection agreement amendments. Said transitional rates are subject to true up back to March 11, 2005.

With regard to the "switch as is" rate discussed above, it should be noted that the only specific conversion charge proposed by BellSouth that has been established by the Commission relates to Enhanced Extended Link ("EEL") conversions. Because the vast majority of the de-listed UNE conversions resulting from the *TRO* and *TRRO* involve administrative functions that are similar to those encountered in converting EELs, the Commission herein establishes that the EEL conversion rate of $5.59 shall be applied to all de-listed UNE conversions resulting from this Docket unless and until the Commission receives a duly filed petition to establish different "switch as is" rates and there is a final determination on such a petition by the Commission.[40]

It should be noted, however, that in situations where requested conversions require physical changes to circuits, such activity should not be considered a mere conversion. Accordingly, any applicable, nonrecurring and installation charges previously approved by the Commission shall apply in situations requiring physical changes to circuits.

---

[40] Indeed, BellSouth's current Statement of Generally Available Terms and Conditions ("SGAT") mirrors the $5.59 rate established for EEL conversions for "as is" switches on a number of elements and/or services.

DOCKET 29543 - #15

2.  **Issue 3.**    **Modification and Implementation of Interconnection Agreement Language:**
*(a) How should existing ICAs be modified to address BellSouth's obligation
to provide network elements that the FCC has found are no longer § 251
(c)(3) obligations? (b) What is the appropriate way to implement in new
agreements pending in arbitration any modifications to BellSouth's
obligations to provide network elements that the FCC has found are no
longer § 251(c) (3) obligations.*

    a.    **The Position of BellSouth**

BellSouth contends that the Commission should order all CLECs
that have not yet executed a *TRO* and *TRRO* compliant amendment to
their interconnection agreement to promptly execute an amendment with
Commission-approved contract language following the issuance of the
Commission's order in this cause. For interconnection agreements that
are currently the subject of arbitrations, BellSouth asserts that the
Commission should impose the change of law conclusions reached in
this Docket. BellSouth asserts that the same rationale should apply to
agreements that are being negotiated, but for which no arbitration has
yet been filed.[41]

    b.    **The Position of CompSouth**

CompSouth asserts that unless parties have specifically agreed
otherwise, the interconnection agreements necessitated by the final
order of the Commission in this proceeding should be completed in a
timely manner after the conclusion of this proceeding. CompSouth
maintains, however, that existing interconnection agreements should
only be modified regarding disputed issues that are within the scope of
this proceeding. If an issue covered by an existing interconnection
agreement is not in dispute in this proceeding or was not affected by the

DOCKET 29543 - #16

FCC's *TRO* or *TRRO* rulings, then the current contract language addressing that issue should not be affected by the decisions in this proceeding.[42]

CompSouth agrees with BellSouth's position that issues resolved in this proceeding that are disputed in pending arbitrations should govern the resolution of the issues in question in those pending arbitrations. If an issue resolved in this proceeding is not an unresolved issue in a pending arbitration and the parties to that arbitration have agreed that they will abide by their negotiated resolutions notwithstanding the results in this case, CompSouth asserts that those resolutions should be honored. Absent such a specific agreement, CompSouth maintains that either party to the arbitration should be able to invoke the change of law provisions of the interconnection agreement once the agreement is approved by the Commission.[43]

c.    **The Findings and Conclusions of the Commission**

The Commission concludes that existing interconnection agreements must be amended to reflect the *TRO* and *TRRO* mandated changes to BellSouth's obligation to provide unbundled network elements pursuant *to § 251(c)(3)*. Amendments to new interconnection agreements pending arbitration shall also be based on the Commission's decisions in this docket unless there is a specific agreement to the contrary by the parties to such an arbitration.

3.  Issue 4.    **High Capacity Loops and Dedicated Transport:** *What is the appropriate language to implement BellSouth's obligation to provide § 251 unbundled*

---

[41] BellSouth Post Hearing Brief at p. 69.
[42] CompSouth Post Hearing Brief at pp. 10-11.
[43] *Id.* at p. 11.

DOCKET 29543 - #17

*access to high capacity loops and dedicated transport and how should the following terms be defined: (i) business line; (ii) fiber-based collocation; (iii) building; (iv) route; (v) Is a CLEC entitled to obtain DS3 transport from a Tier 3 wire center to each of two or more Tier 1 or Tier 2 wire centers? (vi) is a CLEC entitled to obtain dark fiber transport from a Tier 3 wire center to each of two or more Tier 1 or Tier 2 wire centers?*

a.     **The Position of BellSouth**

BellSouth recognizes its § 251 obligation to provide unbundled DS1 loops and transport and unbundled DS3 loops and transport except in instances in which the FCC's impairment tests are satisfied.[44] BellSouth contends, however, that it has no obligation to provide unbundled access to entrance facilities and asserts that the CLECs do not contend otherwise.[45]

BellSouth further contends that no party disputes that the federal rules provide the applicable definition of routes. BellSouth maintains, however, that to the extent that a CLEC orders transport from a Tier III wire center to each of two or more Tier I or Tier II wire centers, and connects those links together in another Tier III wire center, the CLEC has created a route between unimpaired wire centers which should be disallowed as gaming.[46]

With regard to the definition of the remaining terms other than a "building", BellSouth asserts that the prevailing rules of the FCC should be incorporated. BellSouth specifically asserts that CompSouth's proposed fiber based collocator language should be rejected in favor of the faithfully interpreted FCC rule found at 47 C.F.R. § 51.5.[47] BellSouth

---

[44] BellSouth Post Hearing Brief at p. 70 *citing* Testimony of Witness Tipton at pp. 323-330.
[45] *Id. citing* Testimony of Witness Tipton at Tr. p. 327.
[46] *Id. citing TRRO* at ¶ 106.
[47] BellSouth Post Hearing Brief at p. 71.

DOCKET 29543 - #18

lastly urges the Commission to adopt its "reasonable person" definition of a building as that term is not defined in the federal rules.[48]

b.    **The Position of CompSouth**

CompSouth asserts that the FCC rules adopted in the TRRO for purposes of determining nonimpairment for high capacity loops and transport are controlling. CompSouth maintains that the parties have little disagreement with respect to the definition of the two key terms analyzed in determining nonimpairment -- "business lines" and "fiber based collocators."[49] CompSouth notes, however, that there is serious dispute between the parties regarding the proper interpretations of those definitions.

CompSouth particularly disputes BellSouth's interpretation of "business line." CompSouth maintains that BellSouth interprets the FCC's business line definition found at 47 C.F.R. § 51.5 in an internally inconsistent manner which results in BellSouth improperly including UNE loops in its calculation of business lines. Perhaps more importantly, CompSouth asserts that BellSouth improperly accounts for HDSL-capable lines at their full capacity even when such facilities are not used to that extent for the provision of switched access services. CompSouth contends that BellSouth's disjointed reading of the business line definition produces dramatically inflated results which adversely impact nonimpairment determinations for CLECs.[50]

---

[48] *Id.*
[49] CompSouth Post Hearing Brief at pp. 11-12.
[50] *Id.* at pp. 13-23.

DOCKET 29543 - #19

CompSouth maintains that its calculation of business lines is straightforward and does not include inflated counts that improperly incorporate data and spare capacity. CompSouth alleges that its methodology is simple and assumes that the average CLEC utilization of CLEC high capacity lines equals BellSouth's average utilization. CompSouth asserts that this methodology removes inappropriate nonswitched retail lines and nonswitched capacity from the business line counts used to determine impairment.[51]

CompSouth maintains that there is general agreement among the parties regarding the correct methodology to identify fiber based collocators. Indeed, CompSouth reflects that the parties do not have an open issue involving the relevant number of fiber based collocators in Alabama.[52]

With regard to the definition of building, CompSouth urges the Commission to adopt its "reasonable telecom person" definition. CompSouth asserts that its proposed definition will ensure that the deciding factor in defining a building is that the area is served by a single point of entry for telecom services.[53]

With regard to the definition of a route, CompSouth asserts that said term is clearly defined by the FCC in 47 C.F.R. § 51.319(e). CompSouth represents, however, that it is important for the Commission to note that a route is defined in relation to the two wire centers between

---

[51] *Id.* at p. 24.
[52] *Id.* at p. 25.
[53] *Id.* at p. 26.

DOCKET 29543 - #20

which a CLEC is requesting transport, not wire centers beyond or subtending either of those two wire centers.[54]

c.    **The Findings and Conclusions of the Commission**

The parties apparently do not disagree that BellSouth is required to provide nondiscriminatory access to unbundled loops and transport pursuant to the findings and conclusions of the FCC in the *TRO* and *TRRO*. We note with particularity that the FCC rules provide that requesting telecommunications carriers may continue to obtain access to the following:

- Unbundled DS1 loops to any building not served by a wire center with at least 60,000 business lines and 4 or more fiber-based collocators.[55]

- Unbundled DS3 loops to any building not served by a wire center with at least 38,000 business lines and 4 or more fiber-based collocators.[56]

- A maximum of ten unbundled DS1 loops or one DS3 loop to any single building in which such loops are still subject to unbundling requirements.[57]

- DS1 transport except on routes connecting a pair of wire centers, where both wire centers contain at least four fiber-based collocators or at least 38,000 business access lines.[58]

- DS3 or dark fiber transport except on routes connecting a pair of wire centers, each of which contains at least three fiber-based collocators or at least 24,000 business lines.[59]

---

[54] *Id.* at p. 27.
[55] *TRRO* Appendix B, p. 147.
[56] *Id.* at p. 147.
[57] *Id.* at p. 147.
[58] *Id.* at p. 152.
[59] *Id.* at p. 152.

DOCKET 29543 - #21

In addition:

- Dark fiber loops are no longer subject to unbundling requirements.[60]

- CLECs are not impaired without access to entrance facilities connecting an incumbent LEC's network with a competitive LEC's network in any instance.[61]

With regard to the definition of the terms in question we adopt the following definitions:

(i) <u>Business line</u>: shall be defined pursuant to the provisions of 47 C.F.R. § 51.5. Based on the interpretations of this rule by the FCC in the *TRO* and *TRRO*, business lines shall include UNE-P business lines, UNE-L lines and HDSL-capable lines at their full capacity unless otherwise determined by the Commission in a future order.[62]

(ii) <u>Fiber-based collocation</u>: shall be defined pursuant to the requirements of 47 C.F.R. § 51.5. In particular, the number of fiber-based collocators in Alabama is herein determined to be consistent with the agreement reached between BellSouth and CompSouth which is attached hereto as Appendix "A."

(iii) <u>Building</u>: given that there is no definition of building in the FCC's rules and little or no guidance provided by the *TRO* or the *TRRO*, it appears that the most reasonable definition of a building is "a permanent physical structure including, but not limited to, the structure in which people reside, conduct business or work on a daily basis and through which there is one centralized point of entry through which all telecommunication services must transit". Accordingly, two or more physical areas served by individual points of entry through which telecommunications services must transit shall be considered separate buildings.

(iv) <u>Route</u>: shall be defined pursuant to the provisions of 47 C.F.R. § 51.319(e). In interpreting this definition, a route shall be determined in relation to the two wire centers for which a CLEC seeks transport.

With regard to the issues raised concerning DS3 Transport and Dark Fiber Transport, we conclude as follows:

- CLECs are not entitled to obtain DS3 transport from a Tier 3 wire center to each of two or more Tier 1 or Tier 2 wire centers.

- CLECs are not entitled to obtain dark fiber transport from a Tier 3 wire center to each of two or more Tier 1 or Tier 2 wire centers.

---

[60] *Id.* at p. 148.
[61] *Id.* at p. 150.
[62] *See* the Findings and Conclusions of the Commission regarding Issue 5 *Infra* for further discussion of this issue.

DOCKET 29543 - #22

4.   Issue 5.    **Unimpaired Wire Centers: (a*) Does the Commission have the authority to determine whether or not BellSouth's application of the FCC's § 251 nonimpairment criteria for high-capacity loops and transport is appropriate? (b) What procedures should be used to identify those wire centers that satisfy the FCC's § 251 nonimpairment criteria for high-capacity loops and transport? (c) What language should be included in agreements to reflect the procedures identified in (b)?*

a.      **The Position of BellSouth**

BellSouth concedes that state commissions are charged with resolving disputes arising under interconnection agreements and with implementing the changes to interconnection agreements necessitated by the *TRRO*.[63]    BellSouth accordingly asserts that the Commission must resolve the parties' disputes concerning the wire centers in Alabama that meet the FCC's impairment test so that all parties have a common understanding of wire centers from which CLECs must transition UNEs to alternative arrangements.[64]

BellSouth indicates that it seeks relief in a very limited number of wire centers.   In fact, BellSouth notes that it does not seek relief anywhere in Alabama for high capacity loops nor does it seek relief for DS1 transport.

Pursuant to the tests established by the FCC, however, BellSouth asserts that it should be relieved of its unbundling obligation for DS3 transport on a single route in Alabama.  BellSouth requests that the Commission order CompSouth and other CLECs to transition existing § 251 DS3 transport on that route to alternative serving arrangements and further requests that the Commission make clear that

---

[63] BellSouth Post Hearing Brief at p. 74 *citing USTA II* at p. 574.
[64] *Id.* at p. 74 *citing* Testimony of Witness Tipton at Tr. pp. 333-334.

DOCKET 29543 - #23

CLECs have no basis to "self certify" to obtain § 251 DS3 transport in the future on that route.[65]

BellSouth maintains that the only live dispute between the parties regarding the application of the FCC's impairment test relates to the application of the FCC's rule defining business lines.    BellSouth defends its interpretation of the FCC's business line definition as being entirely consistent with the FCC's interpretations in the *TRO* and *TRRO* which indicate that the FCC seeks to capture the maximum revenue opportunities in a given wire center.[66]

With regard to the identification of wire centers in the future that satisfy the FCC's impairment test, BellSouth proposes to notify CLECs of the identity of such wire centers in carrier notification letters with the nonimpairment designation becoming effective 10 business days after the posting of such carrier notification letters. Beginning on said effective date, BellSouth proposes that it no longer be obligated to offer high capacity loops and dedicated transport as UNEs in such wire centers except pursuant to the FCC established self certification process.[67]

BellSouth proposes that high capacity loop and transport UNEs in service at the time of any such Subsequent Wire Center determination of nonimpairment be made available as UNEs for 90 days after the effective date of the impairment designation. BellSouth further proposes that no later than 40 days from the effective date of the nonimpairment designation, affected CLECs must be required to submit spreadsheets

---

[65] *Id.* at p. 75.
[66] *Id.* at pp. 76-78 *citing* the *TRRO* at ¶¶ 22-25 and 104.
[67] *Id.* at p. 81

DOCKET 29543 - #24

identifying their embedded base of UNEs to be converted to alternative Bellsouth services or to be disconnected.[68]

BellSouth recognizes that CompSouth has proposed a different means for identifying future wire centers that would resolve any disputes relating to BellSouth's Subsequent Wire Center identification within 90 days after BellSouth's initial filing. BellSouth represents that it has no conceptual objection to the Commission resolving such future disputes. BellSouth maintains, however, that it is unwilling to agree to a process that limits its right to designate future wire centers to an annual window as nothing in the federal rules supports such a limitation.[69]

b.    **The Position of CompSouth**

CompSouth represents that there is no question that the Commission has the jurisdiction to determine whether or not BellSouth's application of the FCC's § 251 nonimpairment criteria for high capacity loops and transports is appropriate. CompSouth stresses its belief that it is more efficient for the Commission to resolve any disputes regarding nonimpairment criteria at the front end of the process rather than at the back end of a dispute.[70]

CompSouth proposes an annual procedure for the designation of nonimpaired wire centers tied to the filing of updated ARMIS 43-08 business line data filed by BellSouth.[71] CompSouth believes that these

---

[68] *Id.* at pp. 81-82.
[69] *Id.*
[70] CompSouth Post Hearing Brief at pp. 27-28.
[71] *Id.*

DOCKET 29543 - #25

annual filings by BellSouth are the most prudent and efficient method of making impairment assessments.[72]

### c.    The Findings and Conclusions of the Commission

As noted above, Compsouth and BellSouth agree that the Commission has the appropriate jurisdiction to determine whether or not BellSouth's application of the FCC's § 251 nonimpairment criteria for high-capacity loops and transports is appropriate. Further, BellSouth and the CLECs recognize that challenges concerning wire center classifications are to be resolved in the context of § 252 interconnection agreements. As the arbiter of § 252 agreements, the Commission has the flexibility to adopt conforming language for such interconnection agreements and to determine the most efficient process to resolve disputes.

With regard to the procedures that should be used to identify the wire centers that satisfy the FCC's § 251 nonimpairment criteria for high-capacity loops and transport, the parties agree that 47 C.F.R. § 51.5 controls. The parties do not agree however, regarding the interpretation of the aforementioned rule with respect to the appropriate methodology for counting business lines in a wire center.[73]

BellSouth asserts that it is proper to include all UNE loops in the number of business lines calculated in affected wire centers, including UNE loops used to service residential customers. With respect to ISDN and other digital access lines within its wire centers, BellSouth represents that it is appropriate to account for such facilities at their full

---

[72] *Id.*

DOCKET 29543 - #26

system capacity; that is, each 64 kbps-equivalent of those facilities is to be counted as one line. As noted in more detail in the Findings and Conclusions regarding Issue 4 herein, CompSouth asserts that BellSouth's aforementioned treatment of residential UNE loops and ISDN and other digital access facilities is inconsistent with the rules of the FCC and improperly inflates the number of business lines in BellSouth's wire centers.

Unfortunately, the wording of the FCC rule in question does not provide clarity with regard to the correct interpretation between the parties. It does appear however, that the FCC, in the *TRO* and *TRRO*, made references that tend to support the more generous business line count methodology that BellSouth seeks to apply in this proceeding.[74] Additionally, there is no evidence of record that would adequately support a different determination of the applicable business line counts. We accordingly conclude that the nonimpaired wire center determination submitted by BellSouth as part of witness Tipton's prefiled testimony (Exhibit PAT-4) is hereby adopted as the current nonimpairment determination of the Commission.[75] The Commission does, however, reserve the right to further investigate the issue of business line counts in the event that there is further clarification on this issue from the FCC.

---

[73] With regard to future designations of nonimpaired wire centers, see the recommendation regarding Issue 10 *Infra.*
[74] *See TRRO* at pp. 22-25 and 105.
[75] Said exhibit is attached hereto as Appendix B.

DOCKET 29543 - #27

5.  **Issue 9.**    **Conditions Applicable to the Embedded Base:** *What conditions if any, should be imposed on moving, adding, or changing orders to a CLEC's respective embedded bases of switching, high-capacity loops and dedicated transport, and what is the appropriate language to implement such conditions, if any?*

  a.  **The Position of BellSouth**

     Although BellSouth argues that it had no obligation to accept or process orders adding new de-listed UNEs during the transition period established by the FCC for switching, high capacity loops and transport, BellSouth noted that it had abided by the Commission's prior rulings in Docket 29393, *In re: Petition of the Competitive Carriers of the South for an Emergency Declaratory Ruling* with respect to such moves, adds and changes. BellSouth does, however, urge the Commission to confirm with certainty the wire centers that satisfy the FCC's impairment test and specify that once confirmed, CLECs have no basis whatsoever to "self certify" orders for high capacity loops and dedicated transports in the confirmed wire centers.[76]

  b.  **The Position of CompSouth**

     CompSouth asserts that the *TRRO* provides support for the CompSouth position that the FCC intended CLECs to be able to serve their existing customers as of March 11, 2005, by providing adds, moves or changes to the existing customers during the transition period. CompSouth notes that the FCC's intentions were confirmed by the Commission in its orders in Docket 29393.[77]

DOCKET 29543 - #28

c.    **The Findings and Conclusions of the Commission**

The Commission's prior rulings in *Docket 29393* specified the terms and conditions imposed on moves, adds and/or change orders to a CLEC's embedded customer base during the FCC established transition period for local circuit switching, and high-capacity loops and transport. Given the fact that the transition period for those elements expired on March 10, 2006, and the fact that BellSouth apparently processed moves, adds and/or change orders associated with unbundled switching, high capacity loops and dedicated transport during the transition period in accordance with the Commission's previous Orders in *Docket 29393*, this issue appears moot at this juncture.

6.   **Issue 10.    Transition of De-listed Network Elements To Which No Specified Transition Period Applies:** *What rates, terms, and conditions should govern the transition of existing network elements that BellSouth is no longer obligated to provide as § 251 UNEs to non-§ 251 network elements and other services and (a) what is the proper treatment for such network elements at the end of the transition period; and (b) what is the appropriate transition period, and what are the appropriate rates, terms and conditions during such transition period, for unbundled high capacity loops, high capacity transport, and dark fiber transport in and between wire centers that do not meet the FCC's nonimpairment standards at this time, but that meet such standards in the future?*

a.    **The Position of BellSouth**

BellSouth asserts that the FCC removed significant unbundling obligations in the *TRO* and *TRRO* with respect to entrance facilities, enterprise DS1 level switching, OCN loops and transport, fiber to the home, fiber to the curb, fiber sub-loop feeder, line sharing and packet switching. With the exception of entrance facilities which BellSouth has agreed to allow CLECs to transition to with their embedded base and

DOCKET 29543 - #29

excess dedicated transport, BellSouth asserts that it should be authorized to disconnect or convert de-listed service arrangements upon 30-days' written notice absent a CLEC order to disconnect or convert such arrangements. BellSouth sought permission to impose all applicable nonrecurring charges to all default conversions and/or disconnections.[78]

**b.    The Position of CompSouth**

For existing network elements that BellSouth is no longer required to provide as § 251 elements, and that are not covered by the FCC's *TRRO* transition rules (or an agreement to subject them to such transition rules), CompSouth asserts that BellSouth should be obligated to identify, by circuit identification numbers, the specific service agreements or services that it insists be converted to non-§ 251 network elements or other services. CompSouth maintains that CLECs should have 30 days from the receipt of such notice to submit orders to convert or disconnect the circuits in question or dispute the circuits identified on BellSouth's list. CompSouth asserts that BellSouth should not be able to disconnect a specific service arrangement or service that has been properly disputed by a CLEC.[79]

CompSouth stresses that any necessary conversions should be seamless without any customer disruptions or adverse effects to service quality. CompSouth further asserts that such conversions should be

---

[77] CompSouth Post Hearing Brief at pp. 58-61.
[78] BellSouth Post Hearing Brief at pp. 85-86.
[79] CompSouth Post Hearing Brief at p. 62.

DOCKET 29543 - #30

accomplished with no service order, labor, disconnection, project, management or other nonrecurring charges being imposed.[80]

With respect to UNEs which meet the nonimpairment standards established by the FCC in the future, CompSouth notes that the FCC did not adopt a specific default transition process, but instead conveyed its expectation that incumbent LECs and requesting carriers would negotiate appropriate transition mechanisms through the § 252 process.[81]

CompSouth, therefore, asserts that the period and/or process by which a CLECs' subsequent "embedded base" must be transitioned and the rates for such "embedded base" during that transition must be mutually agreed to by BellSouth and the CLEC or established in an arbitration proceeding. CompSouth proposes a maximum of 12 months for subsequent transitions with a minimum of no less than 180 days. CompSouth further proposes that such conversions be subject to existing UNE conversion rates.

CompSouth further urges the Commission to require BellSouth to provide actual written notice of pending wire center nonimpairment findings through the point of contacts designated in each CLECs' interconnection agreement. CompSouth opposes the mere posting of carrier notification letters containing such information claiming that such a process is insufficient and contrary to the general terms and conditions of most interconnection agreements.[82]

---

[80] BellSouth Post Hearing Brief at pp. 62-63.
[81] *Id.* at pp. 62-63, *citing TRRO* ¶¶ 142, note 399, ¶ 196, and note 519.
[82] *Id.* at pp. 64-65.

DOCKET 29543 - #31

c.    **The Findings and Conclusions of the Commission**

In the event that CLECs have de-listed *TRO* elements or
arrangements in place after the effective date of a change of law
amendment, we conclude that BellSouth shall be authorized to
disconnect or convert such services 30 days after the delivery of a
written notice identifying, by circuit identification numbers, the specific
service arrangements that BellSouth insists must be converted to
non-§ 251 network elements. CLECs are required to submit orders to
convert or disconnect the identified circuits and/or services or submit a
written dispute regarding the identification of the circuits questioned by
BellSouth. If CLECs do not submit the requisite orders or dispute the
services and/or circuits identified during the 30-day period, BellSouth
shall be allowed to transition such circuits and/or services, at the
surrogate "switch as is" rate established herein, to equivalent BellSouth
tariffed services.[83] The recurring charges as established in the applicable
BellSouth tariff will apply upon such conversion.

With regard to the requirements for transitions that become
necessary in the future due to wire centers meeting the FCC's
established nonimpairment criteria, we conclude as follows:

(1)    BellSouth should identify and post on its website Subsequent
Wire Centers meeting the nonimpairment criteria set forth in the
*TRRO* in a carrier notification letter ("CNL").

(2)    CLECs shall have 30 calendar days following the CNL to dispute
a nonimpaired wire center claim by BellSouth. During the 30
days, rates for de-listed UNEs shall not change.

(3)    30 calendar days after the CNL, BellSouth shall no longer have
an obligation to provide unbundling of new de-listed UNEs, as
applicable, in the wire centers listed on the Subsequent Wire

---

[83] *See Supra* p. 14.

DOCKET 29543 - #32

Center list. Should a CLEC dispute a specific nonimpaired wire center claim with a UNE order within 30 calendar days following the CNL, BellSouth will provision the CLEC's ordered UNE. BellSouth may, however, review the CLEC claim and seek dispute resolution through the Commission if needed. During the dispute resolution period, the applicable UNE rates will not change unless ordered by the Commission. Upon the Commission's resolution of the dispute, the rates will be trued up, if necessary, to the time BellSouth provisioned the CLEC's order.

(4)   The Subsequent Transition Period for DS1 and DS3 loops and transport in a wire center identified on the Subsequent Wire Center List shall be 180 calendar days and begins on the 30th day following issuance of the CNL; the Subsequent Transition Period for dark fiber transport is 270 calendar days beginning on the 30th day following issuance of the CNL.

(5)   The Subsequent Transition Period applies to the Subsequent Embedded Base (all de-listed UNE arrangements in service in a wire center identified on the Subsequent Wire Center List on the thirtieth day following issuance of the CNL).

(6)   The transition rates to apply to the Subsequent Embedded Base throughout the Subsequent Transition Period should be the rate paid for that element at the time of the CNL posting plus 15 percent.

(7)   CLECs shall be required to submit spreadsheets identifying the Subsequent Embedded Base of circuits to be disconnected or converted to other BellSouth services no later than the end of the Subsequent Transition Period (210 days following the CNL for DS1 and DS3 loops and transport and 300 days following the CNL for dark fiber transport). A projected schedule for the conversion of these affected circuits shall be negotiated between the parties.

(8)   For the Subsequent Embedded Base circuits identified by the end of 210 days for DS1 and DS3 high-capacity loops and transport (300 days for dark fiber transport) following the CNL, BellSouth shall convert the applicable circuits at the "switch as is" surrogate rate established herein.[84] Any applicable recurring tariff charges will apply beginning on the first day following the end of the Subsequent Transition Period.

(9)   If CLECs do not submit the spreadsheets for all of their Subsequent Embedded Base by the end of the Subsequent Transition Period, BellSouth will be permitted to identify the remaining Subsequent Embedded Base and transition the circuits to the equivalent BellSouth tariffed services subject to the surrogate "switch as is" charge established herein.[85]

(10)  For the Subsequent Embedded Base circuits, the applicable recurring tariff charges should apply beginning on the first day

---

[84] *See Supra* p. 14.
[85] *See Supra* p. 14.

DOCKET 29543 - #33

following the end of the Subsequent Transition Period whether or not the circuits have been converted.

7.  **Issue 32.  Binding Nature of Commission Order:** *How should the determinations made in this proceeding be incorporated into existing § 252 interconnection agreements?*

     a.     **The Position of BellSouth**

BellSouth notes that the Commission provided all CLECs with liberal opportunities to intervene throughout the course of the proceedings in this matter. BellSouth accordingly urges the Commission to reaffirm that the outcome of this docket will be binding on both active parties and upon those CLECs that have been provided with notice of this proceeding, but have elected not to actively participate.

In order to ensure a smooth transition, BellSouth urges the Commission to issue an order requiring all CLECs with approved interconnection agreements in Alabama to execute promptly, but no later than 45 days from the issuance of said order, complying amendments to their interconnection agreements. BellSouth further requests that the Commission make it clear that if an amendment is not executed within the allotted timeframe, the Commission's approved language will go into effect for all CLECs in the State of Alabama regardless of whether an amendment is signed.[86]

     b.     **The Position of CompSouth**

CompSouth took no position as to whether the Commission's orders in this docket can or should bind nonparties. CompSouth urges the Commission, however, not to upend existing agreements that

---

[86] *Id.* at p. 88.

DOCKET 29543 - #34

address how changes of law should be incorporated into existing new and § 252 interconnection agreements.[87]    CompSouth additionally requests that the Commission specify that any decisions rendered in this cause apply only to the disputed issues addressed in this proceeding.[88]

c.    **The Findings and Conclusions of the Commission**

Given the broad notice provided by the Commission in this cause and the comprehensive manner in which the issues raised in this proceeding have been addressed nationally, it appears that the findings and conclusions reached by the Commission regarding the disputed issues in this cause shall be binding not only on the parties participating in this cause, but on nonparties as well. We herein note, however, that the Commission is only mandating contract revisions concerning the disputed issues in this matter for which decisions have been rendered by the Commission.

All interconnection agreement amendments necessitated by the Commission's findings and conclusions herein shall be submitted to the Commission within 30 days of the effective date of this Order. If an amendment is not executed and submitted within the allotted timeframe, the language approved herein by the Commission will go into effect regardless of whether an amendment is signed.

C.    **Service-Specific Issues (Issues 13, 15, 16, 29, 31)**

1. **Issue 13.    Performance Plan: *Should network elements de-listed under § 251(c)(3) be removed from BellSouth's SQM/PMAP/SEEM?***

---

[87] CompSouth Post Hearing Brief at p. 117.
[88] *Id.*

DOCKET 29543 - #35

a.    **The Position of BellSouth**

BellSouth contends that elements it is no longer required to unbundle pursuant to § 251(c)(3) should not be subject to a SQM/PMAP/SEEM plan as such plans were designed to ensure that BellSouth continues to provide non-discriminatory access to elements required to be unbundled under § 251(c)(3) following its approval to provide in region interlata service. Given the FCC's revised unbundling rules and the reasoning behind the FCC's relaxed requirements, BellSouth asserts that the market place should now be the source of BellSouth's performance incentives.[89]

BellSouth notes that it recently reached a stipulation in Georgia that has been endorsed by a number of CLECs including AT&T, Covad, MCI and DeltaCom, all of whom are CompSouth members. BellSouth accordingly maintains that there is no legitimate reason that de-listed UNEs should be apart of a UNE performance measurements and penalty plan. BellSouth represents that a failure by the Commission to remove such de-listed UNEs from those plans would be anti-competitive and unfair to BellSouth.[90]

b.    **The Position of CompSouth**

CompSouth asserts that the SQM/PMAP/SEEM performance measurements were instituted to confirm BellSouth's compliance with its § 271 obligations. Because CompSouth maintains that BellSouth will still be required to provide meaningful nondiscriminatory access to switching, loop and transport network elements pursuant to the § 271 competitive

DOCKET 29543 - #36

checklist, CompSouth asserts that the provisions in BellSouth's SQM/PMAP/SEEM addressing those elements should be left in place to ensure that BellSouth does not backslide with regard to its § 271 obligations.[91]

c.    **The Findings and Conclusions of the Commission**

The issue of whether any de-listed elements that are nonetheless required to be made available pursuant to § 271 should remain subject to BellSouth's SQM/PMAP/SEEM is a question which the CLECs should raise with the FCC. Absent a contrary ruling by the FCC, all elements that are no longer required to be made available pursuant to § 251 should be removed from BellSouth's SQM/PMAP/SEEM.[92]

2.   **Issue 15.**    **Conversion of Special Access Circuits to UNEs:** *Is BellSouth required to provide conversion of special access circuits to UNE pricing, and, if so, what rates, terms and conditions and during what timeframe should such new requests for such conversions be effectuated?*

a.    **The Position of BellSouth**

BellSouth indicates that it will convert special access services to UNE pricing subject to the FCC's service eligibility requirements and limitations on high-cap EELs once a CLEC's contract incorporates the terms approved by the Commission on this issue. BellSouth also indicates a willingness to convert UNE circuits to special access services

---

[89] BellSouth Post Hearing Brief at p.89.
[90] *Id.* at pp. 89-90.
[91] CompSouth Post Hearing Brief at pp. 67-69.
[92] We note that the Commission recently approved a Joint Stipulation between BellSouth and numerous CLECs regarding BellSouth's SQM/PMAP/SEEM in Docket 25835, *In Re: Petition for Approval of a Statement of Generally Available Terms and Conditions Pursuant to § 252 (f) of the Telecommunications Act of 1996 and Notification of Intention to File a Petition for In-Region Interlata Authority with the FCC Pursuant to § 271 of the Telecommunications Act of 1996,* pursuant to order entered on November 22, 2005. The stipulation approved by the Commission was represented to be regional in nature and is not with this order, automatically amended by the Commission.

DOCKET 29543 - #37

subject to the stipulation that any special access to UNE conversions should be considered termination of any applicable volume and term tariffed discount plan or grandfathered arrangement.[93]

BellSouth proposes that the rate for single element conversions in Alabama be $24.89 and $26.37 for projects consisting of 15 or more loops submitted on a spreadsheet. BellSouth proposes that the Commission ordered rate of $5.59 remain applicable for EEL conversions. BellSouth further notes that conversions requiring a physical change to circuits are not really conversions and should result in the imposition of all applicable non-recurring and installation charges.[94]

b.    **The Position of CompSouth**

CompSouth notes that BellSouth is required to provide conversion of special access circuits to UNE pricing pursuant to the straight forward procedures established by the FCC. CompSouth asserts that such conversions should be handled on a "switch as is" basis in accordance with the Total Element Long Run Incremental Cost ("TELRIC") rates established by the Commission.[95]

CompSouth agrees with BellSouth's contention that any such conversions should be considered a termination for purposes of any volume and/or term commitments and/or grandfathered status between the CLEC and BellSouth. CompSouth further agrees that any change from a wholesale service to a network element that requires a physical

---

Accordingly, the disputed provisions of BellSouth's SQM/PMAP/SEEM plans will remain in place until a specific amendment is requested and approved by appropriate order in *Docket 25835*.
[93] BellSouth Post Hearing Brief at p.90.
[94] *Id.*
[95] CompSouth Post Hearing Brief at p. 87.

DOCKET 29543 - #38

rearrangement should not be considered to be a conversion for purposes of interconnection agreements.[96]

CompSouth raises objections; however, to the conversion rates proposed by BellSouth noting that the FCC specifically concluded in the *TRO* that the conversion activity in question involves "largely a billing function".[97] In particular, CompSouth notes that the FCC concluded that "termination charges, reconnect and disconnect fees, or non recurring charges associated with establishing a service for the first time may not be applied to conversions and would violate the non-discrimination provisions of § 202 of the Communications Act".[98] CompSouth lastly maintains that the Commission should not give any final approval to any of the increased conversion rates proposed by BellSouth until the parties have had an opportunity to review and question the underlying cost studies and to present arguments regarding those studies to the Commission.[99]

c.     **The Findings and Conclusions of the Commission**

BellSouth does not dispute that it is required to convert special access services to UNE pricing subject to the FCC's established service eligibility requirements. BellSouth also agrees with the CLECs that it will convert UNE circuits to special access services with such conversions to be considered termination of any applicable volume and term tariffed discount plan or grandfathered arrangement. We find the concurring positions of the parties on these issues to be appropriate and controlling.

---

[96] *Id.*
[97] *Id.* at p.78 *citing TRO*, ¶¶ 587 and 588.
[98] *Id.*

DOCKET 29543 - #39

The dispute between the parties regarding this issue relates to the rates for the applicable conversions. BellSouth proposed various charges for such conversions which were not supported by cost studies or any other evidence of record. The CLECs assert that BellSouth should charge applicable nonrecurring "switch as is" rates for the conversions in question. We find that the surrogate nonrecurring "switch as is" rate established herein should be applied for UNE-special access conversions.[100] That rate appears to be most consistent with the findings and conclusions of the FCC in the *TRO*. We also note that any requested conversion discussed herein that requires a physical rearrangement will not be considered a mere conversion and will thus be subject to all applicable non-recurring and installation charges.

3. **Issue 16.** **Pending Conversion Requests:** *What are the appropriate rates, terms, conditions and effective dates, if any, for conversion requests that were pending on the effective date of the TRO?*

   a. **The Position of BellSouth**

   BellSouth asserts that the contractual language contained in a CLEC's interconnection agreement at the time the *TRO* became effective governs the appropriate rates, terms and conditions and effective dates for conversion requests that were pending on the effective date of the *TRO*. BellSouth maintains that rates, terms and conditions are not retroactive and become effective once an interconnection agreement is amended. BellSouth accordingly disputes the testimony of CompSouth witness Gillan who claims that conversion language and rights must be retroactive to March 11, 2005, the effective date of the *TRRO*. BellSouth

---

[99] *Id.* at p.79.

DOCKET 29543 - #40

asserts that such a position is incorrect and plainly inconsistent with the *TRO* and the *TRRO*.[101] BellSouth further contends that the retroactive true-up that it seeks as a result of the elements de-listed by the *TRRO* is explicitly contained in the orders and rules of the FCC.[102]

**b.**    **The Position of CompSouth**

CompSouth asserts that the rates, terms and conditions for conversions pending on the effective date of the *TRO* should be those that reflect the FCC's decisions in the *TRO*. Once conversion language reflecting the *TRO* is included in an interconnection agreement, CompSouth asserts that the parties to the agreement should treat conversions pending as of the 2003 effective date of the *TRO* based on the FCC's forward-looking conversion procedures that were established in the *TRO*.[103]

**c.**    **The Findings and Conclusions of the Commission**

It is recommended that any conversions to standalone UNEs pending on the effective date of the *TRRO* be effective with the date of an amendment or interconnection agreement that addresses such conversions. Such conversions shall, however, be governed by the rates, terms and conditions that existed prior to the *TRO*. The rates, terms and conditions for all other conversions in the amended agreement that will result from this proceeding shall be retroactive to October 2, 2003, the effective date of the *TRO*.

---

[100] *See* p.14 *Supra.*
[101] BellSouth Post Hearing Brief at pp. 91-92.
[102] *Id.* at pp. 92-93 citing *TRRO* notes 408, 524, 630 and 47 C.F.R., § 51.319(a)(4)(iii), § 51.319(d)(2)(iii), § 51.319(e)(2)(ii)(C).
[103] CompSouth Post Hearing Brief at p.79 *citing TRO* ¶ 589.

DOCKET 29543 - #41

4.  **Issue 29.   Enhanced Extended Link ("EEL") Audits:** *What is the approp1 late ICA language to implement BellSouth's EEL audit rights, if any, under t ie TRO?*

  a.    **The Position of BellSouth**

  BellSouth favors the adoption of EEL audit language tl at allows BellSouth to audit CLECs on an annual basis to detern ine their compliance with the qualifying service eligibility criteria.   3ellSouth concedes that it would be required to obtain and pay for the ind ependent auditors utilized to conduct EEL audits pursuant to the America⌐ Institute for Certificate Public Accountants ("AICPA") standards.[104]

  In the event that an auditor determines that CLEC s are in noncompliance, BellSouth proposes that such CLECs be re juired to true-up any difference in payments, convert noncompliant cir :uits and make correct payments on a going-forward basis.  BellSouth a( ditionally proposes that CLECs determined by an auditor to have failed t :⌐ comply with the service eligibility requirements would be required to r ∃imburse BellSouth for the cost of the auditor.[105]

  BellSouth objects to any language that would require i  to show cause prior to the commencement of an audit, list acceptable a iditors in interconnection agreements, or require the agreement of the f arties on auditors.    BellSouth  considers  such  provisions  unworka :le  and inefficient.[106]

  b.    **The Position of CompSouth**

---

[104] BellSouth Post Hearing Brief at p. 93.
[105] *Id.*
[106] *Id.* at p. 94.

DOCKET 29543 - #42

CompSouth asserts that BellSouth's rights to conduct EEL audits were intended by the FCC to be limited and based upon cause.[107] CompSouth thus asserts that BellSouth should be required to provide some basis for audits prior to their commencement. CompSouth accordingly proposes that BellSouth provide CLECs with prior notification of proposed audits and set forth therein the basis for any audit requested.[108]

CompSouth emphasizes the importance of auditor independence and maintains that the most simple and straightforward way to decide the independence of an auditor is to require mutual agreement of the parties with respect to auditor selection. CompSouth asserts that such a process would prevent conflicts prior to the commencement of an audit. CompSouth represents, however, that a preapproved list of entities from which BellSouth may select auditors does not solve the problem of auditor independence given that an auditor's circumstances can change over time.[109]

With regard to the issue of audit cost reimbursement, CompSouth notes that the FCC established a requirement that ILECs reimburse CLECs for audit costs to the extent that an audit finds material compliance by a CLEC. Similarly, CompSouth notes that the FCC established a materiality threshold in order for BellSouth to recover the cost of an audit from a CLEC. To the extent there is material noncompliance, CompSouth concedes that the affected CLEC must

---

[107] CompSouth Post Hearing Brief at p. 111 *citing TRO* ¶ 622.
[108] *Id.* at p. 113.
[109] *Id.* at p. 114.

DOCKET 29543 - #43

reimburse BellSouth for audit related costs. To the extent there is not material noncompliance, however, BellSouth must reimburse the CLEC for the audit related costs.[110]

c.     **The Findings and Conclusions of the Commission**

Based on the foregoing, it is ordered that EEL Audits be performed in accordance with the standards of the American Institute of Certified Public Accountants by an independent third party auditor selected by BellSouth. BellSouth shall be required to provide a 30-day notice of any such audit with said notice to provide a statement from BellSouth as to the reasons for the audit requested and the identity of the auditor selected. BellSouth shall not, however, be required to obtain the consent of the CLEC being audited with respect to the selection of the auditor. CLECs may, however, challenge the legal qualifications of the auditor selected by filing an objection to that effect with the Commission within 10 days of receiving BellSouth's notice of a pending audit wherein the auditor selected by BellSouth is identified. CLECs may dispute any portion of the findings of an audit by petitioning the Commission for a review within 20 days of receiving the reported findings of the auditor.

To the extent that the independent auditor's report concludes that a CLEC failed to comply with applicable service eligibility criteria, the CLEC will be required to true-up any difference in payments, convert all noncompliant circuits to the appropriate service and make the correct payments on a going-forward basis. To the extent that an independent auditor's report concludes that a CLEC failed to comply with the

---

[110] *Id.* at p. 115 *citing TRO* ¶¶ 627-628.

DOCKET 29543 - #44

applicable service and eligibility criteria in all material respects, the CLEC

shall be required to reimburse BellSouth for the cost of the independent

auditor. In the event that the independent auditor concludes that the

CLEC in question did comply with the service eligibility criteria in all

material respects, BellSouth shall be required to reimburse the CLEC for

its reasonable and demonstrable costs associated with the audit. The

Commission finds that the foregoing criteria are most consistent with the

findings and conclusions of the FCC.[111]

5. **Issue 31.** **Core Forbearance Order:** *What language should be used to incorporate the FCC's ISP Remand Core Forbearance Order into interconnection agreements?*

   a. **The Position of BellSouth**

   BellSouth asserts that the Commission should order BellSouth to

   resolve this issue on a carrier by carrier basis depending on factually

   specific circumstances. BellSouth maintains that it is concerned with the

   generic implementation of language regarding this issue based on the

   choices available in the FCC's *ISP Remand Core Forbearance Order*[112]

   which allow CLECs to elect different rate structures. BellSouth thus

   maintains that a "one size fits all" approach is not appropriate for

   implementation of the *Core Forbearance Order*.[113]

   b. **The Position of CompSouth**

   CompSouth asserts that generic contractual changes are

   necessary to implement the *Core Forbearance Order* in order to delete

   all references to the "new markets" and "growth cap" restrictions in

---

[111] *TRO* ¶¶ 622-628.
[112] *In the Matter of Intercarrier Compensation for ISP-Bound Traffic,* CC Docket No. 99-68, FCC 01-131 (rel. Apr. 27, 2001) ("*ISP Remand Core Forbearance Order*" or "*Core Forbearance Order.*").
[113] BellSouth Post Hearing Brief at p. 95.

DOCKET 29543 - #45

existing interconnection agreements. CompSouth further maintains that the contractual changes necessary to implement such forbearance will only slightly differ among various CLECs. CompSouth asserts that the Commission can address BellSouth's concerns that generic implementation of the *Core Forbearance Order* would prevent CLECs from choosing among reciprocal compensation options by merely requiring that all existing interconnections that include the restrictions overturned by the *Core Forbearance Order* be amended to remove those restrictions.[114]

**c.      The Findings and Conclusions of the Commission**

We conclude that all existing interconnection agreements which have references to the "growth caps" and/or the "new markets" rule stricken by the FCC in the *Core Forbearance Order* should be amended to strike such references as part of this proceeding. However carriers seeking to amend additional intercarrier compensation provisions in their respective interconnection agreements must approach such amendments on a case-by-case basis.

**D.      Network Related Issues (Issues 6, 19, 23, 24, 26, 27, 28)**

**1.      Issue 6      HDSL-capable Cooper Loops: *Are HDSL-capable cooper loops the equivalent of DS1 loops for the purpose of evaluating impairment?***

**a.      The Position of BellSouth**

BellSouth asserts that CLECs are not entitled to order UNE HDSL loops in wire centers that satisfy the FCC's thresholds for DS1 loop relief because of the FCC's decision to define DS1 loops as including "two wire and four wire copper loops capable of providing high

---

[114] CompSouth Post Hearing Brief at pp. 115-116.

DOCKET 29543 - #46

bit rate digital subscriber line services, such as two-wire or four-wire HDSL compatible loops."[115] BellSouth asserts that the CLECs attempt to circumvent the application of the FCC's clear and unambiguous definition of DS1 loops as set forth in the above-quoted rule by citing general FCC language addressing HDSL-capable loops. By defining DS1 loops as including two wire and four wire HDSL loops, BellSouth asserts that the FCC expressly removed any obligation to provide such loops in unimpaired wire centers. Additionally, BellSouth maintains that there has been very little interest in its UNE HDSL product since only 178 such loops were in service to all CLECs in Alabama as of June 2005.[116]

With regard to the process for calculating UNE HDSL loops for purposes of impairment thresholds, BellSouth asserts that UNE HDSL loops can and should be counted as 24 business lines pursuant to the findings of the FCC in the *TRO*.[117] Since the FCC has declared that a DS1 loop and a T-1 are equivalent in speed and capacity and has further declared that UNE HDSL loops are used to deliver T-1 services, BellSouth contends that it is obvious that BellSouth's UNE HDSL loops must be counted for purposes of determining business lines in an office on a 64 kbps equivalent basis, or as 24 business lines.[118]

b.    **The Position of CompSouth**

CompSouth asserts that HDSL-capable copper loops are not the equivalent of DS1 loops for purposes of evaluating impairment. CompSouth maintains that an HDSL-capable copper loop is a loop that

---

[115] BellSouth Post Hearing Brief at p. 96 *citing* 47 C.F.R. § 51.319(a)(4).
[116] *Id.* at p. 10.
[117] *Id. citing TRO* note 634.

DOCKET 29543 - #47

does not include the electronics on both ends of the loop that provide the means for the loop to be used to provide DS1 services. CompSouth further represents that a loop qualifies as a DS1 loop for purposes of impairment analysis only if it includes the electronics that permit the loop to provide a service featuring speeds of 1.544 megabytes per second.[119]

CompSouth maintains that the definitions established by the FCC provide that various types of copper loops can be used to provide 1.544 megabit per second signal speeds including HDSL-capable loops. CompSouth asserts, however, that the definitions of the FCC do not convert every copper loop that meets the characteristics of being HDSL-capable into a DS1 loop. In summary, CompSouth asserts that without electronics attached, an HDSL-capable copper loop is nothing more than a span of copper cable and is not a loop capable of delivering 1.544 megabits per second service.[120]

CompSouth argues that BellSouth should still be required to provision the "plain" copper loop without the associated electronics as such loops do not constitute a DS1 loop. CompSouth further maintains that CLECs should still be permitted to attain access at TELRIC rates to an HDSL-capable loop (without electronics) so that CLECs can add their own electronics and provide a DS1 level service to a customer. CompSouth alleges that if BellSouth is permitted to withdraw HDSL-capable copper loops, BellSouth will have precluded CLECs not only from using UNE DS1 loops, but from creating a DS1 service using

---

[118] *Id.*
[119] CompSouth Post Hearing Brief at p. 29 *citing* 47 C.F.R. § 51.319(a)(4)(i).
[120] *Id.*

DOCKET 29543 - #48

CLEC provided electronics on a BellSouth copper loop. CompSouth asserts that such an outcome is not consistent with the findings of the FCC in the *TRO* and *TRRO*.[121]

CompSouth also represents that BellSouth's contention that HDSL-capable copper loops should be counted as DS1 lines for purposes of determining if a wire center has sufficient "business lines" to qualify for high capacity or interoffice transport de-listing is inappropriate. CompSouth asserts that because BellSouth counts every DS1 line as 24 lines, counting all HDSL-capable loops as DS1 lines would vastly inflate the business line count in BellSouth's wire centers in an inappropriate manner.[122]

c.    **The Findings and Conclusions of the Commission**

The arguments presented by the parties on this issue somewhat expanded the scope of the question presented beyond its original parameters. In addition to the presented issue regarding the treatment of HDSL-capable loops for purposes of determining impairment, the parties also addressed the issue of whether BellSouth has an unbundling obligation with respect to HDSL-capable loops in wire centers deemed nonimpaired absent access to DS1 loops.

After consideration of the arguments presented by the parties, we conclude that HDSL-capable loops (*i.e.* BellSouth's two-wire or four-wire high bit rate digital subscriber compatible loop offering are the equivalent of DS1 loops for purposes of evaluating impairment. It appears that counting such loops as 24 voice grade equivalents is the

---

[121] *Id.* at pp. 30-31 *citing TRRO* ¶ 163 note 454.

DOCKET 29543 - #49

approach most consistent with the findings and conclusions of the FCC in the *TRO* and *TRRO* because such an approach better addresses the competitive "revenue opportunity" criteria relied upon by the FCC.[123]

We resolve the issue of whether BellSouth is required to offer HDSL-capable loops in wire centers deemed nonimpaired by requiring BellSouth to provide CLECs with access to cooper loops and to condition cooper loops upon request. BellSouth is not, however, obligated to offer preconditioned/prepackaged loop offerings designed for a specific service type. Further, unbundled cooper loop, nondesigned (with or without conditioning) should be counted as one voice grade equivalent for each two-wire (*e.g.* one voice grade equivalent for a two-wire loop and two voice grade equivalent for a four-wire loop).

2. **Issue 19.   Line Splitting:** *What is the appropriate ICA language to implement BellSouth's obligations with regard to line splitting?*

    a.    **The Position of BellSouth**

BellSouth points out that no witness provided testimony concerning line splitting. BellSouth notes, however, that CompSouth has proposed the adoption of language which would require BellSouth to provide line splitting on a commingled arrangement of a loop and unbundled local switching pursuant to § 271. BellSouth asserts that the loop described by CompSouth does not exist and is not required by the FCC. BellSouth further asserts that the Commission does not have the

---

[122] *Id.* at pp. 31-32.
[123] *TRO* at n. 634, *TRRO* at ¶¶ 43-45, 146.

DOCKET 29543 - #50

requisite jurisdiction and should under no circumstances su port the reincarnation of UNE-P as proposed by CompSouth.[124]

BellSouth also objects to CompSouth's proposal that BellSouth be obligated to provide splitters between data and voice CLEC that are splitting UNE-L. BellSouth urges the Commission not to obli ate it to provide CLECs with splitters when they are utilizing UNE-L a CLECs can readily provide this function for themselves.[125]

BellSouth recognizes that the rules of the FCC require BellSouth to make modifications to its OSS that are necessary for line splitting. BellSouth maintains however, that the plan which is pro osed by CompSouth would require BellSouth to make modifications to its OSS that are beyond the FCC's requirements.[126]

b.     **The Position of CompSouth**

CompSouth maintains that the question of whether lin splitting can involve the commingling of § 251 and 271 elements will be resolved by the Commission's determinations regarding issue nur ber 14, commingling. CompSouth raises additional concerns, however, regarding the inclusion of language requiring CLECs to ndemnify BellSouth for "claims" or "claims and actions" arising out of actions by the other CLECs involved in line splitting arrangements. Com South is fearful that the inclusion of such broad terms might give r se to an obligation for CLECs to defend and indemnify BellSouth agai st entire actions or suits rather than the specific claims made against BellSouth

---

[124] BellSouth Post Hearing Brief at pp. 98-99.
[125] *Id.*
[126] *Id.*

DOCKET 29543 - #51

which do not involve accusations, proof of misconduct or gross negligence.[127]

c.    The Findings and Conclusions of the Commission

In accordance with 47 C.F.R. § 51.319(a)(1)(ii), BellSouth's obligation with regard to the line splitting is to provide nondiscriminatory access to operations support systems necessary for pre-ordering, ordering, provisioning, maintenance and repair, and billing for loops used in line splitting arrangements. The CLECs requesting a line splitting arrangement are obligated to purchase the whole loop and provide their own splitter to be collocated in the applicable central office. Further, CLECs requesting line splitting arrangements will be required to indemnify, defend and hold BellSouth harmless against any and all claims, loss or damage except where arising from, or in connection with, BellSouth's gross negligence or willful misconduct.

3.    **Issue 23.**    **Greenfield Areas:** *(a) What is the appropriate definition of minimum point of entry ("MPOE")? (b) What is the appropriate language to implement BellSouth's obligation, if any, to offer unbundled access to newly-deployed or 'greenfield' fiber loops, including fiber loops deployed to the minimum point of entry ("MPOE") of a multiple dwelling unit ("MDU") that is predominantly residential, and what, if any, impact does the ownership of the inside wiring from the MPOE to each end user have on this obligation?*

**Issue 28.**    **Fiber to the Home:** *What is the appropriate language, if any, to address access to overbuild deployments of fiber to the home and fiber to the curb facilities?*

a.    The Position of BellSouth

BellSouth asserts that there are only 2 substantive differences in the positions of the parties regarding language that addresses issues 23 and 28. According to BellSouth, the major disagreement between the

---

[127] CompSouth Post Hearing Brief at p.89.

DOCKET 29543 - #52

parties relates to the extent to which BellSouth is required to unbundle fiber. In particular, BellSouth strongly disagrees with the CompSouth contention that BellSouth is required to offer CLECs unbundle fiber to the home/fiber to the curb to provide a DS1 loop in any wire center where BellSouth is required to provide access to DS1 loop facilities. BellSouth asserts that such a requirement would be inconsistent with the orders and rules of the FCC.[128]

BellSouth points out that the FCC first granted ILECs fiber unbundling relief in the *TRO* noting that requesting carriers are not impaired without access to fiber to the home loops in new construction and overbuild situations unless the ILEC in question elects to retire existing copper loops in overbuild scenarios. In such cases, fiber loops must be unbundled for narrowband services only[129]. BellSouth further asserts that the FCC clearly stated in the *TRO* that an ILEC's unbundling obligations and limitations for the fiber loops in question "do not vary based on the customer to be served".[130]

According to BellSouth, the FCC also made it quite clear in its subsequent *MDU Reconsideration Order* that BellSouth is not obligated to unbundle fiber loops serving predominantly residential multiple dwelling units and that such loops are governed by the fiber to the home rules.[131]    BellSouth maintains that the FCC further stated that the

---

[128] BellSouth Post Hearing Brief at pp. 100-101 *citing* 47 C.F.R. § 51.319(a)(3).
[129] *Id.* at pp. 101-102 *citing TRO* ¶ 273.
[130] *Id.* at p.102 *citing TRO* ¶ 210.
[131] *Id. citing Order on Reconsideration in the Matter of Review of § 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, CC Docket 01-338, FCC 04-191, at ¶4 (August 9, 2004) *("MDU Reconsideration Order*

DOCKET 29543 - #53

existence of businesses in MDUs does not exempt such build ngs from the fiber to the home unbundling framework established in the T :O.[132]

Following the issuance of the *MDU Reconsideratic : Order*, BellSouth notes that the FCC again addressed the topic of fibe loops in its "*FTTC Reconsideration Order*".[133] According to BellSouth, the FCC therein defined fiber to the curb loop as a "fiber transmissic n facility connecting to fiber distribution plant that is not more than 500 'eet from the customer's premises." BellSouth further notes that the FCC went on to conclude that "requesting carriers are not impaired in greenfi :ld areas and face only limited impairment without access to fiber to the c .rb loops where fiber to the curb loops replace pre-existing loops."[134]

BellSouth thus surmises that CompSouth has no legitim ate basis to insert further limitations on the fiber unbundling relief extend :d by the FCC with respect to fiber to the home and fiber to the curb. ;ellSouth argues that the discussion of the FCC in the *TRO* and its su :sequent orders addressing broadband unbundling make it abundantly : ear that the FCC did not intend to limit the fiber unbundling relief g anted to ILECs as claimed by CompSouth.[135]

b.    **The Position of CompSouth**

CompSouth acknowledges that the FCC adopted reduced, unbundling obligations for fiber to the home, fiber to the curb, ar d fiber to predominately residential MDUs. CompSouth also maintains tl at it has

---

[132] *Id.* at p.102
[133] *Order on Reconsideration in the Matter of Review of § 251 Unbundling Obligations of Incumbent Local Exchange Carriers, CC Docket 01-338,FCC 04-248, at ¶¶ 1-9 (October 18, 2004)("FTTC Reconsideration Order").*
[134] *Id.* at p. 102-103 *citing FTTC Reconsideration Order* at ¶¶ 10-11.
[135] *Id.* at p.102 *citing TRO* at ¶ 273.

DOCKET 29543 - #54

no dispute with BellSouth regarding the definition of Minimum Point Of Entry ("MPOE") or the ownership of inside wiring from the MPOE to end users. CompSouth notes, however, that it does have a significant fundamental disagreement with BellSouth regarding the scope of the reduced broadband unbundling obligations implemented by the FCC.[136]

CompSouth asserts that BellSouth's position is that BellSouth can deny access to § 251 UNE DS1 loops, even in areas the FCC has found remain "impaired" for purposes of § 251. More particularly, CompSouth represents that BellSouth's position is that anywhere BellSouth extends loop fiber or replaces existing copper loop fiber, it may refuse to provision § 251 DS1 loops. CompSouth argues that BellSouth was granted broadband unbundling relief by the FCC only in circumstances where the loops in question are used to serve the mass market, not for all fiber and hybrid loops as BellSouth claims.[137]

CompSouth asserts that the *TRO* is replete with references which clearly indicate that the broadband, unbundling relief granted to ILECs therein by the FCC was confined to mass market loops and was not intended to impact the FCC's impairment analysis for DS1 and DS3 enterprise loops. CompSouth maintains that the FCC's policy in this regard was clarified and reaffirmed in the orders of the FCC that were promulgated subsequent to the *TRO* including the *FTTC Reconsideration Order*, the *MDU Reconsideration Order* and the *Broadband Forbearance Order*.[138] CompSouth additionally cites

---

[136] CompSouth Post Hearing Brief at p. 91.
[137] *Id.* at pp. 91-92.
[138] *Id.* at pp. 92-94, 98.

DOCKET 29543 - #55

language in a brief filed by the FCC with the D.C. Circuit Court of Appeals in *Allegiance Telecom, Inc et al v. FCC*[139] as support for its position that BellSouth may not refuse to unbundle fiber to the home and fiber to the curb loops for the provisioning of DS1 and DS3 loops in wire centers that remain impaired.[140]

CompSouth thus emphasizes that the FCC's rules and decisions regarding broadband unbundling were not intended to constitute a blanket exemption as BellSouth argues. CompSouth asserts that BellSouth remains obligated to provide access to carriers serving enterprise customers even when the CLEC in question cannot otherwise gain access to the loop facilities in that wire center to serve a mass market customer.[141]

c.    **The Findings and Conclusions of the Commission**

As the parties do not dispute the definition of MPOE, a specific finding by the Commission on this issue is not a necessity. We note, however, that MPOE is clearly defined in the rules of the FCC at 47 C.F.R. § 68.105.

As to the remaining questions specifically raised herein under issue 23, we conclude that pursuant to the prevailing orders of the FCC, BellSouth is required to unbundle "greenfield" fiber to the home/fiber to the curb loops to predominantly commercial MDUs.[142] BellSouth has no

---

[139] *Allegiance Telecom, Inc., et al v. FCC*, D.C. Cir. No. 03-1316, Opposition of the Federal Communications Commission to Allegiance Telecom's Motion for Stay Pending Review (filed October 31, 2003); *See* CompSouth Hearing Exhibit 6.
[140] CompSouth Post Hearing Brief at p.102.
[141] *Id* at p.100.
[142] We further note that pursuant to 47 C.F.R. § 51.319(b)(2), ILECs are required to provide a requesting telecommunications carrier with nondiscriminatory access to the subloop for access to multiunit premises wiring on

DOCKET 29543 - #56

obligation to unbundle such fiber loops to predominantly residential MDUs, however.[143]

Outside of the MDU setting, there is a serious dispute between the parties as to the proper treatment of fiber loops in wire centers in which a nonimpairment finding for DS1 or DS3 loops has not been made. We conclude that BellSouth is obligated to unbundle fiber to the home/fiber to the curb loop to provide a DS1 or DS3 loop in such impaired wire centers. We reach this conclusion because we believe the FCC intended for the continued access of DS1 and DS3 loops in impaired wire centers to be an exception to the fiber to the home/fiber to the curb unbundling exemptions. As noted by CompSouth, the most cogent statement of the FCC's intention in this regard is set forth in a brief which the FCC filed with the D.C. Circuit Court of Appeals in response to Allegiance Telecom's request for a stay of the broadband unbundling policies set forth in the *TRO*.[144] Allegiance Telecom and the other requesting carriers were concerned that the FCC may have restricted access to DS1 loops as part of the broadband unbundling policy set forth in the *TRO*. In explaining its position in the *TRO* and the erratum thereto that generated apparent confusion, the FCC noted that it intended DS1 and DS3 loops to remain available in impaired wire

---

an unbundled basis regardless of the capacity level or type of loop that the requesting telecommunications carrier seeks to provision for its customer. Said provision defines subloop access and specifies the terms of availability as technically feasible. This includes access to inside wiring which is owned or controlled by the incumbent LEC.

[143] *MDU Reconsideration Order* at ¶¶ 4-8, *FTTC Reconsideration Order* at ¶ 11.

[144] *See* FCC Brief in *Allegiance Telecom, Inc. v. FCC*, (CompSouth Hearing Exhibit 6 at pp1-2. As this pronouncement by the FCC was made prior to the *MDU Reconsideration Order*, we conclude that the controlling unbundling criteria in the MDU setting is as stated above- whether the MDU in question predominantly commercial or residential.

DOCKET 29543 - #57

centers.[145] We find this statement by the FCC to be most consistent with the overall competitive policies established by the FCC in the *TRO* and *TRRO*.

With respect to the questions raised regarding the overbuild of fiber to the home/fiber to the curb loops in issue 28, we note that the FCC concluded in the *TRO* that requesting carriers are not impaired without access to fiber to the home loops deployed by ILECs in overbuild scenarios except in instances where ILECs elect to retire existing copper loops.[146] In such scenarios, ILECs must unbundle the fiber loops in question for narrowband services only.[147] The existing rules of the FCC clearly incorporate that requirement.[148] Consistent with those rules, we conclude that BellSouth need only provide nondiscriminatory access to a 64 kbps transmission path capable of voice grade service over the fiber-to-the home loop or fiber to the curb loop on an unbundled basis when an election is made to retire copper loops.[149] Notably, existing copper loops that are not retired must be available on a nondiscriminatory basis.[150]

4. **Issue 24**   **Hybrid Loops:** *What is the appropriate ICA language to implement BellSouth's obligation to provide unbundled access to hybrid loops?*

   a.   **The Position of BellSouth**

BellSouth contends that hybrid loops are defined in the federal rules and that the language contained in those rules should be

[145] *Id.*
[146] *TRO* at ¶ 273.
[147] *See* 47 C.F.R. § 51.319 (a)(3)(iii)(C).
[148] *See* 47 C.F.R. § 51.319 (a)(3)(A).
[149] *Id.*
[150] *See* 47 C.F.R. § 51.319 (a)(3)(A).

DOCKET 29543 - #58

incorporated into the interconnection amendments that will result from this proceeding. BellSouth objects, however, to CompSouth's proposed language that would require BellSouth to provide access to hybrid loops as a § 271 obligation.[151]

b.    **The Position of CompSouth**

CompSouth argues that the only "limitation" the FCC placed on BellSouth's unbundling obligations with regard to hybrid loops is that BellSouth need not provide access to the packet-based capability in the loop. CompSouth asserts that this narrow limitation does not affect a CLEC's ability to obtain access to DS1 and DS3 loops in any meaningful way.[152]  CompSouth also proposes language that would obligate BellSouth to provide access to hybrid loops as a § 271 obligation.

c.    **The Findings and Conclusions of the Commission**

The parties do not dispute that hybrid loops are defined in the federal rules at 47 C.F.R. § 51.319(a)(2). In accordance with that rule, we conclude that BellSouth shall be required to provide CLECs with nondiscriminatory unbundled access to the time division multiplexing features, functions and capabilities of a hybrid loop (including DS1 and DS3 capacity) pursuant to § 251 where impairment exists. The access provided shall allow the affected CLEC to establish a complete transmission path between BellSouth's central office and an end-user's premises.

The positions of the parties do diverge, however, with respect to whether BellSouth should be required to provide access to hybrid loops

_____

[151] BellSouth Post Hearing Brief at pp. 105-106.

DOCKET 29543 - #59

pursuant to § 271. For the reasons set forth in the Findings and Conclusions regarding Issue 8(a), the Commission does not appear to have jurisdiction to address the § 271 aspects of this issue.

5. **Issue 26** *What is the appropriate ICA language to implement BellSouth's obligation to provide routine network modifications?*

   a. **The Position of BellSouth**

   BellSouth asserts that line conditioning is a subset of the routine network modifications which BellSouth regularly undertakes for its own customers.[153] According to BellSouth, the FCC has clearly recognized that BellSouth does not have an obligation to substantially alter its network in order to provide superior quality interconnection and unbundled access.[154] BellSouth thus asserts that an ILEC need only perform the same routine network modifications to its existing loop facilities for CLECs as it does for its own customers.[155] BellSouth contends that the D.C. Circuit in *USTA II* upheld the distinction drawn by the FCC in the *TRO* between routine network modifications and superior quality alterations stating that said distinction turns on whether the modification is of the sort that the ILEC routinely performs on demand for its own customers.[156]

   BellSouth lastly asserts that the FCC expressly equated its routine network modification rules to its line conditioning rules in the *TRO*.[157]  BellSouth contends that the FCC's actions in that regard

---

[152] CompSouth Post Hearing Brief at pp. 97-98.
[153] BellSouth Post Hearing Brief at p. 106, *citing TRO* at ¶ 632.
[154] *Id., citing TRO* at ¶ 630 (quoting, *Iowa Utilities Board v. FCC*, 120 F.3d, 753, 813 (8th Cir. 1997)).
[155] BellSouth Post Hearing Brief at p. 107, *citing TRO* at ¶ 633.
[156] BellSouth Post Hearing Brief at p. 107, *citing USTA II* at ¶ 578.
[157] *Id., citing TRO* at ¶¶ 635 and 250.

DOCKET 29543 - #60

confirm that line conditioning is entirely a subset of routine network modifications.

b.     **The Position of CompSouth**

CompSouth urges the Commission to abort BellSouth's attempt to submerge the FCC's preexisting rules on line conditioning into the rules adopted in the *TRO* regarding routine network modifications. CompSouth points out that the line conditioning and routine network maintenance rules are contained in different, wholly separate subsections of the loop unbundling rules.[158] CompSouth asserts that a review of the rules in question clearly indicates that they cover different topics and set forth unique requirements for incumbent local exchange carriers. CompSouth thus states that line conditioning is not at all a "subset" of routine network modifications pursuant to the FCC's rules.[159]

CompSouth further expresses its fear that if BellSouth's interpretation that line sharing is indeed a subset of routine network modifications is adopted by the Commission, the result will be extremely detrimental to CLECs because BellSouth does not condition copper loops over 18,000 feet in length for its own DSL services. CompSouth represents that BellSouth will thus refuse to condition copper loops over 18,000 feet in length for CLECs thereby precluding CLECs from taking advantage of emerging technologies that allow DSL to be provided on loops longer than 18,000 feet if those lines are properly conditioned.[160]

---

[158] CompSouth Post Hearing Brief at p. 106, *citing* 47 C.F.R. § 51.319(a)(1)(iii) and 47 C.F.R. § 51.319(a)(i).
[159] *Id.* at pp. 106-107.
[160] *Id.* at p. 108.

DOCKET 29543 - #61

CompSouth also argues that a straightforward reading of the FCC's rules and orders indicates that line conditioning should be available at TELRIC rates. If BellSouth's interpretation of the rule is accepted, however, CompSouth maintains that BellSouth may demand exorbitant rates to undertake necessary line conditioning functions.[161]

c.    **The Findings and Conclusions of the Commission**

Having considered the foregoing, we conclude that line conditioning is not entirely subsumed within the context of routine network maintenance as that term is defined by the FCC. In fact, the FCC has a specific line conditioning rule, 47 C.F.R. § 319(a)(iii) that was reaffirmed by the FCC in the *TRO*. Said rule should be applied pursuant to the FCC's interpretations thereof.[162] We thus conclude that BellSouth shall be required to provide, for CLECs, the same routine network modifications and line conditioning that it normally performs in order to provide DSL services to its own customers even in instances where BellSouth does not provide advanced services to the CLEC end user in question.

6.  Issue 27.    *What is the appropriate process for establishing a rate, if any, to allow for the cost of a routine network modification that is not already recovered in Commission-approved recurring or nonrecurring rates? What is the appropriate language, if any, to incorporate into the ICAs?*

a.    **The Position of BellSouth**

BellSouth asserts that since it does not perform functions such as removing load coils on loops that exceed 18,000 feet or removing bridged taps on such loops as a routine network maintenance function,

---

[161] *Id.* at p. 108.
[162] *TRO* ¶¶ 632-641 and 642-648.

DOCKET 29543 - #62

the appropriate rate for such services is not TELRIC, but a commercial or tariffed rate. BellSouth further asserts that it should not be limited to TELRIC rates even when the activity the CLECs request was not included in the establishment of such a rate. BellSouth represents that it has no objection to performing nonstandard modifications if CLECs insist upon changes. BellSouth maintains, however, that it is entitled to be fully compensated for performing such functions.[163]

**b.      The Position of CompSouth**

CompSouth objects to any proposal that would allow BellSouth to impose individual case basis ("ICB") pricing for routine network modifications that are performed in the usual and normal course of BellSouth's provisioning of service to customers. CompSouth does not, however, object to the inclusion of language that permits BellSouth to seek cost recovery at the Commission if BellSouth can demonstrate that its routine network modification costs are not recovered in loop rates.

CompSouth does, however, object to BellSouth's alleged attempts to impose unpredictable "special construction" pricing to line conditioning functions. CompSouth requests that the Commission affirm that the TELRIC rates that it has already set for bridged tap removal and load coil removal, including the removal on loops greater than 18,000 feet in length, continue to apply.[164]

**c.      The Findings and Conclusions of the Commission**

We conclude that BellSouth should petition the Commission to establish/modify the rate for any routine network modifications it

---

[163] BellSouth Post Hearing Brief at p. 109.

DOCKET 29543 - #63

performs for which there is not a currently established Commission rate and/or for which BellSouth asserts that its costs are not recovered in loop rates.[165]    Interim rates for the aforementioned services can be established pending the establishment of final rates where applicable.

---

[164] CompSouth Post Hearing Brief at pp. 110-111.

[165] We note that pursuant to Order entered on May 31, 2002 in Docket 27821, *Generic Proceeding to Establish Prices for Interconnection Services and Unbundled Network Elements,* the Commission established that there should be no charge imposed by BellSouth for bridged tap removal and load coil removal on loops of less than 18,000 feet in length. The Commission did, however, establish rates for bridged tap and load coil removal on loops greater than 18,000 feet in length. Said rates remain effective unless and/or until modified by subsequent Commission Order.

DOCKET 29543 - #64

**III.     ORDERING PARAGRAPHS**

IT IS, ACCORDINGLY, ORDERED BY THE COMMISSION, That the foregoing Findings and Conclusions of the Commission are also adopted as the ordering paragraphs of the Commission in this matter.

IT IS FURTHER ORDERED BY THE COMMISSION, That the contractual language attached hereto as Appendix C shall be adopted by all affected entities for purposes of implementing the Findings and Conclusions of the Commission with respect to the issues raised and addressed by the Commission in this cause.

IT IS FURTHER ORDERED BY THE COMMISSION, That jurisdiction in this cause is hereby retained for the issuance of any further order or orders that may appear to be just and reasonable in the premises.

IT IS FURTHER ORDERED, That this Order shall be effective as of the date hereof.

DONE at Montgomery, Alabama, this 20th day of April , 2006.

ALABAMA PUBLIC SERVICE COMMISSION

Jim Sullivan, President

Jan Cook, Commissioner

George C. Wallace, Jr., Commissioner*

*Commissioner Wallace voted in favor of the findings and conclusions set forth herein but did not sign the order.

ATTEST: A True Copy

Walter L. Thomas, Jr., Secretary

**APPENDIX A**
**DOCKET 29543**

**Alabama**

| Wire | Fiber-Based Collocation | |
|------|-----------|-----------|
| Center | BellSouth | CompSouth |
| BRHMALMT | | |
| MTGMALDA | | |
| MTGMALMT | | |
| HNVIALMT | | |
| MOBLALAZ | >4 | >4 |

APPENDIX B
DOCKET 29543 - #1

| State | Wire Center | Total Business Lines | Number of FB Collocators if 3 or Greater | December 2004 Data | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | Interoffice Transport | | | High Capacity Loops | |
| | | | | Tier 1 | Tier 2 | Tier 3 | No Impairment for DS3 | No Impairment for DS1 |
| AL | BRHMALMT | 39,078 | - | X | | | | |
| AL | MTGMALDA | 32,752 | - | | X | | | |
| AL | MTGMALMT | 27,528 | - | | X | | | |
| AL | HNVIALMT | 26,690 | - | | X | | | |
| AL | HNVIALRA | 23,616 | - | | | X | | |
| AL | BRHMALRC | 21,159 | - | | | X | | |
| AL | MOBLALAZ | 20,101 | >4 | X | | | | |
| AL | HNVIALUN | 18,501 | - | | | X | | |
| AL | BRHMALHW | 17,485 | - | | | X | | |
| AL | TSCLALMT | 17,030 | - | | | X | | |
| AL | DCTRALMT | 16,878 | - | | | X | | |
| AL | MOBLALOS | 14,645 | - | | | X | | |
| AL | BRHMALOX | 13,367 | - | | | X | | |
| AL | MOBLALSH | 12,526 | - | | | X | | |
| AL | HNVIALPW | 11,875 | - | | | X | | |
| AL | ALBSALMA | 11,819 | - | | | X | | |
| AL | FLRNALMA | 11,427 | - | | | X | | |
| AL | BRHMALCH | 11,382 | - | | | X | | |
| AL | MOBLALSK | 10,799 | - | | | X | | |
| AL | BRHMALVA | 10,546 | - | | | X | | |
| AL | BRHMALOM | 9,999 | - | | | X | | |
| AL | GDSDALMT | 9,697 | - | | | X | | |
| AL | MTGMALNO | 9,442 | - | | | X | | |
| AL | CLMNALMA | 9,205 | - | | | X | | |
| AL | BSMRALMA | 8,889 | - | | | X | | |
| AL | BRHMALFS | 8,666 | - | | | X | | |
| AL | ANTNALMT | 8,610 | - | | | X | | |
| AL | AUBNALMA | 8,086 | - | | | X | | |
| AL | MDSNALNM | 7,785 | - | | | X | | |
| AL | SHFDALMT | 7,658 | - | | | X | | |
| AL | OPLKALMT | 6,754 | - | | | X | | |
| AL | SELMALMT | 6,599 | - | | | X | | |
| AL | TSCLALDH | 6,495 | - | | | X | | |
| AL | BRHMALWL | 6,441 | - | | | X | | |
| AL | MOBLALAP | 6,104 | - | | | X | | |
| AL | PHCYALMA | 5,905 | - | | | X | | |
| AL | ATHNALMA | 5,875 | - | | | X | | |
| AL | MOBLALSF | 5,799 | - | | | X | | |
| AL | JSPRALMT | 5,788 | - | | | X | | |
| AL | HNVIALLW | 5,784 | - | | | X | | |
| AL | BRHMALEN | 5,089 | - | | | X | | |
| AL | ANTNALOX | 4,651 | - | | | X | | |
| AL | TSCLALNO | 4,585 | - | | | X | | |
| AL | BRHMALEL | 4,409 | - | | | X | | |
| AL | BRHMALCP | 4,288 | - | | | X | | |
| AL | FRHPALMA | 4,277 | - | | | X | | |
| AL | TLDGALMA | 4,148 | - | | | X | | |
| AL | BRHMALEW | 4,106 | - | | | X | | |
| AL | PRVLALMA | 4,075 | - | | | X | | |
| AL | ALVLALMA | 4,070 | - | | | X | | |
| AL | FTPYALMA | 4,042 | - | | | X | | |
| AL | GTVLALNM | 3,878 | - | | | X | | |

APPENDIX B
DOCKET 29543 - #2

| State | Wire Center | Total Business Lines | Number of FB Collocators if 3 or Greater | December 2004 Data | | | | |
|-------|-------------|----------------------|------------------------------------------|--------------------|--|--|--|--|
| | | | | Interoffice Transport | | | High Capacity Loops | |
| | | | | Tier 1 | Tier 2 | Tier 3 | No Impairment for DS3 | No Impairment for DS1 |
| AL | EUFLALMA | 3,824 | - | | | X | | |
| AL | BRHMALTA | 3,564 | - | | | X | | |
| AL | MOBLALPR | 3,515 | - | | | X | | |
| AL | MOBLALSA | 3,378 | - | | | X | | |
| AL | HNVIALRW | 3,341 | - | | | X | | |
| AL | TROYALMA | 3,279 | - | | | X | | |
| AL | ALCYALMT | 3,272 | - | | | X | | |
| AL | BSMRALHT | 3,224 | - | | | X | | |
| AL | SYLCALMT | 3,013 | - | | | X | | |
| AL | WTMPALMA | 2,871 | - | | | X | | |
| AL | BYMNALMA | 2,792 | - | | | X | | |
| AL | CLANALMA | 2,732 | - | | | X | | |
| AL | BRTOALMA | 2,653 | - | | | X | | |
| AL | BOAZALMA | 2,583 | - | | | X | | |
| AL | DMPLALMA | 2,529 | - | | | X | | |
| AL | GDSDALRD | 2,299 | - | | | X | | |
| AL | RLVLALMA | 2,276 | - | | | X | | |
| AL | BRHMALWE | 2,257 | - | | | X | | |
| AL | MNTVALNM | 2,229 | - | | | X | | |
| AL | MOBLALTH | 2,209 | - | | | X | | |
| AL | TSKGALMA | 2,197 | - | | | X | | |
| AL | GRDLALNM | 2,106 | - | | | X | | |
| AL | HRTSALNM | 2,095 | - | | | X | | |
| AL | ANTNALLE | 2,049 | - | | | X | | |
| AL | BRHMALFO | 1,943 | - | | | X | | |
| AL | CLMBALMA | 1,829 | - | | | X | | |
| AL | GDSDALHS | 1,818 | - | | | X | | |
| AL | MTGMALMB | 1,805 | - | | | X | | |
| AL | MOBLALBF | 1,761 | - | | | X | | |
| AL | MOBLALSE | 1,716 | - | | | X | | |
| AL | MOLTALNM | 1,678 | - | | | X | | |
| AL | JCVLALMA | 1,543 | - | | | X | | |
| AL | PNSNALMA | 1,516 | - | | | X | | |
| AL | JCSNALNM | 1,507 | - | | | X | | |
| AL | ATTLALNM | 1,392 | - | | | X | | |
| AL | WRRRALNM | 1,261 | - | | | X | | |
| AL | HZGRALMA | 1,226 | - | | | X | | |
| AL | THVLALMA | 1,194 | - | | | X | | |
| AL | EVRGALMA | 1,175 | - | | | X | | |
| AL | CALRALMA | 1,174 | - | | | X | | |
| AL | CNVIALMA | 1,112 | - | | | X | | |
| AL | DDVLALMA | 996 | - | | | X | | |
| AL | DORAALMA | 994 | - | | | X | | |
| AL | FMTNALMT | 994 | - | | | X | | |
| AL | LVTNALLA | 994 | - | | | X | | |
| AL | HNVLALNM | 950 | - | | | X | | |
| AL | CHBGALMA | 917 | - | | | X | | |
| AL | GNBOALMA | 871 | - | | | X | | |
| AL | CHLSALMA | 807 | - | | | X | | |
| AL | KLLNALMA | 785 | - | | | X | | |
| AL | PDMTALMA | 775 | - | | | X | | |
| AL | LFYTALRS | 768 | - | | | X | | |

APPENDIX B
DOCKET 29543 - #3

| State | Wire Center | Total Business Lines | Number of FB Collocators If 3 or Greater | December 2004 Data | | | | |
|-------|-------------|----------------------|------------------------------------------|-------------------|--------|--------|--------|--------|
| | | | | Interoffice Transport | | | High Capacity Loops | |
| | | | | Tier 1 | Tier 2 | Tier 3 | No Impairment for DS3 | No Impairment for DS1 |
| AL | GYVLALNM | 748 | - | | | X | | |
| AL | RDBAALMA | 734 | - | | | X | | |
| AL | EUTWALMA | 721 | - | | | X | | |
| AL | BSMRALBU | 686 | - | | | X | | |
| AL | MARNALNM | 660 | - | | | X | | |
| AL | RRVLALMA | 610 | - | | | X | | |
| AL | CLMNALFA | 606 | - | | | X | | |
| AL | CTRNALNM | 583 | - | | | X | | |
| AL | WBTNALNM | 572 | - | | | X | | |
| AL | YORKALMA | 560 | - | | | X | | |
| AL | GRLYALMA | 497 | - | | | X | | |
| AL | CYTNALMA | 473 | - | | | X | | |
| AL | PHCYALFM | 462 | - | | | X | | |
| AL | VNCNALMA | 459 | - | | | X | | |
| AL | LNDNALMA | 458 | - | | | X | | |
| AL | CLMNALJC | 451 | - | | | X | | |
| AL | STSNALMA | 444 | - | | | X | | |
| AL | CRLDALMA | 433 | - | | | X | | |
| AL | MTVRALMA | 406 | - | | | X | | |
| AL | MCINALMA | 390 | - | | | X | | |
| AL | BLFNALMA | 363 | - | | | X | | |
| AL | MPVLALMA | 347 | - | | | X | | |
| AL | HNVLALBR | 334 | - | | | X | | |
| AL | LGTNALMA | 314 | - | | | X | | |
| AL | BRPTALMA | 312 | - | | | X | | |
| AL | CRHLALNM | 297 | - | | | X | | |
| AL | CRDVALMA | 292 | - | | | X | | |
| AL | ATHNALER | 285 | - | | | X | | |
| AL | UNTWALNM | 261 | - | | | X | | |
| AL | OHTCALMA | 255 | - | | | X | | |
| AL | FTDPALMA | 254 | - | | | X | | |
| AL | TWCKALMA | 250 | - | | | X | | |
| AL | PRSHALNM | 216 | - | | | X | | |
| AL | TLDGALRF | 213 | - | | | X | | |
| AL | HRTSALPE | 200 | - | | | X | | |
| AL | GDWRALMA | 194 | - | | | X | | |
| AL | HLVIALMA | 194 | - | | | X | | |
| AL | HRBOALOM | 180 | - | | | X | | |
| AL | BSMRALBP | 166 | - | | | X | | |
| AL | LXTNALMA | 134 | - | | | X | | |
| AL | MNFDALMA | 112 | - | | | X | | |
| AL | EUTWALBO | 49 | - | | | X | | |
| | | | | | | | | |
| | Total | 688,366 | | 2 | 3 | 141 | - | - |

<u>**APPENDIX C**</u>
<u>**DOCKET 29543**</u>

<u>**COMMISSION RECOMMENDED CONTRACTUAL LANGUAGE BY ISSUE**</u>

I.   **271 Related Issues (Issues 8, 14, 17, 18 and 22)**

    A.  **Issue 8.**  **Does the Commission have the authority to require BellSouth to include in its interconnection agreements entered into pursuant to § 252, network elements under either state law, or pursuant to § 271 or any other federal law other than § 271?**

        **Recommended Language:**

        No language is necessary as the Findings and Conclusions of the Commission dictate the duties of the affected entities.

    B.  **Issue 14.**  **What is the scope of commingling allowed under the FCC's rules and orders and what language should be included in interconnection agreements to implement commingling (including rates)?**

        **Recommended Language:**

**Commingling of Services:**

    Commingling means the connecting, attaching, or otherwise linking of a Network Element, or a combination, to one or more Telecommunications Services or facilities that <<customer-shortname>> has obtained at wholesale from BellSouth, or the combining of a Network Element or Combination with one or more such wholesale Telecommunications Services or facilities. The wholesale services that can be commingled with Network Elements or a Combination include network elements required to be unbundled under Section 271. <<customer-shortname>> must comply with all rates, terms or conditions applicable to such wholesale Telecommunications Services or facilities.

    Subject to the limitations set forth elsewhere in this Appendix, BellSouth shall not deny access to a Network Element or a Combination on the grounds that one or more of the elements: 1) is connected to, attached to, linked to, or combined with such a facility or service obtained from BellSouth; or 2) shares part of BellSouth's network with access services or inputs for mobile wireless services and/or interexchange services.

    Unless expressly prohibited by the terms of this Attachment, BellSouth shall permit <<customer-shortname>> to Commingle an Unbundled Network Element or a Combination of unbundled Network Elements with wholesale services obtained from BellSouth, services obtained from third parties or facilities provided by <<customer-shortname>>.  For purposes of example only, <<customer-shortname>> may Commingle unbundled Network Elements or Combinations of unbundled Network Elements with wholesale services including

APPENDIX C
DOCKET 29543 - #2

switched and special access services, or services purchased under resale arrangements with BellSouth.

Unless otherwise agreed to by the Parties, the Network Element portion of a commingled circuit will be billed at the rates set forth in this Agreement and the remainder of the circuit or service will be billed in accordance with BellSouth's tariffed rates or rates set forth by separate agreement.

When multiplexing equipment is attached to a commingled arrangement, the multiplexing equipment will be billed from the same agreement or tariff as the higher bandwidth circuit. Central Office Channel Interfaces (COCI) will be billed from the same agreement or tariff as the lower bandwidth circuit.

Terms and conditions for order cancellation charges and Service Date Advancement Charges will apply in accordance with Attachment _ and are incorporated herein by this reference. The charges shall be as se forth in Exhibit _.

**C.  Issue 17    Is BellSouth obligated pursuant to the Telecommunications Act of 996 and FCC orders to provide line sharing to new CLEC customers after October 1, 2004?**

**Issue 18    If the answer to Issue 17 is negative, what is the appropriate language for transitioning all of the CLECs' line sharing arrangements?**

**Recommended Language:**

**Line Sharing:**

**General:** Line Sharing is defined as the process by which <<customer-shortname>> provides digital subscriber line service ("xDSL") over the same copper Loop that BellSouth uses to provide retail voice service, with BellSouth using the low frequency portion of the Loop and <<customer-shortname>> using the high frequency spectrum (as defined below) of the Loop.

**Availability:** Line Sharing arrangements in service as of October 1, 2003 under a prior Interconnection  Agreement between BellSouth and <<customer-shortname>>, will remain in effect until the End User discontinues or moves xDSL service with <<customer-shortname>>. Arrangements pursuant to this Section will be billed at the rates set forth in Exhibit _.

For Line Sharing arrangements placed in service between October 2, 2003, and October 1, 2004, the rates will be as set forth in Exhibit _.

For Line Sharing arrangements placed in service on or after October 2, 2004 (whether under this Agreement only, or under this Agreement and a prior Agreement), the rates will be as set forth in Exhibit _.

APPENDIX C
DOCKET 29543 - #3

Any Line Sharing arrangements placed in service on or after October 2, 2003; and not otherwise terminated, shall terminate on October 2, 2006.

No new line sharing arrangements may be ordered.

**Definitions/Technical Requirements:** The High Frequency Spectrum is defined as the frequency range above the voiceband on a copper Loop facility carrying analog circuit-switched voiceband transmissions. Access to the High Frequency Spectrum is intended to allow <<customer-shortname>> the ability to provide xDSL data services to the End User for which BellSouth provides voice services.

The High Frequency Spectrum shall be available for any version of xDSL complying with Spectrum Management Class 5 of ANSI TI.417, American National Standard for Telecommunications, Spectrum Management for Loop Transmission Systems. BellSouth will continue to have access to the low frequency portion of the Loop spectrum (from 300 Hertz to at least 3000 Hertz, and potentially up to 3400 Hertz, depending on equipment and facilities) for the purposes of providing voice service. <<customer-shortname>> shall only use xDSL technology that is within the PSD mask for Spectrum Management Class 5 as found in the abovementioned document.

Access to the High Frequency Spectrum requires an unloaded, 2-wire copper Loop. An unloaded Loop is a copper Loop with no load coils lowpass filters, range extenders, DSLAMs, or similar devices and minimal bridged taps consistent with ANSI T1.413 and TI.601.

**Loop Modification:** BellSouth will provide Loop Modification to <<customer-shortname>> on an existing Loop for Line Sharing in accordance with procedures as specified in Section 2 of this Attachment. BellSouth is not required to modify a Loop for access to the High Frequency spectrum if modification of that Loop significantly degrades BellSouth's voice service. If <<customer-shortname>> requests that BellSouth modify a Loop and such modification significantly degrades the voice services on the Loop, <<customer-shortname>> shall pay for the Loop to be restored to its original state.

**Termination/Disconnection of Analog Voice Service:** Line Sharing shall only be available on Loops on which BellSouth is also providing, and continues to provide, analog voice service directly to the End User. In the event the End User terminates its BellSouth provided voice service for any reason, or in the event BellSouth disconnects the End User's voice service pursuant to its tariffs or applicable law, and <<customer-shortname>> desires to continue providing xDSL service on such Loop, <<customer-shortname>> or the new voice provider, or both, shall be required to purchase a full stand-alone Loop. In those cases in which BellSouth no longer provides voice service to the End User and <<customer-shortname>> purchases the full stand-alone Loop, <<customer-shortname>> may elect the type of Loop it will purchase. <<customer-shortname>> will pay the appropriate recurring and nonrecurring rates for such Loop as set forth in Exhibit A to this Attachment. In the event <<customer-

APPENDIX C
DOCKET 29543 - #4

shortname>> purchases a voice grade Loop, <<customer-shortname>> acknowledges that such Loop may not remain xDSL compatible.

In the event the End User terminates its BellSouth provided voice service, and <<customer-shortname>> requests BellSouth to convert the Line Sharing arrangement to a Line Splitting arrangement (see below), BellSouth will discontinue billing <<customer-shortname>> for the High Frequency Spectrum and begin billing <<customer-shortname>> for the full stand-alone Loop. BellSouth will continue to bill <<customer-shortname>> for all associated splitter charges if <<customer-shortname>> continues to use a BellSouth splitter. Only one CLEC shall be permitted access to the High Frequency Spectrum of any particular Loop.

Once BellSouth has placed cross-connects on behalf of <<customer-shortname>> to provide <<customer-shortname>> access to the High Frequency Spectrum and chooses to rearrange its splitter or CLEC pairs, <<customer-shortname>> may order the rearrangement of its splitter or cable pairs via "Subsequent Activity". Subsequent Activity is any rearrangement of <<customer-shortname>>'s cable pairs or splitter ports after BellSouth has placed cross-connection to provide <<customer-shortname>> access to the High Frequency Spectrum.

BellSouth shall bill and <<customer-shortname>> shall pay the Subsequent Activity charges as set forth in Exhibit A of this Attachment.

BellSouth's Local Ordering Handbook (LOH) will provide <<customer-shortname>> the LSR format to be used when ordering disconnections of the High Frequency Spectrum or Subsequent Activity.

**Maintenance and Repair - Line Sharing:** <<customer-shortname>> shall have access for repair and maintenance purposes to any Loop for which it has access to the High Frequency Spectrum. <<customer-shortname>> may test from the collocation space, the Termination Point, or the NID. BellSouth will be responsible for repairing voice services and the physical line between the NID at the End User's premises and the Termination Point. <<customer-shortname>> will be responsible for repairing its data services. Each Party will be responsible for maintaining its own equipment.

<<customer-shortname>> shall inform its End Users to direct data problems to <<customer-shortname>>, unless both voice and data services are impaired, in which event <<customer-shortname>> should direct the End Users to contact BellSouth. Once a Party has isolated a trouble to the other Party's portion of the Loop, the Party isolating the trouble shall notify the End User that the trouble is on the other Party's portion of the Loop.

D. **Issue 22.** **What is the appropriate interconnection language, if any, to address access to call related data bases?**

**Recommended Language:**

APPENDIX C
DOCKET 29543 - #5

## Call Related Data bases and Signaling:

Call Related Data bases are the data bases other than OSS that are used in signaling networks, for billing and collection, or the transmission, routing or other provision of a Telecommunication Service. Notwithstanding anything to the contrary herein, BellSouth shall only provide unbundled access to call related data bases and signaling including but not limited to, BellSouth Switched Access 8XX Toll Free Dialing Ten Digit Screening Service, LIDB, Signaling, Signaling Link Transport, STP, SS7 AIN Access, Service Control Point(SCP\Data bases, Local Number Portability (LNP) Data bases and Calling Name (CNAM) Data base Service pursuant to this Agreement where BellSouth is required to provide and is providing Local Switching or UNE-P to <<customer-shortname>> pursuant to this Agreement.

## BellSouth Switched Access (SWA) 8XX Toll Free Dialing Ten Digit Screening Service:

The BellSouth SWA 8XX Toll Free Dialing Ten Digit Screening Service data base (8XX SCP Data base) is a SCP that contains customer record information and the functionality to provide call-handling instructions for 8XX calls. The 8XX SCP IN software stores data downloaded from the national SMS/8XX data base and provides the routing instructions in response to queries from the SSP or tandem. The BellSouth SWA 8XX Toll Free Dialing Ten Digit Screening Service (8XX TFD Service) utilizes the 8XX SCP Data base to provide identification and routing of the 8XX calls, based on the ten digits dialed. At <<customer-shortname>>'s option, 8XX TFD Service is provided with or without POTS number delivery, dialing number delivery, and other optional complex features as selected by <<customer-shortname>>. The 8XX SCP Data base is designated to receive and respond to queries using the ANSI Specification of SS7 protocol.

## LIDB:

LIDB is a transaction-oriented data base accessible through Common Channel Signaling (CCS) networks. For access to LIDB, <<customer-shortname>> must purchase appropriate signaling links pursuant to Section X.4 below. LIDB contains records associated with End User Line Numbers and Special Billing Numbers. LIDB accepts queries from other Network Elements and provides appropriate responses. The query originator need not be the owner of LIDB data. LIDB queries include functions such as screening billed numbers that provides the ability to accept Collect or Third Number Billing calls and validation of Telephone Line Number based non-proprietary calling cards. The interface for the LIDB functionality is the interface between BellSouth's CCS network and other CCS networks. LIDB also interfaces to administrative systems.

## LIDB Technical Requirements:

BellSouth will offer to <<customer-shortname>> any additional capabilities that are developed for LIDB during the life of this Agreement

APPENDIX C
DOCKET 29543 - #6

BellSouth shall process <<customer-shortname>>'s customer records in LIDB at least at parity with BellSouth customer records, with respect to other LIDB functions. BellSouth shall indicate to <<customer-shortname>> what additional functions (if any) are performed by LIDB in the BellSouth network.

Within two (2) weeks after a request by <<customer-shortname>>, BellSouth shall provide <<customer-shortname>> with a list of the customer data items, which <<customer-shortname>> would have to provide in order to support each required LIDB function. The list shall indicate which data items are essential to LIDB function and which are required only to support certain services. For each data item, the list shall show the data formats, the acceptable values of the data item and the meaning of those values.

BellSouth shall provide LIDB systems for which operating deficiencies that would result in calls being blocked shall not exceed thirty (30) minutes per year.

BellSouth shall provide LIDB systems for which operating deficiencies that would not result in calls being blocked shall not exceed twelve (12) hours per year.

BellSouth shall provide LIDB systems for which the LIDB function shall be in overload no more than twelve (12) hours per year.

All additions, updates and deletions of <<customer-shortname>> data to the LIDB shall be solely at the direction of <<customer-shortname>>. Such direction from <<customer-shortname>> will not be required where the addition, update or deletion is necessary to perform standard fraud control measures (e.g., calling card auto-deactivation).

BellSouth shall provide priority updates to LIDB for <<customer-shortname>> data upon <<customer-shortname>>'s request (e.g., to support fraud detection), via password-protected telephone card, facsimile, or electronic mail within one hour of notice from the established BellSouth contact.

BellSouth shall provide LIDB systems such that no more than 0.01% of <<customer-shortname>> customer records will be missing from LIDB, as measured by <<customer-shortname>> audits. BellSouth will audit <<customer-shortname>> records in LIDB against Data Base Administration System (DBAS) to identify record mismatches and provide this data to a designated <<customer-shortname>> contact person to resolve the status of the records and BellSouth will update system appropriately. BellSouth will refer record of mismatches to <<customer-shortname>> within one (1) business day of audit. Once reconciled records are received back from <<customer-shortname>>, BellSouth will update LIDB the same business day if less than five hundred (500) records are received before 1:00 p.m. Central Standard Time.

If more than five hundred (500) records are received, BellSouth will contact <<customer-shortname>> to negotiate a time frame for the updates, not to exceed three (3) business days.

APPENDIX C
DOCKET 29543 - #7

BellSouth shall perform backup and recovery of all of <<customer-shortname>>'s data in LIDB including sending to LIDB all changes made since the date of the most recent backup copy, in at least the same time frame BellSouth performs backup and recovery of BellSouth data in LIDB for itself. Currently, BellSouth performs backups of the LIDB for itself on a weekly basis; and when a new software release is scheduled, a backup is performed prior to loading the new release.

BellSouth shall provide <<customer-shortname>> with LIDB reports of data which are missing or contain errors, as well as any misrouted errors, within a reasonable time period as negotiated between <<customer-shortname>> and BellSouth

BellSouth shall prevent any access to or use of <<customer-shortname>> data in LIDB by BellSouth personnel that are outside of established administrative and fraud control personnel, or by any other Party that is not authorized by <<customer-shortname>> in writing.

BellSouth shall provide <<customer-shortname>> performance of the LIDB Data Screening function, which allows a LIDB to completely or partially deny specific query originators access to LIDB data owned by specific data owners, for Customer Data that is part of an NPA-NXX or RAO-0/1XX wholly or partially owned by <<customer-shortname>> at least at parity with BellSouth Customer Data. BellSouth shall obtain from <<customer-shortname>> the screening information associated with LIDB Data Screening of <<customer-shortname>> data in accordance with this requirement. BellSouth currently does not have LIDB Data Screening capabilities. When such capability is available, BellSouth shall offer it to<<customer-shortname>> under the BFR/NBR Process as set forth in Attachment __.

BellSouth shall accept queries to LIDB associated with <<customer-shortname>> customer records and shall return responses in accordance with industry standards.

BellSouth shall provide mean processing time at the LIDB within 0.50 seconds under normal conditions as defined in industry standards.

BellSouth shall provide processing time at the LIDB within one (1) second for ninety-nine percent (99%) of all messages under normal conditions as defined in industry standards.

**LIDB Interface Requirements:**

BellSouth shall offer LIDB in accordance with the requirements of this subsection.

The interface to LIDB shall be in accordance with the technical references contained within.

APPENDIX C
DOCKET 29543 - #8

The CCS interface to LIDB shall be the standard interface described herein.

The LIDB Data Base interpretation of the ANSI-TCAP messages shall comply with the technical reference herein. Global Title Translation (GTT) shall be maintained in the signaling network in order to support signaling network routing to the LIDB.

The application of the LIDB rates contained in Exhibit _ will be based on a Percent CLEC LIDB Usage (PCLU) factor. <<customer-shortname>> shall provide BellSouth a PCLU. The PCLU will be applied to determine the percentage of total LIDB usage to be billed to the other Party at local rates. <<customer-shortname>> shall update its PCLU on the first of January, April, July and October and shall send it to BellSouth to be received no later than thirty (30) calendar days after the first of each such month based on local usage for the past three months ending the last day of December, March, June and September, respectively. Requirements associated with PCLU calculation and reporting shall be as set forth in BellSouth's Jurisdictional Factors Reporting Guide.

## Signaling:

BellSouth shall offer access to signaling and access to BellSouth's signaling data bases subject to compatibility testing and at the rates set forth in this Attachment. BellSouth may provide mediated access to BellSouth signaling systems and data bases. Available signaling elements include signaling links, STPs and SCPs. Signaling functionality will be available with both A-link and B-link connectivity.

## Signaling Link Transport:

Signaling Link Transport is a set of two (2) or four (4) dedicated 56 kbps transmission paths between <<customer-shortname>> designated SPOI that provide appropriate physical diversity.

## Signaling Link Transport Technical Requirements:

Signaling Link Transport shall consist of full duplex mode 56 kbps transmission paths and shall perform in the following two ways:

As an "A-link" Signaling Link Transport is a connection between a switch or SCP and a home STP switch pair; and

As a "B-link" Signaling Link Transport is a connection between two (2) STP switch pairs in different company networks (e.g., between two (2) STP switch pairs for two (2) CLECs).

Signaling Link Transport shall consist of two (2) or more signaling link layers as follows:

APPENDIX C
DOCKET 29543 - #9

An A-link layer shall consist of two (2) links; and

A B-link layer shall consist of four (4) links.

A signaling link layer shall satisfy interoffice and intraoffice diversity of facilities and equipment, such that:

No single failure of facilities or equipment causes the failure of both links in an A-link layer (i.e.,the links should be provided on a minimum of two (2) separate physical paths end-to-end); and

No two (2) concurrent failures of facilities or equipment shall cause the failure of all four (4)links in a B-link layer (i.e., the links should be provided on a minimum of three (3) separate physical paths end-to-end).

**Signaling Interface Requirements:**

There shall be a DS1 (1.544 Mbps) interface at <<customer-shortname>>'s designated SPOIs. Each 56 kbps transmission path shall appear as a DS0 channel within the DS1 interface.

**STP:**

An STP is a signaling network function that includes all of the capabilities provided by the signaling transfer point switches and their associated signaling links that enables the exchange of SS7 messages among and between switching elements, data base elements and signaling transfer point switches.

**STP Technical Requirements:**

STPs shall provide access to BellSouth Local Switching or Tandem Switching and to BellSouth SCPs/Data bases connected to BellSouth SS7 network. STPs also provide access to third party local or tandem switching and third party provided STPs.

The connectivity provided by STPs shall fully support the functions of all other Network Elements connected to the BellSouth SS7 network. This includes the use of the BellSouth SS7network to convey messages that neither originate nor terminate at a signaling end point directly connected to the BellSouth SS7 network (i.e., transit messages). When the BellSouth SS7 network is used to convey transit messages, there shall be no alteration of the Integrated Services Digital Network User Part (ISDNUP) or Transaction Capabilities Application Part (TCAP) user data that constitutes the content of the message. Rates for ISDNUP and TCAP messages are as set forth in Exhibit A.

If a BellSouth tandem switch routes traffic, based on dialed or translated digits, on SS7 trunks between a <<customer-shortname>> local switch and third party local switch, the BellSouth SS7 network shall convey the TCAP messages that are necessary to provide Call Management features (Automatic Callback, Automatic Recall, and Screening List Editing) between <<customer-shortname>>

APPENDIX C
DOCKET 29543 - #10

local STPs and the STPs that provide connectivity with the third party local switch, even if the third party local switch is not directly connected to BellSouth STPs.

STPs shall provide all functions of the SCCP necessary for Class 0 (basic connectionless) service as defined in Telcordia ANSI Interconnection Requirements. This includes GTT and SCCP Management procedures, as specified in ANSI T1.112.4. Where the destination signaling point is a <<customer-shortname>> or third party local or tandem switching system directly connected to BellSouth SS7 network, BellSouth shall perform final GTT of messages to the destination and SCCP Subsystem Management of the destination. In all other cases, BellSouth shall perform intermediate GTT of messages to a gateway pair of STPs in an SS7 network connected with BellSouth SS7 network and shall not perform SCCP Subsystem Management of the destination. If BellSouth performs final GTT to a <<customer-shortname>> data base, then <<customer-shortname>> agrees to provide BellSouth with the Destination Point Code for <<customer-shortname>> data base.

STPs shall provide all functions of the Operations, Maintenance and Administration Part (OMAP) as specified in applicable industry standard technical references, which may include, where available in BellSouth's network, MTP Routing Verification Test (MRVT) and SCCPRouting Verification Test (SRVT).

Where the destination signaling point is a BellSouth local or tandem switching system or data base, or is a <<customer-shortname>> or third party local or tandem switching system directly connected to the BellSouth SS7 network, STPs shall perform MRVT and SRVT to the destination signaling point. In all other cases, STPs shall perform MRVT and SRVT to a gateway pair of STPs in an SS7 network connected with the BellSouth SS7 network. This requirement may be superseded by the specifications for Internetwork MRVT and SRVT when these become approved ANSI standards and available capabilities of BellSouth STPs.

**SS7:**

When technically feasible and upon request by <<customer-shortname>>, SS7 AIN Access shall be made available in association with switching. SS7 AIN Access is the provisioning of AIN 0.1 triggers in an equipped BellSouth local switch and interconnection of the BellSouth SS7 network with <<customer-shortname>>'s SS7 network to exchange TCAP queries and responses with a <<customer-shortname>> SCP.

SS7 AIN Access shall provide <<customer-shortname>> SCP access to an equipped BellSouth local switch via interconnection of BellSouth's SS7 and <<customer-shortname>> SS7 Networks. BellSouth shall offer SS7 AIN Access through its STPs. If BellSouth requires a mediation device on any part of its network specific to this form of access, BellSouth must route its messages in the same manner. The interconnection arrangement shall result in the BellSouth local switch recognizing the <<customer-shortname>> SCP as at least at parity with BellSouth's SCPs in terms of interfaces, performance and capabilities.

APPENDIX C
DOCKET 29543 - #11

**SS7 Interface Requirements:**

BellSouth shall provide the following STP options to connect <<customer-shortname>> or <<customer-shortname>>-designated Local Switching systems to the BellSouth SS7 network:

An A-link interface from <<customer-shortname>> Local Switching systems; and A B-link interface from <<customer-shortname>> local STPs.

Each type of interface shall be provided by one or more layers of signaling links.

The SPOI for each link shall be located at a cross-connect element in the CO where the BellSouth STP is located. There shall be a DS1 or higher rate transport interface at each of the SPOIs. Each signaling link shall appear as a DS0 channel within the DS1 or higher rate interface.

BellSouth shall provide intraoffice diversity between the SPOI and BellSouth STPs so that no single failure of intraoffice facilities or equipment shall cause the failure of both B-links in a layer connecting to a BellSouth STP.

STPs shall provide all functions of the MTP as defined in the applicable industry standard technical references.

**Message Screening:**

BellSouth shall set message screening parameters so as to accept valid messages from <<customer-shortname>> local or tandem switching systems destined to any signaling point within BellSouth's SS7 network where the <<customer-shortname>> switching system has a valid signaling relationship.

BellSouth shall set message screening parameters so as to pass valid messages from <<customer-shortname>> local or tandem switching systems destined to any signaling point or network accessed through BellSouth's SS7 network where the <<customer-shortname>> switching system has a valid signaling relationship.

BellSouth shall set message screening parameters so as to accept and pass/send valid messages destined to and from <<customer-shortname>> from any signaling point or network interconnected through BellSouth's SS7 network where the <<customer-shortname>> SCP has a valid signaling relationship.

**SCP/Data bases:**

Call Related Data bases provide the storage of, access to, and manipulation of information required to offer a particular service and/or capability. BellSouth shall provide access to the following Data bases: LNP, LIDB, Toll Free Number Data base, ALI/DMS, and CNAM Data base. BellSouth also provides access to SCE/SMS application data bases and DA.

APPENDIX C
DOCKET 29543 - #12

A SCP is deployed in a SS7 network that executes service application logic in response to SS7 queries sent to it by a switching system also connected to the SS7 network. SMS provides operational interfaces to allow for provisioning, administration and maintenance of subscriber data and service application data stored in SCPs.

**SCPs/Data bases Technical Requirements:**

BellSouth shall provide physical access to SCPs through the SS7 network and protocols with TCAP as the application layer protocol.

BellSouth shall provide physical interconnection to data bases via industry standard interfaces and protocols (e.g., SS7, ISDN and X.25).

The reliability of interconnection options shall be consistent with requirements for diversity and survivability.

**LNP Data base:**

The Permanent Number Portability (PNP) data base supplies routing numbers for calls involving numbers that have been ported from one local service provider to another.BellSouth agrees to provide access to the PNP data base at rates, terms and conditions as set forth by BellSouth and in accordance with an effective FCC or Commission directive.

**CNAM Data base Service:**

CNAM is the ability to associate a name with the calling party number, allowing the End User (to which a call is being terminated) to view the calling party's name before the call is answered. The calling party's information is accessed by queries launched to the CNAM data base. This service also provides <<customer-shortname>> the opportunity to load and store its subscriber names in the BellSouth CNAM SCPs.

<<customer-shortname>> shall submit to BellSouth a notice of its intent to access and utilize BellSouth CNAM Data base Services. Said notice shall be in writing no less than sixty (60) days prior to <<customer-shortname>> access to BellSouth's CNAM Data base Services and shall be addressed to <<customer-shortname>>'s Local Contract Manager.

<<customer-shortname>>'s End Users' names and numbers related to UNE-P Services and shall be stored in the BellSouth CNAM data base, and shall be available, on a per query basis only, to all entities that launch queries to the BellSouth CNAM data base. BellSouth, at its sole discretion, may opt to interconnect with and query other calling name data bases. In the event BellSouth does not query a third party calling name data base that stores the calling party's information, BellSouth cannot deliver the calling party's information to a called End User. In addition, BellSouth cannot deliver the calling party's information where the calling party subscribes to any service that would block or

APPENDIX C
DOCKET 29543 - #13

otherwise cause the information to be unavailable. For each <<customer-shortname>> End User that subscribes to a switch based vertical feature providing calling name information to that End User for calls received, BellSouth will launch a query on a per call basis to the BellSouth CNAM data base, or, subject to Section _ above, to a third party calling name data base, to provide calling name information, if available, to <<customer-shortname>>'s End User. <<customer-shortname>> shall pay the rates set forth in Exhibit _, on a per query basis, for each query to the BellSouth CNAM data base made on behalf of an <<customer-shortname>> End User that subscribes to the appropriate vertical features that support Caller ID or a variation thereof. In addition, <<customer-shortname>> shall reimburse BellSouth for any charges BellSouth pays to third party calling name data base providers for queries launched to such data base providers for the benefit of <<customer-shortname>>'s End Users.

BellSouth currently does not have a billing mechanism for CNAM queries. Until a mechanized billing solution is available for CNAM queries, BellSouth shall bill <<customer-shortname>> at the applicable rates set forth in Exhibit _ based on a surrogate of two hundred and fifty-six (256) data base queries per month per <<customer-shortname>>'s End Users with the Caller ID feature.

**SCE/SMS AIN Access:**

BellSouth's SCE/SMS AIN Access shall provide <<customer-shortname>> the capability to create service applications in a BellSouth SCE and deploy those applications in a BellSouth SMS to a BellSouth SCP.

BellSouth's SCE/SMS AIN Access shall provide access to SCE hardware, software, testing and technical support (e.g., help desk system administrator) resources available to <<customer-shortname>>. Training, documentation, and technical support will address use of SCE and SMS access and administrative functions but will not include support for the creation of a specific service application.

BellSouth SCP shall partition and protect <<customer-shortname>> service logic and data from unauthorized access.

When <<customer-shortname>> selects SCE/SMS AIN Access, BellSouth shall provide training, documentation, and technical support to enable <<customer-shortname>> to use BellSouth's SCE/SMS AIN Access to create and administer applications. <<customer-shortname>> access will be provided via remote data connection (e.g., dial-in, ISDN).

BellSouth shall allow <<customer-shortname>> to download data forms and/or tables to BellSouth SCP via BellSouth SMS without intervention from BellSouth.

**Automatic Location Identification/Data Management System:**

**911 and E911 Data bases:**

APPENDIX C
DOCKET 29543 - #14

BellSouth shall provide <<customer-shortname>> with nondiscriminatory access to 911 and E911 data bases on an unbundled basis, in accordance with 47 C.F.R. § 51.319 (f).

The ALI/DMS data base contains End User information (including name, address, telephone information, and sometimes special information from the local service provider or End User) used to determine to which PSAP to route the call. The ALI/DMS data base is used to provide enhanced routing flexibility or E911. <<customer-shortname>> will be required to provide the BellSouth 911 data base vendor daily service order updates to E911 data base in accordance with Section _ below.

**911/E911 Technical Requirements:**

BellSouth's 911 data base vendor shall provide <<customer-shortname>> the capability of providing updates to the ALI/DMS data base through a specified electronic interface. <<customer-shortname>> shall contact BellSouth's 911 data base vendor directly to request interface. <<customer-shortname>> shall provide updates directly to BellSouth's 911 data base vendor on a daily basis. Updates shall be the responsibility of <<customer-shortname>> and BellSouth shall not be liable for the transactions between <<customer-shortname>> and BellSouth's 911 data base vendor.

It is <<customer-shortname>>'s responsibility to retrieve and confirm statistical data and to correct errors obtained from BellSouth's 911 data base vendor on a daily basis. All errors will be assigned a unique error code and the description of the error and the corrective action is described in the CLEC Users Guide for Facility Based Providers that is found on the BellSouth Interconnection Web site.

<<customer-shortname>> shall conform to the BellSouth standards as described in the CLEC Users Guide to E911 for Facilities Based Providers that is located on the BellSouth's Interconnection Web site: www.interconnection.bellsouth.com/guides.

**Stranded Unlocks:**

Stranded unlocks are defined as End User records in BellSouth's ALI/DMS data base that have not been migrated for over ninety (90 days to <<customer-shortname>>, as a new provider of local service to the End User. Stranded Unlocks are those End User records that have been "unlocked" by the previous local exchange carrier that provided service to the End User and are open for <<customer-shortname>> to assume responsibility for such records.

Based upon End User record ownership information available in the NPAC data base, BellSouth shall provide a Stranded Unlock annual report to <<customer-shortname>> that reflects all Stranded Unlocks that remain in the ALI/DMS data base for over ninety (90) days. <<customer-shortname>> shall review the Stranded Unlock report, identify its End User records and request to

APPENDIX C
DOCKET 29543 - #15

either delete such records or migrate the records to <<customer-shoItname>> within two (2) months following the date of the Stranded Unlock report provided by BellSouth. <<customer-shortname>> shall reimburse BellSouth for any charges BellSouth's data base vendor imposes on BellSouth for the deletion of <<customer-shortname>>'s records.

**911 PBX Locate Service®:**

911 PBX Locate Service is comprised of a data base capabiIity and a separate transport component.

Description of Product. The transport component provides a dedicated trunk path from a Private Branch Exchange (PBX) switch to the appropriate BellSouth 911 tandem.

The data base capability of 911 PBX Locate Service() allows <<customer-shortname>> to offer an E911 service to its PBX End Users that identifies to the PSAP the physical location of the <<customer-shortname>> PBX 911 End User station telephone number for the 911 call that is placed b·the End User.

<<customer-shortname>> may order either the data base capability or the transport component as desired or <<customer-shortname>> may cder both components of the service.

**911 PBX Locate Data base Capability:**

<<customer-shortname>>'s End User or <<customer-shortname>>'s End User's data base management agent (DMA) must provide the End User PBX station telephone numbers and corresponding address and location data to BellSouth's 911 data base vendor. The data will be loaded and maintained in BellSouth's ALI data base.

Ordering, provisioning, testing and maintenance shall be provided by <<customer-shortname>> pursuant to the 911 PBX Locate Marketing Service Description (MSD) that is located on the BellSouth Interconnection Web site.

<<customer-shortname>>'s End User, or <<customer-shortname>>'s End User data base management agent must provide ongoing updates to BellSouth's 911 data base vendor within a commercially reasonable time frame of all PBX station telephone number adds, moves and deletions. It will be the responsibility of <<customer-shortname>> to ensure that the End User or DMA maintain the data pertaining to each End User's extension managed by the 911 PBX Locate Service product. <<customer-shortname>> should not submit telephone number updates for specific PBX station telephone numbers that are submitted by <<customer-shortname>>'s End User, or <<customer-shortname>>'s End User DMA under the terms of 911 PBX Locate product.

<<customer-shortname>> must provision all PBX station numbers in the same LATA as the E911 tandem.

APPENDIX C
DOCKET 29543 - #16

<<customer-shortname>> agrees to release, indemnify, defend and hold harmless BellSouth from any and all loss, claims, demands, suits, or other action, or any liability whatsoever, whether suffered, made, instituted or asserted by <<customer-shortname>>'s End User or by any other party or person, for any personal injury to or death of any person or persons, or for any loss, damage or destruction of any property, whether owned by <<customer-shortname>> or others, or for any infringement or invasion of the right of privacy of any person or persons, caused or claimed to have been caused, directly or indirectly, by the installation, operation, failure to operate, maintenance, removal, presence, condition, location or use of PBX Locate Service features or by any services which are or may be furnished by BellSouth in connection therewith, including but not limited to the identification of the telephone number, address or name associated with the telephone used by the party or parties accessing 911 services using 911 PBX Locate Service hereunder, except to the extent caused by BellSouth's gross negligence or willful misconduct. <<customer-shortname>> is responsible for assuring that its authorized End Users comply with the provisions of these terms and that unauthorized persons do not gain access to or use the 911 PBX Locate Service through user names, passwords, or other identifiers assigned to <<customer-shortname>>'s End User or DMA pursuant to these terms. Specifically, <<customer-shortname>>'s End User or DMA must keep and protect from use by any unauthorized individual identifiers, passwords, and any other security token(s) and devices that are provided for access to this product.

<<customer-shortname>> may only use BellSouth PBX Locate Service solely for the purpose of validating and correcting 911 related data for <<customer-shortname>>'s End Users' telephone numbers for which it has direct management authority.

**911 PBX Locate Transport Component:**

The 911 PBX Locate Service transport component requires <<customer-shortname>> to order a CAMA type dedicated trunk from <<customer-shortname>>'s End User premise to the appropriate BellSouth 911 tandem pursuant to the following provisions.

Except as otherwise set forth below, a minimum of two (2) End User specific, dedicated 911 trunks are required between the <<customer-shortname>>'s End User premise and the BellSouth 911 tandem as described in BellSouth's Technical Reference (TR) 73576 and in accordance with the 911 PBX Locate Marketing Service Description located on the BellSouth Interconnection Web site. <<customer-shortname>> is responsible for connectivity between the End User's PBX and <<customer-shortname>>'s switch or POP location. <<customer-shortname>> will then order 911 trunks from their switch or POP location to the BellSouth 911 tandem. The dedicated trunks shall be, at a minimum, DS0 level trunks configured as part of a digital interface (delivered over a <<customer-shortname>> purchased DS1 facility that hands off at a DS1 or higher level digital or optical interface). <<customer-shortname>> is responsible for ensuring that the PBX switch is capable of sending the calling

APPENDIX C
DOCKET 29543 - #17

station's Direct Inward Dial (DID) telephone number to the BellSouth 911 tandem in a specified Multi-frequency (MF) Address Signaling Protocol. If the PBX switch supports Primary Rate ISDN (PRI) and the calling stations are DID numbers, then the 911 call can be transmitted using PRI, and there will be no requirement for the PBX Locate Transport component.

**Ordering and Provisioning:**

<<customer-shortname>> will submit an Access Service Request (ASR) to BellSouth to order a minimum of two (2) End User specific 911 trunks from its switch or POP location to the BellSouth 911 tandem.

Testing and maintenance shall be provided by <<customer-shortname>> pursuant to the 911 PBX Locate Marketing Service description that is located on the BellSouth Interconnection Web site.

**Rates for 911 PBX Local Service:**

Rates for the 911 PBX Locate Service data base component are set forth in Exhibit __.Trunks and facilities for 911 PBX Locate transport component may be ordered by <<customer-shortname>> pursuant to the terms and conditions set forth in Attachment __.

II.    **Transitional Issues (Issues 2, 3, 4, 5, 9, 10, 11 and 32)**

A.  Issue 2.    ***TRRO Transition Plan - What is the appropriate language to implement the FCC's transition plan for (1) switching, (2) high capacity loops and (3) dedicated transport as detailed in the FCC's TRRO, issued February 4, 2005?***

Issue 11.    **UNEs That Are Not Converted: *What rates, terms and conditions, if any, should apply to UNEs that are not converted on or before March 11, 2006, and what impact, if any, should the conduct of the parties have upon the determination of the applicable rates, terms, and conditions that apply in such circumstances?***

**Recommended Language:**

The foregoing language is applicable to CLECs that have current interconnection agreements with BellSouth:

**Transition for DS1 and DS3 Loops:**

**Definitions:**

For purposes of this Section __, the Transition Period for the Embedded Base of DS1 and DS3 Loops and for the Excess DS1 and DS3 Loops is the twelve (12) month period beginning March 11, 2005 and ending March 10, 2006.

For purposes of this Section __, Embedded Base means DS1 and DS3 Loops that were in service for <<customer-shortname>> as of March 11, 2005,

APPENDIX C
DOCKET 29543 - #18

(and/or were added during the Transition Period as permitted by Commission order), in those wire centers that, as of such date (or thereafter as applicable), met the criteria set forth in Section —. The Embedded Base shall not include subsequent disconnects and/or lost End Users.

Excess DS1 and DS3 Loops are those <<customer-shortname>> DS1 and DS3 Loops in service as of March 11, 2005 (or added during the Transition Period) pursuant to Commission Order in excess of the caps set forth in Sections _ and _ below, respectively. Subsequent disconnects and/or lost End Users shall be removed from the calculation of Excess DS1 and DS3 Loops.

**Transition Period Pricing:**

From March 11, 2005, through the expiration of the Transition Period on March 10, 2006, BellSouth shall charge/collect a rate for <<customer-shortname>>'s Embedded Base and <<customer-shortname>>'s Excess DS1 and DS3 Loops equal to the higher of:

115% of the rate paid for that element on June 15, 2004; or

115% of any new rate the Commission established between June 16, 2004 and March 11, 2005.

These rates shall be as set forth in Exhibit. _.

If <<customer-shortname>> failed to submit conversion orders for its Embedded Base and Excess DS1 and DS3 Loops on or before March 10, 2006, BellSouth will identify and transition such circuits to the equivalent wholesale services provided by BellSouth. Those circuits identified and transitioned by BellSouth pursuant to this Section shall be subject to the Commission-established switch-as-is charge of $5.59.

For Embedded Base circuits and Excess DS1 and DS3 Loops converted, the applicable recurring tariff charge shall apply to each circuit as of March 11, 2006. The transition of the Embedded Base and Excess DS1 and DS3 Loops should be performed in a manner that avoids, or otherwise minimizes to the extent possible, disruption or degradation to <<customer-shortname>>'s customers' service.

**Transition for Dark Fiber Loop:**

**Definitions:**

Dark Fiber Loop is an unused optical transmission facility without attached signal regeneration, multiplexing, aggregation or other electronics, from the demarcation point at an End User's premises to the End User's serving wire center. Dark Fiber Loops may be strands of optical fiber existing in aerial or underground structure. BellSouth will not provide line terminating elements, regeneration or other electronics necessary for <<customer-shortname>> to utilize Dark Fiber Loops.

APPENDIX C
DOCKET 29543 - #19

For purposes of this Section _, the Transition Period for Dark Fiber Loops is the eighteen (18) month period beginning March 11, 2005 and ending September 10, 2006.

For purposes of this Section —, Embedded Base means Dark Fiber Loops that were in service for <<customer-shortname>> as of March 11, 2005 and/or added during the Transition Period pursuant to Commission Order. Subsequent disconnects and/or lost of End Users shall be removed from the Embedded Base.

During the Transition Period only, BellSouth shall make available for the Embedded Base Dark Fiber Loops for <<customer-shortname>> at the terms and conditions set forth in this Attachment.

**Transition Period Pricing:**

From March 11, 2005, through the completion of the Transition Period, BellSouth shall charge a rate for <<customer-shortname>>'s Embedded Base of Dark Fiber Loops equal to the higher of:

115% of the rate paid for that element on June 15, 2004; or

115% of any new rate the Commission established between June 16, 2004 and March 11, 2005.

These rates shall be as set forth in Exhibit_.

The Transition Period shall apply only to <<customer-shortname>>'s Embedded Base and <customer-shortname>> shall not add new Dark Fiber Loops pursuant to this Agreement.

Effective September 11, 2006, Dark Fiber Loops will no longer be made available pursuant to this Agreement.

<<customer-shortname>> shall strive to provide spreadsheets to BellSouth no later than September 10, 2006, identifying the specific Dark Fiber Loops, to be either disconnected or converted to other BellSouth services. <<customer-shortname>> may transition from Dark Fiber Loops to other available wholesale facilities provided by BellSouth, including special access, wholesale facilities obtained from other carriers, or self-provisioned facilities. For Conversions as defined in Section _, such spreadsheets shall take the place of an LSR or ASR. The Parties shall negotiate a project schedule for the Conversion of the Embedded Base Dark Fiber Loops. If <<customer-shortname>> chooses to convert the Dark Fiber UNE Loops to special access circuits, BellSouth will include such Dark Fiber Loops once converted within <<customer-shortname>>'s total special access circuits and apply any discounts to which <<customer short name>> is entitled.

If <<customer-shortname>> submits the spreadsheets specified in Section _ above for all of its Embedded Base on or before September 10, 2006,

APPENDIX C
DOCKET 29543 - #20

Conversions shall be subject to Commission- approved switch-as-is charges and no disconnect charges.

If <<customer short name>> fails to submit the spreadsheet(s) specified in Section — above for all of its Embedded Base on or before September 10, 2006, BellSouth will identify <<customer-shortname>>'s remaining Embedded Base, if any, and will transition such circuits to the equivalent tariffed BellSouth service(s). Those circuits identified and transitioned by BellSouth pursuant to this Section shall be subject to Commission-established switch-as-is charge of $5.59.

For Embedded Base circuits converted or transitioned, the applicable recurring tariff charge shall apply to each circuit as of September 11, 2006. The transition of the Embedded Base circuits should be performed in a manner that avoids, or otherwise minimizes to the extent possible, disruption or degradation to <<customer-shortname>>'s customers' service.

**Transition for Local Switching:**

**Definitions:**

Notwithstanding anything to the contrary in this Agreement, the services offered pursuant to this Section _ are limited to DS0 level Local Switching and BellSouth is not required to provide Local Switching pursuant to this Agreement except as set forth in Section _ below.

For purposes of this Section _, the Transition Period for the Embedded Base of Local Switching is the twelve (12) month period beginning March 11, 2005 and ending March 10, 2006.

For purposes of this Section _, Embedded Base shall mean Local Switching and any additional elements that are required to be provided in conjunction therewith that were in service for <<customer-shortname>> as of March 11, 2005 and/or were added during the Transition Period as permitted by Commission order. Subsequent disconnects and/or lost End Users shall be removed from the Embedded Base.

**Transition Period Pricing:**

From March 11, 2005, through the completion of the Transition Period, BellSouth shall charge/collect a rate for <<customer-shortname>>'s Embedded Base of Local Switching equal to the higher of:

The rate at which during <<customer-shortname>> leased that combination of elements on June 15, 2004, plus on dollar; or

Any rate the Commission established between June 16, 2004 and the effective date of the TRRO, plus one dollar.

These rates shall be as set forth in Exhibit_.

APPENDIX C
DOCKET 29543 - #21

If <<customer short name>> failed to submit orders to disconnect or convert all of its Embedded Base of Local Switching on or before March 10, 2006, BellSouth will identify <<customer-shortname>>'s remaining Embedded Base of Local Switching and will disconnect such Local Switching circuits. BellSouth may only impose the Commission-established switch-as-is charge of $5.59 for such disconnections, however.

As of March 11, 2006, Local Switching was no longer required to be made available pursuant to this Agreement.

The transition of the Embedded Base should be performed in a manner that avoids, or otherwise minimizes to the extent possible, disruption or degradation to <<customer-shortname>>'s customers' service.

Notwithstanding any other provision of this Agreement, BellSouth will only provide unbundled access to Common (Shared) Transport to the extent BellSouth is required to provide and is providing Local Switching to <<customer-shortname>>.

**Transition for UNE-P:**

**Definitions:**

UNE-P is DS0 Local Switching, in combination with a Loop and Common (Shared) Transport used to provide local exchange service for the origination or termination of calls. UNE-P supports the same local calling and feature requirements as described in the Local Switching section of this Attachment and the ability to presubscribe to a primary carrier for intraLATA toll service and/or to presubscribe to a primary carrier for interLATA toll service.

Notwithstanding anything to the contrary in this Agreement, BellSouth is not required to provide UNE-P pursuant to this Agreement except as set forth in this Section.

For purposes of this Section _, the Transition Period for UNE-P is the twelve (12) month period beginning March 11, 2005 and ending March 1, 2006.

For purposes of this Section —, Embedded Base shall mean UNE-P and any additional elements that are required to be provided in conjunction with UNE-P (signaling networks, call-related databases, and shared transport), as such elements are defined at 47 C.F.R. § 51.319(d)(4)(i), that were in service for <<customer-shortname>> as of March 11, 2005 and/or added during the Transition Period pursuant to Commission order. Subsequent disconnects, and/or lost End Users shall be removed from the Embedded Base.

**Transition Period Pricing:**

From March 11, 2005, through the completion of the Transition Period, BellSouth shall charge/collect a rate for <<customer-shortname>>'s Embedded Base of Local Switching equal to the higher of:

APPENDIX C
DOCKET 29543 - #22

The rate at which during <<customer-shortname>> leased that combination of elements on June 15, 2004, plus on dollar; or

The rate the Commission established, if any, between June 6, 2004, and the effective date of the TRRO, plus one dollar.

These rates shall be as set forth in Exhibit_.

If <<<<customer-shortname>>>> failed to submit orders or spreadsheets converting all of the Embedded Base of UNE-P on or before March 0, 2006, BellSouth will identify <<<customer-shortname>>>>'s remaining Embedded Base of UNE-P and will transition such UNE-P to resold BellSouth telecommunication services, as set forth in Attachment _. Those circuits identified and transitioned by BellSouth shall be subject to the Commission-established switch-as-is charge of $5.59.

For Embedded Base UNE-P converted or transitioned, the applicable recurring tariff charges shall apply as of March 11, 2006. The transition of the Embedded Base should be performed in a manner that avoids, or otherwise, minimizes to the extent possible, disruption or degradation to <customer short name>>'s customers' service.

As of March 11, 2006, UNE-P was no longer required to be made available pursuant to this Agreement.

BellSouth shall make 911 updates in the BellSouth 911 database for <<customer short name>>'s UNE-P. BellSouth will not bill <<<<customer-shortname>>>> for 911 surcharges. <<<<customer-shortname>>>> is responsible for paying all 911 surcharges to the applicable governmental agency.

**Transition for DS1 and DS3 Dedicated Transport Including DS1 and DS3 Entrance Facilities:**

**Definitions:**

Dedicated Transport is defined as BellSouth's transmission facilities between wire centers or switches owned by BellSouth, or between wire centers or switches owned by BellSouth and switches owned by <<<customer-shortname>>>>, including but not limited to DS1, DS3 and OCN level services, as well as dark fiber, dedicated to <<<<customer-shortname>>>>. BellSouth shall not be required to provide access to OCN level Dedicated Transport under any circumstances pursuant to this Agreement. In addition, except as set forth in Section _, BellSouth shall not be required to provide to <<<customer-shortname>>>> unbundled access to interoffice transmission facilities that do not connect a pair of wire centers or switches owned by BellSouth ("Entrance Facilities").

For purposes of this Section _, the Transition Period for the Embedded Base of DS1 and DS3 Dedicated Transport, Embedded Base Entrance Facilities and for Excess DS1 and DS3 Dedicated Transport, is the twelve (12) month period beginning March 11, 2005 and ending March 10, 2006.

APPENDIX C
DOCKET 29543 - #23

For purposes of this Section _, Embedded Base means DS1 and DS3 Dedicated Transport that were in service for <<customer short name>> as of March 11, 2005 and/or added during the Transition Period pursuant to Commission order in those wire centers that, as of such date, met the criteria set forth in Sections _ or _ below. Subsequent disconnects and/or lost End Users shall be removed from the Embedded Base.

For purposes of this Section _, Embedded Base Entrance Facilities means Entrance Facilities that were in service for <<<<customer-shortname>>>> as of March 11, 2005 and/or added during the Transition Period pursuant to Commission order. Subsequent disconnects and/or lost customers shall be removed from the Embedded Base.

For purposes of this Section _, Excess DS1 and DS3 Dedicated Transport means those <<<<customer-shortname>>>> DS1 and DS3 Dedicated Transport facilities in service as of March 11, 2005 and/or added during the Transition Period pursuant to Commission order, in excess of the caps set forth In Section _. Subsequent disconnects and/or lost End Users shall be removed from Excess DSI and DS3 Loops.

**Transition Period Pricing:**

From March 11, 2005, through the completion of the Transition Period, BellSouth shall charge/collect a rate for <<<<customer-shortname>>>>'s Embedded Base of DS1 and DS3 Dedicated Transport and for <<<<customer-shortname>>>>'s Excess DS1 and DS3 Dedicated Transport, as described in this Section _, equal to the higher of:

115% of the rate paid for that element on June 15, 2004; or

115% of any new rate the Commission established between June 16, 2004 and March 11, 2005.

These rates shall be as set forth in Exhibit _.

From March 11, 2005, through the completion of the Transition Period, BellSouth shall charge/collect a rate for <<customer short name>>'s Embedded Base Entrance Facilities as set forth in Exhibit _.

If <<<<customer-shortname>>>> failed to submit the spreadsheet(s) identifying its Embedded Base circuits, Embedded Base Entrance Facilities and Excess DS1 and DS3 Dedicated Transport on or before March 12, 2006, BellSouth will identify <<customer short name>>'s remaining Embedded Base circuits, Embedded Base Entrance Facilities and Excess DSI and DS3 Dedicated Transport, if any, and will transition such circuits to the equivalent tariffed BellSouth service(s). Those circuits identified and transitioned by BellSouth shall be subject to the Commission-established switch-as-is charge of $5.59.

For Embedded Base circuits, Embedded Base Entrance Facilities and Excess DS1 and DS3 Dedicated Transport converted or transitioned, the applicable recurring tariff charge shall apply to each circuit as of March 1, 2006.

APPENDIX C
DOCKET 29543 - #24

The transition of the Embedded Base, Embedded Base Entrance Facilities and Excess DS1 and DS3 Dedicated Transport should be performed in a manner that avoids, or otherwise, minimizes to the extent possible, disruption or degradation to <<customer short name>>'s customers' service.

**Transition for Dark Fiber Transport and Dark Fiber Transport Entrance Facilities:**

**Definitions:**

Dark Fiber Transport is defined as Dedicated Transport that consists of unactivated optical interoffice transmission facilities without attached signal regeneration, multiplexing, aggregation or other electronics. Except as set forth in Section_ below, BellSouth shall not be required to provide access to Dark Fiber Transport Entrance Facilities pursuant to this Agreement.

For purposes of this Section _ the Transition Period for the Embedded Base Dark Fiber Transport and Embedded Base Dark Fiber Entrance Facilities is the eighteen (18) month period beginning March 11, 2005 and ending September 10, 2006.

For purposes of this Section _, Embedded Base means Dark Fiber Transport that was in service for <<<<customer-shortname>>>> as of March 11, 2005 and/or added during the Transition Period pursuant to Commission order in those wire centers that, as of such date, met the criteria set forth in Section _ or _ below. Subsequent disconnects and/or lost End Users shall be removed from the Embedded Base.

For purposes of this Section _, Embedded Base Dark Fiber Entrance Facilities means Fiber Entrance Facilities that were in service for <<customer short name>> as of March 11, 2005 and/or were added during the Transition Period pursuant to Commission order in those wire centers that, as of such date, met the criteria set forth in _. Subsequent disconnects and/or lost End Users shall be removed from the Embedded Base.

**Transition Period Pricing:**

From March 11, 2005, through the completion of the Transition Period, BellSouth shall charge/collect a rate for <<<<customer-shortname>>>>'s Embedded Base and Embedded Base Dark Fiber Entrance Facilities equal to the higher of:

115% of the rate paid for that element on June 15, 2004; or

115% of any new rate the Commission established between June 16, 2004 and March 11, 2005.

These rates shall be as set forth in Exhibit_.

APPENDIX C
DOCKET 29543 - #25

From March 11, 2005, through the completion of the Transition Period, BellSouth shall charge/collect a rate for <<customer short name>>'s Embedded Base Entrance Facilities as set forth in Exhibit _.

No later than September 10, 2006 <<<<customer-shortname>>>> shall strive to submit spreadsheet(s) identifying all of the Embedded Base of Dark Fiber Transport and Dark Fiber Entrance Facilities to be either disconnected or converted to other BellSouth services as Conversions pursuant to Section _. <<<<customer-shortname>>>> may transition from these Dark Fiber Transport and Dark Fiber Entrance Facilities to other available wholesale arrangements provided by BellSouth, wholesale facilities obtained from other carriers or self-provisioned facilities. For Conversions as defined in Section _, such spreadsheet shall take the place of an LSR or ASR. If a <<customer short name>> chooses to convert the Dark Fiber UNE Transport circuits and Dark Fiber Entrance Facilities to special access circuits, BellSouth will include such Dark Fiber UNE Transport circuits and Dark Fiber UNE Entrance Facilities once converted within <<<<customer-shortname>>>>'s total special access circuits and apply any discounts to which <<<<customer-shortname>>>> is entitled. The Parties shall negotiate a project schedule for the Conversion of the Embedded Base of Dark Fiber Transport and Dark Fiber Entrance Facilities.

If <<customer short name>> submits the spreadsheets specified in Section — for all of its Embedded Base of Dark Fiber Transport and Dark Fiber Entrance Facilities on or before September 10, 2006, Conversions shall be subject to Commission-approved switch-as-is charges.

If <<<<customer-shortname>>>> fails to submit the spreadsheet(s) for all of its Embedded Base of Dark Fiber Transport and Dark Fiber Entrance Facilities prior to September 10, 2006, BellSouth will identify <<<<customer-shortname>>>>'s remaining Embedded Base of Dark Fiber Transport and Dark Fiber Entrance Facilities, if any, and will transition such circuits to the equivalent tariffed BellSouth service(s) subject to the Commission-approved switch-as-is charge of $5.59.

For Embedded Base Dark Fiber Transport and Embedded Base Dark Fiber Entrance Facilities converted or transitioned, the applicable recurring tariff charge shall apply to each circuit as of September 11, 2006. The transition of the Embedded Base Dark Fiber Transport and Embedded Base Dark Fiber Entrance Facilities should be performed in a manner that avoids, or otherwise, minimizes to the extent possible, disruption or degradation to <<<<customer-shortname>>>>'s customers' service.

**Conversion of Wholesale Services to Network Elements or Network Elements to Wholesale Services:**

Upon request, BellSouth shall convert a wholesale service, or group of wholesale services, to the equivalent Network Element or Combination that is available to <<<<customer-shortname>>>> pursuant to Section 251 of the Act and under this Agreement or convert a Network Element or Combination that is available to <<customer short name>> pursuant to Section 251 of the Act and

APPENDIX C
DOCKET 29543 - #26

under this Agreement to an equivalent wholesale service or group of wholesale services offered by BellSouth (collectively 'Conversion'). BellSouth shall charge the applicable nonrecurring Commission-approved switch-as-is rates for Conversions to specific Network Elements or Combinations found in Exhibit __. BellSouth shall also charge the same nonrecurring switch-as-is rates when converting from Network Elements or Combinations. Any rate change resulting from the Conversion will be effective as of the next billing cycle following BellSouth's receipt of a complete and accurate Conversion request from <<<<customer-shortname>>>>. Any change from a wholesale service group of wholesale services to a Network Element/Combination, or from a Network Element/Combination to a wholesale service/group of wholesale services, that requires a physical rearrangement will not be considered to be a Conversion for purposes of this Agreement. BellSouth will not require physical rearrangements if the conversion can be completed through record changes only. Orders for Conversions will be handled in accordance with the guidelines set forth in the Ordering Guidelines and Processes and CLEC Information Packages.

B.  Issue 3.      **Modification and Implementation of Interconnection Agreement Language:** *(a) How should existing ICAs be modified to address BellSouth's obligation to provide network elements that the FCC has found are no longer § 251 (c)(3) obligations? (b) What is the appropriate way to implement in new agreements pending in arbitration any modifications to BellSouth's obligations to provide network elements that the FCC has found are no longer § 251(c) (3) obligations.*

                        **Recommended Language:**

            No language is necessary as the Findings and Conclusions of the Commission dictate the duties of the affected entities.

C.  Issue 4.      **High Capacity Loops and Dedicated Transport:** *What is the appropriate language to implement BellSouth's obligation to provide § 251 unbundled access to high capacity loops and dedicated transport and how should the following terms be defined: (i) business line; (ii) fiber-based collocation; (iii) building; (iv) route; (v) Is a CLEC entitled to obtain DS3 transport from a Tier 3 wire center to each of two or more Tier 1 or Tier 2 wire centers? (vi) is a CLEC entitled to obtain dark fiber transport from a Tier 3 wire center to each of two or more Tier 1 or Tier 2 wire centers?*

                        **Recommended Language:**

**Loops/Transport:**

            Language to implement BellSouth's obligation to provide § 251 unbundled access to high capacity loops and dedicated transport is set forth under Issue 2.

**Definitions:**

APPENDIX C
DOCKET 29543 - #27

(i) **Business Line:** For purposes of this Attachment _, a "Business Line" is, as defined in 47 C.F.R. § 51.5, a BellSouth-owned switched access line used to serve a business customer, whether by BellSouth itself or by a CLEC that leases the line from BellSouth. The number of business lines in a wire center shall equal the sum of all BellSouth business switched access lines, plus the sum of all UNE loops connected to that wire center, including UNE loops provisioned in combination with other unbundled elements. Among these requirements, business line tallies (1) shall include only those access lines connecting end-user customers with BellSouth end-offices for switched services, (2) shall not include non-switched special access lines, (3) shall account for ISDN and other digital access lines by counting each 64 kbps-equivalent as one line. For example, a DS1 line corresponds to 24 64 kbps-equivalents, and therefore to 24 business lines."

(ii) **Fiber-Based Collocation:** For purposes of this Attachment _, a "Fiber-Based Collocator" is, as defined in 47 C.F.R. § 51.5, any carrier, unaffiliated with BellSouth, that maintains a collocation arrangement in a BellSouth wire center, with active electrical power supply, and operates a fiber-optic cable or comparable transmission facility that (1) terminates at a collocation arrangement within the wire center; (2) leaves the BellSouth wire center premises; and (3) is owned by a party other than BellSouth or any affiliate of BellSouth, except as set forth in this paragraph. Dark fiber obtained from an incumbent LEC on an indefeasible right of use basis shall be treated as non-incumbent LEC fiber-optic cable. Two or more affiliated fiber-based collocators in a single wire center shall collectively be counted as a single fiber-based collocator. For purposes of this paragraph, the term affiliate is defined by 47 U.S.C. § 153(1) and any relevant interpretation in this Title.

(iii) **Building:** For purposes of this Attachment _, a "Building" is a permanent physical structure including, but not limited to, a structure in which people reside, or conduct business or work on a daily basis and through which there is one centralized point of entry in the structure through which all telecommunications services must transit. As an example only, a high rise office building with a general telecommunications equipment room through which all telecommunications services to that building's tenants must pass would be a single "building" for purposes of this Attachment _. Two or more physical areas served by individual points of entry through which telecommunications services must transit will be considered separate buildings. For instance, a strip mall with individual businesses obtaining telecommunication services from different access points on the building(s) will be considered individual buildings, even though they might share common walls.

(iv) **Route:** For purposes of this Attachment _, a "Route" is, as defined in 47 C.F.R. §. 51.319(e), a transmission path between one of an incumbent LEC's wire centers or switches and another of the incumbent LEC's wire centers or switches. A route between two points (e.g. wire center or switch "A" and wire center or switch "Z") may pass through one or more intermediate wire centers or switches (e.g., wire center or switch "X"). Transmission paths between identical end points (e.g., wire center or switch "A" and wire center or switch "Z") are the

APPENDIX C
DOCKET 29543 - #28

same "route," irrespective of whether they pass through the same intermediate wire centers or switches, if any.

D.  Issue 5.    **Unimpaired Wire Centers: (a) *Does the Commission have the authority to determine whether or not BellSouth's application of the FCC's § 251 nonimpairment criteria for high-capacity loops and transport is appropriate? (b) What procedures should be used to identify those wire centers that satisfy the FCC's § 251 nonimpairment criteria for high-capacity loops and transport? (c) What language should be included in agreements to reflect the procedures identified in (b)?***

Recommended Language:

There is no language recommended for this issue as the initial non-impaired wire center determination of the Commission is set forth in Appendix B hereto.  The procedures for the designation of future wire centers as non-impaired and the procedures for service transitions necessitated thereby are set forth for the language recommended in issue 10 below.

E.  Issue 9.    **Conditions Applicable to the Embedded Base: *What conditions, if any, should be imposed on moving, adding, or changing orders to a CLEC's respective embedded bases of switching, high-capacity loops and dedicated transport, and what is the appropriate language to implement such conditions, if any?***

Recommended Language:

No language is necessary as the Findings and Conclusions of the Commission render this issue moot.

F.  Issue 10.    **Transition of De-listed Network Elements To Which No Specified Transition Period Applies: *What rates, terms, and conditions should govern the transition of existing network elements that BellSouth is no longer obligated to provide as § 251 UNEs to non-§ 251 network elements and other services and (a) what is the proper treatment for such network elements at the end of the transition period; and (b) what is the appropriate transition period, and what are the appropriate rates, terms and conditions during such transition period, for unbundled high capacity loops, high capacity transport, and dark fiber transport in and between wire centers that do not meet the FCC's nonimpairment standards at this time, but that meet such standards in the future?***

Recommended Language:

(a) The following language is recommended only for CLECs with existing ICAs with BellSouth:

Except to the extent expressly provided otherwise in this Attachment, <<customer-shortname>> may not maintain unbundled network elements or

APPENDIX C
DOCKET 29543 - #29

combinations of unbundled network elements, that are no longer offered pursuant to this Agreement (collectively "Arrangements"). In the event BellSouth determines that <<customer-shortname>> has in place any Arrangements after the Effective Date of this Agreement, BellSouth will provide <<customer-shortname>> with written notice that such Arrangements must be converted or disconnected within thirty (30) days of the receipt of such notice. The written notice provided by BellSouth must identify, by circuit identification number(s), the specific Arrangement(s) which BellSouth insists must be converted or disconnected. Those circuits identified by <<customer-shortname>> within such thirty (30) day period for conversion shall be converted subject to Commission-approved switch-as-is rates with no UNE disconnect charges. If <<customer-shortname>> fails BellSouth's dispute BellSouth's claims or fails to submit orders to disconnect, or convert such Arrangements within the established thirty (30)-day period, BellSouth will transition such circuits to the equivalent tariffed BellSouth service(s) subject to the Commission-established switch-as-is rate. The full nonrecurring charges for installation of the equivalent BellSouth service as set forth in BellSouth's tariffs will not apply to such conversions. However, the applicable recurring tariff charges shall apply to each circuit upon conversion.

(b) Modifications and Updates to the Wire Center List and Subsequent Transition Periods. (The language below is applicable both to existing and new ICAs):

**DS1 or DS3 loops, or Dedicated Transport in Wire Centers that Meet the TRRO Non-Impaired Criteria in the Future:**

In the event BellSouth identifies additional wire centers that meet the criteria set forth in Section _, but that were not included in the Initial Non-Impaired Wire Center List adopted by the Commission, BellSouth shall include such additional wire centers in a carrier notification letter (CNL). Each such list of additional wire centers shall be considered a "Subsequent Wire Center List."

Effective thirty (30) calendar days after the date of a BellSouth CNL providing a Subsequent Wire Center List, BellSouth shall not be required to unbundle new DS1 or DS3 Loops, or transport, as applicable, in such additional wire center(s), except pursuant to self-certification by <<customer-shortname>>. BellSouth may review the self-certification claim of <<customer-shortname>> and seek dispute resolution through the Commission if needed. During the dispute resolution period, the applicable DS1 or DS3 loop rate will not change unless ordered by the Commission. Upon the Commission's resolution of the dispute, said rates will be trued up if necessary, to the time BellSouth provisioned in the order in question.

BellSouth shall make available de-listed DS1 and DS3 Loops and transport that were in service for <<customer-shortname>> in a de-listed wire center on the Subsequent Wire Center List as of the thirtieth (30th) calendar day after the date of BellSouth's CNL identifying the Subsequent Wire Center List (Subsequent Embedded Base) until one hundred and eighty (180) calendar days after the thirtieth (30th) calendar day from the date of BellSouth's CNL identifying the Subsequent Wire Center List (Subsequent Transition Period).

APPENDIX C
DOCKET 29543 - #30

Subsequent disconnects and/or lost End Users shall be removed from the Subsequent Embedded Base.

The rate that shall apply to the Subsequent Embedded Base throughout the entire Subsequent Transition Period shall be the rate paid for that element at the time of the CNL posting, plus 15%.

No later than one hundred and eighty (180) calendar days from BellSouth's CNL identifying the Subsequent Wire Center List, <<customer-shortname>> shall submit a spreadsheet(s) identifying the Subsequent Embedded Base of circuits to be disconnected or converted to other BellSouth services. For Conversions as defined in Section _, such spreadsheets shall take the place of an LSR or ASR. The Parties shall negotiate a project schedule for the Conversion of the Subsequent Embedded Base of circuits. If a <<customer-shortname>> chooses to convert the de-listed DS1 and DS3 Loops and Transport to special access circuits, BellSouth will include such de-listed DS1 and DS3 Loops and Transport once converted within <<customer-shortname>>'s total special access circuits and apply any discounts to which <<customer-shortname>> is entitled. The Parties shall negotiate a project schedule for the Conversion of the Subsequent Embedded Base.

If <<customer-shortname>> submits the spreadsheet(s) for its Subsequent Embedded Base by one hundred and eighty (180) calendar days from BellSouth's CNL identifying the Subsequent Wire Center List, those identified circuits shall be subject to the Commission-approved switch as-is charge.

If <<customer-shortname>> fails to submit the spreadsheet(s) for all of its Subsequent Embedded Base by one hundred and eighty (180) calendar days after the date of BellSouth's CNL identifying the Subsequent Wire Center List, BellSouth will identify <<customer-shortname>>'s remaining Subsequent Embedded Base, if any, and will transition such circuits to the equivalent tariffed BellSouth service(s) subject to the switch-as-is rate established by the Commission.

For Subsequent Embedded Base circuits converted or transitioned, the applicable recurring tariff charges shall apply on the first day after the end of the Subsequent Transition Period. The transition of the Subsequent Embedded Base circuits should be performed in a manner that avoids, or otherwise minimizes to the extent possible, disruption or degradation to <<customer-shortname>>'s customers' service.

**Dark Fiber Transport in Wire Centers that Meet the TRRO Non-Impaired Criteria in the Future:**

In the event BellSouth identifies additional wire centers that meet the criteria set forth in Section _ above, but that were not included in the Initial Non-Impaired Wire Center List adopted by the Commission, BellSouth shall include

APPENDIX C
DOCKET 29543 - #31

such additional wire centers in a CNL. Each such list of additional wire centers shall be considered a "Subsequent Wire Center List."

Effective thirty (30) calendar days after the date of a BellSouth CNL providing a Subsequent Wire Center List, BellSouth shall not be required to unbundle new Dark Fiber Transport, as applicable, in such additional wire center(s), except pursuant to self-certification by <<customer-shortname>>. BellSouth may review the self-certification claim of <<customer-shortname>> and seek dispute resolution through the Commission if needed. During the dispute resolution period, the applicable Dark Fiber Transport rate will not change unless ordered by the Commission. Upon the Commission's resolution of the dispute, said rates will be trued up if necessary, to the time BellSouth provisioned the order in question.

For purposes of Section _, BellSouth shall make available dark fiber transport that was in service for <<customer-shortname>> in a wire center on the Subsequent Wire Center List as of the thirtieth (30th) calendar day after the date of BellSouth's CNL identifying the Subsequent Wire Center List (Subsequent Embedded Base) until two hundred and seventy (270) calendar days after the thirtieth (30th) calendar day from the date of BellSouth's CNL identifying the Subsequent Wire Center List (Subsequent Transition Period).

Subsequent disconnects and/or lost End Users shall be removed from the Subsequent Embedded Base.

The rate that shall apply to the Subsequent Embedded Base throughout the entire Subsequent Transition Period shall be the rate paid for that element at the time of the CNL posting, plus 15%.

No later than two hundred and seventy (270) calendar days from BellSouth's CNL identifying the Subsequent Wire Center List <<customer-shortname>> shall submit a spreadsheet(s) identifying the Subsequent Embedded Base of circuits to be disconnected or converted to other BellSouth services. For Conversions as defined in Section _, such spreadsheets shall take the place of an LSR or ASR. The Parties shall negotiate a project schedule for the Conversion of the Subsequent Embedded Base of circuits. If a <<customer-shortname>> chooses to convert the Dark Fiber Transport to special access circuits, BellSouth will include such Dark Fiber Transport once converted within <<customer-shortname>>'s total special access circuits and apply any discounts to which <<customer-shortname>> is entitled. The Parties shall negotiate a projected schedule for the Conversion of the Subsequent Embedded Base.

If <<customer-shortname>> submits the spreadsheet(s) for its Subsequent Embedded Base within two hundred and seventy (270) calendar days from BellSouth's CNL identifying the Subsequent Wire Center List, those identified circuits shall be subject to the Commission-approved switch-as-is charge.

If <<customer-shortname>> fails to submit the spreadsheet(s) for all of its Subsequent Embedded Base within two hundred and seventy (270) calendar

APPENDIX C
DOCKET 29543 - #32

days after the date of BellSouth's CNL identifying the Subsequent Wire Center List, BellSouth will identify <<customer-shortname>>'s remaining Subsequent Embedded Base, if any, and will transition such circuits to the equivalent tariffed BellSouth service(s) subject to the switch-as-is charge established by the Commission.

For Subsequent Embedded Base circuits converted or transitioned, the applicable recurring tariff charges shall apply on the first day after the end of the Subsequent Transition Period. The transition of the Subsequent Embedded Base circuits should be performed in a manner that avoids, or otherwise, minimizes to the extent possible, disruption or degradation to <<customer-shortname>>'s customers' service.

**G. Issue 32.** **Binding Nature of Commission Order:** *How should the determinations made in this proceeding be incorporated into existing § 252 interconnection agreements?*

**Recommended Language:**

No language is necessary as the Findings and Conclusions of the Commission establish the duties of affected entities with respect to this issue.

**III.** **Service-Specific Issues (Issues 13, 15, 16, 29, 31)**

**A. Issue 13.** **Performance Plan:** *Should network elements de-listed under § 251(c)(3) be removed from BellSouth's SQM/PMAP/SEEM?*

**Recommended Language:**

<<company-shortname> may purchase and use Network Elements and Other Services from BellSouth in accordance with 47 C.F.R §51.309. Performance Measurements associated with this Attachment _ are contained in Attachment _. The quality of the Network Elements provided pursuant to §251, as well as the quality of the access to said Network Elements that BellSouth provides to CLEC, shall be, to the extent technically feasible, at least equal to that which BellSouth provides to itself, and its affiliates.

The Parties shall comply with the requirements as set forth in the technical references within this Attachment _. BellSouth shall comply with the requirements set forth in the technical reference TR73400, as well as any performance or other requirements identified in this Agreement, to the extent that they are consistent with the greater of BellSouth's actual performance or applicable industry standards. If one or more of the requirements set forth in this Agreement are in conflict, the technical reference TR73600 requirements shall apply. If the parties cannot reach agreement, the dispute resolution process set forth in the General Terms and Conditions of this Agreement shall apply.

**B. Issue 15.** **Conversion of Special Access Circuits to UNEs:** *Is BellSouth required to provide conversion of special access circuits to UNE pricing, and, if so,*

APPENDIX C
DOCKET 29543 - #33

*what rates, terms and conditions and during what timeframe should such new requests for such conversions be effectuated?*

### Recommended Language:

### Conversion of Wholesale Services to Network Elements or Network Elements to Wholesale Services:

Upon request, BellSouth shall convert a wholesale service, or group of wholesale services, to the equivalent Network Element or Combination that is available to <<company-shortname>> pursuant to Section 251 of the Act and under this Agreement, or convert a Network Element or Combination that is available to <<company-shortname>> pursuant to Section 251 of the Act and under this Agreement to an equivalent wholesale service or group of wholesale services offered by BellSouth (collectively "Conversion"). BellSouth shall charge the applicable nonrecurring switch-as-is rates for Conversions to specific Network Elements or Combinations found in Exhibit __. BellSouth shall also charge the same nonrecurring switch-as-is rates when converting from Network Elements or Combinations. Any rate change resulting from the Conversion will be effective as of the next billing cycle following BellSouth's receipt of a complete and accurate Conversion request from <<company-shortname>>. A Conversion shall be considered termination for purposes of any volume and/or term commitments and/or grandfathered status between <<company-shortname>> and BellSouth. Any change from a wholesale service/group of wholesale services to a Network Element/Combination, or from a Network Element/Combination to a wholesale service/group of wholesale services that requires a physical rearrangement will not be considered to be a Conversion for purposes of this Agreement. BellSouth will not require physical rearrangements if the Conversion can be completed through record changes only. Orders for Conversions will be handled in accordance with the guidelines set forth in the Ordering Guidelines and Processes and CLEC Information Packages as referenced in Sections ___ and ___ below.

Any outstanding conversions shall be effective on or after the effective date of this agreement.

### Ordering Guidelines and Processes:

For information regarding Ordering Guidelines and Processes for various Network Elements, Combinations and Other Services, <<company-shortname>> should refer to the "Guides" section of the BellSouth Interconnection Web site.

Additional information may also be found in the individual CLEC Information Packages located at the "CLEC UNE Products" on BellSouth's Interconnection Web site at:

www.interconnection.bellsouth.com/guides/html/unes.html

The provisioning of Network Elements, Combinations and Other Services to CLEC's Collocation Space will require cross-connections within the central

APPENDIX C
DOCKET 29543 - #34

office to connect the Network Element, Combinations or Other Services to the demarcation point associated with CLEC's Collocation Space. These cross-connects are separate components that are not considered a part of the Network Element, Combinations or Other Services and, thus, have a separate charge pursuant to this Agreement.

**C.  Issue 16.    Pending Conversion Requests:**  *What are the appropriate rates, terms, conditions and effective dates, if any, for conversion requests that were pending on the effective date of the TRO?*

**Recommended Language:**

No language is recommended as the Findings and Conclusions of the Commission dictate the duties of the affected entities.

**D.  Issue 29.    Enhanced Extended Link ("EEL") Audits:** *What is the appropriate ICA language to implement BellSouth's EEL audit rights, if any, under the TRO?*

BellSouth may audit <<company-shortname>> records in order to verify compliance with the high capacity EEL eligibility criteria. To invoke its limited right to audit, BellSouth shall send a written Notice of Audit to CLEC. Such Notice of Audit will be delivered to CLEC no less than thirty (30) calendar days prior to the date upon which BellSouth seeks to commence an audit and shall set forth the reasons for the audit requested and the identity of the auditor selected by BellSouth.    BellSouth shall not be required to obtain the consent of the <<company-shortname>> with respect to the selection of the auditor. <<company-shortname>> may, however, challenge the legal qualifications of the auditor selected by filing an objection to that effect with the Commission within 10 days of receiving BellSouth's Notice of Audit.

The auditor selected shall be an independent third party retained and paid for by BellSouth. The audit must be performed in accordance with the standards established by the American Institute for Certified Public Accountants (AICPA) which will require the auditor to perform an "examination engagement" and issue an opinion regarding <<company-shortname>>'s compliance with the high capacity EEL eligibility criteria. AICPA standards and other AICPA requirements will also be used to determine the independence of an auditor. The independent auditor's report will conclude whether <<company-shortname>> complied in all material respects with the applicable service eligibility criteria. Consistent with standard auditing practices, such audits require compliance testing designed by the independent auditor.

To the extent the independent auditor's report concludes that <<company-shortname>> failed to comply with the service eligibility criteria, <<company-shortname>> must true-up any difference in payments, convert all noncompliant circuits to the appropriate service, and make the correct payments on a going forward basis.

To the extent the independent auditor's report concludes that <<company-shortname>> failed to comply in all material respects with the

APPENDIX C
DOCKET 29543 - #35

service eligibility criteria, <<company-shortname>> shall reimburse BellSouth for the cost of the independent auditor. To the extent the independent auditor's report concludes that <<company-shortname>> did comply in all material respects with the service eligibility criteria, BellSouth will reimburse <<company-shortname>> for its reasonable and demonstrable costs associated with the audit. <<company-shortname>> will maintain appropriate documentation to support its certifications and may dispute any portion of the findings of an audit by petitioning the Commission for a review within 20 days of receiving the reported findings of the auditor.

E.  **Issue 31.**  **Core Forbearance Order:** *What language should be used to incorporate the FCC's ISP Remand Core Forbearance Order into interconnection agreements?*

**Recommended Language:**

No language is recommended as the Findings and Conclusions of the Commission dictate the duties of the affected entities.

IV.  **Network Related Issues (Issues 6, 19, 23, 24, 26, 27, 28)**

A.  **Issue 6**  **HDSL-capable Cooper Loops:** *Are HDSL-capable cooper loops the equivalent of DSI loops for the purpose of evaluating impairment?*

**Recommended Language:**

**2-wire or 4-wire HDSL-Compatible Loop:** This is a designed loop which meets Carrier Serving Area (CSA) specifications , may be up to 12,000 feet long and may have up to 2,500 feet of bridged tap (inclusive of Loop length). It may be a 2-wire or 4-wire circuit and will come standard with a test point, OC, and DLR.

**4-wire Unbundled DS1 Digital Loop:** This is a designed 4-wire Loop that is provisioned according to industry standards for DS1 or Primary Rate ISDN services and will come standard with a test point, OC, and a DLR. A DS1 Loop may be provisioned over a variety of loop transmission technologies including copper, HDSL-based technology or fiber optic transport systems. It will include a 4-wire DS1 Network Interface at the End User's location. For purposes of this Agreement, including the transition of DS1 and DS3 Loops described in Section _ above, DS1 Loops include 2-wire and 4-wire HDSL Compatible Loops.

B.  **Issue 19.**  **Line Splitting:**  *What is the appropriate ICA language to implement BellSouth's obligations with regard to line splitting?*

**Recommended Language:**

**Line Splitting:** Shall mean that <<customer-shortname>> purchases a whole loop and provides the splitter to provide voice and data services through an arrangement with a third party CLEC, who is either the provider of data services (Data CLEC) or the provider of voice services (Voice CLEC), to deliver voice and data service to End Users over the same Loop. The Voice CLEC and

APPENDIX C
DOCKET 29543 - #36

Data CLEC are different carriers, with <<customer-shortname>> being either the Voice CLEC or Data CLEC.

**Line Splitting: UNE-L:** In the event <<customer-shortname>> provides its own switching or obtains switching from a third party, <<customer-shortname>> may engage in line splitting arrangements with another CLEC using a splitter, provided by <<customer-shortname>>, in a Collocation Space at the central office where the loop terminates into a distribution frame or its equivalent.

**Line Splitting:** Loop and UNE Port (UNE-P: To the extent <<customer-shortname>> is purchasing UNE-P pursuant to this Agreement, BellSouth will permit <<customer-shortname>> to replace UNE-P with Line Splitting). The UNE-P arrangement will be converted to a stand-alone Loop, a Network Element switch port, two (2) collocation cross-connects and the high frequency spectrum line activation. The resulting arrangement shall continue to be included in <<customer-shortname>>'s Embedded Base as described in Section _ below.

<<customer-shortname>> shall provide BellSouth with a signed LOA between it and the third party CLEC (Data CLEC or Voice CLEC) with which it desires to provision Line Splitting services, where <<customer-shortname>> will not provide voice and data services.

Line Splitting arrangements in service pursuant to this Section _ must be disconnected or provisioned pursuant to Section _ above on or before March 10, 2006.

**Provisioning Line Splitting and Splitter Space – UNE-P:** <<customer-shortname>> or BellSouth may provide the splitter. When <<customer-shortname>> or its authorized agent owns the splitter, Line Splitting requires the following: a non-designed analog Loop from the serving wire center to the NID at the End User's location; a collocation cross-connection connecting the Loop to the collocation space; a second collocation cross-connection from the collocation space connected to a voice port; the high frequency spectrum line activation, and a splitter. When BellSouth owns the splitter, Line Splitting requires the following: a non-designed analog Loop from the serving wire center to the NID at the End User's location with CFA and splitter port assignments, and a collocation cross-connection from the collocation space connected to a voice port.

An unloaded 2-wire copper Loop must serve the End User. The meet point for the Voice CLEC and the Data CLEC is the point of termination on the MDF for the Data CLEC's cable and pairs.

The foregoing procedures are applicable to migration from a UNE-P arrangement to line splitting service.

**Provisioning Line Splitting and Splitter Space – UNE-L:** <<customer-shortname>> provides the splitter when providing Line Splitting with UNE-L. When <<customer-shortname>> or its authorized agent owns the splitter, Line

APPENDIX C
DOCKET 29543 - #37

Splitting requires the following: a loop from NID at the End User's location to the serving wire center and terminating into a distribution frame or its equivalent.

**CLEC Provided Splitter – Line Splitting – UNE-P and UNE-L:** To order High Frequency Spectrum on a particular Loop, <<customer-shortname>> or its authorized agent must have a DSLAM collocated in the central office that serves the End User of such Loop.

<<customer-shortname>> or its authorized agent may purchase, install and maintain central office POTS splitters in its collocation arrangements.

<<customer-shortname>> or its authorized agent may use such splitters for access to its customers and to provide digital line subscriber services to its customers using the High Frequency Spectrum. Existing Collocation rules and procedures and the terms and conditions relating to Collocation set forth in Attachment _ Central Office shall apply.

Any splitters installed by <<customer-shortname>> or its authorized agent in its collocation arrangement shall comply with ANSI T1.413, Annex E, or any future ANSI splitter Standards. <<customer-shortname>> or its authorized agent may install any splitters that BellSouth deploys or permits to be deployed for itself or any BellSouth affiliate.

**Maintenance – Line Splitting – UNE-P and UNE-L:** BellSouth will be responsible for repairing voice troubles and the troubles with the physical loop between the NID at the End User's premises and the termination point.

BellSouth must make all necessary network modifications, including providing nondiscriminatory access to operations support systems necessary for pre-ordering, ordering, provisioning, maintenance and repair, and billing for loops used in line splitting arrangements. BellSouth may use existing state commission collaboratives and change management processes to address OSS modifications that are necessary to support line splitting.

**Indemnity:** <<customer-shortname>> shall indemnify, defend and hold harmless BellSouth from and against any Claims, Losses, and Costs, which arise out of actions related to the other service provider (i.e., CLEC party to the line splitting arrangement who is not <<customer-shortname>>), except to the extent caused by BellSouth's gross negligence or willful misconduct.

PROVIDED, HOWEVER, that all amounts advanced in respect of such Claims, Losses and Costs shall be repaid to <<customer-shortname>> by BellSouth if it shall ultimately be determined in a final judgment without further appeal by a court of appropriate jurisdiction that BellSouth is not entitled to be indemnified for such Claims, Losses and Costs because the Claims, Losses and Costs arose as a result of BellSouth's gross negligence or willful misconduct.

BellSouth will indemnify, defend and hold harmless <<customer-shortname>> from and against any Claims, Losses, and Costs, which arise out of

APPENDIX C
DOCKET 29543 - #38

actions related to the other service provider (i.e., CLEC party to the line splitting arrangement who is not <<customer-shortname>>) brought against

<<customer-shortname>> to the extent such Claim alleges that the cause of Claim, Loss and Cost was the result of BellSouth's gross negligence or willful misconduct.

PROVIDED, HOWEVER, that BellSouth shall have no obligation to indemnify <<customer-shortname>> under this section unless: <<customer-shortname>> provides BellSouth with prompt written notice of any such Claim; <<customer-shortname>> permits BellSouth to assume and control the defense to such action, with counsel chosen by BellSouth; and BellSouth does not enter into any settlement or compromise of such Claim.

PROVIDED, HOWEVER, that all amounts advanced in respect of such Claims, Losses and Costs shall be repaid to BellSouth by <<customer-shortname>> if it shall ultimately be determined in a final judgment without further appeal by a court of appropriate jurisdiction that <<customer-shortname>> is not entitled to be indemnified for such Claims, Losses and Costs because the Claims, Losses and Costs did not arise as a result of BellSouth's gross negligence or willful misconduct.

"Claim" means any threatened, pending or completed action, suit or proceeding, or any inquiry or investigation that BellSouth or <<customer-shortname>> in good faith believes might lead to the institution of any such action, suit or proceeding.

"Loss" means any and all damages, injuries, judgments, fines, penalties, amounts paid or payable in settlement, deficiencies, and expenses (including all interest, assessments, and other charges paid or payable in connection with or respect of such Losses) incurred in connection with the Claim.

"Costs" means all reasonable attorney's fees and all other reasonable fees, expenses and obligations paid or incurred in connection with the Claim or related matters, including without limitation, investigating, defending or participating (as a party, witness or otherwise) in (including on appeal), or preparing to defend or participate in any Claim.

C. Issue 23.    **Greenfield Areas:** *(a) What is the appropriate definition of minimum point of entry ("MPOE")? (b) What is the appropriate language to implement BellSouth's obligation, if any, to offer unbundled access to newly-deployed or 'greenfield' fiber loops, including fiber loops deployed to the minimum point of entry ("MPOE") of a multiple dwelling unit ("MDU") that is predominantly residential, and what, if any, impact does the ownership of the inside wiring from the MPOE to each end user have on this obligation?*

Issue 28.    **Fiber to the Home:** *What is the appropriate language, if any, to address access to overbuild deployments of fiber to the home and fiber to the curb facilities?*

APPENDIX C
DOCKET 29543 - #39

**Recommended Language:**

<u>**GREENFIELD AND OVERBUILD FIBER TO THE HOME/FIBER TO THE CURB:**</u>

**Definitions:**

**Fiber to the Home (FTTH):** are local loops consisting entirely of fiber optic cable, whether dark or lit, serving an End User's premises or, in the case of predominantly residential multiple dwelling units (MDUs), a fiber optic cable, whether dark or lit, that extends to the MDU minimum point of entry (MPOE).

**Fiber to the Curb (FTTC):** loops are local loops consisting of fiber optic cable connecting to a copper distribution plant that is not more than five hundred (500) feet from the End User's premises or, in the case of predominantly residential MDUs, not more than five hundred (500) feet from the MDU's MPOE. The fiber optic cable in a FTTC loop must connect to a copper distribution plant at a serving area interface from which every other copper distribution subloop also is not more than five hundred (500) feet from the respective End User's premises.

**Greenfield Requirements:** In new build (Greenfield) areas, where BellSouth has only deployed FTTH/FTTC facilities, BellSouth is under no obligation to provide such FTTH and FTTC Loops. FTTH facilities include fiber loops deployed to the MPOE of a MDU that is predominantly residential regardless of the ownership of the inside wiring from the MPOE to each End User in the MDU.

**Overbuild Requirements:** In FTTH/FTTC overbuild situations where BellSouth also has copper Loops, BellSouth will make those copper Loops available to CLEC on an unbundled basis, until such time as BellSouth chooses to retire those copper Loops using the FCC's network disclosure requirements. In these cases, BellSouth will offer a 64kbps second voice grade channel over its FTTH/FTTC facilities. BellSouth's retirement of copper Loops must comply with Applicable Law.

**DS1/DS3 Requirements:** Notwithstanding the above, nothing in this Section shall limit BellSouth's obligation to offer CLECs unbundled DS1 or DS3 loops (or loop/transport combination) in any wire center where BellSouth is required to provide access to such loop facilities.

**Subloops:** BellSouth shall provide <<customer-shortname>> with nondiscriminatory access to the subloop for access to multiunit premises wiring on an unbundled basis regardless of the capacity level or type of loop that the <<customer-shortname>> seeks to provision for its customer. The subloop for access to multiunit premises wiring is defined as any portion of the loop that it is technically feasible to access at a terminal in the incumbent LEC's outside plant at or near a multiunit premises. One category of this subloop is inside wire, which is defined for purposes of this section as all loop plant owned or controlled by the incumbent LEC at a multiunit customer premises between the minimum point of

APPENDIX C
DOCKET 29543 - #40

entry as defined in §68.105 of the FCC rules and the point of demarcation of the incumbent LEC's network as defined in §68.3 of the FCC rules.

Upon notification by a requesting telecommunications carrier that it requests interconnection at a multiunit premises where BellSouth owns controls, or leases wiring, BellSouth shall provide a single point of interconnection that is suitable for use by multiple carriers.

**D. Issue 24    Hybrid Loops: *What is the appropriate ICA language to implement BellSouth's obligation to provide unbundled access to hybrid loops?***

**Recommended Language:**

**HYBRID LOOPS:**

Hybrid loops are defined in the federal rules at 47 CFR §51.319(a)(2) as local loops, composed of both fiber optic cable, usually in the feeder plant, and copper twisted wire or cable, usually in the distribution plant.

BellSouth shall provide <<company-shortname>> with nondiscriminatory access to the time division multiplexing features, functions and capabilities of a hybrid loop, including DS1 and DS3 capacity under §251 where impairment exists, on an unbundled basis to establish a complete transmission path between BellSouth's central office and an end-user's premises.

BellSouth shall not engineer the transmission capabilities of its network in a manner, or engage in any policy, practice, or procedure, that disrupts or degrades access to a local loop or subloop, including the time division multiplexing-based features, functions, and capabilities of a hybrid loop, for which a requesting telecommunications carrier may obtain or has obtained access pursuant to this Attachment.

**E. Issue 26    *What is the appropriate ICA language to implement BellSouth's obligation to provide routine network modifications?***

**Issue 27.    *What is the appropriate process for establishing a rate, if any, to allow for the cost of a routine network modification that is not already recovered in Commission-approved recurring or nonrecurring rates? What is the appropriate language, if any, to incorporate into the ICAs?***

**Recommended Language:**

**ROUTINE NETWORK MODIFICATIONS:**

**Definitions:** BellSouth will perform Routine Network Modifications (RNM) in accordance with the requirements of 47 C.F.R. § 51.319(a)(7) and (e)(4) for Loops and Dedicated Transport provided under this Attachment. A routine network modification is an activity that BellSouth regularly undertakes for its own customers. Routine network modifications include, but are not limited to, rearranging or splicing of cable; adding an equipment case; adding a doubler or

APPENDIX C
DOCKET 29543 - #41

repeater; adding a smart jack; installing a repeater shelf; adding a line card; and deploying a new multiplexer or reconfiguring an existing multiplexer Routine network modifications may entail activities such as accessing manholes, deploying bucket trucks to reach aerial cable, and installing equipment casings. Routine network modifications do not include the construction of a new loop, or the installation of new aerial or buried cable for a CLEC.

**Rates:** BellSouth will provide for <<company-shortname>> at no additional charge, all RNM which BellSouth normally provides for its own customers and for which BellSouth recovers its costs through the rates set forth in Exhibit _. BellSouth will otherwise perform Routine Network Modifications pursuant to the existing non-recurring charges and recurring rates ordered by the Alabama Public Service Commission for loop and transport facilities as set forth in Exhibit A. For any RNM performed by BellSouth for which there is not a Commission-established rate or any RNM for which BellSouth alleges that its costs are not recovered through existing rates, BellSouth shall immediately petition the Commission to establish a permanent rate. The Commission will establish interim rates for such RNM that will be subject to true-up upon the establishment of a final rate.

If BellSouth does not normally provide a network modification requested by <<company-shortname>> for BellSouth customers, and does not recover the costs of the network modification requested in the rates set forth in Exhibit __, then such request will be handled as a project on an individual case basis ("ICB"). BellSouth will provide a price quote for the request and, upon receipt of payment from <<company-shortname>>, BellSouth will perform the network modification.

RNM will be performed within the intervals established for the Network Element and subject to the performance measurements and associated remedies set forth in Attachment _ of this Agreement. Either BellSouth or <<customer-shortname>> may seek resolution of any dispute regarding the classification of a network modification as routine or non-routine from the Commission.

**LINE CONDITIONING:**

**Definitions:** Line Conditioning is defined as the removal from a copper loop or copper subloop of any device that could diminish the capability of the loop or subloop to deliver high-speed switched wireline telecommunications capability, including digital subscriber line service. Such devices include, but are not limited to, bridged taps, load coils, low pass filters, and range extenders.

**Rates:** BellSouth shall perform line conditioning pursuant to the non-recurring rates and provisions ordered by the Alabama Public Service Commission in Docket 27821 which provides that BellSouth shall perform loop conditioning for loops less than 18,000 feet at no cost. Such rates were established pursuant to the Federal Communications Commission's forward-looking pricing principles promulgated pursuant to section 252(d)(1) of the

APPENDIX C
DOCKET 29543 - #42

Telecommunications Act and in compliance with rules governing nonrecurring costs in 47 CFR 51.507(e).

**Technical requirements:** BellSouth shall condition Loops, as requested by <<customer sho-tname>>, whether or not BellSouth offers advanced services to the End User on that Loop.

In some instances, <<customer-shortname>> will require access to a copper twisted pair loop unfettered by any intervening equipment (e.g., filters, load coils, range extenders, etc.), so that <<customer-shortname>> can use the loop for a variety of services by attaching appropriate terminal equipment at the ends. <<customer-shortname>> will determine the type of service that will be provided over the loop.

In those cases where <<customer-shortname>> has requested that BellSouth modify a Loop so that it no longer meets the technical parameters of the original Loop type (e.g., voice grade, ISDN, ADSL, etc.) the resulting modified Loop will be ordered and maintained as a UCL. BellSouth shall provide the following: 1) removal of devices on 2-wire or 4-wire Loops equal to or less than 18,000 feet at no additional cost,  2) removal of devices on 2-wire or 4-wire Loops longer than 18,000 feet; and 3) removal of bridged-taps on loops of any length at rates established in APSC Docket 27821. (The specific non-recurring and recurring charges shall apply for each element ordered.)

<<customer-shortname>> shall request Loop make up information pursuant to this Attachment prior to submitting a service inquiry and/or an LSR for the Loop type that <<customer-shortname>> desires BellSouth to condition.