UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| MOMENTUM TELECOM, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ALABAMA PUBLIC SERVICE COMMISSION, | ) | |
| | ) | |
| JIM SULLIVAN, in his capacity as a President of the Alabama Public Service Commission, | ) ) ) | Civil Action No. 2:06-cv-00577-DRB |
| JAN COOK, in her capacity as a Commissioner of the Alabama Public Service Commission, and | ) ) ) | |
| | ) | |
| GEORGE C. WALLACE, JR., in his capacity as a Commissioner of the Alabama Public Service Commission | ) ) ) | |
| | ) | |
| Defendants. | ) ) | |

## BRIEF IN SUPPORT OF COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff Momentum Telecom, Inc. ("Momentum") submits this brief in support of its complaint for a declaratory judgment pursuant to the scheduling order entered by the Court on September 15, 2006.

## I.    INTRODUCTION

Under Section 271 of the federal Telecommunications Act of 1996, 47 U.S.C. §271, BellSouth Telecommunications, Inc. ("BellSouth"), a local exchange telephone company operating in Alabama, is required to lease portions of its network to competing local carriers such as Momentum Telecom.  In accordance with other federal statutes and orders of the Federal

Communications Commission, the lease rates charged to Momentum by BellSouth for these "Section 271 network elements" must be "just and reasonable."

The Alabama Public Service Commission ("APSC") has broad, general authority under state law to regulate local telephone companies. Among the Commission's statutory powers is the duty to insure that the prices charged by local telephone companies are "just and reasonable."

This declaratory judgment action asks whether the APSC has jurisdiction under state and federal law to determine whether the rates charged by BellSouth to lease network elements under Section 271 are just and reasonable or whether federal law has preempted the Commission's ratemaking authority.

In its Answer to Momentum's Complaint, the APSC explains that the agency has not reached a determination whether it has the authority under state law to set just and reasonable rates for Section 271 network elements ("Answer of APSC," paragraph 60) and that the agency "will defer to the wisdom of the court" on this issue.  <u>Id</u>., at 14.

## II.    SUMMARY

The brief presents two main arguments in favor on the APSC's jurisdiction to establish just and reasonable rates for Section 271 network elements.  First, the state commission has ratemaking authority under Alabama law and nothing in the federal Telecommunications Act or the rulings of the FCC has preempted the APSC's ability to exercise that authority in order to review BellSouth's rates for Section 271 elements.  Second, Section 271 itself requires that the terms and conditions under which BellSouth leases network elements to competitors must be set forth either in state-approved contracts or state-approved tariffs, thus giving state regulators the opportunity and authority to determine whether the lease rates contained in those contracts or tariffs are just and reasonable.  This second argument, which is discussed later in this brief, was

rejected by the Alabama Commission, but the agency has yet  not ruled on the state law/preemption question, explaining in its Answer that it will defer to the Court "with respect to the issue of whether the APSC, acting pursuant to its powers under Alabama state law and the Telecommunications Act of 1996, may set rates for 47 U.S.C. §271 network elements."  Answer of APSC, at 14-15.  This summary will focus on the state law/preemption argument and the two federal court opinions which have directly addressed this issue.

Under Alabama state law, the APSC has authority "to set rates for telecommunications service providers . . .consistently with the Constitution of the State and of the United States."  "Answer of APSC," paragraph 38;  See Ala Code §37-1-31.  Alabama law also "provides that such rates must be 'just and reasonable.'"  "Answer of APSC," paragraph 39;  Ala. Code §37-1-80.

Momentum and the APSC agree that, under Section 271 of the Act, BellSouth is required to lease certain network elements, including "local switching," to Momentum at a "just and reasonable" price.  "Answer of APSC," paragraphs 30-32; see 47 U.S.C. §271(c)(2)(B)(vi).  Since there is no conflict between the duty of the APSC under state law to insure that local telephone companies charge "just and reasonable" rates and the requirement of federal law that BellSouth lease Section 271 network elements to Momentum at "just and reasonable" rates, Alabama law has not been preempted.  The APSC retains jurisdiction to review the lease rates charged by BellSouth and, if necessary, establish appropriate prices consistent with state and federal law.

In order to determine whether a state law has been preempted, courts determine whether federal law (1) contains "explicit preemption language," (2) is so "pervasive" as to occupy the field, leaving no room for state action or (3) conflicts with state law so that "compliance with both federal and state regulations is a physical impossibility" or where state

law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  BellSouth v. NuVox Communications et al. 2006 WL 2617123, (United States District Court, Northern District of Georgia) opinion issued Sept. 12, 2006, slip copy, p. 9, quoting This That and the Other Gift and Tobacco v. Cobb County, Ga., 285 F.3d 1319, 1322 (11th Cir. 2002) and Wisconsin Public Intervenors v. Motier, 501 U.S. 597, 604-05 (1991).

As District Judge Duffey found in the BellSouth v. NuVox, decision, supra, the 1996 Act "does not supplant state authority" (id., at 9) and it "cannot be said to completely preempt the field."  Id., at 10.  To the contrary, the Act expressly preserves state authority over "access and interconnection obligations" of local telephone companies as long as those state-mandated obligations are "consistent with" the requirement of the Act and do not "substantially prevent implementation" of the Act and its purposes.  47 U.S.C. §251(d)(3).  See also 47 U.S.C. §253(b) ("Nothing in this section shall affect the ability of a state to impose, on a competitively neutral basis . . . requirements necessary to . . . ensure the continued quality of telecommunications services . . .").

Finally, there is no "conflict" preemption where both federal and state law require the same thing:  that BellSouth's rates for leasing local switching to Momentum pursuant to Section 271 be "just and reasonable."  That standard, as the FCC has recognized, is a term of art in regulatory law and has the same meaning to both federal and state regulators.  As the FCC explained, "[T]he pricing of checklist network elements [required under Section 271] are reviewed utilizing the basic just, reasonable and nondiscriminatory rate standard . . . that is fundamental to common carrier regulation that has historically been applied under most federal and state statutes …"  Triennial Review Order ("TRO"), 18 FCC Rcd. 16978 (2003) paragraph 663.

Based on state regulatory laws similar to Alabama's statutes, state public service commissions in other states, including Georgia[1], Kentucky[2], Minnesota[3] and Tennessee[4] have ruled that state regulators have jurisdiction to review rates charged by the incumbent Bell carrier for leasing network elements pursuant to Section 271. Other states, however, have either held that they lack such jurisdiction or, as Alabama has done, decided to hold the matter in abeyance and "defer to the wisdom of the Court."

The FCC has provided no help. The identical issue before the Court – whether states may set "just and reasonable" rates for services which a Bell carrier is required to provide under Section 271 – has been pending, unanswered, before the FCC for more than two years. See "Emergency Petition of BellSouth for Declaratory Ruling and Preemption of State Action," WC Docket No. 04-245 (July 1, 2004).[5] In the meantime, two federal district courts have ruled directly on the state law/preemption question, one in favor of state jurisdiction and the other in favor of federal preemption.[6]

---

1 Georgia: "Generic Proceeding to Examine Issues Related to BellSouth's Obligations to Provide Unbundled Network Elements," Docket No. 19341-U, Order issued March 8, 2006; Order on Reconsideration issued March 24, 2006. Copy attached as Exhibit 1.

2 Kentucky: "In the Matter of BellSouth Telecommunications Inc.'s Notice of Intent to Disconnect Southeast Telephone, Inc. for Non-Payment," Case Nos. 2005-00519 and 2005-00533, Order issued August 16, 2006. Copy attached as Exhibit 2.

3 Minnesota: "In the Matter of a Potential Proceeding to Investigate the Wholesale Rates Charged by Qwest," Docket No. P-421/CI-05-1996, Order issued May 4, 2006. A copy of this Order, which discusses at some length the issue of whether the agency's ratemaking authority under state law has been preempted by the Act, is attached as Exhibit 3.

4 Tennessee: "In Re: Petition for Arbitration of ITC^DeltaCom Communications, Inc. with BellSouth . . ." Docket No. 03-00119. Order issued October 20, 2005. Copies of pages 1, 24-39, and 80 are attached as Exhibit 4.The Tennessee order also contains an extensive analysis of the state law/preemption issue

5 The BellSouth petition was filed in response to a ruling by the Tennessee Regulatory Authority asserting that agency's jurisdiction under both federal and state law over Section 271 rates. A copy of the relevant pages of the Tennessee is attached. Exhibit 4.

6 There are other cases addressing various aspects of state jurisdiction under Section 271 of the Act but none of these opinions rules directly on the question of whether federal law preempts a state commission acting under state law from setting "just and reasonable" rates for a network element offered under Section 271.

*(Footnote continued on next page.)*

Upholding a decision of the Maine Public Utilities Commission, the United States District Court for the District of Maine held that the "broad authority" of the state commission to make telecommunications services available upon "terms that are just and reasonable" authorized the PUC to set just and reasonable rates for Section 271 elements and that the state's ratemaking jurisdiction had not been preempted by federal law. Verizon New England v. Maine Public Utilities Commission, 403 F.Supp. 2d 96 (D. Me. 2005) (Order denying Plaintiff's Motion for Preliminary Injunction) and also 2006 WL 2007655 (D. Me. July 18, 2006) (Order Granting Defendants' Motion for Summary Judgment).

The Maine Court's preemption analysis focused on the language of Section 271, finding nothing in the statute that expressly or by implication preempted the ratemaking authority of the Main Commission. The Court wrote (403 F.Supp. 2d at 102):

---

In Verizon New England v. New Hampshire Public Service Commission, 2006 WL 2433249 (D.N.H.) (August 22, 2006), The Court overturned the commission's decision that it had the power to set 271 rates because Verizon was estopped from challenging the agency's jurisdiction. The Court expressly declined to address the commission's authority under state law to set rates for Section 271 elements. See footnote 29.

In Deica Communications, Inc. v. Florida Public Service commission Case No. 4: 06CV72-RH/WCS (N.D. Fla., Sept. 12, 2006), the Court affirmed the Florida Commission's ruling that the agency had no jurisdiction to enforce the provisions of Section 271. The Court did not address, nor did the parties raise, the commission's authority under state law to set rates for Section 271 elements. See footnote 7. (Since this order is not available on Westlaw, a copy is attached as Exhibit 5.)

In Qwest v. Public Utilities Commission of Colorado, 2006 WL 771223 (D. Colo.), the Colorado District court affirmed a ruling by the Colorado Commission holding that the agency had authority under Section 252(e) of the Act to review an agreement between Qwest (a regional Bell carrier like BellSouth) and MCImetro (a competitive local exchange carrier like Momentum) in which Qwest leased Section 271 elements to MCImetro. Although the Court did not address the issue of whether the Colorado Commission had jurisdiction to set rates for Section 271 elements, the Court's decision upholding the state commission's power to review the contract means that state regulators must determine, pursuant to Section 252(e)(2)(A)(ii), whether the Section 271 rates contained in the agreement are "consistent with the public interest, convenience and necessity," that is, whether the rates are just and reasonable.

In two other cases, federal courts observed that BellSouth's obligations under Section 271 to lease certain network elements to competitors may be enforced only by filing a complaint at the FCC. See BellSouth Telecommc'ns, Inc. v. Mississippi Public Serv. Comm'n, 368 F.Supp.2d 557, 565 (S.D. Miss. 2005); BellSouth Telecommc'ns, Inc. v. Cinergy Commc'ns Co., 2006 WL 695424, No. 03:05-CV-16-JMH, slip op. at 12 (E.D. Ky. 2005). Neither case addressed the power of a state commission, acting under state law, to determine whether the rates at which those elements are offered are "just and reasonable."

The central, vital predicate for this argument is that federal law preempts state regulation of § 271 obligations. It is clear that the statute is not intended to have any such effect. While § 271 states that the approval of an application submitted by a BOC to provide InterLATA services shall be by the FCC, *see* §§ 271(d)(1) and (b)(1), neither that provision nor any other provision in the Act confers exclusive jurisdiction on the FCC with respect to rate-making for § 271 UNEs. A careful reading of §271 shows that the language of it contains absolutely not express provision for rates or any comment on authority to make rates….Thus, the authority of state commissions over rate-making and its applicable standards is not pre-empted by the express or implied content of § 271.

The Court then addressed Verizon's alternative argument that the FCC's rulings had implicitly preempted the Maine Commission's ratemaking authority. The Court found no such words in the FCC's orders, explaining (id.):

Furthermore, Verizon has failed to direct the Court to any order of the FCC interpreting § 271 to provide an exclusive grant of authority for rate-making under § 271. The only FCC order presented by Verizon that relates to rate-making under § 271 provides "[w]hether a particular checklist element's rate satisfies the just and reasonable pricing standard of section[s] 201 and 202 is a fact-specific inquiry that the [FCC] will undertake." TRO ¶ 664. That language says nothing, however, about the *exclusivity* of FCC jurisdiction or about PUC rate-making authority. Here again, Plaintiff overreaches. Verizon has failed to present, and this Court has been unable to find, any FCC order specifically interpreting the Act as providing the FCC with exclusive authority to set rates under § 271.

On the other hand, the United States District Court for the Eastern District of Missouri recently overturned a ruling of the Missouri Public Service Commission ("MPSC") and held that the state commission had no jurisdiction to set Section 271 rates and that the agency's ratemaking authority under state law had been preempted. Southwestern Bell Telephone v. Missouri Public Service Commission, 2006 WL 65536 (Sept. 14, 2006).

The Missouri Court primarily addressed the issue of whether Section 271 contains an implicit grant of authority to state commissions to establish rates for Section 271 elements. (That argument is discussed later in this brief.) Neither the Court (nor, apparently, the parties)

discussed in any detail the Missouri Commission's power under state law or the traditional, three-pronged federal preemption test. After discussing whether the language of Section 271 gave the state jurisdiction to review Section 271 rates, the court briefly addressed the state law/preemption issue, disagreeing with the Maine Court's analysis (slip copy at 11):

> The Court declines to follow Verizon New England, Inc. v. Maine Public Utilities Comm'n, which concluded that state commissions have the authority to require § 271 elements in interconnection agreements and to set rates under § 271. See 403 F.Supp.2d at 102. The decision cites no federal law grant of authority to support its conclusion, but rather implies it from § 271's silence with respect to rate-making authority and relies on Maine law as a source of authority. This reasoning is contrary to the FCC's rulings and the decisions of most state commission, and fails to adequately acknowledge the Act's transfer of the regulation of local telecommunications competition from the states to the FCC. AT&T Corp. v. Iowa Utilities Board, 525 U.S. at 378 n.6. Under the current regulatory scheme, "while Congress has chosen to retain a significant role for state commissions, the scope of that role is measured by federal, not state, law." Southwestern Bell, 225 F.3d at 947.

While finding that Missouri state law has been preempted by "the FCC's rulings" and "the Act's transfer" of regulatory authority "from the states to the FCC," the Court's opinion does not cite any specific ruling of the FCC nor any section of the Act to support the Court's finding of preemption.

Momentum suggests that the Maine Court's analysis of the preemption issue is more persuasive. Whether or not Section 271 of the Act grants ratemaking authority to state commissions, an argument discussed further below, it is clear that nothing in Section 271 or any ruling of the FCC preempts the power of the Alabama Commission, acting under state law, to set just and reasonable rates for network elements offered by BellSouth to Momentum pursuant to Section 271.

For these reasons, as explained below in more detail, Momentum asks that the Court expeditiously consider this complaint for a declaratory judgment and declare that the

Alabama Public Service Commission has the power under state and federal law to establish just

and reasonable rates for network elements offered by BellSouth under Section 271.

### III.    STATUTORY AND REGULATORY FRAMEWORK

This case involves the interpretation and application of the Telecommunications

Act of 1996 (the "Act"), Pub. L. 104-104, 110 Stat. 56, codified at 47 U.S.C. § 151-614.    The

Act was designed to promote competition in local telephone markets by ending regulated

monopolies enjoyed by incumbent telephone companies ("ILECs") such as BellSouth.    As the

Eleventh Circuit Court of Appeals explained:

> Before the Telecommunications Act became law, most areas were
> served by a single local exchange carrier, now known as the
> "incumbent local exchange carrier."  Over the years, the incumbent
> local carrier constructed hardware networks to deliver residential
> and commercial telephone service to the area.  Because they were
> without competition and were often compensated based on how
> much they spent (the "rate-of-return method"), incumbent local
> carriers had an incentive to construct networks that were
> inefficient.  The Telecommunications Act was enacted to "uproot[]
> the monopolies that traditional rate-based methods had
> perpetuated."  The Act preempted state laws that protected local
> monopolies, and it imposed on local carriers affirmative duties to
> facilitate market entry by new local carriers, known as
> "competitive local exchange carriers."

MCI Worldcom Communications, Inc. v. BellSouth Telecommunications, Inc., 446 F.3d 1164,

1166-67 (11th Cir. 2006) (citations omitted).  As the Court of Appeals for the D.C. Circuit

recently described, the Act allows the FCC to require that ILECs make certain of their network

elements available to CLECs:

> To minimize the characteristics of natural monopoly in the market,
> the Act gave the FCC broad powers to require ILECs to make
> unbundled network elements ("UNEs") available to competitive
> local exchange carriers ("CLECs").  47 U.S.C. § 251(c)(3), (d); see
> also 47 U.S.C. § 153(29) (defining a "network element" as a
> "facility or equipment used in the provision of a
> telecommunications service").    Thus, the [FCC] may require the
> ILECs to offer pieces of their networks as unbundled building

blocks, which the CLECs can lease, repackage, and use to compete
against the ILECs in communications markets across the country.

Covad Comm. Corp. v. FCC, ___ F.3d ___, 2006 WL 1651045 (June 16, 2006).

   **(1)    Section 251 of the Act.**

         In Section 251 of the Act, Congress left to the Federal Communications

Commission ("FCC") the designation of elements to be "unbundled," specifying that in doing so

the FCC was to consider, "at a minimum, whether . . . the failure to provide access to such

network elements would impair the ability of the telecommunications carrier seeking access to

provide the services that it seeks to offer."  47 U.S.C. § 251(d)(2) (This is commonly called the

"impairment" standard.)

         The list of required UNEs under Section 251 has not remained constant since the

passage of the Act ten years ago.  The federal courts reversed three attempts by the FCC to

establish such a list under the "impairment" standard of Section 251(d)(2).  As the Court of

Appeals for the D.C. Circuit explained:

> The Act became effective on February 8, 1996, a little more than
> eight years ago.  Twice since then the courts have faulted the
> Commission's efforts to identify the elements to be unbundled.
> The Supreme Court invalidated the first effort in *AT&T Corp. v.
> Iowa Utilities Board,* 525 U.S. 366, 389-90, 119 S.Ct. 721, 734,
> 142 L.Ed.2d 835 (1999) ("*AT&T*"). We invalidated much of the
> second effort (including separately adopted "line-sharing" rules) in
> *United States Telecom Association v. FCC,* 290 F.3d 415 (D.C.
> Cir. 2002) ("*USTA I*"). The Commission consolidated our remand
> in that case with its "triennial review" of the scope of obligatory
> unbundling and issued the Order on review here. See [TRO].
> Again, regrettably, much of the resulting work is unlawful.

U.S. Telecom Ass'n v. F.C.C., 359 F.3d 554, 561 (D.C. Cir. 2004) ("USTA II").  As it signaled

in the last sentence quoted above, the USTA II Court invalidated for a third time a portion of the

FCC's determination of the scope of obligatory unbundling under Section 251.  Thus, the USTA

II Court remanded the matter to the FCC yet again for a determination of what network elements ILECs are required to make available to CLECs under Section 251.

   In response to USTA II, the FCC entered its "Triennial Review Remand Order," limiting the ILECs' Section 251 unbundling obligations by dropping certain network elements from the list of UNEs to which access is required under Section 251.  Unbundled Access to Network Elements, Order on Remand, WC Docket No. 04-313; CC Docket No. 01-338, 20 FCC Rcd 2533 (2005) ("Triennial Review Remand Order" or "TRRO").  The United States Court of Appeals for the D.C. Circuit recently upheld the TRRO, stating that "the [FCC's] fourth try [at implementing the unbundling provisions of the Act] is a charm."  Covad Comm. Corp. v. FCC, ___ F.3d ___, 2006 WL 1651045 (June 16, 2006).

   The FCC also has the authority to determine what method the state commissions may use in setting rates for Section 251 UNEs.  47 U.S.C. §251(d)(1).  The FCC exercised that authority in establishing the Total Element Long-Run Incremental Cost ("TELRIC") method for setting UNE rates.[7]  See 47 C.F.R. § 51.505.

   **(2)    Section 252 of the Act.**

   The terms and conditions under which a CLEC leases UNEs from an ILEC are set forth in interconnection agreement between the two carriers.  Interconnection agreements must be submitted to and approved by the applicable "state commission" (in Alabama, the APSC).  The Act encourages ILECs and CLECs to negotiate and agree upon access rates via an interconnection agreement.  47 U.S.C. § 251(c)(1).  Under Section 252, if the ILEC and CLEC cannot negotiate an agreement, either party may petition the state commission to arbitrate any

---

[7] The TELRIC of an element is the "forward-looking cost over the long run" of an element, "taking as a given the incumbent LEC's provision of other elements." 47 C.F.R. § 51.505(b).  The TELRIC must be measured "based on the use of the most efficient telecommunications technology currently available and the lowest cost network configuration."  47 C.F.R. § 51.505(b)(1).

open issues.  47 U.S.C. § 252(b).  "Congress delegated to each state commission the authority to approve the interconnection agreement, including the pricing of unbundled network elements [UNEs]."  <u>MCI Worldcom</u>, 446 F.3d at 1167; <u>see also</u> 47 U.S.C. § 252(e).

      **(3)**      **Section 271 of the Act.**

      Section 271 of the Act gave the largest ILECs, the Bell operating companies or "BOCs" such as BellSouth, the right to enter the market for long distance telephone service, a market in which they previously had been forbidden from participating.  In order to enter the long distance market, a BOC must satisfy a "competitive checklist" containing fourteen requirements.  Checklist item two requires BOCs to provide "[n]ondiscriminatory access to network elements in accordance with the requirements of sections 251(c)(3) and 251(d)(1)," while checklist items four, five, six, and ten require the BOC to provide unbundled access to, respectively, local loops, local transport, local switching, and call-related databases, 47 U.S.C. §§ 271(c)(2)(B)(ii), 271(c)(2)(B)(iv)-(vi),(x).

      The FCC has concluded, and the D.C. Circuit has affirmed, that "checklist items four, five, six and ten imposed unbundling requirements for those elements independent of the unbundling requirements imposed by §§ 251-52." <u>U.S. Telecom Ass'n v. F.C.C.</u>, 359 F.3d 554, 588 (D.C. Cir. 2004) ("<u>USTA II</u>"); <u>see also</u> Report and Order and Order on Remand and Further Notice of Proposed Rulemaking, <u>Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers</u>, CC Docket Nos. 01-338 et al., FCC 03-36, 18 FCC Rcd 16978 (Aug. 21, 2003) ("Triennial Review Order" or "TRO").  As such, "none of the requirements of § 251(c)(3) applies to items four, five, six and ten on the § 271 competitive checklist." <u>USTA II</u>, 359 F.3d at 590.

      Although the FCC no longer requires ILECs to make certain network elements available to CLECs pursuant to Section 251, BOCs are still required to make those network

elements available to CLECs if they are listed in Section 271. Thus, the TRRO's delisting of a network element under Section 251 does not relieve a BOC's obligation to provide that element if it is mandatory under Section 271. While a BOC is no longer obligated to offer such a Section 271 network element (which has been de-listed under Section 251) at TELRIC prices, the element still must be priced at "just and reasonable" rate. See 47 U.S.C. § 201; TRO, ¶ 663.

**B.     Under the plain language of Section 271, a BOC's compliance with the competitive checklist must funnel through an interconnection agreement approved by the state commission under Section 252.**

In Section 271, Congress directly tied a BOC's obligations under the competitive checklist (including providing Section 271 network elements) to providing that access through an interconnection agreement. Section 271(c)(2) states that a BOC meets the conditions necessary to seek approval to enter the long distance market "if, within the State for which the authorization is sought . . . such company is providing access and interconnection pursuant to one or more agreements described in paragraph (1)(A)" or, alternatively, through a state-approved tariff of terms and conditions that the company generally offers. The statute also requires that "such access and interconnection" must include access to each of the network elements named in the competitive checklist." 47 U.S.C. § 271(c)(2)(A) (emphasis added).

The "agreements described in paragraph (1)(A)" are binding agreements that have been approved by the state commission under Section 252. Section 271(c)(1)(A) states:

> A Bell operating company meets the requirements of this subparagraph if it has entered into one or more binding agreements that have been approved under section 252 of this title specifying the terms and conditions under which the Bell operating company is providing access and interconnection to its network facilities for the network facilities of one or more unaffiliated competing providers of telephone exchange service . . . to residential and business subscribers.

47 U.S.C. § 272(c)(1) (emphasis added). Thus, under the plain language of the Act, when a BOC makes network elements available to ILECs under Section 271, it must do so either through

an interconnection agreement approved by the state commission under Section 252(a) or (b) or a general offering of terms and conditions approved by the state commission under Section 252(f).

As such, Section 271 elements, like Section 251 elements, must be offered pursuant to interconnection agreements or tariffs, either of which must be submitted to and approved by a state commission under Section 252.

## IV.    UNDISPUTED FACTS PARTICULAR TO THIS CASE

After the FCC's entry of the TRRO and as a result of a joint petition filed by Momentum and ITC^DeltaCom Communications, Inc. on November 29, 2004, and a separate petition filed by BellSouth on November 2, 2004, the APSC opened a generic proceeding (Docket No. 29543) for the purposes of "clarifying issues related to the legal and regulatory changes that resulted from the [FCC's] issuance of the Triennial Review Order, the decision of the Supreme Court in USTA II and the FCC's Triennial Review Remand Order entered in response to the USTA II decision."  Final Order Resolving Disputed Issues, Complaint, Ex. 3, p. 1; see also Petition Regarding the Establishment of a Generic Proceeding on Change in Law and Nondiscriminatory Pricing for UNEs, Complaint, Ex. 1; Petition to Establish Expedited Generic Proceeding, Complaint, Ex. 2.  One of the issues the PSC undertook to resolve in Docket No. 29543 was denominated as Issue No. 8:  "Does the Commission have the authority to require BellSouth to include in its interconnection agreements entered into pursuant to Section 252, network elements under either state law, or pursuant to Section 271 or any other federal law other than Section 251?"  Final Order, Complaint, Ex. 3, p. 2.  Other parties, including Competitive Carriers of the South ("CompSouth", a nonprofit association of CLECs), Centurytel of Alabama, LLC, and Sprint Communications Company, LP, eventually joined Docket No. 29543.  See Complaint, Ex. 3, p. 2.

On October 6, 2005, the PSC held a hearing on all open matters, including Issue No. 8. At its regularly scheduled meeting on Tuesday, March 7, 2006, the PSC unanimously approved recommendations from its staff regarding Issue No. 8 and the other pending issues in Docket No. 29543. On April 20, 2006, the PSC formalized its action of March 7, 2006, issuing a Final Order Resolving Disputed Issues (the "Final Order"). See Complaint, Ex. 3. In the Final Order, as to Issue 8, the PSC determined that, as a matter of law, "it does not appear that the Commission has the requisite jurisdiction to compel the inclusion of § 271 elements in dispute in this proceeding in interconnection agreements that are submitted to the Commission for its review pursuant to § 252. Further, there appears to be no express or implied obligation on the part of BellSouth to negotiate the terms and conditions regarding § 271 elements." Complaint Ex. 3, p. 5.

On March 7, 2006, Momentum filed with the PSC an Emergency Petition for Reconsideration of the PSC's final determinations of Issues 8 and 14. See Momentum's Emergency Petition for Reconsideration, Complaint, Ex. 4. In its Emergency Petition for Reconsideration, Momentum noted that the PSC's final determination of Issues 8 and 14 was contrary to existing federal court decisions, as well as state commissions of border states Georgia and Tennessee. Complaint, Ex. 4, ¶ 4. Momentum also asserted that the PSC's final determination, if allowed to stand, would force Momentum to shut down and leave its 15,000 Alabama subscribers without a competitive alternative for telephone service. Id.

On May 2, 2006, the PSC ruled that Momentum's Emergency Petition for Reconsideration would be held in abeyance. The PSC reasoned that "[t]he core issues raised by Momentum are currently before the federal district court in Georgia. A ruling on Momentum's Petition will thus be deferred until there is guidance from the federal district court in question."

Order Holding in Abeyance of Momentum Telecom, Inc.'s Emergency Petition for Reconsideration, Complaint., Ex. 5.[8]

## V.    ARGUMENT

### a.  The PSC may set rates for Section 271 elements and may require BellSouth to include Section 271 elements in its interconnection agreements.

#### i.  Under the plain language of Section 271, a BOC's compliance with the competitive checklist must funnel through an interconnection agreement approved by the state commission under Section 252

As noted above, Congress, in drafting Section 271, directly tied a BOC's obligations under the competitive checklist (including providing Section 271 network elements) to providing that access through an interconnection agreement, which a state commission must approve pursuant to Section 252. As such, Section 271 elements must be offered pursuant to the same review process as Section 251 elements.[9] Thus, the APSC erred as a matter of fundamental statutory interpretation when it determined that "it may not require BellSouth to include certain

---

[8] The referenced case is BellSouth Telecomm., Inc. v. Georgia Pub. Serv. Comm'n, et al., Case No. 1:06-cv-00162-CC (N.D. Ga.), in which BellSouth is bringing a declaratory judgment action and request for injunctive relief against the Georgia Public Service Commission based on that commission's election set rates for Section 271 elements. A copy of the Georgia Commission order is attached as Exhibit 1.

[9] Additionally, it is settled law that state commissions can set rates for elements other than those found in Section 251 in at least one other circumstance. Specifically, if the parties' interconnection agreements contain open issues other than as pertain to Section 251 elements, the state commission has the power to arbitrate and resolve "*any issue* left open after unsuccessful negotiation", even if the open issues "include issues other than those listed in § 251(b) and (c)." Coserv. Ltd. Liability Corp. v. Southwestern Bell Tel. Co., 350 F.3d 482, 487 (5th Cir. 2003) (emphasis original); see also 47 U.S.C. § 251(b)(1). That is,

> where the parties have voluntarily included in negotiations issues other than those duties required of an ILEC by § 251(b) and (c), those issues are subject to compulsory arbitration under § 252(b)(1). The jurisdiction of the [state commission] as arbitrator is not limited by the terms of § 251(b) and (c); instead, it is limited by the actions of the parties in conducting voluntary negotiations.

Id. Furthermore, the state commission has the affirmative obligation to resolve all issues presented in the petition. See 47 U.S.C. § 252(b)(4)(C) ("The State commission shall resolve each issue set forth in the petition and the response . . ."). Thus, there is no question that the PSC may set rates for 271 network elements when the parties include those elements in interconnection agreements that also cover Section 251 elements. The real question in this litigation, therefore, is: can a BOC avoid having the PSC set rates for Section 271 elements by having two separate interconnection agreements – one for Section 251 elements and another for Section 271 elements – with each CLEC?

47 U.S.C. §271 elements in its [Section 252] interconnection agreement." "Answer of APSC,"

paragraph 60.

> **ii. Alabama state law gives the PSC the power to set rates for telecommunications services; nothing in federal law preempts that authority.**

Although the Alabama Commission did not agree with Momentum's argument

that Section 271 elements must be offered pursuant to state–approved interconnection

agreements, the APSC has not ruled on the issue of whether the agency, acting under state law,

may review BellSouth's rates for Section 271 network elements. Such a review might arise, for

example, if a competing carrier filed a complaint about BellSouth's rates or if the Commission

initiated a generic proceeding to determine whether those rates are just and reasonable.

Under Alabama law, the PSC has the authority to set rates for telecommunications

service providers "as they may be exercised consistently with the Constitution of the state and of

the United States." Ala. Code § 37-1-31; accord QCC v. Hall, 757 So.2d 1115 (Ala. 2000);

South Cent. Bell Tel. Co. v. Holmes, 689 So.2d 786 (Ala. 1996). State law provides that such

rates must be "just and reasonable," the same standard Congress and the FCC has established for

rate setting under Section 271. Ala. Code § 37-1-80; see also Alabama Pub. Serv. Comm'n v.

Southern Bell Tel. & Tel. Co., 268 Ala. 312, 106 So.2d 163 (Ala. 1958), rehearing overruled 269

Ala. 361, 113 So.2d 503.

> 1. The text of Section 271 does not limit the PSC's power to set rates.

There is no support in the text of Section 271 for an evisceration of the states'

traditional power to set rates for telecommunications services within their borders, subject to

federal guidance on what standard should be used in doing so. There is no express preemption,

"field" preemption, or conflict preemption in the requirements of the statute.  As the Maine

District Court explained,

> A careful reading of § 271 shows that the language of it contains
> absolutely no express provision for rates or any comment on
> authority to make rates.  In fact, the word "rate" does not appear at
> all in § 271. There is simply no express consideration of rate-
> making or rate-making authority set out in § 271.  . . .  Thus, the
> authority of state commissions over rate-making and its applicable
> standards is not pre-empted by the express or implied content of §
> 271.

<u>Verizon New England, Inc. v. Maine Pub. Util. Comm'n</u>, <u>supra</u>, 403 F. Supp. 2d at 102.[10]  But

see <u>Southwestern Bell v. Missouri Public Service Commission</u>, discussed <u>supra</u>, at p. 8.

BellSouth likely will argue, as Verizon did in Maine, that Section 271 should be

read to contain an exclusive grant of authority for rate making under § 271.  It may cite

Paragraph 664 of the FCC's Triennial Review Order, which states that "[w]hether a particular

checklist element's rate satisfies the just and reasonable pricing standard of section[s] 201 and

202 is a fact-specific inquiry that the [FCC] will undertake."  However, as the <u>Verizon</u> court

correctly determined:

> That language says nothing, however, about the exclusivity of FCC
> jurisdiction or about [state commission] rate-making authority.
> Here again, Plaintiff overreaches.  Verizon has failed to present,
> and this Court has been unable to find, any FCC order specifically
> interpreting the Act as providing the FCC with exclusive authority
> to set rates under § 271.

<u>Verizon</u>, 403 F. Supp. 2d at 102.

Furthermore, the FCC itself has never asserted that its authority to set Section 271

rates is exclusive.  The FCC has had plenty of opportunity to do so if it wished.  In fact, it has

---

10 Interestingly, the Alabama Commission has expressly denied that its failure to review BellSouth's Section 271
rates is "contrary to the determination" of the Maine District Court in the <u>Verizon</u> case.  "Answer of APSC,"
paragraph 50.  That is presumably another indication that the APSC has yet to rule on the state law/preemption
issue.

had the question of whether states may set rates for services required by Section 271 pending before it for more than two years, but has failed to answer it to date.  See Emergency Petition of BellSouth for Declaratory Ruling and Preemption of State Action, WC Docket No. 04-245 (July 1, 2004).  Obviously, the FCC must not feel strongly that it has exclusive jurisdiction to set Section 271 rates, else it would have stated so in the ample time it has had to do so.

Furthermore, the FCC has expressly acknowledged the traditional role of state law in setting rates. In the Triennial Review Order, the FCC discussed the "just and reasonable" standard to be applied to network elements offered under Section 271:

> Thus, the pricing of checklist network elements that do not satisfy the unbundling standards in section 251(d)(2) are reviewed utilizing the basic, just, reasonable and nondiscriminatory rate standard of sections 201 and 202 that is fundamental to common carrier regulation that has historically been applied under most federal and state statutes, including (for interstate services) the Communications Act.

TRO, ¶ 663 (emphasis added).  Because nothing in Section 271 preempts a state from setting rates for "competitive checklist" elements and because, indeed, the FCC has expressly acknowledged that role of state statues in determining just and reasonable rates, it would be entirely proper for the APSC to set rates for Section 271 network elements.

2. There is no implied preemption of the PSC's authority to set rates for Section 271 elements.

Congress, in enacting the Act, did not purport to preempt all state regulation on telephone carriers.  Indeed, Congress expressly preserved the states' ability to enforce laws that furthered Congress's goals of fostering local competition and state commission authority to enforce state regulations and policies regarding the operation of local telecommunications markets "as long as state commission regulations are consistent with the Act."  Michigan Bell Tel. Co. v. MCIMetro Access Transmission Servs., Inc., 323 F.3d 348, 359 (6th Cir. 2003); see also 47 U.S.C. § 251(d)(3).  This principle is in accord with the general principle that a federal

law will not be held to supersede a state's exercise of power unless Congress's intention to do so is abundantly clear.  On this subject, the Supreme Court has stated:

> This Court has repeatedly refused to void state statutory programs, absent congressional intent to pre-empt them. 'If Congress is authorized to act in a field, it should manifest its intention clearly. <u>It will not be presumed that a federal statute was intended to supersede the exercise of the power of the state unless there is a clear manifestation of intention to do so.</u> The exercise of federal supremacy is not lightly to be presumed.'

<u>N.Y. State Dep't of Soc. Servs. v. Dublino</u>, 413 U.S. 405, at 413, (1973) (emphasis added; quoting <u>Schwartz v. Texas</u>, 344 U.S. 199, 202-203, (1952)).

Furthermore, the primary objective of the Telecommunications Act of 1996 has been to open the telecommunications markets to effective competition.  <u>See</u>, <u>e.g.</u>, <u>Iowa Utilities Board v. FCC</u>, 120 F.3d 753, at, 791-92.  To do so, the methods that Congress has chosen include, among others, to require BOCs and other ILECs to open their networks, interconnect with competitors upon request, and establish fair, reasonable, non-discriminatory rates for Section 271 elements.  None of these objectives suggest an intent to preempt and displace state standards requiring just and reasonable non-discriminatory rates.  As such, the Act should not be held to preclude state commissions for exercising state law powers to set rates for telecommunications services, including rates for Section 271 network elements.  <u>See</u>, <u>e.g.</u>, <u>Dublino</u>, 413 U.S. at 421 ("Where coordinate state and federal efforts exist within a complementary administrative framework, and in the pursuit of common purposes, the case for federal pre-emption becomes a less persuasive one.").  This is particularly true since the determination of a BOC's adherence to the competitive checklist is not made broadly, but rather is made on a state-to-state basis, in consultation with state commissions.  <u>See</u> 47 U.S.C. § 271(c)(2)(A).

As a practical matter, of course, it would be absurd to seek the FCC's intervention on setting rates for each Section 271 element for each BOC-CLEC pair for each of the 50 states. Those decisions are better left – and necessarily left – to state commissions that are already experienced in the setting of rates for network elements within their jurisdictions.

      **b.  <u>This is a proper action under the Declaratory Judgment Act.</u>**

Momentum brings this action pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and pursuant to 28 U.S.C. § 1331, which authorizes this Court to interpret the Constitution, laws or treaties of the United States. The Alabama Commission agrees that this case is properly before the Court. "Answer of APSC," paragraphs 8, 9, 10, and 64.

The Declaratory Judgment Act provides that "[i]n the case of an actual controversy within its jurisdiction, any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. 28 U.S.C. § 2201; <u>see also</u> Fed. Rule Civ. Proc. 57 ("The existence of another adequate remedy does not preclude a judgment for declaratory relief in cases where it is appropriate."). A party who invokes the court's authority under the Declaratory Judgment Act must show "(1) that they personally have suffered some actual or threatened injury as a result of the alleged conduct of the defendant; (2) that the injury fairly can be traced to the challenged action; and (3) that it is likely to be redressed by a favorable decision." <u>GTE Directories Pub. Corp. v. Trimen America, Inc.</u>, 67 F.3d 1563, 1567 (11th Cir. 1995).

In the present case, Momentum meets all three criteria. First, Momentum is harmed because the PSC has thus far declined to determine and set "just and reasonable" rates for network elements that Momentum leases from BellSouth under Section 271. Second, the harm to Momentum is directly due to the APSC's failure to act because of its uncertainty as to a matter of federal law. And third, Momentum's injury is likely to be redressed by a favorable

decision because the APSC has expressly stated that it will defer to the Court for guidance on this issue.  As such, this matter is properly before this Court and the Court should rule, consistent with the principles stated above, that the PSC may set just and reasonable rates for Section 271 elements.

## VI.    CONCLUSION

Under both the Act and under applicable state law, the APSC may set "just and reasonable" rates for Section 271 network elements.  Because the APSC declined to exercise this authority pending instructions from the Court, this case is ripe for declaratory judgment on this issue.

Respectfully submitted,


/s/ James H. McLemore
James H. McLemore (MCL014)

OF COUNSEL:
CAPELL & HOWARD, P.C.
150 South Perry Street (36104)
P.O. Box 2069 (36101-0078)
Montgomery, Alabama  36102
(334) 241-8058
(334) 241-8258 fax


Henry M. Walker (Tenn. Reg. No. 000272)
George H. Nolan (Tenn. Reg. No. 014974)
Jonathan D. Rose (Tenn. Reg. No. 020967)


OF COUNSEL:
BOULT, CUMMINGS, CONNERS & BERRY, PLC
1600 Division Street, Suite 700
P.O. Box 340025
Nashville, Tennessee  37203
(615) 252-2348


*Attorneys for Momentum Telecom, Inc.*

- 22 -

## <u>CERTIFICATE OF SERVICE</u>

I certify that copies of the foregoing have been served upon the following counsel of record by electronic filing and by depositing a copy of same in the United States mail, properly addressed and postage prepaid this 22nd day of September, 2006.

| | |
|---|---|
| Hon. George Scott Morris<br>Alabama Public Service Commission<br>100 N. Union Street, Suite 836<br>Montgomery, AL 36104 | Hon. Francis B. Semmes<br>BellSouth Telecommunications, Inc.<br>3196 Highway 280 South<br>Room 304-N<br>Birmingham, AL  35243 |
| Hon. Walter R. Byars<br>Steiner, Crum & Byars, P.C.<br>P. O. Box 668<br>Montgomery, AL 36101 | Hon. Sean A. Lev<br>Kellogg Huber Hanson Todd Evans & Figel<br>Sumner Square, Suite 400<br>1615 M Street NW<br>Washington, D.C. 20036 |

/s/ James H. McLemore
OF COUNSEL