**EXHIBIT 4**

Case 2:06-cv-00577-WKW-TFM   Document 25-5   Filed 09/22/2006   Page 1 of 19

BEFORE THE TENNESSEE REGULATORY AUTHORITY

NASHVILLE, TENNESSEE

October 20, 2005

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| PETITION FOR ARBITRATION OF ITC^DELTACOM | ) | DOCKET NO. |
| COMMUNICATIONS, INC. WITH BELLSOUTH | ) | 03-00119 |
| TELECOMMUNICATIONS, INC. PURSUANT TO | ) | |
| THE TELECOMMUNICATIONS ACT OF 1996 | ) | |

## FINAL ORDER OF ARBITRATION AWARD

### TABLE OF CONTENTS

FACTS AND PROCEDURAL HISTORY ..................................................................................................1

ISSUE 2: DIRECTORY LISTINGS .........................................................................................................3

ISSUE 9: OSS PARITY .........................................................................................................................8

ISSUE 11: ACCESS TO UNEs ............................................................................................................10

ISSUE 21: DARK FIBER AVAILABILITY ............................................................................................15

ISSUE 25: PROVISION OF ASYMMETRIC DIGITAL SUBSCRIBER LINE ............................................19

ISSUE 26: LOCAL SWITCHING-LINE CAP AND OTHER RESTRICTIONS ...........................................24

ISSUE 36: UNE/SPECIAL ACCESS COMBINATIONS ..........................................................................40

ISSUE 37: CONVERSION OF A SPECIAL ACCESS LOOP TO A UNE LOOP THAT TERMINATES TO DELTACOM'S COLLOCATION ......................................................................................42

ISSUE 44: ESTABLISHMENT OF TRUNK GROUPS FOR OPERATOR SERVICE, EMERGENCY SERVICES AND INTERCEPT ............................................................................................44

ISSUE 46: BUSY LINE VERIFICATION / BUSY LINE VERIFICATION WITH INTERRUPT ...................44

ISSUE 47: COMPENSATION FOR THE USE OF DELTACOM'S COLLOCATION SPACE ("REVERSE COLLOCATION") ........................................................................................52

ISSUE 56: CANCELLATION CHARGES ..............................................................................................56

ISSUE 57: RATES AND CHARGES FOR CONVERSION OF CUSTOMERS FROM SPECIAL ACCESS TO UNE-BASED SERVICE ................................................................................................59

ISSUE 59: PAYMENT DUE DATE .......................................................................................................61

ISSUE 60: DEPOSITS .........................................................................................................................64

### ISSUE 26: LOCAL SWITCHING- LINE CAP AND OTHER RESTRICTIONS

(a) Is the line cap on local switching in certain designated MSAs only for a particular customer at a particular location?

(b) Should the Agreement include language that prevents BellSouth from imposing restrictions on DeltaCom's use of local switching?

(c) Is BellSouth required to provide local switching at market rates where BellSouth is not required to provide local switching as an Unbundled Network Element (UNE)?

(d) What should be the market rate?

#### A. Position of the Parties

DeltaCom opines that the existing language in the contract states that the four line cap only applies to a single physical end user location with four or more DS0 (Digital Signal, Level 0) equivalent lines. The current contract language also includes language that prevents BellSouth from imposing restrictions on DeltaCom's use of local switching. DeltaCom requests that this language continue in the new agreement.[95]

Joseph Gillan, witness for DeltaCom, recommends that the Authority reject BellSouth's market-based switching rates subject to the three line rule and that the existing TELRIC UNE rate of $1.89, established by the Authority, should remain in effect for all analog switch ports since those are the rates the Authority has found to be just and reasonable.[96] Finally, DeltaCom argues that to the extent that BellSouth is allowed to price a service at market rates, those rates must be approved by the Authority and supported by relevant market analysis.[97]

BellSouth witness, Kathy Blake, states that BellSouth is only required to provide local switching as set forth in 47 C.F.R. § 51.319(c)(2) and the interconnection agreement should not include language that prevents BellSouth from imposing restrictions on DeltaCom's use

---

[95] Jerry Watts, Pre-Filed Direct Testimony, pp. 14-15 (August 4, 2003)
[96] Joseph Gillan, Pre-Filed Direct Testimony, p. 4 (August 4, 2003)
[97] Id at 2-5

24

of local switching. The current FCC rules impose restrictions on DeltaCom's use of local switching and set forth criteria under which BellSouth may avail itself of the local switching exemption. Ms. Blake says that BellSouth will provide local switching at the market-based rate where it is not required to unbundle local switching. BellSouth maintains that its rates for local switching are not appropriate for consideration in an arbitration proceeding because local switching is not required by the Act or the FCC's rules implementing the Act and such rates are not governed by 47 U.S.C. §§ 251 or 252.[98] BellSouth points out that the Arbitrators voted in the AT&T arbitration to "permit BellSouth to aggregate lines provided to multiple locations of a single customer to determine compliance with FCC Rule 51.319(c)(2),"[99] and that the Authority clarified that "[a]lthough BellSouth can aggregate lines of a customer running from multiple locations for the purpose of determining if BellSouth is obligated to provide unbundled local switching pursuant to FCC Rule 51.319(c)(2), this aggregation must be based on each location within the Nashville Metropolitan Statistical Area served by AT&T."[100]

### B. Deliberations and Conclusions – January 12, 2004

With respect to Issue 26(a), it was noted by a majority of the panel that the four-line carve out per customer should reflect the Authority's previous decision in the AT&T arbitration, in which the Authority has permitted BellSouth to aggregate lines provided to multiple locations of a single customer.[101] Furthermore, the majority stated that the four-line carve out and the language regarding line count per customer should continue unless altered

---

[98] Kathy Blake, Pre-Filed Direct Testimony, pp 3-4 (August 4, 2003)
[99] Id at 4-5 (quoting from *Final Order of Arbitration Award*, TRA Docket No 00-00079, p 20 (November 29, 2001))
[100] Id at 5 (quoting from *Order Granting Requests in Part for Reconsideration and Clarification*, TRA Docket No 00-00079, p. 5 (April 22, 2002))
[101] Transcript of Proceedings, p 16 (January 12, 2004); see also *In the Matter of the Interconnection Agreement Negotiations Between AT&T Communications of the South Central States, Inc, TCG MidSouth Inc, and BellSouth Telecommunications, Inc, Pursuant to 47 U S C § 252*, TRA Docket No. 00-00079, *Final Order of Arbitration Award*, p 20 (November 29, 2001).

25

as a result of TRA Docket No. 03-00491, the TRA's nine month proceeding to determine the availability of UNE switching.[102] As a result, a majority of the Arbitrators voted that the line cap on local switching in certain designated metropolitan statistical areas ("MSAs") permits BellSouth to aggregate lines provided to multiple locations of a single customer.[103]

As to Issue 26(b), DeltaCom asserted that the panel should adopt language from the parties' current interconnection agreement. The specific language states, "except as otherwise provided herein, BellSouth shall not impose any restrictions on ITC^DeltaCom regarding the use of Switching Capabilities purchased from BellSouth."[104] The Arbitrators disagreed with DeltaCom and stated that the proposed language from DeltaCom attempts to thwart prevailing rules.[105] The FCC rules, particularly as set forth in the TRO, specify how and when an ILEC may restrict the use of local switching.[106] DeltaCom's proposed language does not reference any state or federal rules or proceedings. As such, the Arbitrators disagreed with DeltaCom, and voted that the Agreement not include language that prevents BellSouth from imposing any restrictions on DeltaCom's use of local switching.[107]

As to Issues 26(c) and (d),[108] to the extent that the rate for a particular element has not been ordered in a generic proceeding and the rate is proposed in the context of negotiating an interconnection agreement, a party should not be precluded from litigating the issue before the Authority in an arbitration. Section 252(c)(2) of the Act states that in an arbitration a state

---

[102] Transcript of Proceedings, p. 16 (January 12, 2004).
[103] *Id* at 49. Director Jones disagreed with the majority on this part of Issue 26. Director Jones concluded that the local switching exemption should be applied on a per location basis. In support of this conclusion, Director Jones cited the FCC's decision in CC Docket No. 00-251. *Petition of Worldcom, Inc Pursuant to Section 252(e)(5) of the Communications Act for Preemption of the Jurisdiction of the Virginia State Corporation Commission Regarding Interconnection Disputes with Verizon Virginia Inc, and for Expedited Arbitration*, CC Docket No 00-218, CC Docket No 00-249, CC Docket No 00-251, Memorandum Opinion and Order, 17 FCC Rcd 27,039, 27212 (2002) (concluding "that the local switching exemption applies on a 'per location' basis"). *See* Transcript of Proceedings, pp 16-17 (January 12, 2004)
[104] *Post-Hearing Brief of ITC^DeltaCom Communications, Inc*, p 24 (October 27, 2003) (citing parties' current approved interconnection agreement, Attachment 2, Section 9 1 2)
[105] Transcript of Proceedings, p 16 (January 12, 2004)
[106] 47 C.F R § 51 319(d) (2003).
[107] Transcript of Proceedings, p. 15 (January 12, 2004)
[108] Chairman Tate did not agree with the majority decision on Issue 26(d) as deliberated June 21, 2004

26

that in an arbitration a state commission shall establish any rates for interconnection, services, or network elements. As a result, the Arbitrators rejected BellSouth's claim that market based rates for switching are not appropriate for an arbitration proceeding and found that BellSouth is required to provide local switching at market rates where BellSouth is not required to provide local switching as a UNE.[109]

The Arbitrators observed that the record in this docket was not sufficient to allow the development of an appropriate rate for unbundled local switching.[110] While both parties proposed a rate, the $14 rate proposed by BellSouth was not presented with cost studies.[111] Therefore, it could not be determined that the $14 rate was just and reasonable as required by FCC rule. Additionally, TELRIC rate proposed by DeltaCom could not be supported since by law, and in this instance, switching is not a UNE under Section 251. It would be inconsistent with FCC rules to price non-251 network elements the same as 251 UNEs, i.e. at TELRIC. For these reasons, the Arbitrators did not support the rate proposed by either party and voted unanimously to require the parties to submit final and best offers as to the appropriate interim rate for local switching.[112]

### C. Final Best Offers

The parties submitted FBOs on February 20, 2004. In its filing, BellSouth argued that the Authority lacks the jurisdiction to consider or mandate the pricing of network elements that BellSouth will provide under 47 U.S.C. § 271 (not 47 U.S.C. § 251) and that the FCC has subsequently determined that a checklist element that does not have to be unbundled (such as switching) is subject to the "just and reasonable" pricing standard set forth in 47 U.S.C. §§ 201 and 202. Furthermore, it avers that the jurisdiction to enforce 47 U.S.C. §§ 201 and 202

---

[109] *Id* at 16.
[110] *Id* at 15
[111] Transcript of Proceedings, v II pp 479-483 (August 27, 2003)
[112] Transcript of Proceedings, p 16 (January 12, 2004).

27

is vested with the FCC, not with state commissions. BellSouth agreed that it is required to provide switching pursuant to § 271 of the Act, and in satisfaction of that obligation, it offers a Wholesale Local Platform DS0 Service priced at $26.48 for Zone 1, $30.31 for Zone 2 and $35.32 for Zone 3. BellSouth explains that this rate includes the port, features and TELRIC-based analog Service Level 1 ("SL1") loop. As an alternative, BellSouth requested another thirty days to negotiate a rate acceptable to both parties.[113] BellSouth provided no cost justification for the rates proposed.

DeltaCom proposes to pay BellSouth a flat rate of $5.08 per month per analog switch port, with no additional usage or feature charges. In support of this proposed rate DeltaCom uses the embedded cost for central office switching, plus a contribution equal to the average contribution of BellSouth's services in Tennessee in 2002. The rate development for the charge of $5.08 is based on BellSouth's reported central office switching expenses for 2002 and includes an estimated share of its depreciation costs for switching plant in service. This expense is directly available in ARMIS[114] 43-08 (row 6210). The portion of its depreciation expense attributed to central office switching is estimated by applying the ratio of central office switching plant in service to Total Plant in Service to the annual depreciation of plant.

### D. Deliberations and Conclusions – Issue 26(d)

Following three continuances, on June 21, 2004, the Arbitrators deliberated the final and best offers submitted by the parties regarding Issue 26(d). The majority of the panel adopted DeltaCom's FBO of $5.08 as an interim rate.[115]

---

[113] *BellSouth Telecommunications, Inc's Best and Final Offers*, pp 2-5 (February 20, 2004).
[114] ARMIS is an acronym for Automated Reporting Management Information System, which is maintained by the FCC's Industry Analysis and Technology Division
[115] Chairman Tate proposed a $14 interim rate on grounds that (1) TELRIC rates are not market-based, (2) the FBOs submitted by the parties did not constitute negotiated market-based rates; (3) one or more CLECs had entered into agreements that provided for the $14 rate and these CLECs operated under these agreements for three years, and (4) the $14 rate represented the only marked-based rate in the record Chairman Tate proposed that the $14 rate be adopted as an interim rate unless and until the FCC or the Authority set a different rate or the parties negotiate a different rate

28

Notwithstanding BellSouth's assertions that the Authority lacked jurisdiction, the Arbitrators deliberated the switching issue as an open issue presented in a § 252 arbitration proceeding.

The Act expressly provides for state commission jurisdiction to arbitrate all open issues presented pursuant to Section 252(b)(4)(C). In addition, the Federal Act makes it clear that state commissions must arbitrate all open issues in interconnection agreements. Section 252(b)(4)(C) states:

> (C) The State commission shall resolve each issue set forth in the petition and the response, if any, by imposing appropriate conditions as required to implement subsection (c) upon the parties to the agreement, and shall conclude the resolution of any unresolved issues not later than 9 months after the date on which the local exchange carrier received the request under this section.[116]

In addition, Section 252 contains no exception for Section 271 elements presented as an open issue in an arbitration.

The TRA has broad statutory authority to arbitrate any open issue submitted in a Section 252 arbitration. Section 252(b)(4)(C) provides that "the State commission shall resolve each issue set forth in the petition" for arbitration "and the response" thereto. The scope of open issues presented for arbitration under Section 252 includes "issues on which incumbents are mandated to negotiate."[117] Switching is an element of access and interconnection which Bell operating companies are mandated to negotiate pursuant to Section 271(c)(2)(B)(vi).

Beyond those issues that are mandated for negotiation, "the parties are free to include interconnection issues that are not listed in § 251(b) and (c) in their negotiations" and may

---

[116] 47 U.S.C. § 252(b)(4)(C) (2001)
[117] *MCI v BellSouth*, 298 F 3d 1269, 1274 (11th Cir 2002)

29

"petition for compulsory arbitration of any open issue."[118] The Court of Appeals for the Fifth Circuit, in *Coserv Ltd Liability Corp. v. Southwestern Bell*:

> There is nothing in § 252(b)(1) limiting open issues only to those listed in § 251(b) and (c). By including an open-ended voluntary negotiations provision in § 252(a)(1), Congress clearly contemplated that the sophisticated telecommunications carriers subject to the Act might choose to include other issues in their voluntary negotiations, and to link issues of reciprocal interconnection together under the § 252 framework. In combining these voluntary negotiations with a compulsory arbitration provision in § 252(b)(1), Congress knew that these non-251 issues might be subject to compulsory arbitration if negotiations fail. That is, Congress contemplated that voluntary negotiations might include issues other than those listed in § 251(b) and (c) and still provided that any issue left open after unsuccessful negotiation would be subject to arbitration by the PUC. We hold, therefore, that where parties have voluntarily included in negotiations issues other than those duties required of an ILEC by § 251(b) and (c), those issues are subject to compulsory arbitration under § 252(b)(1). The jurisdiction of the PUC as arbitrator is not limited by the terms of § 251(b) and (c); instead, it is limited by the actions of the parties in conducting voluntary negotiations. It may arbitrate only issues that were the subject of the voluntary negotiations. The party petitioning for arbitration may not use the compulsory arbitration provision to obtain arbitration of issues that were not the subject of negotiations . . . . An ILEC is clearly free to refuse to negotiate any issues *other than those it has a duty to negotiate* under the Act when a CLEC requests negotiation pursuant to § 251 and 252. [Emphasis added.][119]

BellSouth has a duty and cannot refuse to negotiate the price for the switching element pursuant to Section 271(c)(2)(B)(vi). The price for the switching element was presented as an open issue in DeltaCom's petition for arbitration. Upon the failure of the parties to reach agreement of this non-251 issue, DeltaCom properly presented the price for switching as an open issue in the arbitration. As an open issue in the arbitration, the issue was properly before the TRA for resolution under Section 252 of the Federal Act. Further, BellSouth did not include this issue (Issue No. 26(d)) in its July 2, 2003 motion to remove certain issues from the arbitration.

---

[118] *Coserv Ltd Liability Corp v Southwestern Bell*, 350 F 3d 482, 487 (5th Cir. 2003)
[119] *Id*, at 487-488

Further, there is no language contained in the Federal Act that expressly prohibits state jurisdiction over Section 271 elements that are included in issues required to be arbitrated pursuant to Section 252. Rather, there is language that indicates that Congress gave states a role in determining Section 271 elements through state approval of both SGAT conditions and interconnection agreements. Under Section 271(c)(1) of the Federal Act, an incumbent telephone company must offer network elements either through a statement of generally available terms and conditions or an interconnection agreement. Each must be filed with and approved by the state commission.[120] Section 271 of the Federal Act requires an incumbent telephone company to satisfy its competitive checklist obligations through interconnection agreements.[121] These interconnection agreements are required to be approved by a state commission under Section 252.[122]

BellSouth must provide switching pursuant to the requirements of Section 271. In its *Final Best Offer* BellSouth argued that the TRA does not have jurisdiction to establish the rate for switching. BellSouth argued that, because Section 271 elements are regulated under Sections 201 and 202 of the Federal Act, state commissions are precluded from setting a rate for a Section 271 switching element. BellSouth cites to ¶ 664 of the TRO as standing for the proposition that "...the jurisdiction to enforce Sections 201 and 202 of the Act is vested with the FCC, not with state public service commissions." Paragraph 664 of the TRO, in its entirety, states:

> Whether a particular checklist element's rate satisfies the just and reasonable pricing standard of section 201 and 202 is a fact-specific inquiry that the Commission will undertake in the context of a BOC's application for section 271 authority or in an enforcement proceeding brought pursuant to section 271(d)(6). We note, however, that for a given purchasing carrier, a BOC might satisfy this standard by demonstrating that the rate for a section 271 network element is at or below the rate at which the BOC offers comparable functions

---

[120] 47 U.S.C. § 252(e) and (f) (2001)
[121] 47 U.S.C § 271(c)(2)(A) (2001)
[122] 47 U.S.C § 271(c)(1)(A) (2001)

31

to similarly situated purchasing carriers under its interstate access tariff, to the extent such analogues exist. Alternatively, a BOC might demonstrate that the rate at which it offers a section 271 network element is reasonable by showing that it has entered into arms-length agreements with other, similarly situated purchasing carriers to provide the element at that rate.

Paragraph 664 offers two examples of situations where the FCC will make determinations of fact regarding whether a rate for a Section 271 element is just and reasonable. There is nothing, however, in the above-quoted language, to preclude a state commission from setting the rate for a Section 271 element.

Congress explicitly charged state commissions with the responsibility to arbitrate Section 252 disputes, and this charge includes arbitrating the rates, terms and conditions of Section 271 elements. Further, the fact that the FCC has the authority to enforce Section 271 does not diminish or cut off the obligations of the state commissions to arbitrate interconnection agreements required by Section 271 which also includes establishing rates for elements required by the competitive checklist.

Section 271(c)(2)(A) links BellSouth's obligations under the competitive checklist to its providing that access through an interconnection agreement (or SGAT):

> (A) AGREEMENT REQUIRED - A Bell operating company meets the requirements of this paragraph if, within the State for which the authorization is sought—
>
> (i)   (I)   such company is providing access and interconnection pursuant to one or more agreements described in paragraph (1)(A) [Interconnection Agreement], or
>
>       (II)   such company is generally offering access and interconnection pursuant to a statement described in paragraph (1)(B) [an SGAT], and
>
> (ii)   such access and interconnection meets the requirements of subparagraph (B) of this paragraph [the competitive checklist].[123]

---

[123] 47 U S C § 271(c)(2)(A) (2001).

By directly tying interconnection agreements to Section 271(c)(1)(A) and (B), the Act explicitly ties compliance with the competitive checklist to the review process described in Section 252. As Section 271(c)(1) states:

(1)    AGREEMENT OR STATEMENT- A Bell operating company meets the requirements of this paragraph if it meets the requirements of subparagraph (A) or subparagraph (B) of this paragraph for each State for which the authorization is sought.

>    (A)    PRESENCE OF A FACILITIES-BASED COMPETITOR- A Bell operating company meets the requirements of this subparagraph if it has entered into one or more **binding agreements that have been approved under section 252** specifying the terms and conditions under which the Bell operating company is providing access and interconnection to its network facilities for the network facilities of one or more unaffiliated competing providers of telephone exchange service (as defined in section 3(47)(A), but excluding exchange access) to residential and business subscribers.[124]

This language demonstrates that Section 271 network elements must be offered pursuant to the same, identical review process as Section 251 network elements.

The FCC's TRO determined that pricing of Section 271 elements must be more liberal than TELRIC prices but produce just and reasonable prices.[125] The TRO states:

> Thus, the pricing of checklist network elements that do not satisfy the unbundling standards in section 251(d)(2) are reviewed utilizing the basic just, reasonable, and nondiscriminatory rate standard of sections 201 and 202 that is fundamental to common carrier regulation that has historically been applied under most federal and state statutes, including (for interstate services) the Communications Act. Application of the just and reasonable and nondiscriminatory pricing standard of sections 201 and 202 advances Congress's intent that Bell companies provide meaningful access to network elements.[126]

Thus, the FCC recognized that the pricing standards of Section 271 elements must be the same as the pricing standards used before the Federal Act such as those standards in Sections

---

[124] 47 U.S C. § 271(c)(1)(A) (2001) (Emphasis added)
[125] This does not mean that TELRIC prices are not just and reasonable  On the contrary, TELRIC prices must first meet the just and reasonable definition of the Act
[126] TRO, 18 FCC Rcd at 17389

33

201 and 202. Nevertheless, it is significant that the FCC did not change the division of pricing responsibility defined in the Federal Act. While the FCC will continue to set the pricing standards, it continues to be incumbent upon state commissions to apply those standards in the process of establishing rates.[127] The FCC did not change the process utilized to resolve pricing disputes of Section 271 elements. There is no indication that the FCC intended to remove Section 271 elements from state arbitrations or from approval of interconnection agreements consistent with Section 252.

In the regulatory scheme set up by the Federal Act, state commissions are directed by provisions of the Federal Act and FCC regulations in making decisions, which are subject to federal court review.[128] Thus, cooperative federalism is a statutory framework in which there is both state and federal regulation of telecommunications services. The parameters of both federal and state regulation within this statutory framework are determined by the Federal Act and the state statutes establishing regulatory authority.

In construing the reach of the TRA's authority, the Tennessee Supreme Court has held:

> Any authority exercised by the Public Service Commission must be as the result of an express grant of authority by statute or arise by necessary implication from the expressed statutory grant of power. *Pharr v. Nashville, Chattanooga and St. Louis Railway,* 186 Tenn. 154, 208 S.W.2d 1013 (1948); *Nashville, Chattanooga and St. Louis Railway v. Railroad and Public Utilities Commission et al,* 159 Tenn. 43, 15 S.W.2d 751 (1929). In either circumstance, the grant of power to the Commission is strictly construed.[129]

---

[127] The United States Supreme Court affirmed this division of responsibility in *AT&T Corp. v. Iowa Utilities Bd.*, 525 U S 366, at 384 (1999), emphasis added:
 "252(c)(2) entrusts the task of establishing rates to the state commissions . . The FCC's prescription, through rulemaking, of a requisite pricing methodology no more prevents the States from establishing rates than do the statutory 'Pricing standards' set forth in 252(d). It is the States that will apply those standards and implement that methodology, determining the concrete result in particular circumstances."
[128] *Id* at 352
[129] *Tennessee Pub Serv Comm'n v Southern Ry Co*, 554 S W 2d 612, 613 (Tenn 1977).

The Tennessee Court of Appeals has echoed this interpretation of the TRA's authority:

> The Commission, like any other administrative agency, must conform its actions to its enabling legislation. It has no authority or power except that found in the statutes. While its statutes are remedial and should be interpreted liberally, they should not be construed so broadly as to permit the Commission to exercise authority not specifically granted by law.[130]

The TRA must exercise its authority in accordance with legislative limitations, directives and policy. In other words, "its actions must be harmonious and consistent with its statutory authority."[131] Chapter 4 of Title 65 sets forth the statutory framework for the TRA's authority to regulate public utilities. Pursuant to Tenn. Code Ann. § 65-4-104, the statutory grant of authority over public utilities given to the TRA is extensive:

> The authority has general supervisory and regulatory power, jurisdiction, and control over all public utilities, and also over their property, property rights, facilities, and franchises, so far as may be necessary for the purpose of carrying out the provisions of this chapter [Chapter 4].

Tenn. Code Ann. § 65-4-106 provides:

> This chapter [Chapter 4] shall not be construed as being in derogation of the common law, but shall be given a liberal construction, and any doubt as to the existence or extent of a power conferred on the authority by this chapter or chapters 1, 3, and 5 of this title shall be resolved in favor of the existence of the power, to the end that the authority may effectively govern and control the public utilities placed under its jurisdiction by this chapter.

In addition to the general powers described in the above referenced statutes, the TRA has been given specific authority or power by Tenn. Code Ann. § 65-5-201(a) "to fix just and reasonable individual rates, joint rates, tolls, fares, charges or schedules thereof," by Tenn. Code Ann. § 65-4-117(3) "to fix just and reasonable standards, classifications, regulations, practices or services to be furnished, imposed, observed and followed thereafter by any public

---

[130] *BellSouth Telecommunications, Inc v Greer*, 972 S W.2d 663, 680 (Tenn Ct App 1997) (internal citations omitted)
[131] *Tennessee Cable Television Ass'n v Tennessee Pub Serv Comm'n*, 844 S.W 2d 151, 159 (Tenn Ct App. 1992)

35

utility," and by Tenn. Code Ann. § 65-4-114(1) to require every public utility to "furnish safe, adequate, and proper service."

With the passage of the Tennessee telecommunications act in 1995 (the "Tennessee Act"), the Tennessee General Assembly changed regulation of telecommunications companies in Tennessee and established a new direction for the State and a new mandate to the TRA. The expressed goal of the Tennessee Act is articulated at Tenn. Code Ann. § 65-4-123:

> The general assembly declares that the policy of this state is to foster the development of an efficient, technologically advanced, statewide system of telecommunications services by permitting competition in all telecommunications services markets, and by permitting alternative forms of regulation for telecommunications services and telecommunications services providers. To that end, the regulation of telecommunications services and telecommunications services providers shall protect the interests of consumers without unreasonable prejudice or disadvantage to any telecommunications services provider; universal service shall be maintained; and rates charged to residential customers for essential telecommunications services shall remain affordable.

The Tennessee Act also recognizes and imposes certain requirements on providers of telephone services:

> All telecommunications services providers shall provide non-discriminatory interconnection to their public networks under reasonable terms and conditions; and all telecommunications services providers shall, to the extent that it is technically and financially feasible, be provided desired features, functions and services promptly, and on an unbundled and non-discriminatory basis from all other telecommunications services providers.[132]

In *Mich. Bell Tel. Co. v. MCImetro Access Transmission Servs*, the Sixth Circuit Court of Appeals stated:

> When Congress enacted the federal Act, it did not expressly preempt state regulation of interconnection. In fact, it expressly *preserved* existing state laws that furthered Congress's goals and authorized states to implement additional requirements that would foster local interconnection and competition, stating

---

[132] Tenn Code Ann § 65-4-124(a).

> that the Act does not prohibit state commission regulations "if such regulations are not inconsistent with the provisions of [the FTA]." 47 U.S.C. § 261. Additionally, Section 251(d)(3) of the Act states that the Federal Communications Commission shall not preclude enforcement of state regulations that establish interconnection and are consistent with the Act. 47 U.S.C. § 251(d)(3).[133]

The Tennessee statutes and the relevant provisions of the Federal Act together form the basis for the authority of the TRA to set an interim rate for switching in the context of an arbitration proceeding and to convene a generic proceeding for the purpose of determining a permanent rate for switching. While Section 271 establishes the enforcement authority of the FCC regarding Section 271 issues, it does not strip the TRA of its authority to set rates for Section 251 or Section 271 elements. The TRA is exercising its authority provided by the General Assembly prior to the enactment of the federal act as the legal foundation for its actions. Additionally, the TRA's decision is consistent with the requirement that its actions not conflict with any current federal requirements.

According to FCC rules, in situations where unbundled switching is not required under Section 251, the element must still be offered to competitors in order to comply with the requirements of Section 271; however, the rate does not have to comply with TELRIC pricing methodology. Instead, the FCC requires that rates for unbundled elements offered pursuant to Section 271 must be "just and reasonable."[134] The reason for requesting FBOs in this case was to determine a just and reasonable rate for unbundled switching.

In its FBO on Issue No. 26(d), DeltaCom proposed a rate of $5.08 (usage included) which was based on BellSouth's ARMIS 43-08 (row 6210) reported central office switching expenses for 2002 and an estimated share of its depreciation costs for switching plant in service.

---

[133] *Mich Bell Tel Co v MCImetro Access Transmission Servs*, 323 F 3d 348, 358 (6th Cir 2003)
[134] TRO, 18 FCC Rcd at 17389

37

BellSouth's FBO was based on the price it charges for wholesale local platform DS0 service.[135] The proposed rates were $26.48 in Zone 1; $30.31 in Zone 2; and $35.32 in Zone 3. Inclusive in these rates are the port, features, and an analog SL1 loop. These rates did not include usage, which was an additional per-minute charge.

During the deliberations it was noted that BellSouth failed to demonstrate that its proposed switching rate is at or below the rate at which BellSouth offers comparable functions to similarly situated purchasing carriers under its interstate access tariff or that the rate is reasonable by showing that it had entered into arm's length agreements with other similarly situated purchasing carriers to provide the switching element at the rate proposed in its final best offer.[136] It was also noted that BellSouth's FBO did not contain a stand-alone rate for switching. Additionally, the Arbitrators noted that existing case law holds that a just and reasonable rate includes a utility's operating expenses as well as a fair return on investments and concluded that DeltaCom's proposed rate of $5.08 contained those elements.[137] Thereafter, a majority of the Arbitrators voted to adopt DeltaCom's Final Best Offer of $5.08 as an interim rate subject to true up.[138] The Arbitrators voted unanimously to have the Chair open a generic docket to adopt a rate for switching outside of 47 U.S.C. § 251

---

[135] *See In Re Petition for Arbitration of ITC^DeltaCom Communications, Inc with BellSouth Telecommunications, Inc Pursuant to the Telecommunications Act of 1996*, TRA Docket No. 03-00119, BellSouth's Best and Final Offers, p 5 (February 20, 2004)

[136] Transcript of Proceedings, p. 4 (June 21, 2004) The *Triennial Review Order* states
> Whether a particular checklist element's rate satisfies the just and reasonable pricing standard of section 201 and 202 is a fact-specific inquiry that the Commission will undertake in the context of a BOC's application for section 271 authority or in an enforcement proceeding brought pursuant to section 271(d)(6). We note, however, that for a given purchasing carrier, a BOC might satisfy this standard by demonstrating that the rate for a section 271 network element is at or below the rate at which the BOC offers comparable functions to similarly situated purchasing carriers under its interstate access tariff, to the extent such analogues exist Alternatively, a BOC might demonstrate that the rate at which it offers a section 271 network element is reasonable by showing that it has entered into arms-length agreements with other, similarly situated purchasing carriers to provide the element at that rate.

*Triennial Review Order*, ¶ 664

[137] Transcript of Proceedings, p. 4 (June 21, 2004), *see Farmers Union Central Exchange v FERC*, 734 F 2d 1486, 1502 (D C Cir 1984); *see also FPC v Hope Natural Gas Co*, 320 U S 591, 596-598, 605, 64 S.Ct 281, 88 L.Ed 333 (1994)

[138] See supra n 115, Chairman Tate did not vote with the majority with respect to the rate for local switching

requirements.[139] The Arbitrators unanimously found that the interim rate should be trued up to the earlier of establishment of: 1) a switching rate in the generic docket; 2) a commercially negotiated switching rate; or 3) FCC rules regarding switching rates outside of 47 C.F.R. §251.

---

[139] Transcript of Proceedings, pp. 2-9 (June 21, 2004)

**ORDERED**

The foregoing *Final Order of Arbitration Award* reflects the Arbitrators' resolution of Issue Nos. 2, 9, 11, 21, 25, 26, 36, 37, 44, 46, 47, 56, 57, 59, 60, 62, 63, 64, 66 and 67. All resolutions contained herein comply with the provisions of the Telecommunications Act of 1996 and are supported by the record in this proceeding.

TENNESSEE REGULATORY AUTHORITY,
BY ITS DIRECTORS ACTING AS
ARBITRATORS

_____
Deborah Taylor Tate, Chairman[276]

_____
Pat Miller, Director[277]

_____
Ron Jones, Director[278]

---

[276] Chairman Tate dissented in whole or in part as to Issues 26(d), 60(b) and 62
[277] Director Miller dissented in whole or in part as to issues 47 and 59
[278] Director Jones dissented in whole or in part as to Issues 25, 26(a) and 63