Exhibit 1

1 of 5 DOCUMENTS

**ILLINOIS BELL TELEPHONE COMPANY, Plaintiff, vs. ERIN M. O'CONNELL-DIAZ, LULA M. FORD, ROBERT F. LIEBERMAN, and KEVIN K. WRIGHT, in Their Official Capacities as Commissioners of the Illinois Commerce Commission and Not as Individuals, Defendants, and ACCESS ONE, INC., et al., Intervenors.**

**Case No. 05 C 1149**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*2006 U.S. Dist. LEXIS 70221*

**September 28, 2006, Decided
September 28, 2006, Filed**

**PRIOR HISTORY:** *Ill. Bell Tel. Co. v. Hurley, 2005 U.S. Dist. LEXIS 6022 (N.D. Ill., Mar. 29, 2005)*

**COUNSEL:** [*1]  For Illinois Bell Telephone Company, Plaintiff: Theodore A. Livingston, Demetrios G. Metropoulos, Hans J. Germann, John E. Muench, Mayer, Brown, Rowe & Maw LLP, Chicago, IL.

For Edward C Hurley, Chairman, Erin M O'Connell-Diaz, Lula M Ford, Robert F Lieberman, Kevin K Wright, in their official capacities as commissioners of the Illinois Commerce Commission and Not as individuals, Defendants: Thomas R. Stanton, Illinois Commerce Commission, Chicago, IL; John P. Kelliher, Office of General Counsel, Illinois Commerce Commission, Chicago, IL.

For Globalcom, Inc., Intervenor Defendant: Eric Thomas Harstad, Matthew Gavin McCarty, Globalcom, Inc., Chicago, IL.

For Covad Communications Company, Intervenor Defendant: Henry T. Kelly, Shane D Fleener, Kelley, Drye & Warren, Chicago, IL; Joseph E Donovan, O'Keefe, Ashenden, Lyons & Ward, Chicago, IL.

For Data Net Systems, L.L.C., TruComm Corp, Illinois Public Telecommunications Association, Inc., Intervenor Defendants: Michael Walter Ward, Michael W. Ward, P.C., Buffalo Grove, IL.

For CIMCO Communications, Inc., Forte Communications, Inc., Access One, Inc., Mpower Communications, Corp., Intervenor Defendants: Thomas H. [*2] Rowland, Kevin D Rhoda, Stephen James Moore, Rowland & Moore, Chicago, IL.

For Talk America Inc, Trinsic Communications Inc, proposed: Henry T. Kelly, Shane D Fleener, Kelley, Drye & Warren, Chicago, IL; Joseph E Donovan, O'Keefe, Ashenden, Lyons & Ward, Chicago, IL.

For MCImetro Access Transmission Services LLC, proposed: John R. Harrington, William R Lee, Jenner & Block LLP, Chicago, IL.

**JUDGES:** JOAN B. GOTTSCHALL, United States District Judge.

**OPINION BY:** JOAN B. GOTTSCHALL

**OPINION:**

### MEMORANDUM OPINION AND ORDER

Judge Joan B. Gottschall

Illinois Bell Telephone Company ("SBC") n1 has brought suit challenging determinations made by the Illinois Commerce Commission ("ICC") that require SBC to provide its competitors with access to certain portions of SBC's network. SBC claims that the ICC's regulations are preempted by federal law. The parties agree that there are no disputed factual issues and have filed cross-motions for summary judgment. For the reasons that follow, the parties' motions are granted in part and denied in part.

------

n1 After SBC filed suit, Illinois Bell Telephone Company's parent corporation merged with

AT&T Communications, Inc. As a result, Illinois Bell now refers to itself as "AT&T Illinois." Nevertheless, the plaintiff has continued to refer to itself in this litigation as "SBC." For consistency, the court will follow the same practice for the purposes of this order.

[*3]

DISCUSSION

I. Background

The central question at issue in this litigation is whether the federal Telecommunications Act of 1996 ("the Act," "the 1996 Act"), *47 U.S.C. § 151 et seq.*, preempts certain provisions of the Illinois Public Utilities Act ("IPUA," "the Illinois Act"), *220 ILCS § 5/1-101, et seq.* Answering this question requires an understanding of the two statutes, as well as the implementing regulations issued by the FCC and the ICC. This task is complicated, however, by several factors, foremost among which is the 1996 Act itself. As the Supreme Court has noted, it "would be gross understatement to say that the 1996 Act is not a model of clarity. It is in many important respects a model of ambiguity or indeed even self-contradiction." *AT & T Corp. v. Iowa Utilities Bd., 525 U.S. 366, 397, 119 S. Ct. 721, 142 L. Ed. 2d 834 (1999).* Nor have the FCC's attempts to interpret the 1996 Act always helped to clarify matters. Indeed, the FCC's regulations have been reversed and remanded on several occasions, both by the Supreme Court and the D.C. Circuit. Meanwhile, the ICC has attempted to interpret the IPUA based on the [*4] FCC's varied reinterpretations of the 1996 Act's requirements. Because the parties' arguments presuppose familiarity with this thicket of statutes, cases, and regulations, the court provides the following background.

A. Federal Telecommunications Act of 1996

Until the 1990s, local phone service generally was regarded as a natural monopoly. *See, e.g., Iowa Utilities, 525 U.S. at 371.* Under this early regime, states typically granted an exclusive franchise in each local service area to a local exchange carrier (LEC). These LECs owned the network facilities, which included the local loops (wires connecting telephones to switches), the switches (equipment directing calls to their destinations), and the transport trunks (wires carrying calls between switches) that constituted a local exchange network. The rates charged by such companies typically were regulated by each state's public utility commission (PUC).

Technological advances, however, have opened up the possibility of competition among providers of local telephone service. In an effort to promote such competition, Congress passed the 1996 Act. A central feature of the Act is its so-called "unbundling" obligations, which [*5] require incumbent local exchange carriers ("ILECs") to provide new market entrants ("competing local exchange carriers" or "CLECs") with access to certain portions of the ILECs' networks at a fair price. As the Seventh Circuit has explained, "Congress recognized that without allowing new entrants to use the incumbents' local exchange networks and other technology and services, the incumbents would maintain a stranglehold on local telephone service: no new entrant could realistically afford to build from the ground up the massive communications grid the incumbents had developed through years of monopolistic advantage." *Indiana Bell Tel. Co., Inc. v. McCarty, 362 F.3d 378, 382 (7th Cir. 2004).*

**1.** *Section 251* **of the 1996 Act**

Incumbents' general unbundling obligations are set forth in *Section 251 of the 1996 Act*. *Section 251(d)* charges the FCC with determining which network elements should be unbundled. In making these determinations, Congress instructed the FCC to "consider, at a minimum, whether - (A) access to such network elements as are proprietary in nature is necessary; and (B) the failure to provide access to such network elements would impair the ability [*6] of the telecommunications carrier seeking access to provide the services that it seeks to offer." *47 U.S.C. § 251(d)(2)*. The latter requirement is often referred to as the "impairment requirement."

The FCC has made several efforts to specify incumbents' unbundling obligations. The Commission issued its first unbundling order in August 1996. *In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, 11 FCC Rcd 15499 (1996)* ("First Local Competition Order"). There, the FCC interpreted the "impairment" standard "as requiring the Commission and the states . . . to consider whether the failure of an incumbent to provide access to a network element would decrease the quality, or increase the financial or administrative cost of the service a requesting carrier seeks to offer, compared with providing that service over other unbundled elements in the incumbent LEC's network." *Id.* P 285. In addition, the FCC decided that *any* increase in cost or decrease in quality, regardless of degree, constituted impairment. In *AT&T Corp. v. Iowa Utils. Bd., 525 U.S. 366, 119 S. Ct. 721, 142 L. Ed. 2d 834 (1999)*, however, the Supreme [*7] Court held that the FCC had interpreted the impairment requirement too broadly. Specifically, the Court found that the Commission had failed to take into account whether CLECs could provide the network elements themselves, or acquire the requested element from a third party. Indeed, the Court stated that under the FCC's standard it was "hard to imagine when the incumbent's failure to give

access to the element would not constitute an 'impairment.'" *Id.* at 389.

On remand from *Iowa Utilities*, the Commission offered a new interpretation of the impairment requirement. Specifically, the FCC held that a market entrant would be impaired if, "taking into consideration the availability of alternative elements outside the incumbent's network, including self-provisioning by a requesting carrier or acquiring an alternative from a third-party supplier, lack of access to that element materially diminishes a requesting carrier's ability to provide the services it seeks to offer." *Implementation of the Local Competition Provisions of the Telecommunications Act of 1996, Third Report and Order and Fourth Further Notice of Proposed Rulemaking, 15 FCC Rcd 3696 (1999).* [*8] Once again, however, the FCC's interpretation was deemed inadequate. Specifically, in *United States Telecom Ass'n v. FCC, 351 U.S. App. D.C. 329, 290 F.3d 415, 427 (D.C. Cir. 2002)* ("*USTA I*"), the D.C. Circuit found the FCC's revised definition unreasonable because, among other reasons, the Commission had failed to "differentiate between those cost disparities that a new entrant in *any* market would be likely to face and those that arise from market characteristics linked (in some degree) to natural monopoly . . . that would make genuinely competitive provision of an element's function wasteful." *Id.* at 427-28 (internal quotation marks omitted).

On remand from *USTA I*, the Commission made yet another attempt to interpret the impairment requirement. *See In the Matter of Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers, Report and Order and Order on Remand and Further Notice of Proposed Rulemaking, 18 F.C.C.R. 16978 (2003)* ("Triennial Review Order," "TRO"). The FCC now determined that a CLEC would be "impaired when lack of access to an incumbent LEC network element posed a barrier or barriers to entry, including operational [*9] and economic barriers, that are likely to make entry into a market uneconomic." *Id.* P 84. The FCC also made blanket determinations that CLECs were impaired without access to certain network elements, at the same time delegating to state commisions the authority to perform more "nuanced" and "granular" impairment determinations.

The D.C. Circuit once again rejected many of the FCC's findings. *United States Telecom Association v. FCC, 360 U.S. App. D.C. 202, 359 F.3d 554, 576 (D.C. Cir. 2002)* ("*USTA II*"). In particular, *USTA II* held that the FCC's new impairment standard was overly vague. The court also found that the FCC could not delegate to state commissions the responsibility for making more detailed findings in response to the FCC's blanket determinations of impairment.

On February 4, 2005, the FCC issued its response to *USTA II. See In the Matter of Unbundled Access to Network Elements, Order on Remand, 20 F.C.C.R. 2533 (2005)* ("TRO Remand Order," "TRRO"). In relevant part, the TRRO stated that ILECs no longer have an obligation to provide CLECs with unbundled access to certain network elements. TRO Remand Order P 199. The FCC found that removal of the unbundling [*10] requirement was justified because newer, more efficient switching technologies were now widely available and continued dependence on the ILECs infrastructure negatively affected incentives to invest in new technologies. *Id.* The TRRO's holdings recently were upheld by the D.C. Circuit in *Covad Communications Co. v. F.C.C., 450 F.3d 528 (D.C. Cir. 2006)*.

### B. The Illinois Communications Commission

Prior to the passage of the 1996 Act, Illinois, like a number of other states, had already taken steps of its own to promote local telephone competition. Originally, SBC had been regulated by the state using a traditional "rate of return" framework, which capped the rates SBC could charge at an amount necessary to recoup costs and provide a "reasonable" rate of return on SBC's equity. SBC later petitioned for an alternative form of regulation with fewer earnings restrictions to enable it to respond to the advent of new local competition. In exchange for this alternative regulation, SBC agreed to make portions of its network available to its new competitors. *Section 13-801 of the Illinois Public Utilities Act* contains the requirements to which ILECs that have opted [*11] for alternative regulation status are subject. On June 11, 2002, the ICC issued an order further specifying SBC's obligations under *Section 13-801. See Ill. Bell. Filing to Implement the Public Utils. Act, Doc. No. 01-0614, 2002 Ill. PUC LEXIS 564 (Ill. Comm. Comm'n June 11, 2002).* Importantly, for the purposes of this litigation, the Illinois Act, unlike the 1996 Act, embodies no impairment requirement. Illinois' unbundling requirements therefore differ from the unbundling requirements announced by the FCC.

### C. Procedural History of the Present Dispute

After *Section 13-801 of the IPUA* took effect in June 2001, the ICC initiated proceedings to implement the law. In June 2002, the ICC issued its final order. In August 2002, SBC filed suit challenging *Section 13-801* and the June 2002 Order. The gravamen of the complaint was that Illinois law and the ICC's regulations were preempted by the 1996 Act and the FCC's regulations. After SBC filed suit, a number of competing local exchange carriers ("the Competing Carriers") were granted leave to intervene. n2

n2 The Competing Carriers include Globalcom, Inc., Covad Communications Co., Access One, Inc., CIMCO Communications, Inc., Forte Communications, Inc., Mpower Communications Corporation, Data Net Systems, L.L.C., TruComm Corporation, and Illinois Public Telecommunications Association.

[*12]

At the time the litigation was first initiated, the FCC was preparing to issue its *Triennial Review Order*. SBC therefore filed a motion, which the court later granted, to suspend briefing in the case until the TRO had been issued. When the TRO was finally issued, the ICC asked the court to remand the case so that the ICC could reconsider its interpretation of *Section 13-801* in light of the TRO's new unbundling rules. The court granted the remand in May 2004.

The ICC subsequently issued two decisions: the *Phase I Remand Order*, issued in April 2005, and the *Phase II Remand Order*, issued in November 2005. The *Phase I Order* addressed the ramifications of the FCC's TRO, while the *Phase II Order* addressed the implications of the TRRO. Generally speaking, the orders did not substantially change the state law requirements. Indeed, the ICC took great pains to emphasize that its powers were limited, and that it was unable to reinterpret Illinois law so as to avoid a conflict with federal law.

> As a creature of statute, the Commission has no general powers except those expressly conferred by the legislature. Moreover, the Illinois Supreme Court has long instructed [*13] that an administrative agency can neither limit nor extend the scope of its enabling legislation. . . . The Commission must follow and implement the statute's plain language irrespective of its opinion regarding the desirability of the results surrounding the operation of the statute. . . . There are areas where the plain language of the statute conflicts with recent pronouncements of the TRO and USTA II. In those instances, we have no ability to substitute language consistent with federal law to avoid a conflict.

Phase I Order at 61-62.

In February 2005, SBC filed suit once again in this court and moved for a preliminary injunction. While noting that SBC had demonstrated a likelihood of success on the merits, the court concluded that the threat of irreparable injury was greater to the Competing Carriers than to SBC, and that the public interest favored maintenance of the status quo and militated against entry of a preliminary injunction. *See llinois Ill. Bell Tel. Co. v. Hurley, 2005 U.S. Dist. LEXIS 6022, No. 05 C 1149, 2005 WL 735968 (N.D. Ill. Mar. 29, 2005)*. Thereafter, the parties filed the cross-motions for summary judgment presently before the court.

**D. The Current Complaint** [*14]

SBC's current complaint challenges several requirements under Illinois law. These are as follows:

> . The ICC's determination that, under Illinois law, SBC must unbundle certain network elements, viz.: (1) local circuit switching; (2) switching related elements; (3) Ocn-level loops and dedicated transport; (4) dark fiber loops; (5) entrance facilities; (6) feeder subloops; (7) DS1 and DS3 loops and dedicated transport; and (8) dark fiber transport.

> . Illinois' so-called combination requirements (i.e., requirements that SBC allow competing carriers to locate and install their own equipment on SBC's premises).

> . Illinois' "collocation requirements." Collocation refers to a competing carrier locating and installing its own equipment on an ILEC's premises.

> . Illinois' requirements with respect to "splitters" (i.e., devices that separate the high- and low-frequency portions of a copper loop, allowing for the simultaneous transfer of high-speed DSL data transmission and single line telephone service).

> . The ICC's ruling regarding "terminating switching" (i.e., a competitor's use of an SBC switch to complete delivery of a call from that carrier's customer to an [*15] SBC customer).

SBC argues that each of these Illinois requirements conflicts with, and therefore is preempted by, the 1996 Act and the accompanying FCC regulations. The court examines the parties' arguments with respect to each of the requirements.

**II. Standard of Review**

Summary judgment will be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. In considering a motion for summary judgment, the court must view the record and any inferences to be drawn from it in the light most favorable to the party opposing summary judgment. *See Griffin v. Thomas, 929 F.2d 1210, 1212 (7th Cir. 1991)*. The party opposing summary judgment may not rest upon the pleadings, but "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*.

### III. Network Elements

The court first examines the parties' [*16] arguments with respect to whether SBC must unbundle a specific group of network elements: local circuit switching, switching-related elements, OCn-level loops, dedicated transport, dark fiber loops, entrance facilities, feeder subloops, DS1 loops, DS3 loops, DS 1 transport, DS3 transport, and dark fiber transport.

#### A. SBC's Argument

The form of SBC's argument is relatively straightforward: it simply identifies various network elements with respect to which the federal and Illinois requirements conflict and argues that the latter are preempted by the former. Specifically, SBC looks to FCC decisions declining to require the unbundling of particular network elements. Since Illinois law requires these very same elements to be unbundled, SBC argues, Illinois law is preempted. Of course, it might seem that a decision by the FCC *declining to require* that a particular network element be unbundled does not amount to a ruling that states may not require unbundling of those elements if they so choose. However, the FCC's own remarks on this point demonstrate otherwise:

> If a decision pursuant to state law were to require the unbundling of a network element for which the Commission [*17] has either found no impairment - and thus has found that unbundling that element would conflict with the limits in *section 251(d)(2)* - or otherwise declined to require unbundling on a national basis, we believe it unlikely that such decision would fail to conflict with and "substantially prevent" implementation of the federal regime, in violation of *section 251(d)(3)(C)*. Similarly, we recognize that in at least some instances existing state requirements will not be consistent with our new framework and may frustrate its implementation. It will be necessary in those instances for the subject states to amend their rules and to alter their decisions to conform to our rules.

TRO P 195. In other words, a finding by the FCC that CLECs are not impaired without access to particular network elements is tantamount to a finding that incumbents cannot be required to unbundle those elements.

It is unnecessary to examine in great detail SBC's arguments with respect to each of the individual network elements, since, to a large extent, the Competing Carriers and the ICC do not dispute that federal law and Illinois law differ in the manner that SBC asserts. Instead, as shown below, the defendants [*18] focus their efforts on attempting to show that, for a variety of reasons, the differences between the two bodies of law do not warrant a finding of preemption. The court therefore briefly considers SBC's arguments with respect to various kinds of network elements, and then moves on to a more thorough consideration of the issues raised by the Competing Carriers and the ICC.

The network elements in question fall roughly into one of two groups: the first group consists of those elements for which the FCC has made a nationwide finding of non-impairment (or, as SBC puts it, with respect to which the FCC has announced a nationwide bar on orders requiring unbundling); the second group consists of elements the unbundling of which the FCC has held may be required under certain circumstances (i.e., elements that, if not unbundled, may impair CLECs' ability to compete).

The first group consists of local circuit switching, switching-related elements, OCn-level loops, dedicated transport, dark fiber Loops, entrance facilities, and feeder subloops. SBC convincingly shows that the FCC has declined to require the unbundling of each of these elements, based on a nationwide finding that CLECs will [*19] not be impaired in the absence of such unbundling. SBC also shows that Illinois law, as interpreted by the ICC, requires the unbundling of these same elements, without regard to any finding of impairment. Hence, the court concludes that SBC has made at least a provisional showing that Illinois law with respect to these elements may be preempted by the 1996 Act.

The second group consists of DS1 and DS3 loops, DS 1 transport, DS3 transport, and dark fiber transport. As SBC acknowledges, the FCC has held that the unbundling of these elements may be required under certain

circumstances. Nonetheless, SBC maintains that Illinois regulations with respect to these elements are preempted because Illinois requires these elements to be unbundled irrespective of particular circumstances. The court is not persuaded. The parties have not explained whether the conditions requiring or permitting unbundling under federal law are present in this litigation. If those conditions are present, federal and state law will coincide in the same practical result, even if the criteria underlying the two bodies of law differ. Moreover, if the conditions requiring unbundling under federal law are present here, [*20] it is unclear how the Illinois requirements might negatively affect competition or interfere with the purposes underlying the 1996 Act. In short, the parties have not given the court enough information to decide whether these elements are preempted. As a result, all of the parties' motions for summary judgment are denied with respect to DS1 loops, DS3 loops, DS 1 Transport, DS3 transport, and Dark Fiber transport

Having made these initial determinations, the court turns to a consideration of the Competing Carriers' and the ICC's arguments.

### B. The ICC's and the Competing Carriers' Arguments

Rather than confronting directly SBC's contention that *Section 13-801* conflicts with *Section 251*, the Competing Carriers and the ICC begin by mounting peripheral attacks, coming together in a kind of pincer movement. On the one hand, the Competing Carriers argue that SBC's preemption argument fails because SBC has voluntarily subjected itself to the regulations it seeks to challenge. Because SBC can withdraw itself from the offending regulations at any time, the Competing Carriers assert, SBC is precluded from challenging the regulations. On the other hand, the ICC argues that SBC's preemption [*21] argument fails because, regardless of the unbundling requirements imposed by *Section 251*, SBC is subject to the same requirements by virtue of *Section 271*. The court examines the Competing Carriers' and the ICC's arguments in turn.

### 1. The Competing Carriers: Preemption and Voluntariness

The Competing Carriers' lead argument is premised on the fact that SBC voluntarily petitioned to be subject to the state regulations of which it now complains. Because SBC can remove itself from the regulations, the Competing Carriers claim, it cannot claim that the regulations are preempted. For several reasons, the court finds the Competing Carriers' position unpersuasive.

### a. Voluntariness

As an initial matter, it is doubtful whether the Competing Carriers are correct in asserting that SBC can voluntarily withdraw from alternative regulations. This question gave the court pause when it confronted SBC's motion for a preliminary injunction, and the court later directed the ICC to provide additional briefing on the extent to which SBC could voluntarily withdraw from alternative regulation. The ICC's briefing makes clear that SBC cannot unilaterally remove itself from alternative regulation. [*22] While it is true that SBC may *petition* the ICC to withdraw, the ICC has the final say regarding whether or not to rescind its approval of SBC's alternative regulation plan. Moreover, the statute directs the ICC to consider a number of specific conditions in determining whether to rescind an alternative regulation plan, and the ICC may rescind if, after holding a hearing, it determines that the conditions are no longer satisfied. *220 ILCS 5/13-506.1(b)*. n3 The Commission may rescind if it finds that the conditions no longer can be satisfied. Hence, it is a gross oversimplification to claim that SBC may remove itself from alternative regulation simply by filing a petition. Although SBC voluntarily petitioned to be subject to the alternative regulations, it does not follow that SBC can voluntarily remove itself from those regulations, or that ICC approval of a petition by SBC to withdraw is a *fait accompli*. n4

---

n3 Those conditions are whether the plan: (1) is in the public interest; (2) will produce fair, just, and reasonable rates for telecommunications services; (3) responds to changes in technology and the structure of the telecommunications industry that are, in fact, occurring; (4) constitutes a more appropriate form of regulation based on the Commission's overall consideration of the policy goals set forth in the statute; (5) specifically identifies how ratepayers will benefit from any efficiency gains, cost savings arising out of the regulatory change, and improvements in productivity due to technological change; (6) will maintain the quality and availability of telecommunications services; and (7) will not unduly or unreasonably prejudice or disadvantage any particular customer class, including telecommunications carriers. *220 ILCS 5/13-506.1(b)*.

[*23]

n4 The Competing Carriers point out that SBC has not even attempted to withdraw. However, the ICC need not wait for SBC to petition; the IPUA explicitly provides that the ICC can rescind approval of an alternative regulation plan on its own initiative. *220 ILCS 5/13-506.1(e)*. The fact that SBC has not petitioned to withdraw is therefore of little significance.

#### b. Preemption and Alternative Regulation

While the court is not convinced by the Competing Carriers' contention that SBC can voluntarily withdraw from alternative regulation, the court need not rest its holding on that ground. For even if SBC could voluntarily remove itself from the regulations in question, the Competing Carriers' argument still fails. While the Competing Carriers spend several pages recounting the history of SBC's attempts to obtain the alternative regulation, they never succeed in demonstrating precisely why SBC should be precluded from asserting that the regulations are preempted. The Competing Carriers claim that the doctrine of preemption does not apply to voluntarily assumed [*24] obligations. As authority for this contention, the Competing Carriers cite only two cases - *Cipollone v. Liggett Group, Inc., 505 U.S. 504, 112 S. Ct. 2608, 120 L. Ed. 2d 407 (1992)* and *Association of Intern. Auto. Mfrs., Inc. v. Commissioner, Mass. Dept. of Environmental Protection, 208 F.3d 1 (1st Cir. 2000)* - neither of which supports their theory. *Cippollone* and *Association of Intern. Auto. Manufacturuers* stand only for the proposition that federal preemption is generally confined to formal state laws and regulations and is not applicable to contracts and other private or voluntary agreements. The alternative regulations to which SBC is subject, however, are not contracts or private agreements.

The court found few other cases addressing the application of the preemption doctrine to voluntarily assumed legal obligations; any cases even remotely relevant, however, undermine the Competing Carriers' theory. The Ninth Circuit, for example, recently addressed a similar issue in *Olympic Pipe Line Co. v. City of Seattle, 437 F.3d 872 (9th Cir. 2006)*. There, the City of Seattle entered into two contracts with the Olympic Pipe Line Company to provide safety oversight [*25] of a hazardous liquid pipeline within the city's boundaries. *Id.* at *874*. A section of the pipeline later exploded, and Seattle maintained that it would shut down the portion of Olympic's pipeline within Seattle's city limits if Olympic refused to comply with a list of safety demands. *Id.* Olympic sued, arguing that Seattle's attempt to impose safety regulations pursuant to the parties' contracts was preempted by the Pipeline Safety Improvement Act of 2002, *49 U.S.C. § 60101 et seq.* ("PSA"). *Id.* The court held that the City's regulations were indeed preempted. *Id.* at *882*. The City argued that Olympic was nevertheless precluded from raising the preemption argument because Olympic had voluntarily entered into its agreements with the City. *Id.* The court rejected the argument, stating, "Federal preemption is the allocation of power and decision-making authority between the federal government and the state and local governments, based on the *Supremacy Clause of the Constitution*. Preemption is a power of the federal government, not an individual right of a third party that the party can 'waive.'" *Id.* 882-83 [*26] (internal citation omitted).

Similarly, SBC interprets the Competing Carriers' argument as asserting that parties are estopped from challenging the constitutionality of statutes from which those parties benefit. In this connection, SBC cites the Seventh Circuit's decision in *Alliant Energy Corp. v. Bie, 330 F.3d 904 (7th Cir. 2003)*, as holding that, so long as the challenged provision is severable from the rest of the statute, SBC is not foreclosed from challenging *Section 13-801*. *Id.* at *909*. SBC makes a convincing showing that the provision is severable. Specifically, SBC points to the presumption under Illinois law that statutory provisions are severable; the fact that *Section 13-506.1*, the general alternative regulation statute, existed for several years prior to the enactment of *Section 13-801*; and finally, the fact that the sponsors of *Section 13-801* in the Illinois General Assembly specifically expressed their intention that the provision be severable from the rest of the statute. *See* Ill. General Assembly, H.R. Tr. of Debate on H.B. 2900, at 178 (May 31, 2001) ("[I]t is clear that this General Assembly intends for House Bill 2900 to be [*27] a severable Act should a court determine that any Section or subdivision of any Section violate State or Federal law or is preempted under Federal law."). The Competing Carriers' retort to SBC's argument is wholly inadequate, consisting of a solitary, bald assertion that the provisions are not severable. Competing Carriers' Reply in Opp. to Summ. Judgment at 6.

#### c. Preemption: Congressional Objectives

Next, the Competing Carriers argue that the *Section 13-801*'s requirements are not preempted because, regardless of whether the requirements have been voluntarily assumed, they do not conflict with or otherwise undermine Congress's purpose in passing the 1996 Act. The Competing Carriers make several arguments on this point, all of which fail.

The Competing Carriers first contend that the ICC's regulations are not preempted because the 1996 Act disavows "implied preemption." Specifically, *Section 601*, an uncodified provision of the Act, provides that the "Act and the amendments made by this Act shall not be construed to modify, impair, or supersede Federal, State, or local law unless expressly so provided in such Act or amendments." *47 U.S.C. § 152*. The Competing [*28] Carriers argue that the state laws and regulations at issue in this litigation cannot be preempted because the 1996 Act nowhere expressly declares such laws and regulations to be preempted.

This argument founders on a separate preemption provision contained in *Section 251* itself. That provision states:

> In prescribing and enforcing regulations to implement the requirements of this section, the Commission shall not preclude the enforcement of any regulation, order, or policy of a State commission that--
>
> (A) establishes access and interconnection obligations of local exchange carriers;
>
> (B) is consistent with the requirements of this section; and
>
> (C) does not substantially prevent implementation of the requirements of this section and the purposes of this part.

*47 U.S.C. § 251(d)(2)*. In short, the Competing Carriers appear fundamentally to misapprehend SBC's position: SBC does not argue that the Illinois regulations are preempted because of some implicit contradiction between *Section 13-801* and the 1996 Act. Rather, SBC contends that the Illinois requirements are preempted because they fail to comport with the specific criteria expressly [*29] listed in *Section 251*.

The Competing Carriers further argue that Illinois requirements are not preempted by *Section 251*'s preemption provision because Illinois' requirements are consistent with the 1996 Act and do not substantially prevent the Act's requirements and purposes. Specifically, the Competing Carriers argue that *Section 13-801* has the same overriding purpose as the 1996 Act - namely, that of "promot[ing] competition and reduc[ing] regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies." Pub.L. No. 104-104, 110 Stat. 56, 56 (1996). While it is true that both the 1996 Act and the IPUA are aimed at promoting competition in the telecommunications industry, the Competing Carriers' position is much too facile. For, as judicial decisions interpreting both the 1996 Act and the FCC's regulations make clear, unbundling *simpliciter* does not necessarily promote competition. As the D.C. Circuit observed in *USTA I*, "the [Supreme] Court's opinion in *Iowa Utilities Board* . . . plainly recognized that unbundling is not an unqualified good. [*30] " *290 F.3d at 429*. Rather, "[e]ach unbundling of an element imposes costs of its own, spreading the disincentive to invest in innovation and creating complex issues of managing shared facilities." *Id.* (citing *Iowa Utilities Board, 525 U.S. at 428-29*) (Breyer, J., concurring in part and dissenting in part)). Hence, the fact that Illinois' requirements make no provision for impairment and embody no limiting standard can very well mean that they frustrate the 1996 Act's goals.

The Competing Carriers's remaining arguments need not be considered at length. For instance, the Competing Carriers claim that the FCC's decision not to require the unbundling of a particular network element does not mean that the FCC has *forbidden* states from imposing those requirements. This argument, however, runs afoul of the FCC's own pronouncement in the *Triennial Review Order* that "[i]f a decision pursuant to state law were to require the unbundling of a network element for which the Commission . . . declined to require unbundling on a national basis, we believe it unlikely that such decision would fail to conflict with and 'substantially prevent' implementation [*31] of the federal regime." TRO P 195. The Carriers apparently ignore the fact that the FCC did not merely decline to require ILECs to unbundle the network elements; rather, the FCC imposed a nationwide bar on such unbundling.

The Competing Carriers go on to argue that there is no conflict between federal and state law - and hence no preemption of the latter by the former - because it is entirely possible for SBC simultaneously to comply with both bodies of law. Indeed, the Carriers point out that SBC has entered into voluntary agreements with CLECs for certain of the network elements at issue in this litigation. This, the Competing Carriers conclude, shows that there is no conflict between the FCC's nationwide bar on the unbundling of network elements and SBC's providing those elements to CLECs. But this argument is confused: the point is not whether SBC can comply with both state and federal regulations; the question, rather, is whether there is a conflict between the FCC requirements, which maintain that certain requirement *cannot* be imposed, with the Illinois requirements, which impose precisely those requirements. When properly understood, the conflict is obvious.

### d. Ripeness [*32]

The final arrow in the Competing Carriers' quiver is based on language in the D.C. Circuit's recent opinion in *Covad Communications Co. v. F.C.C., 450 F.3d 528 (D.C. Cir. 2006)*. Near the end of the opinion, the court briefly took up an objection to the FCC's regulations made by the New Jersey Division of the Ratepayer Advocate ("NJDRA"). The court stated:

> Finally, we address a miscellaneous claim, raised only in NJDRA's petition,

Case 2:06-cv-00577-WKW-TFM    Document 29-3    Filed 10/24/2006    Page 10 of 15

Page 9
2006 U.S. Dist. LEXIS 70221, *

> that the FCC cannot preempt state public utility commissions from regulating telecommunications carriers. . . .
>
> Again, the Ratepayer Advocate's argument is meritless. NJDRA's claim boils down to the proposition that the Act's preemptive force is unconstitutional *as applied*, notwithstanding the fact that the Act has *not been applied*. Given that we have already held that any preemption challenge must be raised (if at all) only after the FCC attempts to preempt a state commission's unbundling authority, and given that the *Order* under review does not contain any reference to the Commission's preemptive authority (much less does it actually preempt anything), NJDRA's legal arguments are unripe at best.

*Id.* 550-51 [*33] (emphasis in original). The Competing Carriers argue on the basis of this dictum that the FCC has not preempted any state laws and that, as a result, SBC's claims are not ripe.

The court does not accept the Competing Carrier's contention. It is clear that the FCC has not declared any specific regulation to have been preempted. But the court does not agree that, as the Competing Carriers argue, the court can make no finding of preemption unless and until the FCC makes such a finding. As SBC argues, such an interpretation would fly in the face of clearly established Supreme Court precedent. For example, the Supreme Court has explicitly rejected the notion that an agency must specifically announce its intention to preempt state laws or regulations. *See, e.g., Geier v. American Honda Motor Co., Inc.,* 529 U.S. 861, 885, 120 S. Ct. 1913, 146 L. Ed. 2d 914 (2000) ("The dissent would require a formal agency statement of pre-emptive intent as a prerequisite to concluding that a conflict exists. . . . [T]he Court has never before required a specific, formal agency statement identifying conflict in order to conclude that such a conflict in fact exists. . . . To insist on a specific expression of agency intent [*34] to pre-empt, made after notice-and-comment rulemaking, would be in certain cases to tolerate conflicts that an agency, and therefore Congress, is most unlikely to have intended."). Indeed, with respect to the 1996 Act itself, the Supreme Court has indicated that federal courts have jurisdiction to entertain preemption questions. *See Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland,* 535 U.S. 635, 642, 122 S. Ct. 1753, 152 L. Ed. 2d 871 (2002) ("Verizon seeks relief from the Commission's order 'on the ground that such regulation is pre-empted by a federal statute which, by virtue of the *Supremacy Clause of the Constitution*, must prevail,' and its claim 'thus presents a federal question which the federal courts have jurisdiction under *28 U.S.C. § 1331* to resolve.'") (quoting *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 96, n. 14, 103 S. Ct. 2890, 77 L. Ed. 2d 490 (1983)). The court therefore rejects the Competing Carriers' position that under *Covad*, the preemption issue cannot be reached.

### e. Summary

None of the foregoing considerations is to deny that the Competing Carriers' theory possesses a certain intuitive appeal. The fact that SBC challenges the very alternative regulations [*35] for which it lobbied so aggressively may well seem mendacious. Nonetheless, the Competing Carriers have failed to identify any doctrinal basis for their position regarding preemption. Indeed - as SBC repeatedly has pointed out - the ICC has not joined or otherwise expressed any support to the Competing Carriers' argument. The court declines to grant the Competing Carriers' motion for summary judgment on this asserted ground. n5

---

n5 While the Competing Carriers argue that SBC's voluntary participation in the alternative regulation entitle them to summary judgment, they also argue, somewhat contradictorily, that summary judgment should be denied because it is unclear whether the ICC would grant a request by SBC to withdraw from the alternative regulations. Because the court holds that the Competing Carriers' argument fails even on the assumption that the regulations were voluntarily entered into, the court finds no bar to summary judgment.

---

### 2. The ICC: Section 271

The ICC's chief argument is that, irrespective [*36] of SBC's obligations under *Section 251*, SBC has an independent obligation to unbundle the elements in question under a separate provision of the Act, *viz.*, *Section 271*. *Section 271* applies to Bell Operating Companies ("BOCs"), subsidiaries of AT&T that were divested as part of a 1984 consent decree which settled the United States' antitrust suit against AT&T. *See United States v. Am. Tel. & Tel. Co.,* 552 F. Supp. 131, 165 (D.D.C. 1982), aff'd sub nom. *Maryland v. United States,* 460 U.S. 1001, 103 S. Ct. 1240, 75 L. Ed. 2d 472 (1983). Under the consent decree, BOCs were forbidden from providing long-distance telephone services. *Id*; *see also AT&T Corp. v. F.C.C.,* 361 U.S. App. D.C. 354, 369 F.3d 554, 556 (D.C. Cir. 2004) (summarizing relevant history). The 1996 Act now allows BOCs to apply to the FCC for authorization to provide long-distance services

originating in any in-region state. In exchange, however, BOCs are subject to certain requirements. Specifically, *Section 271* sets forth a fourteen-item "competitive checklist" consisting of the minimum requirements that a BOC must meet in order to obtain approval to provide long-distance service. Among these requirements is the obligation [*37] to unbundle loop, switching, and transport elements. In contrast to *Section 251*, *Section 271*'s obligations do not require a finding of impairment. Since SBC is a BOC and has obtained approval to provide in-region long-distance service, the ICC claims that SBC is subject to *Section 271*'s requirements. And since *Section 271* requires SBC to unbundle without making any finding of impairment, the ICC argues that *Section 13-801* does not require SBC to do anything more than is already required of SBC under the Act. Hence, the ICC contends, the Illinois requirements are not preempted.

SBC advances a barrage of responses to the ICC's argument. SBC's core contention, however, is that *Section 271* is part of a regulatory framework that is entirely separate from the framework to which *Sections 251* and *252* framework belong. SBC points out that state commissions are given no authority to enforce *Section 271*'s requirements. Rather, the part of the Act that includes *Section 271* is to be administered exclusively by the FCC. Additionally, SBC argues that a state must comply with *Section 251*'s preemption provision regardless of whether the state's regulations are consistent or compliant with *Section 271* [*38] . Specifically, *Section 251*'s preemption provision allows for the preservation of state regulations that are consistent "with the requirements of *this section*" (i.e., *Section 251*) and do not "substantially prevent implementation of the requirements of *this section*" (i.e., *Section 251*). In other words, SBC contends, the ICC cannot rely on *Section 271* to justify *Section 13-801*'s requirements or to save the regulations from preemption.

The arguments on both sides possess a certain amount of suasive force, and both sides are able to cite case authority for their positions. *Compare Bellsouth Telcomms., Inc. v. Miss. PSC, 368 F. Supp. 2d 557, 565-66 (D. Miss. 2005)* ("[I]n light of the FCC's decision to not require BOCs to combine *section 271* elements no longer required to be unbundled under *section 251*, it [is] clear that there is no federal right to *271*-based UNE-P arrangements. . . . [E]ven if *§ 271* imposed an obligation to provide unbundled switching independent of *§ 251* with which BellSouth had failed to comply, *§ 271* explicitly places enforcement authority with the FCC . . . [so that] it is the prerogative of the FCC, and not this court, to address [*39] any alleged failure by BellSouth to satisfy any statutorily imposed conditions to its continued provision of long distance service.") (internal citations and quotations omitted) *with Verizon New England, Inc. v. Maine Public Utilities Com'n, 403 F. Supp. 2d 96, 102 (D. Me. 2005)* ("Plaintiff states that in the Act, 'Congress gave the Federal Communications Commission ... exclusive jurisdiction to establish, interpret, price, and enforce these network access obligations under *Section 271*.' This assertion is overbroad and not supported by the provisions of *§ 271* of the Act. The central, vital predicate for this argument is that federal law preempts state regulation of *§ 271* obligations. It is clear that the statute is not intended to have any such effect.") (internal citation omitted).

Although the question is a close one, the court concludes that SBC has the better argument. The structure of the Act strongly suggests Congress's intent to separate *Sections 251* and *252* from *Section 271*, as well its intent to confine state authority to the former provisions. The ICC argues that its regulations are not an attempt to *enforce Section 271*'s requirements. Nevertheless, [*40] the ICC purports to rely on *Section 271*, and in so doing, is attempting to accomplish through indirect means what it is clearly prevented from doing directly. Moreover, although the Seventh Circuit has not definitively pronounced on the question, to the extent that it has addressed state authority *vis a vis Section 271*, its position supports SBC. *Cf. Indiana Bell Telephone Co., Inc. v. Indiana Utility Regulatory Com'n., 359 F.3d 493, 495 (7th Cir. 2004)* ("The state commission makes a recommendation, which is merely advisory, as to whether the BOC has satisfied the requirements. The Act reserves to the FCC the authority to decide whether to grant a *section 271* application.") (citing *MCI Telecomms. Corp. v. Illinois Bell Tel. Co., 222 F.3d 323 (7th Cir. 2000)).*

The court further notes that, in addition to the small number of courts that have confronted the question of *Section 271*'s import, a number of state utility commissions have opined on the matter. While the decisions are once again divided, a greater number of decisions can be cited in support of SBC's position. *See, e.g., In re Arbitration of Dicea Communications, Inc. d/b/a/ Covad. Communications Co. v. Qwest Corp., No. ARB-05-1, 2005 Iowa PUC LEXIS 186, at *10 (May 24, 2005)* [*41] , ("Clearly, the provisions that are at issue in this arbitration are unbundling obligations pursuant to *§ 271*, rather than *§ 251* obligations. Therefore, the Board lacks jurisdiction or authority to require that Qwest include these elements in an interconnection agreement arbitration brought pursuant to *§ 252*."); *Dieca Communications, Inc. Interconnection Arbitration, Case No. PU-05-165, 2006 N.D. PUC LEXIS 3, at *22-*23 (Feb. 8, 2006)* ("We find that we do not have the authority under the Act to impose unbundling obligations under *Section 271*. The FCC has the exclusive authority to determine whether Qwest has complied with the substantive provisions of *Section 271* including the checklist provisions.

Enforcement of *Section 271* requirements is also clearly under the exclusive jurisdiction of the FCC. State commissions have only a consulting role under the Act."); *In re Petition of Dieca Communications, Inc. d/b/a Covad Communications Co. for Arbitration of an Interconnection Agreement with Qwest Corp., Case No. CVD-T-05-1, 2005 Ida. PUC LEXIS 139, at *9 (July 18, 2005)* ("[T]he Commission does not have the authority under *Section* [*42] *251* or *Section 271* of the Act to order the *Section 271* unbundling obligations as part of an interconnection agreement." Order No. 29825); *but see In Re: Generic Proceeding to Examine Issues Related to BellSouth Telecommunication, Inc's. Obligations to Provide Unbundled Network Elements, Docket No. 19341-U, 2006 Ga. PUC LEXIS 21, at *2-*3 (Mar. 8, 2006)* ("*Section 271* requires that the BOC provide access to unbundled network elements ("UNEs") on the competitive checklist set forth within the statute at just and reasonable rates. The *Section 271* competitive checklist items (i) and (ii) make explicit reference to compliance with provisions in *Sections 251* and *252*. Therefore, the *Section 252* agreements are the vehicles through which a BOC demonstrates compliance with *Section 271*. As such, it is logical to conclude that obligations under *Section 271* must be included in a *Section 252* interconnection agreement.") (citations omitted).

In sum, the court declines to grant the ICC's motion for summary judgment to the extent that it is premised on *Section 271*. n6

---

n6 As a final piece of evidence, the ICC points to a passage in a brief submitted by the FCC urging the Supreme Court not to grant certiorari in *USTA II*. There, the FCC remarked:

> NARUC is wrong to suggest that the FCC's pricing proposal forecloses the States from setting rates for facilities or services that are provided solely to comply with *Section 271*. In the *Triennial Order*, the FCC expressed no opinion as to precisely what role the States would play in establishing rates under *Section 271*. Until the Commission expressly addresses that question, the matter is not suitable for judicial review.

Brief for the Federal Respondents in Opposition at 21, National Ass'n of Regulatory Utility Com'rs v. United States Telecom Ass'n, *petition for cert. denied*, 73 U.S.L.W. 3234 (U.S. Oct. 12, 2004) (No. 04-15). The court finds this isolated remark, adopted within the context of a specific litigation, to be of limited relevance here: it is but a single statement - and one that, inasmuch as it is merely an expression of agnosticism, undermines the ICC's position as much as it supports it. Furthermore, to the extent that the FCC suggests that the matter is not suitable for judicial review, the FCC's argument again undermines the ICC's position.

---

[*43]

3. Summary

The court concludes that Illinois' requirements with respect to the unbundling of local circuit switching, switching-related elements, OCn-level loops, dedicated transport, dark fiber Loops, entrance facilities, and feeder subloops are in conflict with the corresponding federal unbundling regulations. However, the court is unable to determine the extent to which Illinois requirements regarding the unbunding of DS1 loops, DS3 loops, DS 1 transport, DS3 transport, and dark fiber transport are incompatible with federal unbundling regulations. The court is unpersuaded by the Competing Carriers' and the ICC's arguments that Illinois law with respect to these network elements is not preempted. Hence, the court concludes that Illinois regulations are preempted insofar as they require the unbundling of of local circuit switching, switching-related elements, OCn-level loops, dedicated transport, dark fiber Loops, entrance facilities, and feeder subloops. With respect to the preemption of Illinois' requirements regarding the unbunding of DS1 loops, DS3 loops, DS 1 transport, DS3 transport, and dark fiber transport, the court declines to issue a definitive ruling.

Having considered [*44] the parties' arguments with respect to the unbundling of the various network elements, the court now turns to an examination of whether other requirements imposed by *Section 13-801* are preempted by the 1996 Act.

**IV. Combination Requirements**

In addition to their dispute over the network elements themselves, the parties disagree over whether SBC must furnish CLECs with pre-existing *combinations* of network elements. According to SBC, federal law requires incumbents to provide combinations only of those network elements that are required to be unbundled under *Section 251 of the 1996 Act*. Because it is not required to unbundle the individual elements for its competitors, SBC argues, it also cannot be required to provide combinations of those elements to competitors. *Sec-*

tion 13-801 of the IPUA*, however, requires SBC to combine network elements for CLECs. SBC therefore contends that Illinois' combination requirements conflict with federal law and are preempted.

In response, the ICC once again attempts to rely on *Section 271*. Specifically, the ICC claims that *Section 13-801* merely requires the combination of elements that SBC is required to unbundle pursuant to *Section 271* [*45] (as opposed to those that must be unbundled under *Section 251*). And while the ICC acknowledges that the *FCC* has declined to require ILECs to combine the elements that incumbents were required to unbundle under *Section 271*, the ICC insists that the FCC did not preclude *states* from requiring ILECs to combine those elements.

The court finds the ICC's argument strained and unconvincing. At bottom, the ICC's argument with respect to the combination requirements is essentially the same as its argument with respect to the unbundling of the network elements themselves. The court already has found the ICC's attempt to rely upon *Section 271* unavailing. The court reaches the same conclusion here. Because Illinois' combination requirements are inconsistent with the Act, the court holds that they are preempted. With respect to this issue, therefore, the court grants summary judgment in SBC's favor and denies the ICC's and the Competing Carriers' motions for summary judgment.

**V. Splitters**

A "splitter" is a device that separates the high- and low-frequency portions of a copper loop so that the loop may be used simultaneously for high-speed DSL data transmission and single line [*46] telephone service. All of the parties appear to agree that splitters are not "network elements" under federal law and that, accordingly, federal law does not require SBC to unbundle splitters. n7 However, the parties draw different conclusions from this fact. According to the ICC, the fact that splitters are not network elements means that there is no federal requirement with which Illinois law might conflict, and hence no respect in which by which Illinois law might be preempted. SBC, on the other hand, argues that Congress restricted the universe of items that ILECs can be required to unbundle to those constituting "network elements" under the Act. Hence, SBC argues, if an item is not a network element within the meaning of the Act, an ILEC cannot be required to unbundle it.

>   n7 SBC's position is somewhat ambiguous. At some places in its opening brief, SBC indicates that splitters are not network elements. *See* SBC Mot. Summ. Judgment at 14 ("The ICC thus recognized ...that the splitter is not a 'network element' as defined by federal law."). At other places, however, SBC suggests a contrary view. For example, in the chart summarizing various federal and state requirements *vis a vis* various network elements, splitters are listed as a network element. *Id.* at 16.

[*47]

The parties have not directed the court to any case authority on this question; nor has the court been able to find any decisions explicitly confronting the issue. To the extent that courts have addressed related issues, however, they appear to assume that states are *without power* to regulate items that have not been deemed network elements. *See, e.g., MCI Telecomms. Corp. v. BellSouth Telecomms., Inc., 112 F. Supp. 2d 1286, 1294 (N.D. Fla. 2000)* (if state commission correctly determined that dark fiber was not a "network element" under the Act, the incumbent would not be required to provide its competitor with access to dark fiber). The court concludes that Illinois' unbundling requirement with respect to splitters is preempted by the 1996 Act.

The ICC claims that a finding of preemption on this point would run counter to the fact that the Act intended to preserve much of the authority that states traditionally have exercised in the area of telecommunications. However, the extent to which the Act was designed to keep state authority intact is uncertain. Clearly, Congress did not intend to strip states of all authority in the area. Nevertheless, [*48] it is beyond question that the Act brought about a fundamental restructuring of the federal-state relationship with respect to telecommunications regulation. As the Supreme Court stated in *AT&T*:

> [T]he question . . . is not whether the Federal Government has taken the regulation of local telecommunications competition away from the States. With regard to the matters addressed by the 1996 Act, it unquestionably has. The question is whether the state commissions' participation in the administration of the new *federal* regime is to be guided by federal-agency regulations. If there is any "presumption" applicable to this question, it should arise from the fact that a federal program administered by 50 independent state agencies is surpassing strange. . . . This is, at bottom, a debate not about whether the States will be allowed to do their own thing, but about whether it will be the FCC or the

federal courts that draw the lines to which they must hew.

*525 U.S. at 378 n.6.*

In short, the court rejects the ICC's assertion of plenary authority over items not considered network elements under the Act, and concludes that Illinois' regulations requiring [*49] SBC to unbundle splitters are preempted. Summary judgment on this point is granted in favor of SBC.; correlatively, the ICC's and the Competing Carriers' motions for summary judgment are denied.

**VI. Terminating Switches**

As SBC explains, in order to complete a long-distance call from one of its customers to a customer of one of its competitors, a carrier serving the calling party must deliver the call over the terminating switch that serves the other party at the terminating end of the call. Typically, this requires a carrier to purchase "terminating access service" from the carrier that owns the terminating switch by paying a "terminating access charge" for using that switch. The dispute over whether SBC may charge access termination fees is similar to the dispute over whether SBC must unbundle splitters. For although not defined as a network element under federal law, the ICC has found that the terminating switch *is* a network element under Illinois law and has held that it must be unbundled.

As it argued in the case of splitters, the ICC argues that it is precisely because the terminating switch is not a network element under federal law that there is no conflict [*50] between state and federal law on this point. SBC again draws the exact opposite conclusion: the fact that terminating access has not been deemed a network element means that states' attempts to regulate the subject in any way are verboten.

Given the similarity of the arguments, the court can see no reason why it should not reach the same conclusion with respect to terminating access as it reached with respect to splitters. Indeed, the court finds that there is even greater support for a finding of preemption here, for the ICC's own earlier pronouncements belie its current position. Specifically, in its *Phase I Remand Order*, the ICC stated:

> We agree . . . that *Section 13-801(d)(4)* prevents SBC from charging for terminating access. State and federal law undoubtedly clash in this instance. We are unable to reconcile the plain language of our state law with the recent directives in federal law. As we have previously determined, *Section 13-801(d)(4)* allows requesting carriers to use a network elements platform to provide telecommunications services. The state statute defines a network element rather broadly. Thus, a terminating switch port, while never deemed an unbundled network [*51] element under federal *Section 251* by the FCC, is a network element under *Section 13-216 of the PUA*. We therefore find that SBC may not charge CLECs for terminating access when the CLECs are using unbundled local switching with shared transport to provide local service. The Commission cannot gloss over the disparity between state and federal law. We can only highlight this conflict and leave it to the District Court to resolve the inconsistency.

Phase I Remand Order P 119 (emphasis in original). In short, despite the dismissive position it has now taken, the ICC itself clearly realized that the Illinois law conflicted with the 1996 Act and that the conflict gave rise to serious concern about preemption.

In response, the ICC argues that it never specifically admitted that Illinois law was preempted on this point. Rather, the ICC claims, it merely noted that Illinois and federal law differed with respect to terminating access. This attempt at reinterpretation is implausible. Regardless of whether the ICC ever used the word "preemption," its concern over the issue is palpable in the passage above. n8 The court concludes that SBC is entitled to summary judgment with respect [*52] to the ICC's regulations regarding terminating access; the ICC's and the Competing Carriers' motions for summary judgment are correspondingly denied.

> n8 Of course, the mere fact that the ICC espoused this position at an earlier point does not necessarily mean that its current position is incorrect. The fact that the ICC itself found SBC's position convincing, however, does underscore the general persuasiveness of SBC's view. SBC argues that, having asserted the earlier view, the ICC cannot adopt a different position for the purposes of this litigation. Because the ICC's position warrants rejection on other grounds, he court declines to take a position on SBC's argument with respect to the latter issue.

### VII. Collocation Requirements

Collocation refers to an arrangement under which a competing carrier locates and installs its own equipment on an ILEC's premises. *See, e.g., Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 406, 124 S. Ct. 872, 157 L. Ed. 2d 823 (2004).* It is undisputed [*53] that both Illinois law and federal law require ILECs to allow collocation by their competitors. SBC contends, however, that when the two bodies of law are examined more closely, a conflict arises. Specifically, SBC points out that, under federal law, collocation is required only where necessary to connect the competitor to the ILEC's network; *Section 13-801*'s collocation requirement, however, embodies no such criterion. As a result, SBC argues, Illinois law is preempted. For its part, the ICC argues that nothing in the Act prevents Illinois from imposing requirements that exceed those imposed under federal law. In other words, in the ICC's view, the federal "necessity" requirement represents a floor, not a ceiling, where the issue of collocation is concerned.

On this point, the court finds that the ICC has the better argument. In particular, the ICC points to FCC decisions and orders that lend direct support to the ICC's position. For example, the FCC's 1999 Collocation Order stated that the "collocation rules set forth in the Order serve as minimum standards, and permit any state to adopt additional requirements," and that "states will continue to have the flexibility to respond [*54] to specific issues by imposing additional requirements." *Deployment of Wireline Services Offering Advanced Telecommunications Capability ("Collocation Order"), 14 FCC Rcd 4761 (1999)*, PP 8, 23. Similarly, in its Local Competition Order of 1996, the FCC stated that "the states should have flexibility to apply additional collocation requirements that are otherwise consistent with the 1996 Act and our implementing regulations." *In re Implementation of the Local Competition Order Provisions in the Telecommunications Act of 1996, 11 FCC Rcd. 15499, 15783-84 (1996).* It is true that both of these FCC orders are comparatively old and that both have been vacated and remanded with respect to certain of their specific holdings. Nevertheless, SBC has made no showing that the FCC's announcements with respect to collocation have been disturbed by later developments. Hence, with respect to collocation, the court grants summary judgment in favor of the ICC and the Competing Carriers. n9

---

n9 The parties have addressed the requirements at issue in the litigation more or less separately from one another. As a result, they have not discussed the practical effect of the court's upholding certain of the Illinois requirements while rejecting others. For example, the parties have not advised the court of any logistical or technological difficulties that might arise from the court's holding that SBC is required to allow collocation by its competitors but is not required to unbundle the various network elements at issue in the litigation. The court therefore assumes that no such difficulties will impede implementation of the court's order.

---

[*55]

### CONCLUSION

For the foregoing reasons, the parties' cross-motions for summary judgment are granted in part and denied in part. Specifically, SBC is granted summary judgment with respect to the following Illinois requirements: (1) local circuit switching, switching-related elements, OCn-level loops, dedicated transport, dark fiber loops, entrance facilities, and feeder subloops; (2) combination requirements; (3) splitters; and (4) access fee termination. The court grants the ICC and the Competing Carriers summary judgment with respect to Illinois' collocation requirements. With respect to DS1 and DS3 loops, DS 1 transport, DS3 transport, and dark fiber transport, the court denies all parties' motions for summary judgment.

ENTER:

JOAN B. GOTTSCHALL

United States District Judge

Dated: September 28, 2006