UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| MOMENTUM TELECOM, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ALABAMA PUBLIC SERVICE COMMISSION, | ) | |
| | ) | |
| JIM SULLIVAN, in his capacity as a President of the Alabama Public Service Commission, | ) ) ) | Civil Action No. 2:06-cv-00577-WKW |
| JAN COOK, in her capacity as a Commissioner of the Alabama Public Service Commission, and | ) ) ) ) | |
| GEORGE C. WALLACE, JR., in his capacity as a Commissioner of the Alabama Public Service Commission | ) ) ) ) | |
| Defendants. | ) ) | |

**REPLY TO RESPONSES OF DEFENDANTS AND OF BELLSOUTH TO
BRIEF IN SUPPORT OF COMPLAINT FOR DECLARATORY JUDGMENT**

The plaintiff, Momentum Telecom, Inc. ("Momentum"), pursuant to the parties'

joint Rule 26(f) report [Docket No. 19] and the Court's Orders of September 28, 2006 [Docket

No. 27], October 30, 2006 [Docket No. 32] and November 21, 2006 [Docket No. 34], hereby

submits this Reply to the Responses of Defendants and of BellSouth [Dockets No. 28 and 29,

respectively] to Momentum's Brief in Support of Complaint for Declaratory Judgment. As the

parties noted in their joint Rule 26 report, this case presents only issues of law and therefore the

parties intend for the matter to be submitted to the Court for decision upon the filing of this Reply. <u>See</u> Joint Report [Docket No. 19], p. 3, § 4.[1]

## I.    INTRODUCTION

Both the Alabama Commission and BellSouth have largely dodged the issue which Momentum has asked the Court to address:  Does the Alabama PSC retain jurisdiction to determine whether the rates charged by BellSouth to lease switching services to competitors are "just and reasonable" or has that power been preempted by federal law?

After declining to rule on Momentum's argument and informing the Court in its Answer that the agency "will defer to the wisdom of the court" on this issue, the Alabama Commission now says, in effect, "we meant we would defer to some other federal court, not this one." Nowhere in its brief does the PSC dispute Momentum's contention that the state agency retains jurisdiction to review BellSouth's switching rates.  The agency takes no position on this critical question.  Meanwhile, Momentum is forced to continue paying BellSouth's excessive and, as yet, unreviewed leasing prices.  Momentum has asked the agency to rule on the jurisdictional issue so that the company can argue for lower, more reasonable rates.  The PSC can not logically hold Momentum's request "in abeyance" for months to await federal court guidance and then argue here that Momentum's request for such guidance is premature . . . yet that is precisely the argument that the state defendants make.

BellSouth also evades the preemption question, but does so more cleverly.  The incumbent carrier does not dispute the statements made by both Momentum and the Alabama Commission that the state agency has the power under state law to establish "just and

---

[1] Bellsouth has denominated its brief, in part, a "Motion for Summary Judgment." <u>See</u> Docket No. 29-1.  To the extent the Court deems it necessary to make a formal request for summary judgment in a case such as this, where only legal issues are disputed, Momentum requests that its original brief on the merits [Docket No. 28] be considered a motion for summary judgment on the legal issues presented in the Complaint.  Therefore, the Court functionally has before it cross-motions for summary judgment by Momentum, Defendants, and BellSouth.

reasonable" switching rates. Similarly, BellSouth does not dispute the FCC's explanation that switching prices must, under federal law, comply with "the basic just, reasonable and nondiscriminatory rate standard . . . that has historically been applied under most federal and state statutes."

If the applicable state and federal standards are the same, what is the basis for BellSouth's claim that the state agency's ratemaking power has been preempted? That is never made clear because BellSouth does not dispute, or even discuss, the standard, three-part preemption analysis used in this Circuit to determine whether a state statute has been preempted by federal law. Instead, BellSouth changes the subject. BellSouth contends that Momentum's true "aim" in this litigation is the restoration of "the anticompetitive UNE Platform" and that this "desired result" is "directly contrary to the FCC's expert judgment" concerning the best method of promoting competition. BellSouth Opposition, at 22-23. The company thus tries to turn a federal preemption question into a debate over regulatory policy. But even the policy debate misses the mark. A "just and reasonable" rate could be, and traditionally has been, a cost-based rate. It "might" also be, as the FCC has explained, a commercially negotiated rate or even a tariffed rate for a similar service. Those are issues for regulators to address, based on the evidence presented to them, in arriving at a "just and reasonable" result. These are issues which should and could be addressed by the Alabama Commission. These are not determinative of, or even relevant to, the federal preemption question before the Court.

In sum, the "preemption" argument as presented in BellSouth's brief is not really about whether federal law preempts the Alabama Commission's ratemaking authority but about how the state's power ought to be exercised, in BellSouth's view, to be consistent with federal law and the FCC's policy objectives. Those arguments belong in another forum and, Momentum suggests, that is where the Court should direct the parties.

## II. THIS COURT CAN AND SHOULD HOLD THAT FEDERAL LAW DOES NOT PREEMPT THE PSC'S STATE LAW AUTHORITY TO SET RATES FOR "COMPETITIVE CHECKLIST" NETWORK ELEMENTS.

### A. BellSouth's Preemption Arguments are Without Merit.

In its opposition brief, BellSouth argues that federal law preempts Momentum's power under Alabama state law to set rates for network elements that are listed in 47 U.S.C. § 271. BellSouth generally asserts that Alabama Code § 37-1-31, which authorizes the PSC to set rates for telecommunication service providers and Alabama Code § 37-1-80, which provides that such rates shall be "just and reasonable," are preempted by the Telecommunications Act of 1996. BellSouth makes no attempt to go through the required three-pronged preemption analysis, however. Upon following that preemption analysis, as this Court must, it becomes clear that nothing in the Telecommunications Act preempts the above-cited sections of the Alabama Code or the PSC's ability to act under those state statutes.

A party arguing for federal preemption must clear a high bar. The presumption is against preemption, especially in areas the states have traditionally regulated, as the Supreme Court of the United States has explained:

> [D]espite the variety of these opportunities for federal preeminence, we have never assumed lightly that Congress has derogated state regulation, but instead have addressed claims of pre-emption with the starting presumption that Congress does not intend to supplant state law. Indeed, in cases like this one, where federal law is said to bar state action in fields of traditional state regulation, . . . we have worked on the 'assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'

New York Conf. of Blue Cross v. Travelers Ins. Co., 514 U.S. 645, 654-55, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995).[2]  In determining whether federal law preempts a state statute, the Court

---

2 See also Nat'l Ass'n of State Util. Consumer Advocates v. Fed. Commc'n Comm'n, 457 F.3d 1238, 1252 (11th Cir. 2006), in which the Court of Appeals for the Eleventh Circuit stated:

must undertake a three-pronged analysis.  According to the Court of Appeals for the Eleventh Circuit:

> Federal law may preempt state law in three ways.   First, express "[p]re-emption occurs when Congress, in enacting a federal statute, expresses a clear intent to pre-empt state law."  La. Pub. Serv. Comm'n [v. F.C.C.], 476 U.S. [355,] . . . 368, 106 S.Ct.[, 1890,] . . . 1898.   Second, conflict preemption occurs "when there is outright or actual conflict between federal and state law."   Id.  Third, field preemption occurs "where compliance with both federal and state law is in effect physically impossible."  Id.

Nat'l Ass'n of State Util. Consumer Advocates v. FCC, 457 F.3d 1238, 1252 (11th Cir. 2006).

**1.    Congress has not expressly preempted Alabama Code § 37-1-31 or Alabama Code § 37-1-80.**

"'Express preemption'" occurs when Congress has manifested its intent to preempt state law explicitly in the language of the statute.  English v. General Elec. Co., 496 U.S. 72, 79, 110 S.Ct. 2270, 2275, 110 L.Ed.2d 65 (1990).   Congress has not expressly preempted Sections 37-1-31 and 37-1-80 of the Alabama Code because it has not manifested a "clear intent" in the language of the Telecommunications Act to do so.  Likewise, the FCC has not purported to preempt state statutes empowering state public service commissions from setting rates for Section 271 network elements.  See, e.g., Verizon New England v. Maine Pub. Utils. Comm'n, 403 F.Supp.2d 96, 102 (D. Me. 2005). ("Verizon has failed to present, and this

---

"Although the Constitution makes a few of the federal government's powers exclusive, the states retain concurrent authority over most of the areas in which the federal government can act."   [Caleb] Nelson, [Preemption, 86 Va. L. Rev. 225,] . . . 225 [(2000)].   We accordingly presume that "Congress does not cavalierly pre-empt state[ ]law."  Medtronic, Inc., 518 U.S. at 485, 116 S.Ct. at 2250.   "[F]ederal regulation of a field of commerce should not be deemed preemptive of state regulatory power in the absence of persuasive reasons-either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained."  Fla. Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963).

457 F.3d at 1252.

Court has been unable to find, any FCC order specifically interpreting the Act as providing the FCC with the exclusive authority to set rates under § 271.")

Furthermore, the Telecommunications Act contains at least five separate savings clauses preserving state commission authority. Most importantly, 47 U.S.C. § 152(b) explicitly preserves state commission authority over intrastate telecommunications:

> Nothing in this chapter shall be construed to apply or to give the Commission jurisdiction with respect to (1) charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communication service by wire or radio or any carrier . . ..

47 U.S.C. § 152(b) (2004); see also 47 U.S.C. §§ 251(d)(3), 252(e)(3), 261; 110 Stat. 56, § 101 ("No implied effect: This Act and the amendments made by this Act shall not be construed to modify, impair, or supersede Federal, State, or local law unless expressly so provided in such Act or Amendments."). While certain other provisions of the Act evidence Congressional intent to preempt specific aspects of state regulation, the Supreme Court has found that "[i]nsofar as Congress has remained silent, however, § 152(b) continues to function." AT&T v. Iowa Utils. Bd., 525 U.S. 366, 381 n.8 (1999). Since Congress did not specifically withdraw the PSC's authority under state law to set rates for network elements, including those listed in Section 271's competitive checklist, there is no issue of express preemption.

## 2. There is no conflict preemption

As noted above, conflict preemption occurs when there is outright conflict or actual conflict between federal and state law. More particularly, conflict preemption may be found "where it is 'impossible for a private party to comply with both state and federal requirements,' . . . or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" Freightliner Corp. v. Myrick, 514 U.S. 280,

287, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995) (quoting English v. General Elec. Co., 496 US 72, 79 (1990) and Hines v. Davidowitz, 312 US 52, 67 (1941) .

It obviously is not impossible to reconcile state law that empowers the PSC to set "just and reasonable" rates for telecommunications services with a federal requirement that certain such services be provided for "just and reasonable" rates. BellSouth apparently claims, however, that "just and reasonable" means something different under state law than under federal law and therefore claims that a conflict exists. Specifically, BellSouth claims that as to rates for Section 271 network elements, the FCC has defined "just and reasonable" to mean the prevailing market rate. BellSouth then reasons that the correlation between "just and reasonable" rates and market rates "would be meaningless if a state commission such as the PSC purported to set a regulated rate upon which CLECs could insist." BellSouth Opposition at 21. BellSouth's conclusion is a *non sequitur*, however. BellSouth's logic would prevent any agency, state or federal, including the FCC, from setting "just and reasonable" rates for Section 271 network elements. See, e.g., BellSouth's Opposition at 21 ("rates under § 271 should be set by the market, not by a government regulator.") (emphasis added). But it is undisputed that the FCC, which unquestionably is a "government regulator," has the power to set such rates. As such, BellSouth's argument fails for pure logical fallacy. Furthermore, BellSouth fails to mention the importance of monitoring the "market" closely where one market participant enjoys a monopoly on the relevant goods and/or services.

Indeed, Congress designed Section 271 to temper the effects of the overwhelming market power of BellSouth and other BOCs. As such, BellSouth's implication that the Court should interpret Section 271 to allow BellSouth the unchecked ability to name its own "take it or leave it" price for required network elements in the name of a "market rate" is as absurd and offensive as it is self-serving. In any event, comments by the FCC on the definition of "just and

reasonable" have no bearing on a state commission's power to set rates, even though they may inform the state commission's analysis. See AT&T Corp. v. Iowa Utils. Bd., 525 U.S. at 384 ("The FCC's prescription, through rulemaking, of a requisite pricing methodology no more prevents the States from establishing rates than do the statutory 'Pricing standards' set forth in 252(d).").

Moreover, the FCC has not defined the term "just and reasonable" as rigidly as BellSouth describes. In fact, in the Triennial Review Order, the FCC equated "just and reasonable" to the historical standard applied for rate setting by the states:

> Thus, the pricing of checklist network elements that do not satisfy the unbundling standards in section 251(d)(2) are reviewed utilizing the basic just, reasonable, and nondiscriminatory rate standard of sections 201 and 202 that is fundamental to common carrier regulation that has historically been applied under most federal and state statutes, including (for interstate services) the Communications Act. Application of the just and reasonable and nondiscriminatory pricing standard of sections 201 and 202 advances Congress's intent that Bell companies provide meaningful access to network elements.

Triennial Review Order ¶ 663 (emphasis added, footnote omitted); see also id., ¶ 656 ("[W]e find that the appropriate inquiry for network elements required only under section 271 is to assess whether they are priced on a just, reasonable and not unreasonably discriminatory basis— the standards set forth in sections 201 and 202."). The PSC's use of such historical standard to set rates obviously is not "impossible," nor would it "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," particularly where the FCC has not undertaken to set such rates itself.[3] It is also important to remember that

---

[3] The FCC has indicated that a BOC "might" satisfy the just and reasonable standard "by demonstrating that the rate for a section 271 network element is at or below the rate at which the BOC offers comparable functions to similarly situated purchasing carriers under its interstate access tariff, to the extent such analogues exist" and "might" satisfy the just and reasonable standard "by showing that it has entered into arms-length agreements with other, similarly situated purchasing carriers to provide the element at that rate." Triennial Review Order, 18 FCC Rcd. 16978 (2003), ¶ 664 (emphasis added). However, these conditional examples certainly do not support BellSouth's sweeping contention that the FCC has defined a "just and reasonable" rate as the "market rate."

Section 271 elements are inherently "local", i.e. intrastate – not interstate, services.  See 47 U.S.C. § 271(c)(2)(B)(iv)-(vi) (specifically characterizing loops, transport, and switching as "local" facilities).  Since BellSouth has not overcome the presumption that "the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress," the doctrine of conflict preemption does not apply in this case.

BellSouth also argues that Alabama law allowing the PSC to set rates for Section 271 elements is "in conflict with the FCC's decision to eliminate the anticompetitive UNE Platform."  BellSouth Opposition at 22.  BellSouth's argument is incorrect, however.  This case asks whether federal law preempts the PSC's state law power to set rates for network elements that BellSouth already has to provide pursuant to 47 U.S.C. § 271.  This case simply does not raise the question of whether the PSC may set rates for other network elements.

3.    There is no field preemption of the PSC's state law authority to set rates for Section 271 network elements.

Field preemption occurs where "federal regulation in a legislative field is so pervasive that we can reasonably infer that Congress left no room for the states to supplement it", i.e., where Congress has "occupied the field."  Cliff v. Payco Gen. Am. Credits, Inc., 363 F.3d 1113, 1122 (11th Cir. 2004).  "The question whether the regulation of an entire field has been reserved by the Federal Government is, essentially, a question of ascertaining the intent underlying the federal scheme."  Hillsborough County, Florida v. Automated Med. Labs., 471 U.S. 707, 713, 105 S.Ct. 2371, 2375 (1985).

The FCC, in its order originally implementing the Telecommunications Act of 1996, described the intents underlying the federal scheme established by the Act as "opening up local markets to competition, and permitting interconnection on just, reasonable, and nondiscriminatory terms."  Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, First Report and Order, 11 F.C.C.R. 15499, at ¶ 167 (1996);

accord AT & T Corp. v. Iowa Utils. Bd., 525 U.S. at 371 (in passing the Telecommunications Act of 1996, Congress sought to "end[] the longstanding regime of state-sanctioned monopolies" in the local telephone markets."). Thus, the Court must determine whether the setting of "just and reasonable" rates for Section 271 network elements by the PSC pursuant to state law conflicts with these intents. The PSC's setting of "just and reasonable" rates acting pursuant to state law would necessarily complement – not thwart – the Congressional purpose of "permitting interconnection on just, reasonable, and nondiscriminatory terms." Likewise, the PSC's setting of "just and reasonable" rates for Section 271 elements would not thwart Congress's goals of "opening up local markets to competition." (How could unjust and unreasonable rates better serve Congress's goals?) Indeed, the network elements at issue in this declaratory judgment action are those listed in Section 271 of the Act, which requires BOCs like BellSouth to make these elements available to competitive carriers, thereby ending monopolies and increasing competition.

Importantly, the FCC itself has not taken the position that its powers preempt those of state commissions in setting rates for Section 271 network elements. First, the FCC, addressing the Supreme Court in the context of opposing a petition for writ of certiorari to the United States Court of Appeals for the D.C. Circuit in the wake of the D.C. Circuit's opinion in U.S. Telecom Ass'n v. F.C.C., 359 F.3d 554. (D.C. Cir. 2004), noted that the FCC has "yet to apply its announced 'just and reasonable' approach to rates in any State." Brief of Federal Respondents on Opposition to Petition for Writ of Certiorari, National Assoc. of Regulatory Util Comm'rs v. U.S. Telecom Assoc., 2004 WL 1950685, at *22-*23. The FCC further explained that Petitioner NARUC (National Association of Regulatory Utility Commissioners):

> is wrong to suggest that the FCC's pricing proposal forecloses the States from setting rates for facilities or services that are provided solely to comply with Section 271. In the Triennial Review Order,

> the FCC expressed no opinion as to precisely what role the states
> would play in establishing rates under Section 271.

Id. at 23.  Second, as noted in Momentum's opening brief, the FCC has had the question of whether states may set rates for services required by Section 271 pending before it for more now almost two and half years, but still has failed to rule on that issue.  The fact that the FCC has deliberately expressed no opinion underscores the fact that federal regulation of Section 271 network elements is not "so pervasive that we can reasonably infer that Congress left no room for the states to supplement it."[4]

4.    **Momentum's position is completely consistent with the Maine District Court's opinion, which was correctly decided.**

The preemption analysis set forth above is entirely consistent with the holding of the United States District Court for the District of Maine on this issue.  As explained in Momentum's opening brief, the Maine court squarely held after considered analysis that "the authority of state commissions over rate-making and its applicable standards is not pre-empted by the express or implied content of § 271."  Verizon New England v. Maine Pub. Utils. Comm'n, 403 F.Supp. 2d 96, 102 (D. Me. 2005); see also Momentum Br. in Supp. of Compl. for Decl. J. [Docket No. 25] at 6-7, 18.  Although the United States District Court for the Eastern District of Missouri came to the opposite conclusion, it did so with very little analysis, apparently as an afterthought.  See Southwestern Bell Tel. Co. v. Missouri Pub. Svc. Comm'n, 2006 WL 3103677, at *11 (E.D. Mo. 2006).  Significantly, the Missouri Court did not undertake

---

[4] BellSouth makes much of Justice Scalia's dictum in footnote 6 of AT&T Corp. v. Iowa Utilities Board, 525 U.S. 366, 119 S.Ct. 721 (1999) that "the Federal Government has taken the regulation of local telecommunications competition away from the States . . . [w]ith regard to the matters addressed by the 1996 Act."  The issue which sparked the footnote was the 5-3 majority's holding that "[t]he FCC has rulemaking authority to carry out the 'provisions of this Act'".  Iowa Utils. Bd., 525 U.S. at 378 n.6.  In the footnote, Justice Scalia observed that the real issue the court was deciding was "whether it will be the FCC or the federal courts that draw the lines to which [the states] must hew."  Id. at 378 n.6.  In the present case, the FCC has not drawn a line excluding states from exercising their ratemaking powers under state law for network elements listed in Section 271 of the Act.  As such, there is no conflict between the "matters addressed by the 1996 Act," as interpreted by the FCC, and the PSC's exercise of its state law power to set rates for such elements.

the three-pronged preemption analysis required by the Eleventh Circuit and the Supreme Court. And while the Illinois Court in the unreported case <u>Illinois Bell Tel. Co. v. O'Connell-Diaz</u>, 2006 WL 2796488 (N.D. Ill Sept. 28, 2006), disagreed with the Maine Court, it specifically opined that "the question is a close one." Furthermore, the Illinois Court was deciding a much different question than that before this Court, the Illinois Commerce Commission having imposed obligations on Illinois Bell well beyond rate setting. As such, and for the reasons submitted above, Momentum submits that the Maine court's holding is the better reasoned – and the most on-point.[5]

**B.**      <u>**The question of whether federal law preempts the PSC's power under Alabama state law to set rates for network elements that are listed in "competitive checklist" is ripe for decision.**</u>

Both the PSC and Bellsouth incorrectly claim that the issue of whether the PSC can set rates for Section 271 network elements is unripe for decision. They base their arguments on the premise that the PSC has not yet reached a decision on that issue itself. That premise is incorrect, however. Issue Number 8 before the PSC in Docket No. 29543 was denominated as follows: "Does the Commission have the authority to require BellSouth to include in its interconnection agreements entered into pursuant to Section 252, network elements under <u>either state law</u>, or pursuant to Section 271 or any other federal law other than Section 251?" Final Order, Compl., Ex. 3, p. 2. In determining Issue Number 8, the PSC answered that question "no." Specifically, the PSC found that "the Commission's <u>sole authority</u> to review interconnection agreements is derived from § 252 and the interplay between §§ 251 and 252." Final Order, Complaint, Ex. 3, pp. 4-5 (emphasis added). Logically, a holding that the PSC's

---

[5] None of the other cases cited in BellSouth's Opposition reached the issue of whether a state commission may set rates for network elements listed in Section 271. As noted in Momentum's opening brief, there are other cases addressing various aspects of state commission jurisdiction under Section 271, but none of those opinions rules directly on the question of whether federal law preempts a state commission acting under state law from setting "just and reasonable" rates for network elements offered under Section 271. See Momentum's Br. in Supp. of Compl. for Decl. J. at pp. 5-6, n.6.

"sole authority" to review interconnection agreements is found in federal law necessarily includes a finding that the PSC's historical and statutory state law authority to do so has been preempted. Thus, the premise of the PSC and BellSouth's ripeness argument – the conclusory assertion that the PSC has not ruled on the "state law issue" – is false, as is the PSC's suggestion that "Momentum has not chosen to pursue a ruling by the APSC on its state law authority to establish rates for § 271 elements."[6] PSC's Opposition at 14. Correspondingly the PSC and BellSouth's ripeness argument must fail. See Holifield v. Reno, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (a plaintiff's "conclusory assertions" contradicting evidence in the record are, "in the absence of supporting evidence, . . . insufficient to withstand summary judgment"); cf. Fed. R. Evid. 1002 (the proof of the contents of a document, e.g., the PSC's Final Order, comes from the document itself).

## C.    **The Eleventh Amendment does not prohibit the Court from determining whether federal law preempts Alabama state law.**

The PSC argues that the Eleventh Amendment to the United States Constitution prohibits the Court from determining whether federal law preempts the PSC's power under Alabama state statutory law to set rates for the network elements listed in 47 U.S.C. § 271. In support of its argument, the PSC cites Pennhurst State School Hospital v. Halderman, 465 U.S. 89 (1984) and its progeny. In Pennhurst, the Supreme Court held that Eleventh Amendment sovereign immunity prohibits federal courts from ordering state officials to conform their

---

[6] Defendants claim that Momentum asserted in its opening brief that the PSC had not yet determined the state law issue. Defendants misunderstand Momentum's statement. The PSC has not finally ruled on this issue only in the sense that it has expressly refused to determine the Motion for Reconsideration "until there is guidance from the federal district court in question." Order Holding in Abeyance of Momentum Telecom, Inc.'s Emergency Petition for Reconsideration, Compl., Ex. 5. Indeed, the PSC has expressly stated that it will "defer to the wisdom of the Court with respect to the issue of whether the APSC, acting pursuant to its powers under state law . . . may set rates for 47 U.S.C. § 271 network elements. PSC's Ans. at 13-14. Since, in this posture, further administrative proceedings plainly would be futile until this Court (or whatever federal court the PSC is looking to for guidance) affirms the PSC's state law power to set rates for Section 271 network elements, there is no issue of ripeness. See, e.g., Shalala v. Ill. County on Long Term Care, Inc., 529 U.S. 1, 13 (2000) ("[T]he doctrine of ripeness contains an exception if further administrative proceedings would be futile.")

conduct to state law.  As the PSC notes, lower federal courts have subsequently extended the Pennhurst principle to prohibit federal courts from issuing a declaratory judgment that would have the effect of requiring state officials to conform their conduct to state law, with certain exceptions.

Pennhurst does not apply in this case, however.  First, the PSC has consented to federal jurisdiction.  As noted above, when the PSC was asked to reconsider its Final Order as to Issue Number 8, the PSC held that it would not do so "until there is guidance from the federal district court in question."  Order Holding in Abeyance of Momentum Telecom, Inc.'s Emergency Petition for Reconsideration, Complaint., Ex. 5 (emphasis added).  Later, in answering the Complaint in this case, the PSC stated that it will "defer to the wisdom of the Court with respect to the issue of whether the APSC, acting pursuant to its powers under state law . . . may set rates for 47 U.S.C. § 271 network elements."  PSC's Ans. at 13-14 (emphasis added).  The PSC cannot have it both ways, refusing to rule on a motion to reconsider its holding on Issue No. 8 (including as to whether it may set rates for Section 271 network elements pursuant to state law) pending a decision of a federal court, but simultaneously objecting to a federal court's making such a decision.  Since the PSC has twice stated its intention to defer to/ receive guidance from a federal court and is still holding in abeyance Momentum's petition for reconsideration, the PSC may not now reject guidance from this Court.

Second, the PSC invoked federal preemption (at least by implication) in ruling against Momentum on Issue Number 8 in the Final Order.  Although the PSC never uses the word "preemption," the PSC ruled that its "sole authority to review interconnection agreements is derived from § 252 and the interplay between §§ 251 and 252."  Final Order, Complaint, Ex. 3, pp. 4-5 (emphasis added).  This language implies that the Telecommunications Act preempts Alabama state law pursuant to the supremacy clause of the United States Constitution.  In this

declaratory judgment, Momentum effectively seeks a judgment that the PSC was wrong in its legal determination of federal preemption. As such, the issue before the Court is not "based on state law," but is based on a determination by the PSC under federal law.[7] Cf. Corcoran v. Sullivan, 112 F.3d 836 (7th Cir. 1997) ("Any claim of federal preemption of a state statute is a federal constitutional claim because the basis of such preemption is the supremacy clause."). This Court can and should determine the issues presented. (This Court is a more proper venue for this determination that is the Georgia Court to which the PSC has expressly looked for guidance.)

Finally, Momentum does not ask the Court to force the PSC to set rates pursuant to state law, or even declare that is has to follow any particular course. See Compl., Prayer for Relief, ¶ 1 ("Momentum prays that the Court enter an order . . . [d]eclaring that the PSC, acting pursuant to its powers under Alabama state law and the Telecommunications Act of 1996, may set rates for Section 271 network elements and may require BellSouth to include Section 271 network elements in its interconnection agreements.") (emphasis added). Since Momentum is seeking only the resolution of an issue rooted in federal law (albeit one that has some relationship to state law) and is not asking the Court to foist any action upon the PSC either directly or indirectly, the PSC's Eleventh Amendment concerns are unfounded. Rather, Momentum asks the Court to resolve an open question on which the PSC expressly has sought federal court guidance and expressly refused to take further action without federal court guidance, leaving Momentum in regulatory limbo. The Eleventh Amendment is no bar to such a determination by this Court.

---

[7] It is worth noting that the PSC does not dispute that Alabama Code §§ 37-1-31 and 37-1-80 would give the PSC the power to set rates for Section 271 network elements but for the federal preemption issue. Therefore, there is no issue of state law interpretation for the Court.

**D.    Alabama Code § 37-2A-4(b) does not bar the requested relief.**

At the end of its response brief, BellSouth makes a halfhearted argument that Alabama Code § 37-2A-4(b) bars the relief Momentum requests. The relevant section of that statute, according to BellSouth, states as follows:

> The [PSC] may require incumbent local exchange carriers to unbundle their networks, but the commission shall not require the carriers to unbundle in a manner that exceeds in degree or differs in kind from the unbundling requirements of the Federal Communications Commission.

Ala. Code § 37-2A-4(b)(1). That statute is not relevant to the issue of whether the PSC may set rates for Section 271 network elements. Momentum is not asking the Court to declare that the PSC should "unbundle in a manner that exceeds in degree or differs in kind from the unbundling requirements of the Federal Communications Commission." Momentum is only asking the Court to declare that the PSC can set rates for Section 271 network elements and, correspondingly, require BellSouth to include Section 271 network elements in its interconnection agreements. The network elements at issue are those that BellSouth already is required to provide pursuant to 47 U.S.C. § 271. As such, BellSouth's contention that rate setting by the PSC as to these network elements would exceed in degree or differ in kind from the FCC's requirements is unfounded.

**III.    NOT ONLY DOES FEDERAL LAW NOT PREEMPT THE PSC'S STATE LAW AUTHORITY TO SET RATES, BUT THE TELECOMMUNICATION ACT'S TEXT FULLY SUPPORTS SUCH EXERCISE OF STATE LAW AUTHORITY.**

BellSouth and the PSC argue that the Telecommunications Act of 1996 contains no express or implied authority for review by the PSC of BellSouth's rates for network elements which BellSouth is required to make available to CLECs only by virtue of Section 271.[8] The

---

[8] In this section of its opposition brief, the PSC again incorrectly states that "Momentum has not at any point formally requested that the APSC render a determination on its ability to establish §271 network element rates for BellSouth pursuant to the APSC's 'broad general authority under state law to regulate telephone companies.'" PSC

crux of BellSouth's argument comes from a sentence fragment BellSouth pulls not from the Act, but from a eight-year-old FCC Order on a petition for "reconsideration or clarification of a declaratory order" regarding a petition by a BOC to consolidate LATAs (Local Access and Transport Areas) in Minnesota and Arizona.  See BellSouth's Opposition at 6 (quoting the subject order as stating that Congress granted the FCC the "sole authority" to "administer" Section 271).  The fact that BellSouth must rely on this fragment -- not to mention the relatively vague term "administer" -- from a relatively obscure and dated FCC Order is telling.  In any event, BellSouth is simply incorrect in its representation of the subject FCC Order, in which the FCC held that it had sole jurisdiction over <u>LATA boundaries</u>.    Nothing in the Minnesota/Arizona LATA Order remotely preempted state commissions from regulating rates for Section 271 network elements.[9]  As noted in the preceding section, the FCC has affirmatively avoided taking a position on the question before the Court.

In any event, the PSC's authority to review rates for Section 271 elements derives from Section 271 itself.  As Momentum explained in its opening brief, a BOC's obligations under Section 271 are directly tied to providing access to network elements listed in the competitive checklist through an interconnection agreement such as "described in paragraph (1)(A)" of Section 271, or alternatively through a statement of generally available terms and

Opposition at 15.  As noted above, BellSouth's assertion is contradicted by the PSC's Final Order, in which the PSC resolves the following issue in the negative:  "Does the Commission have the authority to require BellSouth to include in its interconnection agreements entered into pursuant to Section 252, network elements under <u>either state law,</u> or pursuant to Section 271 or any other federal law other than Section 251?"  Final Order, Complaint, Ex. 3, p. 2 (emphasis added).

[9] Specifically, U.S. West and the Arizona Communication Commission requested reconsideration of an earlier FCC finding that the FCC had exclusive authority under Section 153 of the Telecommunications Act to modify LATA boundaries.  <u>U.S. West Petitions to Consolidate LATAs in Minnesota and Arizona</u>, 14 F.C.C.R. 14392, at ¶ 1 (1999); 47 U.S.C. § 153(25) (defining a LATA as a geographic area established prior to the passage of the Telecommunications Act or an area "established or modified . . . and approved by the [FCC].")  Throughout its decision rejecting the request for reconsideration, the FCC focused on its exclusive jurisdiction "concerning LATA boundaries" and how allowing states to modify those boundaries would be inconsistent with the explicit direction of Congress in Section 153(25).  The FCC made no comment on state commission authority to set rates for Section 271 network elements.

conditions. 47 U.S.C. § 271(c)(2)(A). The subject interconnection agreements are "binding agreements that have been approved under Section 252" of the Act. 47 U.S.C. § 272(c)(1)(A). The alternative, a statement of generally available terms and conditions ("SGAT"), must also be "approved" by the state commission under Section 252. 47 U.S.C. § 272(c)(1)(A). Clearly, the Act requires the PSC to undertake an approval process for Section 271 network elements as to the terms and conditions that either have been negotiated by BellSouth and a CLEC or are contained in an SGAT. Additionally, the Act specifically gives the state commission the power to reject an interconnection agreement or SGAT if it is "not consistent with the public interest." 47 U.S.C. §§ 251(e), (f). Momentum submits that proposed rate terms are "consistent with the public interest" when such terms are "just and reasonable," the accepted and historical standard under both state and federal law, as discussed in the preceding section of this Reply. If a state commission rejects an interconnection agreement or SGAT on the basis that its rates or other terms are not in the public interest, the commission is then left in the arena of acting under its powers under state law to determine "just and reasonable" terms. Section 252(f)(2) supports the exercise of a state commission's authority under state law at that point. Section 252(f)(2) says that, as to an SGAT, "nothing in this section shall prohibit a State commission from establishing or enforcing other requirements of state law in its review of such statement . . .." As such, Congress plainly contemplated that a state commission could go beyond a literal rejection of proposed terms and proceed within the dictates of state law.[10]

---

[10] BellSouth cites the decisions of what is calls the "overwhelming majority" (actually 26 of 50, even by BellSouth's own generous characterization of many of these decisions) of state commissions that it claims have refused to acknowledge their authority to set rates for Section 271 network elements, but it fails disclose the fact that many states have held otherwise, including Arizona, California, Illinois, Kentucky, Michigan, Minnesota, New Hampshire, Tennessee, and Georgia. See 2006 Ariz. PUC LEXIS 5, at *46-47; 2006 Cal. PUC LEXIS 33, at *38; 2006 Ga. PUC LEXIS 3, at *3-*11; 2004 Ill. PUC LEXIS 675; 2006 Ky. PUC LEXIS 680; 2005 Mich. PSC LEXIS 309, at *25; 2006 Minn. PUC LEXIS 48, at *5-*14; 2005 N.H. PUC LEXIS 24, at *55-*77; 2005 Tenn. PUC LEXIS 332, at *55-*77; 2006 Tenn. PUC LEXIS 170, at *9-*13 (titles omitted due to length; copies attached).

Indeed, the FCC has indicated that it contemplates that the state commissions will have an ongoing role with respect to the oversight of Section 271 network elements.  In the Order in which it certified Verizon's compliance with the competitive checklist in Pennsylvania upon approval by the Pennsylvania state commission, the FCC acknowledged: "Moreover, the Pennsylvania Commission will continue its oversight of Verizon's performance through ongoing state proceedings. As the Commission has recognized, ongoing state proceedings demonstrating a commitment to advancing the pro-competitive purposes of the Act serve a vitally important role in the section 271 process."  16 F.C.C.R. 17419, at ¶ 3 (2001) (emphasis added).  Similarly, in its "Maine 271 Order" the FCC stated that it would be "working in concert with the Maine Commission" to monitor Verizon's post-approval compliance to ensure that Verizon did not "cease to meet any of the conditions required for [Section 271] approval. 17 F.C.C.R. 11659, at ¶ 65 (2002).   Likewise, in its "New York 271 Order", the FCC endorsed state commission authority to enforce commitments made by Verizon to the New York Public Service Commission.  There, the FCC stated:

> Complaints involving a BOC's alleged noncompliance with specific commitments the BOC may have made to a state commission, or specific performance monitoring and enforcement mechanisms imposed by a state commission, should be directed to that state commission rather than the FCC.

15 F.C.C.R. 3953, at ¶ 452  (1999) (emphasis added), aff'd, AT&T Corp. v. FCC, 220 F.3d 607 (D.C. Cir. 2000).  Clearly, the FCC is not interested in undertaking the administrative overload that would result if Section 271 rate issues were submitted to it rather than the state commissions, who are the historical entities that set rates for telecommunications services in local markets.  The FCC must act on a Section 271(d)(6) enforcement complaint with 90 days.  See 47 U.S.C. § 271(d)(6)(B).  It is unimaginable that the FCC could investigate and establish just and reasonable Section 271 element rates in such expedited proceedings, particularly in

potentially multiple simultaneous proceedings.    Indeed, when the FCC handled a similar rate setting arbitration, it took almost five years from the filing of a petition for arbitration to final resolution of pricing issues.[11]    Therefore, as a practical matter, it makes much more sense for state commissions to establish rates for Section 271 elements.  Because the PSC's exercise of state law authority to set rates for Section 271 network elements is not only the best practical solution, but is also entirely consistent with and supported by the Telecommunications Act of 1996, Momentum respectfully requests that the Court grant the relief requested in the Complaint.


Respectfully submitted,


s/ Jonathan D. Rose
James H. McLemore (MCL014)
CAPELL & HOWARD, P.C.
150 South Perry Street (36104)
P.O. Box 2069 (36101-0078)
Montgomery, Alabama  36102
(334) 241-8058

*Attorney for Momentum Telecom, Inc.*


Of Counsel:
Henry M. Walker (Tenn. Reg. No. 000272)
George H. Nolan (Tenn. Reg. No. 014974)
Jonathan D. Rose (Tenn. Reg. No. 020967)
BOULT, CUMMINGS, CONNERS & BERRY, PLC
1600 Division Street, Suite 700
P.O. Box 340025
Nashville, Tennessee  37203
(615) 252-2348

---

[11]  See, generally, Petition of WorldCom, Inc. Pursuant to Section 252(e)(5) of the Communications Act . . ., Memorandum Opinion and Order, 20 F.C.C.R. 5279 (FCC Wireline Bureau rel. March 11, 2005).

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on November 29, 2006, I electronically filed the foregoing

using the ECF system, which will send notification of such filing to the following:

**Walter R. Byars**
Steiner Crum & Byars PC
P.O. Box 668
Montgomery, AL 36101-0668

**Sean A. Lev**
Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, DC 20036

**George Scott Morris**
Alabama Public Service Commission
100 N Union Street, Suite 836
Montgomery, AL 36104

**Francis B. Semmes**
BellSouth Telecommunications, Inc.
3196 Highway 280 South, Room 304-N
Birmingham, AL 35243

<u>s/ Jonathan D. Rose</u>