# Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, First Report and Order, 11 F.C.C.R. 15499, at ¶167 (1996)

*(Excerpt)*

Westlaw.

11 F.C.C.R. 15499, 11 FCC Rcd. 15499, 4 Communications Reg. (P&F) 1, 1996 WL 452885 (F.C.C.)

Page 1

(Cite as: 11 F.C.C.R. 15499, 11 FCC Rcd. 15499, 4 Communications Reg. (P&F) 1, 1996 WL 452885 (F.C.C.))

11 F.C.C.R. 15499, 11 FCC Rcd. 15499, 4 Communications Reg. (P&F) 1, 1996 WL 452885 (F.C.C.)

Federal Communications Commission (F.C.C.)
First Report and Order

**\*\*1 IN THE MATTER OF IMPLEMENTATION OF THE LOCAL COMPETITION PROVISIONS IN THE TELECOMMUNICATIONS ACT OF 1996**
CC Docket No. 96-98

Interconnection between Local Exchange Carriers and Commercial Mobile Radio Service Providers
CC Docket No. 95-185
FCC 96-325

Adopted: August 1, 1996
        Released: August 8, 1996

\*15499 By the Commission: Chairman Hundt and Commissioners Quello, Ness, and Chong issuing separate statements.
\*15505 I. INTRODUCTION, OVERRVIEW, AND EXECUTIVE SUMMARY

**A. The Telecommunications Act of 1996 - A New Direction**

1. The Telecommunications Act of 1996$^{FN[FN1]}$ fundamentally changes telecommunications regulation. In the old regulatory regime government encouraged monopolies. In the new regulatory regime, we and the states remove the outdated barriers that protect monopolies from competition and affirmatively promote efficient competition using tools forged by Congress. Historically, regulation of this industry has been premised on the belief that service could be provided at the lowest cost to the maximum number of consumers through a regulated monopoly network. State and federal regulators devoted their efforts over many decades to regulating the prices and practices of these monopolies and protecting them against competitive entry. The 1996 Act adopts precisely the opposite approach. Rather than shielding telephone companies from competition, the 1996 Act requires telephone companies to open their networks to competition.

2. The 1996 Act also recasts the relationship between the FCC and state commissions responsible for regulating telecommunications services. Until now, we and our state counterparts generally have regulated the jurisdictional segments of this industry assigned to each of us by the Communications Act of 1934. The 1996 Act forges a new partnership between state and federal regulators. This arrangement is far better suited to the coming world of competition in which historical regulatory distinctions are supplanted by competitive forces. As this Order demonstrates, we have benefitted enormously from the expertise and experience that the state commissioners and their staffs have contributed to these discussions. We look forward to the continuation of that cooperative working relationship in the coming months as each of us carries out the role assigned by the 1996 Act.

3. Three principal goals established by the telephony provisions of the 1996 Act are: (1) opening the local exchange and exchange access markets to competitive entry; (2) promoting increased competition in telecommunications markets that are already open to competition, including the long distance services market; and (3) reforming our system of universal service so that universal service is preserved and advanced as the local exchange and exchange access markets move from monopoly to competition. In this rulemaking and related proceedings, we are taking the steps that will achieve the pro-competitive, deregulatory goals of the 1996 Act. The Act directs us and our state colleagues to remove not only statutory and regulatory impediments to competition, but economic and operational impediments as well. We are directed to remove these impediments to competition in all \*15506 telecommunications markets, while also preserving and advancing universal service in a manner fully consistent with competition.

\*\*2 4. These three goals are integrally related. Indeed, the relationship between fostering competition in local telecommunications markets and promoting greater competition in the long distance market is fundamental to the 1996 Act. Competition in local exchange and exchange access markets is desirable, not only because of the social and economic benefits competition will bring to consumers of *local* services, but also because competition eventually will eliminate the ability of an incumbent local exchange carrier to use its control of bottleneck local fa-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

11 F.C.C.R. 15499, 11 FCC Rcd. 15499, 4 Communications Reg. (P&F) 1, 1996 WL 452885 (F.C.C.)
(Cite as: 11 F.C.C.R. 15499, 11 FCC Rcd. 15499, 4 Communications Reg. (P&F) 1, 1996 WL 452885 (F.C.C.))

Page 37

compassed in the existing agreement. Pacific Telesis asserts that requiring renegotiation and arbitration of existing agreements would waste resources and interfere with parties' settled expectations.FN[FN321]

*15583 3. Discussion

165. We conclude that the 1996 Act requires all interconnection agreements, "including any interconnection agreement negotiated before the date of enactment of the Telecommunications Act of 1996," to be submitted to the state commission for approval pursuant to section 252(e).FN[FN322] The 1996 Act does not exempt certain categories of agreements from this requirement. When Congress sought to exclude preexisting contracts from provisions of the new law, it did so expressly. For example, section 276(b)(3) provides that "nothing in this section shall affect any existing contracts between location providers and payphone service providers or interLATA or intraLATA carriers that are in force and effect as of the date of enactment of the Telecommunications Act of 1996."FN[FN323] Nothing in the legislative history leads us to a contrary conclusion. Congress intended, in enacting sections 251 and 252, to create opportunities for local telephone competition. We believe that this procompetitive goal is best effected by subjecting all agreements to state commission review.

**51 166. The first sentence in section 252(a)(1) refers to requests for interconnection "pursuant to section 251."FN[FN324] The final sentence in section 252(a)(1) requires submission to the state commission of all negotiated agreements, including those negotiated *before* the enactment of the 1996 Act. Some parties have asserted that there is a tension between those two sentences. We conclude that the final sentence of section 252(a)(1), which requires that *any* interconnection agreement must be submitted to the state commission, can and should be read to be independent of the prior sentences in section 252(a)(1). The interpretation suggested by some commenters that preexisting contracts need only be filed if they are amended subsequent to the 1996 Act, or incorporated by reference into agreements negotiated pursuant to the 1996 Act, would force us to impose conditions that were not intended by Congress.

167. As a matter of policy, moreover, we believe that requiring filing of all interconnection agreements best promotes Congress's stated goals of opening up local markets to competition, and permitting interconnection on just, reasonable, and nondiscriminatory terms. State commissions should have the opportunity to review *all* agreements, including those that were negotiated before the new law was enacted, to ensure that such agreements do not discriminate against third parties, and are not contrary to the public interest. In particular, preexisting agreements may include provisions that violate or are inconsistent with the *15584 procompetitive goals of the 1996 Act, and states may elect to reject such agreements under section 252(e)(2) (A). Requiring all contracts to be filed also limits an incumbent LEC's ability to discriminate among carriers, for at least two reasons. First, requiring public filing of agreements enables carriers to have information about rates, terms, and conditions that an incumbent LEC makes available to others. Second, any interconnection, service or network element provided under an agreement approved by the state commission under section 252 must be made available to any other requesting telecommunications carrier upon the same terms and conditions, in accordance with section 252(i).FN[FN325] In addition, we believe that having the opportunity to review existing agreements may provide state commissions and potential competitors with a starting point for determining what is "technically feasible" for interconnection.FN[FN326]

168. Conversely, excluding certain agreements from public disclosure could have anticompetitive consequences. For example, such contracts could include agreements not to compete. In addition, if we exempt agreements between neighboring non-competing LECs, those parties might have a disincentive to compete with each other in the future, in order to preserve the terms of their preexisting agreements. Such a result runs counter to the goal of the 1996 Act to encourage local service competition. Moreover, preserving such "noncompeting" agreements could effectively insulate those parties from competition by new entrants. For example, if a new entrant seeking to provide competitive local service in a rural community is unable to obtain from a neighboring BOC interconnection or transport and termination on terms that are as favorable as those the BOC offers to the incumbent LEC in the rural area, the new entrant cannot effectively compete.FN[FN327] This is because the new entrant will have to charge its subscribers higher rates than the incumbent LEC charges to place calls to sub-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.