**Brief of Federal Respondents in Opposition
to Petition for Writ of Certiorari,
<u>National Assoc. of Regulatory Util. Comm'rs
v. U.S. Telecom Assoc.</u>,
2004 WL 1950685, at 22-23 (2004),
(Nos. 04-12, 04-15, 04-18)**

Westlaw.

2004 WL 1950685 (U.S.)                                                                                                                    Page 1
(Cite as: 2004 WL 1950685)

For Opinion See 125 S.Ct. 316, 125 S.Ct. 345Briefs and Other Related Documents
Supreme Court of the United States.
NATIONAL ASSOCIATION OF REGULATORY UTILITY COMMISSIONERS, et al., Petitioners,
v.
UNITED STATES TELECOM ASSOCIATION, et al.
AT&T Corp., et al., Petitioners,
v.
United States Telecom Association, et al.
California, et al., Petitioners,
v.
United States Telecom Association, et al.
Nos. 04-12, 04-15, 04-18.
September 1, 2004.

On Petitions for a Writ of Certiorari to the United States Court of Appeals for the District of Columbia Circuit

Brief for the Federal Respondents in Opposition
John A. Rogovin, General Counsel.Austin C. Schlick, Deputy General Counsel.John E. Ingle, Deputy Associate General, Counsel.James M. Carr, Counsel, Federal Communications, Commission, Washington, D.C. 20554.Paul D. Clement, Acting Solicitor General, Counsel of Record.R. Hewitt Pate, Assistant Attorney General.Makan Delrahim, Deputy Assistant Attorney, General.Catherine G. O'Sullivan, Nancy C. Garrison, Attorneys, Department of Justice, Washington, D.C. 20530-0001, (202) 514-2217.
QUESTIONS PRESENTED

The Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56, seeks to bring competition to local telephone markets in part by requiring incumbent local exchange carriers (ILECs) to give competitors access to elements of the ILECs' networks "on an unbundled basis." 47 U.S.C. 251(c)(3). In determining what network elements an ILEC must make available to new entrants, the Federal Communications Commission is directed to consider, "at a minimum," whether the lack of access to a particular nonproprietary element would "impair" the ability of a new entrant to provide service. 47 U.S.C. 251(d)(2). The questions presented in this case are:

1. Whether the Commission reasonably determined under Section 251 not to require ILECs to unbundle certain loop facilities that allow the provision of broadband service.

2. Whether the court of appeals correctly determined, with respect to broadband and other network facilities that the Commission has not required to be unbundled under Section 251, that petitioners' contentions concerning preemption of state unbundling requirements are not ripe for judicial review.

3. Whether the court of appeals erred in vacating Commission rules requiring the unbundling, subject to state commission determinations, of mass-market switching and certain dedicated transport facilities under Section 251(c)(3).

*III TABLE OF CONTENTS

Opinions below ... 1

Jurisdiction ... 2

Statement ... 2

Argument ... 14

1. Broadband unbundling ... 14

2. Line sharing and preemption ... 17

3. Narrowband unbundling ... 24

Conclusion ... 27

TABLE OF AUTHORITIES

Cases:

AT&T Corp. v. Iowa Utils. Bd., 525 U.S. 366 (1999) ... 2, 3, 4, 5, 15, 19, 24, 26

Alascom, Inc. v. FCC, 727 F.2d 1212 (D.C. Cir. 1984) ... 20

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Bartholdi Cable Co. v. FCC*, 114 F.3d 274 (D.C. Cir. 1997) ... 19

*Batterton v. Francis*, 432 U.S. 416 (1977) ... 26

*Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984) ... 26

*City of New York v. FCC*, 486 U.S. 57 (1988) ... 21

*Coserv Limited Liability Corp. v. Southwestern Bell Tel. Co.*, 350 F.3d 482 (5th Cir. 2003) ... 24

*Fidelity Fed. Sav. & Loan Ass'n v. De la Cuesta*, 458 U.S. 141 (1982) ... 21

*Geier v. American Honda Motor Co.*, 529 U.S. 861 (2000) ... 21

*Glover v. United States*, 531 U.S. 198 (2001) ... 19

*Iowa Utils. Bd. v. FCC*, 120 F.3d 753 (8th Cir. 1997), aff'd in part and rev'd in part sub nom. *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366 (1999) ... 4

*IV *National Park Hospitality Ass'n v. Department of the Interior*, 538 U.S. 803 (2003) ... 20

*Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726 (1998) ... 21

*United States Telecom Ass'n v. FCC*, 290 F.3d 415 (D.C. Cir. 2002), cert. denied, 538 U.S. 940 (2003) ... 6, 7, 8, 26

*Verizon Communications Inc. v. FCC*, 535 U.S. 467 (2002) ... 6, 17, 24, 26

*Wisconsin Dep't of Health & Family Servs. v. Blumer*, 534 U.S. 473 (2002) ... 26

*WorldCom, Inc. v. United States Telecom Ass'n*, cert. denied, 538 U.S. 940 (2003) ... 8, 26

Statutes and regulation:

Communications Act of 1934, 47 U.S.C. 151 *et seq.*:

47 U.S.C. 201 ... 12, 22

47 U.S.C. 202 ... 12, 22

47 U.S.C. 251 ... 3, 11, 16, 20, 21, 22

47 U.S.C. 251(c) ... 2, 24

47 U.S.C. 251(c)(3) ... 3, 5, 9, 11, 22, 23, 26

47 U.S.C. 251(d)(1) ... 3, 12, 23

47 U.S.C. 251(d)(2) ... 3, 5, 13, 14, 15, 18, 21, 26

47 U.S.C. 251(d)(3) ... 11, 20, 21

47 U.S.C. 251(d)(3)(B) ... 21

47 U.S.C. 251(d)(3)(C) ... 11, 21, 22

47 U.S.C. 252 ... 23

47 U.S.C. 252(c) ... 4

47 U.S.C. 252(c)(2) ... 23

47 U.S.C. 252(d) ... 23

47 U.S.C. 252(d)(1) ... 12, 22, 23

47 U.S.C. 271 ... 12, 22, 23, 24

47 U.S.C. 271(d)(6) ... 23, 24

47 U.S.C. 405 ... 19

*V Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 ... 2

§ 706, 110 Stat. 153 (47 U.S.C. 157 note) ... 17

47 C.F.R. 51.317(b)(1) ... 5

Miscellaneous:

*Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, In re*, 11 F.C.C.R. 15,499 (1996) ... 4

*Implementation of the Local Competition Provisions of the Telecommunications Act of 1996, In re*, 15 F.C.C.R. 3696 (1999) ... 5

*Order and Notice of Proposed Rulemaking*, FCC No. 04-179 (Aug. 20, 2004) < http://hraunfoss.fcc.gov/edocs_public/attachmatch/FCC

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

-04-179Al.pdf> ... 13, 14, 25

1OPINIONS BELOW

The opinion of the court of appeals (Pet. App. 1a-65a[FN1]) is reported at 359 F.3d 554. The order of the Federal Communications Commission (Pet. App. 66a-1035a) is *2 reported at 18 F.C.C.R. 16,978, as corrected by Errata, 18 F.C.C.R. 19,020.

> FN1. All references to the Pet. App. are to the appendix to the petition for a writ of certiorari in No. 04-15.

JURISDICTION

The judgment of the court of appeals was entered on March 2, 2004. On May 24, 2004, the Chief Justice extended the time within which to file a petition for a writ of certiorari in No. 04-12 to and including June 30, 2004. On May 25, 2004, the Chief Justice extended the time within which to file a petition for a writ of certiorari in Nos. 04-15 and 04-18 to and including June 30, 2004, and all the petitions were filed on that date. The jurisdiction of this Court is invoked under 28 U.S.C. 1254(1).

STATEMENT

1. With the passage of the Telecommunications Act of 1996 (1996 Act), Pub. L. No. 104-104, 110 Stat. 56, Congress "ended the longstanding regime of state-sanctioned monopolies" in local telephone service. *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 371 (1999) (*AT&T*). The 1996 Act "fundamentally restructures local telephone markets" by imposing on incumbent local exchange carriers (ILECs) "a host of duties intended to facilitate market entry" by aspiring competitors. *Ibid.* The Act imposes on each ILEC an "obligation *** to share its network with competitors" under the terms prescribed by 47 U.S.C. 251(c). *AT&T*, 525 U.S. at 371. Under Section 251(c), a competitive local exchange carrier (CLEC) may use the ILEC's network in three ways: "It can purchase local telephone services at wholesale rates for resale to end users; it can lease elements of the incumbent's network 'on an unbundled basis'; and it can interconnect its own facilities with the incumbent's network." *Ibid.*

*3 The central network-sharing provision of the 1996 Act is Section 251(c)(3), which provides that a new entrant may "access" (*i.e.*, lease) "elements" of an incumbent's network on an "unbundled basis" under rates, terms, and conditions that are just, reasonable, and nondiscriminatory. 47 U.S.C. 251(c)(3). Examples of "network elements" include "the local loops (wires connecting telephones to switches), the switches (equipment directing calls to their destinations), and the transport trunks (wires carrying calls between switches) that constitute a local exchange network." *AT&T*, 525 U.S. at 371.

Congress required that the Federal Communications Commission was to complete the task of adopting regulations to implement the requirements of Section 251 within six months after enactment of the 1996 Act. 47 U.S.C. 251(d)(1). For purposes of "determining what network elements should be made available" under Section 251(c)(3), the 1996 Act directs the Commission to "consider, at a minimum, whether *** access to such network elements as are proprietary in nature is *necessary*," and whether, as to non-proprietary elements, "the failure to provide access to such network elements would *impair* the ability of the telecommunications carrier seeking access to provide the services that it seeks to offer." 47 U.S.C. 251(d)(2) (emphasis added). The statute does not define or otherwise elaborate on the terms "necessary" and "impair." This case concerns only non-proprietary elements, and the "impair" standard is thus at issue.

Under procedures prescribed in the 1996 Act, the specific rights and duties of incumbents and competing carriers are set forth in "interconnection agreements." If an incumbent and a competing carrier are unable to reach a negotiated agreement, the 1996 Act provides *4 that the relevant state commission shall "arbitrate" all "open issues" between the parties by applying the " requirements of section 251 of the Act, including the regulations" adopted by the Federal Communications Commission. 47 U.S.C. 252(c).

2. a. In August 1996, the FCC adopted initial rules for implementing the local competition provisions of the 1996 Act. *In re Implementation of the Local Competition Provisions in the Telecommunications*

*Act of 1996*, 11 F.C.C.R. 15,499 (1996) (*Local Competition Order*). The FCC designated all components of the incumbents' networks as network elements and required incumbents to lease to their competitors preassembled combinations of some or all of those elements. It also required that rates for network elements be set under the FCC's "total element long-run incremental cost" (TELRIC) pricing standard. On petitions for review, the United States Court of Appeals for the Eighth Circuit affirmed some parts of the *Local Competition Order* and reversed others. *Iowa Utils. Bd. v. FCC*, 120 F.3d 753 (1997). On certiorari, this Court affirmed in part and reversed in part. *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366 (1999).

The Court affirmed the FCC's general authority to adopt rules governing the States' participation in the administration of the 1996 Act, including rules establishing a methodology that the States would apply when setting the prices of unbundled network elements. *AT&T*, 525 U.S. at 377-385. The Court also affirmed several aspects of the FCC's unbundling rules, including various rules that allowed CLECs to "lease a complete, preassembled network" at cost-based rates. *Id.* at 392-395. At the same time, the Court held that the FCC had not adequately given effect to the "necessary" and "impair" standards in adopting its rules *5 governing unbundled access under Section 251(d)(2). *Id.* at 387-392. The Court held that the Commission had erroneously read Section 251(c)(3) as requiring incumbents to "provide all network elements for which it is technically feasible to provide access" and had treated Section 251(d)(2) as merely authorizing the FCC to "create isolated exemptions from some underlying duty to make all network elements available." *Id.* at 391 (citation omitted). The Court further held that the Commission had erred in refusing to consider "the availability [to new entrants] of elements outside the incumbent's network" and in treating any cost or quality difference - no matter how trivial - as conclusive evidence of impairment. *Id.* at 389-390. While acknowledging that the Commission was not bound to any particular interpretation of the terms of Section 251(d)(2), the Court held that "the Act requires the FCC to apply *some* limiting standard, rationally related to the goals of the Act." *Id.* at 388.

Responding to this Court's decision in *AT&T*, the Commission revised its rules in 1999 to adopt a new interpretation of the statutory impairment standard. *In re Implementation of the Local Competition Provisions of the Telecommunications Act of 1996*, 15 F.C.C.R. 3696 (1999) (*Remand Order*). Under the revised interpretation, a competing carrier was deemed to be "impaired" with respect to a particular element if, "taking into consideration the availability of alternative elements outside the incumbent LEC's network *** lack of access to that element materially diminishes a requesting carrier's ability to provide the services it seeks to offer." 47 C.F.R. 51.317(b)(1). Under that standard, the FCC removed some elements from the national list (directory and operator services, packet switching, and switching to serve certain large " enterprise"*6 customers), but maintained access requirements that allowed competing carriers who do not have their own network facilities to obtain a combination of loops, transport, and switching that could be used to serve "mass market" (*i.e.*, residential and small business) customers. Numerous ILECs filed petitions for review in the D.C. Circuit challenging the FCC's revised unbundling rules.

b. While those petitions were pending, this Court rejected the ILECs' challenge to the FCC's TELRIC rules for pricing unbundled elements in *Verizon Communications Inc. v. FCC*, 535 U.S. 467 (2002). The Court in *Verizon* addressed claims that were central to the incumbents' simultaneous D.C. Circuit challenge to the scope of unbundling - *i.e.*, that making combinations of all unbundled elements available at TELRIC rates "may simulate the competition envisioned by the Act but does not induce it" and "perversely creates incentives against competition in fact." *Id.* at 503. This Court rejected those claims, finding that the evidence did not support the argument that TELRIC rates would "stifle" investment incentives, *id.* at 517 n.33, and concluding that, in any event, the statute gave the FCC discretion to choose "to induce [potential entrants] to compete in less capital-intensive facilities with lessened incentives to build their own bottleneck facilities." *Id.* at 510.

c. Shortly after this Court issued its *Verizon* decision addressing TELRIC pricing, the D.C. Circuit granted

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the ILECs' petitions for review of the FCC's 1999 *Remand Order*. *United States Telecom Ass'n v. FCC*, 290 F.3d 415 (2002) (*USTA I*), cert. denied, 538 U.S. 940 (2003). The court of appeals recognized "the extraordinary complexity of the Commission's task," and acknowledged that Congress "gave no detail as to *7 either the kind or degree of impairment" that would justify mandatory unbundling. *Id.* at 421-422. Nonetheless, the court of appeals remanded the Commission's rules for further consideration.

The D.C. Circuit determined that the Commission's network unbundling rules were impermissibly overbroad in three respects. First, the court of appeals took issue with the Commission's decision "to adopt a uniform national rule" requiring unbundling "without regard to the state of competitive impairment in any particular market." *USTA I*, 290 F.3d at 422. The court concluded that the Commission should have adopted "a more nuanced concept of impairment" that (among other things) accounted for the effects of any existing implicit universal service subsidies. *Id.* at 422-423. Second, although the court recognized that "any cognizable competitive 'impairment' would necessarily be traceable to some kind of disparity in cost" between obtaining an unbundled network element and obtaining a reasonable substitute for the element, it faulted the Commission for relying on cost disparities that may be "faced by virtually any new entrant in any sector of the economy, no matter how competitive the sector." *Id.* at 426. Lastly, the court of appeals set aside the Commission's decision to allow CLECs to lease the high-frequency portion of ILECs' copper loops to provide broadband service (a practice known as "line sharing"), because the agency "failed to consider the relevance of competition in broadband services coming from cable (and to a lesser extent satellite)." *Id.* at 428.

The United States and the FCC did not ask this Court to review the D.C. Circuit's decision overturning the *Remand Order*. In its response to a certiorari petition filed by CLECs, the government agreed that the *USTA I* decision was "erroneous for many of the *8 reasons set forth in the petition," that the decision was "in significant tension with this Court's reasoning in *Verizon* and *AT&T*," and that the court of appeals did not accord "appropriate deference to the FCC's reasonable implementation of a complex statute." Fed. Resp. Br. at 14, *WorldCom, Inc. v. United States Telecom Ass'n*, cert. denied, 538 U.S. 940 (2003) (No. 02-858). But the government explained that it had decided not to seek review of the D.C. Circuit's decision because the FCC was already in the process of completing its so-called "Triennial Review" proceeding, in which the Commission "as a matter of discretion" had undertaken to engage in "much" of the analysis required by *USTA I*. Fed. Resp. Br. at 17. The Court denied certiorari. 538 U.S. 940 (2003).

3. In August 2003, the Commission issued its *Triennial Review Order*, the agency decision now on review. Pet. App. 66a-1035a. In the *Triennial Order*, the Commission stated that it would find competitive impairment and require unbundling "when lack of access to an incumbent LEC network element poses a barrier or barriers to entry, including operational and economic barriers, that are likely to make entry into a market uneconomic." *Id.* at 161a. The Commission stated that it would make this determination by asking "whether all potential revenues from entering a market exceed the costs of entry, taking into consideration any countervailing advantages that a new entrant may have." *Ibid.*

Applying its revised impairment standard, the FCC significantly cut back the scope of unbundling that it had mandated under the 1999 *Remand Order*. Among other things, the Commission substantially curtailed mandatory unbundling of the broadband capabilities of ILECs' fiber loops serving residential customers. Pet. *9 App. 341a-362a. It also decided to phase out line sharing requirements that allowed CLECs to lease the high-frequency portion of copper loops in order to provide broadband services to their customers. *Id.* at 326a-332a. To reduce market disruption, however, the Commission created a three-year transition period for eliminating line sharing. During the first year of the transition, CLECs could obtain new line sharing arrangements by paying 25% of the full loop rate. The following year, the line sharing rate would increase to 50% of the loop rate. Then, in the final year of the transition, the rate for new line sharing arrangements would increase to 75% of the loop rate. *Id.* at 336a-337a.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

At the same time, the Commission found that competitive conditions justified the continued unbundling of other elements under Section 251(c)(3). In particular, the Commission maintained unbundling requirements for switches used to serve the mass market (*i.e.*, residential and small business customers) and for dedicated transport facilities below a certain capacity level. Pet. App. 464a-465a, 477a-478a, 549a-551a. In combination with unbundled loops, the availability of unbundled switches and transport facilities enabled CLECs to continue to serve residential users by means of a "platform" of elements obtained entirely from ILECs.

The FCC found that CLECs were generally impaired absent unbundled mass-market switching because they could not use their own switches without obtaining expensive, operationally difficult, and disruptive manual "hot cuts" to rewire connections between the loops used by mass market customers and a CLEC switch. Pet. App. 554a-556a. The Commission found that the need for hot cuts "creates an insurmountable disadvantage to [CLECs] seeking to serve the mass market" by connecting *10 their own switches to the loops they would lease from incumbents - even at the low volume of orders that had been placed in the past. *Id.* at 572a-573a. The Commission further determined that incumbents likely would be unable to provide the vastly greater volumes of hot cuts that would become necessary if unbundled switching were eliminated for the mass market and service for new *and existing* mass market customers had to be cut over through the hot cut process to non-ILEC switching facilities. *Id.* at 561a-565a.

The FCC also made national impairment findings for certain categories of dedicated transport. The Commission determined that dedicated transport facilities have natural monopoly characteristics and that there are substantial structural impediments to the deployment of alternative transport facilities. Pet. App. 440a-442a, 473a-477a. The Commission found that a CLEC could earn sufficient revenues to overcome those disadvantages in the case of very-high-capacity transport facilities (for which it found no impairment), but not in the case of lower-capacity facilities such as DS1, DS3, and dark fiber facilities (for which it found impairment and required unbundling on a route-specific basis). *Id.* at 453a-456a, 464a-467a, 470a-471a, 477a-478a.

The Commission recognized that conditions in some local markets might provide a basis for finding that CLECs are not impaired without access to mass-market switching and lower-capacity transport. Pet. App. 486a, 508a-512a, 587a-589a, 596a-597a. The record before the FCC, however, did not contain "sufficiently granular information" to allow the agency to identify individual local markets in which CLECs might not be impaired. *Id.* at 265a. Furthermore, the agency concluded that "states are better positioned than [the *11 FCC] to gather and assess the necessary information." *Ibid.* The FCC accordingly "delegated" to state commissions the task of analyzing local conditions and determining the ILECs' unbundling obligations for mass-market switching and dedicated transport in any market in which they found no impairment under FCC-prescribed standards. *Id.* at 467a-468a, 471a-473a, 479a-480a, 570a-571a. In particular, the FCC authorized each state commission to create exceptions to the national unbundling requirements in any market where the state commission (1) found that deployment-based triggers were satisfied (*id.* at 481a-503a, 552a-553a, 596a-611a) or (2) determined a lack of impairment by applying the Commission's general impairment standard to the conditions in that local market to identify areas where competitive facilities could potentially be deployed (*id.* at 496a-497a, 503a, 611a-612a).

The Commission addressed the possibility that a state commission might require the unbundling of an element that the FCC had determined not to include on its list of unbundled elements. The Commission invited parties, in that event, to petition the FCC for a declaratory ruling that the state unbundling requirement exceeds the limits on state authority set forth in Section 251(d)(3). The Commission expressed the view that any such state requirement would be "unlikely" to survive scrutiny under Section 251(d)(3)(C), which preempts state laws that are not "consistent with" or "substantially prevent" implementation of the requirements of Section 251. Pet. App. 272a.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The Commission also concluded that the Bell operating companies must continue to provide access to some facilities or services that are no longer generally subject to unbundling under Section 251(c)(3), in accordance with the access requirements that those companies *12 had to satisfy to provide long-distance telephone service under 47 U.S.C. 271. Pet. App. 755a-758a. The Commission determined, however, that the cost-based pricing standard prescribed by Section 252(d)(1) - and the Commission's TELRIC pricing rules - would not apply to facilities or services that Bell companies provide solely to comply with Section 271. Instead, the Commission determined that prices for those facilities or services would be governed by the "just and reasonable" pricing standard set forth in Sections 201 and 202 of the Communications Act of 1934, 47 U.S.C. 201, 202. Pet. App. 758a-764a.

4. On petitions for review, the D.C. Circuit upheld some parts of the *Triennial Order* and vacated others. Pet. App. 1a-65a. Among other things, the court of appeals vacated the rules requiring unbundling of mass-market switching and dedicated transport. *Id.* at 8a-32a. First, the court held that the Commission lacked authority to delegate impairment determinations to the States. *Id.* at 9a-16a, 25a-27a. Having invalidated the States' ability to determine unbundling obligations, the court then vacated the agency's nationwide impairment findings for mass-market switching and dedicated transport. The court reasoned that the Commission, in making the nationwide impairment findings that were subject to further state consideration, did not itself sufficiently account for distinctions among markets or consider more narrowly tailored alternatives to unbundling. *Id.* at 16a-21a, 27a-32a.

The court of appeals rejected the CLECs' challenges to the FCC's rules concerning unbundling of ILEC broadband facilities. The court held that the agency had reasonably decided not to require unbundling of incumbents' broadband facilities in light of record evidence showing that mandatory unbundling of such *13 facilities was discouraging both incumbents and their potential competitors from investing in new broadband facilities. Pet. App. 34a-35a. The court of appeals also affirmed the Commission's decision to phase out line sharing. The court upheld as reasonable the Commission's conclusion under Section 251(d)(2) that other considerations (including the availability of alternative broadband facilities, the skewed incentives created by the extremely low rates that had been set for the line sharing network element, and the presence of substantial intermodal competition in the provision of broadband Internet access) outweighed any impairment that might result if line sharing arrangements were no longer available. *Id.* at 45a-47a.

Finally, the court of appeals dismissed as unripe the state commissions' challenges to the FCC's discussion concerning preemption of state unbundling requirements. The court determined that the Commission had made only a "general prediction" that state unbundling orders might be preempted in certain circumstances. Because the Commission had not yet taken any final action to preempt specific state regulations, and because deferral of judicial review would not cause any hardship to the state commissions, the court of appeals ruled that the States' preemption claims were not ripe for review. Pet. App. 63a-64a.

5. On August 20, 2004, the FCC released an *Order and Notice of Proposed Rulemaking*, FCC No. 04-179, <http://hraunfoss.fcc.gov/edocs_ public/attachmatch/FCC-04-179A1.pdf>, in which the agency solicited public comment on what unbundling rules it should issue to implement the court of appeals' mandate, and adopted interim measures to limit disruption in telecommunications markets during the pendency of the rulemaking. In a statement accompanying that recent decision, FCC *14 Chairman Powell noted that he has scheduled a Commission vote on the remand proceeding for December 2004. *Id.* at 41.

ARGUMENT

CLECs and state commissions have petitioned this Court to review the D.C. Circuit's decision. Those parties seek review insofar as the court of appeals upheld the FCC's determinations not to require unbundling of broadband elements and to phase out line sharing; dismissed as unripe contentions that the FCC unlawfully preempted state authority; and vacated the FCC rules requiring ILECs to unbundle mass-market

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

switching and certain dedicated transport facilities, subject to impairment determinations by the States. None of those issues warrants review by the Court in this case.

1. *Broadband Unbundling.* The court of appeals correctly affirmed the FCC's decision not to require unbundling of the broadband capabilities of ILECs' loops. The Commission reasonably applied Section 251(d)(2) when it considered, "at a minimum," whether lack of access to those broadband loop capabilities "would impair the ability of the telecommunications carrier seeking access to provide the services that it seeks to offer." 47 U.S.C. 251(d)(2). In the *Triennial Order*, the Commission construed the statutory "at a minimum" clause in accordance with its plain terms to authorize the agency to consider factors other than competitive impairment when deciding whether to require unbundling of particular network elements. Pet. App. 247a-258a. The court of appeals correctly held that the Commission's reading of the statute was reasonable, and that the Commission may decline to order unbundling "even in the face of some impairment, where such unbundling*15 would pose excessive impediments to infrastructure investment." *Id.* at 37a. The Commission further found that the dampening effect of unbundling requirements on investment in broadband facilities outweighed the limited evidence that competitors would be impaired without unbundled access to certain broadband loops. *Id.* at 341a-362a. Identifying substantial record evidence that supports the agency's conclusion, the court of appeals upheld the Commission's determination not to require unbundling of broadband loop capabilities. *Id.* at 37a-45a.

There is no basis for the CLECs' assertion (04-15 Pet. 15-19) that the court of appeals' decision on the broadband unbundling rules conflicts with this Court's decisions in *AT&T* and *Verizon*. The CLECs rely on the Court's conclusion in *AT&T* that the Act does not impose a "facilities-ownership requirement" on carriers that seek to lease unbundled network elements. 04-15 Pet. 16-17 (quoting *AT&T*, 525 U.S. at 392). But in *AT&T*, this Court determined only that the Act does not require competing carriers to deploy some facilities of their own before they may lease any unbundled ILEC facilities. That determination has no bearing on the entirely different question whether considerations of investment incentives may justify a decision by the FCC to eliminate broadband unbundling obligations.

Contrary to the assertions of the CLECs (04-15 Pet. 17-18), the court's affirmance of the FCC's application of Section 251(d)(2) to broadband elements also does not conflict with *Verizon*. In that case, this Court rejected the ILECs' contention that the FCC's use of the TELRIC methodology to set rates for unbundled elements created unreasonable disincentives to invest in new facilities. Citing record evidence of significant investment in local telephone facilities by new competitors,*16 the Court concluded that the challenged regulatory scheme "is not easily described as an unreasonable way to promote competitive investment." 535 U.S. at 517. The *Verizon* decision did not foreclose the possibility that the Commission might in the future decline to require unbundling of particular facilities, such as new broadband loop facilities, out of concern for the effect such unbundling might have on investment incentives. Indeed, the Court in *Verizon* expressly declined to endorse the specific policies before it. See *id.* at 517, 539.

The court of appeals noted that the Commission had found evidence in its Triennial Review proceeding that the "regulatory environment" of unbundling had deterred ILECs from deploying the electronic equipment needed to provide broadband service over hybrid fibercopper loops. Pet. App. 39a-40a, 356a-357a. Substantial record evidence also supported the Commission's conclusion that elimination of broadband unbundling requirements would give both ILECs and CLECs greater incentives to build out all-fiber loops to their customers' premises. *Id.* at 40a-41a, 312a-313a, 341a-342a, 356a-357a. On the basis of that evidence specifically addressing broadband facilities, the Commission reasonably decided to lift certain broadband unbundling requirements even though the absence of such unbundling might create some impairment. The court of appeals' affirmance of that decision involves a fact-bound application of Section 251 and does not conflict with any decision of this Court or any court of appeals.

Contrary to the CLECs' suggestion (04-15 Pet. 21),

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

moreover, the FCC acted consistently with the Act when it considered investment incentives as part of its broadband unbundling analysis. In *Verizon*, this Court affirmed the Commission's rules for pricing network *17 elements after similarly considering whether those rules would unduly discourage the development of facilities-based competition. *Verizon, 535 U.S. at 501-523*. Moreover, Congress commanded the FCC to promote broadband investment. Section 706 of the 1996 Act directs the Commission to "encourage the deployment *** of advanced telecommunications capability to all Americans" by utilizing "regulating [sic] methods that remove barriers to infrastructure investment." 110 Stat. 153 (47 U.S.C. 157 note). The Commission determined in the *Triennial Order* that it could best foster broadband investment and facilities-based competition by relieving ILECs of certain unbundling obligations with respect to broadband facilities. That determination does not merit further review.

2. *Line Sharing and Preemption*

a. The court of appeals correctly upheld the FCC's decision to phase out line sharing requirements, under which ILECs had been required to provide access to the high-frequency portion of their copper loops to CLECs for the provision of broadband services. Pet. App. 45a-47a.

In attacking that aspect of the *Triennial Order*, the state commissions focus principally on the FCC's finding that broadband service provided over cable television systems ("cable modem service") is a competitive alternative to broadband services that are provided over ILEC networks. 04-18 Pet. 14-17; 04-12 Pet. 28; see Pet. App. 331a-332a. The state commissions contend that cable modem service is not widely available in every State. Even assuming that to be true, however, it is irrelevant here. The Commission made clear - and the court of appeals understood - that the competitive alternative provided by cable modem *18 service was not the "dispositive" factor in the agency's decision to end line sharing. *Id.* at 46a, 332a. Rather, the Commission determined that continuing the ILECs' line sharing obligations was unnecessary under Section 251(d)(2) because CLECs could economically provide broadband service by leasing the entire loop (not just the high-frequency portion) from an ILEC. Applying its impairment standard, which takes into account all potential revenues from a loop's various uses (including voice, data, video, and other services), the Commission concluded that the revenues from those services *collectively* "would offset the costs associated with purchasing the entire loop." *Id.* at 45a; see *id.* at 327a-328a. The state commissions do not seriously contest that fact-bound conclusion.

The Commission also found substantial evidence on the record before it that, even if ILECs did not have to share their loops with CLECs in line sharing arrangements, in light of the rules adopted in the *Triennial Order*, CLECs could lease entire unbundled loops and enter into "line-splitting" arrangements with other CLECs - under which one CLEC provides broadband service using the high-frequency capabilities of the loop, while another CLEC (rather than the ILEC, as in line sharing) uses the low-frequency portion of the loop to provide voice service. Pet. App. 45a, 328a-329a. In light of all those factors, the Commission reasonably decided to discontinue mandatory line sharing. The agency's conclusion about the significance of the record evidence raises no issue that would warrant review by this Court.

b. To address the legitimate business concerns of CLECs that have used line sharing arrangements to provide broadband service to their customers, and to protect those customers from service disruption or *19 drastic rate changes, the Commission adopted a three-year plan for phasing out the ILECs' line sharing obligations and phasing in associated price increases in annual increments. California contends that the Commission's formula for setting rates for transitional line sharing during this three-year period impermissibly preempts state ratemaking authority. 04-18 Pet. 20-23. Because it appears that no party raised that issue before the FCC, the issue cannot be raised on judicial review of the *Triennial Order*. See 47 U.S.C. 405; *Bartholdi Cable Co. v. FCC*, 114 F.3d 274, 279-280 (D.C. Cir. 1997). This preemption issue, moreover, received so little attention in the briefs below that the court of appeals did not even address it. See *Glover v. United States*, 531 U.S. 198, 205 (2001) ("In the ordinary course we do not decide

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

questions neither raised nor resolved below."). In any event, the issue concerns a three-year transition period, of which one year already has run. It therefore lacks ongoing importance.

Finally, California's ratesetting-preemption claim lacks merit. The FCC has authority to adopt pricing methodologies for unbundled network elements, which the States then apply. *AT&T*, 525 U.S. at 377-385. Like the pricing rules at issue in *AT&T* and *Verizon*, the Commission's transitional pricing rules for line sharing do not set specific rates. Rather, they require that line sharing rates reflect certain percentages of the full loop rate that is set by the relevant State. Consistent with the statutory division of responsibilities between the FCC and the States, the FCC has established a methodology and the States will "implement that methodology, determining the concrete result in particular circumstances." *Id.* at 384. Furthermore, the States' past efforts to establish line sharing rates justified the FCC's decision to place limits on the *20 States' discretion to set transitional rates. As the court of appeals observed, most States had previously set line sharing rates "at approximately zero," which "distorted competitive incentives." Pet. App. 45a-46a. The Commission's transitional rate formula was reasonably designed to address that problem.

c. California contends that the FCC unlawfully preempted state authority to require line sharing when it is not required under FCC rules. 04-18 Pet. 23-28. The court of appeals correctly ruled that that contention is not ripe in the instant proceeding. Pet. App. 63a-64a. Contrary to California's suggestion, the *Triennial Order* does not include final FCC action preempting any state line sharing rule or other unbundling requirement. In paragraph 195 of the *Triennial Order*, the Commission invited parties to seek declaratory rulings from the FCC if they believe that a particular state unbundling obligation is inconsistent with the limits on state authority in 47 U.S.C. 251(d)(3) and the FCC's rules. Pet. App. 272a. The Commission predicted that if States require line sharing or unbundling of elements that the FCC has determined not to subject to mandatory unbundling under Section 251, such state requirements are "unlikely" to be found consistent with the 1996 Act.

*Id.* at 63a, 272a. But the Commission did not preempt any state rules, and it is uncertain whether the FCC ever will issue a preemption order of this sort in response to a request for declaratory ruling. See *Alascom, Inc. v. FCC*, 727 F.2d 1212, 1218-1220 (D.C. Cir. 1984). There also is no urgency to review that issue before a concrete controversy involving a particular state ruling is presented. Under the circumstances, California's preemption claim is not ripe for review. See *National Park Hospitality Ass'n v. Department of the Interior*, 538 U.S. 803, 807-812 (2003); *21 *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 732-737 (1998).

Even if California's preemption claim were ripe, California is wrong in arguing (04-18 Pet. 24-26) that the FCC's unbundling rules lack preemptive effect. This Court has long recognized that "[f]ederal regulations have no less pre-emptive effect than federal statutes." *Fidelity Fed. Sav. & Loan Ass'n v. De la Cuesta*, 458 U.S. 141, 153 (1982). Accordingly, "[t]he statutorily authorized regulations of an agency will preempt any state or local law that conflicts with such regulations or frustrates the purposes thereof." *City of New York v. FCC*, 486 U.S. 57, 64 (1988).

California incorrectly contends that Section 251(d)(3), which preserves some state authority, effectively nullifies the preemptive power of the FCC's unbundling regulations. Unless Congress expressly provides otherwise, a statutory "saving clause" such as Section 251(d)(3) does not diminish the preemptive force of federal regulations. See *Geier v. American Honda Motor Co.*, 529 U.S. 861, 869-874 (2000). Section 251(d)(3) is essentially a "conflict-preemption" provision and is, therefore, limited in scope. It does not preserve all state network-access requirements, but only preserves those state regulations that are "consistent with the requirements" of Section 251 and do "not substantially prevent implementation" of those requirements. 47 U.S.C. 251(d)(3)(B) and (C). Because Congress authorized the Commission to set standards governing the determination of "what network elements should be made available," 47 U.S.C. 251(d)(2), state laws or rulings inconsistent with the FCC's unbundling regulations would be inconsistent with the congressionally authorized "implementation of the require-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ments of *22 [Section 251]," 47 U.S.C. 251(d)(3)(C), and hence preempted.

d. The National Association of Regulatory Utility Commissions and the Arizona Corporation Commission (collectively NARUC) make a similar preemption claim concerning the pricing of facilities or services for which the FCC has determined not to continue unbundling obligations under 47 U.S.C. 251(c)(3). 04-12 Pet. 29-30. The Bell companies must continue to provide some facilities or services under the separate requirements of 47 U.S.C. 271, the statute that governs the Bell companies' entry into the long-distance market. In the *Triennial Order*, the FCC ruled that the cost-based pricing standard prescribed by 47 U.S.C. 252(d)(1) does not apply to those facilities or services that must be made available only under Section 271, rather than under Section 251. The Commission stated that, in that situation, rates must comply with the "just and reasonable" pricing standard in Sections 201 and 202 of the Communications Act of 1934, 47 U.S.C. 201, 202. Pet. App. 758a-764a. The Commission also stated that determining a Bell company's compliance with that pricing standard for a particular facility or service requires "a fact-specific inquiry" that the agency will undertake, if necessary, "in an enforcement proceeding brought pursuant to section 271(d)(6)." *Id.* at 764a.

NARUC claims that the FCC's "pricing proposal" under Section 271 intrudes on the States' authority to set rates for network elements. 04-12 Pet. 29-30. That issue was not prominently raised in the briefs below, and the court of appeals did not address it. The issue is unripe for consideration by this Court for another reason as well. As petitioners acknowledge, 04-12 Pet. 29, the FCC has made only a pricing "proposal." The Commission has yet to apply its announced "just and *23 reasonable" approach to rates in any State. Unless and until the Commission conducts an enforcement proceeding under Section 271(d)(6) to review rates in a particular State, there is no final agency action for a court to review, nor any concrete injury to NARUC.

In addition, NARUC is wrong to suggest that the FCC's pricing proposal forecloses the States from setting rates for facilities or services that are provided solely to comply with Section 271. In the *Triennial Order*, the FCC expressed no opinion as to precisely what role the States would play in establishing rates under Section 271. Until the Commission expressly addresses that question, the matter is not suitable for judicial review.

In any event, NARUC's challenge to the FCC's pricing discussion rests on a flawed legal premise. NARUC suggests that Section 252 of the Act gives state commissions exclusive authority to set rates for network elements and equivalent facilities and services under all circumstances. 04-12 Pet. 29-30. That is incorrect. Section 252(c)(2) directs state commissions to "establish any rates for *** network elements *according to subsection (d).*" 47 U.S.C. 252(c)(2) (emphasis added). Section 252(d) specifies that States set "the just and reasonable rate for network elements" *only* "for purposes of [47 U.S.C. 251(c)(3)]." 47 U.S.C. 252(d)(1). The statute makes no mention of a state role in setting rates for facilities or services that are provided by Bell companies to comply with Section 271 and are *not* governed by Section 251(c)(3). The FCC reasonably concluded that it is authorized to review the rates for those facilities or services, because the statute elsewhere expressly empowers the FCC to enforce compliance with *24 the requirements of Section 271. See 47 U.S.C. 271(d)(6).[FN2]

> FN2. This case does not involve the question whether state commissions may arbitrate issues outside the scope of Section 251(c) when parties voluntarily include those issues within negotiations toward an interconnection agreement. See generally *Coserv Limited Liability Corp. v. Southwestern Bell Tel. Co.,* 350 F.3d 482 (5th Cir. 2003).

3. *Narrowband Unbundling.* Finally, all of the petitioners seek review of the D.C. Circuit's vacatur of the agency rules requiring the unbundling of mass-market switching and dedicated transport. 04-15 Pet. 22-30; 04-12 Pet. 15-28; 04-18 Pet. 29. The court of appeals vacated those rules on the grounds that: (1) the FCC lacked authority for its delegation to the States of responsibility for deciding whether the

FCC's unbundling standards would allow an ILEC to obtain relief for particular facilities in particular geographic areas; and (2) without that state-based exception process, the FCC's nationwide findings of impairment with respect to mass-market switching and dedicated transport were overly broad. Pet. App. 8a-27a.

The D.C. Circuit's analysis of the FCC's nationwide impairment findings is inconsistent in some respects with the applicable principles of deferential judicial review. As this Court has recognized, the 1996 Act is a complex statute replete with ambiguity, and Congress "is well aware that the ambiguities it chooses to produce in a statute will be resolved by the implementing agency." *AT&T, 525 U.S. at 397;* see *Verizon, 535 U.S. at 539* ("The job of judges is to ask whether the Commission made choices reasonably within the pale of statutory possibility in deciding what and how items must be leased and the way to set rates for leasing *25 them."). Nevertheless, the Commission intends to proceed expeditiously to adopt new rules in light of the requirements specified by the D.C. Circuit in *USTA I* and this case. In its Notice of Proposed Rulemaking concerning those new rules, the Commission recognized "the necessity of formulating permanent rules quickly" and stated its intent to issue such rules within approximately six months. See FCC No. 04-179, ¶¶ 15, 21 <http://hraunfoss.fcc.gov/edocs_ public/attachmatch/FCC-04-179A1.pdf>. The Chairman of the FCC has scheduled the matter for a vote by the full Commission in December 2004. See pp. 13-14, *supra.*

Quick agency action to establish new rules consistent with the court of appeals' decision will avoid the uncertainty - for consumers and the communications industry as a whole - that would be associated with the process of merits review by this Court and any ensuing remand proceedings in the court of appeals. For that reason, and to conserve both judicial and agency resources, the government has concluded that the court of appeals' decision does not, on balance, warrant review at this time.

a. The ILECs contended below - and the court of appeals agreed - that the FCC lacked authority under the Communications Act to delegate to the state commissions a central role in making final unbundling determinations for mass-market switching and some types of dedicated transport. Although the court of appeals discussed delegation issues generally, see Pet. App. 10a-16a, its conclusion was that the provisions of the Communications Act do not indicate with sufficient clarity a congressional authorization for the specific state role established by the *Triennial Order. Id.* at 9a-10a. That conclusion is not in conflict with any other judicial decision specifically addressing the Act. Furthermore,*26 the D.C. Circuit has not applied the delegation analysis described in the instant decision in any other context, and the practical consequences of its approach are unclear. For those reasons, it would be premature for this Court to consider the broader delegation questions asserted by the petitions for certiorari, including the arguments that the court of appeals' reasoning conflicts in some respects with *Batterton v. Francis, 432 U.S. 416 (1977),* and *Wisconsin Department of Health & Family Services v. Blumer, 534 U.S. 473 (2002).*

b. In this case and *USTA I,* the D.C. Circuit imposed on the Commission, in conducting its impairment analysis under Section 251(c)(3) and (d)(2), requirements that go beyond those found in the statute itself. As the court of appeals has recognized, the 1996 Act provides the FCC with "no detail" about how to carry out the "extraordinar[ily] complex[]" task of determining which network elements incumbent carriers must make available to competitors. *USTA I, 290 F.3d at 421-422.* Furthermore, as the government explained in its response to the petition for certiorari in *USTA I,*[FN3] the D.C. Circuit's constraints on the FCC's impairment analysis are in tension with this Court's reasoning in *AT&T* and *Verizon.* In those cases, this Court reaffirmed and applied the settled principle that reviewing courts must generally defer to an expert agency's reasonable implementation of a complex, broadly drafted statute. See, *e.g., AT&T, 525 U.S. at 397; Verizon, 535 U.S. at 539;* see generally *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843-845 (1984).*

FN3. Fed. Resp. Br. at 14-16, *WorldCom, Inc. v. United States Telecom Ass'n, supra* (No. 02-858).

*27 Nevertheless, the court of appeals did not purport to apply the statutory impairment standard conclusively to particular facts. The court instead stated that it was making "general observations" about its understanding of the impairment standard and required the Commission to conduct "a re-examination" of impairment issues on remand and "implement a lawful scheme." Pet. App. 21a, 22a, 27a. As noted, the FCC intends quickly to issue new network-unbundling rules that comply with the court of appeals' decision. In light of that intention, and for the other reasons stated above, the United States and the FCC have concluded that this aspect of the court of appeals' decision does not warrant further review.

CONCLUSION

The petitions for a writ of certiorari should be denied.

National Ass'n of Regulatory Utility Com'rs v. United
2004 WL 1950685 (U.S.)

Briefs and Other Related Documents (Back to top)

• 2004 WL 2075756 (Appellate Petition, Motion and Filing) Reply Brief (Sep. 14, 2004)
• 2004 WL 2021253 (Appellate Petition, Motion and Filing) Reply to Briefs in Opposition to Petition for Writ of Certiorari (Sep. 07, 2004)
• 2004 WL 1950686 (Appellate Petition, Motion and Filing) Brief for Respondents BellSouth, Qwest, SBC, USTA, and Verizon in Opposition (Sep. 01, 2004)
• 04-15 (Docket) (Jul. 02, 2004)
• 04-18 (Docket) (Jul. 02, 2004)
• 2004 WL 1494922 (Appellate Petition, Motion and Filing) Petition for a Writ of Certiorari (Jun. 30, 2004)
• 2004 WL 1494953 (Appellate Petition, Motion and Filing) Petition for Writ of Certiorari (Jun. 30, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.