**<u>Arizona 271 Order,</u>**
**2006 Ariz. PUC LEXIS 5, at \*46-47**

LEXSEE

IN THE MATTER OF THE PETITION OF DIECA COMMUNICATIONS, INC., dba
COVAD COMMUNICATIONS COMPANY FOR ARBITRATION OF AN
INTERCONNECTION AGREEMENT WITH QWEST CORPORATION

DOCKET NO. T-03632A-04-0425; DOCKET NO. T-01051B-04-0425; DECISION NO.
68440

Arizona Corporation Commission

2006 Ariz. PUC LEXIS 5

February 2, 2006

**CORE TERMS:** copper, interconnection, carrier, arbitration, network, loop, retirement, unbundling, telecommunications, customer, incumbent, regeneration, unbundled, wholesale, fiber, collocation, pricing, notice, Telecom Act, commingling, requesting, space, state law, discontinuance, checklist, preempted, collocating, processing, transport, switching

[*1] APPEARANCES: Michael W. Patten, ROSHKA, HEYMAN & DeWULF, P.L.C.; Andrew R. Newell, KRYS BOYLE, P.C.; and Karen Shoresman Frame, on behalf of Covad Communications Company; and John M. Devaney, PERKINS COIE, L.L.P.; Timothy Berg, FENNEMORE CRAIG, P.C.; and Norman G. Curtright and Winslow B. Waxter, on behalf of Qwest Corporation.

**PANEL:** COMMISSIONERS: JEFF HATCH-MILLER, Chairman; WILLIAM A. MUNDELL; MARC SPITZER; MIKE GLEASON; KRISTIN K. MAYES; Dwight D. Nodes, ARBITRATOR

**OPINIONBY:** NODES

**OPINION: OPINION AND ORDER**

DATES OF HEARING: February 7 and 18, 2005

PLACE OF HEARING: Phoenix, Arizona

**BY THE COMMISSION:**

On June 8, 2004, DIECA Communications, Inc., dba Covad Communications Company ("Covad") filed with the Arizona Corporation Commission ("Commission") a Petition for Arbitration ("Petition") of a proposed interconnection agreement with Qwest Corporation ("Qwest") pursuant to A.A.C. R14-2-1505 and Section 252(b) of the Communications Act of 1934, as amended by the Telecommunications Act of 1996 ("1996 Telecom Act" or "Act").

On July 6, 2004, Qwest filed a Response to the Petition for Arbitration. On July 21, 2004, Qwest filed a Motion to Dismiss Portions [*2] of Covad's Petition for Arbitration. Qwest's Motion requested a Commission Order dismissing Issue 2 in Part G of Covad's Petition, to the extent Covad seeks Commission authority to: require Qwest to provide unbundled network elements ("UNEs") pursuant to Section 271 of the Act; set UNEs rates that Qwest provides under Section 271; or require Qwest to provide UNEs under state law in a manner that conflicts with the access ordered by the Federal Communications Commission ("FCC") in its *Triennial Review Order*. n1

n1 *Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers ("Triennial Review Order" or "TRO"), 18 FCC Rcd. 16978 (2003), aff'd in part and rev'd in part, United States Telecom Association v. FCC, 359 F.3d 554 (D.C. Cir. 2004) ("USTA II").*

A Procedural Conference was conducted on August 9, 2004 to discuss scheduling and other procedural issues. The parties agreed on dates for filing testimony, [*3] conducting the hearing, and filing of briefs. A schedule for filing pleadings regarding Qwest's Motion to Dismiss, and for oral argument on the Motion, was also discussed.

Pursuant to the schedule established at the August 9, 2004 Procedural Conference, Covad filed its Response to Qwest's Motion to Dismiss on August 16, 2004; the Commission's Utilities Division Staff ("Staff") filed its Opposition to Qwest's Motion to Dismiss on August 31, 2004; and Qwest filed its Combined Reply to the Responses of Staff and Covad on September 10, 2004. On September 29, 2004, Qwest, Covad, and Staff filed their respective Comments regarding the effect on this proceeding of the FCC's interim unbundling rules and Notice of Proposed Rulemaking n2.

n2 *Triennial Review Order, supra;* Order and Notice of Proposed Rulemaking, Review *of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers,* WC Docket No. 04-313, CC Docket No. 01-338, FCC 04-179 (rel. Aug. 20, 2004).

By Procedural Order [*4] issued October 6, 2004, in accordance with the schedule requested by the parties, oral argument on Qwest's Motion to Dismiss was set for December 15, 2004 n3, and the hearing was scheduled to commence on February 7, 2005. The Procedural Order also set dates for submitting pre-filed testimony.

n3 By Procedural Order issued December 7, 2004, the oral argument was cancelled at the request of the parties due to the expectation that the FCC would be issuing revised rules in accordance with the *USTA II* decision.

On December 20, 2004, Covad filed the Direct Testimony of Michael Zulevic and Elizabeth Balvin, and Qwest filed the Direct Testimony of William Easton, Karen Stewart, and Michael Norman.

A Procedural Conference was conducted on January 6, 2005 to discuss scheduling of witnesses and the status of the previously scheduled oral argument. During the Conference, Covad and Qwest agreed that no ruling on the Motion to Dismiss should be made prior to the February 7, 2005 arbitration hearing, and the parties would brief [*5] the issues raised by Qwest's Motion to Dismiss as part of their post-hearing briefs on all of the disputed arbitration issues.

On January 18, 2005, Covad filed the Rebuttal Testimony of Michael Zulevic and Elizabeth Balvin, and Qwest filed the Rebuttal Testimony of William Easton, Karen Stewart, Renee Albersheim, and Michael Norman.

On January 31, 2005, Covad filed the Joint Issues Matrix setting forth the issues that had been resolved through negotiation and the issues that remained in dispute.

Hearings were held February 7 and 18, 2005 at the Commission's offices in Phoenix, Arizona.

Post-hearing briefs were filed by Covad and Qwest on March 11, 2005. Reply briefs were filed on March 28, 2005.

On June 3, 2005, Qwest filed Supplemental Authority in the form of an Arbitration Order issued by the Iowa Utilities Board (Covad/Qwest Arbitration Docket No. ARB-05-01, Issued May 24,2005).

On July 20, 2005, Covad filed Supplemental Authority from an Arbitration Order issued on July 11, 2005 by the Missouri Public Service Commission (*Southwestern Bell Telephone dba SBC Missouri's Petition for Compulsory Arbitration of Unresolved Issues for a Successor Interconnection Agreement,* Case No. [*6] TO-2005-0336).

On July 20, 2005, Qwest filed additional Supplemental Authority from an Order issued on July 18, 2005 by the Idaho Public Utilities Commission (Covad/Qwest Arbitration Docket No. CVD-T-05-01, Order No. 29825) and an oral ruling by the South Dakota Public Service Commission on July 12, 2005.

On August 1, 2005, Qwest filed Supplemental Authority in the form of an Order issued by the South Dakota Public Service Commission (Covad/Qwest Arbitration Docket TC05-056, *Arbitration Order* issued July 26, 2005).

By Procedural Order issued August 12, 2005, Covad, Qwest and Staff were directed to file statements by August 26, 2005 regarding the impact on this proceeding, if any, of the FCC's August 5, 2005 press release regarding its decision to eliminate facilities sharing requirements on facilities-based wireline broadband Internet access service providers.

On August 26, 2005, Covad filed a Statement indicating that the FCC's Decision would have no impact on any of the issues in this arbitration docket.

On August 26, 2005, Qwest filed a Statement that the FCC's Decision potentially would have a profound effect of this proceeding, and further deliberation should be undertaken [*7] once the FCC's Decision is issued.

On August 26, 2005, Staff filed a Request for Extension to File Comments. Staff stated that it would need at least three weeks from the date the FCC's Decision was issued to offer a response on the effect of the FCC's Decision.

By Procedural Order issued August 30, 2005, Staff's request for an extension of time was granted.

On September 22, 2005, Qwest filed a Fourth Notice of Supplemental Authority in the form of an Order issued by the Oregon Public Utility Commission (Order No. 05-980, issued September 6, 2005, *In the Matter of Covad Communication Company Petition for Arbitration*).

On October 24, 2005, Qwest filed a Fifth Notice of Supplemental Authority in the form of a Recommended Decision of the Hearing Examiner of the New Mexico Public Regulation Commission (Case No. 04-00208-UT, issued October 14, 2005, *In the Matter of Covad Communication Company Petition for Arbitration*).

On November 3, 2005, Staff filed a Request for Procedural Order. Staff stated that the FCC had issued the anticipated Decision on September 23, 2005 n4, and Staff therefore requested that a Procedural Order should be issued allowing two additional weeks for the [*8] parties to comment on the impact of the FCC's Order on the issues raised in this proceeding.

n4 *In the Matter of Appropriate Framework for Broadband Access to the Internet over Wireline Facilities*, Report and Order and Notice of Proposed Rulemaking, CC Docket No. 02-33 et al. (Rel. September 23, 2005) ("*Broadband Order*").

On November 7, 2005, a Procedural Order was issued directing Staff, Covad, and Qwest to file comments regarding the impact of the FCC's Order on this proceeding, by no later than November 21, 2005.

On November 21, 2005, Covad filed a Second Notice of Supplemental Authority in the form of an Arbitration Order issued the Tennessee Regulatory Authority (Docket No. 03-00119, issued October 20, 2005, *Petition for Arbitration of ITC Deltacom Communications, Inc. with Bellsouth Telecommunications, Inc.*).

On November 21, 2005, Covad filed its Comments Regarding the FCC's *Broadband Order*. Covad contends that nothing in the *Broadband Order* affects the issues presented in the arbitration [*9] petition that is before the Commission in this docket.

On November 21, 2005, Qwest filed its Comments Relating to the FCC's *Wireline Broadband Order*. Qwest argues that the FCC's Broadband Order does affect the arbitration issues, especially with respect to Covad's "alternative service" proposal for copper loop retirements. Qwest also claims that the *Broadband Order* draws into question whether Covad is a telecommunications carrier entitled to an interconnection agreement, or whether Covad is an information services provider.

On November 21, 2005, Staff filed a Statement regarding the *Broadband Order*'s effect on this arbitration proceeding. According to Staff, the *Broadband Order* "would have no impact on the unbundling issues raised in this case, to the extent Covad seeks the unbundled network elements to provide a telecommunications service." Staff cites to the FCC's statement that "nothing in this Order changes a requesting telecommunications carrier's UNE rights under section 251 and our implementing rules" (*Broadband Order*, at P 127).

On December 2, 2005, Covad filed a *Reply to Qwest's Comments Regarding the FCC's Broadband Order*. Covad contends that the [*10] FCC has already responded to the question raised by Qwest and found that the *Broadband Order* has no effect on Covad's rights under 47 U.S.C. § 251 and, by extension, 47 U.S.C. § 252. Covad claims that Qwest's arguments ignore the FCC's specific statement that the *Broadband Order* does not impact UNE and interconnection issues. Covad also argues that the Commission has already determined that Covad is a telecommunications carrier pursuant to the granting of a CC&N for the provision of such services.

Having reviewed the various arguments regarding the impact of the FCC's *Broadband Order* on the issues presented herein for arbitration, we believe the arbitration issues are properly before us for consideration in this proceeding. We will therefore proceed to a determination of those issues based on the record presented through testimony and exhibits at the arbitration hearing.

### ISSUES FOR ARBITRATION

Covad's Petition contains five remaining disputed issues: 1) copper retirement requirements; 2) unified agreement/unbundled network elements; 3) commingling; 4) regeneration of Competitive Local Exchange [*11] Carrier ("CLEC") signals; and 5) billing/payment issues.

## Issue No. 1: What are Qwest's obligations when it retires copper facilities?

### Positions of the Parties

Covad and Qwest are in agreement with a portion of the language set forth below in Section 9.1.15. However, Covad proposes additional language for Section 9.1.15, as well as adding additional subsections (9.1.15.1 and 9.1.15.1.1). The language proposed by each of the parties is set forth below, with proposed deletions shown in "strike-through" format and proposed additions underlined.

| Qwest Proposed Language | Covad Proposed Language |
|---|---|
| 9.1.15 In the event Qwest decides to retire a copper loop, copper feeder or copper subloop and replace it with fiber, Qwest will: (i) provide notice of such planned retirement on its website (www.qwest.com/disclosures); and (ii) provide e-mail notice of such planned retirement to CLECs; and (iii) provide public notice of such planned replacement to the FCC. Qwest Can proceed with copper retirement at the conclusion of the applicable FCC notice Process as identified in FCC rules unless retirement was explicitly denied (or otherwise delayed Or modified). Such notices shall be in addition to any applicable state commission requirements. | 9.1.15 In the event Qwest decides to retire a copper loop, copper feeder or copper subloop and replace it with fiber, Qwest will: (i) provide notice of such planned retirement on its website (www.qwest.com/disclosures); and (ii) provide e-mail notice of such planned retirement to CLECs; and (iii) provide public notice of such Planned replacement to the FCC. Qwest Can Proceed with copper retirement at the conclusion of the applicable FCC notice process as identified in FCC rules unless retirement was explicitly denied (or otherwise delayed Or modified). Such notices shall be in addition to any applicable state commission requirements. The e-mail notice provided to each CLEC shall include the following |

Qwest Proposed Language

Covad Proposed Language
information: city and state;
wire center; planned
retirement date; the FDI
address; a listing of
all impacted addresses in the
DA; a listing of all
CLEC's customer impacted
addresses; old and new cable
media, including
transmission characteristics;
circuit identification
information; and cable
and pair information.
9.1.15.1 Continuity of
Service During Copper
Retirement. This section
applies where Qwest
retires copper feeder cable
and the resultant loop
is comprised of either (1)
mixed copper media
(i.e., copper cable of
different gauges or
transmission characteristics);
or (2) mixed
copper and fiber media (i.e.,
hybrid copper-fiber
loop)(collectively, "hybrid
loops") over which
Qwest itself could provide a
retail DSL service.
This section does not apply
where the resultant
loop is a fiber to the home
(FTTH) loop or a
fiber to the curb (FTTC)
loop (a fiber
transmission facility
connecting to copper
distribution plant that
is not more than 500 feet
from the customer's
premises) serving mass
market or residential
End User Customers.
9.1.15.1.1 When Qwest
retires copper feeder for
loops serving CLEC-served
End User Customers
or the CLEC at the time
such retirement is
implemented, Qwest shall adhere to all
regulatory and legal requirements
pertaining to

| Qwest Proposed Language | Covad Proposed Language |
| --- | --- |
| | changes in the Qwest network. Qwest will not retire copper facilities serving CLEC's End User Customers or CLEC, at any time prior to discontinuance by CLEC or CLEC's End User Customer of the service being provided by CLEC, without first provisioning an alternative service over any available, compatible facility (i.e., copper or fiber) to CLEC or CLEC End User Customer. Such alternative service shall be provisioned in a manner that does not degrade the service or increase the cost to CLEC or End User Customers of CLEC. Disputes over copper retirement shall be subject to the Dispute Resolution provisions of this Interconnection Agreement. |

[*12]
**Covad**

Covad states that the dispute on this issue centers on the conditions under which Qwest may retire copper plant that is used to serve Covad's digital subscriber line ("xDSL") customers. Covad contends that the FCC limited application of its copper retirement rules to situations where CLECs would not be denied access to loops. According to Covad, the *TRO* addressed only copper retirement and fiber replacement regarding fiber to the home ("FTTH") and fiber to the curb ("FTTC"). Covad claims that it has made substantial investments in deploying its xDSL network and Qwest's retirement of copper facilities has the potential to destroy Covad's investment which relies on copper facilities.

Covad also argues that the Commission has authority pursuant to <u>Arizona Administrative Code ("A.A.C.") R14-2-1307</u> n5 to enforce additional requirements regarding the retirement of copper facilities. Covad asserts that the Commission's policy objectives of protecting both competitors and consumers would be furthered by adopting Covad's copper retirement proposals because Qwest is not provisioning broadband services to Arizona customers over fiber [*13] cable that has replaced retired copper facilities.

n5 <u>A.A.C. R14-2-1307</u> requires ILECs to provide "essential facilities or services" (including unbundled loops) under terms and conditions that are equivalent to the terms and conditions under which the ILEC provides such facilities and services to itself.

Covad further contends that, contrary to Qwest's assertions, its alternative service proposal is sufficiently defined because it includes parameters for service quality and price stability. According to Covad, there are means to determine if service has been degraded by a copper retirement and the current wholesale rate for line sharing should be maintained

2006 Ariz. PUC LEXIS 5, *

for any alternative service necessary for Covad to serve its customers in the event copper facilities are replaced with fiber.

Covad also argues that Qwest's proposed notice provisions are inadequate when copper retirements are contemplated. Covad asserts that Qwest's proposed notice fails to provide CLECs with specific [*14] customer information that would enable the CLECs to readily determine if specific customers would be affected by the retirement. Covad contends that Qwest's proposed notice is inferior to the procedures employed in Bellsouth's territory, in which specific customer addresses are provided to affected DSL providers. Covad argues that even if the Commission believes that FCC rules do not require the type of notice proposed by Covad, the Commission should assert its authority to require the notice requirements requested by Covad.

## Qwest

According to Qwest, this issue arises from the practice of Incumbent Local Exchange Carriers ("ILECs") retiring copper facilities and replacing them with fiber. Qwest witness Karen Taylor testified that the ability to retire copper facilities is important from a cost perspective because, otherwise, ILECs would be required to maintain redundant copper and fiber networks when fiber facilities are installed to replace copper (Qwest Ex. 2, at 2). Ms. Taylor also stated that being able to replace copper with fiber advances the FCC's objective of increasing economic incentives for carriers to deploy fiber facilities (*Id.* at 4-5).

Qwest contends that [*15] the FCC's *Triennial Review Order* confirms the right of ILECs to retire copper facilities that are replaced with fiber facilities. In Paragraph 271 of the *TRO*, the FCC stated: "we decline to prohibit incumbent LECs from retiring copper loops or copper subloops that they have replaced with fiber." Qwest argues that Covad's proposal to prohibit Qwest from retiring copper facilities unless it provides Covad, or Covad's end-users, with an alternative service is inconsistent with the FCC's rules and is ambiguous to the point of being incapable of implementation with respect to what constitutes an acceptable alternative service. Qwest argues that Covad's proposed interconnection agreement ("ICA") does not define the "alternative service" that would have to be provided and Qwest would have no way of knowing what service to provide to comply with the ICA. According to Qwest, state regulatory commissions in Colorado, Minnesota, Utah, and Washington have rejected Covad's proposal regarding retirement of copper facilities.

Qwest also asserts that, contrary to Covad's contention, there is no FCC limitation on copper retirements only for FTTH and FTTC replacements. Qwest cites a decision [*16] by the Colorado Commission n6 which rejected the same argument raised by Covad.

n6 *Petition of Qwest Corporation for Arbitration of an Interconnection Agreement*, Docket No. 04B-160T, Decision No. C04-1348, Colorado Public Utilities Commission *Order Granting in Part and Denying in Part Application for Rehearing, Reargument, or Reconsideration* (Nov. 16, 2004), at P 35.

Regarding the practical effects of copper retirements, Qwest claims that no Covad customer has ever been disconnected in Arizona or anywhere in Qwest's region due to a copper loop retirement. Ms. Stewart testified that Qwest routinely leaves copper loops in place when it deploys fiber and out of the approximately 286,000 copper/fiber hybrid loops installed in Arizona, Qwest has never disconnected a Covad line sharing customer as a result of hybrid loop installation (Tr. 76). Qwest contends that, even if Covad customers were affected by a copper loop retirement, Covad could continue serving the affected customers by purchasing other services from [*17] Qwest (Qwest Ex. 2, at 18).

With respect to notice, Qwest claims that the only condition placed on retirement of copper facilities is the requirement that ILECs provide notice of intent to retire specific copper facilities when those facilities are being replaced with FTTH loops, so that CLECs can object to the FCC. Qwest contends that its proposed language goes beyond the FCC's requirements by providing CLECs with notice of *all* planned copper retirements, not just FTTH replacements. Qwest asserts that the *TRO* requires only the filing of a public notice with the FCC or notice through industry publications or an accessible internet site. However, Qwest's proposed ICA would provide notice of copper retirements through Qwest's website, by a public filing with the FCC, and through an e-mail notice to CLECs, as well as any additional notices required under state law. According to Qwest, its proposed language provides additional protection for Covad and other CLECs by Qwest's commitment to leave copper loops and subloops in service where technically feasible, and by coordinating with Covad the transition from old to new facilities to keep service interruption to a minimum.

Page 7

Qwest [*18] also disputes Covad's contention that FCC rules require Qwest to identify specific Covad customers affected by copper retirements. Ms. Stewart testified that Qwest's database provides a "raw loop data tool" from which Covad can determine the addresses of its customers that are affected by the retirements (Tr. 77-78).

**Resolution of Issue No. 1**

We agree with Qwest that Covad's copper retirement proposals are not supported by FCC rules. As Qwest points out, the FCC's *TRO* rejected CLEC arguments that ILECs should be precluded from retiring copper loops, stating: "we decline to prohibit incumbent LECs from retiring copper loops or copper subloops that they have replaced with fiber" (*TRO* P 271). The ability of ILECs, subject to proper notice requirements, to replace copper facilities with fiber is consistent with the FCC's, as well as this Commission's, policy of encouraging deployment of advanced telecommunications services. We also believe that Covad's "alternative service" proposal (which would prohibit Qwest from retiring copper facilities unless the cost to Covad or its customers is not increased or the quality of service is not degraded) is insufficiently defined to [*19] allow any meaningful ability of the parties or the Commission to determine if the standard proposed by Covad has been satisfied on a case-by-case basis. There is no such requirement in any FCC Order, and state commissions in Colorado, Minnesota, Washington, and Utah have rejected Covad's proposal on this issue.

Imposition of the type of requirement suggested by Covad would potentially saddle Qwest with the obligation to maintain duplicative copper and fiber facilities, a result that is inconsistent with sound public policy and encouragement of investment in forward-looking technology. Although there is no requirement for Qwest to maintain duplicative facilities, Qwest's witness Karen Stewart pointed out that "when Qwest puts overlay facilities in its network it tends to leave the copper facilities in place when it is technically feasible" (Tr. 76). Indeed, Covad witness Michael Zulevic conceded that Qwest has never retired a copper loop anywhere in Qwest's 14-state region, including Arizona, that resulted in Covad losing service to a customer (*Id.* at 27-28). Even if such were to occur, Ms. Stewart testified that Covad would be able to maintain service to its affected customer [*20] by purchasing other services from Qwest (Qwest Ex. 3, at 13-14).

We also find that Qwest's proposed notice provisions comply with applicable requirements. As set forth in the *TRO*, an ILEC must provide notice of planned modifications to its network by either filing a public notice to the FCC, or through industry publications or an accessible internet site (*TRO* PP 273 and 288). Qwest's proposed form of notice would list planned copper retirements on Qwest's website, through a public filing with the FCC, and by an e-mail notice to CLECs. Qwest has also agreed to provide any additional notices that may be required by Arizona law. We do not believe it is appropriate to impose a requirement on Qwest to inform Covad whether service to Covad's customers may be affected by retirement of copper facilities. Such a condition could require speculation by Qwest as to potential impacts on specific Covad customers, a requirement that is not contemplated by the FCC's rules, and would improperly shift responsibility from Covad to Qwest. Qwest's witness indicated that CLECs can determine the addresses of their customers affected by the copper facilities retirement by accessing Qwest's "raw loop [*21] data tool" and comparing those addresses to the CLEC's customer records. With respect to Covad's claim that specific address information is provided in Bellsouth's territory, the document submitted in the record (Qwest Ex. 1) shows only that a list of all customers in a given distribution area, and not Covad-specific customer information, is provided where copper retirements are planned (Tr. 49-50).

Based on the record and applicable rules and regulations, we find that Qwest's proposed copper retirement proposal, including notice requirements, is reasonable and should be adopted.

**Issue No. 2: May Section 271 Elements and Unbundled Elements Under State Law be Included in the Interconnection Agreement? n7**

n7 As noted above, Qwest moved to dismiss Issue No. 2 as a matter beyond the Commission's jurisdiction. Prior to the hearing, Covad and Qwest agreed that there was no need for the Commission to separately rule on the Motion to Dismiss prior to the hearing because the Commission could address the issue as part of the Order in this proceeding. Due to the fact that Issue No. 2 is a legal issue, the parties did not submit testimony on this issue but relied on post-hearing briefs to support their positions.

[*22]

Section 251(c)(3) of the 1996 Telecom Act requires ILECs to provide access to their networks (via unbundled network elements), and Section 252(d)(1) sets the pricing standard to be employed for the UNEs (*i.e.*, through total element long run incremental cost ("TELRIC") pricing). Section 251(c)(3) also requires compliance with Section 251(d)(2) which requires access only for those UNEs that meet the so-called "necessary and impair" standard n8.

n8 The *TRO* maintained the prior definition of "necessary" (where lack of access to a given UNE would as a practical, economic, and operational matter preclude the requesting carrier from providing the services it seeks to offer)(TRO P 170). The definition of "impairment" was modified by the *TRO* to situations where "lack of access to an incumbent LEC network poses a barrier or barriers to entry, including operational and economic barriers, that are likely to make entry into a market uneconomic" (*TRO* P 84).

Section 271 of the 1996 Telecom Act details the specific [*23] requirements that ILECs must meet as a condition of being permitted to provide interLATA toll services. Under Section 271, state commissions reviewed the 14 competitive checklist items prior to approval being granted by the FCC. Section 271 Checklist Item No. 2 requires ILECs to provide nondiscriminatory access to UNEs in accordance with the requirements of Sections 251(c)(3) and 252(d)(1). In the *TRO*, the FCC limited the Section 251 and 252 unbundling and pricing standards to specific types of loops, subloops, and transport (although the *USTA II* decision overturned the *TRO*'s mass market switching requirements, thus eliminating switching as a Section 251 UNE for all practical purposes).

Section 271 Checklist Items 4, 5, 6, and 10 require ILECs to provide access to loops, transport, switching and signaling. Although a number of Section 251 UNEs were eliminated, Paragraph 653 of the *TRO* stated that an independent obligation continues to exist for ILECs to provide access to those UNEs pursuant to Section 271. Unlike Checklist Item 2, the other checklist items do not cross-reference Sections 251(c)(3) and 252(d)(1) and, therefore, UNEs unbundled under Checklist Items 4, [*24] 5, 6, and 10 need only meet the "just and reasonable" set forth in 47 U.S.C. PP 201-202, as opposed to the TELRIC pricing standard under Section 251 (*TRO* P 656).

**Positions of the Parties**

**Covad**

Covad and Qwest disagree regarding whether Qwest has a continuing obligation to provide certain network elements, including certain unbundled loops (including high capacity loops, line splitting, and subloop elements), and dedicated transport, after the FCC's *TRO* decision. Covad contends that Qwest's obligations to provide network elements pursuant to Section 271 of the 1996 Telecom Act should be memorialized in the interconnection agreement and this Commission has authority to arbitrate disputes regarding such obligations. Covad also argues that Qwest continues to be obligated to provide unbundled access to "essential facilities" under Arizona law, pursuant to A.A.C.R14-2-1310.

This issue arises due to differences in interpretation of the FCC's statements in the *TRO* and the *USTA II* decision. The FCC determined that Bell Operating Companies ("BOCs") have an independent obligation under Section 271 to provide unbundled [*25] access to certain network elements set forth in the Section 271 checklist (*TRO* PP 653-655). The court in *USTA II* upheld the FCC's decision on this point (*USTA II*, at 588), and thus BOCs remain obligated to provide access to local loops, local transport, local switching, and databases and signaling for call routing and completion in accordance with Section 271 checklist items 4, 5, 6, and 10 (47 U.S.C. § 271(c)(2)(B)(iv),(v),(vi), and (x)). Thus, according to Covad, separate and distinct unbundling obligations remain in place under Sections 251 and 271.

Covad argues that the *TRO* made clear that Section 271 created independent access obligations for BOCs regardless of the FCC's analysis of competitor impairment and unbundling obligations for ILECs under Section 251. The *TRO* stated that [Section 271] "Checklist items 4, 5, 6, and 10 separately impose access requirements regarding loop, transport, switching, and signaling, without mentioning Section 251" (*TRO* P 654). Covad relies on a decision by the Maine Public Utilities Commission which found that state commissions have the authority to arbitrate Section 271 pricing in the [*26] context of Section 252 arbitrations. *See, Order -- Part II, Verizon-Maine Proposed Schedules, Terms, Conditions and Rates for Unbundled Network Elements and Interconnection (PUC 20) and Resold Services (PUC 21)*, Maine PUC Docket No. 2002-682 (September 3, 2004).

According to Covad, the Commission's enforcement of Qwest's 271 checklist obligations would not conflict with any other provision of the 1996 Telecom Act and therefore no federal preemption concerns are implicated. Covad cites to Section 271(d)(2)(B), which requires the FCC to consult with state commissions in reviewing BOC compliance with the Section 271 checklist, as well as the FCC's Order approving Qwest's ability to offer interLATA services in Arizona, which refers to "cooperative state and federal oversight" over Qwest's entry into the long distance market in Arizona n9.

n9 *In the Matter of the Application of Qwest Communications International, Inc. for Authorization to Provide In-Region, InterLATA Services in Arizona*, WC Docket No. 03-194, Memorandum Opinion and Order, FCC 03-309 (December 3, 2003) ("*Qwest 271 Order*"), P 61.

[*27]

With respect to pricing of Section 271 UNEs, Covad concedes that the *TRO* applies a different legal standard (*i.e.*, "just and reasonable") than is required for Section 251 UNEs ("necessary and impair"). However, Covad argues that the Arizona Commission has already established through its rules (A.A.C. R14-2-1310) that TSLRIC is the cost methodology to be employed for pricing essential facilities sought by CLECs. Covad claims that TSLRIC is a forward-looking cost methodology that is closely related to the TELRIC standard in place for Section 251 UNEs and, therefore, the Section 271 UNEs should continue to be priced at existing TELRIC rates until new 271 rates are established for those UNEs (*See, Verizon-Maine 271 Order*, at 19-20).

Covad also contends that existing state rules authorize the Commission to require access to loops, including high capacity loops, line splitting arrangements, and subloop arrangements, as well as dedicated transport. Covad cites A.A.C. R14-2-1307(C), which lists "essential facilities or services" as termination of local and long-distance calls; interconnection [*28] with 911 calls; access to numbering resources; dedicated channel network access connections; and unbundled loops. According to Covad, the issue of whether the Commission's rules are preempted by the 1996 Telecom Act has already been decided in the Commission's Order enacting the unbundling rules. In that Decision, the Commission stated the 1996 Telecom Act did not preclude issuance of the Commission's rules and that "although the Proposed Rules cover similar issues as the Act, we believe they are consistent." Decision No. 59671 (July 22, 1996), P 6.

Citing Paragraphs 191 and 192 of the *TRO*, Covad also argues that the FCC specifically recognized that Congress did not intend to preempt the states with respect to access to UNEs. Covad asserts that the savings clause of Section 251 limits preemption only to those instances where state actions "substantially prevent" the implementation of the federal regulatory regime and that "merely an inconsistency" between state and federal regulations was not sufficient for FCC preemption under Section 251(d)(3). *TRO* P 192. According to Covad, the FCC's statements regarding preemption are consistent with existing boundaries between state and [*29] federal regulations. Covad also claims that the FCC established a process for parties to seek a declaratory ruling in situations where they believe state regulations overstep or conflict with federal law.

Finally, Covad argues that although this Commission's unbundling rules are not likely to be preempted, the Commission should refrain from "adjudication of the constitutionality of legislative enactments" because such action is beyond the jurisdiction of administrative agencies.

**Qwest**

Qwest disputes the arguments raised by Covad regarding interpretation of federal standards and the ability of state commissions to impose additional unbundling obligations on ILECs in an arbitration proceeding. Qwest claims Covad fails to recognize the 1996 Telecom Act's limits on state law authority, which must be exercised in accordance with Section 251 and the FCC's unbundling regime. Qwest contends that Covad is seeking access to network elements without any showing that it will be impaired without access to those elements. Qwest also asserts that Covad is improperly seeking the Commission's authority to require unbundling and set rates under Section 271, given the FCC's exclusive [*30] jurisdiction over the availability and pricing of Section 271 UNEs. Qwest cites an Order by the Washington Commission which decided that it "has no authority under Section 251 or Section 271 of the Act to require Qwest to include Section 271 elements in an interconnection agreement." The Washington Commission also concluded that "any unbundling requirement based on state law would likely be preempted as inconsistent with federal law, regardless of the method the state used to require the element." n10

n10 *In the Matter of the Petition for Arbitration of Covad Communications Company with Qwest Corporation*, Washington State Utilities and Transportation Commission Docket No. UT-043045, Order No. 06 (February 9, 2005), at 15-16.

According to Qwest, there is no statutory or legal basis for including terms and conditions for network elements under Section 271 in a Section 252 interconnection agreement. Qwest claims that the FCC has defined the "interconnection agreements" that must be submitted to state commissions [*31] for approval as "only those agreements that contain an ongoing obligation relating to section 251 (b) or (c) . . ." n11 Therefore, Qwest contends that only Section 251 elements must be included in interconnection agreements and that Section 271 UNEs are properly addressed only through commercial agreements and tariffs.

n11 Memorandum Opinion and Order, *Qwest Communications International, Inc. Petition for Declaratory Ruling on the Scope of the Duty to File and Obtain Prior Approval of Negotiated Contractual Arrangements under Section 252(a)(1)*, FCC 02-276, WC Docket No. 02-89, P 8, n. 26 (October 2, 2004) ("*Qwest Declaratory Order*").

Qwest argues further that there is no legal authority for Covad's claim that state commissions have authority to impose unbundling obligations under Section 271. Qwest asserts that Section 271(d)(3) confers exclusive authority on the FCC to determine if BOCs have complied with Section 271 checklist items, and state commissions have only a non-substantive, consulting role in that [*32] determination. Qwest contends that *USTA II* made clear that the only authority that state commissions have under the Act is that which Congress has expressly delegated. *USTA II, supra*, at 565-568. Qwest also cites decisions by federal courts in the 7th and 3rd Circuits to support its arguments that state commissions have no independent sovereign authority under the Act. *See, Indiana Bell Telephone Co., Inc. v. Indiana Utility Regulatory Comm'n*, 359 F.3d, 493, 494 (7th Cir. 2004); *MCI Telecommunications Corp. v. Bell Atlantic-Pennsylvania*, 271 F.3d 491, 510 (3rd Cir. 2001). Qwest claims that these decisions make clear that state commissions have only investigative and consulting roles under Section 271, compared to the substantive authority assigned to the states under Sections 251 and 252. Qwest argues that adoption of Covad's claim of independent state unbundling authority would result in an impermissible conflict with federal law and the federal scheme of regulation, and is therefore barred under the doctrine of federal preemption.

With respect to pricing, Qwest claims that Covad's arguments are flawed because [*33] states have no power to set rates for Section 271 elements. According to Qwest, the only network elements over which states have pricing authority are those elements provided by an ILEC pursuant to Section 251(c)(3). Qwest also disputes Covad's contention that state commissions may use TELRIC pricing for Section 271 elements. Qwest cites the *TRO* where the FCC stated that Section 271 rate elements are to be priced based on the Section 201-202 standard that such rates must not be unjust, unreasonable, or unreasonably discriminatory and that TELRIC pricing standards are not applicable to Section 271 elements (*TRO*, PP 656-664). Qwest also quotes the *USTA II* decision which found that there was "nothing unreasonable in the [FCC's] decision to confine TELRIC pricing to instances where it has found impairment." *USTA II, supra*, at 589.

Qwest also opposes Covad's attempt to raise the issue of line-splitting in this proceeding. Qwest claims that Covad failed to raise line-splitting as a contested issue for arbitration until its post-hearing brief and thus consideration of the issue is procedurally improper. Qwest disputes Covad's contention that Qwest has acceded line-splitting [*34] as a loop-based product through its position regarding commercial agreements. Qwest argues that Covad's claims about Qwest's position are factually incorrect and, if given a chance to present testimony on the issue, Qwest could have shown why Covad's arguments are incorrect. Qwest asserts that consideration of this issue without an evidentiary record would be prejudicial to Qwest, and Covad's attempt to introduce the issue for consideration by the Commission should therefore be rejected.

Finally, Qwest contends that the Commission should adopt Qwest's proposed listing of network elements that the FCC has ruled ILECs are not required to provide under Section 251. Qwest points to its proposed language in Section

2006 Ariz. PUC LEXIS 5, *

9.1.1.6 of the ICA, which lists 18 separate elements and services that Qwest contends ILECs are not required to unbundle pursuant to the *TRO*. Qwest asserts that, absent a specific delineation of the "de-listed" UNEs in the ICA, Covad is likely to demand unbundling of those elements. Therefore, Qwest seeks adoption of its proposed language.

## Resolution of Issue No. 2

Unresolved Issue No. 2 seeks a decision regarding whether the Commission has authority to require [*35] Qwest to unbundle certain network elements under the provisions of Section 271 and Arizona rules pertaining to competitive telecommunications services. In determining the proper scope of the Commission's review of this issue, it is appropriate to discuss what constitutes an "interconnection agreement" and what types of interconnection agreements are required to be filed.

47 U.S.C. § 252(a)(1) encourages ILECs and competitive carriers to voluntarily negotiate agreements for interconnection, services, or network elements without regard to the standards set forth in subsections (b) and (c) of Section 251 n12. In the event disputes arise with respect to negotiated agreements, any party may seek arbitration of the disputed issues by a state commission (Section 252(b)).

n12 Subsections (b) and (c) of Section 251 describe the obligations of all local exchange carriers and incumbent local exchange carriers, respectively, with regard to interconnection.

Section 252(e)(1) requires that " [*36] *any* interconnection agreement adopted by negotiation or arbitration shall be submitted for approval to the State commission" (emphasis added). Pursuant to Section 252(c), the applicable standards of review by state commissions for consideration of an arbitration request are as follows:

In resolving by arbitration under subsection (b) of this section any open issues and imposing conditions upon the parties to the agreement, a State Commission shall-

(1) ensure that such resolution and conditions meet the requirements of section 251 of this title, including the regulations prescribed by the Commission pursuant to section 251 of this title;

(2) establish any rates for interconnection, services, or network elements according to subsection (d) of this section; and

(3) provide a schedule for implementation of the terms and conditions by the parties to the agreement.

In a request for a declaratory ruling by Qwest, the FCC addressed the types of agreements that must be filed under Section 252, stating that:

An agreement that creates an *ongoing* obligation pertaining to resale, number portability, dialing parity, access to rights-of-way, reciprocal compensation, interconnection, [*37] unbundled network elements, or collocation is an interconnection agreement that must be filed pursuant to section 252(a)(1). (emphasis original) n13

The *Qwest Declaratory Order* also stated that state commissions "should be responsible for applying, in the first instance, the statutory interpretation . . . to the terms and conditions of specific agreements" (*Declaratory Order* at P 7). The FCC stated that its Decision is "consistent with the structure of section 252, which vests in the states the authority to conduct fact-intensive determinations relating to interconnection agreements" (*Id.*).

n13 *Qwest Declaratory Order, supra.*

2006 Ariz. PUC LEXIS 5, *

Through its arbitration request on this issue, Covad seeks to include provisions in its interconnection agreement defining Qwest's interconnection and access obligations under 47 U.S.C. § 271 of the 1996 Telecom Act. Section 271 includes Specific Interconnection Requirements that must be provided by a BOC to comply [*38] with the Competitive Checklist prerequisites of Section 271 (47 U.S.C. § 271(c)(2)(B)). This provision requires, among other things, that the BOC must provide:

> (iv) Local loop transmission from the central office to the customer's premises, unbundled from the local switching or other services.

> (v) Local transport from the trunk side of a wireline local exchange carrier switch unbundled from switching or other services.

> (vi) Local switching unbundled from transport, local loop transmission, or other services.

In the *TRO*, the FCC reinforced these ongoing requirements for BOCs pursuant to Section 271 stating that "the requirements of Section 271(c)(2)(B) establish an independent obligation for BOCs to provide access to loops, switching transport, and signaling regardless of any unbundling analysis under section 251" (*TRO*, P 653).

Qwest relies heavily on the language of Section 252(a)(1), which states in relevant part:

> "Upon receiving a request for interconnection, services, or network elements *pursuant to section 251*, an incumbent local exchange carrier may negotiate and enter into a binding agreement with the requesting [*39] telecommunications carrier or carriers without regard to the standards set forth in subsections (b) and (c) of section 251." (emphasis added)

Qwest's reliance on this language ignores the fact that Qwest is obligated pursuant to Section 271 to make network elements available independent of its Section 251 obligations. Moreover, the language cited by Qwest clearly states that ILECs may negotiate binding agreements *without regard to the standards* set forth in Section 251.

The Commission's authority to review and approve interconnection agreements is set forth in Section 252(e) which requires that "*Any* interconnection agreement adopted by negotiation or arbitration *shall be submitted for approval to the State commission*." (Section 252(e)(1), emphasis added). Contrary to Qwest's assertions, there is no constraint in Section 252(e)(1) that would limit the types of negotiated agreements that must be approved by state commissions to only those addressing network elements, interconnection, or access under Section 251. Rather, Section 252 is clear on its face that "any interconnection agreement" must be submitted for state commission approval. If the drafters of the 1996 Telecom [*40] Act had intended the type of limitation suggested by Qwest, they could easily have added the same language to Section 252 that is contained in Section 251. The absence of such language is a clear indication that the Telecom Act intended broad review authority for state commissions.

When read in conjunction with the entirety of the Telecom Act, the Section 271 obligations described above must be considered the type of interconnection and access requirements contemplated under Section 252. Indeed, Section 271(c)(2) is titled "SPECIFIC INTERCONNECTION REQUIREMENTS" and, under subsection (A) of that provision, the requesting BOC is considered to have met the requirements of the section if it is providing access or interconnection pursuant to its SGAT or an interconnection agreement, both of which require state commission approval under Section 252. Since Section 271 does not contain any separate provisions for approval of interconnection agreements or SGAT provisions, it must be presumed that the review process of such Section 271 provisions would occur within the Section 252 review process.

We are also cognizant of the fact that, in approving Qwest's Section 271 application, the FCC [*41] intended an ongoing role for the Arizona Commission in monitoring Qwest's operations with respect to the provision of interLATA services in Arizona. In approving Qwest's application, the FCC stated:

Working in concert with the Arizona Commission, we intend to closely monitor Qwest's post-approval compliance for Arizona . . .

. . .

We are confident that cooperative state and federal oversight and enforcement can address any backsliding that may arise with respect to Qwest's entry into Arizona n14.

n14 *Qwest 271 Order, supra,* PP 59-60.

We believe that our ongoing oversight and monitoring role may be exercised in any appropriate proceeding before the Commission, including this Section 252 arbitration matter, wherein Qwest's actions are being reviewed with respect to compliance with the provision of services being provided to competitive carriers. We believe that our exercise of jurisdiction in this matter is consistent with the joint state and federal scheme of ensuring compliance [*42] by Qwest with the Section 271 checklist requirements, in conjunction with the FCC's authority to hold Qwest accountable for deviations from the FCC's Section 271 approval.

Qwest also argues that the Commission has no jurisdiction to impose unbundling requirements under Arizona law that the *TRO* or *USTA II* decisions struck down. We disagree with Qwest's assertions and believe that our independent authority under state law is not preempted by the FCC's *TRO* decision or *USTA II.* Section 251(d)(3) specifically prohibits the FCC from preventing "the enforcement of any regulation, order, or policy of a State commission that -- (A) establishes access and interconnection obligations of local exchange carriers; (B) is consistent with the requirements of this section; and (C) does not substantially prevent implementation of the requirements of this section and the purposes of this part." Absent some evidence that this Commission's Rules related to interconnection and access conflict with federal law, we do not believe that the Rules are preempted.

Pursuant to A.A.C. R14-2-1506(A), interconnection agreements must be submitted to the Commission [*43] for approval under 47 U.S.C. § 252(e) within 30 days of a Commission Order regarding an arbitration petition or within 30 days of execution of a negotiated agreement. Under the Commission's Rules, an Interconnection Agreement is defined as a "formal agreement between any telecommunications carriers providing or intending to provide telecommunications services in Arizona, setting forth the particular terms and conditions under which interconnection and resale services, as appropriate, will be provided." A.A.C. R14-2-1502. With respect to whether the agreement contains "interconnection services," A.A.C. R14-2-1302 defines such services as "those features and functions of a local exchange carrier's network that enable other local exchange carriers to provide local exchange and exchange access services. Interconnection services include, but are not limited to, those services offered by local exchange carriers which have been classified by the Commission as essential services."

Although Qwest cites decisions by other in-region state commissions in support of its arguments, [*44] those decisions reflect a variety of conclusions with respect to assertion of state jurisdiction. For example, the Utah Public Service Commission declined to adopt Covad's proposed language on this issue, but also specifically declined to accept Qwest's argument that the Utah Commission was preempted from asserting jurisdiction under state law. The Utah Commission stated:

We agree with Covad's general proposition that states are not preempted as a matter of law from regulating in the field of access to network elements . . . [and] we reject Qwest's apparent view that we are totally preempted by the federal system from enforcing Utah law requiring unbundled access to certain network elements.

The fact that under a careful reading of the law the Commission may under certain circumstances impose Section 271 or state law obligations in a Section 252 arbitration does not lead us to conclude it would be reasonable in this case to do so. n15

n15 *In the Matter of the Petition of DIECA Communications, Inc., DBA Covad Communications Company, for Arbitration to Resolve Issues Relating to an Interconnection Agreement with Qwest Corporation*, Arbitration Report and Order, Utah PSC Docket No. 04-2277-02 (February 8, 2005), at 19-21.

[*45]

In its Covad/Qwest arbitration proceeding, the Minnesota Public Utilities Commission rejected the language proposed by both Covad and Qwest regarding this issue. The Minnesota Commission directed the parties to adopt language consistent with its conclusion that it is premature to remove any Section 251 elements from the ICA n16. Covad contends that the net effect of this decision is that the parties are required to re-insert language into the ICA providing access to all of the elements Covad seeks, but pursuant to Section 251 of the Act, rather than Section 271.

n16 *In the Matter of the Petition of Covad Communications Co. for Arbitration of an Interconnection Agreement with Qwest Corporation Pursuant to 47 U.S.C. § 252(b)*, Minnesota Public Utilities Commission Docket No. P-5692, 421/IC-04-549, Arbitrator's Report (December 16, 2004), at 15-16; Order Resolving Arbitration Issues and Requiring Filed Interconnection Agreement (March 14, 2005), at 5.

The decision by the Washington [*46] Commission most closely aligns with Qwest's preemption arguments. The Washington Commission concluded that any effort by the state to enforce state unbundling laws would be preempted by federal law n17.

n17 *In the Matter of the Petition for Arbitration of Covad Communications Co. with Qwest Corporation Pursuant to 47 U.S.C. § 252 and the Triennial Review Order*, Washington State Utilities and Transportation Commission Docket No. UT-043045, Final Order Affirming, in Part, Arbitrator's Report and Decision; Granting, in Part, Covad's Petition for Review; Requiring Filing of Conforming Interconnection Agreement (February 9, 2005), at 15-23.

For the reasons described above, we disagree that state law unbundling requirements are necessarily preempted under existing federal law and we therefore decline to follow the reasoning set forth in the Washington Commission's Order.

With respect to pricing of Section 271 elements, we agree with Covad that the current TELRIC pricing of those network [*47] elements should remain in place because they have previously been found to have complied with state and federal law. As Covad points out, the FCC has required continued access at current (TELRIC) wholesale prices for those elements for which wholesale prices were established and relied upon in the FCC's granting of Qwest's Section 271 application (*TRO* P 665). The previously established prices for these elements would clearly qualify as fair, just and reasonable rates, and should be continued absent a request by Qwest to alter the conditions of its interLATA entry into the Arizona market. A further phase of this proceeding shall be instituted within 30 days to determine just and reasonable rates consistent with state and federal law.

**Issue No. 3: What are Qwest's obligations regarding "commingling" of network elements?**

"Commingling" is the "connecting, attaching, or otherwise linking of a UNE, or a UNE combination, to one or more facilities or services that a requesting carrier has obtained at wholesale from an incumbent LEC *pursuant to any method other than unbundling under section 251(c)(3) of the Act*, or the combining of a UNE or UNE combination with one or more such [*48] wholesale services" (*TRO* P 579, emphasis added). The *TRO* permits "requesting carriers to commingle UNEs and combinations of UNEs with services (*e.g.*, switched and special access services offered pursuant to tariff), and to require incumbent LECs to perform the necessary functions to effectuate such commingling upon re-

quest" (*Id.*). As explained below, this issue requires consideration of the FCC's definition of "commingling" and other parts of the *TRO* related to ILEC obligations to provide elements under Section 271.

| Qwest Proposed Language | Covad Proposed Language |
|---|---|
| "Commingling" means the connecting, attaching, or otherwise linking of an Unbundled Network Element, or a Combination of Unbundled Network Elements, to one or more facilities or services that a requesting Telecommunications Carrier has obtained at wholesale from Qwest, or the combination of an Unbundled Network Element, or a Combination of Unbundled Network Elements, with one or more such facilities or services. | "251(c)(3) UNE" means any unbundled network element obtained by CLEC pursuant to Section 251 of the Act.<br><br>"Commingling" means the connecting, attaching, or otherwise linking of 251(c)(3) UNEs or a Combination of 251(c)(3) UNEs to one or more facilities or services that a requesting Telecommunications Carrier has obtained at wholesale from Qwest, pursuant to any method other than unbundling under Section 251(c)(3) of the Act, or the combination of an 251(c)(3) UNE or a Combination of 251(c)(3) UNEs with one or more such facilities or services. |
| 9.1.1.1 This Agreement does not provide for the purchase and/or provision of resold telecommunications services with unbundled network elements provided pursuant to section 251 (c)(3) of the Act, or for commingling of resale telecommunications services with other resale telecommunications services. At CLEC's request, the parties will negotiate an amendment to this Agreement governing resale and the commingling of resold telecommunications pursuant to Applicable Law. | 9.1.1.1 Commingling -- CLEC may commingle 251 (c)(3) UNEs and combinations of 251 (c)(3) obtained by any UNEs with any other services method other than unbundling under section 251 (c)(3) of the Act, including switched and special access services offered pursuant to tariff and resale. Qwest will perform the necessary functions to effectuate such commingling upon request. This Agreement does not provide for the purchase and/or provision of resold telecommunications services with unbundled network elements provided pursuant to section 251 (c)(3) of the Act, or for commingling of resale telecommunications services with other |

| Qwest Proposed Language | Covad Proposed Language |
|---|---|
| | resale telecommunications services. |
| | At CLECs |
| | request, the parties will |
| | negotiate an amendment |
| | to this Agreement governing |
| | resale and the |
| | commingling of resold |
| | telecommunications |
| | pursuant to Applicable Law. |

[*49]

**Positions of the Parties**

**Covad**

Covad concedes that Section 271 elements are not required to be commingled with other Section 271 elements. However, Covad contends that Section 271 elements should be considered wholesale facilities and services that may be commingled with Section 251(c)(3) UNEs. Covad asserts that paragraph 579 and footnote 1990 of the *TRO* require BOCs to commingle Section 251(c)(3) UNEs based on the distinct nature of Section 271 elements as wholesale services.

**Qwest**

Qwest argues that the *TRO* does not require BOCs to commingle or combine Section 271 elements with other Section 271 elements or with Section 251(c)(3) UNEs. According to Qwest, the FCC's definition of commingling obligations for Section 251(c)(3) UNEs must be read in conjunction with its determination that Section 271 elements are not required to be combined. Qwest claims that Covad's interpretation of paragraph 579 of the *TRO* is incorrect because Section 271 Checklist Items 4, 5, 6, and 10 do not cross-reference the combination requirements set forth in Section 251.

**Resolution of Issue No. 3**

Paragraph 579 of the FCC's *TRO* states, in part, that:

[*50] An incumbent LEC shall permit a requesting telecommunications carrier to commingle a UNE or a UNE combination with one or more facilities or services that a requesting carrier has obtained at wholesale from an incumbent LEC pursuant to a method other than unbundling under section 251(c)(3) of the Act. In addition, upon request, an incumbent LEC shall perform the functions necessary to commingle a UNE or UNE combination with one or more facilities or services that a requesting carrier has obtained at wholesale from an incumbent LEC pursuant to a method other than unbundling under section 251(c)(3) of the Act. As a result, competitive LECs may connect, combine, or otherwise attach UNEs and combinations of UNEs to wholesale services (e.g., switched and special access services offered pursuant to tariff), and incumbent LECs shall not deny access to UNEs and combinations of UNEs on the grounds that such facilities or services are somehow connected, combined, or otherwise attached to wholesale services.

Paragraph 584 addressed ILEC commingling obligations with respect to Section 251(c)(3) as they relate to resale services provided under Section 251(c)(4). Paragraph 584, as amended by a [*51] subsequent errata to the *TRO* (errata shown in strike through form), also includes the following discussion of ILEC commingling obligations:

As a final matter, we require that incumbent LECs permit commingling of UNEs and UNE combinations with other wholesale facilities and services, including any services offered for resale pursuant to section 251(c)(4) of the Act. n18

n18 *TRO*, P 584, as modified by Errata Order, *In the Matter of Review of the Section 251 Unbundling Obliga-tions of Incumbent Local Exchange Carriers, Implementation of the Local Competition Provisions of the Tele-communications Act of 1996, Deployment of Wireline Services Offering Advanced Telecommunications Capabil-ity*, CC Docket Nos. 01-338, 96-098, 98-147, FCC 03-227 (September 17, 2003), at P 27 ("*Errata Order*").

In considering whether state commissions may independently require ILECs to commingle Section 271 elements with Section 251(c)(3) UNEs, we must first determine whether Section 271 elements are "wholesale" services under [*52] the FCC's commingling definition. We agree with Covad that Section 271 elements are wholesale facilities or services that are obtained from an ILEC by a method other than unbundling under Section 251(c)(3).

With respect to whether the FCC intended to exclude Section 271 elements from commingling obligations entirely, we agree with Covad's interpretation of the *TRO*'s footnote 1990 which (as amended in the *Errata Order*) provides as follows:

We decline to require BOCs, pursuant to section 271, to combine network elements that are no longer re-quired to be unbundled under section 251. Unlike section 251(c)(3), items 4-6 and 10 of section 271's competitive checklist contain no mention of "combining" and, as noted above, do not refer back to the combination requirement set forth in section 251(c)(3). n19

n19 *Errata Order*, P 31.

Given the FCC's removal of the language cited above, it is reasonable to conclude that although ILECs are not re-quired to commingle 271 elements, they must permit requesting carriers [*53] to commingle Section 251(c)(3) UNEs with wholesale services such as Section 271 elements. It is also reasonable to conclude that the FCC's removal of the phrase "any network elements unbundled pursuant to section 271" from paragraph 584 of the *TRO* was not intended to indicate that Section 271 elements are not wholesale services that may be commingled with Section 251 UNEs. We believe it is appropriate for the interconnection agreement to include language regarding commingling of Section 251(c)(3) UNEs with Section 271 elements and we therefore adopt Covad's proposed language regarding commingling of network elements.

**Issue No. 5: What are Qwest's obligations regarding channel regeneration between CLEC collocation sites?**

Regeneration refers to the "boosting" of a digital signal to meet applicable technical standards for a particular type of loop or service (Covad Ex. 3, at 32). Regeneration of a signal is sometimes required if the distance is too great be-tween two CLEC collocation spaces or between a CLEC and an ILEC's switch within the central office. The issue in dispute is whether Qwest is required to provide channel regeneration for CLEC-to-CLEC connections as a wholesale [*54] product, as Covad argues, or whether the FCC's rules and decisions except ILECs from this regeneration obliga-tion (Qwest Ex. 4, at 2). The parties' proposed language is set forth below.

| Qwest Proposed Language | Covad Proposed Language |
|---|---|
| 8.2.1.23.1.4 CLEC is responsible for the end-to-end service design that uses ICDF Cross Connection to ensure that the resulting service meets its Customer's needs. This is accomplished by CLEC using the Design Layout Record (DLR) for the service connection. Regeneration may be required, depending on the distance parameters of the | 8.2.1.23.1.4 CLEC is responsible for the end-to-end service design that uses ICDF Cross Connection to ensure that the resulting service meets its Customer's needs. This is accomplished by CLEC using the Design Layout Record (DLR) for the service connection. Depending on the distance parameters of the combination, regeneration may be |

Qwest Proposed Language combination.

Covad Proposed Language required. Qwest shall assess charges for CLEC to CLEC regeneration, if any, on the same terms and conditions, and at the same rates as ILEC to CLEC regeneration.

8.3.1.9 Channel Regeneration Charge. Required when the distance from the leased physical space (for Caged or Cageless Physical Collocation) or from the collocated equipment (for Virtual Collocation) to the Qwest network is of sufficient length to require regeneration. Channel Regeneration will not be charged separately for Interconnection between a Collocation space and Qwest's network or between non-contiguous Collocation spaces of the same CLEC. Qwest shall charge for regeneration requested as a part of CLEC-to-CLEC Cross Connections under the FCC Access No. 1 tariff, Section 21.5.2. (EICT). Cable distance limitations are addressed in ANSI Standard T 1.102-1993 "Digital Hierarchy-Electrical Interface; Annex B".

8.3.1.9 Channel Regeneration Charges. Required when the distance from CLEC's leased physical space (for Caged or Cageless Physical Collocation) or from the collocated equipment (for Virtual Collocation) to the Qwest network ("ILEC to CLEC regeneration"), to CLEC's non-contiguous Collocation space ("CLEC to CLEC regeneration"), or to the Collocation space of another CLEC ("CLEC to CLEC regeneration") is of sufficient length to require regeneration based on the ANSI Standard for cable distance limitations. Channel Regeneration Charges shall not apply until the Commission approves a wholesale Channel Regeneration Charge. After approval of such charge, Channel Regeneration Charges shall be assessed for ILEC to CLEC and CLEC to CLEC regeneration on the same terms and conditions, and at the same rates. If CLEC requests Channel Regeneration in spite of the fact that it is not required to meet ANSI standards, Qwest will provide such regeneration, and CLEC will pay the Channel Regeneration Charge described herein.

9.1.10 Intentionally left blank
 [*55]

### Positions of the Parties

### Covad

Covad has proposed language for the interconnection agreement that would require Qwest to provide regenerated cross connects between Covad collocations, as well as between a Covad collocation and another CLECs collocation, when requested by Covad. Covad claims that the FCC's cross-connection rules must be viewed in the context of the FCC's intent to protect CLECs from discrimination related to ILEC collocation restrictions. Covad argues that Qwest's proposed language would impose technically infeasible and/or costly requirements on CLECs needing regeneration of cross connects between CLEC collocation spaces. According to Covad, Qwest's requirement that CLECs must self-provision regeneration is contrary to Section 251(c)(6), which requires ILECs to provide physical collocation on terms and conditions that are "just, reasonable, and nondiscriminatory."

Covad cites to the FCC's *Fourth Report and Order* n20 to support its argument that ILECs must provision cross-connections between CLECs. In that Order, the FCC stated its concern that ILECs would be acting in an unreasonable and discriminatory manner if they refused to provide cross-connects [*56] between collocators and that an ILEC's "re-

fusal to provide a cross-connect between two collocated carriers would violate the [ILECs] duties under section 251(c)(6)" (*Id.* at PP 79-80).

n20 *In the Matter of Deployment of Wireline Services Offering Advanced Telecommunications Capability, Fourth Report and Order* ("*Fourth Report and Order*") CC Docket No. 98-147, FCC 01-204 (August 8, 2001).

Covad claims that the exception to the ILEC cross-connect requirement contained in 47 C.F.R. Sec. 51.323(h)(1) n21 assumes that CLECs could self-provision the necessary cross-connects under conditions that would not violate the just and reasonable standards set forth in Section 251(c)(6). Covad contends that although Qwest may make a technically feasible route available between collocators, unlike the facilities available to collocators, Qwest regenerates its own signals at or near mid-span using equipment located near its distribution frame. As a result, Covad argues that Qwest's cross-connect [*57] requirements are discriminatory and should be rejected.

n21 This section states that an ILEC must provide, at the request of a collocating telecommunications carrier, "a connection between the equipment in the collocated spaces of two or more telecommunications carriers, except to the extent the incumbent LEC permits the collocating parties to provide the requested connection for themselves or a connection is not required under paragraph (h)(2) of this section."

## Qwest

According to Qwest, it currently provides several methods for Covad to connect its facilities with other CLEC facilities in Qwest central offices, including by a direct connection and by COCC-X n22. Qwest witness Michael Norman testified that, for direct connections with another CLEC, Covad is responsible for engineering, provisioning, and designing the connection circuit (Tr. 186-187). When COCC-X is used, Covad and the connecting CLEC are responsible for bringing their connections to a common ICDF in the central office, where Qwest provides [*58] a cross-connect or jumper wire connecting the Covad and connecting CLEC facilities (*Id.*). Mr. Norman testified that, in both types of connections, if the circuit length prevents adequate signal strength between the CLEC facilities, regeneration of the signal would be required (Qwest Ex. 4, at 3). Mr. Norman indicated that Covad's collocated facilities have never required regeneration of a signal at any of Qwest's Arizona offices. If regeneration were required, Mr. Norman stated that Covad could purchase a regeneration product called expanded interconnection channel termination ("EICT"), which is available through Qwest's FCC access tariff (Tr. 187).

n22 COCC-X refers to "cross-connection" of facilities on the same interconnection distribution frame ("ICDF") (Tr. I, 186).

As set forth above, Qwest's proposed language provides that Qwest will not charge for regeneration between Qwest's network and Covad's collocation spaces; that Qwest will not charge separately for regeneration for Covad to connect two of its non-contiguous [*59] collocation spaces; and that a connecting CLEC may order the EICT product out of Qwest's FCC 1 Access tariff (Qwest proposed ICA Section 8.3.1.9).

Qwest argues that the FCC has clearly addressed ILEC obligations for regeneration in its *Fourth Report and Order, supra.* Qwest claims that ILECs are required to provide a connection between two CLEC collocation spaces in only two specific instances: 1) if the ILEC does not permit the CLEC to provide the connection for themselves; and 2) pursuant to Section 201 where the requesting carrier submits certification that more than 10 percent of the amount of traffic will be interstate. Qwest contends that since it permits Covad to make its own cross connections, Qwest has no legal obliga-

tion to provide connections, or regeneration of the connection's signal between Covad and another CLEC (Qwest Ex. 4, at 5-6).

Qwest disputes Covad's contention that it is discriminatory for Qwest to charge for regeneration of a CLEC-to-CLEC connection due to economic infeasibility. According to Qwest, the FCC has clearly defined the only instances where regeneration must be provided by ILECs, and cost to the CLEC is not a factor [*60] to be considered. Qwest contends that it makes its collocation space available in a non-discriminatory manner and there is no basis for Covad to claim otherwise. Qwest witness Norman testified that in the event Covad requested collocation space midway between its collocation space and the space of a partnering CLEC, Qwest would make every attempt to accommodate the request subject to space availability (Tr. 200-202). Therefore, Qwest requests that its proposed language on regeneration be adopted in this proceeding.

### Resolution of Issue No. 5

The FCC's rules (47 C.F.R. 51.323(h)(1)) regarding CLEC-to-CLEC connections provide in relevant part:

> (h) As described in paragraphs (1) and (2) of this section, an incumbent LEC shall permit a collocating telecommunications carrier to interconnect its network with that of another collocating telecommunications carrier at the incumbent LEC's premises and to connect its collocated equipment to the collocated equipment of another telecommunications carrier within the same premises, provided that the collocated equipment is also used for interconnection with the incumbent LEC or for access to the incumbent [*61] LEC's unbundled network elements.

> (1) An incumbent LEC shall provide, at the request of a collocating telecommunications carrier, a connection between the equipment in the collocated spaces of two or more telecommunications carriers, *except to the extent the incumbent LEC permits the collocating parties to provide the requested connection for themselves* or a connection is not required under paragraph (h)(2) of this section. Where technically feasible, the incumbent LEC shall provide the connection using copper, dark fiber, lit fiber, or other transmission medium, as requested by the collocating telecommunications carrier. (emphasis added)

There is no dispute that Qwest permits collocating CLECs to provide their own cross connections and thus the FCC's rules make such connections, as well as necessary regeneration, the responsibility of the collocating CLECs. This CLEC responsibility for regeneration of cross connects assumes that the ILEC is in compliance with the requirement set forth in Section 251(c)(6), that the ILEC provides collocation on terms and conditions that are just, reasonable, and nondiscriminatory. The evidence supports Qwest's contention that it provides collocation [*62] in accordance with Section 252(c)(6) and we agree, therefore, that Qwest's proposed language on this issue should be adopted.

### Issue No. 8: What are the appropriate terms for billing and payment due dates, and timing for discontinuance of orders and discontinuance of service for non-payment?

Covad has requested that the due date for payment of bills issued by Qwest should be 45 days for invoices containing: line splitting or loop splitting products; bills without a circuit ID or USOC; or new rate elements, new services, or new features not previously ordered by Covad. Qwest maintains that the payment due date should remain 30 days for all services rendered by Qwest to Covad. The parties' respective proposed language is described below.

| Qwest Proposed Language | Covad Proposed Language |
|---|---|
| 5.4.1 Amounts payable under this Agreement are due and payable within thirty (30) calendar Days after the date of invoice, or within twenty (20) calendar Days after receipt of the invoice, whichever is later (payment due date). If the payment due date is not a business day, the payment shall be due the next business day. | 5.4.1 Amounts payable for any invoice containing (1) line splitting or loop splitting products, (2) a missing circuit ID, (3) a missing USOC, or (4) new rate elements, new services, or new features not previously ordered by CLEC (collectively "New Products") (hereinafter collectively referred to as "Exceptions") are due and payable within forty-five (45) calendar |

Days after the date of invoice, or within twenty (20) calendar days after receipt of the invoice, whichever is later (payment due date) with respect to the New Products Exception, the forty-five (45) day time period shall apply for twelve (12) months. After twelve (12) months' experience, such New Products shall be subject to the thirty (30) day time frame hereinafter discussed. Any invoice that does not contain any of the above Exceptions are due and payable within thirty (30) calendar Days after the date of invoice, or within twenty (20) calendar Days after receipt of the invoice, whichever is later. If the payment due date is not a business day, the payment shall be due the next business day.

5.4.2 One Party may discontinue processing orders for the failure of the other Party to make full payment for the relevant services, less any disputed amount as provided for in Section 5.4.4 of this Agreement, for the relevant services provided under this Agreement within thirty (30) sixty (60) calendar Days following the payment due date. The Billing Party will notify the other Party in writing at least ten (10) business Days prior to discontinuing the processing orders for the relevant services. If the Billing Party does not refuse to accept additional orders for the relevant services on the date specified in the ten (10) business Days notice, and the other Party's non-compliance continues, nothing contained herein shall preclude the Billing party's right to refuse to accept additional orders for the relevant services from the non-complying Party without further notice. For order processing to resume, the billed Party will be required' to make full payment of all charges for the relevant

5.4.2 One Party may discontinue processing orders for the failure of the other Party to make full payment for the relevant services, less any disputed amount as provided for in Section 5.4.4 of this Agreement, for the relevant services provided under this Agreement within thirty (30) calendar Days following the payment due date. The Billing Party will notify the other Party in writing at least ten (10) business Days prior to discontinuing the processing of orders for the relevant services. If the Billing Party does not refuse to accept additional orders for the relevant services on the date specified in the ten (10) business Days notice, and the other Party's non-compliance continues, nothing contained herein shall preclude the Billing Party's right to refuse to accept additional orders for the relevant services from the non-complying Party without further notice. For order processing to resume, the billed Party will be required to make full payment of all charges for the relevant services not disputed in good faith

under this Agreement. Additionally, the Billing Party may require a deposit (or additional deposit) from the billed Party, pursuant to this section. In addition to other remedies that may be available at law or equity, the billed Party reserves the right to seek equitable relief including injunctive relief and specific performance.

5.4.3 The Billing Party may disconnect any and all relevant services for failure by the billed Party to make full payment, less any disputed amount as provided for in Sections 5.4.4 of this Agreement, for the relevant services provided under this Agreement within sixty (60) calendar Days following the payment due date. The billed Party will pay the applicable reconnect charge set forth in Exhibit A required to reconnect each resold End User Customer line disconnected pursuant to this paragraph. The Billing Party will notify the billed Party at least ten (10) business Days prior to disconnection of the unpaid service(s). In case of such disconnection, all applicable undisputed charges, including termination charges, shall become due. If the Billing Party does not disconnect the billed Party's service(s) on the date specified in the ten (10) business Days notice, and the billed Party's noncompliance continues, nothing contained herein shall preclude the Billing Party's right to disconnect any or all relevant services of the non-complying Party without further notice. For reconnection of the non-paid service to occur, the billed Party will be required to make full payment of all past and current undisputed charges under this Agreement for the relevant services. Additionally, the Billing Party will request a deposit (or recalculate the deposit) as

services not disputed in good faith under this Agreement. Additionally, the Billing Party may require a deposit (or additional deposit) from the billed Party, pursuant to this section. In addition to other remedies that may be available at law or equity, the billed Party reserves the right to seek equitable relief including injunctive relief and specific performance.

5.4.3 The Billing Party may disconnect any and all relevant services for failure by the billed Party to make full payment, less any disputed amount as provided for in Section 5.4.4 of this Agreement, for the relevant services within ninety (90) calendar Days following the payment due date. The billed Party will pay the applicable reconnect charge set forth in Exhibit A required to reconnect each resold End User Customer line disconnected pursuant to this paragraph. The Billing Party will notify the billed Party at least ten (10) business Days prior to disconnection of the unpaid service(s). In case of such disconnection, all applicable undisputed charges, including termination charges, shall become due. If the Billing Party does not disconnect the billed Party's service(s) on the date specified in the ten (10) business Days notice, and the billed Party's noncompliance continues, nothing contained herein shall preclude the Billing Party's right to disconnect any or all relevant services of the non-complying Party without further notice. For reconnection of the non-paid service to occur, the billed Party will be required to make full payment of all past and current undisputed charges under this Agreement for the relevant services. Additionally, the Billing Party will request a

specified in Section 5.4.5 and 5.4.7 from the billed Party, pursuant to this Section. Both Parties agree, however, that the application of this provision will be suspended for the initial three (3) Billing cycles of this Agreement and will not apply to amounts billed during those three (3) cycles. In addition to other remedies that may be available at law or equity, each Party reserves the right to seek equitable relief, including injunctive relief and specific performance.

deposit (or recalculate the deposit) as specified in Section 5.4.5 and 5.4.7 from the billed Party, pursuant to this Section. Both Parties agree, however, that the application of this provision will be suspended for the initial three (3) Billing cycles of this Agreement and will not apply to amounts billed during those three (3) cycles. In addition to other remedies that may be available at law or equity, each Party reserves the right to seek equitable relief, including injunctive relief and specific performance.

[*63]

### Positions of the Parties

### Covad

Covad argues that Qwest's wholesale billing system currently produces invoices that require substantial human effort to process and verify. Covad witness Elizabeth Balvin testified that Qwest's invoices are not received by Covad for 5 to 8 days after they are issued (Covad Ex. 1, at 7). Covad also criticizes the fact that Qwest provides only the Billing Telephone Number ("BTN"), rather than the Circuit Identification Number ("CIN"), for line-shared and line-split loops, making electronic verification by Covad impossible (Tr. 266). Covad claims that allowing a 45-day period for review and payment of wholesale bills would enable Covad a meaningful amount of time to review and audit bills for accuracy, which would be beneficial to both parties.

Covad disagrees with Qwest's assertion that this issue should be resolved through the Change Management Process ("CMP"), rather than through arbitration. According to Covad, Qwest has previously refused a request through the CMP to include the CIN on bills issued to Covad. Covad also claims that Qwest has previously agreed to a billing arrangement whereby payment would be due 30 days following receipt [*64] by the CLEC (Tr. 296). Qwest witness William Easton conceded that this arrangement was in effect in a prior agreement with AT&T, but stated that AT&T has now agreed to the same payment terms proposed by Qwest in this proceeding (Id. at 296-297).

Covad agrees that Qwest should have the ability to discontinue processing orders from Covad, and discontinue service to Covad, in the event that Qwest does not receive payment from Covad. However, Covad disagrees with the timing of Qwest's right to discontinue order processing or disconnect. Covad proposes that the time period for such actions should be extended from the 30 days proposed by Qwest to 60 days for discontinuance of order processing, and from Qwest's proposed 60 days to 90 days before Qwest could discontinue service to Covad altogether. Covad argues that its proposal would have only a minimal impact on Qwest's cash flow, compared to the devastating impact on Covad's business if Qwest were to stop processing orders or discontinue service.

### Qwest

Qwest claims that its proposed language regarding payment due dates is consistent with industry standards, and that Covad has abided by the current 30-day timeframe for more [*65] than 5 years without adverse impact. Qwest also contends that Covad has ample remedies available for improper billing, including interest paid to Covad on amounts wrongfully paid. Qwest asserts that Covad has not established that Qwest's billing practices prevent Covad from processing and paying bills within the current 30-day time period.

According to Qwest, although the number of bills subject to manual review by Covad is minimal, other CLECs have agreed to the 30-day timeframe without problem, and Covad itself has accepted the 30-day payment due date when it entered into a Commercial Line Sharing Agreement with Qwest in April 2004 n23 (Qwest Ex. 6, at 6-9; Qwest Ex. 7, at 13). Qwest contends that Covad's proposed language would effectively result in a 15-day interest free loan by Qwest

to Covad, and if other CLECs were to opt-in to such terms, the effect on Qwest would be exacerbated. Qwest argues that its proposal is commercially reasonable, is consistent with industry standards, and has been agreed to by numerous CLECs.

n23 According to Qwest witness Renee Albersheim, the terms of the ICA approved in this proceeding will apply only to grandfathered Covad accounts established prior to October 1, 2003, a customer base that will continue to shrink over time. The Commercial Agreement referenced above applies to all Covad accounts after that date (Tr. II, 321).

[*66]

With respect to the timing of discontinuance of order processing and disconnection of service, Qwest claims that its proposed language is in accord with industry standards and would limit Qwest's financial exposure due to unpaid bills. Mr. Easton pointed out that the potential harm to Covad is minimized due to the requirement that Qwest must provide notice to Covad prior to discontinuance or disconnection (Qwest Ex. 6, at 14, 16-17). In addition, Qwest may pursue the discontinuance and disconnection remedies only if Covad fails to pay the undisputed portion of its bills (*Id.*). Qwest argues that Covad's proposal would place an unfair burden on Qwest, by increasing the risk that Qwest would fail to be made whole in the event of a CLEC's insolvency. Qwest requests that its proposed language on payment of bills, as well as discontinuance of order processing and disconnection of service, be adopted by the Commission.

**Resolution of Issue No. 8**

We believe that Qwest has set forth credible arguments regarding the appropriateness of the 30-day payment due date. Qwest points out that the 30-day due date is the industry standard, and that Covad has agreed to that same standard in [*67] its 2004 Commercial Agreement with Qwest. The 30-day standard is also employed in numerous other CLEC agreements and is contained in Qwest's SGAT. Covad's attempt to limit its proposed 45-day timeframe only to billing for certain circumstances (*i.e.*, new services and missing CINs and USOCs) would likely lead to even further delays and confusion in the processing of bills and payments. We will therefore adopt Qwest's proposed language with respect to payment of bills issued to Covad.

Regarding the discontinuance and disconnection issue, we agree with Qwest that its proposed language is appropriate. As discussed above, Covad does not oppose Qwest's ability to discontinue processing of orders or discontinuance of service for non-payment. Covad simply seeks an additional 30 days beyond what is proposed by Qwest for each of these remedies. As discussed above, Qwest may seek the discontinuance and disconnection remedies only in instances where Covad fails to pay the undisputed portion of its bills and, further, Qwest must provide notice prior to taking such action thereby mitigating the chance that discontinuation or disconnection would occur if Covad failed to pay its bills due to [*68] an oversight. We believe that the Qwest proposal is consistent with industry standards and, after weighing the concerns expressed by Covad with the potential financial risk to Qwest for non-payment, we agree that Qwest's language should be adopted.

* * * *

Having considered the entire record herein and being fully advised in the premises, the Commission finds, concludes, and orders that:

**FINDINGS OF FACT**

1. On June 8, 2004, Covad filed with the Commission its Petition pursuant to 47 U.S.C. § 252(b) of the 1996 Telecom Act.

2. Covad is a Virginia corporation authorized to provide local exchange service in Arizona, and is a competitive local exchange carrier under the Act.

3. Qwest is a Colorado corporation providing local exchange and other services in Arizona, and is a Bell Operating Company and incumbent local exchange carrier under the terms of the Act.

4. On July 6, 2004, Qwest filed a Response to Petition for Arbitration. On July 21, 2004, Qwest filed a Motion to Dismiss Portions of Covad's Petition for Arbitration. Qwest's Motion requested a Commission Order dismissing Issue 2

in Part G of Covad's Petition, to the extent Covad seeks [*69] Commission authority to: require Qwest to provide unbundled network elements pursuant to Section 271 of the Act; set UNE rates that Qwest provides under Section 271; or require Qwest to provide UNEs under state law in a manner that conflicts with the access ordered by the Federal Communications Commission in its Triennial Review Order.

5. A Procedural Conference was conducted on August 9, 2004 to discuss scheduling and other procedural issues. The parties agreed on dates for filing testimony, conducting the hearing, and filing of briefs. A schedule for filing pleadings regarding Qwest's Motion to Dismiss, and for oral argument on the Motion, was also discussed.

6. Pursuant to the schedule established at the August 9, 2004 Procedural Conference, Covad filed its Response to Qwest's Motion to Dismiss on August 16, 2004; the Commission's Utilities Division Staff filed its Opposition to Qwest's Motion to Dismiss on August 31, 2004; and Qwest filed its Combined Reply to the Responses of Staff and Covad on September 10, 2004. On September 29, 2004, Qwest, Covad, and Staff filed their respective Comments regarding the effect on this proceeding of the FCC's interim unbundling rules and Notice [*70] of Proposed Rulemaking.

7. By Procedural Order issued October 6, 2004, in accordance with the schedule requested by the parties, oral argument on Qwest's Motion to Dismiss was set for December 15, 2004, and the hearing was scheduled to commence on February 7, 2005. The Procedural Order also set dates for submitting pre-filed testimony.

8. On December 20, 2004, Covad filed the Direct Testimony of Michael Zulevic and Elizabeth Balvin, and Qwest filed the Direct Testimony of William Easton, Karen Stewart, and Michael Norman.

9. A Procedural Conference was conducted on January 6, 2005 to discuss scheduling of witnesses and the status of the previously scheduled oral argument. During the Conference, Covad and Qwest agreed that no ruling on the Motion to Dismiss should be made prior to the February 7, 2005 arbitration hearing, and the parties would brief the issues raised by Qwest's Motion to Dismiss as part of their post-hearing briefs on all of the disputed arbitration issues.

10. On January 18, 2005, Covad filed the Rebuttal Testimony of Michael Zulevic and Elizabeth Balvin, and Qwest filed the Rebuttal Testimony of William Easton, Karen Stewart, Renee Albersheim, and Michael Norman. [*71]

11. On January 31, 2005, Covad filed the Joint Issues Matrix setting forth the issues that had been resolved through negotiation and the issues that remained in dispute.

12. Hearings were held February 7 and 18, 2005 at the Commission's offices in Phoenix, Arizona.

13. Post-hearing briefs were filed by Covad and Qwest on March 11, 2005. Reply briefs were filed on March 28, 2005.

14. On June 3, 2005, July 20, 2005, and August 1, 2005 Qwest and Covad filed various decisions by other state commissions as Supplemental Authority.

15. By Procedural Order issued August 12, 2005, Covad, Qwest and Staff were directed to file statements by August 26, 2005 regarding the impact on this proceeding, if any, of the FCC's August 5, 2005 decision to eliminate facilities sharing requirements on facilities-based wireline broadband Internet access service providers.

16. On August 26, 2005 Covad filed a Statement indicating that the FCC's decision will have no impact on any of the issues in this arbitration docket.

17. On August 26, 2005, Qwest filed a Statement that the FCC's Decision potentially would have a profound effect of this proceeding, and further deliberation should be undertaken once the FCC's [*72] Decision is issued.

18. On August 26, 2005, Staff filed a Request for Extension to File Comments. Staff stated that it would need at least three weeks from the date the FCC's Decision was issued to offer a response on the effect of the FCC's Decision.

19. By Procedural Order issued August 30, 2005, Staff's request for an extension of time was granted.

20. On September 22, 2005, Qwest filed a Fourth Notice of Supplemental Authority in the form of an Order issued by the Oregon Public Utility Commission (Order No. 05-980, issued September 6, 2005, *In the Matter of Covad Communication Company Petition for Arbitration*).

21. On October 24, 2005, Qwest filed a Fifth Notice of Supplemental Authority in the form of a Recommended Decision of the Hearing Examiner of the New Mexico Public Regulation Commission (Case No. 04-00208-UT, issued October 14, 2005, *In the Matter of Covad Communication Company Petition for Arbitration*).

22. On November 3, 2005, Staff filed a Request for Procedural Order. Staff stated that the FCC had issued the anticipated Decision on September 23, 2005, and Staff therefore requested that a Procedural Order should be issued allowing two additional weeks for the [*73] parties to comment on the impact of the FCC's Order on the issues raised in this proceeding.

23. On November 7, 2005, a Procedural Order was issued directing Staff, Covad, and Qwest to file comments regarding the impact of the FCC's Order on this proceeding, by no later than November 21, 2005.

24. On November 21, 2005, Covad filed a Second Notice of Supplemental Authority in the form of an Arbitration Order issued by the Tennessee Regulatory Authority (Docket No. 03-00119, issued October 20, 2005, *Petition for Arbitration of ITC Deltacom Communications, Inc. with Bellsouth Telecommunications, Inc.*).

25. On November 21, 2005, Covad filed its Comments Regarding the FCC's *Broadband Order*. Covad contends that nothing in the *Broadband Order* affects the issues presented in the arbitration petition that is before the Commission in this docket.

26. On November 21, 2005, Qwest filed its Comments Relating to the FCC's *Wireline Broadband Order*. Qwest argues that the FCC's Broadband Order does affect the arbitration issues, especially with respect to Covad's "alternative service" proposal for copper loop retirements. Qwest also claims that the *Broadband Order* draws into question [*74] whether Covad is a telecommunications carrier entitled to an interconnection agreement, or whether Covad is an information services provider.

27. On November 21, 2005, Staff filed a Statement regarding the *Broadband Order's* effect of this arbitration proceeding. According to Staff, the *Broadband Order* "would have no impact on the unbundling issues raised in this case, to the extent Covad seeks the unbundled network elements to provide a telecommunications service." Staff cites to the FCC's statement that "nothing in this Order changes a requesting telecommunications carrier's UNE rights under section 251 and our implementing rules" (*Broadband Order*, at P127).

28. On December 2, 2005, Covad filed a *Reply to Qwest's Comments Regarding the FCC's Broadband Order*. Covad contends that the FCC has already responded to the question raised by Qwest and found that the *Broadband Order* has no effect on Covad's rights under 47 U.S.C. § 251 and, by extension, 47 U.S.C. § 252. Covad claims that Qwest's arguments ignore the FCC's specific statement that the *Broadband Order* does not impact UNE and interconnection [*75] issues. Covad also argues that the Commission has already determined that Covad is a telecommunications carrier pursuant to the granting of a CC&N for the provision of such services.

29. Based on review of the various arguments regarding the impact of the FCC's *Broadband Order* on the issues presented herein for arbitration, the arbitration issues are properly before the Commission for consideration in this proceeding.

30. The parties submitted five issues to be arbitrated in this proceeding. The Commission has analyzed the evidence presented at the hearing, as well as the legal arguments raised in the briefs filed in this docket, and has resolved the issues as stated in the Discussion above.

31. The Commission hereby adopts the Discussion above and incorporates the parties' positions and the Commission's resolution of the issues described herein.

32. Pursuant to A.A.C. R14-2-1506(A), the parties will be ordered to prepare and sign an interconnection agreement incorporating the issues as resolved by the Commission, for review by the Commission pursuant to the Act, within 30 days from the effective date of this Decision.

**CONCLUSIONS** [*76] **OF LAW**

1. Covad and Qwest are public service corporations within the meaning of Article XV of the Arizona Constitution.

2. Covad and Qwest are telecommunications carriers within the meaning of 47 U.S.C. § 252.

3. The Commission has jurisdiction over Covad and Qwest and of the subject matter of the Petition.

4. The Commission's resolution of the issues described herein is just and reasonable, meets the requirements of the 1996 Telecom Act and regulations prescribed by the FCC pursuant to the Act, is consistent with the best interests of the parties, and is in the public interest.

**ORDER**

IT IS THEREFORE ORDERED that the Commission hereby adopts and incorporates as its Order the resolution of the issues contained in the Discussion above.

IT IS FURTHER ORDERED that Covad and Qwest shall prepare and sign an interconnection agreement incorporating the terms of the Commission's Decision herein.

IT IS FURTHER ORDERED that the signed interconnection agreement shall be submitted to the Commission for its review within 30 days of the effective date of this Decision.

IT IS FURTHER ORDERED that Qwest's Motion to Dismiss is denied in accordance with [*77] the discussion and resolution set forth hereinabove regarding Issue 2 in Covad's Petition for Arbitration.

IT IS FURTHER ORDERED that this Decision shall become effective immediately.

BY ORDER OF THE ARIZONA CORPORATION COMMISSION.