<u>__California 271 Order,__</u>
**2006 Cal. PUC LEXIS 37, at \*38**

LEXSEE

Application of Pacific Bell Telephone Company, d/b/a SBC California for Generic Proceeding to Implement Changes in Federal Unbundling Rules Under Sections 251 and 252 of the Telecommunications Act of 1996

Decision 06-01-043; Application 05-07-024

California Public Utilities Commission

2006 Cal. PUC LEXIS 33

January 26, 2006, Dated; July 28, 2005, Filed

**CORE TERMS:** loop, wire, transition, customer, transport, commingling, network, conversion, unbundled, carrier, tariff, interconnection, non-impaired, fiber, self-certification, unbundling, copper, high-capacity, wholesale, incumbent, requesting, designation, dedicated, dark, competitive, hybrid, fiber-based, commingled, collocation, residential

**PANEL:** [*1] MICHAEL R. PEEVEY, President; GEOFFREY F. BROWN; SUSAN P. KENNEDY; DIAN M. GRUENEICH; RACHELLE B. CHONG, Commissioners

**OPINION: DECISION ADOPTING AMENDMENT TO EXISTING INTERCONNECTION AGREEMENTS**

## I. Summary

In this decision, we adopt an amendment to the existing interconnection agreements (ICAs) that various Competitive Local Exchange Carriers (CLECs) have with SBC California (SBC). This change-of-law proceeding results from changes in federal unbundling obligations of Incumbent Local Exchange Carriers (ILECs). The Commission directed SBC to negotiate amendments to its ICAs with CLECs in order to implement the changes in unbundling rules and to initiate a consolidated proceeding to resolve any disputed issues. The purpose of this proceeding is for the Commission to resolve those issues on which parties were unable to come to agreement.

## II. Background

Pacific Bell Telephone Company d/b/a SBC California (SBC) filed its application to initiate a generic proceeding to amend the existing ICAs between SBC and various CLECs on July 28, 2005. In orders issued in 2003 and 2005, known, respectively, as the *Triennial Review Order* (TRO) n1 and the *Triennial Review Remand Order* (TRRO), [*2] n2 the Federal Communications Commission (FCC) eliminated or restricted the unbundling obligations for numerous Unbundled Network Elements (UNEs). Because the bulk of SBC's ICAs were negotiated and arbitrated before the *TRO* and *TRRO* were issued, those agreements for the most part do not embody the significant changes to the unbundling rules reflected in those FCC orders.

n1 *In the Matter of Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers, Report and Order and Order on Remand and Further Notice of Proposed Rulemaking, 18 FCC Rcd. 16978,* FCC 03-36 (2003)(TRO).

n2 *In the Matter of Unbundled Access to Network Elements; Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers, Order on Remand, 20 FCC Rcd 2533,* FCC 04-290 (rel. Feb. 4, 2005) (TRRO).

In the wake of the *TRRO*, this Commission issued the *TRO Closure* Order, which closed its TRO proceeding. The Commission also directed SBC to negotiate amendments [*3] to its ICAs with CLECs in order to implement the *TRRO* and to initiate a consolidated proceeding to resolve any disputed issues. Accordingly, SBC filed its application.

We reiterate the September 23, 2005 Ruling by the Administrative Law Judge (ALJ) that any carrier with an interconnection agreement with SBC that has a dispute over the change-of-law provisions related to the FCC's *TRO* and *TRRO* orders will be subject to the outcome of this proceeding. The Commission does not intend to conduct individual arbitrations to implement change-of-law provisions relating to the two FCC orders. SBC was required to send a copy of the Ruling to each carrier with whom it has an interconnection agreement so that any carrier that wanted to could take an active role in the proceeding.

The CLECs filed a consolidated response to SBC's application on September 16, 2005. That filing included a markup of the disputed issues in the amendment. Following a series of telephone conference calls with the parties to the proceeding, the assigned ALJ issued a Ruling on October 6, 2005 that established a procedural schedule for the proceeding.

The proceeding will proceed in three separate tracks. The [*4] first track involves disputed issues that do not require hearings. Parties filed Opening Briefs on those issues on October 28, 2005, and Reply Briefs on November 14, 2005. Those issues are the subject of this decision.

A separate procedural schedule was adopted for the Batch Hot Cut portion of the proceeding. Finally, one issue area was set aside for hearing to resolve disputed issues of fact. That issue, the rate for Routine Network Modifications (RNM) and the RNM parity issue was addressed in arbitration hearings November 28-30 and December 1, 2005. Opening Briefs were filed on RNM issues on January 9, 2006 and Reply Briefs, January 25, 2006. Those issues will be addressed in a subsequent Commission order.

## III. Disputed Issues

The parties brought 44 disputed issues for the Commission that are resolved in this decision. This count excludes six disputed issues that relate to Routine Network Modifications and Batch Hot Cuts, that will be addressed separately.

### A. Issue 1: Section 0.1.1 -- Which parties' definition of "building" should be used in the Amendment?

In the *TRRO*, the FCC limited a CLEC's right to purchase unbundled DS1 and DS3 loops to a maximum of 10 DS1 Loops, [*5] and one DS3 loop in any single "building." Unfortunately, the FCC did not provide a definition of a "building" or a "single building" so we must do so in this amendment.

SBC claims that its proposed definition of a building is the closer of the two to the commonly understood meaning of "single building." However, we find that SBC's definition of a building is much too broad. One portion of the SBC definition reads as follows:

An educational, industrial, governmental or medical premises or campus shall constitute a single building for purposes of the DS1 and DS3 loop caps provided that all of the structures are located on the same continuous property and the DS1 and/or DS3 loops are terminated at a single structure and are subsequently routed throughout the premises or campus. . . .

In other words, an entire college campus would be considered a single building, even though there could be dozens of actual physical buildings on the campus. SBC presents this definition because it would limit the number of DS1's and/or DS3's available to a requesting CLEC. SBC's definition goes far beyond the clear meaning of the phrase "single building."

At the same time, the CLECs' proposed definition [*6] is also self-serving. The CLECs add the caveat that a single building "is a structure under one roof with a single MPOE [Minimum Point of Entry]." In their brief, the CLECs give the example of a shopping mall, with MPOE's at either end. Under the CLECs' proposed definition, they would be entitled to have 10 DS1's at *each* MPOE, even though the two MPOEs are located in a structure under one roof.

Rather than adopt either definition, we will amend the definition in Section 0.1.1 to give a simple definition of a single building that we believe comports with the FCC's intent in its *TRRO* order. The following language is adopted for Section 0.1.1:

0.1.1 For purposes of this Attachment relative to the DS1 and DS3 loop caps as defined in the TRRO Rules 51.319(a)(4)(ii) and 51.319(a)(5)(ii), a "building" or a "single building" is a structure under one roof. Two or more physical structures that share a connecting wall or are in close physical proximity shall not be considered a single building solely because of a connecting tunnel, covered walkway, a shared parking garage or parking area.

**B. Issue 2: Sections 0.1.2, 0.1.3, 0.1.4, and 0.1.5 -- (a) is SBC required to provide FTTH, [*7] FTTC and Hybrid Loops on an unbundled basis for customers that are not defined as "mass market" customers, or, in the case of multiple-dwelling units (MDUs), MDUs that are not "predominantly residential"? (b) If so, then how should the amendment define "mass market"? (c) If so, then how should the amendment define "predominantly residential" MDUs?**

This dispute concerns the scope of SBC's unbundling obligations with respect to fiber-to-the home (FTTH), fiber-to-the-curb (FTTC), and hybrid loops. The CLECs propose to limit the definition of these loops to those serving "mass market" customers, while SBC asserts that the FCC's no-unbundling determination applies regardless of what type of customer the CLEC seeks to serve with a fiber loop.

Rule 51.319(a)(3)(i) as originally written, spoke of fiber loops that are deployed to "a residential unit," but the FCC subsequently issued an errata in which it replaced "residential unit" with the customer-neutral term "end user's customer premises." The CLECs contend that the FCC intended its FTTH and FTTC rules to be confined to "mass market" customers, and not to cover the DS1's and DS3's typically purchased by enterprise customers.

The CLECs [*8] state that SBC's proposed definitions of FTTH and hybrid loops are broad enough to encompass DS1 and DS3 loops, since most such loops are provisioned over fiber. The CLECs say that SBC seeks the ability to deny CLECs unbundled access to DS1 loops that serve enterprise customers on the grounds that the FCC's FTTH and hybrid loop rules apply to them. According to the CLECs, the TRO rejected such a result:

> DS1 loops will be available to requesting carriers, without limitation, regardless of the technology used to provide such loops . . . The unbundling obligation associated with DS1 loops is in no way limited by the rules we adopt today with respect to hybrid loops typically used to serve mass market customers. n3

n3 *TRO*, P 325, n. 956.

We find it significant that the sections on FTTH loops (PP 273-284) and hybrid loops (PP 285-297) appear in a section of the *TRO* titled "Specific Unbundling Requirements for Mass Market Loops." Clearly, the FCC did not anticipate that the rules adopted for FTTH and hybrid [*9] loops would apply to enterprise loops. The CLECs' proposed language in Sections 0.1.2, 0.1.3 and 0.1.4, which limits the rules to mass market customers is adopted. As the CLECs state, if enterprise loops were included, CLECs would be denied the ability to receive unbundled access to most DS1 loops, which the FCC clearly did not intend, as the language cited above illustrates.

The parties also dispute the definition of "predominantly residential" MDU. In its *MDU Order*, n4 the FCC adopted an additional clarification to the mass market/enterprise dichotomy for MDUs that house both mass market and enterprise customers. Rather than establish different access rates for different customers in the same building, the FCC granted unbundling relief for "predominantly residential" MDUs and left unbundling obligations in place for other non-predominantly residential MDUs. Unfortunately, the FCC did not provide a definition of the term "predominantly residential."

n4 Order on Reconsideration, *Review of Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers,* 19 FCC Rcd 15856 (2004) ("*MDU Order*").

[*10]

SBC proposes that an MDU that allocates more than 50 percent of the rental square footage to residences would be considered "predominantly residential." The CLECs on the other hand, propose 75 percent. SBC urges the Commission to use the dictionary definition of "predominant," which according to SBC is typically defined as "to be of or have a greater quantity or importance, preponderate." n5 SBC also points out that under the CLECs' definition, many buildings would fall into limbo, with no category. For example, an apartment complex that allocates 60 percent of its rentable square footage to residences, would not be "predominantly residential" because it falls below the CLECs' 75 percent threshold. We agree with SBC, that under the CLECs' definition, MDUs that are up to 74 percent residential would not be considered "predominantly residential." That does not make sense. We will adopt SBC's proposed language in Section 0.1.2.

n5 SBC citing *Webster's Third New International Dictionary of the English Language* (2002).

[*11]

The parties dispute the definition of a "mass market customer." SBC asserts that it is a residential customer or a very small business customer. SBC states that a very small business customer would have 23 or fewer DS-0s, while the CLECs assert a very small business customer would have less than four DS-0's. We concur with the CLECs, and adopt their definition in Section 0.1.5. A "very small business" is much more likely to have only a few business lines, and is not likely to be served by 23 DS-0s.

**C. Issue 3: Section 0.1.10 -- Should stand-alone UNE loops used to serve residential customers be counted as "business lines" for purposes of the wire center non-impairment determinations for high-capacity loops and transport? Should UNE loops used only to provide non-switched services be counted as "business lines" for purposes of the wire center non-impairment determination for high-capacity loops and transport?**

In the *TRRO*, the FCC determined that CLECs are not impaired without access to DS3 high-capacity loops in wire centers with at least 38,000 business lines and four or more unaffiliated fiber-based collocators, and that CLECs are not impaired without access to DS1 loops [*12] in wire centers with at least 60,000 business lines and four or more unaffiliated fiber-based collocators. The FCC also adopted similar rules for high-capacity transport.

The dispute in Issue 3 centers around the definition of "business lines." As SBC points out, the FCC's rule in § 51.5 reads in part, "The number of business lines in a wire center shall equal the sum of all incumbent LEC business switched access lines, plus the sum of all UNE loops connected to that wire center, including UNE loops provisioned in combination with other unbundled elements." SBC uses this as evidence that the FCC intended to include all UNE loops in the count, including those used to provide residential service.

The CLECs would have us believe that the term UNE loops should be considered those "used to serve a business customer." However, the FCC's rule Section 51.5 mirrors the language in P 105 which states in part: "The BOC wire center data that we analyze in this Order is based on ARMIS 43-08 business lines, plus business UNE-P, plus UNE-loops." Since the FCC uses the phrase "UNE loops" in both the discussion and in its rule, we must assume that that is exactly what the FCC meant.

SBC points out [*13] that paragraph 114, footnote 322 explains how the FCC compiled the data it used regarding the relationship between business access line counts and fiber-based collocations in the Bell Operating Companies' (BOCs) wire centers for purposes of establishing the tiers. Because the initial record evidence on this point varied from one BOC to another and did not show evidence of wire centers below 5,000 business lines, the BOCs each filed revised data sets, all based on the same definition of business line, and including all wire centers.

SBC states that the FCC stressed that it wanted a rule that would be easy to administer, using data readily available to ILECs. According to SBC, they do not have the information necessary to determine how a CLEC is using its UNE loops. When SBC provides a UNE loop to a CLEC, the loop is terminated at a collocation arrangement. SBC does not know the service that the CLEC actually provides to the end user over the loop. Similarly, SBC does not possess the information necessary to distinguish between the UNE loops the CLECs are using to provide business service and the UNE loops the CLECs are using to provide residential service to an end user.

We agree with [*14] SBC that they do not have the information necessary to distinguish UNE loops used by CLECs to serve residential customers versus business customers. Also, the FCC's language is clear that all UNE loops are to be included in the count. SBC's proposed language relating to Issue 3 is adopted in Section 0.1.10.

**D. Issue 3A: Section 0.1.10 -- How should Centrex and PBX trunks and Centrex extensions be counted for purposes of the "business line" tallies for purposes of the wire center non-impairment determinations for high capacity loops and transport?**

Issue 3A involves how business lines should be defined and counted for purposes of determining whether a wire center meets the FCC's tests for non-impairment with respect to high capacity loops and transport. According to the CLECs, the total number or business lines in a particular, wire center is equal to the number of simultaneous connections between end-user business customers and the Public Switched Telephone Network (PSTN) that can be established at that wire center. The CLECs state that their proposed terms recognize that Centrex users cannot place simultaneous calls to the PSTN from each Centrex station.

SBC counters the CLEC [*15] proposal, saying that the business line count the FCC is using is based on ARMIS 43-08 business line counts. SBC points out that ARMIS Table II, cols. (ce) states: "For service that is provided by equipment connecting a Centrex-Co on the telephone company premises to station equipment on the customer's premises . . . enter the total number of analog circuits and 64 kilobits (kb) per second or equivalent digital circuits, including ISDN-based Centrex-CO Lines." SBC's proposed language in Section 0.1.10 relating to Issue 3A is adopted. SBC's language is consistent with the FCC's method of counting Centrex lines, while the CLEC's proposal to count nine Centrex extensions as one line is not.

**E. Issue 4: Section 0.1.13 -- Should an entity that is subject to a binding agreement that, if consummated, would result in its becoming an affiliate of SBC be counted as an SBC-affiliated fiber-based collocator for purposes of the non-impairment determinations for high-capacity loops and transport prior to the consummation of such an affiliation?**

The disputed language relates to the definition of a fiber-based collocator. The CLECs propose to add language to make it clear the term "fiber-based [*16] collocator" does not apply to SBC, any affiliate of SBC, or any entity that is currently subject to a binding agreement that, if consummated, would result in its becoming an affiliate of SBC.

SBC points out that in P 102, the FCC states:

> In tallying the number of fiber-based collocators for purposes of our transport impairment analysis, parties shall only count multiple collocations at a single wire center by the same or affiliated carriers as one fiber-based collocation."

Parties' initial briefs were submitted before the FCC approved the merger of SBC and AT&T. SBC states that in connection with the FCC's approval of the proposed SBC/AT&T merger, SBC committed to the following:

> Within 30 days after the Merger Closing Date, SBC/AT&T shall exclude fiber-based collocation arrangements established by AT&T or its affiliates in identifying wire centers in which SBC claims there is no impairment pursuant to Section 51.319(a) and (e) of the Commission's rules. To the extent SBC has submitted to the FCC or a state commission collocation data or lists of wire centers that meet or do not meet the impairment test for DS1 or DS3 loop or transport facilities, SBC/AT&T shall file with [*17] the FCC and such state commission, within thirty days of the Merger Closing Data, revised data or lists that reflect the exclusion of AT&T collocation arrangements, as required by this condition. n6

n6 SBC citing Letter from Thomas F. Hughes, Vice President -- Federal Regulatory, SBC Services, Inc. to Marlene H. Dortch, Secretary, FCC, Attach. At 1, WC Docket No. 05-65 (Oct. 31, 2005)) Reply Exh. 6).

SBC states that in light of SBC's commitment, the issue is currently moot. The CLECs disagree, saying that SBC has taken the position that even merger conditions are waived if they are not included in an ICA.

SBC objects to the language proposed by the CLECs, saying it would apply to future mergers, which is contrary to the FCC's rules. We disagree with SBC's conclusion that the CLECs' proposed language applies to future mergers. That language refers only to "SBC, any affiliate of SBC, or any entity that is currently subject to a binding agreement that, if consummated, would result in its becoming an affiliate of SBC." [*18] The use of the word "currently" would limit the application to any binding agreement in effect at the time the Amendment goes into effect.

**F. Issue 5: Section 0.1.16 -- Should SBC be required to permit, and to perform the functions necessary to enable, CLECs to commingle Section 271 elements with other SBC wholesale facilities and services, including but not limited to UNEs?**

According to SBC, the FCC made it clear that ILECs are not required to combine or commingle UNEs under Section 271. As the FCC said in the *TRO:* "We decline to require BOCs, pursuant to section 271, to combine network elements that no longer are required to be unbundled under section 251." n7 Furthermore, asserts SBC, while the *TRO* originally listed Section 271 elements in the context of commingling obligations in paragraph 584, the *TRO Errata* specifically removed this reference, thus confirming that commingling obligations do not extend to Section 271 elements. (See *TRO Errata* P 27.)

n7 *TRO* P 655 n. 1990.

The CLECs counter [*19] SBC's argument saying that SBC's reference to the *TRO Errata* is incomplete and misleading. While the FCC's *Errata* struck a reference to P 584 of the TRO that BOCs were required under Section 251 to commingle Section 271 elements, SBC fails to mention that the *Errata* also struck the reference to footnote 1990 of the *TRO*, which SBC cited above in support of its position. While the FCC struck those contradictory references, the FCC did retain P 579, which gives broad authority for commingling:

> By commingling, we mean the connecting, attaching, or otherwise linking of a UNE, or a UNE combination, to one or more facilities or services that a requesting carrier has obtained at wholesale from an incumbent LEC pursuant to any method other than unbundling under Section 251(c)(3) of the Act, or the combining of a UNE or UNE combination with one or more such wholesale services.

The FCC's rule on commingling, Section 51.309(e), similar to P 579 cited above, includes no prohibition on commingling UNEs with Section 271 elements. There is no question that Section 271 elements are wholesale elements. If the FCC had intended to bar the commingling of UNEs with Section 271 elements, [*20] it would have made changes to P 579 and Section 51.309(e) at the time that it made changes to P 584 and footnote 1990. It did not do so. Therefore, we are left with the plain language of Section 51.309(e) and P 579, which clearly allow for the commingling of UNEs with Section 271 elements.

Second, the CLECs assert that SBC's desired exemption for Section 271 elements directly contravenes the *TRO's* unambiguous holding that "a restriction on commingling would constitute an dunjust and unreasonable practice' under § 201 of the 1996 Act, as well as an undue and unreasonable prejudice or advantage under § 202 of the Act.'"

Both SBC and the CLECs cite findings by other state commissions on this issue, and both sides have support for their position. While we find the analysis and findings of other state commissions of interest, they are not binding on this Commission.

Still we find the following citation from the Washington State Utilities and Transportation Commission's rationale for requiring commingling of Section 251 and Section 271 network elements in an arbitration order between Qwest and Covad to be pertinent to this discussion:

> The next question is whether the FCC has [*21] excluded Section 271 elements as a whole from commingling obligations, as Qwest asserts, or allows Section 251(c)(3) UNEs to be commingled with Sec-

tion 271 elements, as Covad claims. We find Covad's interpretation of paragraph 1990 persuasive, and reverse the Arbitrator's decision on this point as well. The FCC removed language from footnote 1990 that would support Qwest's expansive view prohibiting any commingling of Section 271 elements. The subject of the FCC's commingling definition is Section 251(c)(3) UNEs, not wholesale services. It is reasonable to infer that BOCs are not required to apply the commingling rule by commingling Section 271 elements with other wholesale elements, but that BOCs must allow requesting carriers to commingle Section 251(c)(3) UNEs with wholesale services, such as Section 271 elements. The D.C. Circuit's decision in *USTA II* supports this finding. The D.C. Circuit approved the FCC's finding that "in contrast to ILEC obligations under Section 251, the independent Section 271 unbundling obligations didn't include a duty to combine network elements."

We also agree with Covad that the phrase "any network element unbundled pursuant to Section 271" was [*22] removed from paragraph 584 of the Triennial Review Order in order to allow the paragraph to address commingling of resale services, not to imply that Section 271 elements are not wholesale services. Given other language in the Triennial Review Order, and with no explanation from the FCC as to the omitted language, it does not appear appropriate to place the weight Qwest proposes to the deleted language.

We find it appropriate, and consistent with federal law, to include language addressing commingling of Section 251(c)(3) UNEs with Section 271 elements in the agreement, as there is a direct connection with interconnection obligations under Section 251(c)(3). Our authority to require commingling of Section 251(c)(3) UNEs with wholesale Section 271 elements is found not under Section 271, but rather under Section 252(c)(1), which requires us to ensure that interconnection agreements meet the requirements of Section 251, including the FCC's regulations addressing commingling. n8

n8 Final Order Affirming, In Part, Arbitrator's Report and Decision, Granting, In Part, Covad's Petition for Review; requiring Filing of Conforming Inter-Connection Agreement. *In the Matter of The Petition for Arbitration of Covad Communications Company with Qwest Corporation Pursuant to 47 U.S.C. Section 252(b) and the Triennial Review Order*, Washington State Utilities and Transportation Commission, at 26 (Feb. 9, 2005).

[*23]

We find that the commingling of UNEs with Section 271 elements is consistent with applicable law. In reaching that conclusion we concur with the Washington Commission find that our authority to require commingling of Section 251(c)(3) UNEs with wholesale Section 271 elements is found not under Section 271, but rather under Section 252(c)(1), which requires a state commission to ensure that ICAs meet the requirements of Section 251, including the FCC's regulations addressing commingling. The CLECs' proposed language in Section 0.1.16 shall be adopted.

**G. Issue 6: What are the appropriate definitions for seven items:**

**a. Section 0.1.20 -- "line splitting"**

SBC states that the definition the CLECs proposes to add is unnecessary and improper. According to SBC, line splitting is not a proper subject for a proceeding to implement the *TRO* and *TRRO*, neither of which changed the rules regarding line splitting. The CLECs' definition of line splitting would refer to a serving arrangement that could involve the provision of voice and data on a single loop by a single CLEC, or the provision of voice and data on a single loop by two different CLECs. SBC proposes a definition that [*24] would limit the definition to a situation in which two different CLECs provide the voice and data service on a single loop.

According to SBC, the FCC makes it clear that the CLEC is providing DSL service over the high frequency portion of the loop, not "data or advanced services," as the CLECs propose. In addition, the CLECs eliminate the word "copper," which would appear to allow them to obtain line splitting over hybrid and fiber loops, in spite of the fact that line splitting is found in the FCC's rules for copper loops. In Section 51.319, the FCC defines line splitting as follows:

An incumbent LEC shall provide a requesting telecommunications carrier that obtains an unbundled *copper* loop from the incumbent LEC with the ability to engage in line splitting arrangements with an-other competitive LEC. . . . Line splitting is the process in which *one competitive LEC* provides narrow-band voice service over the low frequency portion of a copper loop *and a second competitive LEC* pro-vides digital subscriber line service over the high frequency portion of the same loop. n9

n9 47 C.F.R. § 51.319(a)(1)(ii) (emphasis added).

[*25]

The FCC's definition in Section 51.319 demonstrates that the FCC clearly envisions that two different CLECs will be involved in the line splitting process. SBC's definition for line splitting in Section 1.20 is adopted. We disagree with SBC's assertion that there is no need for a definition of line splitting in this amendment. The more clarity we can pro-vide in the ICA, the fewer disputes we will see down the road.

**b. Section 0.1.21 -- "local loop"**

SBC opposes two items that CLECs propose to add to the definition of local loop, dark fiber and integrated digital loop carrier (IDLC) loops. As SBC points out, Rule 51.319(a)(6) provides as follows:

[a]n incumbent LEC is not required to provide requesting telecommunications carriers with access to a dark fiber loop on an unbundled basis.

The FCC established an 18-month transition period for pre-existing dark fiber arrangements, but in Rule 51.319(a)(6)(ii), the FCC states "Requesting carriers may not obtain new dark fiber loops as unbundled network ele-ments." Therefore, we believe it would be inappropriate to include a definition for dark fiber loops that would be in ef-fect for the life of this amendment. Section 3.2 in the amendment [*26] makes it clear that CLECs are entitled to re-ceive dark fiber over the 18-month transition period.

SBC is correct that it is not required to provide access to IDLC loops except for one limited purpose: a "non-packetized transmission path capable of voice-grade service . . . between the central office and customer's premises." The FCC makes clear that the unbundling obligation for IDLC loops is limited to narrowband service using the TDM-based features, functions and capabilities of those hybrid loops.

In their comments on the DD, the CLECs indicate that they simply want to ensure that SBC's obligation to provide dark fiber exists during the requisite transition period. The CLECs acknowledge that undisputed language in Section 3.1.1 states that SBC is no longer required to provide unbundled access to dark fiber loops. Section 3.2, however, im-plements the requirement that dark fiber lops must nevertheless be provided during an 18-month transition period. As to IDLC-provisioned loops, the CLECs assert that these are clearly a type of loop that ILECs are required to provide on an unbundled basis. SBC's definition of a local loop in Section 0.1.21 is adopted, with the additional language [*27] pro-posed by the CLECs. It is appropriate to include those items in a definition of a local loop.

**c. Section 0.1.22 -- "cross connect"**

The CLECs state that SBC attempts to narrow the definition of cross connect by limiting it only to the "media" used, and second by enumerating specific purposes for cross connects. The CLECs are concerned that inserting the words "media used to" could be interpreted to mean that cross connects are defined only as the materials used and not the physical work that must be carried out by a central office technician to connect the CLEC's collocation arrangements and SBC's frame using that piece of wire or cable.

Similarly, the CLECs assert that SBC's proposed language enumerating specific purposes for cross connects could be interpreted to exclude any other purpose for cross connects.

SBC points out that the CLECs' definition includes the term "optical cable," even though the FCC has made it clear that SBC is under no obligation to unbundle optical loops. The definition of cross connect that SBC cited from the *TRO* comes from Newton's Telecom Dictionary and is generic in nature. We will revise the proposed definitions proffered by

CLECs and SBC. [*28] We will delete the reference to "the media" so that it is clear that we are not just referring to the piece of wire or cable, but also to work necessary to connect the CLEC's collocation arrangement to SBC's frame. At the same time, we agree with SBC, that it is inappropriate to include the phrase "optical cable," since the FCC clearly does not require unbundling of optical facilities. Also, we prefer not to describe the purposes for the cross connects because SBC does not have the right to screen the purpose for which a CLEC orders a cross connect. We have eliminated those portions of the definition that we find objectionable and adopt the following blended definition for Section 0.1.22 as follows:

> The term "cross connect" refers to a cable that connects CLEC's collocation arrangement to the ILEC's distribution frame.

### d. Section 0.1.23 -- "DS0"

As SBC says, the CLECs' definition is internally inconsistent. At one point it says a DS-0 is "capable of transmitting at 64 kb per second." Elsewhere in the definition the CLECs say a DS-0 is "up to and including" 64 kb per second. SBC provides an adequate definition of DS0, without the inconsistencies in the CLECs' definition so [*29] SBC's definition in Section 0.1.23 will be adopted.

### e. Section 0.1.24 -- "hot cut"

The CLECs state that their proposed definition of hot cut is consistent with the definition of hot cut used by the FCC in the *TRO*.

SBC states that the definition for "hot cut" is unnecessary because nothing in the *TRO* or *TRRO* alters SBC's obligation to provide hot cuts on individual lines. The CLECs state that their definition simply recognizes the fact that a hot cut involves the physical transfer of an in-service loop. For the sake of clarity, the CLECs are willing to remove the last word, "transferred" from their definition. The CLEC definition would be as follows:

> The term "hot cut" refers to an individual transfer of a DS 0/voice grade loop with live customer's service(s).

It is appropriate to include a definition for hot cut in this amendment, since the issue of batch hot cuts will be considered in a separate track of this proceeding. The CLECs' language in Section 0.1.24 (as modified above) is adopted.

### f. Sections 0.1.25, 5.2 and 5.4 -- "applicable law"

The CLECs assert that without a definition for "Applicable Law," SBC can argue after the amendment goes into effect [*30] that Section 271 does not apply and that state unbundling laws do not apply. SBC sees the CLEC language as an attempt to justify continued unbundling for the UNEs that the FCC discontinued in the *TRO* or *TRRO*.

We disagree with SBC's conclusion. We need to include the "Applicable Law" provision to ensure that CLECs have access to Section 271 elements, recognizing that those elements are not available to the CLECs as UNEs. We do not dispute SBC's conclusion that those elements are no longer subject to Section 251 unbundling rules. However, CLECs are entitled to access to those elements, so it is important that the definition of applicable law encompass that right, as well as the right to order substitute services from federal and state tariffs. The CLECs' proposed definition of applicable law in Sections 0.1.25, 5.2 and 5.4 is adopted.

### g. Sections 0.1.26, 2.0, 3.2.3, 4.1, 4.1.1.5, 4.1.1.7, 4.1.3.1, 4.3 and 4.5 -- "relevant transition period"

SBC sees the CLECs' definition of "relevant transition period" as an attempt to override FCC's transition periods by state law. The CLECs state they are not suggesting that the Commission override the FCC's *TRRO* transition periods, [*31] but they assert that the California Commission has co-equal authority with the FCC in managing the transition from certain discontinued Section 251(c)(3) UNEs to a successor regime.

In this decision, we have upheld the transition periods adopted by the FCC for transitioning the initial groups of UNEs. However, the FCC is silent on the timeframe to adopt for future transitions, and in Issue 21, we have adopted what we believe are fair transition periods. Therefore, we see the need to have a definition of the term "relevant transition period" in this amendment, so we will adopt the CLECs' language in Sections 0.1.26, 2.0, 3.2.3, 4.1, 4.1.1.5, 4.1.1.7, 4.1.3.1., 4.3 and 4.5.

**H. Issue 7: Sections 1.1(IX) 1.3.2, 5.8 and 13 -- Should the amendment include rates and terms for SBC's Section 271 obligations? If so, what should those rates and terms be?**

The CLECs assert that the Act requires SBC to include its independent unbundling obligation under Section 271 in its Section 252 agreements. The FCC has emphasized, "BOCs have an independent obligation, under § 271(c)(2)(B), to provide access to certain network elements that are no longer subject to unbundling under § 251" and must do so [*32] in accordance with Section 201 and 202 on a "just, reasonable, and not unreasonably discriminatory basis." n10

n10 *TRO*, PP 653-656.

According to SBC, state commissions have no authority to administer or enforce Section 271. As the Seventh Circuit has held, a state commission may not "parlay its limited role in issuing a recommendation under § 271 to impose substantive requirements under the guise of § 271 authority." n11 Rather, it is the prerogative of the FCC to address any alleged failure by a BOC to satisfy any statutorily imposed conditions on its continued provision of long distance service.

n11 SBC cites *Indiana Bell Tel. Co. v. Indiana Util. Reg. Comm'n, 359 F.3d 493, 497* (7<th> Cir. 2004).

The CLECs disagree saying that the FCC has made it clear that the states have a continuing role in the Section 271 process and that the FCC's jurisdiction is not exclusive. Accordingly, SBC's [*33] argument to the contrary is incorrect. For example in its final Section 271 order addressing Qwest's application for entry into the Arizona interLocal Access and Transport Area (LATA) market, the FCC explained:

> We note that in all of the previous applications that the Commission has granted to date, the applicant was subject to an enforcement plan administered by the relevant state commission to protect against backsliding after BOC entry into the long distance market. These mechanisms are administered by the state commissions and derive from authority the states have under state law or under the federal Act. As such, these mechanisms can serve as critical complements to the Commission's authority to preserve checklist compliance pursuant to Section 271(d)(6). n12

n12 *Qwest Communications for Authorization Under Section 271 of the Communications Act to provide In-Region, InterLATA Service in the State of Arizona*, WC Docket No. 03-194, Memorandum Opinion and Order, FCC 03-309, at n. 196.

The CLECs point [*34] out that SBC argued to the D.C. Circuit that a CLEC that fails to secure terms reflecting an ILEC's unbundling obligations under any source of law in its Section 252 interconnection agreement waives its rights under such law. SBC argued:

> Under the language and structure of the 1996 Act, the obligations between ILECs and CLECs are governed in the first instance by their interconnection agreements. Indeed, absent such an agreement an ILEC has no obligation to make *any* facilities available to the CLEC, much less on the terms and conditions required by the FCC's Section 271(d)(6) regulations. n13

n13 *SBC v. FCC*, D.C. Cir. Docket 03-1147, Brief of SBC Communications, Inc. p. 15 (Sept. 28, 2004).

The CLECs point out that their requested contract proposal does not call upon this Commission to enforce Section 271; it merely asks the Commission to perform its duties under Section 252, which Congress delegated directly to the states. As the CLECs point out, the Commission clearly has authority to take this action. [*35]

We wish to avoid disputes of this nature by ensuring that the amendment covers SBC's Section 271 obligations.

The CLECs assert that the cases cited by SBC are not directly on point. The recent Kentucky and Mississippi federal district court decisions cited by SBC recognize that the 1996 Act vests the FCC with authority to enforce violations of Section 271. But the FCC's enforcement authority in no way precludes or preempts state commissions from implementing Section 271 in the first place when acting as a federal arbitrator under Section 252. No court has ever held that states cannot establish Section 271 rates in this federal capacity.

The CLECs hold that the cases cited by SBC do not support its restriction on Commission authority, and we agree with that conclusion.

Section 13.1, which identifies the network elements SBC must provide under the Section 271 checklist, is rejected. As SBC points out in its comments on the DD, the CLEC-proposed language is too broad in claiming that Section 271 elements include "local loop transmission" and "local switching (regardless of technology used)." Certain loop types, e.g., the packetized functionality of hybrid loops, and packet switching [*36] are exempt from unbundling obligations. We will adopt the portion of Section 1.1(ix) relating to this issue.

Issue 7 also deals with the pricing of Section 271 elements and making routine network modifications to the Section 271 elements. The CLECs propose Total Element Long Run Incremental Cost (TELRIC) pricing for the Section 271 elements, saying that the Commission can establish Section 271 rates in Section 252 arbitrations, because the Act vests primary jurisdiction with the states -- not the FCC -- to arbitrate disputes involving the rates and terms to be included in ICAs. The CLECs state that the FCC has noted that Section 271 rates are subject to a "just and reasonable" standard under the Act. They assert that the Commission has equal authority to establish just and reasonable rates for federal Section 271 elements in a Section 252 arbitration proceeding as it does to establish TELRIC rates for Section 251 UNEs in such proceedings.

The CLECs claim that because the Communications Act and this Commission's precedent require the inclusion of Section 271 rates and terms in ICAs, and because only CLECs have proposed such terms, the CLECs' proposed terms must be adopted. Indeed, CLECs [*37] assert that they have proposed just and reasonable terms, while SBC has refused to propose any terms at all. We do not agree that TELRIC pricing is warranted for declassified Section 271 elements. Paragraph 656 states:

> TELRIC Pricing for checklist network elements that have been removed from the list of Section 251 UNEs is neither mandated by statute nor necessary to protect the public interest. . . . As set forth below, we find that the appropriate inquiry for network elements required under Section 271 is to assess whether they are priced on a just, reasonable and not unreasonably discriminatory basis -- the standards set forth in Sections 201 and 202. n14

n14 *TRO* P 656.

SBC asserts in P 664 that the FCC makes it clear that it retains the authority to determine whether the rate for a particular checklist element satisfies the just and reasonable pricing standard of Sections 201 and 202, which the FCC terms a "fact-specific inquiry that the Commission will undertake in the context of a BOC's application [*38] for Section 271 authority or in an enforcement proceeding brought pursuant to section 271(d)(6)." We do not agree that the FCC has exerted sole jurisdiction over the pricing of Section 271 elements.

However, we concur with SBC that the rates, terms and conditions applicable to access are not appropriate for inclusion in this Amendment. However, in Issue 5 we find that SBC must commingle Section 271 elements. Therefore, SBC has an obligation to establish rates for those de-listed elements so that CLECs may obtain them for purposes of commingling. Those rates could be published in an Accessible Letter, placed in a tariff, or subject to commercial agreement, but the elements must be readily obtainable by the CLECs.

If the CLECs dispute that SBC's rates are just and reasonable, they may file a complaint at this Commission. We will address the jurisdictional issues at that time.

Section 13.3 states that certain duties of SBC with respect to Section 251 UNEs also apply to Section 271 Elements: nondiscriminatory performance of routine network modifications, commingling and conversions, provisioning intervals; and nondiscriminatory maintenance and repair. We find the CLECs' language to be [*39] overly broad. The elements are no longer UNEs so the rules that pertain to UNEs should not apply to those elements. Section 13.3 is rejected.

Section 13.4 states that to the extent a CLEC has another agreement with SBC limiting SBC's obligations to provide Section 271 elements, the other agreement will control over the provisions of this Section 13. Section 13.4 is adopted. If a CLEC has voluntarily entered into an agreement to limit SBC's Section 271 obligations, that other agreement should control over this Section 13.

Section 13.5 states that a CLEC may request that any Section 251 UNE or combination be reclassified as a corresponding Section 271 element, provided that SBC is obligated to provide such elements under Section 271. Section 13.5 also stresses that SBC will perform such reclassification at no charge. Since we are requiring SBC to continue to provide Section 271 elements under this amendment, it is appropriate to include this language in the amendment. The CLECs' proposed language in Section 3.5 is adopted.

**I. Issue 8: Section 1.3.2 and subsections, and Section 4.3 -- Under what circumstances may SBC process disconnect or conversion orders for high capacity loops, [*40] transport, or dark fiber and for loop and/or transport arrangements that are to be transitioned during the FCC transition periods? When the CLEC transitions to an alternative arrangement prior to the end of the applicable FCC transition period, what processes should SBC and CLECs use, and what rate should apply from the date the arrangement is transitioned through the end of the FCC transition period?**

**Issue 15: Sections 2.1.4 and 3.2.3 -- Where a CLEC migrates embedded base ULS/UNE-P and/or affected DS1 and DS3 loop/transport customers to a functionally equivalent or analogous SBC service prior to the expiration of the applicable transition period, should the transition rate specified by the FCC in the TRO Remand Order apply for such alternate service until the end of the transition period -- i.e., until March 11, 2006?**

**Issue 25: Sections 4.2 and 4.3 -- How should transitions from high capacity loops and transport be handled and what charges apply?**

These issues all relate to the transitioning to other services of UNEs that have been declassified by the FCC. The CLECs state that their proposed language in Sections 1.3.2, 1.3.2.1, and 1.3.2.2 makes it clear that the [*41] serving arrangements to which they may transition TRO affected elements include any arrangements that are otherwise available to them under applicable law. These include arrangements that rely, in whole or in part, on elements or services that SBC must make available pursuant to Section 271, combinations of unbundled network elements, or elements or services that SBC must make available pursuant to other applicable state or federal law, as well as facilities that are self-provisioned by the CLECs.

SBC disputes the CLECs' language, stating that it is an attempt to continue to access discontinued UNEs "under Applicable Law." SBC views the language in Section 1.3.2 to "convert a TRO Affected Element to an analogous element or service that is required under state law," as a backdoor way to have the Commission mandate unbundling that is contrary to the FCC rules. We do not agree with SBC's interpretation of the CLECs' language. Rather, the language proposed by the CLECs gives them the option to replace TRO affected elements with any lawful alternative arrangements that may be available to them, whether under federal or state law. They would have the latitude to transition to elements required [*42] pursuant to Section 271, or services under state or federal tariffs. This is appropriate. The CLEC language relating to this issue in Sections 1.3.2 and 1.3.2.2 shall be adopted.

Language proposed by the CLECs in Section 1.3.2, subsection 1.3.2.2, and Sections 2.1.4 and 3.2.3 would entitle a CLEC that has transitioned TRO affected elements to analogous or functionally-equivalent wholesale services the option of being billed for the replacement services at the same prices that applied to the TRO affected elements, during the entire transition period.

SBC disputes that the CLECs are entitled to UNE pricing for arrangements that are converted prior to March 11, 2006, and cites P 199 in the FCC's *TRRO* order as follows:

> During the twelve-month transition period [for transitioning from UNE-P arrangements] . . . competitive LECs will continue to have access to UNE-P priced at TELRIC plus one dollar until the incumbent LEC successfully migrates those UNE-P customers to the competitive LECs' switches or to alternative access arrangements negotiated by the carriers.

Clearly, the FCC did not anticipate that the transition rate would remain in effect for the entire transition period, [*43] even if transition is completed in advance of the deadline. The CLECs will cease to pay their current TELRIC rates once those customers have been migrated to other serving arrangements. The CLECs' proposed language relative to this issue in Section 1.3.2, subsection 1.3.2.2 and Sections 2.1.4 and 3.2.3 is rejected.

The CLECs proposed language in Section 4.2 that is intended to prevent double billing of crossconnect charges when discontinued loop and transport UNEs are converted to analogous special access service. The CLECs' concern arises because SBC typically begins billing for tariffed crossconnects soon after crossconnect orders are submitted, but the actual transition of the related UNEs to tariffed special access service may occur sometime later. The CLECs state that adopting the CLECs' language would not result in any undue hardship for SBC. All that SBC would need to do in order to comply with the CLECs' proposal is to coordinate its initial billing of tariffed crossconnect charges with its initial billing of tariffed special access charges. The CLECs' proposed language in Section 4.2 is adopted. The CLECs should not have to pay for crossconnects until the special access circuit [*44] is installed and operational.

The CLECs assert that their proposed language in Section 4.3 is intended to enable CLECs to designate the last day of the relevant transition period as the due date for conversion or disconnection of *TRRO* affected loop and transport elements. SBC disputes the CLEC language, saying the FCC established a period of transition for *TRRO* affected elements, not just a single end date. The FCC did not specify that CLECs can wait until March 10, 2006 and then seek to "flash cut" all of their UNE-P lines to other arrangements. We believe that the CLECs have an obligation to ensure that they submit their orders to complete the transition in a timely fashion. The transition should *be completed* by the end of the transition period, not *begin* on that date. SBC's language in Section 4.3 is adopted.

**J. Issue 9: Sections 1.3.3, 2.1.3.3, and 3.2.2.2 -- To what extent may SBC impose charges on transitioning the embedded base of declassified TRO, DS-0 local circuit switching, UNE-P and high capacity loops and transport elements?**

**Issue 46: Sections 10.1.2 and subsections, and 10.1.3.1 -- What charges (if any) and procedures should apply to conversion [*45] orders?**

The contract provisions at issue relate to SBC's nonrecurring charges that apply to transitions of *TRO* and *TRRO* affected UNEs to other serving arrangements and to "conversions" of wholesale services to unbundled network elements and vice versa. The parties have combined the discussion of transitions and conversions (Issues 9 and 46) because the provisioning processes are virtually identical in each case.

There is substantial disagreement as to whether service order charges should be assessed where no physical work is required. The CLECs claim that the FCC explicitly prohibits ILECs from imposing such charges:

> Because incumbent LECs are never required to perform a conversion in order to continue serving their customers, we conclude that such charges are inconsistent with an incumbent LECs' duty to provide nondiscriminatory access to UNEs and UNE combinations on just, reasonable, and nondiscriminatory rates, terms, and conditions. [Cite omitted.] Moreover, we conclude that such charges are inconsistent with Section 202 of the Act, which prohibits carriers from subjecting any such person or class of persons (*e.g.*,

competitive LECs purchasing UNEs or UNE combinations) [*46] to any undue or unreasonable prejudice or disadvantage. n15

n15 *TRO*, P 587.

In case of transitions from TRO or TRRO affected elements to analogous wholesale services, or for conversions of UNEs to wholesale services, the CLECs assert that allowing SBC to assess tariffed record change charges would provide it with a windfall. The CLECs point out that tariffed record change charges for special access circuits are designed to recover, among other things, the costs of modifying special access circuit provisioning records, which SBC has agreed should not be a CLEC's responsibility.

While the CLECs acknowledge that some billing record changes would also be necessary, the process of making those changes should be fully-automated and of negligible cost to SBC.

We concur with the FCC's finding in P 587 of the *TRO* cited above that because ILECs are never required to perform conversions in order to continue serving their own customers, such charges are inconsistent with Section 202 of the Act, which prohibits carriers [*47] from subjecting any person or class of persons to any undue or unreasonable prejudice or disadvantage. In the following paragraph, the FCC also reiterates that the conversions between wholesale services and UNEs are "largely a billing function." Given the FCC's finding cited above, it is inappropriate to charge a nonrecurring charge for record changes. Therefore, we conclude that no charges are warranted for conversions and transitions that do not involve physical work, and the CLECs' language on this issue in Sections 1.3.3, 2.1.3.3, 3.2.2.2, 10.1.2, and 10.1.3.1 is adopted.

The CLECs and SBC agree that CLECs should be required to pay for physical work that is needed in order to effect transitions and conversions. However, the parties do not agree on what constitutes "physical work." In their opening brief, the CLECs propose the following language to clarify what is not included in the definition of "physical work":

To avoid any doubt, adding or modifying circuit i.d. tags or similar activities, such as manually modifying TIRKS or other facility records, signage, or records relating to accounting or billing, that do not result in an actual change in the routing, interconnection, [*48] or other operating characteristics of facilities that otherwise are re-used in the same configuration shall not be deemed "physical work" for which non-recurring charges are assessable.

SBC concurs that modifying circuit I.D. tags is not compensable physical work, but finds the CLECs' proposed use of "similar activities" is unduly vague and would create uncertainty over what is and is not compensable when performing a transition. SBC asserts that there are many functions that SBC performs to transition a facility that do not involve handling the facility, but are nevertheless compensable via non-recurring charges. These include some of the very activities the CLECs' language identifies as non-compensable, such as modifying records to ensure proper billing.

In their comments on the DD, the CLECs indicate the parties disagree as to whether CLECs should be financially responsible for manual work to accommodate billing and accounting changes related to conversions. The CLECs assert that, like the need to re-tag circuits, these changes result from SBC's practice of maintaining separate records for UNEs. The CLECs believe that this type of work is distinguishable from work that is required [*49] to actually change the routing, interconnection, or other operating characteristics of facilities that are being converted. The CLECs concur that they should be responsible for the latter, but believe they should not be responsible for the former.

The CLECs assert that the types of "similar activities" they are dealing with are record changes which are precisely the types of activities the DD properly decides cannot be subject to charges.

We concur with the CLECs' statement that the activities listed are the types of activities involved in a conversion that we have determined SBC should perform at no charge. These record changes should be treated the same. However, we still reject the phrase "similar activities" as vague. That phrase should be removed from Sections 1.3.3, 2.1.3.3 and 3.2.2.2.

There is also disagreement over the specific charges that will be applied when physical work is required. The CLECs propose that non-recurring charges should, in all cases, be drawn from the service that is the end result. That is to say, where a UNE is converted to a tariff, the non-recurring charges, in those instances where physical work is required, would be drawn from the tariff. According [*50] to SBC, the CLECs' proposal would avoid legitimate charges for activities that SBC performs on the CLECs' behalf. SBC responds that the costs captured on the UNE side involve the revisions that need to be made to SBC's UNE ordering and billing systems; on the special access side, the costs are those necessary to establish the ordering and billing records in the different systems SBC uses to track and bill special access. The activities are distinct and are not duplicative charges, as the CLECs contend.

The CLECs assert there would be excess cost recovery in some instances because various costs typically associated with establishing new services will not be incurred by SBC in carrying out transitions or conversions, yet CLECs will still be paying nonrecurring charges designed to recover such costs. The CLECs suggest that their approach -- in which only the applicable nonrecurring charges for the service transitioned to would be assessed-is fairer.

SBC states that the CLECs' proposal assumes that the non-recurring charges that SBC assesses when it discontinues a UNE capture the same costs as the charges applied when SBC provisions a service such as special access. SBC states that the [*51] assumption is wrong. In that scenario, the costs captured on the UNE side involve the revisions that need to be made to SBC's UNE ordering and billing systems; on the special access side, the costs are those necessary to establish the ordering and billing records in the different systems SBC uses to track and bill special access. The activities are distinct.

While SBC disputes that the charges are duplicative, SBC does not dispute the CLECs' allegation that there are some costs typically associated with establishing new services that will not be incurred by SBC in carrying out transitions or conversions. Again, based on the fact that SBC never has to perform these functions for its own customers, we will adopt the CLECs' proposed language that allows for a single non-recurring charge, that of the service being transitioned to. This will ensure that CLECs are not required to pay for functions that it is not necessary to perform for these transitions or conversions. The CLECs' language in Section 10.1.3.1 is adopted.

The CLECs have proposed language that would require SBC to assess the rates applicable to fully mechanized service orders, regardless of whether SBC's systems are capable [*52] of handling the service orders on such a basis. SBC disagrees saying that if a CLEC places an order manually, SBC must be permitted to assess the applicable manual service order charge to recover the cost of the work required. We agree with SBC. The CLECs should pay the appropriate non-recurring charge based on how they submit their service orders. SBC's language in Sections 1.3.3, 2.1.3.3, and 10.1.3.1 is adopted.

**K. The CLECs have proposed language that would require SBC to assess the rates applicable to fully mechanized service orders, regardless of whether SBC's systems are capable of handling the service orders on such a basis. SBC disagrees saying that if a CLEC places an order manually, SBC must be permitted to assess the applicable manual service order charge to recover the cost of the work required. We agree with SBC. The CLECs should pay the appropriate non-recurring charge based on how they submit their service orders. SBC's language in Sections 1.3.3, 2.1.3.3, and 10.1.3.1 is adopted. Issue 10: Sections 1.3.3, 2.1.3.3, 3.2.2.2, and 10.1.3.1 -- With respect to the transition of declassified elements and the conversion of wholesale services to UNEs and UNEs to wholesale [*53]  services, must SBC accomplish such transitions and conversions in a seamless manner?**

According to SBC, in several sections the CLECs propose language that affirmatively requires that "any conversion takes place in a seamless manner that does not affect the customer's perception of service quality." n16 SBC acknowledges that the *TRO* contains language that is similar to that presented by the CLECs, but SBC believes there is no basis for converting the language into a contractual right, which may well not be enforceable. Also, SBC asserts that the CLEC language does not take into account that, in many circumstances, any lack of seamlessness is the fault of the CLEC, not the ILEC.

n16 Amendment Sections 1.3.3, 2.1.3.3, 3.2.2.2, 10.1.3.1.

The specific language the CLECs have proposed in the four sections is: "Any conversions shall take place in a seamless manner that does not affect the customer's perception of service quality." The CLECs assert that to the extent that transitions of *TRO* or *TRRO* affected [*54] elements are tantamount to conversions, i.e., the elements are being replaced by analogous wholesale services, there is no reason why the transitions should not take place on a completely seamless basis.

SBC points out that when the FCC expressed the hope that conversions would be "a seamless process that does not affect the customer's perception of service quality," it simultaneously acknowledged that "conversions may increase the risk of service disruptions to competitive LEC customers because they often require a competitive LEC to groom inter-exchange traffic off [of] circuits and equipment that are already in use in order to comply with the eligibility criteria." n17

n17 *TRO* P 586.

Moreover, SBC states that agreed upon contract language in Sections 1.3.3, 2.1.3.2 and 3.2.2.1 recognizes that some disruption is "unavoidable" and simply directs SBC to minimize any disruption that is detectible to the end user. This language that both parties agreed to recognizes that perfection is not always achievable. The agreed-upon [*55] language is a more realistic view of conversions, insofar as some service disruptions may be unavoidable as circuits are rearranged. In its comments on the DD, SBC gives an example, namely in instances where UNE-P is transferred to re-sale, the customer will have to reprogram the handsets for certain features (call forwarding, etc.), in which case it is physically impossible that the transition will be imperceptible to the end user.

We concur that some disruptions may be unavoidable. The agreed-upon language mandates that those disruptions should be minimized. The CLECs' proposed language in Sections 1.3.3, 2.1.3.3, 3.2.2.2, and 10.1.3.1 relating to Issue 10 is rejected.

**L. Issue 11: Sections 1.3.3, 2.1.3.3, 3.2.2.2, 10.1.3.1 -- Should these provisions be deemed effective as of March 12, 2005?**

All of these sections relate to the pricing for conversions. The CLECs' proposed language provides that the charges established in the amendment for conversions and transitions be made effective as of March 11, 2005, which marks the beginning of the Relevant Transition Period for network elements that currently are classified as *TRO* or *TRRO* affected elements. Under the *TRRO*, once [*56] the amendment is approved, SBC is permitted to increase its charges for these affected elements on a retroactive basis, effective as of March 11, 2005. The CLECs' proposed language would eliminate potential disputes concerning what charges should apply to transitions and conversions that occur prior to the date the amendment is finally approved by the Commission. The CLECs state that the same outcomes that are adopted for application on a prospective basis should be applied to resolve pricing issues that would otherwise remain open for earlier conversions and transitions.

The four sections proposed by the CLECs all contain similar language. The proposed language in Section 1.3.3 is as follows:

The provisions of this paragraph shall be deemed effective as of March 12, 2005, and shall apply to all orders for conversions or disconnection of TRO Remand Declassified Elements on or after that date.

SBC disputes that language saying that the CLECs are attempting to impose various obligations on SBC retroactively. For example, a conversion that was ordered in August 2005 and that took place in September 2005, would be retroactively subject to the other language that the CLECs propose. [*57] The CLEC proposed language would include the requirement that conversion to take place in a seamless manner, would ban most non-recurring charges, and would require SBC to charge the "fully mechanized" service order rate even if the CLEC submitted the order manually. According to SBC, even if the Commission were to adopt the CLECs' proposals, there is no reason to make them retroactive to March 12, 2005. We agree; the CLECs' proposed language relating to this issue in Sections 1.3.3, 2.1.3.3, 3.2.2.2 and 10.1.3.1 is rejected.

In their comments on the DD, the CLECs point out that for the past several months the CLECs and SBC have been carrying out the work needed in order to complete transitions of discontinued UNEs to alternative serving arrangements by the end of the transition period. As a result, the CLECs have been submitting orders and making network changes without benefit of having Commission-approved rates in place.

The CLECs agree that it does not make sense to adopt a requirement that past conversions be seamless. However, the CLECs urge the Commission to carve out any troublesome provisions while retaining retroactive applications only for the provisions governing transition [*58] and conversion charges. According to the CLECs, the DD leaves unresolved the issue of the charges that apply to transitions and conversions that have already taken place. Yet, the applicable law is precisely the same throughout the transition period.

SBC responds in its reply comments that the CLECs' request would violate state rules against retroactive rulemaking. SBC also asserts that the conversions that have taken place to date have been conducted under the terms of existing ICAs. SBC points out that such agreements are binding unless and until they are amended. We agree with SBC that the rates, terms and conditions relating to transitions and conversions in existing ICAs would apply to any such conversions that occur prior to the effective date of this Amendment.

**M. Issue 12: Sections 2.1.1, 3.2.1, and 4.1.3.1 -- Which rates for ULS/UNE-P embedded base should apply during the transition period?**

SBC asserts that, under the FCC's rules, SBC is entitled to a transition rate for TRO and TRRO affected elements that is the higher of (A) the rate CLEC paid for the affected element as of June 15, 2004 plus 15% or (B) the rate the state commission established, if any, between June [*59] 16, 2004 and March 11, 2005 for the affected elements, plus 15%. The CLECs point out that on June 15, 2004, the prices charged for the principal components of mass market UNE-P combinations were interim and subject to true-up pursuant to Decision (D.) 02-05-042. n18 However, DS1/DS3 loop prices, while subject to review in on-going proceedings, were not subject to true-up. Nevertheless, some but not all CLECs had agreements in place with SBC that provided for true-up of charges for DS1/DS3 loops upon completion of the Commission's on-going price-review proceeding.

n18 D.02-05-042, *Interim Opinion Establishing Interim Rates for Pacific Bell Telephone Company's Unbundled Loop and Unbundled Switching Network Elements*, A.01-02-024/A.01-02-035/A.01-02-034, May 16, 2002.

According to the CLECs, the case of DS1/DS3 loops presents the greatest potential for discrimination. The higher rates are those that were in effect on June 15, 2004, except for carriers that had contracts with SBC providing for a true-up to what turned [*60] out to be significantly lower rates adopted by D.04-09-063 and restated by D.05-03-026. Under SBC's proposal, some CLECs could be charged the rates that applied in June 2004 while CLECs that had DS1/DS3 true-up agreements would be entitled to have their transition rates based on the lower rates adopted by D.05-03-026. The CLECs view SBC's assessing different transition rates as discriminatory and prejudicial for CLECs who had not entered into the earlier true-up agreements.

The CLECs express concern that the lack of specificity in SBC's language would leave open the possibility for SBC to attempt to invoke the Commission's June 15, 2004 date in all cases.

SBC asserts that its language precisely mirrors the FCC's rules adopted in the *TRRO*. By contrast, the CLECs have proposed that, in all situations, the price will be that established by this Commission in D.05-03-026, as amended by D.05-03-037 and 05-05-031. According to SBC, that proposal contradicts the FCC's transition rules. The FCC's rules allow the ILEC to establish the relevant transition rates based on either the rate "the requesting carrier" paid on June 15, 2004, or the rate the state Commission has established between [*61] June 16, 2004 and the effective date of the *TRRO*. The rates the CLECs propose were established after June 15, 2004. Thus, the CLEC's proposal would foreclose SBC from basing a transition rate on the rates in place on June 15, 2004.

The CLECs' language in Section 2.1.1.1 is rejected. The FCC established rules for transition rates, and we do not have the authority to change those transition rates for all CLECs affected by this amendment.

**N. Issue 13: Section 2.1.1.1 -- Should the amendment include a provision that CLECs can order new ULS/UNE-P for their embedded base until May 1, 2005?**

The CLECs assert that their proposed language mirrors that in D.05-03-028. They state that although May 1, 2005 has come and gone, in order to avoid future disputes it is important that the amendment acknowledge the provisions of that decision. That will eliminate any doubts concerning applicable charges relating to covered orders submitted during the period between March 11, 2005 and May 1, 2005.

SBC opposes the CLEC language saying that it is an apparent attempt to retroactively extend to all CLECs the limited relief that was granted to a handful of CLECs in D.05-03-028. SBC believes the Commission's [*62] decision to allow new UNE-P orders for the embedded base until May 1, 2005 is contrary to the language of the *TRRO*. Since the *TRRO* took effect on March 11, 2005, and that decision included a ban on new UNE-P arrangements applied to existing customers, the only logical conclusion is that existing customers were not allowed to purchase new UNE-P arrangements as of March 11, 2005.

In D.05-03-028, the Commission granted a request to require SBC to continue to process CLEC orders involving additional UNE-Ps for the embedded base of customers who already had UNE-P's until May 1, 2005. The stated purpose of that extension was to allow the parties time to negotiate amendments to their ICAs. Given the stated purpose for the extension-namely, the negotiation of an Amendment to ICAs-it makes no sense to grant that relief retroactively.

In their comments on the DD, the CLECs express concern that the failure to acknowledge D.05-03-028 creates a gap in the rates, terms and conditions governing the UNE-P arrangements that were added, moved or changed by CLECs in reliance on their rights under that decision. We do not share that concern. The Commission's order allowed for those additions, [*63] moves and changes for the embedded base of customers. We do not need to reiterate that in this Amendment. Those changes would be covered by the terms and conditions of the underlying ICA.

**O. Issue 14: Section 2.1.3.4 -- What rates should apply to ULS/UNE-P services if the embedded base ULS/UNE-P customer's service has not been disconnected or migrated by the deadline to be specified in the amendment?**

The parties dispute the rates that should apply to ULS/UNE-P services that have not been migrated by the deadline. The CLECs assert that those customers should be re-priced to Total Service Resale (TSR) while SBC advocates market-based rates. SBC points out that in that same section, SBC has agreed that the *TRRO* transition pricing will continue "if CLEC has met all of its due dates as agreed to by the Parties, including dates renegotiated between the Parties, and SBC does not complete all of the tasks necessary to complete a requested conversion or migration."

In their comments on the DD, the CLECs assert that imposing market based pricing on the CLECs would be unlawful. The CLECs point out that SBC is bound by Public Utilities Code Section 451 [*64] and U.S.C. Section 201(b) requiring carriers' rates to be "just and reasonable" The CLECs assert there is no evidence in this proceeding to support such a finding, since the rates SBC would charge are not in a tariff, are not published and have not been approved by the Commission. By contrast, SBC's tariff resale rates have been reviewed and approved by the Commission.

We find that adopting SBC's market based rates would be unduly punitive for failure to make the deadline to transition services from ULS/UNE-P arrangements. We will instead adopt the CLECs' TSR rates that we previously approved. The CLECs' proposed language in Section 2.1.3.4 is adopted.

**P. Issue 16: Section 3.1.1 -- Is there an Multi-Tenant Establishment (MTE) exception to FCC Rule 51.319(a)(6)(i), which rule states that ILECs are not required to provide requesting carriers with access to dark fiber loops on an unbundled basis, such that CLECs can have access to MTE subloops that begin at or near an MTE to provide access to MTE premises wiring?**

Section 3.1.1 provides that under Rule 51.319(a)(6)(i), "SBC is not required to provide requesting telecommunications carrier with access to dark fiber loop on an unbundled [*65] basis." The CLEC would add an exception for a MTE subloop that begins at or near an MTE to provide access to MTE premises wiring.

According to SBC, this issue is moot because SBC owns no inside wire subloop. California is a Minimum Point of Entry (MPOE) state which means the property owner is responsible for provisioning service from the MPOE to the individual tenant's space, and fiber to the MPOE is considered to be part of the feeder portion of the loop and is therefore not required to be unbundled. n19

n19 *TRO* P 253.

The parties agree that in the *TRRO*, the FCC found that requesting carriers are not impaired without access to unbundled dark fiber loops in any instance. SBC suggests that since the FCC's current rule provides that dark fiber loops do not have to be unbundled, it follows that SBC does not have to unbundle dark fiber subloops.

The CLECs disagree saying the FCC treated subloops as a distinct UNE from loops, noting that subloop elements are frequently necessary building blocks to a competitor's [*66] eventual deployment of a loop.

We agree with the CLECs that the FCC discussed subloops separately from loops, and in the *TRRO* the FCC did not disturb its findings in the *TRO* relative to subloops. The FCC included a significant analysis of the need for subloops in a MTE environment, and those findings are not displaced in the *TRRO*. While SBC says that since California is an MPOE state the issue is moot, to the extent that SBC has subloops that could assist CLECs to have access to MTEs, those subloops should be unbundled. The CLECs' language in Section 3.1.1 is adopted.

**Q. Issue 17: Section 3.1.4.1 -- Should a CLEC be prohibited from obtaining more than ten unbundled DS1 dedicated transport circuits on each route where DS3 dedicated transport is available as a UNE?**

The CLECs acknowledge that the FCC has established a cap on the number of DS1 transport circuits that a CLEC can obtain as Section 251 UNEs. The dispute between the parties relates to the scope of that limitation. The CLECs' position is that the 10 circuit limitation for DS1 transport applies only on those transport routes where DS3 transport is not available as a UNE (i.e., on those routes where CLECs are [*67] not impaired with respect to DS3 transport).

SBC disputes the CLECs' interpretation saying the FCC's DS1 cap in no way depends on whether DS3 transport is available as a UNE. SBC cites the FCC's rule from the *TRO* which provides:

> Cap on unbundled DS1 transport circuits. A requesting telecommunications carrier may obtain a maximum of ten unbundled DS1 dedicated transport circuits on each route where DS1 dedicated transport is available on an unbundled basis. n20

n20 *TRRO*, Rule 51.319(e)(2)(ii)(B).

The CLECs acknowledge that while the above-cited rule does not explicitly address the limitation on the applicability of the DS1 transport cap, the related text of the *TRRO* does so in a clear and unambiguous fashion. The CLECs cite 128 of the *TRRO* as follows:

> Limitation on DS1 Transport. On routes for which we determine that there is no unbundling obligation for DS3 transport, but for which impairment exists for DS1 transport, we limit the number of DS1 transport circuits that each carrier may obtain [*68] on that route to 10 circuits. . . . When a carrier aggregates sufficient traffic on DS1 facilities such that it effectively could use a DS3 facility, we find that our DS3 impairment conclusions should apply.

The CLECs conclude from the above language that the limitation of 10 DS1 UNE transport circuits only applies on those particular routes where the IELC is no longer obligated to provide DS3 UNE transport but where impairment exists for DS1 transport. The CLECs state that the reasoning behind the FCC's adoption of the DS1 cap makes no sense when applied to situations where DS3 transport remains available as a UNE. For one thing, there is no concern that a CLEC might obviate DS3 non-impairment via use of multiple DS1 UNE transport circuits. More importantly, if the DS1 transport cap is applied in an over-broad manner it will have a negative effect on the use of DS1 EELs and on competition in the small and medium-sized business customer market where the use of DS1 EELs is most prevalent.

SBC states that the text of *TRRO* P 128 is entirely consistent with Rule 319(e)(2)(ii)(B), namely, the volume cap for DS1 dedicated transport applies where DS3 dedicated transport is not available [*69] as a UNE and it also applies where DS3 dedicated transport is available as a UNE. It applies across the board, in both cases.

We disagree with SBC's conclusion that the text of *TRRO P* 128 is entirely consistent with Rule 319(e)(2)(ii)(B). In P 128, the FCC states very clearly that the DS1 limitation applies *only* on those routes for which the FCC determines that there is no unbundling obligation for DS3 transport. The Rule itself should not be read in a vacuum, but within the context of the dicta that lead to creation of the rule. The CLECs' language in Section 3.1.4.1 is adopted.

**R. Issue 18: Section 4.1 -- Where a CLEC has not self-certified for the initial list of wire centers designated as having met the threshold criteria for non-impairment for loops and/or transport, the CLEC must transition off of applicable UNEs within a defined transition period as governed by the attachment to the joint petition [CLEC language] as governed by the amendment [SBC's language]. The issue here is can the CLEC, with respect to seeking new UNEs from such wire center(s), provide a self-certification after the defined transition periods have expired?**

Under the *TRRO*, before submitting [*70] an order for high-capacity loops or transport, CLECs are required to self certify, after performing a diligent inquiry, that they are entitled to order the high-capacity circuit as a UNE. SBC proposes that CLECs self-certify only if they wish to obtain unbundled high-capacity loops or transport at a wire center SBC has designated as meeting the FCC's no-impairment threshold. The core of the dispute centers around whether it is appropriate to set a deadline for self-certification.

According to the CLECs, SBC's proposal would require a CLEC to challenge SBC's initial list within a year, or to waive its challenge, even if the CLEC had not yet entered a particular wire center. The CLECs add that they are not proposing an unfettered right to submit self-certifications. For circuits that were in place as of March 11, 2005, the CLECs have agreed in Section 4.1.1 to a one-year limit to make the self-certifications. Furthermore, as the CLECs agreed to in Section 4.1.1, if the Commission has previously found that a particular wire center is non-impaired, another CLEC would be precluded in the future from submitting a self-certification for that wire center. Finally, the CLECs have agreed to [*71] make a reasonably diligent inquiry to determine whether the wire center meets the impairment thresholds before submitting a self-certification and order for the UNE.

CLECs should not have to waive their right to challenge SBC's determination that a wire center meets the FCC's no-impairment threshold because they are not ready to enter a particular wire center. That would require a CLEC with no current business plan involving a current wire center to invest time and money into reviewing SBC's documentation and participating in a proceeding at this Commission. At the same time, SBC requires certainty as to the designation of a particular wire center. The CLECs' language in Section 4.1 is adopted. We note that in Issue 22, we establish a deadline of three years for a CLEC to self-certify and challenge SBC's were center designation.

**S. Issue 19: Sections 4.1, 4.1.1.8, and 4.6-A CLEC may provide a self-certification and SBC may dispute such self-certification through a proceeding at the Commission. The issue here is, in addition to this dispute resolution procedure, can CLECs request at any time, and is SBC obligated to provide to CLECs, information and supporting documentation on which [*72] SBC based its wire center designation?**

In Sections 4.1 and 4.1.1.8, the CLECs are asking for the basic information that supports SBC's claim of non-impairment. If SBC claims that a particular wire center is non-impaired, the CLECs assert that it is only fair for SBC to provide the information that supports that claim. In many instances, including wire center-specific ARMIS data and the identity of fiber-based collocators, only SBC possesses that data. The CLECs see it as a matter of equity that both parties to the dispute should have access to the relevant information.

In Section 4.6, the CLECs are requesting reasonable notice from SBC on when SBC believes additional wire centers are close to becoming non-impaired. This information allows CLECs to shape their business plans in a manner that minimizes the risk of sudden unforeseen loss of UNE access in those wire centers.

SBC objects to giving the CLECs access to SBC data at any time, upon demand. SBC sees it as improper and unnecessary. According to SBC, the agreed-upon language relating to the information available to CLECs when a dispute over a wire center arises is sufficient. SBC also asserts that the data on the identity of [*73] fiber-based collocators, as well as data demonstrating that those collocators are in fact fiber-based, is highly sensitive not only to SBC but also to the CLECs that have collocated in SBC's wire centers.

The CLECs rebut SBC's argument that it cannot provide confidential information about other CLECs to requesting CLECs. The CLECs view SBC's argument as inconsistent with the fact that SBC has agreed to provide the same exact information to CLECs once a dispute is filed. The CLECs have agreed to be bound by a protective order in both cases. That should suffice to protect the confidentiality interests of the parties.

We concur with the CLECs that when a wire center is designated as non-impaired, it has a large impact on the CLEC's business. While the FCC did not require that ILECs provide any advance notice of a wire center designation, we believe that CLECs are entitled to the information in advance to be able to adjust business plans, and to plan to dispute a designation. SBC is generally the only source of information the CLEC needs, so SBC must provide that information to CLECs. The CLECs' proposed language in Sections 4.1, 4.1.1.8 and 4.6 is adopted.

**T. Issue 20: Section 4.1.1.1  [\*74]  -- How frequently may SBC update its list of non-impaired wire centers?**

SBC indicates that it has identified the wire centers that met the FCC's non-impairment thresholds as of March 11, 2005 and notified the CLECs via Accessible Letters. However, because the number of business lines and the number of fiber-based collocators at a wire center can change over time, the wire centers that meet the FCC's non-impairment criteria will also change. Therefore, SBC proposes language that would permit SBC to update its list of non-impaired wire centers as relevant changes occur.

The CLECs assert that SBC should not update the list more than once during any given six-month period. They state that their language is appropriate because it minimizes disruption to customers. The CLECs also point out that while the Illinois commission ruled in the favor of SBC on this issue, the commission's decision was premised on the fact that it was granting the CLECs a 12 to 18 month transition period for newly delisted UNEs. The Commission reasoned that if CLECs have enough time for transitions, it shouldn't matter how often the list is updated. The CLECs assert the situation here is different because SBC  [\*75]  advocates for a 90-day transition period for newly-delisted UNEs.

SBC argues that CLECs could time the turn-up of a new fiber-based collocation, by delaying it until after the updates had been made so that CLECs could enjoy unbundled access for the remainder of the six-month period. The CLECs respond that SBC's allegation is without merit. CLECs do not have the operational luxury of timing implementation of collocations to achieve a six-month extension of a small subset of circuits. CLECs collocate to access a wide array of potential customers, and it would be irrational to delay those collocations for regulatory purposes.

We agree with the CLECs that having SBC update its list of non-impaired wire centers on a known periodic basis lends certainty to the planning process for the CLEC. However, we believe that it is not fair to make SBC wait six months to update its list. Therefore, we will adopt the requirement that SBC may update its list of non-impaired wire centers on a quarterly basis. That language should be reflected in Section 4.1.1.1 as follows:

> SBC may update the wire center list as changes occur but may not update the list more frequently than one time during any [\*76]  three month period.

**U. Issue 21: Section 4.1.1.5-Where a CLEC does not self-certify within 60 days of SBC issuing an Accessible Letter designating that the threshold has been met in additional wire center(s), the CLEC must transition off of applicable UNEs which were already provisioned at the time the Accessible Letter was issued. The issue here is how long is this transition period for CLECs, and during this transition period can the CLEC order applicable UNEs from the newly designated wire center(s)?**

In the *TRRO*, the FCC provided for an extended transition period for wire centers that met its non-impairment threshold as of the *TRRO's* effective date, recognizing that there would be significant changes in the regulatory framework for high-capacity loops and dedicated transport. However, the FCC did not set any timetable as to future delistings of particular wire centers.

In this proceeding, SBC proposes that CLECs transition from unbundled high-capacity loops and dedicated transport within 90 days after SBC designates an office as unimpaired. By contrast, the CLECs propose the same time periods as in the *TRRO*, 12 months for newly designated high-capacity loops  [\*77]  and DS1/DS3 transport and 18 months for dark fiber dedicated transport.

SBC bases its argument on the fact that in future declassifications, CLECs will not need to modify their ICAs. Also, the volume of circuits to be transitioned in subsequent wire center delistings should be significantly less than in the initial implementation of the *TRRO*.

We believe that the timeline proposed by SBC is too tight to permit an orderly transition away from UNEs. At the same time, the 12/18 month periods appear excessive, in light of the fact that CLECs will not need to negotiate change of law provisions as part of the process. Still, there is no reason to believe that the necessary tasks involved in transition-

ing from UNEs can be completed in significantly less time than during the initial transition period. Therefore, in Section 4.1.1.5 we will adopt a transition period of nine months for DS1/DS3 high capacity loops and DS1/DS3 dedicated transport. The transition period for dark fiber dedicated transport is 12 months.

SBC points out that there is also disputed language in Section 4.1.1.5 regarding the availability of new UNEs during a future transition period. The CLECs language would allow them [*78] to order new DS1s for existing customers, even up to a year after a given wire center is no longer deemed impaired. SBC states that such language is contrary to the *TRRO*.

SBC quotes the following sections from the TRRO: Paragraph 142 ("These transition plans shall apply only to the embedded customer base, and do not permit competitive ILECs to add new dedicated transport UNEs pursuant to Section 251(c)(3) where the [FCC] determines that no Section 251(c) unbundling requirement exists." Paragraph 195 states: "There transition plans shall apply only to the embedded customer base, and do not permit competitive LECs to add new high-capacity loop UNEs pursuant to Section 251(c)(3) where the [FCC] has determined that no Section 251(c) unbundling requirement exists."

We concur with SBC that the *TRRO* does not allow CLECs to add new high-capacity loops or dedicated transport during the transition period. The CLECs' proposed language on this issue in Section 4.1.1.5 is rejected; SBC's proposed language is adopted.

**V. Issue 22: Sections 4.1.1.6 and 4.8-Can CLECs, with respect to seeking new UNEs from newly designated wire center(s), provide a self-certification more than 60 days after [*79] SBC issues the applicable Accessible Letter? If so, is SBC required to provision new UNEs during the dispute resolution process, including, if applicable, during the applicable transitional period?**

The issue here is the same as Issue 18, namely whether a CLEC may self-certify at any time for (i) wire centers that are initially listed as non-impaired (Issue 18) or (ii) wire centers that are subsequently designated as non-impaired (Issue 22). The CLECs point out that in P 234 of the *TRRO*, the FCC made it clear that it was the CLEC's self-certification which would be the trigger for an ILEC to challenge that self-certification, and which in turn would trigger dispute resolution before the state commission. The CLECs accuse SBC of wanting to turn the FCC's process on its head by obtaining the equivalent of a finding in its favor even before any dispute resolution has been filed with the state commission and even before any CLEC has issued a self-certification.

In its comments on the DD, SBC states that there are significant problems of proof in establishing that a wire center meets the FCC's thresholds years after the fact. It would be impossible to prove that a particular fiber-based [*80] collocation arrangement was up and running years before. Likewise, it would be impossible to allow Commission staff to physically inspect the wire center as it existed at the time SBC designated it as non-impaired.

We concur with SBC that it is unworkable to have no firm, fixed deadline after which no CLEC would be permitted to self-certify. SBC proposes three years, and we concur that three years will ensure that CLECs do not seek to self-certify many years after the fact, thus creating inordinate problems of proof. We will adopt the CLECs' proposed language in Section 4.8, but add the following caveat at the end of the first sentence: "up to three years from the date SBC designates a wire center as non-impaired." The three-year limitation would apply to CLECs operating in the wire center at the time of SBC's designation, and also to CLECs that enter the wire center after that date. SBC's language in Section 4.1.1.6 is rejected. That language would set a cap of 60 days for the CLEC to self-certify.

**W. Issue 23: Section 4.1.2 -- A CLEC may provide a self-certification and SBC may dispute such self-certification through a proceeding at the Commission. Where such a dispute is before [*81] the Commission, and where the CLEC withdraws its self-certification before the Commission renders a decision, is the affected wire center subject to future self-certification?**

In Section 4.1.2, SBC proposes that if a CLEC files a self-certification that is then disputed by SBC, and the CLEC withdraws its self-certification before the Commission has made a determination regarding the wire center designation, the wire center designation that was the subject of the dispute will be treated as though the Commission approved SBC's designation. SBC states that this language would only take effect if there were no other CLECs that had filed a self-certification for the wire center in question.

SBC states that its proposal is geared towards preventing gaming, whereby a CLEC might file a self-certification, withdraw that certification after a dispute, and then refile some months or years later, long after all other CLECs had transitioned away from the wire center in question. Because wire center designations are permanent, it makes no sense

to allow any single CLEC to keep a wire center's status perpetually up for debate simply by certifying and then with-drawing.

The CLECs respond that SBC's [*82] proposal is unfair to CLECs that were not involved in the withdrawal of the initial self-certification. Those CLECs would be barred from disputing SBC's designation, solely because another CLEC withdraws its self-certification.

SBC states that although the CLECs claim that SBC's proposal is "particularly unfair to CLECS that were not in-volved in the withdrawal of the initial self-certification," SBC has agreed to language in Section 4.1.3 requiring it to (1) notify "all other CLECs" of any wire center dispute, and (2) agree not to oppose intervention by any other CLEC" Therefore, any other CLEC would be able to intervene in the dispute if they so desire, and even if the original CLEC then drops out for whatever reason, the Commission would presumably have the underlying facts and resolve the still-viable dispute. In their comments on the DD, the CLECs request that all interested parties be allowed to participate, not just the parties that initially intervene. We concur that that should be made clear in Section 4.1.3. We agree that SBC is entitled to regulatory certainty as to the status of that wire center for future purposes.

SBC's language in Section 4.1.2 reads as follows:

> [*83]
> . . . If a CLEC withdraws its self-certification after a dispute has been filed with the California Commis-sion, but before the California Commission has made a determination regarding the wire center designa-tion, the wire center designation(s) that were the subject of the dispute will be treated as through the Cali-fornia Commission approved SBC's designations.

SBC is not entitled to a determination regarding a wire center's designation, without a determination by the Com-mission. SBC's proposed language in Section 4.1.2 is rejected.

**X. Issue 24: Section 4.1.3 -- When SBC disputes a CLEC's self-certification, is SBC required to notify all CLECs of the filing via an Accessible Letter that includes the case number and directions for accessing the docket on the Commission's website?**

CLECs ask that the Accessible Letter used to notify CLECs when SBC disputes a CLEC's self-certification include the case number and directions for accessing the docket on the Commission's website. The CLECs point out that SBC has the information while the CLEC community does not. The CLECs say it is administratively complex matter for non-participating CLECs to try to identify a docket number when all [*84] they know is that a dispute has been filed.

SBC disputes the CLECs' position saying CLECs are capable of identifying Commission docket numbers. More importantly, there is no reason to force SBC to delay carrier notifications until the Commission has launched a new docket and made it available on the website. We disagree. There is generally only a few days' delay in assigning a docket number to a filing. We agree that it is difficult for the CLECs to try to identify a docket number when all they know is that a dispute has been filed, and the delay of a few days in releasing the Accessible Letter does not unduly prejudice SBC. The CLECs' proposed language in Section 4.1.3 is adopted, with one modification. In its comments on the DD, SBC asserts that it should not have to provide "directions for accessing the docket on the Commission's web-site." SBC asserts that it has no more expertise regarding navigation of the Commission's website than the CLECs do. We agree. That language is stricken from Section 4.1.3.

**Y. Issue 26: Section 4.4 -- How should affected elements be provided to a building that is served by both im-paired and non-impaired wire centers and is physically located in the [*85] serving area of the impaired wire center?**

The CLECs have proposed that when a single building is served by a non-impaired wire center and an impaired wire center, they should be entitled to keep ordering UNEs from both the impaired and non-impaired wire centers. They defend this proposal on the theory that some customers choose two completely separate loop paths into their premises for redundancy.

SBC asserts that the CLECs' allegation is not true. The very fact that the wire center is not impaired means that the CLEC does not require access to UNEs to serve customers. Instead, if one of the wire centers in question is non-impaired, the CLEC would simply need to choose between (a) self deployment or (b) purchasing wholesale service or some other alternative arrangement.

We agree with SBC that it would be inconsistent with the federal rules to let CLECs continue to access UNE loops from a non-impaired wire center. As SBC points out, CLECs have alternative ways to provide redundancy for their customers. SBC's language in Section 4.4 is adopted.

**Z. Issue 27: Section 4.6 -- Should SBC be required, on a quarterly basis, to post on its website information advising when it believes a [*86] wire center has reached 90% of the number of business lines needed for the wire center to be classified as a Tier 1 or a Tier 2 wire center, and to specify which wire centers it considers to have two or three fiber collocators?**

SBC opposes the CLECs' proposal that it post quarterly information on its website advising when it believes a wire center has reached 90% of the business lines needed for the wire center to be classified as a Tier 1 or a Tier 2 wire center, and to specify which wire centers it considers to have two or three fiber collocators.

SBC explains that it does not currently monitor the quarterly status of business line counts or fiber-based collocators in each wire center. SBC also said that the ARMIS data containing business line counts are available only on an annual basis. The CLECs state that they want information on the status of wire centers because it will enable them to begin to adjust their business plans so that they are better positioned for an orderly transition to alternative arrangements.

SBC insists the CLECs will have ample time to migrate away from UNEs in the case of future wire center changes. Second, SBC points out that the CLECs claim that, even [*87] if ARMIS data are available only annually, SBC "has only to repost the previous information" from prior quarters. But the contractual language that CLECs propose does not allow SBC simply to repost outdated information. To the contrary, SBC asserts that the CLECs' proposed Section 4.6 requires current and up-to-date information.

According to the CLECs, the information should be readily available to SBC. Reason dictates that SBC will be tracking closely, and on an on-going basis, the data that determines whether a wire center changes Tier status, allowing SBC to declare additional wire centers as non-impaired at the earliest possible time permitted.

While SBC claims the information is sensitive, the proposed language does not require SBC to divulge any confidential information as it would be provided pursuant to the TRO protective order.

Certainly SBC will have the information on the status of its wire centers much more readily available than the CLECs do. It will level the playing field to provide the information, and we are not convinced that it is unduly burdensome to provide the information. As the CLECs state, it defies belief that SBC is not going to track the information on [*88] an ongoing basis. However, the terms of Section 4.6 do not require SBC to collect any additional information, but to the extent that SBC compiles the information for its own use, that same information should be made available on CLECs on the SBC website. If SBC does not have an alternative method for counting business lines, then the annual ARMIS data will suffice. However, if SBC develops an alternate method of counting business lines, that information should be provided to the CLECs. The CLECs' language in Section 4.6 is adopted.

**AA. Issue 28: Section 4.7 -- (a) Should the amendment address what termination charges apply for loops and/or transport purchased under SBC's tariff if a wire center is determined to be non-impaired: (b) If so, what termination charges should apply to the cancellation of the tariffed transport or collocation facilities?**

When a wire center is determined to be non-impaired for high-capacity loops, the CLECs seek the right to cancel tariffed special access arrangements that they have previously ordered in that wire center. They urge that, when a CLEC cancels such tariffed arrangements, it should be able to reduce or circumvent the early termination penalties [*89] that it previously agreed to accept in exchange for a long-term discount.

SBC points out that the CLECs' claim is rooted in the false premise that, when a wire center is determined to be non-impaired, the CLEC can no longer compete there and thus has no further use of the special access arrangements it has obtained. But the point of the FCC's impairment criteria is to identify wire centers where CLECs are capable of relying on competitive supply. Where a wire center meets those criteria, a CLEC can deploy its own facilities or rely on third-party providers to replace those previously obtained UNEs.

As SBC points out, the FCC has approved early termination fees on numerous occasions. According to SBC, the FCC has already answered this concern in the analogous circumstance where a CLEC seeks to convert a special access arrangement to a UNE arrangement. There the FCC held that, "to the extent a competitive LEC enters into a long-term contract to receive discounted special access services, such competitive LEC cannot dissolve the long-term contract

based on a future decision to convert the relevant circuits to UNE combinations based on changes in customer usage." n21

n21 *TRO P* 587.

[*90]

We agree with SBC. CLECs have competitive alternatives to replace UNEs in non-impaired wire centers, and while *TRO P* 587 cited above is not strictly on point because it is dealing with the specific issue of the conversion of special access circuits to UNEs, the basic premise is the same. If a CLEC enters into a long-term contract to receive discounted services, the CLEC may not dissolve the long-term contract based on new circumstances. The CLECs' proposed language in Section 4.7 is rejected.

**BB. Issue 29: Section 4.9 -- Should the amendment include a provision that allows for the reversion of non-impaired wire centers to impaired wire centers? If so, what credits (if any) and procedures should apply in connection with the reversion?**

The CLECs' proposed language in Section 4.9 would provide for retroactive re-pricing of high cap loops or transport circuits that are transitioned to special access as the result of an error by SBC in designating a wire center as impaired.

The CLECs assert that SBC is the repository of all relevant information: the numbers of business lines and loops served out of the wire center, the number and identity of fiber-based collocators, etc. Based [*91] on diligent review of information provided by SBC, CLECs may challenge SBC's determination if they detect errors, but the information that CLECs rely on for such information all comes from SBC. SBC clearly is in the best position to ensure that its wire center designations are accurate.

SBC disputes the CLECs' contention that SBC can unilaterally impose an error on the CLECs since the CLECs have an opportunity to challenge SBC's wire center designations. For each wire center that SBC designates as non-impaired the CLECs can self-certify if they believe the designation to be erroneous, SBC may dispute such certification and the Commission is available to resolve such disputes. SBC disputes that if the final outcome of a given wire center is erroneous, it is unfair automatically to place the blame on SBC, as the CLECs' proposal does.

We agree with the CLECs that SBC is the repository of all relevant information in determining non-impairment of a particular wire center. The language in Section 4.9 is clear that the terms apply only where a non-impaired wire center reverts back to an impaired wire center "due to an error in SBC's classification." We concur with the CLECs, that in that [*92] case, they should be entitled to convert their services back to UNEs and be compensated for the difference in pricing. The CLECs' language in Section 4.9 is adopted, with one exception. In its comments on the DD, SBC states that it is not reasonable to require SBC to transition access circuits to UNEs in 10 days. SBC proposes 90 days, which we agree is reasonable.

**CC. Issue 30: Section 5.1 -- The parties agree that SBC CA will make certain commingled arrangements available in California if an SBC ILEC affiliate voluntarily makes them available in any of its 13 SBC ILEC states. The issue is whether SBC California should be required to provide a commingled arrangement in CA if an SBC ILEC is ordered to do so by a state commission other than the CPUC?**

SBC states that the CLECs' proposed language for Section 5.1 would require that SBC offer commingling in California merely because another state commission in SBC's 13-state region ordered it. According to SBC, such a proposal would unlawfully turn any single pro-CLEC state commission order into a nationwide mandate. Moreover, a commingling arrangement available in another state could be incompatible with SBC California's network.

CLECs [*93] respond that there is no good reason to force CLECs to repeat the dispute resolution process in state after state. CLECs consider the Bona Fide Request (BFR) process as onerous and expensive. The CLECs state the Commission should accept the CLECs' proposed language for Section 5.1 since this will only bind SBC to doing what SBC "has been objectively determined to be able to do."

The CLECs' proposed language in Section 5.1 is rejected. We do not intend to establish precedent, based on the decisions of other state commissions.

**DD. Issue 31: Section 5.1 -- What commingling arrangements should SBC be required to offer to CLECs in this amendment?**

Issue 31 relates to the list of specific commingling arrangements that SBC should be required to offer to CLECs under this amendment. According to the CLECs, the list of 13 "available" commingling arrangements has been agreed to by SBC in the negotiation of amendments to its ICAs to incorporate the TRO and TRRO in at least Michigan, Illinois, Ohio and Indiana. Also, the first twelve commingled arrangements were also agreed to by SBC Arkansas and were approved in Texas.

After the CLECs in California began marking up SBC's proposed TRO/TRRO [*94] amendment, SBC filed an *"Errata"* to eliminate two of the commingling arrangements entirely and to re-write two of the arrangements to eliminate reference to connections between DS1 and DS3 transport UNEs, respectively, and special access loops.

According to the CLECs, commingling arrangements viii (UNE loop to special access multiplexer) and xiii (the connection of high-capacity loops to a special access multiplexer) are essential to the ability of CLECs to use high-capacity UNE loops to provide service to their end-users, in the absence of the UNE platform. Similarly essential are the connection of SBC UNE transport, at both the DS1 And DS3 transmission levels, to special access loops of the same transmission capacity. Particularly with the elimination of the availability of DS1 and DS3 UNE loops in certain wire centers, per the TRRO, it will increasingly become necessary for CLECs to purchase loops from SBC's special access tariffs. Where this is necessary, it is essential that SBC be required to provide connections between such special access loops and the DS1 and DS3 transport UNEs, where they remain available. SBC's argument that these connections are offered under the terms [*95] of commingling arrangement xi and xii, does not address the issue. The CLECs assert that commingling arrangement xi ensures connection of a DS3 transport UNE only to a "non-channelized" DS3 loop; this would not provide the arrangement guaranteed in the final clause of arrangement x, which offers connection to either a channelized or non-channelized special access DS3 loop. Similarly, commingling arrangement xii includes the same limitation for a DS1 loop.

SBC responds that the parties agree that SBC will support the connection of a high-capacity loop to a special access multiplexer, but CLECs dispute SBC's clarifying language in xiii that this connection is not in itself a commingling arrangement. According to SBC, under the FCC's rule, commingling is specifically defined as the connecting of UNEs and wholesale facilities. SBC asserts that a special access multiplexer is neither because SBC does not offer a multiplexer on a wholesale, standalone basis, whether pursuant to tariff or otherwise. Instead, SBC provides a multiplexer only with channel termination service and/or interoffice transport.

SBC does not explain why it is not willing to provide commingling of channelized DS1 and [*96] DS3 loops, as well as non-channelized. The CLECs have made a convincing argument that they will need that form of commingling, so the CLECs' language in Section 5.1, subsections ix and x is adopted. With regard to sub-issues viii and xiii, CLECs claim that these items are essential to the ability of CLECs to use high-capacity UNE loops to provide service to their end-users. The CLECs have made convincing arguments about why they need these particular commingling arrangements. Since SBC has agreed to these commingling arrangements in other states, we see no reason why they should not be available in California as well. The CLECs' language in viii and xiii is adopted. We have adopted Section viii which requires commingling of "UNE loop to special access multiplexer." We also adopt SBC's language in Section V.1 (viii) in which SBC stresses that a multiplexer is not a UNE.

**EE. Issue 32: Section 5.7 -- If SBC changes or adds to its access tariffs in a manner that would restrict or impact the availability of commingled arrangements, (a) what notice should SBC be required to give to CLECs of such tariff changes or additions, and (b) should existing commingled arrangements provided under [*97] the agreement be grandfathered?**

The language proposed by the CLECs requires 60 days' notice before eliminating the availability of a product in SBC's access tariff. Also, the CLECs ask to "grandfather" commingled arrangements if the access service that is part of the commingled arrangement is withdrawn. The CLECs also include language that SBC shall cooperate with CLECs to see that they are not impeded from implementing new commingling arrangements.

According to SBC, there are many valid reasons why SBC would withdraw an access service, including insufficient demand, out-dated technology, etc. SBC asserts that such questions should be resolved in future fact-specific disputes, not in an industry-wide amendment.

SBC points to the fact that they may change federal tariffs within 30 days and California tariffs, within 30 days or less.

We find the CLECs' request to have 60 days' notice of a proposed change in the access tariff is reasonable, since the CLECs will rely on the commingled arrangement to provide service to their customers and will need time to plan how to transition to another service, if necessary. This notice has nothing to do with the notice required by this Commission [*98] and the FCC for implementing tariff changes. It simply gives the affected CLEC additional time to plan, in advance of formal filings at this Commission or at the FCC.

In its comments on the DD, SBC asserts that the adopted language is extraordinarily broad, as it would require SBC to provide 60 days' advance notice of *any* change in SBC's access tariffs that affected DS1 or DS3 loops or transport in any way at all even as to CLECs who are not using those elements in commingled arrangements. SBC also finds the language the CLECs propose to be internally inconsistent. Is the 60 days' notice required only if SBC eliminates the availability of a product, as opposed to any and all tariff changes?

SBC also asserts that the DD's conclusions violate the filed-rate doctrine, which bars one customer from receiving services under a tariff that are different than all other similarly-situated customers. SBC stresses that under the DD, not all carriers who purchase SBC's tariffed services will be treated equally. Instead, those carriers who choose to commingle their tariffed services with UNEs will receive favorable terms, both as to notice and grandfathering.

In response, the CLECs point out [*99] that not all discrimination among customers is illegal, only that which is "undue." n22 We find that a CLEC purchasing an access service for commingling with a UNE is different from all other "similarly-situated customers," since the CLEC is relying on the commingled arrangement of an access service and a UNE to provide service to its customer. Without that access portion of the arrangement, the CLEC cannot provide service to its customer.

n22 *See e.g.*, D.98-01-022, mimeo. at 5, in which the Commission permitted SBC's DALIS tariff rates to be used on an interim basis, however, subject to true-up, notwithstanding the tariff's differences from the rates that SBC was charging CLECs for access to the same data under interconnection agreements. This interim arrangement was found not to constitute undue discrimination because rates in the interconnection agreements were "part of an integral package of terms and conditions specifically negotiated by the parties," and it would not be appropriate to arbitrarily single out one term of such interconnection agreements and apply that term to other competitors that were not bound by the comprehensive terms of any one interconnection contract." Discriminatory treatment is considered undue only if it provides an advantage to some customers and a disadvantage to others. To establish any such effect, comparison must be made between comparable situations. *Reuben H. Donnelley Corp. v Pacific Bell*, D.91-01-016, (a99a, 39 Cal, P.U.C.2d 209, 242.

[*100]

As the CLECs point out, most network changes require considerably longer planning horizons than sixty days, and SBC surely plans its special access tariff changes for longer than that. Therefore, there should be no problem in giving the CLECs' 60 days' notice of changes that affect their service.

We agree with SBC that the CLECs' proposed language is broad and confusing. We believe that the notice should go only to the CLECs who are actually purchasing an access service as part of a commingled arrangement, and the notice would be limited to notice about that specific access service. We will make changes to Section 5.7 below.

We have ordered ILECs to grandfather services in the past, and we will do so in this instance, as well. Grandfathering a particular access service will enable the CLEC to continue to serve its customer. However, we point out that the grandfathering we order applies only to our California tariff since we do not have the authority to require grandfathering of a federal tariff. We agree with SBC, that the final sentence of Section 5.7 is vague and difficult to enforce, and it will be rejected.

Following is the adopted language for Section 5.7:

In the event that [*101] SBC changes its Access tariffs, or adds new Access Tariff(s), that would restrict or impact the availability or provisioning of Commingled arrangements under this Attachment or the Agreement, SBC will provide 60 days notice to CLEC if the tariff change affects the availability of a product used by that CLEC to provide a commingled arrangement, pursuant to the notification process associated with such access tariffs as provided for under Section 214 or applicable state law prior to such changes or additions. Additionally, for additions or changes that do more than impact rates, SBC will grandfather in place Commingled arrangements ordered out of its state Access tariff that have been ordered prior to the Access tariffs effective date.

**FF. Issue 33, Section 6.1 -- Which term, amendment or agreement, should be used to correctly identify the scope of any conditions or limitations for obtaining access to EELs or to any other UNE combinations?**

The parties dispute whether the "Amendment" that is the subject of this arbitration should be the sole source of conditions or limitations on the availability of enhanced extended loops (EELs) to CLECs, or whether SBC should be permitted to [*102] continue in effect any conditions or limitations on the availability of EELs that appear in the CLECs' underlying agreements.

SBC points out that in agreed-upon language, Point 2 of the amendment expressly provides that in the event of a conflict between the amendment and the agreement, the amendment will govern. SBC states that its language is intended not to retain illegal restrictions but to allow for instances where an agreement's General Terms and Conditions impose obligations on the party that are not contradicted by the amendment, in which case the terms of the agreement will govern.

In light of the protections offered under Point 2, CLECs will not be bound by restrictions on EELs that are included in various CLECs' ICAs. However, the language in Section 6.1 could be open to interpretation. SBC's proposed language states, in part:

> SBC shall not impose any additional conditions or limitations upon obtaining access to EELs, or to any other UNE combinations, other than those set out in this Agreement.

The CLECs proposed language is adopted in Section 6.1. There should be no additional "conditions or limitations upon obtaining access to EELs," other than those in this amendment. [*103] We find SBC's proposed language at odds with the requirement in Point 2 that the amendment will govern.

**GG. Issue 34: Section 6.3.6 -- Should CLECs be able to provide blanket certification of eligibility for purchase of EELs in a particular central office?**

The CLECs state that their proposed language promotes the FCC's rationale in the *TRO* which is to limit undue burdens on CLECs while at the same time effectively limiting UNE access to bona fide providers of qualifying service. The CLECs assert that the FCC did not intend to apply a cumbersome paper process to qualifying CLECs via circuit-by-circuit certification.

The CLECs rely on the language in P 624 which states in part:

> We do not specify the form for such self-certification, but we readopt the Commission's findings in the *Supplemental Order Clarification* that a letter sent to the incumbent LEC by a requesting carrier is a practical method.

SBC relies on the language in P 599 which states:

> We apply the service eligibility requirements on a circuit-by-circuit basis, so each DS1 EEL (or combination of DS1 loop with DS3 transport) must satisfy the service eligibility criteria.

SBC's language in Section 6.3.6 [*104] is adopted. The CLECs' language would allow the CLEC to provide a blanket certification letter, rather than a "circuit specific certification." The FCC's language in PP 623 and 624 is clearly dealing with certification of a single circuit; nowhere does the FCC support a blanket certification. We note that a letter would be appropriate, if it contained circuit-specific certification.

In their comments on the DD, the CLECs assert that the FCC is clear that the *criteria* required for a CLEC to self-certify has nothing to do with the *process* for certification. The CLECs therefore assert that a letter containing circuit-specific certification is not appropriate. We do not agree. In reviewing the section of the *TRO* that deals with EEL certification, the FCC clearly anticipates that that information will be certified on a circuit-by-circuit basis.

> We conclude that requesting carrier self-certification to satisfying the qualifying service eligibility criteria for high-capacity EELs is the appropriate mechanism to obtain promptly the requested circuit . . . n23

And further in the following paragraph:

> Before accessing (1) a converted high-capacity EEL, (2) a new high-capacity [*105] EEL, or (3) part of a high-capacity commingled EEL as a UNE, a requesting carrier must certify to the service criteria set forth in Park VII.B.2.b in order to demonstrate that it is a bona fide provider of qualifying service. We do not specify the form for such a self-certification, but we readopt the Commission's finding in the *Supplemental Order Clarification* that a letter sent to the incumbent LEC by a requesting carrier is a practical method. n24

n23 *TRO* P 623.

n24 *TRO* P 624.

**HH. Issue 36: Section 6.3.7.4 -- What process should be used if a CLEC disagrees with the conclusions of the auditor's report? Also, should CLECs be required to remit payment or permitted to withhold payments pending a dispute?**

The CLECs do not dispute that, if an independent auditor concludes that a CLEC has incorrectly self-certified that it meets the FCC's EEL eligibility criteria, the CLEC is required to pay a true-up for each affected circuit. SBC points out that the TRO expressly provides, "[t]o the extent the [*106] independent auditor's report concludes that the competitive LEC failed to comply with the service eligibility criteria, that carrier must true-up any difference in payments, convert all noncompliant circuits to the appropriate service, and make the correct payments on a going forward basis." (TRO P 627.)

The parties provide different methods for resolving any disputes regarding the independent auditor's conclusion. SBC would require the CLEC to initiate a proceeding here at the Commission, while the CLECs would employ the dispute resolution procedures in the ICA. SBC claims that the CLEC proposal would delay the true-up payments until after any dispute over the independent auditor's conclusion is resolved. Both parties point out that the parties reached an agreement in the parallel Illinois proceeding; that agreement required the CLEC to place the disputed amount into an escrow account, pending resolution. SBC supports that approach while the CLECs reject it, stating that they should not be required to undertake additional financial and administrative burdens when there is a legitimate dispute over an auditor's findings.

We believe that disputes under this ICA should be resolved using [*107] the dispute resolution process established in the ICA. Therefore, we will order that the CLECs' language on that issue be adopted. However, the FCC makes it clear that auditing is an important element in the CLECs' right to order and utilize EELs. Therefore, violation of the rules for use of EELs is not taken lightly. Therefore, we will adopt the establishment of an escrow account, based on the Illinois model. However, in their comments on the DD, the CLECs make a convincing argument that holding unlimited amounts of funds in an escrow account for an unpredictable amount of time would be unreasonably handicap CLECs. Therefore, we have established that fifty percent of the disputed amount will be placed in the escrow account. The following language is adopted in Section 6.3.7.4:

SBC shall provide CLEC with a copy of the report within 2 business days from the date of receipt. If the parties disagree as to the findings or conclusions of the auditor's report, the parties should resolve such disputes in accordance with the Dispute Resolution process set forth in the General Terms and Conditions of the Agreement. No changes will be made until the dispute is resolved. However, CLEC shall [*108] pay 50 percent of the disputed amount into an escrow account, pending resolution. If the auditor's findings are upheld in the dispute resolution process, the disputed amounts held in escrow shall be paid to SBC and SBC shall retain any disputed amounts already paid by CLEC. If the auditor's report concludes that CLEC failed to comply in all material respects with the eligibility criteria and if CLEC does not dispute the finding the CLEC will submit payment for the disputed amounts to SBC.

**II. Issue 37: Section 6.3.7.5 -- To what extent should CLEC reimburse SBC for the cost of the auditor in the event of an auditor finding of noncompliance?**

Section 6.3.7.5 requires a CLEC to correct the noncompliance of any circuit determined by the auditor to be non-compliant and to reimburse SBC for the cost of the audit. The CLECs propose that an audited CLEC's payment should be in proportion to the number of non-compliant circuits, i.e. by comparing such circuits to the total number of all high capacity circuits leased by the CLEC which were the subject of the audit. Under SBC's proposal, if the number of non-compliant circuits is 10 percent or more of the circuits investigated, the CLEC [*109] is in substantial non-compliance and must pay the entire cost of the audit.

SBC's language is Section 6.3.7.5 is adopted. We believe that SBC's language is fair. Ten percent non-compliant circuits demonstrates serious disregard for the FCC's rules. In that case, the CLEC should pay the entire cost of the audit.

**JJ. Issue 47: Section 11.1.3-What conditions should apply before SBC can retire a copper loop that CLEC is currently using to provide service to a customer?**

SBC points out that the FCC's rules require that, "[p]rior to retiring any copper loop or copper subloop that has been replaced with a fiber-to-the-home loop or a fiber-to-the-curb loop, an incumbent LEC must comply with: (A) The network disclosure requirements set forth in Section 251(c)(5) of the Act and in Section 51.325 through Section 51.355; and (B) Any applicable state requirements. SBC states that its proposed language in Section 11.1.3 implements this language practically verbatim. In addition, SBC has agreed to additional pro-CLEC language allowing the CLECs the option of requesting a line and station transfer (LST) to copper (or non-packetized) loop where available.

The CLECs insist that they simply request [*110] the ability to continue serving an existing DSL customer over an existing copper loop, unless SBC obtains a finding from the Commission that decommissioning the copper loop is in the public interest. The CLECs state that SBC's voluntary offer to perform an LST does not address the underlying problem, because SBC's offer only applies when an alternative copper loop facility is available. If an alternative copper loop facility is unavailable, SBC will simply disconnect the original copper loop and disconnect the customer's DSL service. The CLECs assert that since SBC and the CLECs do not offer the same brands of DSL service, the CLEC's customer may not be able to get the DSL service he/she wants from SBC.

SBC points out that the FCC rejected the suggestion that continued availability of DSL-capable loop is a prerequisite to copper retirement. The FCC found that in overbuild situations-which is by definition the case where SBC seeks to retire a copper loop following deployment of fiber facilities -- the "fiber loops must be unbundled for narrowband services only." n25

n25 *TRO* P 273.

[*111]

Paragraph 284 reads as follows:

As a final matter, we stress that we are not preempting the ability of any state commission to evaluate an incumbent LEC's retirement of its copper loops to ensure such retirement complies with any applicable state legal or regulatory requirements. We also stress that we are not establishing independent authority

based on federal law for states to review incumbent LEC copper loop retirement policies. We understand that many states have their own requirements related to discontinuance of service, and our rules do not override these requirements. We expect that the state review process, working in combination with the Commission's network disclosure rules noted above, will address the concerns of an incumbent LEC retiring its copper loops.

We need to read the paragraph in its entirety to understand the role the FCC envisions for the states. We have not promulgated any rules regarding the retirement of copper loops, and we reject the CLECs' proposed language in Section 11.1.3 that would require SBC to come to the Commission for permission to retire *a single copper loop*. While we acknowledge that we would prefer that customers not lose their DSL [*112] service, we do not intend to micromanage SBC's network to the extent requested by the CLECs.

**KK. Issue 48: Section 11.1.4 -- What restrictions, if any, should be placed on SBC's policy, practice, and procedure for the engineering and pricing of local loops, subloops, and hybrid loops?**

SBC states that the agreed-upon language in Section 11.1.4 precisely captures the FCC's Rule 51.319(a)(9). The CLECs make much of the fact that SBC agreed to this same language in several other states, saying that the CLECs' proposal merely gives the requirements of Section 51.319(a)(9) necessary context by setting out the access to a local loop that the CLECs are entitled to.

We disagree with the CLECs' view. The language that the CLEC is entitled to the "full capabilities" of a fiber loop would mean that the CLEC has access to the packetized portion, as well as to the TDM capabilities of the loop which are used to provide voice service. That would be contrary to the FCC's rules, which allow CLECs only to the TDM path on a fiber loop. The CLECs' language in Section 11.1.4 is rejected.

In addition, we have already determined in Issue 47 above, that SBC will not be restricted from retiring its copper [*113] loop plant. Section 11.1.4 would limit the ability of SBC to retire loop plant, if that retirement would "limit or restrict CLEC's ability to access all of the loop features, functions and capabilities, including DSL capabilities . . ."

**LL. Issue 49: n26 Section 11.2.5 -- Where CLEC has requested access to a loop to a customer premises that SBC serves with an IDLC hybrid loop, under what conditions can SBC impose nonrecurring charges other than standard loop order charges and, if applicable, charges for routine network modifications?**

n26 The CLECs and SBC have reversed the order of Issues 49 and 50. We have used SBC's numbering system.

The CLECs state that the *TRO* makes it clear that SBC is not excused from its obligations to provide unbundled hybrid loops where it has deployed IDLC systems. The FCC recognized that providing unbundled access to IDLC loops may require the ILECs to implement practices and procedures different from those used to provide access to UDLC loops. Despite this finding, the FCC explicitly [*114] held that:

Even still, we require incumbent LECs to provide requesting carriers access to a transmission path over hybrid loops served by Integrated DLC systems. We recognize that in most cases this will be either through a spare copper facility or through the availability of Universal DLC systems. Nonetheless even if neither of these options is available, incumbent LECs must present requesting carriers a technically feasible method of unbundled access. n27

n27 *TRO* at P 297 (footnotes omitted).

According to the CLECs, the heart of Issue 49 is whether it is appropriate for SBC to charge a CLEC for the cost of building a new loop when other, less costly means of providing a CLEC unbundled access to an IDLC loop are readily available. The CLECs' proposal would only prohibit SBC from charging extra fees for special construction when no

such construction was truly necessary. The CLECs have agreed to afford flexibility to SBC to decide which "technically feasible method" of access to offer to the CLEC, so that [*115] SBC can maintain control over its network.

The CLECs' language merely requires that SBC charge the CLEC the "least cost technically feasible method of un-bundled access." SBC is left with the final decision as to how to provide that service, either through building a new loop, finding another copper pair, or using a ULDC loop. The CLECs' language in Section 11.2.5 is fair and will be adopted. There is no reason why SBC should not choose the least cost alternative.

**MM. Issue 50: Section 11.2–Should Section 11.2 of the interconnection agreement amendment, which relates to hybrid loops, include language derived from footnote 956 of the TRO?**

Issue 2 above addresses the parties' dispute over whether SBC may refuse to make hybrid loops available to CLECs to serve customers that are not defined as Mass Market Customers. In that issue, we determined that the FCC did not anticipate that the rules adopted for FTTH and hybrid loops would apply to enterprise loops, and that the FCC clearly did not intend that CLECs would be denied the ability to receive unbundled access to DS1 loops served over fiber. Therefore, for the same reasons given in Issue 2, we adopt the CLECs' language in Section [*116] 11.2.

**NN. Issue 51: Sections 14.2, 14.3, 14.4, and 14.5 -- Is SBC required to provide entrance facilities to CLECs pursuant to 251(c)(3)? If not, what is the applicable process for the transition or disconnection of such facilities? Is SBC required to provide entrance facilities to CLECs for use in interconnection pursuant to Section 251(c)(2)? If so, what rate should apply? May CLEC request that entrance facilities or dedicated transport be "reclassi-fied" as an interconnection facility and, if yes, what rate, if any, should apply?**

An entrance facility is a form of dedicated transport that provides a transmission path between the networks of SBC and a CLEC. The parties agree that both the *TRO* and *TRRO* held that entrance facilities need not be unbundled, and are no longer a UNE under Section 251(c)(3). The dispute is whether the CLECs are entitled to continue to receive entrance facilities for purposes of interconnection under Section 251(c)(2).

SBC asserts that Section 251(c)(2), which governs interconnection, does not require the provision of any facilities, but only requires that the incumbent permit a CLEC to interconnect the CLEC's own facilities to the incumbent's [*117] network.

The CLECs do not agree, stating that the CLECs have obtained entrance facilities from SBC both (1) to use to backhaul their own services from the central office to their own facilities and (2) to interconnect with SBC's network for the transmission and routing of telephone exchange service and exchange access service. CLECs state that they were entitled to access for the first purpose as a UNE under Section 251(c)(3), and for the second purpose under Section 251(c)(2). According to the CLECs, the FCC held unequivocally that though it declassified entrance facilities as a UNE under Section 251(c)(3), nothing in that decision affected the requirement that ILECs provide such facilities at TELRIC prices when used for interconnection pursuant to Section 251(c)(2). n28

n28 The CLECs cite TRO PP 366 and 368 and *TRRO* P 140.

SBC on the other hand states that it is clear that Section 251(c)(2) does not require the provision of any facilities, but only requires that the incumbent permit a CLEC to interconnect the [*118] CLEC's own facilities to the incum-bent's network.

In other words, SBC asserts that Section 251(c)(2) allows CLECs only to choose a "point": at which to interconnect with the ILEC's network; it is Section 251(c)(3) that "further" allows CLECs to obtain access to ILEC facilities. SBC also states that even assuming the text of Section 251(c)(2) could be read to require the provision of any facilities at all, the required facilities are limited to those facilities located at the interconnection point that is within SBC's network, not the miles of transport ordered by CLECs extending outside SBC's network. According to SBC, the *TRO* and *TRRO* re-quire at most that ILECs provide crossconnect facilities that permit CLECs to connect their own networks at a techni-cally feasible point within the ILEC's network.

The *TRO* and the *TRRO* do not support SBC's contention that interconnection responsibilities do not include facili-ties.

In reaching this determination n29we note that, to the extent that requesting carriers need facilities in order to "interconnect with the [incumbent LEC's] network," section 251(c)(2) of the Act expressly provides for this and we do not alter the Commission's [*119] interpretation of this obligation.

In addition, *TRRO P* 140 reads as follows:

[o]ur finding of non-impairment with respect to entrance facilities does not alter the right of competitive LECs to obtain interconnection facilities pursuant to section 251(c)(2) *for the transmission and routing of telephone exchange service and exchange access service*. Thus, competitive LECs will have access to these facilities at cost-based rates to the extent that they require them to interconnect with the incumbent LEC's network. (Emphasis added.)

n29 The determination discussed in this paragraph is the FCC's determination that the dedicated transport UNE includes only those transmission facilities within the ILEC's network.

Clearly, the FCC established that interconnection would include the facilities used to effect that interconnection, and those facilities encompass more than just the crossconnects described by SBC. The FCC is also clear that interconnection, like UNEs, should be priced at TELRIC. The CLECs' language [*120] in Sections 14.2-14.5 is adopted.

**OO. Issue 52: Sections 15 and 1.1(IX) -- Should CLECs' proposed Section 15 (Signaling System 7) and other reference to SS7 be included in the amendment or handled elsewhere?**

SS7, or "Signaling System 7" is the network infrastructure that transmits signaling messages within and between networks. In the *TRO*, the FCC ruled that SS7 is a UNE only where CLECs are impaired without access to unbundled local switching. Subsequently, in the *TRRO*, the FCC eliminated the unbundled switching obligation altogether, making clear that this decision also eliminated any obligation to provide unbundled access to an ILEC's signaling network. SBC cites P 200, n 529 as follows:

To the extent that unbundling of shared transport, signaling, and call-related databases were contingent upon unbundling of local circuit switching in the *Triennial Review Order*, the availability of those elements on an unbundled basis continue to rise or fall with the availability of unbundled local circuit switching.

As a result, ILECs will not in the future be required to unbundle signaling networks at all. However, SBC states that it will continue to provide access to [*121] SS7 pursuant to the terms and conditions in its access tariffs.

According to SBC, the CLECs attempt to resurrect the SS7 unbundling obligation by claiming that SBC must unbundle SS7 pursuant to the interconnection obligation in Section 251(c)(2) and thus provide it at TELRIC rates.

In its comments on the DD, SBC states that the language proposed by the CLECS is actually drawn from SBC's previous UNE offering of SS7. SBC opposes the extensive CLEC language that broadly requires that SBC provide access to its SS7 signaling. SBC notes that the following language which allows for interconnection to SBC's SS7 network was voluntarily agreed to in its ongoing bilateral arbitration with MCI:

15 Signaling

15.1 Where Signaling System 7 (SS7) is deployed, the Parties will use SS7 signaling as defined in GR 317 and GR 394, including ISDN User Part ("ISUP") for trunk signaling and Transaction Capabilities Application Part ("TCAP") for SS7 based features. The Parties may interface with one another on an SS7 basis either directly or through a Third Party. The Parties will cooperate in the exchange of TCAP mes-

sages to facilitate full interoperability of SS7 based features between their respective [*122] networks, including CLASS features and functions, to the extent each carrier offers these features and functions to its own end user customers. The Parties shall exchange unaltered SS7 signaling parameters, including, but not limited to, Automatic Number Identification (ANI), Calling Party Number (CPN), Calling Party Category, Charge Number, Originating Line Information (OLI), etc. Privacy indicators will be honored by the parties.

15.2 Where available, the Parties will provide network signaling information such as Transit Network Selection ("TNS") parameter, Carrier Identification Codes ("CIC"), Common Channel Signaling (CCS) Platform and CIC/OZZ information (non CCS environment) at no charge wherever this information is needed for call routing or billing. The Parties will follow all industry standards pertaining to TNS and CIC/OZZ codes.

The CLECs view this as similar to the access to entrance facilities described in Issue 51. We agree. The FCC states that carriers have to provide interconnection to their SS7 network.

We reiterate the same conclusion that we made in Issue 51, interconnection of the SS7 signaling networks is required pursuant to the Act's interconnection requirement [*123] of Section 251(c)(2), and as such must be priced at TELRIC. The CLEC's language in Sections 1.1(ix) is adopted. The CLECs' proposed language in Section 15 which allows for unbundled access to SBC's SS7 network is rejected and replaced with the language proposed by SBC above.

## IV. Comments on Draft Decision

The draft decision of the ALJ in this matter was mailed to the parties in accordance with Pub. Util. Code § 311(g)(1) and Rule 77.7 of the Commission's Rules of Practice and Procedure. Comments were filed on January 18, 2006 and Reply Comments, on January 23, 2006. Those comments have been taken into account, as appropriate, in finalizing this decision.

## V. Assignment of Proceeding

Michael R. Peevey is the Assigned Commissioner and Karen A. Jones is the assigned ALJ in this proceeding.

## Findings of Fact

1. A single building is defined as a structure under one roof.

2. The FCC did not anticipate that the rules adopted for FTTH and hybrid loops would apply to enterprise loops.

3. An MDU which allocates more than 50 percent of the rental square footage to residences is "predominantly residential."

4. A very small business [*124] is not likely to be served by 23 DS-0's.

5. The FCC's rule Section 51.5 specifies that all UNE loops are to be included in the definition of a business line.

6. The term "fiber-based collocator" does not apply to SBC, any affiliate of SBC, or any entity that is currently subject to a binding agreement that would result in its becoming an affiliate of SBC.

7. The FCC envisions that two different CLECs will be involved in the line splitting process.

8. It is appropriate to include a definition for dark fiber loops.

9. The unbundling obligation for IDLC loops is limited to narrowband service using the TDM-based features, functions and capabilities of hybrid loops.

10. The term cross connect refers to a cable that connects CLEC's collocation arrangement to the ILEC's distribution frame.

11. It is appropriate to include a definition for hot cut in this amendment, since the issue of batch hot cuts will be considered as part of this proceeding.

12. The definition of "Applicable Law" provided by the CLECs ensures that CLECs have access to Section 271 elements.

13. TELRIC pricing is not required for declassified Section 271 elements.

14. The FCC has not claimed exclusive jurisdiction over the [*125] pricing of the Section 271 elements.

15. CLECs have the option to replace TRO affected elements with any lawful alternative arrangements that may be available to them, whether under federal or state law.

16. CLECs will cease to pay their current TELRIC rates once those customers have been migrated to other serving arrangements.

17. CLECs have an obligation to ensure that they submit their orders to complete the transition in a timely fashion.

18. ILECs are never required to perform conversions in order to continue serving their own customers.

19. Conversions between wholesale services and UNEs are largely a billing function.

20. It is inappropriate to charge a nonrecurring charge for record changes involved in a conversion or transition that does not involve physical work.

21. There are some costs typically associated with establishing new services that will not be incurred by SBC in carrying out transitions or conversions.

22. CLECs should pay the appropriate non-recurring charge based on how they submit their service orders.

23. In the *TRRO*, the FCC ruled that new UNE-P arrangements were not available after March 11, 2005.

24. CLECs are entitled to TSR pricing if the migration [*126] of their customers is not completed by the deadline.

25. The FCC discussed subloops separately from loops, and in the *TRRO* the FCC did not disturb its findings in the *TRO* relative to subloops.

26. The DS1 limitation applies only on those routes for which the FCC determines that there is no unbundling obligation for DS3 transport.

27. When a wire center is designated as non-impaired, it has a large impact on the CLEC's business.

28. CLECs are entitled to advance information on wire center designations to be able to adjust their business plans, and to plan to dispute a designation.

29. Having SBC update its list of non-impaired wire centers on a known periodic basis brings certainty to the planning process for the CLEC.

30. It is appropriate to have SBC update its list of non-impaired wire centers no more than one time during any given three-month period.

31. Transition periods of nine months for DS1/DS3 high capacity loops and DS1/DS3 dedicated transport and 12 months for dark fiber dedicated transport will allow CLECs to perform the necessary tasks involved in transitioning from UNEs.

32. CLECs may not add new high-capacity loops or dedicated transport during the transition [*127] period.

33. It is appropriate to establish a deadline of three years for CLECs to self-certify and dispute SBC's designation of a particular wire center as non-impaired.

34. It is difficult for the CLECs to try to identify a docket number when all they know is that a dispute has been filed.

35. It would be inconsistent with federal rules to let CLECs continue to access UNE loops from a non-impaired wire center.

36. SBC has the information on the status of its wire centers much more readily available than the CLECs do.

37. If SBC does not have an alternative method for counting business lines, then the annual ARMIS data will suffice.

38. CLECs have competitive alternatives to replace UNEs in non-impaired wire centers.

39. If a CLEC enters into a long-term contract to receive discounted services, the CLEC may not dissolve the long-term contract based on new circumstances.

40. The CLECs need commingling of channelized DS1 and DS3 loops in order to serve their customers.

41. The CLECs' request to have 60 days' notice of a proposed change in SBC's access tariffs is reasonable, in those instances where the CLEC is using the affected service as part of a commingled arrangement.

42. SBC should [*128]  be required to grandfather the special access services in its California tariff, in the event that loss of the service would impact a CLEC's commingling arrangement.

43. There should no additional conditions or limitations upon obtaining access to EELs, other than those in the amendment.

44. Disputes under an ICA should be resolved using the dispute resolution process established in the ICA.

45. Auditing is an important element in the CLECs' right to order and utilize EELs.

46. Violation of the rules for use of EELs is not taken lightly.

47. It is appropriate to establish an escrow account for those cases where the CLEC disputes the auditor's findings.

48. Ten percent non-compliant EEL circuits demonstrates serious disregard for the FCC's rules.

49. The Commission has not promulgated any rules regarding the retirement of copper loops.

50. The Commission does not intend to micromanage SBC's network, by requiring SBC to petition to retire a single copper loop.

51. When CLECs request access to a premises served by an IDLC loop, it is appropriate that SBC charge the CLEC the least cost technically feasible method of unbundled access.

52. Entrance facilities used for purposes of interconnection [*129]  must be made available to CLECs pursuant to Section 251(c)(2).

53. The FCC requires ILECs to interconnect their signaling networks with those of CLECs, pursuant to Section 251(c)(2).

54. This is a proceeding under the state arbitration provisions of the Act.

## Conclusions of Law

1. Nothing about the result of this arbitration is inconsistent with governing federal law.

2. No arbitrated portion of the Amendment to the ICA fails to meet the requirements of Section 251 of the Act, including FCC regulations pursuant to Section 251, or the standards of Section 252(d) of the Act.

3. The arbitrated amendment should be approved.

4. Section 51.309(e) and *TRO P* 579 allow for commingling of UNEs with Section 271 elements.

5. The Commission's authority to require commingling Section 251(c)(3) UNEs with wholesale Section 271 elements is found in Section 252(c)(1).

6. A restriction on commingling would constitute an unjust and unreasonable practice' under Section 201 of the 1996 Act, as well as undue and unreasonable prejudice or advantage under Section 202 of the Act.

7. Conversion charges are inconsistent with Section 202 of the Act, which prohibits carriers from subjecting any person [*130]  or class of persons to any undue or unreasonable prejudice or disadvantage.

## ORDER

Therefore, **IT IS ORDERED** that:

1. Pursuant to the Telecommunications Act of 1996, the Amendment to the Interconnection Agreements between SBC California and various Competitive Local Exchange Carriers is adopted.

2006 Cal. PUC LEXIS 33, *

2. The parties' shall have in place fully-executed copies of the amendment within 14 days of the effective date of this order.

3. The effective date for the amendments shall be the effective date of this order.

This order is effective today.

Dated January 26, 2006, at San Francisco, California.

MICHAEL R. PEEVEY

President

GEOFFREY F. BROWN

SUSAN P. KENNEDY

DIAN M. GRUENEICH

RACHELLE B. CHONG

Commissioners