**<u>Illinois 271 Order</u>,**
**2004 Ill. PUC LEXIS 675**

2 of 2 DOCUMENTS

XO Illinois, Inc.
Petition for Arbitration of an Amendment to an Interconnection Agreement with Illinois Bell Telephone Company Pursuant o Section 252(b) of the Communications Act of 1934, as Amended

04-0371

ILLINOIS COMMERCE COMMISSION

*2004 Ill. PUC LEXIS 675*

October 28, 2004

**OPINION:** [*1]

### AMENDATORY ARBITRATION DECISION

### ARBITRATION DECISION

By the Commission:

## I. PROCEDURAL BACKGROUND

This proceeding was initiated by a Petition for Arbitration ("Petition") filed with this Commission on May 3, 2004 by XO Illinois, Inc. ("XO"), pursuant to subsection 252(b) of the federal Telecommunications Act of 1996 ("Federal Act") n1 and *83 Ill.Adm.Code 761*, to amend an interconnection agreement (the "ICA") with Illinois Bell Telephone Company d/b/a SBC Illinois ("SBC"). SBC is an incumbent local exchange carrier ("ILEC") in certain geographic areas of Illinois. XO is a competitive local exchange carrier ("CLEC") providing telecommunications services in, *inter alia*, areas in which SBC also provides local services.

n1 *47 U.S.C. § 252*(b).

SBC filed its Response to XO's Petition on June 1, 2004. SBC also identified additional disputed issues for resolution, as it is permitted to do under subsection 252(b)(4) of the [*2] Federal Act n2. XO filed its Response to SBC's issues on June 15, 2004. That filing included an Unresolved Issues Matrix, which contained, *inter alia*, the parties' disputed issues and their respective proposed amendatory texts for the ICA.

n2 *47 U.S.C. § 252*(b)(4).

XO initially identified seven issues for arbitration. SBC filed a motion to dismiss on May 13, 2004, to which XO and Commission Staff ("Staff") filed responses on May 21, 2004. The Administrative Law Judge ("ALJ") issued a Ruling on the SBC motion on June 3, 2004, dismissing XO Issue 1 and postponing ruling on XO's other issues pending additional flings. On June 8, 20004, XO requested reinstatement of XO Issue 1 and voluntarily withdrew XO Issue 3. On June 24, 2004, the ALJ issued a Ruling reinstating XO Issue 1 and acknowledging withdrawal of XO Issue 3.

On June 9, 2004, XO filed a motion to dismiss certain SBC arbitration issues and to strike related language in SBC's proposed amendment to the ICA. On June 16, 2004, [*3] SBC and Staff filed their respective responses to XO's motion. On June 24, 2004, the ALJ issued a Ruling denying XO's motion (except with regard to certain forward-looking contract language proposed by SBC).

The ALJ conducted a pre-trial hearing on May 11, 2004 in Chicago, Illinois. The parties agreed that open issues would be addressed and contested through written briefings and waived evidentiary hearings. This was consistent with XO's Request for Waiver or Variance of Commission's Rules, filed in conjunction with the Petition, in which XO requested that no evidentiary hearings be conducted n3. The case was marked "heard and taken" on June 29, 2004.

> n3 On May 21, 2004, SBC filed its Response to XO's Motion for Waiver or Variance, in which it declared "no objection" to XO's motion insofar as it pertained to arbitration issues presented by XO.

On June 28, 2004, XO filed a Motion to Withdraw Petition and Terminate Arbitration Proceedings. On June 29, Staff filed a Response recommending that XO's motion be granted. On [*4] July 6, 2004, SBC filed a Response opposing XO's motion. XO withdrew the motion on July 13, 2004.

An Initial Brief ("Init. Br.") and Reply Brief ("Reply Br.") were each filed by XO, SBC and Staff. An ALJ's Proposed Arbitration Decision was served on all parties. Briefs on exceptions ("BOEs") were filed by each participant on August 20, 2004.

Also on August 20, 2004, the Federal Communications Commission ("FCC") issued its "Status Quo Order," n4 which significantly affects certain substantive issues in this proceeding. Accordingly, SBC and XO each filed a Supplemental Brief ("Supp. Br.") on August 31, 2004, and Staff filed its Supplemental Brief on September 1, 2004. Each party filed a Supplemental Reply Brief ("Supp. Rep. Br.") on September 3, 2004. Each such brief addressed the impact of the *Status Quo* Order on this case.

> n4 In the Matter of Unbundled Access to Network Elements & Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers, WC Docket No. 04-313 & CC Docket No. 01-038, Order and Notice of Proposed Rulemaking (rel. Aug. 20, 2004). (Note: We use "*Status Quo* Order" to avoid confusion with the FCC decision colloquially known as the "Interim Order.")

[*5]
## II. JURISDICTION

Subsection 252 of the Federal Act provides that within a specified time period "after the date on which an incumbent local exchange carrier receives a request for negotiation under this section, the carrier or any other party to the negotiation may petition a State commission to arbitrate any open issues." Both XO's Petition and SBC's Response assert that there are open issues between the parties. There is no dispute that the Petition was timely filed. Consequently, the Commission has jurisdiction to arbitrate the issues presented.

Section 252 of the Federal Act proscribes certain procedures, standards and outcomes for arbitrations conducted under that section. In addition, the Commission has adopted rules and procedures for such arbitrations in *83 Ill.Adm.Code 761*. The foregoing federal and state provisions apply to this proceeding.

In its dismissal motion of May 13, 2004, SBC argued that this proceeding could not be conducted under Section 252. As the ALJ ruled, this arbitration was compelled by paragraph 703 of the TRO, which mandates that carriers use Section 252 arbitration processes to incorporate TRO-related changes [*6] in their ICA, when that ICA is "silent" on

legal change and transition timing. Since the change-of-law provision in the SBC-XO ICA contemplates negotiation, but has no dispute resolution mechanism to resolve an impasse (other than a reference to "applicable law"), the ALJ held that the ICA was "silent" and that the parties therefore defaulted to FCC-required arbitration.

## III. DEFICIENT FRAMING OF OPEN ISSUES

In many instances in this arbitration, the parties have failed to conform to the letter or the spirit of Section 252 of the Federal Act. That statute contemplates a period of 135 days for voluntary negotiations between an ILEC and CLEC for the purpose of achieving an ICA. During the 25 days thereafter, either party can request state commission arbitration of "open issues." Arbitration is requested by a petition, accompanied by documents concerning "the unresolved issues" between the parties. The other carrier may respond within the subsequent 25 days. The Commission must then resolve each of the "unresolved issues" presented in the petition and response, within a period of between 85 and 100 days (depending upon when arbitration was requested). Both Section 252 and Section [*7] 251(c)(1) of the Federal Act impose an obligation to negotiate in good faith.

The Commission believes that the foregoing statutory framework requires diligent and persistent negotiation by the carriers, in support of the clear Congressional intention to foster interconnection. Thus, the initial 135-day negotiation period should be spent doing just what the statute says -- negotiating. This inherently involves identifying both a party's own interests and its differences with its prospective interconnection partner, followed by a resolute effort to clarify and narrow those differences. By the 135<th> day, negotiations should have either produced a complete agreement or precisely framed the parties' remaining unresolved issues. Then, if either party perceives that negotiations are truly at an impasse, this Commission's processes can be enlisted for deciding "unresolved issues."

In the Petition here, XO asserts that "[o]ther than exchanging a few letters and proposed amendments, the parties have not engaged in direct negotiations with each other...XO repeatedly requested that SBC provide dates and times that it was available for negotiations. However, SBC did not do so." Petition at 6. [*8] SBC has never addressed these assertions; thus, it has never denied them.

Accordingly, XO complains that it was not "able to completely determine SBC's positions on each and every issue" that XO presented for arbitration. Id., at 7. This may explain why XO frames certain issues that are either far too general (e.g., "[w]hat eligibility and certification requirements should apply for access to high-capacity EELs pursuant to FCC and ICC rules," XO Issue 6) and/or unconstructively self-evident (e.g., "[s]hould SBC's right to audit...be limited consistent with FCC rules," XO Issue 7). XO may have been attempting to keep these issues broad enough to accommodate whatever specific disputes SBC eventually raised under those general topics. (Alternatively, XO may have hoped to retain the flexibility to alter its own strategies as the case unfolded.)

In the Response, SBC re-frames several of XO's issues, as well as presenting its own. In many instances, however, those issues exceed the inappropriate generality of the XO issues quoted above. Repeatedly, SBC presents this question: "What terms and conditions should apply to...[a service or process]?" Such catch-all questions, along with those [*9] XO issues that are comparably over-broad, are not proper "open" or "unresolved" issues within the meaning of Section 252. Rather, they reflect the absence of negotiations between the parties. It is inconceivable to this Commission that after 135 days of the diligent negotiations contemplated by the Federal Act, carriers would need to ask us to decide every term and condition that should, and should not, apply to wholesale service conversions, high-capacity EELs, dark fiber, line conditioning, SS7, call-related data bases and other important services and provisioning processes.

Several serious adverse consequences flow from the failure to negotiate, to narrow differences, and to properly frame unresolved issues. First, the resources of this Commission and its Staff are squandered. The parties, who are, after all, commercial enterprises, should be expending *their own* resources to determine the terms of their interconnection, as the Federal Act contemplates. The Commission should be presented only with carefully framed disagreements after resolute discussions have led to impasse, not broad and open-ended topics that reflect the absence of discussions. A "let the Commission figure [*10] it out" approach is not what the Congress intended and it diverts us from other duties.

2004 Ill. PUC LEXIS 675, *10

Second, the arbitrating carriers, our Staff and our ALJ are hampered in their preparation for, and conduct of, arbitration proceedings, when the parties frame their actual disputes and stake out their positions on an amorphous, rolling basis, as they have here. Thus, there is often considerable divergence between the "unresolved" issues initially presented by each carrier and the issues each actually addresses in its position summaries (required by the ALJ) and supporting arguments. Further, in several instances, the parties brief different points under the same vague issue or sub-issue. Worse, the carriers settled issues without informing Staff, with the result that Staff briefed resolved issues.

Such circumstances are especially deleterious within the compressed time frame allotted to arbitration under Section 252. Precious time is wasted as the real disputed issues gradually take shape (and sometimes change shape), and as the parties, Staff and ALJ adjust on the fly to the changing landscape of the case. Moreover, the truncated arbitration time frame is itself indicative of Congress's expectation [*11] that precise, unambiguous and fully negotiated issues would be presented for resolution, not broad topics more appropriate for a rulemaking or industry-wide workshop.

Third (and related to the preceding two paragraphs), ambiguous issues tend to produce an under-developed or poorly targeted record. Thus, the parties here frequently accuse each other of failing to produce necessary evidence, and Staff declares that it cannot form an opinion on certain issues due to the absence of sufficient factual evidence. Those excessively broad issues initially framed by the parties apparently appeared to be, by their terms, amenable to resolution without evidentiary hearings. However, by the time the carriers framed some of their actual disputes which should have been properly framed in the first place -- the time to develop a suitable factual record had passed.

Fourth, the federal and state policies favoring interconnection and effective competition are frustrated. This Commission is obligated by the Federal Act to impose conditions and establish rates in the ICA that appropriately implement the substantive requirements of the law. The carriers, in turn, are required to present an ICA for approval [*12] that meets statutory requirements and FCC regulations. These outcomes are far more difficult when the parties have not earnestly negotiated or presented clear and concise issues for final resolution. Absent diligent negotiations, interconnection without arbitration is less likely. Absent carefully framed and properly narrowed issues for arbitration, a complete, unambiguous and approvable ICA is less likely.

It is not enough that XO and SBC each presented its own proposed contract terms. A densely worded schedule of contractual text is not an unresolved issue. It is a monologue. Furthermore, laying those texts side-by-side is not the same as presenting satisfactory open issues. Those texts are lengthy, detailed and highly technical and the movement or deletion of even a single word can dramatically alter the parties' rights and responsibilities. It is not up to the Commission or its Staff to cull those texts in an attempt to discern what elements present a meaningful dispute for which the parties want a specific resolution. That is the job of the parties.

Moreover, it is clear that SBC and XO each know how to frame a clear, concise and carefully tailored issue when they want to. XO [*13] Issues 2 and 5, and SBC Issues 3 and 6 (except subsection (d)) are particularly strong examples.

SBC takes exceptions to the foregoing assessment. It asserts that "[w]hile the parties included topic headings in the arbitration petitions and matrices, those headings were and are intended only as a short-hand description of the topic of an issue." SBC BOE at 28. "[T]he parties presented their competing contract language for arbitration, and briefed their particular disputes regarding that contract language." *Id.*, at 29

SBC's comments reflect a severe and disappointing misunderstanding of what the Federal Act requires and of the consequences of noncompliance. This Commission "shall limit its consideration...to *the issues set forth in the petition and response*." 47 CFR 252(b)(4)(A) (emphasis added). The Federal Act clearly distinguishes *issues* from a party's supporting materials. "A party that petitions a State Commission...shall, at the same time as it submits the petition, provide...all relevant documents concerning (i) *the unresolved issues* [and] (ii) *the position of each party with respect to those issues*." 47 CFR 252((b)(4)(C) (emphasis added). Thus, the Federal [*14] Act regards issues as separate from "the position of [a] party with respect to those issues." While "topic headings," "short-hand descriptions" and "contract language" might constitute the latter, they are not the former. The Commission cannot resolve such non-issues under

2004 Ill. PUC LEXIS 675, *14

subsection 252(b)(4)(A). The Commission can only resolve issues - which, in the context of Section 252, are precisely delineated disputes on points of fact, law or policy.

Nevertheless, in addition to resolving the properly framed unresolved issues presented here, the Commission has endeavored in this Decision to offer specific guidance regarding several ill-formed issues as well. To do otherwise would only delay the process of incorporating the "TRO," n5 as well as the impact of recent *Status Quo* Order n6, into the parties ICA, as the FCC requires. However, we have done no more than what can be supported by the record created by the parties.

> n5 The FCC's Triennial Review Order, In the Matter of Review of Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers, etc., CC Docket No's 01-338, 96-98 & 98-147, Report and Order and Order on Remand and Notice of Proposed Rulemaking (rel. Aug. 21, 2003).

[*15]

> n6 The Status Quo Order creates an "Interim Period" and "Transition Period." The Interim Period starts on the date of publication of the order in the Federal Register and the Transition Period begins immediately after the Interim Period ends. The Commission expects publication of the order on or before September 9, 2004. Even if publication occurs after entry of this Arbitration Decision, however, we nonetheless believe that we are bound by the mandates in the *Status Quo* Order. That Order has already been released by the FCC, and publication will take place in accordance with federal procedures.

## IV. ISSUES FOR RESOLUTION

### A. OPEN ISSUES PRESENTED BY XO

**1. (a) Should SBC be required to make routine network modifications to unbundled network elements ("UNEs"), including loops and transport (including dark fiber), consistent with FCC rules and at the current nonrecurring rates approved by the Commission?**

**(b) Should unbundled network elements UNEs that require network modifications be subject to the standard performance measure provisioning intervals of all UNEs?**

**SBC re-characterizes** [*16] **this issue as follows:**

**(a) Must SBC make routine network modifications at "no additional cost" to XO?**

**(b) Should network modification projects be subject to the standard performance measurement provisioning intervals?**

### 1. Parties' Positions and Proposals n7

> n7 Each party summarized its own positions and proposals, at the direction of the ALJ. Those summaries appear in this Order as drafted by the parties, without any substantive change by the Commission or the ALJ. Minor editorial revisions were made by the ALJ for the sole purpose of standardizing the legal citations, abbreviations and format used throughout this Order. Under no circumstance should anything in the "Parties' Positions and Proposals" sections of this Order be

2004 Ill. PUC LEXIS 675, *16

presented or construed as an assertion, finding or conclusion of the Commission.

a.) XO

(XO-1a). FCC rules require SBC to make routine network modifications to UNEs, including loops, transport, and dark fiber. *47 C.F.R. § 51.319(a)(8)* [*17] & (e)(5). The *TRO* requires ILECs to make the same routine modifications to these UNEs that they make for equivalent services provided to their own customers. *TRO* P 639. The costs of these modifications are captured in SBC's current recurring or nonrecurring charges for these UNEs. Indeed, SBC normally performed these functions for CLECs until an internal SBC policy change halted such work. In addition, SBC regularly performs this work, without additional charge, on special access circuits. If SBC seeks to recover additional charges for routine network modifications, SBC has not produced any evidence to demonstrate the need for, or amount of, any such additional charges and should seek to do so through the proper UNE costing proceeding at the Commission and not through this arbitration.

(XO-1b). The *TRO* expressly stated that to the extent that routine network modifications to existing loop facilities affect loop provisioning intervals contained in performance metrics, "we expect that states will address the impact of these modifications as part of their recurring reviews of incumbent LEC performance." *TRO* at P 639. Thus, the FCC assumes that these performance metrics [*18] apply to all UNEs, including those requiring routine network modifications. Indeed, the FCC observed that at least one ILEC "provides the routine modifications listed above with minimal delay, in most cases, to their own retail customers." *Id.*, fn.1940. SBC has provided no evidence to the contrary in this proceeding, and should present any such evidence as part of the Commission's review of SBC's performance, not this arbitration.

b.) SBC

Issue XO-1 involves several discrete disputes. *First*, the Federal Act, the FCC's rules, and the *TRO* are clear that SBC Illinois is entitled to recover its costs of performing routine network modifications. XO proposes to deny SBC cost recovery on the theory that SBC should (or already does) recover these costs in its recurring rates, but XO has proposed no mechanism to adjust SBC's recurring rates to account for such costs, nor has it even attempted to demonstrate that such costs are somehow already recovered in SBC's current UNE loop prices. The Commission should thus reject XO's proposal, and adopt SBC's proposal that pricing for such modifications should be determined on an individual case basis. (SBC proposed Section 3.16.1.) [*19] SBC acknowledges its duty to avoid double recovery of costs, but this can be dealt with through the ICB pricing process rather than attempting, in this proceeding, to determine whether and to what extent a large variety or work may or may not be included in current unbundled loop prices. This is consistent with the approach of the FCC's Wireline Competition Bureau in the Cavalier n8 arbitration.

        n8 Petition of Cavalier Telephone LLC, FCC DA 03-3947 (Order, adopted & released Dec. 12, 2003).

*Second*, the Commission should reject XO's proposal in Section 3.16.1 to require SBC to construct new loops under the pretext of a "routine network modification." Constructing new facilities is not a "modification" of existing facilities at all. Moreover, in the *TRO* the FCC held *without qualification* that ILECs are not required to "build[] a loop from scratch by trenching or pulling cable," and are not "required to trench or place new cables for a requesting carrier." *TRO*, PP 636, 639. XO's proposed contract [*20] language runs afoul of these directives.

*Third*, the Commission should also reject XO's proposal in Section 3.16.2 to add several specific vague items, not listed by the FCC, as examples of routine network modifications. Those items do not appear in the *TRO*, and XO has provided no evidence that the listed activities in fact constitute routine network modifications under the FCC's rule. SBC'S proposed language, by contrast, accurately tracks the FCC's language and clear intent, and should be adopted.

2004 Ill. PUC LEXIS 675, *20

*Fourth*, XO's proposal in Section 3.16.3 to require SBC to "provide light continuity and functional signal carriage across both ends of a dark fiber" is unsupported by the *TRO*. Dark fiber is just that -- dark. The FCC concluded that CLECs must activate dark fiber themselves using "self-provided optronic equipment," and that "carriers that request dark fiber transport . . . must purchase and deploy necessary electronics." *TRO*, PP 381-82. XO cannot sneak in the back door, under the guise of a "routine network modification," precisely what the FCC prohibited. Moreover, the FCC's routine network modification rule provides that, with respect to dark fiber, such modifications [*21] include activities to "enable a requesting telecommunications carrier to light a dark fiber." 47 CFR319(e)(5). In other words, again the FCC confirmed that it is the CLEC that must do the "lighting."

*Fifth*, the provisioning of network elements that require routine network modifications should not be made subject to the standard provisioning intervals used for UNEs that do not require such modifications. (XO Section 3.16.4.) There is no reason to alter SBC's existing performance measures that govern network element modification. Performing routine network modification activities manifestly increases the time reasonably necessary to provision a network element. It would be against all reason to subject routine network modifications to the same provisioning intervals that were created to measure the provisioning of network elements that do not require such modifications. Moreover, the FCC directed states to "address the impact of these modifications as part of their recurring reviews of incumbent LEC performance." *TRO*, P 639. If XO believes that performance measures should be used to measure the provisioning of network elements that require routine network modifications, it can [*22] raise that issue at the appropriate time (for example, in the 6-month performance measure and remedy plan review that the Commission has already established as part of the Section 271 Plan, in which all CLECs may participate).

c.) Staff

Staff notes that SBC is required to perform certain routine network modifications upon XO's request. SBC's opposition appears to the Staff to be to XO's assertion that it must perform these modifications without charge. SBC asserts that: "SBC ILLINOIS' UNE Loop rates do not take into consideration any additions or modifications to the existing UNE Loop. The existing UNE Loop is already established to capacity. Any modifications to increase capacity, pursuant to the TRO rules, have not been cared for [sic] in the existing UNE Loop rates."

It appears to the Staff that a great many, if not all, of the costs associated with routine network modifications (i.e., with those modifications that SBC performs for its own customers) *may* be costs that SBC recovers in its UNE rates. Specifically, the Staff understands that certain of these costs are recovered in the Annual Charge Factor, which is an adder to UNE rates. The Commission addressed this question [*23] in its recent *Loop TELRIC Order. See* Loop TELRIC Order at 262, 265.

In the Staff's view, this may include such activities as: rearrangement or splicing of cable; adding a doubler or repeater; adding an equipment case; adding a smart jack; installing a repeater shelf; adding a line card, and suchlike other tasks. However, neither party has identified with any degree of specificity what it considers "routine network modifications" to consist of.

This presents a problem, inasmuch as the record before the Commission in this proceeding is simply not adequate to make a determination of this issue. The Commission may determine this issue based upon which party is determined to have the burden of proof. *However, the Staff recommends that both parties frame their positions with greater particularity in their reply briefs.*

2. Analysis and Conclusions

XO Issue 1-a. There is no dispute that FCC rules require SBC to make routine network modifications to UNEs. It is also settled that the TRO, along with the FCC's pre-existing rules, assure SBC "an opportunity to recover the cost of the routine network modifications" required in the TRO. TRO, P 640. XO acknowledges this. XO Init. Br. at [*24] 3. Thus, SBC's reframed version of XO Issue 1-a (SBC/XO 1-a) is readily answered - SBC is not required to make routine

network modifications at no additional cost to XO, unless SBC's opportunity to recover such modification costs lies elsewhere. "The issue, then, is whether the recurring or non-recurring UNE rates that the Commission has authorized SBC to charge include such costs, and if they do not, what are those costs, and what type of cost recovery mechanism should be used." n9 XO Init. Br. at 3.

> n9 This is one of many examples of a party presenting an open issue for resolution, then substantially reframing the issue for argument purposes. The "real" issue should have been presented in the first place in the Petition or Response. Furthermore, the issue XO discusses in its brief is really a compilation of several issues, each of which should have been expressly presented as separate issues or sub-issues in XO's Petition or issues matrix.

The parties agree that SBC does recover some network modification costs in its [*25] TELRIC-based UNE rates. The parties disagree as to whether *all* of the costs of routine modifications are so recovered. Using the example of "a doubler or repeater to enhance voice transmission," SBC Init. Br. at 3, SBC claims that some routine modifications are not accounted for in SBC's existing rates. *Id.* "Some" other network modifications, SBC avers, "might or might not be included [in TELRIC-based prices] depending on the nature of the work presented." *Id.* XO counters that SBC is "fully compensate[d]" through UNE rates for the costs of modifications, principally because SBC "already undertakes [those modifications] for its end user and tariff customers" and includes the associated costs in reports used to develop UNE rates. XO Init. Br. at 4.

Staff's position is that "a great many, if not all, of the costs associated with routine network modifications (i.e., with those modifications that SBC performs for its own customer n10) may be costs that SBC recovers in its UNE rates. Specifically, the Staff understands that certain of these costs are recovered in the Annual Charge Factor, which is an adder to UNE rates." Staff Init. Br. at 31. (In Staff's tentative view, the [*26] costs associated with adding a doubler or repeater are among those recovered in existing UNE rates. n11 *Id.*, at 32.)

> n10 "By 'routine network modifications' we mean that incumbent LECs must perform those activities that incumbent LECs regularly undertake for their own customers." TRO P 632.

> n11 The FCC states that the addition of a doubler or repeater is a routine modification. TRO P 634. The FCC's regulations reflect that determination. *E.g., 47 CFR 51.319 (e)(5).*

The identification of the modification costs recovered through SBC's existing UNE rates is not in the record. XO and SBC accuse each other of failing to establish such identification. XO Init. Br. at 4; SBC Init. Br. at 3. Both are correct. Neither side offered an identification in their filings n12. Therefore, as Staff suggests, the Commission has no adequate foundation for a conclusion on this issue. Staff Init. Br. at 31.

> n12 Indeed, neither party framed an open issue concerning the identity of the modification costs encompassed in such rates.

[*27]

That said, XO argues that the Commission should address SBC's recovery of any presently un-recovered modification costs in a generic costing proceeding, not in an arbitration. XO Init. Br. at 4. SBC's preferred alternative is that "pricing for routine network modifications be addressed on an individual case basis ('ICB')," using pricing provisions SBC would incorporate in the parties' ICA. SBC Init. Br. at 3. SBC supports this proposal with the assertion that "ICB pricing will allow it to determine whether the costs associated with any particular XO request are or are not

2004 Ill. PUC LEXIS 675, *27

already included in the UNE loop price." *Id.* This is a curious assertion, since it implicitly concedes that SBC already knows which network modification costs are presently recovered through UNE rates. Had it provided that information for the record, we would have been able to offer more specific resolution to the parties' disputes regarding network modifications.

Given the state of the record, however, the Commission can only provide principles that the parties will have to apply in order to amend their ICA in accordance with this Decision. First, SBC is prohibited from imposing a charge for any cost already [*28] recovered through its existing UNE rates or any other rate. Second, SBC may impose a charge, on an ICB basis, for any routine network modification cost that is not recovered through existing UNE rates (or any other rate) and for any network modification cost that is not "routine" (see below).

We reject XO's recommendation to address SBC's recovery of any presently un-recovered modification costs in a generic costing docket. As noted, the TRO establishes that SBC is entitled to an opportunity to recover such costs, and we will not delay that opportunity until the close of a docket that does not now exist.

The question of how to distinguish routine network modifications from any other service SBC might provide to XO is not expressly presented in either parties' version of XO Issue 1. Consequently, we will provide only those conclusions and requirements respecting network modifications that we deem essential to completing an ICA.

First, we note that the TRO (as stated above) defines routine network modifications as those an ILEC regularly undertakes for its own customers. The FCC specifically applies this principle to an ILEC's provision of high capacity loop facilities to competitors. [*29] TRO P 633. The FCC also gives this principle broad application to transmission, excepting only the construction of "an altogether new loop" from its general requirement that an ILEC "modify an existing transmission facility in the same manner it does for its own customers." *Id.*, P 639. On the other hand, the FCC concluded that an ILEC is not required "to trench or place new cables n13 for a requesting carrier, whether [to serve] a new customer or along an existing route." *Id.*, P 636. We hold that the parties' amended ICA must strictly incorporate the foregoing FCC principles.

n13 New cable includes installation of new aerial or buried cable. TRO P 632.

Second, specifically regarding unbundled DS1 circuits and loops, the FCC concluded that routine modifications to local loops shall include the addition of the "types of electronics that [ILECs] ordinarily attach to a loop for a customer requiring a DS1 loop, even if such electronics are not attached to a particular loop." TRO P 398. The Commission holds that this [*30] FCC requirement must be fully reflected in the XO/SBC amended ICA. We flatly reject SBC's claim that the term "electronics" is vague and in flux. SBC Init. Br. at 5. As the FCC, which found the term sufficiently clear, explains, the key variable is not what electronics are at any moment in time, but whether there is equivalence between what the CLEC and the ILEC's own customers are receiving. TRO P 634.

We similarly disregard SBC's objection that "tasks listed by XO regarding cross-connects and terminating a DS1 loop to the appropriate NID do not appear anywhere in the *TRO's* discussion of ordinary network modifications." SBC Init. Br. at 5. Again, the distinguishing characteristic of a routine network modification is whether the ILEC performs it for its own customers, not whether it is expressly mentioned in the TRO. TRO P 634.

Third, with specific respect to dark fiber -- which XO includes in the text of XO Issue 1 -- certain FCC principles discussed above are applicable. SBC is no more required to install new dark fiber than it is to install a new cable. Nor is SBC obliged to perform modifications for CLEC dark fiber that are not routinely provide to other ILEC customers.

Additionally, [*31] the CLEC has the duty to furnish its own optronics to activate dark fiber. TRO PP 311, 381-82. However, as SBC recognizes, an ILEC must perform the "activities needed to enable a requesting telecommunications carrier to light a dark fiber transport facility." *47 CFR 51.319 (e)(5)*, cited in SBC Init. Br. at 7.

2004 Ill. PUC LEXIS 675, *31

Whether this includes the activities described by XO in its proposed section 3.16.3 (activities to "enable CLECs to have light continuity and functional signal carriage across both ends of a dark fiber transport or loop facility") cannot be discerned from the record, which is silent on the subject. Nonetheless, if such activities are among the routine modifications SBC provides its customers, or if they are "needed to enable a requesting telecommunications carrier to light a dark fiber transport facility," they are routine modifications that SBC must supply to XO in connection with unbundled dark fiber.

On exceptions, XO stresses that only SBC knows - and XO has no way to verify whether SBC provides a network modification for its own customers, whether SBC already covers the cost of a routine modification through another charge or rate, [*32] or whether costs are accurately reflected in SBC's proposed modification charge to XO. XO BOE at 2. Therefore, XO asks that we require SBC to provide "information sufficient to verify" SBC's position on the foregoing matters whenever SBC either refuses to perform a modification for XO or imposes a modification charge. *Id.* XO's concerns are commercially reasonable, but its remedial proposal goes too far. The question of what information is "sufficient" is likely to embroil the parties, and this Commission, in frequent dispute, as are SBC objections that XO wants confidential or competitively sensitive data. Accordingly, to address XO's legitimate concerns in this competitive context, without inviting disputes or jeopardizing confidentiality, we will require SBC to expressly certify (when it refuses to perform a modification) that it does not perform such modification for its own customers or (when it imposes a modification charge) that no cost recovered by such charge is recovered by any other rate or charge. We will not oblige SBC to certify that its charges are cost-based, since that obligation is already associated with UNEs generally and no additional requirements are needed [*33] for network modifications specifically.

XO Issue 1-b. The FCC states that "to the extent that certain routine network modifications to existing loop facilities affect loop provisioning intervals contained in, for example, section 271 performance metrics, we expect that states will address the impact of these modifications as part of their recurring reviews of incumbent LEC performance." *TRO* at P 639. XO is therefore correct that the FCC directs us to incorporate routine modifications in our measurement of UNE provisioning performance. XO Init. Br. at 4. The question is how.

SBC maintains that it "*already has performance measures* that separately measure the performance of the facilities modification process for orders that are worked through that process." SBC Init. Br. at 8 (emphasis in original). However, a "facilities modification process" is not, by its terms, the same as a loop and transport provisioning process, and neither party explains the extent to which the former captures the latter. Moreover, insofar as existing performance measures address loop and transport provisioning, the record does not reveal whether routine modifications are already considered.

In any event, [*34] SBC argues that the "recurring review" of SBC performance (as contemplated by the FCC, above) was built into the "Section 271 Plan" developed in our Docket 01-0662. That plan includes a semi-annual process for altering the performance measures addressed by the plan. However, Section 6.4 of the Section 271 Performance Plan, on which SBC relies, SBC Init. Br. at 8, simply refers the parties back to the Commission for dispute resolution when they cannot agree upon revisions. The parties certainly disagree here with respect to the reasonableness of measuring modified and un-modified provisioning together. Moreover, although the FCC directs us to account for routine network modifications in our "recurring reviews" of ILEC performance, it does not prohibit us from (or even advise against) addressing this subject in arbitration proceedings. For that matter, it is not clear that we can refrain from resolving an open arbitration issue on the subject (although requiring the parties to use the Section 271 Performance Plan procedures is arguably a permissible resolution of that open issue).

Accordingly, so that the parties can proceed toward a completed ICA, we will articulate certain conclusions [*35] respecting routine modifications and performances measures, with the proviso that the procedures in the Section 271 Performance Plan should not be disturbed in the process. First, it necessarily follows that XO's proposed text (XO 3.16.4) dramatically overreaches, by declaring that SBC's performance with respect to network modifications would be factored into the calculation of remedies *outside the parties' ICA.* The tail would thus wag the dog, as the calculation of Section 271 Performance Plan remedies (to the extent that they do or will address loop and transport provisioning)

would be subordinated to the terms of this arbitrated agreement.

Second, the Commission perceives no benefit in creating a discrepancy between the treatment of routine modifications in the Section 271 Performance Plan and in the instant ICA. To the contrary, we would be creating administrative burdens without policy justification. Therefore, the treatment here should mirror the Section 271 Performance Plan -- if that plan presently addresses SBC' loop and transport provisioning performance and if it already accounts for routine modifications (whether by *express* inclusion or exclusion of such modifications). [*36] If the plan does not address routine modifications for loop and transport provisioning, then the principles adopted in the next paragraph should be incorporated in the parties' ICA n14.

> n14 However, even if the Section 271 Performance Plan does not presently address routine modifications to loop and transport provisioning, the parties' ICA should contain a provision to incorporate any future Section 271 Plan provisions on the subject, using the ICA's change-of-law provision.

Third (and only if the Section 271 Performance Plan is silent on the subject), we conclude that routine network modifications should be included in any standard loop and transport provisioning intervals and performance measurement calculations contained in the parties' ICA. Provisioning tasks do not have to be identical in all instances to be fairly included in the same aggregated analysis. Modifications that are, in common practice, "routine" -- that occur frequently and are accomplished through customary procedures -- are reasonably regarded as [*37] part of provisioning itself. Since SBC did not inform the record that routinely modified provisioning typically requires substantially more time and materials than un-modified provisioning, so as to constitute an apples-to-oranges comparison, the Commission has no basis for declaring it so n15. Indeed, it could be that routine modifications are part of most provisioning n16 (but, again, the parties created no record on the subject). It obviously follows that non-routine network modifications (that is, modifications outside the definition of routine modifications used above) should not be included in standard intervals or performance calculations.

> n15 Moreover, a properly weighted performance measure need not prejudice anyone. Logically, both simple and complex tasks can be reasonably measured together, so long as the resulting factor accurately reflects both. Rationale comparisons of annual performance can then be made.

> n16 The FCC states that "Verizon provides the routine modifications listed above [in the TRO], with minimal delay, in most cases, to their own retail customers." TRO P639, fn. 1940.

[*38]

**2. (a) Must SBC permit XO to commingle unbundled network elements, combination of unbundled network elements, and wholesale services, consistent with FCC rules?**

**(b) Should XO be required to submit a bona fide request ("BFR") and go through the BFR process in order to commingle?**

**(c) Should SBC be permitted to charge XO on a time and material basis for commingling?**

**SBC re-characterizes this issue as follows:**

> **May XO commingle UNEs with a non-UNE that is offered by SBC-Illinois pursuant to Section 271 or commingled UNES that are no longer lawful UNEs?**

2004 Ill. PUC LEXIS 675, *38

1. Parties' Positions and Proposals

a.) XO

(XO-2a). SBC is required under the FCC's rules to permit commingling of UNEs, combinations of UNEs, and wholesale services. As explained in XO's motion to dismiss certain SBC issues, XO objects to SBC's attempt to include only what it defines as "Lawful UNEs" in the language SBC has proposed for the Amendment. SBC is improperly attempting to modify or alter the change-in-law provisions of the Agreement so that any change of law with regard to UNEs would be self-effectuating or automatic. Nothing in the *TRO* provides ILECs this right, and the FCC expressly [*39] rejected the proposals of SBC and other ILECs to make such automatic changes to agreements.

SBC's contract language also states that SBC shall not have an obligation to perform the functions necessary to commingle unless certain conditions are met. The FCC, however, explicitly requires an ILEC "upon request," to "perform the functions necessary to commingle a UNE or a UNE combination with one or more facilities or services." *TRO* at P 579. SBC's contract language inserts a number of other grounds upon which SBC may refuse to perform the functions to commingle, which are not found in the FCC's rules or the *TRO*. SBC incorporates this language from the U.S. Supreme Court Case in *Verizon Communications, Inc. v. FCC, 535 U.S. 467,* which is a case that did not address commingling. The FCC was fully aware of that decision and did not include any of the restrictions that SBC has somehow derived from that case. SBC's proposed contract language, therefore, unlawfully seeks to have this Commission impose restrictions that the FCC refused to authorize.

XO has included network elements pursuant to Section 271(c) because of the current state of uncertainty. [*40] While the FCC declined to require commingling of Section 271 network elements with wholesale services, the FCC did not preclude commingling of Section 271 network elements and UNEs. In addition, the ultimate fate of UNEs and Section 271 network elements has yet to be decided. Accordingly, XO has proposed to incorporate commingling requirements "to the extent required by Applicable Law." Thus, to the extent that Applicable Law does not require commingling of Section 271 network elements, such commingling would not be required.

(XO-1b). There is no basis for SBC to require XO to submit a bona fide request ("BFR") for commingling. Requests for commingling generally are comparable to a request to convert wholesale services to UNEs, which is merely a billing change. The ILECs have been required to perform conversions since at least the issuance of the FCC's UNE Remand Order, several years ago, and SBC has completed such requests for XO. SBC, however, has never required XO to submit a BFR in order to have SBC process XO's conversion or billing change requests, nor has SBC offered any evidence to demonstrate that a BFR is necessary to process a commingling request.

(XO-2c). The *TRO* [*41] states that ILECs may assess monthly recurring rates for commingling on an element-by-element basis and a service-by-service basis, but the FCC has not authorized any non-recurring charges for commingling. *TRO* at P 582. SBC's proposal to assess unspecified "time and material" charges for performing commingling functions thus is inconsistent with applicable law. Nor has SBC introduced any evidence on the nature of these functions, much less the costs that SBC claims it will incur. In any event, this issue in general, and any such evidence in particular, should be reviewed in the context of a generic costing proceeding, not this arbitration.

b.) SBC

*First,* XO's proposed language to require the commingling of "section 271 network elements" should be rejected. In its *Errata* to the *TRO*, the FCC expressly deleted the *single* reference to section 271 network elements that it originally made in its commingling discussion (in P 584), indicating that that reference was in error. As a result, nowhere in that discussion does the FCC include section 271 network elements in the list of wholesale services that CLECs may commingle with UNEs. To the contrary, the FCC refers [*42] only to tariffed access services and section 251(c)(4) resale services. *TRO,* PP 579-84. Thus, the Commission should reject XO's attempt to include section 271 network elements in the parties' commingling contract language, and instead direct the parties to incorporate SBC Illinois'

2004 Ill. PUC LEXIS 675, *42

proposed language. (Section 3.14.1.)

Second, the Commission should adopt SBC Illinois' proposal to include the so-called Verizon restrictions" in the parties' commingling contract language. (Section 3.14.1) Even if Verizon addressed only combinations, that does not mean XO should be allowed to demand commingling where doing so would, for instance, threaten the security or reliability of the network or discriminatorily impede the ability of other CLECs to access UNEs or interconnect.

*Third*, the Commission should approve the use of the bona fide request process for submitting commingling requests. (Sections 3.14.1.3 and 3.14.1.3.1.) That process, which is well-defined and has a long history, has previously been approved for use in situations for ordering undefined or unidentified arrangements, and there is no need to depart from the process here. Moreover, SBC Illinois has made a commitment [*43] to develop processes to eliminate the need for BFRs, as commingled arrangements are identified and defined.

*Fourth*, XO's suggestion that SBC Illinois should be required to perform commingling functions free of charge must be rejected. See Section 3.14.1.3.2. In the *TRO*, the FCC simply did not address the nonrecurring charges for performing the activities necessary to establish commingling arrangements. But that silence cannot be interpreted to mean that SBC Illinois cannot impose cost-based charges to recover the costs it incurs in performing such functions, any more than the FCC's failure to expressly address, for instance, the monthly charges for mass market loops means that all loops are now free. Nor can that silence be interpreted as an attempt to overrule the pricing requirements of the Federal Act (something the FCC could not lawfully do in any event) or the FCC's TELRIC rules, which allow incumbents to recover the costs they incur in providing network elements to competitors.

c.) Staff

XO is correct that commingling of certain UNEs and combinations of UNEs is required. SBC is correct to the extent that it contends it need not commingle UNEs unbundled pursuant to [*44] Section 271 with other UNEs or combinations thereof.

Neither party's proposed contract language reflects the state of the law. XO proposes language that would, if adopted, require SBC to commingle Section 271 UNEs with other UNEs and services. XO Issues Matrix at 5, Proposed Contract Provision 3.10.1. n17 SBC, on the other hand, makes several proposals that are equally improper, but rather more complex.

n17 SBC, in its Issues Matrix, refers to XO's proposal as Provision 3.14.1. SBC Issues Matrix at 22.

SBC appears to be positioning itself, in its proposed contract provisions, to unilaterally withdraw UNEs when some court or tribunal determines that they no longer need be offered on an unbundled basis. SBC's contract proposal absolves it of any responsibility to combine or commingle any UNEs not on the SBC-maintained list of so-called "Lawful UNEs." SBC Issues Matrix at 25, Contract Provision 3.14.1.4. Under its contract proposal, SBC appears to reserve to itself the right to determine -- and, indeed, from time to time [*45] re-determine -- what constitutes a "Lawful UNE." See SBC Issues Matrix at 1 *et seq.*, Contract Provisions 1.1, 2.2, 6 (SBC only required to provide UNEs as required by law, as it changes from time to time, notwithstanding contract provisions to the contrary).

This, however, is not the only defect in SBC's contract proposal. SBC's proposed contract provisions state as follows:

SBC-ILLINOIS shall have no obligation to perform the functions necessary to Commingle (or to complete the actual Commingling) if (i) the CLEC is able to perform those functions itself; or (ii) it is not technically feasible, including that network reliability and security would be impaired; or (iii) SBC-ILLINOIS's ability to retain responsibility for the management, control, and performance of its

network would be impaired; or (iv) SBC-ILLINOIS would be placed at a disadvantage in operating its own network; or (v) it would undermine the ability of other Telecommunications Carriers to obtain access to Lawful UNEs or to Interconnect with SBC-ILLINOIS's network; or (vi) CLEC is a new entrant and is unaware that it needs to Commingle to provide a Telecommunications Service, but such obligation under this Section [*46] ceases if SBC-ILLINOIS informs CLEC of such need to Commingle.

SBC Issues Matrix at 23, Provision 3.14.1

The limitations that SBC places upon commingling are found nowhere in the *TRO*. The *TRO's* findings with respect to commingling are abundantly clear: "We...modify our rules to affirmatively permit requesting carriers to commingle UNEs and combinations of UNEs with services..., and to *require incumbent LECs to perform the necessary functions to effectuate such commingling upon request*." TRO, P579 (emphasis added). Thus, SBC's proposal clearly over-reaches, and should be rejected.

Staff favors XO's contract provision, with an exclusion for Section 271 UNEs.

2. Analysis and Conclusions

XO Issue 2-a. This sub-issue is appropriately resolved in conjunction with SBC's version (SBC/XO-2). SBC is obliged to commingle n18 UNEs, combinations of UNEs and wholesale services. TRO P 579. SBC is not required to commingle UNEs and UNE combinations with network elements unbundled pursuant to Section 271. The FCC specifically removed that requirement from TRO P 584 when it issued its TRO Errata. XO's interpretation of the remaining text in TRO P 584 is unsupportable.

> n18 Commingling refers to the use of UNEs and wholesale services in the same network. Under previous FCC rulings prohibiting commingling, the CLECs had to operate two functionally equivalent networks or rely solely on either UNEs or wholesale services. TRO P580. Commingling thus "raise[d] the costs of competitive LECs." *Id.*, fn. 1788.

[*47]

The Commission rejects SBC's proposal to label the UNEs that SBC must commingle as "lawful." For the reasons discussed more extensively in connection with SBC Issue 1, this is superfluous terminology that appears designed to confer unilateral power on SBC and is likely to engender wasteful litigation. In particular, we agree with XO and Staff that SBC's proposed application of the term "lawful" would enable SBC to unilaterally incorporate changes of law concerning UNEs into the parties' ICA, in derogation of the ICA's existing change-of-law provision and the FCC's directive, in TRO P 701, to use that provision to incorporate such changes. XO Init. Br. at 6-7; Staff Init. Br. at 38-39.

Regarding SBC's proposal to incorporate into the ICA, for commingling purposes, elements of the decision in *Verizon Communications, Inc., v. FCC, 535 U.S. 467 (2002)*, concerning UNE *combinations*, SBC is straying beyond the boundaries of this proceeding. As the ALJ established by a Ruling on June 3, 2004, the scope of this arbitration is limited to the subject of the parties' negotiations, which focused solely on changes of law mandated by the TRO, as modified by *USTA v. FCC, 359 F. 3d. 554 (D.C. Cir. 2004)* [*48] ("USTA II"). The Verizon decision, which preceded the TRO and was therefore known to the parties when negotiations were requested, was not the subject of negotiation n19. SBC Motion to Dismiss, Attach's 1 & 2; Petition, Ex. 1.

> n19 Furthermore, to the extent SBC (or, for that matter, XO) believed Verizon constituted a material change of law under the parties' ICA, it could have invoked existing change-of-law provisions to address that decision.

2004 Ill. PUC LEXIS 675, *48

That said, even assuming *arguendo* that the principles of Verizon were arguably within the scope of this arbitration (for example, as part of the legal context surrounding the FCC's analysis in the TRO), we would still decline to apply the Verizon UNE combination rules to the ICA's provisions concerning the commingling of UNEs and wholesale services. The FCC did not elect to apply the pre-existing Verizon combination rules to commingling and we will not second-guess that decision. To the contrary, such threshold tests as whether SBC "would be placed [*49] at a disadvantage in operating its own network," which SBC proposes, are virtual invitations to delay and dispute between competitors n20. Additionally, SBC did not lay an evidentiary foundation for the conclusion that commingling creates functional issues similar to those posed by combinations.

> n20 Indeed, the FCC did not include this factor in its rules pertaining to *combinations. 47 CFR 51.315.*

XO Issue 2-b. SBC's proposed BFR process is cumbersome and, as a standardized procedural requirement, unnecessary. Although SBC is correct that this Commission has previously approved the BFR process for "specialized requests," SBC Init. Br. at 11, SBC has not established that commingling is typically (or even frequently) a specialized request. Indeed, XO maintains, and we concur, that commingling is generally comparable to a billing change. XO Init. Br. at 9. This is not to say that a BFR would never be appropriate for an individual commingling request. But a BFR, which can involve [*50] several months just for an SBC *response*, e.g., SBC Init. Br. at 11, is inapposite (and arguably anti-competitive) as a standardized mechanism for requesting commingling.

XO Issue 2-c. SBC's proposed commingling charge is unsupported by discussion -- much less, approval -- in the TRO. Nor has SBC otherwise established the justification (whether practical or legal) for such a charge. As the FCC notes, commingling originated as a *regulatory* construct, not a practical one, intended to temporarily impede the admixture of Section 251 UNEs and wholesale services n21. TRO P 579 & 583. In contrast, SBC's proposed commingling charge treats commingling as a practical task that differs from the practical tasks associated with combining, say, two Section 251 UNEs or two wholesale services. The Commission disagrees and, accordingly concludes that any cost of commingling is already recovered through SBC's rates for, respectively, UNEs and wholesale services, and any standard or extraordinary charges already imposed for provisioning such items n22. SBC adduced no evidence to the contrary n23. Additionally, we are concerned -- though we need not decide here -- that a discrete commingling charge [*51] could constitute an unreasonable condition on the procurement of wholesale services, per Section 251(c)(4)(B) of the Federal Act.

> n21 Thus, in the TRO, the FCC concluded that "the commingling restriction is no longer necessary to preserve the status quo while the [FCC] grapples with potential modifications to its universal service and access charge policies." TRO P583.

> n22 "The work SBC Illinois performs to provide XO a commingled UNE is part of the cost of providing that UNE." SBC Init. Br. at 12.

> n23 "SBC Illinois is not proposing to identify and quantify particular costs in this proceeding." SBC Reply Br. at 10.

**4. Is SBC required to convert a wholesale service, or a group of wholesale services, to unbundled network elements or combinations of unbundled network elements consistent with FCC and ICC rules?**

**SBC re-characterizes this issue as follows:**

**What terms and conditions should apply to conversions form wholesale services to UNEs?**

1. Parties' Positions and Proposals

a.) XO [*52]

The FCC has required that upon XO's request and conditioned on XO satisfying the appropriate eligibility requirements, SBC must convert a wholesale service, or a group of wholesale services, to UNEs or a combination of UNEs. The D.C. Circuit's decision in USTA II should not be at issue in this proceeding, as XO explained in its motion to dismiss certain SBC issues. But even if it were, nothing in USTA II addresses conversions, much less relieves SBC of any obligation to undertake such conversions. In addition, as discussed in the context of the previous issues, XO objects to SBC's attempt to modify or alter the change-in-law provisions of its existing Agreement.

SBC is not entitled to charge for conversions of wholesale services to UNEs or UNE combinations. The FCC noted that ILECs may not impose termination charges, disconnect or re-connect fees and that because ILECs never have to perform a conversion to continue serving their own customers, it is inconsistent with the Act for an ILEC to impose such charges. *TRO* at P 587. The FCC further noted that such conversions are "largely a billing function." *Id. at P 588.* No service order charges [*53] are appropriate under such circumstances, but even if they were, the Commission should address this issue in a generic cost proceeding, not this arbitration, particularly when SBC has asked for *carte blanche* to charge whatever it likes without producing any evidence whatsoever of any costs that SBC will incur to make the conversions.

Similarly, SBC's proposed language that SBC will "develop and implement processes" for ordering conversions is improper and unreasonable. See, e.g., 3.15.4. SBC has already completed conversions for CLECs. Thus, the processes should be in place. The FCC concluded that, if necessary, carriers will establish necessary procedures to perform conversions through negotiations, which is what XO is proposing here. *TRO* at P 585. XO currently submits orders for most UNEs and special access services via the ASR process. It only makes sense to revise that process to permit electronic orders for conversions. SBC, however should not be permitted to burden or delay XO's ability to obtain conversions while allegedly developing an appropriate process, as SBC has proposed. XO's contract language thus tracks the FCC requirements while SBC proposes language that [*54] would modify those requirements for the benefit of SBC.

Other provisions of SBC's proposed language are also unreasonable and would provide SBC with too much unilateral power. For example, the *TRO* provides no authority for SBC to engage in self-help if it believes that XO has not met the applicable eligibility requirements. Indeed, SBC's language leaves unclear how SBC would make such a determination, thus leaving SBC with virtually unfettered discretion to reconvert UNEs to special access services. Such discretion is fundamentally inconsistent with the FCC's objectives in the *TRO*.

b.) SBC

A "conversion" is the process of changing the provision of a wholesale service to the provision of the equivalent UNE (or combination of UNEs). In USTA II the D.C. Circuit disagreed with the FCC's "decision to allow 'conversions' of wholesale special access purchases to UNEs." *USTA II, 359 F.3d at 593.* The D.C. Circuit agreed with the ILECs that those rules were "too lax," because "the presence of robust competition in a market where CLECs use critical ILEC facilities by purchasing special access at wholesale rates . . . precludes a finding that the [*55] CLECs are 'impaired' by a lack of access to the element." *Id. at 592-93.* While XO suggests the Commission should ignore USTA II, the Commission cannot, consistent with the arbitration provisions of the Federal Act or the federal Constitution, ignore binding federal law. Thus, the Commission should adopt SBC Illinois' proposed contract language regarding USTA II

(Section 3.15.1), which provides that upon the issuance of the mandate in USTA II, SBC Illinois is not required to perform conversions unless "lawful and effective FCC rules or orders require conversion."

The Commission should also approve SBC Illinois' proposed language to govern conversions in the event "lawful and effective FCC rules or orders require conversion," and reject XO's competing language. First, XO's proposal to prohibit SBC Illinois from assessing *any* charges in connection with conversions is clearly inconsistent with the *TRO*. In the *TRO*, the FCC identified only particular "wasteful and unnecessary charges" that should not be assessed. *See TRO*, P 587. It did not prohibit all charges, as XO proposes. (Section 3.15.3.)

Moreover, nonrecurring charges to cover [*56] the costs that SBC Illinois actually incurs to process a conversion request are neither "wasteful" nor "unnecessary." To the contrary, they are required by the Federal Act and the FCC's pricing rules. XO does not deny that SBC Illinois actually performs activities and incurs costs to process an XO order for a conversion, such as service ordering and billing change functions and costs. Pursuant to the Federal Act and the FCC's TELRIC pricing rules, SBC Illinois is entitled to recover these costs from XO. Furthermore, the Commission recently approved cost-based non-recurring project administration charges applicable to conversions of special access services and resale private line circuits to UNEs. Order, Docket No. 02-0864, at 214-15 (June 9, 2004).

Similarly, the FCC held that CLECs cannot "supersede or dissolve existing contractual arrangements through a conversion request." *TRO*, P 587. Thus, to the extent that XO seeks to do just that through a conversion request, it is appropriate (and required by the *TRO*) that SBC Illinois assess any applicable early termination or similar charges, as SBC Illinois' proposed language provides. Moreover, the FCC expressly refused to grant [*57] CLECs a "fresh look" with respect to special access to UNE conversions, holding that doing so "would neither be in the public interest nor represent a competitively neutral approach." *Id.* P696. Thus, SBC Illinois' proposed Section 3.15.10 should be adopted to implement these FCC requirements. Moreover, the Commission should reject XO's proposed section 3.15.7, which would require SBC Illinois to convert a special access service within 30 days, with no minimum period termination liability, where SBC Illinois denies a request for a UNE (e.g., for a lack of facilities). That proposed language finds no support in the *TRO*, and is contrary to the FCC's holdings regarding the applicability of early termination charges.

The Commission should also approve SBC Illinois' proposed language regarding the ordering processes for conversions. (Sections 3.15.4, 3.15.5, 3.15.6.) Where SBC Illinois has not developed processes for conversion orders, it should follow the change management guidelines. The change management process has previously been examined and approved by this Commission (and the FCC), and there is no reason to depart from that process. While XO would like to dictate new ordering [*58] processes via a two-party arbitration, the development of new processes is more appropriately handled through a process that allows for the input of all CLECs, as the change management process does. Moreover, the contract should require XO to "follow the guidelines and ordering requirements" in place for the particular service to be converted, as SBC Illinois proposes.

Finally, the Commission should approve SBC Illinois' proposed language regarding eligibility criteria. (Sections 3.15.2 and 3.15.8.) In the *TRO*, the FCC held that a CLEC must "meet[] the eligibility criteria that may be applicable" to convert services, and held that "the serving incumbent LEC may convert the UNE or UNE combination to the equivalent wholesale services in accordance with the procedures established between the parties" in the event the CLEC "fails to meet the eligibility criteria for serving a particular customer." *TRO*, P 586. XO does not propose any language to implement these requirements. SBC Illinois' proposed language, on the other hand, appropriately implements these requirements.

c.) Staff

XO appears to be entitled under the *TRO* to seamless, quick, and inexpensive conversion of eligible [*59] wholesale services to UNEs. It is not clear how this is to be accomplished. XO proposes an "ASR-driven" conversion process, while SBC's proposed contract provisions appear to posit that there is no conversion process for wholesale service to UNEs currently in place, and accordingly one will be developed pursuant to SBC's so-called "Change

Management Process". XO also proposes that conversions be completed within 15 days of XO's request for such conversion, while SBC does not propose any minimum period.

Staff is unclear as to why XO proposes an "ASR-driven" ordering process, or what precisely it means by "ASR" under these circumstances. "ASR" is an acronym for "Access Service Request", which is, as Staff further understands it, an obsolescent form of electronic ordering platform used for many years by ILECs and CLECs. Staff is unaware of any legal obligation that SBC is under to deploy such a platform, why it ought to be expected to do so, or whether such a platform is effective or standard. In any case, the TRO clearly does not require an "ASR-driven" ordering process. n24

> n24 The FCC specifically declined to order the adoption of any specific procedure or process for conversions. TRO, P585.

[*60]

XO properly requests that conversion orders be processed within 15 days. The *TRO* clearly calls for "expeditious" conversions that are "seamless" to end users. The Staff therefore consider some time limitation upon the completion of conversions to be proper, and SBC fails to propose one. Moreover, the FCC directs that such timeframes be negotiated and memorialized in contracts. *Id.*, PP588-89. In light of SBC's failure to make any proposal, XO's proposal for 15 days n25 appears reasonable, and the Staff urges its acceptance.

> n25 The FCC declined to adopt a 10-day interval, but not, apparently because of the brevity of the 10-day interval itself. TRO, P588.

With respect to conversion charges, SBC proposes that it be permitted to charge applicable service ordering and record change charges.

While the FCC did not make clear in the *TRO* what charges it considers properly assessed for conversions, it made clear what charges it considers *improper*. First, it noted that ILECs never have to perform conversions to [*61] serve their own retail customers, and accordingly that termination, re-connection, and disconnection fees, and "other nonrecurring charges associated with establishing a service for the first time" are inconsistent with Section 202 of the federal Act and an ILEC's duty of nondiscrimination. Clearly, therefore, imposition of any such charges is improper.

Second, the FCC recognized that conversions are almost entirely billing functions. This appears to exclude any charges or fees not associated with executing a billing change.

While SBC might lawfully be permitted to assess a modest record change fee of some sort, any additional charge is clearly improper. SBC's request for a service ordering charge falls squarely within the prohibited category of "other non-recurring charges associated with establishing a service for the first time".

The Staff therefore recommends that SBC be permitted to assess a billing change charge, but no other.

2. Analysis and Conclusions

SBC's reframed version of XO Issue 4 (SBC/XO-4) is among those not properly presented as an open arbitration issue. It is a general and over-broad question that calls upon the Commission to draft a portion of the parties' ICA, [*62] not to resolve a dispute. Taken literally, it asks us to start from scratch on the subject of conversions, and to select every term and condition that will and will not apply. XO's version of this issue, when taken at face value, merely asks whether SBC must comply with FCC conversion rules. The answer to that question is self-evident and gets the parties no closer to interconnection. Patently, the real disputes here concern specific TRO directives concerning conversion, but

XO did not properly frame those disputes as open issues. Consequently, the Commission will identify those disputes that significantly impede amendment of the parties' existing ICA and provide guidelines for resolution.

The threshold issue concerns the effect of USTA II on the ILEC conversion duty established at TRO P 586. SBC contends that USTA II removed that duty wherever parallel service is available at wholesale. SBC Reply Br. at 11. However, the court neither said that nor overturned the FCC's imposition of the conversion obligation. Rather, it articulated principles for the FCC to consider while it revisited the qualifying/non-qualifying services distinction remanded (but not vacated) on other grounds [*63] by the court. Those principles focus on the state of competition, not on the availability of wholesale service. Specifically, the court stated that where wholesale services have produced "robust competition," impairment is precluded. *359 F.3d at 593*. Similarly, (with respect to EELs in particular) the court said that "if history showed that lack of access to EELs had not impaired CLECs in the past," that would be "evidence" of future non-impairment. *Id*. Unless and until the findings suggested by the court are made (presumably, by the FCC), the TRO conversion duty remains in effect.

Moreover, the court expressly upheld the TRO's eligibility requirements for CLEC access to EELs, *id*., which the FCC specifically applied to conversions from special access. TRO P 593. That ruling is inconsistent with SBC's position that USTA II overturned the conversion obligation created by the TRO. Accordingly, the Commission concludes that the conversion obligation survived USTA II.

Regarding SBC's proposed non-recurring charges for processing conversions, there is no substantial disagreement that the charge we approved in Docket 02-0864 n26, for conversions [*64] of special access to EELs (and conversions of resale private lines to UNEs), is appropriate here. SBC Reply Br. at 12; XO Reply Br. at 11; Staff Rep. Br. at 11. However, although SBC cites this "project administration charge" in support of including a conversion cost in the ICA, it is not clear that this charge is equivalent to what SBC characterizes as "service order charges and record change charges" in SBC proposed Section 3.15.3. If those latter charges address different underlying costs than does the administration charge, it was up to SBC to prove that fact. Moreover, our Order in Docket 02-0864 indicates that the activities associated with processing a conversion are either captured by the administrative charge or were disapproved for recovery in that case. Therefore, for conversion of access to EELs (and conversions of resale private lines to UNEs), SBC should be limited to the amount of the project administration charge approved in Docket 02-0864.

n26 Illinois Bell Telephone Co., Filing to Increase Unbundled Loop and Nonrecurring Rates, Order, June 9, 2004, at 214-15.

[*65]

For other conversions, the TRO precludes imposition of conversion charges. TRO P 587. SBC misreads TRO P587, presuming that the FCC intended to bar only those nonrecurring charges associated with a new service. SBC Reply Br. at 12. First-time charges were simply one example of the charges prohibited by the FCC. The essential principle in P587 is nondiscrimination -- that is, since ILECs "are never required to perform a conversion in order to continue serving their own customers," *id*., CLECs would be disadvantaged by conversion-related charges. To avert that result which the FCC characterized as unjust, unreasonable and discriminatory within the meaning of Sections 202 and 251 of the Federal Act - the FCC knowingly subordinated ILEC conversion cost recovery to parity among competitors n27.

n27 We will not apply the parity principle to access-to-EEL conversions or resale-private-line-to-UNE conversions, in order to avoid inconsistency with our holding in Docket 02-0864, which addressed charges solely under our state jurisdiction.

[*66]

SBC objects that the foregoing tradeoff is impermissible under the Federal Act, because it contravenes the

cost-based pricing requirement of subsection 252(d)(1)(A)(i). SBC BOE at 19. That objection is better directed to the FCC, the agency that resolved the tension among federal statutory commandments concerning nondiscrimination (Sections 202 and 251) and cost recovery (Sections 252). In any case, this Commission notes that Section 252 itself treats nondiscrimination as co-equal with cost recovery n28. We will not second-guess the FCC's balancing of these requirements in the TRO n29. As for SBC's contention that the FCC barred only conversion charges that are not cost-based, SBC BOE at 19, the Commission observes that the FCC never said so and, moreover, that the FCC's examples of prohibited charges (e.g., re-connect and disconnect fees, TRO P587) *are* presumably cost-based, like SBC's own such charges. Docket 02-0864, Order, June 9, 2004, at 196-99.

> n28 That is, just as subsection 252(d)(1)(A)(i) mandates rates based on cost, subsection subsection 252(d)(1)(A)(ii) mandates nondiscrimination.

[*67]

> n29 SBC also endeavors to position *itself* as the object of discrimination with respect to conversion costs. It avers that because it receives no CLEC "contribution" for its own expenses, it would be disadvantaged if it had to give CLECs a "free ride" on conversions. SBC BOE at 20, fn. 7. However, as the FCC emphasized, an ILEC never has to convert its own services.

However, in TRO P587, the FCC exempted properly applicable early termination penalties from its limitation on conversion related charges. Although XO posits that such penalties can be reduced or eliminated pursuant to TRO P698, XO Reply Br. at 12, that would simply mean that such penalties were no longer properly applicable (or "appropriate," as the TRO uses the latter term in P698). It has nothing to do with the FCC's intentional and detailed exemption of those penalties from its conversion charge limitation.

Regarding order processing and timing, SBC, despite having argued elsewhere in this arbitration for precision, clarity and detail in the ICA, proposes that parties develop procedures in the future through the industry-wide change [*68] management process associated with OSS. SBC Init. Br. at 18. Alternatively, SBC proposes to unilaterally develop processes at some unspecified future point. SBC proposed Section 3.15.4. SBC proposes no time limit for the completion of conversions.

For its part, XO proposes manually processing by SBC until an "ASR-driven conversion process" is developed. XO proposed Section 3.15.4. However, XO also asserts that the "necessary processes...already must be in place," including an ASR process, XO Init. Br. at 13, so it is not clear why XO's proposed text assumes that an ASR-driven conversion process still needs to be developed. SBC denies that an ASR process is already in place, SBC Init. Br. at 18; SBC Reply Br. at 15, while Staff calls the ASR process obsolete. Staff Init. Br. at 43.

Since the parties waived evidentiary hearings, the record does not permit us to make findings regarding the foregoing claims. We can only articulate principles that the parties should employ in their amended ICA. First, a clear conversion ordering process must be included in the ICA and immediately available once the arbitrated amendment is approved and in effect. The purpose of this proceeding is to incorporate [*69] the TRO, including its conversion mandates, into the parties' ICA. Resort to the change management process unnecessarily and inefficiently postpones that incorporation indefinitely.

Second, the parties' ICA must specify a time frame for processing conversions, in keeping with the FCC's declaration that it "expect[s] carriers to establish any necessary timeframes to perform conversions in their [ICAs] or other contracts." TRO PP 588. Furthermore, such time frame must facilitate "expeditious" conversions. *Id.* We cannot determine, however, whether XO's 15-day proposal is reasonable. XO proposed Section 3.5.16. XO supplied no supporting evidence or argument, which might have demonstrated, for example, that a 15-day (or similar) interval is

already used in comparable circumstances.

Third, SBC's proposed Section 3.15.8 is disapproved, for reasons also discussed in connection with SBC Issue 1 (below). It would empower SBC to refuse or discontinue a conversion, based upon SBC's unilateral assessment of the ramifications of regulatory and judicial authorities. Moreover, that proposed section wrongly authorizes SBC to act immediately upon service of written notice, without response, much [*70] less assent, from XO.

To be clear - our objection to Section 3.15.8 is not that it bars or terminates unwarranted conversions, but that it allows SBC to, first, unilaterally decide what conversions are unwarranted and, second, immediately disturb XO's provision of service to customers. Accordingly, as we require in connection with SBC Issue 2 (below), changes in law must be subjected to the ICA's existing change-of-law mechanisms, to determine whether SBC may bar conversions based on those changes. Disputes about individual conversions must first be addressed by the ICA's dispute resolution processes, to determine whether conversion is indeed unwarranted in each disputed case. Thereafter, if remedial action is appropriate, SBC must allow a reasonable amount of time, before implementing self-help measures, for XO and its customers to select alternative provisioning.

**5. May XO, consistent with FCC rules, provide non-qualifying services using the same unbundled network elements it uses to provide qualifying services?**

**SBC re-characterizes this issue as follows:**

> **Should the agreement clearly set forth the terms and conditions pursuant to which XO may provide non-qualifying [*71] services using the same unbundled network elements it uses to provide qualifying services?**

1. Parties' Positions and Proposals

a.) XO

The FCC has concluded that XO may provide non-qualifying service using the same UNEs it uses to provide qualifying services. *E.g., TRO* at P 148. XO's proposed language incorporates this concept, while SBC's proposed language includes numerous provisions that go beyond the requirements of the *TRO*, including additional certification and audit provisions that the FCC never envisioned, much less authorized. These provisions are unreasonable and would make it difficult and unduly burdensome for XO to use UNEs for non-qualifying services even though XO satisfies the conditions required by the FCC.

XO also objects to SBC's proposed definition of "local." Again, the FCC has adopted no such definition, nor is a definition warranted. The Parties' interconnection agreement has established the terms and conditions under which XO can obtain UNEs from SBC. Indeed, XO has been obtaining UNEs from SBC for years, and the Parties have a clear understanding of what XO can obtain from SBC as a UNE. Even were that not the case, SBC's proposed definition [*72] would unreasonably restrict XO's access to UNEs. XO, for example, may obtain interoffice dedicated transport from SBC between wire centers that are not within the same local calling area to enable XO to provide local services to customers in an SBC exchange other than the one in which XO's switch is located. The FCC did not even remotely contemplate such a restriction.

b.) SBC

In the *TRO*, the FCC promulgated "qualifying service" rules, intended to ensure that CLECs requesting UNEs use those UNEs to provide services in competition with traditional ILEC services, and not, for instance, solely to provide long distance. The D.C. Circuit concluded that "the prevention of 'gaming' by CLECs seeking to offer services for which they are not impaired" is a "legitimate" goal. *USTA II, 359 F.3d at 592.* Thus, the parties should include

2004 Ill. PUC LEXIS 675, *72

qualifying service language in their contract.

SBC Illinois' proposed language most accurately reflects the qualifying service restrictions, and should be adopted. SBC Illinois' proposal that a carrier cannot access UNEs unless it is a "telecommunications carrier" providing "telecommunications services" (Section 1.2) is required [*73] by the Federal Act, which contains those very limitations. *47 U.S.C. § 251*(d)(2). Thus, this language is appropriate regardless of the state of the FCC's qualifying service rules.

The Commission should also adopt SBC Illinois' proposed language providing that to access UNEs, XO must "provide" at least one "qualifying service" (that is, a service offered in competition with the telecommunications services traditionally the exclusive or primary domain of SBC Illinois, like local voice service) on a common carrier basis. (Sections 1.2, 2.22.2.) XO should not be allowed to access UNEs to provide solely "non-qualifying services," like long distance service. Section 251(d)(2) of the Federal Act provides for unbundled access where the lack of access would impair the ability of the entrant "to provide the services it seeks to offer," and it has never been shown (and SBC Illinois does not believe could ever be shown) that CLECs are "impaired" in offering solely non-qualifying services like long distance service without access to UNEs.

XO's proposed language, which would not require XO to actually provide any qualifying service, but only to "offer" a qualifying [*74] service, and even then only on a private carriage basis, would impermissibly allow XO to "game" any qualifying service restriction. For instance, XO could satisfy its proposed requirement by "offering" local service to select customers on a private carriage basis for ten times the prevailing prices, knowing full well that that offer would never be accepted, and then proceed to access UNEs to provide solely non-qualifying services. The Commission should also conclude, as did the FCC, that XO must offer qualifying services on a common carrier basis, to "ensure[] that the benefits of competition accrue to the general public." *TRO*, P 151.

Further, SBC Illinois' proposed language regarding certification of compliance with qualifying service restrictions is reasonable and should be adopted. (Sections 1.2.3, 1.2.4, 1.2.4.1.) SBC Illinois' language provides that the CLECs' use of UNEs constitutes a representation that it complies with the qualifying service requirements, and requires the CLEC to provide written certification only upon request. Finally, the Commission should adopt SBC Illinois' proposed definition of "local." (Sections 2.22.1 and 2.22.3.) The term is significant in the [*75] context of the qualifying service provisions of the parties' contract, and should not be left undefined as XO proposes.

c.) Staff

XO is correct in its assertion that it is undoubtedly permitted to provide non-qualifying services using UNEs so long as it is also providing qualifying services. The Staff further notes that SBC is correct in asserting that it has provided "detailed language regarding the conditions pursuant to which XO may provide non-qualifying services using the same unbundled network elements it uses to provide qualifying services." There are several anomalies in SBC's language, however.

First, for purposes of determining what qualifies as a "telecommunications services offered by requesting carriers in competition with those telecommunications services that have been traditionally within the exclusive or primary domain of incumbent LECs." SBC would define "local" as "within the SBC Illinois designated local calling area in which the requested lawful UNE is provided."

While SBC makes much of the detailed nature of the contract provisions it proposes, it is silent upon what an "SBC ILLINOIS designated local calling area" might be. The Staff suspects, however, that [*76] SBC does not mean "within the same LATA," but more probably "within the same exchange or Band." The Staff further suspects that this restriction might have the effect of preventing XO from using UNEs to provide certain types of intraLATA service. The Staff therefore recommends that "local" be defined as "intraLATA". The Staff sees no impediment to the adoption of the remainder of SBC's proposal.

2004 Ill. PUC LEXIS 675, *76

2. Analysis and Conclusions

XO's version of this issue is easily resolved -- FCC rules permit XO to provide non-qualifying services using the same UNES it uses for qualifying services. TRO P 143. SBC does not dispute this.

As for SBC's version of XO-5 (SBC/XO-5), a resolution of the issue, as phrased, would not address the actual disputes presented. That is, SBC is not really asking us to determine whether contract terms should be "clearly set forth," but to decide several specific - but unframed - issues concerning what those terms should be. Again, the presentation of differing contract provisions is not the same as framing issues, and it is not up to the Commission to determine what disputed issues arise from those provisions. That said, we will resolve those actual disputes between the [*77] parties that we find to be essential to completing ICA provisions addressing the mixture of qualifying services and non-qualifying services.

First, the Commission agrees with SBC's recommendation that the ICA define "common carrier" and require XO to offer at least one qualifying service on a common carrier basis. The purpose of the parties' negotiations has been to incorporate the TRO in their ICA. The common carrier requirement is a clear regulatory directive that the TRO freshly and emphatically attached to the identification of qualifying services n30. TRO P 149-153. We also approve SBC's proposal to incorporate, into the ICA the definition of common carrier in *NARUC v. FCC, 533 F.2d 601* (**xx Cir.** 1976). The term "common carrier" is not self-defining and the FCC discussed the NARUC definition favorably in its analysis. *Id.*, P 152.

> n30 That is, the qualifying service that must be provided with non-qualifying service(s) using UNEs.

Second, we cannot perceive the basis for [*78] XO's objection to SBC's proposed requirement that XO be a "telecommunications carrier" under the law. It is a fundamental requirement (indeed, only a "telecommunications carrier" could participate in this arbitration under Section 252 of the Federal Act).

Third, the Commission rejects SBC's contention that a definition of the term "local" should be included in the ICA terms pertaining to the use of qualifying services for both qualifying and non-qualifying services. Presumably, SBC is endeavoring to distinguish qualifying services ("telecommunications services offered by requesting carriers in competition with those telecommunications services that have been traditionally within the exclusive or primary domain of [ILECs]," TRO P 140) from long distance services, which the FCC regards as non-qualifying. *Id.*, fn. 466. However, USTA II has clouded the meaning and viability of that distinction by questioning the FCC's analysis and remanding the pertinent TRO provisions for reconsideration. *359 F.3d 592.*

Moreover, SBC's recommended definition of "local" ("within the [SBC] designated local calling area [LCA] in which the...UNE is provided") is unsuited [*79] to its purported purpose of delineating those services in "direct competition" with SBC's "core services." SBC Init. Br. at 23. Assuming, as Staff surmises, that SBC's intended LCA is less than the pertinent LATA, Staff Init. Br. at 48, it is not reflective of the manner in which local providers wage "direct competition" for, *e.g.*, POTS n31 customers. Such competition is conducted on a LATA-wide playing field. Indeed, SBC's restrictive definition gives support to the suggestion by Staff and XO that SBC's actual purpose is to hinder XO's provision of FX services. *Id.*; XO Init. Br. at 15.

> n31 Section 2.22 of the proposed ICA (undisputed); TRO P 135.

Fourth, the Commission will not approve several of the conditions SBC attaches to its provision of qualifying services. While SBC purports that these conditions will tend to preclude ambiguity and dispute, we find that the opposite result is at least as likely.

2004 Ill. PUC LEXIS 675, *79

For example, SBC's proposed Section 2.1 would allow XO to use a UNE to provide non-qualifying service only [*80] when "FCC orders and rules" so permit. At its most benign, this is a superfluous provision that merely says the parties will adhere to the law. More probably, however, it will become a source of contention as the contracting parties quarrel about the effects of future FCC rulings. Again, the purpose of this ICA amendment arbitration is to incorporate the provisions of the TRO, which *do* permit XO to provide non-qualifying service with a UNE. It is preferable to accommodate future regulatory rulings through the ICA's change-of-law mechanisms, rather than scattering litigious language among the day-to-day working provisions of the agreement.

SBC's proposed Section 1.2.1 contravenes the TRO, by requiring each UNE in a combination to meet criteria that the TRO either does not contain or expressly rejects. For example, the TRO states that certification is "unnecessary to verify that carriers provide qualifying services over [the "last-mile UNEs]." TRO P 592, fn. 1824 & P 623, fn. 1899. Thus, SBC Section 1.2.1 should not be included in the ICA.

SBC argues that the written certification requirement in its proposed Section 1.2.3 will only apply "upon request" from SBC and is, therefore, [*81] not an impediment to obtaining qualifying UNEs. SBC Init. Br. at 22. However, nothing in SBC's proposed amendatory ICA text would preclude SBC from making standardized requests. We disapprove the written certification requirement, both in its own right and as it would operate in conjunction with Section 1.2.1. Furthermore, it is unnecessary in light of the "continuous warrant" provision in Section 1.2.3, which we approve.

The Commission rejects the "offer" versus "provide" distinction urged by SBC in support of its proposed Section 1.2. SBC Init. Br. at 22. It is a false distinction and an invitation to needless dispute. Indeed, the FCC defines a qualifying service as one that is "*offered* by requesting carriers." TRO P 135 (emphasis added). A carrier that offers a service will have to provide it to any qualified customer. If it does not do so, SBC can invoke our complaint processes.

We will render no judgment on the remaining terms proposed by SBC, since, as noted above, SBC framed no particular issues about them.

### 6. What eligibility and certification requirements should apply for access to high-capacity EELs pursuant to FCC and ICC rules?

1. Parties'Positions and Proposals [*82]

a.) XO

The *TRO* specifies the eligibility and certification requirements for obtaining enhanced extended links ("EELs"). XO's proposed contract language properly reflects those requirements, while SBC proposes additional language that exceeds the FCC mandates. SBC's contract language regarding certification is unnecessary, confusing, and goes beyond the requirements of the *TRO*. For example, SBC requires the CLEC to certify that it provide certification on a specific form provided by SBC that has not yet been developed by SBC nor seen by XO. Further, SBC requires CLEC to maintain documentation to support eligibility certifications. XO's language in contrast, is simpler and ensures compliance with the requirements of the FCC's rules and the *TRO*. SBC's alleged need for uniformity does not justify SBC's overreaching and in any event, can be accommodated in XO's proposed language through *negotiation*, rather than by having SBC unilaterally impose certification requirements.

As discussed in the issues above, moreover, XO objects to SBC's proposal to use the terms "Lawful UNE," as inconsistent with the change of law provision in the Parties' existing Agreement, and "local," [*83] as beyond the scope of the *TRO* and unduly restrictive of XO's rights to obtain UNEs. SBC's inclusion of the term "end user" should be rejected on the same grounds.

b.) SBC

In the *TRO*, the FCC promulgated specific eligibility criteria to govern access to EELs, designed to ensure that CLEC use EELs to provide local service, and imposed upon CLECs certain obligations to certify their compliance with those criteria. The D.C. Circuit affirmed the EEL eligibility criteria, finding them to be "reasonable" and "satisfactorily explained." *USTA II*, *359 F.3d at 592-93*.

The FCC's rules requiring the unbundling of dedicated transport and high-capacity loops have been vacated, and the FCC's rules require the provision of combinations (including EELs) only of network elements that the FCC has found should be unbundled under Section 251. However, to the extent that the FCC were to require SBC Illinois in the future to provide unbundled high-capacity loops and dedicated transport (and thus EELs), the FCC's EEL rules would apply, and thus it is reasonable to reflect the FCC's EEL eligibility and certification rules in the parties' contract, although those [*84] rules (and corresponding contract language) would come into play only if the FCC adopts new rules that require EEL unbundling.

Thus, SBC Illinois' proposed contract language should be adopted. SBC Illinois' proposed language appropriately tracks and implements the FCC's EEL eligibility rules, while XO's proposed language does not. For instance, SBC Illinois' proposed definition of an EEL tracks the FCC's definition, while XO's proposed definition includes "entrance facilities" -- which the FCC expressly held are *not* UNEs. (Section 2.13.) *See TRO*, PP 365, 368, n.1116. Similarly, the *TRO* (P 604) holds that an EEL must terminate in a collocation arrangement; SBC Illinois' proposed language incorporates this requirement, while XO's inexplicably does not.

The parties also dispute the appropriate language governing certification with the eligibility criteria. XO should be required to use a standard certification form, as SBC Illinois proposes, to increase efficiency and lower the costs of processing such forms. Sections 3.14.3.2 and 3.14.3.3. It would be inappropriate to allow XO to certify compliance via any undefined "method of its choosing," as XO proposes.

XO also opposes [*85] contract language proposed by SBC Illinois that provides commercial certainty regarding the types of documentation that XO must preserve in accordance with the requirements of the *TRO*. Section 3.14.3.6.2. But it is commercially reasonable to specify the records that must be maintained, rather than leave it open for future disputes, and SBC Illinois' proposed language should be adopted.

Further, XO would deny an auditor's finding of non-compliance with the EEL eligibility criteria any effect, but would instead require that an audit be "confirmed" by the Commission or the FCC. (Section 3.14.3.2.) That proposal is directly contrary to the *TRO*, which provides that "*[t]o the extent the independent auditor's report concludes that the competitive LEC failed to comply with the service eligibility criteria*, that carrier must true-up any difference in payments, convert all noncompliant circuits to the appropriate service, and make the correct payments on a going-forward basis." *TRO*, P 627 (emphasis added). Giving the auditor's report such effect is especially reasonable in light of the fact that an auditor must be *independent* and mutually agreed upon by *both* parties. [*86] Moreover, XO is not barred from seeking further review if it believes an auditor's report is in error. Pursuant to the *TRO*, however, SBC Illinois cannot be required in every instance to bear the burden to seek further review and "confirmation" from the Commission or the FCC if the auditor concludes XO has not complied with the EEL eligibility requirements.

The parties also have several disputes regarding the precise language to implement the FCC's detailed eligibility criteria. XO's proposed language violates those criteria, and must be rejected. SBC Illinois' proposed language, on the other hand, is directly supported by FCC's actual rule and the *TRO*, and should be adopted. For instance, SBC Illinois proposes (and XO opposes) language in Sections 3.14.3.3, 3.14.3.3.2, 3.14.3.3, 3.14.3.4, 3.14.3.5, 3.14.3.3.4.1, 3.14.3.3.4.2, and 3.14.3.3.5 that parallels the FCC's rule and its discussion in the *TRO* near or literally *verbatim*.

Finally, XO opposes SBC Illinois' proposed language providing that the failure of SBC Illinois to enforce the eligibility criteria does not constitute a waiver of its right to subsequently enforce those criteria. Section 3.14.4. XO has not explained [*87] its objection to this commercially reasonable language, and this language should be adopted.

2004 Ill. PUC LEXIS 675, *87

c.) Staff

XO's proposed contractual provision that defines an EEL as "sometimes includ[ing] ... entrance facilit[ies]", is clearly contrary to the *TRO*, and cannot be adopted.

With respect to certification, SBC's proposal, goes beyond the requirements for certification imposed by the *TRO*. The *TRO* does not require self-certification by a CLEC to take any specific form, but instead states that a letter sent by a CLEC to an ILEC is a "practical" method. SBC's proposal, which requires specific certification to eight different facts, goes beyond practical and verges upon "the imposition of [an] undue gating mechanism[] that could delay the initiation of the ordering or conversion process," which the FCC clearly prohibited. Moreover, since the *TRO* clearly places the obligation to retain records associated with the certification process upon the CLEC, a simpler certification process does not prejudice SBC's rights in any way.

XO proposes that, in the event of an audit finding that it is not in compliance with certification requirements, SBC should be required to continue to provide [*88] the noncompliant circuits until such time as the Commission confirms the audit findings. This, while not quite as "incredible" as SBC appears to consider it, nonetheless is inconsistent with the TRO.

It is clear that the *TRO* requires a CLEC to convert non-compliant circuits upon an adverse finding by the auditor, not the confirmation of the auditor's findings by the Commission. The TRO does not provide for state Commission confirmation of an auditor's findings, nor does it provide for what effectively constitutes a stay of conversion of non-compliant circuits pending such Commission confirmation. Accordingly, XO's proposal must be rejected.

XO is not without a remedy if it considers itself aggrieved by perceived misuse of the audit process. As noted above, it can resort to the Commission to challenge the independence of any auditor SBC might select. Moreover, it may vindicate its rights under Sections 13-514 and 13-515 of the Illinois Public Utilities Act ("PUA"), which, respectively, prohibit a variety of anti-competitive acts, and provide for a complaint process pursuant to which an aggrieved carrier may obtain relief from the Commission. Thus, XO's proposed remedy should not [*89] be adopted.

2. Analysis and Conclusions

In this instance, it is XO that has not properly presented an open arbitration issue. Again, the question posed is general and over-broad and asks the Commission to draft a portion of the parties' ICA, not to resolve a dispute n32. Taken literally, it asks us to start from scratch on the subject of EELs, and to select every term and condition that will and will not apply. Consequently, as we do with other ill-framed issues in this proceeding, the Commission will address certain disputed factors that we perceive to be fundamental to drafting ICA provisions regarding high-capacity EELs n33. However, we decline to speculate about other questions that the parties might have framed, based on their differences in proposed contract text.

n32 The Commission also disapproves SBC's reference to disputes about "miscellaneous provisions" in its proposed contract language. SBC Init. Br. at 27. If a proposed contract provision elicits a dispute that a party wants resolved through arbitration, it is not "miscellaneous." It is, or should be, the subject of a properly posed open arbitration issue. Furthermore, when no properly framed issue is presented, as in the case of XO-6, how is the Commission to separate the material contract provisions from "miscellaneous" text?

[*90]

n33 USTA II vacated the FCC's national impairment finding concerning dedicated transport, a principal component of the EEL. However, the FCC's *Status Quo* Order requires an ILEC to continue

2004 Ill. PUC LEXIS 675, *90

providing unbundled access to dedicated transport on "the same rates, terms and conditions that applied under their [ICAs] as of June 15, 2004" for a six-month period. *Status Quo* Order, PP 1 & 16. Additionally, USTA II did not vacate the TRO's EEL eligibility requirements.

First, we concur with SBC and Staff that entrance facilities are not included within the definition of EELs. SBC Init. Br. at 25; Staff Init. Br. at 53. The FCC was quite clear on this point. TRO PP 365-68 & fn. 1116, & P 575.

Second, as SBC and Staff recommend, SBC Init. Br. at 25; Staff Init. Br. at 53, we disagree with XO (XO Section 3.14.3.2) that an auditor's nonconformance finding must be confirmed by this Commission before remedial action can be required. The FCC directed CLECs to come into compliance and make reparations based on *the auditor's* conclusions. TRO P 627. The FCC also prefers that the audit occur "in a [*91] self-executing manner with minimal regulatory involvement." *Id., P 628.* This does not mean that an auditor's report is beyond challenge before this Commission n34. But the FCC has concluded that a CLEC's obligation to take corrective action arises from the audit report, apart from Commission ratification. (Other issues concerning audits will be analyzed in connection with XO Issue 7, below.)

n34 We will not address here what the appropriate mechanism(s) for an audit challenge would be under our enabling statutes and rules. Nor do we address now whether the Commission has authority to stay implementation of an audit report. We do conclude, however, that EEL compliance audits are subject to our jurisdiction.

Third, the parties jockey for advantage by selective incorporation of elements in *47 CFR 51.318.* To settle several disputes associated with that regulation, the Commission holds that the ICA should either incorporate it by reference in its entirety, [*92] or spell out all of its provisions in the amended ICA. In either case, every provision should govern the parties' conduct.

Fourth, the Commission specifically disapproves of SBC's proposed Section 3.14.3.7. In that provision, SBC promises to abjure self-help *so long as XO is in compliance with all applicable requirements.* This begs the question of why SBC would need *any* remedy, self-executed or otherwise, if XO is in compliance. Furthermore, this illusory promise allows SBC to unilaterally determine XO's compliance status and, after rendering self-interested judgment, to impose a remedy. This effectively affronts the TRO, which bars self-help once *the CLEC* certifies compliance with FCC rules. TRO P 623, fn. 1900.

Fifth, we reject SBC's insistence (in SBC Section 3.14.3.6) that XO must certify its eligibility for a high-capacity EEL on a specific form provided by SBC. The FCC indicated that a letter from the CLEC would suffice. TRO P 624. In any event, SBC cannot achieve its purported goal of standardization for all carriers, SBC Init. Br. at 26, through an individual arbitration. On the other hand, XO's proposal to use some method "of its own choosing" (in XO Section 3.14.3.2) [*93] is capricious and potentially inefficient. It is better that XO use a "reasonably compliant" method (probably the letter described by the FCC), as XO also suggests n35.

n35 If SBC prepares a standardized form<35>, XO (and other CLECs) would presumably utilize it voluntarily if it promotes efficiency for all carriers. The fact that the parties cannot agree on an ordering mechanism suggests that the real dispute is not SBC's form versus XO's letter, but about substantive terms that will or will not be included therein.

Sixth, the Commission finds it preferable that the ICA refer to the "customer," rather than the "end user customer," as XO recommends. There is merit in XO's concern that "end user" has the potential to engender unproductive disputes.

Our requirement, above, that the ICA include all of the provisions in *47 CFR 51.318* vitiates SBC's apprehension that customers other than local voice customers will improperly receive service. SBC Reply Br. at 24-25. Although SBC expresses [*94] a particular worry about wholesale customers, *id.*, at 25, the FCC declared that "[a]s a further check on potential for abuse, we make clear that there requirements apply to all *wholesale* as well as retail service offerings over high-capacity EELs." TRO P 588 (emphasis added).

### 7. Should SBC's right to audit XO's compliance with the qualifying service eligibility criteria for high-capacity EELs be limited consistent with ICC rules?

**SBC re-characterizes this issue as follows:**

**What terms and conditions should apply to audits to confirm that the CLEC meets service eligibility criteria?**

1. Parties' Positions and Proposals

a.) XO

XO's proposed language is consistent with the requirements that the FCC established for audits of compliance with high capacity EEL eligibility and certification obligations. Specifically with respect to XO's proposal to require SBC to identify particular circuits and eligibility criteria at issue and limit the audit accordingly ensures that SBC does not abuse its limited audit rights to undertake a regulatory fishing expedition. Indeed, because XO would be responsible for the audit costs if the auditor finds material noncompliance, [*95] SBC's unnecessary expansion of the audit to include circuits with which there are no compliance issues merely inflates the cost that XO could be required to pay.

SBC's proposed language gives SBC additional rights that are not included in the *TRO* and burdens the agreement with unnecessary verbiage. For instance in Section 3.14.3.8.5, XO proposes to track the requirements contained in the *TRO* and requires that XO convert non-compliant circuits. SBC, in contrast, adds language saying that SBC may convert these circuits without input from XO. SBC also proposes language that eliminates the *TRO* limit of one audit per twelve month period and potentially allows itself multiple audits within the course of a year. All of the language that SBC proposes to add to this section is inconsistent with the *TRO*.

SBC's proposed language also would burden the agreement with unnecessary detail. For example in Section 3.14.3.8.3, SBC proposes specifically to list auditing standards. Such a list is unnecessary because these standards are part of the standards of the American Institute for Certified Public Accountants.

b.) SBC

SBC Illinois' language best reflects and implements its "right [*96] to audit compliance with the qualifying service eligibility criteria" (*TRO*, P 626), while XO's proposed language would impermissibly restrict that right.

The FCC held that "incumbent LECs may obtain and pay for an independent auditor to audit, on an annual basis, compliance with the qualifying service eligibility criteria." *TRO*, P626. XO's proposal to limit such audits (and resulting remedies) to instances where SBC Illinois identifies specific circuits with respect to which it asserts specific eligibility criteria are not satisfied is unreasonable and inappropriate, and should be rejected. See XO Sections 3.14.3.8.1 - .2 and 3.14.3.8.5 - .6. The *TRO* contains no such limitation on the ILEC's audit rights. And such a limitation would not make any sense. The FCC created the audit right precisely because ILECs do not possess the data required to determine whether a CLEC is in compliance with the eligibility criteria -- that data is possessed by the CLEC. *See TRO*, P 626 (audits are appropriate to satisfy "the incumbent LECs' need for usage information").

Moreover, the FCC already created the safeguards necessary to balance the ILECs' right to demand an audit to determine [*97] compliance against the risk of illegitimate audits. In particular, the FCC limited the right to require an

audit to an annual basis, requires the ILEC to pay for the audit, and requires the ILEC to reimburse the CLEC's costs if the auditor concludes the CLEC was in compliance.

With respect to auditing standards, SBC Illinois proposes (and XO opposes) tracking the FCC's language precisely. (Section 3.14.3.8.3.) In paragraph 626 of the *TRO*, the FCC provided specific guidance on the auditor's duties, and these requirements should be reflected in the parties' contract. XO's suggestion that incorporating the FCC's specific requirements "would burden the agreement with unnecessary detail" should be rejected. There is nothing "unnecessary" about the FCC's requirements.

The parties also disagree regarding proposed language governing true-up payments and the application of TELRIC-based rates where it is determined that XO was not in compliance with the eligibility criteria. (Section 3.14.3.8.5) While the *TRO* calls for true-up payments in such an event (P 627), it does not specify when such payments begin. The parties' contract should fill in this detail, as SBC Illinois' proposed language [*98] does. Moreover, TELRIC-based rates do not apply for any period where XO is not in compliance with the eligibility criteria, because for such periods XO is not entitled to UNEs at TELRIC-based rates. Indeed, that is the entire point of the eligibility criteria, and XO's objection to this language is unfathomable.

With respect to the conversion of noncompliant circuits (*e.g.*, the conversion of an EEL to special access where XO does not satisfy the EEL eligibility criteria), SBC Illinois' proposed language provides that it may "initiate and affect such a conversion on its own." (Section 3.14.3.8.5.) XO's contrary language would allow XO to delay compliance with the eligibility requirements until such time as XO chooses to submit a conversion request to convert noncompliant circuits. That is an unreasonable proposal. SBC Illinois' language, on the other hand, treats noncompliant EELs and other noncompliant conversions in an identical manner, and with respect to conversions in general the FCC held that "[t]o the extent a competitive LEC fails to meet the eligibility criteria for serving a particular customers, *the serving incumbent LEC may convert the UNE or UNE combination to the* [*99] *equivalent wholesale service*." *TRO*, P 586 (emphasis added).

Finally, SBC Illinois' cost-shifting language should be adopted, and XO's rejected. (Section 3.14.3.8.6.) The FCC held that the burden to bear auditing costs depends on whether or not the auditor concludes that the CLEC has substantially complied with the eligibility criteria. If the CLEC was in substantial compliance, then the ILEC must bear auditing costs. If the CLEC was not in substantial compliance, then the CLEC must bear the costs. *TRO*, PP 627-28. SBC Illinois' language properly reflects the FCC's holding. XO's proposed "pro-rata" cost apportionment, on the other hand, is contrary to the FCC's requirements, and must be rejected.

C.) Staff

The TRO grants an ILEC the right to audit a CLEC's compliance with certification requirements "on an annual basis, compliance with the qualifying service eligibility criteria." It does not specifically require the ILEC to indicate which, if any, circuits its believes to be non-compliant, nor does it require the ILEC to allege any sort of good cause or good faith belief that the CLEC in question is using non-compliant circuits. *Id.*

XO's proposal, however, explicitly [*100] requires SBC to specify which circuits it considers non-compliant, and to limit its audit to those facilities, and moreover appears to require SBC to show, or at least have, good cause to conduct an audit before it does so. This provision is at variance with the *TRO*, and cannot be adopted.

2. Analysis and Conclusions

Again, the parties fail to properly frame their disputed open issues for arbitration. SBC requests broad guidance on a topic, while XO poses a question (in essence, "should SBC comply with FCC rules?") that not only answers itself, but produces an answer SBC would not dispute. Such questions move the parties no closer to interconnection. Thus, the Commission will address those disputed factors that we perceive to be fundamental to drafting ICA provisions regarding audits.

2004 Ill. PUC LEXIS 675, *100

We agree with XO that the FCC intended to grant ILECs a right, not a duty, to audit CLECs' compliance with qualifying service eligibility criteria. XO Init. Br. at 19. We further agree with XO that the right conferred on ILECs is a "limted" right, per TRO P626, and that such audits may occur no more than annually, again per TRO P626. *Id.* However, we disagree with XO's argument that an ILEC can [*101] exercise its annual audit right "only when the ILEC has reason to believe that the CLEC is not in compliance with applicable requirements." *Id.*, at 20. Nothing in TRO PP625-29 indicates that an ILEC must have "cause" to initiate the annual audit n36.

> n36 SBC's own proposed contract text (Section 3.14.3.8.1) does state that SBC will identify "specific cause" when invoking its audit right. However, SBC rejects the cause requirement at SBC Init. Br. at 30-31. To whatever extent SBC believes its audit right is dependent upon suspicion of XO's non-compliance, it is, like XO, incorrect.

Instead, the Commission concludes that the FCC gave ILECs the option of initiating an audit, with or without suspicion of noncompliance, no more than once every 12 months. By requiring the ILEC to pay auditing costs (at least initially), TRO P626, the FCC created a disincentive against invoking that option, even on an annual basis n37. Thus, while the FCC imposed no "cause" requirement, it discouraged ILECs from acting without cause by [*102] allocating audit costs to the ILEC (unless an audit establishes material CLEC noncompliance, TRO P627).

> n37 That is, the FCC allocated audit cost "so that [an ILEC] will only rely on the audit mechanism in appropriate circumstances," TRO P628).

XO's perception of the audit as a mechanism for resolving specific disputes was apparently based on text in TRO P623, fn. 1900, ("an [ILEC] that questions the competitor's certification may do so by initiating the audit procedures set forth below [in TRO PP625-29]"). While XO's perception is certainly not unreasonable, we find that TRO footnote 1900 is better reconciled with TRO PP625-29 by assuming that the footnote does not imply a cause requirement, but simply describes circumstances that might well prompt the ILEC to invoke its annual audit right.

Therefore, the Commission disapproves of XO's proposed contract language that would require SBC to identify either specific EELs alleged to be out of compliance, or specific criteria purportedly violated. That said, because of the [*103] cost burden associated with a general audit (including the additional responsibility to pay XO's audit participation costs if material compliance is established by the audit, TRO P628), SBC might well choose to focus on specific allegations (and for that matter, the parties can *agree* about this in their ICA). We will not impose this requirement, however.

The Commission will also not approve SBC's request to set aside the 12-month limit on audits once non-compliance is established. SBC hit. Br. at 32, fn. 14. As already noted, the audit right is a *limited* one, and noncompliance is not necessarily a result of improper CLEC conduct. More frequent audits would upset the "appropriate balance" between CLEC and ILEC interests that the FCC fashioned in TRO P626. Moreover, because the FCC requires the CLEC to true-up "any difference in payments" between what the CLEC actually paid and should have paid, TRO P627, the ILEC will be made whole in any case. The CLEC would also risk paying the ILEC's audit costs in any subsequent annual audit, which is the FCC's intended disincentive against continued noncompliance.

The Commission additionally rejects SBC's request, in SBC proposed Section [*104] 3.14.3.8.5, that true up payments begin "from the date that the non-compliant circuit was established." As SBC knows, noncompliance does not necessarily start when a circuit is established n38. Consequently, true-up responsibility should begin when noncompliance begins. While fixing the start of noncompliance may not always be simple, the answer to that concern is not to require true-up for time periods when the CLEC was *in* compliance.

n38 *See*, e.g., SBC proposed Section 3.14.3.2 ("facilities...*at any time* determined to be noncompliant...") and SBC proposed Section 1.2.3 ("CLEC *continuously* represents and warrants that it satisfies Qualifying Service(s) conditions...") (emphasis added).

On the other hand, we approve SBC's request to convert a noncompliant circuit at its own volition without CLEC consent (SBC proposed Section 3.1.4.3.8.5). This is not a form of self-help that contravenes TRO P623, fn. 1900, as XO contends. XO Init. Br. at 20. By its terms, SBC's proposed language only permits SBC to act [*105]  *after* an auditor establishes noncompliance. We will, however, require the parties to include a reasonable notice provision in the ICA, so that XO, and the customers involved, will have time to consider alternative arrangements before SBC converts a circuit.

The parties disagreement concerning apportionment of auditing costs, when the auditor finds the CLEC is not compliant "in all material respects" with eligibility criteria, is a harbinger of future disputes regarding proportionality. XO is presumably apprehensive that, with an all-or-nothing approach, it will bear the entire cost of an audit because of a trivial instance of noncompliance. On the one hand, the FCC was creating "an incentive for [CLECs] to request EELs only to the extent permitted by the rules we adopt here." TRO P623. On the other hand, the FCC strove to avoid "imposing undue burdens upon [CLECs]" with its auditing procedures. TRO P622. Furthermore, this Commission does not want to encourage an ILEC to initiate an audit it might not otherwise initiate, knowing that even a minor transgression will impose substantial cost and inconvenience on the CLEC. Accordingly, although we will not adopt XO's pro-rata allocation,  [*106]  which is unsupported in the TRO, we hold that the materiality requirement must be construed to require more than trivial violations before cost responsibility can be transferred to XO.

## B. OPEN ISSUES PRESENTED BY SBC

**1. Should the ICA obligate SBC to continue to provide network elements that have been declassified or should the ICA state that SBC is required to provide only "lawful" UNEs?**

**XO re-characterizes this issue as follows:**

**(a) Whether based upon the FCC's directive in the TRO, SBC may attempt to modify the Interconnection Agreement between the parties, to make changes in the law or the rules or regulations promulgated by the FCC or the [ICC] (including USTA II) self-effectuating or automatically effective without any need to negotiate those changes as required by the "Change of Law" provision in the ICA.**

**b) Does the issuance of USTA II mean that through this proceeding SBC may no longer make certain UNEs available under Section 251?**

1. Parties' Positions and Proposals

a.) SBC

Issue SBC-1 concerns whether the interconnection agreement should obligate SBC Illinois to continue to provide network elements that are no longer required [*107]  to be unbundled (*i.e.*, that have been "declassified") at the same rates, terms, and conditions that would apply if the network elements were required to be unbundled. SBC Illinois' proposed language appropriately reflects the scope of SBC Illinois' obligation to provide UNEs, stating that SBC Illinois is required to provide as UNEs only those network elements that are actually, and lawfully, UNEs. XO's proposed language, on the other hand, would have the inappropriate and unlawful effect of requiring SBC Illinois to provide, as UNEs, network elements that are not actually, lawfully UNEs.

The contract language SBC Illinois proposes provides that SBC Illinois is required to provide only "Lawful UNEs,"

defined as "UNEs that SBC Illinois is required to provide pursuant to Section 251(c)(3) of the Act, as determined by lawful and effective FCC rules and associated lawful and effective FCC and judicial orders or lawful and effective orders and rules of the [ICC] that are necessary to further competition in the provision of telephone exchange service or exchange access and that are not inconsistent with the [Federal Act] or the FCC's regulations to implement the [Federal Act]." Network [*108] elements that do not satisfy this standard, but were previously provided as UNEs, are considered "declassified." This language appropriately reflects SBC Illinois' obligations to provide UNEs under the *TRO* and the Federal Act.

While section 251(c)(3) of the Act requires ILECs to "unbundle" certain network elements, Congress did not specify the particular network elements that must be unbundled. Rather, it directed the FCC to determine which network elements must be unbundled by applying the "impairment" test of section 251(d)(2). Moreover, as the D.C. Circuit made clear in USTA II, it is the *FCC* that must determine which network elements satisfy the "impairment" requirement of section 251(d)(2), and thus must be offered as UNEs pursuant to section 2512(c)(3). *USTA II, 359 F.3d at 561.* In short, "the UNEs that SBC Illinois is required to provide pursuant to Section 251(c)(3) of the Act" are limited to those "determined by lawful and effective FCC rules and associated lawful and effective FCC . . . orders," precisely as SBC Illinois' proposed contract language provides.

SBC Illinois' proposed contract language also provides that "lawful UNEs" [*109] include those network elements that SBC Illinois is required to unbundle pursuant to "lawful and effective orders and rules of the [ICC] that are necessary to further competition in the provision of telephone exchange service or exchange access and that are not inconsistent with the [Federal Act] or the FCC's regulations to implement the [Federal Act]." Again, such language is required by the *TRO* and the Federal Act. In the *TRO*, the FCC held that "states do not have plenary authority under federal law to create, modify or eliminate unbundling obligations." *TRO*, P 187. Rather, the FCC held, such actions must be "consistent with the Act" and with "the [FCC's] section 251 implementing regulations" (*TRO*, P 193 & n.614), which is precisely what SBC Illinois' proposed language provides. This language is also directly supported by section 261(c) of the Act ("additional state requirements"), which states: "Nothing in this part precludes a State from imposing requirements on a telecommunications carrier for intrastate services that are *necessary to further competition in the provision of telephone exchange service or exchange access, as long as the State's requirements are* [*110] *not inconsistent with* [sections 251-261 of the Act] *or the [FCC's] regulations to implement* [those sections]." *47 U.S.C. § 261*(c) (emphasis added).

SBC Illinois' proposed language appropriately implements the *TRO*. XO's objection that the language might have the effect in some circumstances of creating new "change in law"-like procedures, to the extent it would apply to future UNE declassifications, is without merit. XO also proposes contract language to govern future UNE declassifications in some situations, as well as additions to the list of UNEs, instead of relegating all such events to the parties' existing change of law process. Thus, XO's assertion that SBC Illinois' language must be rejected simply because it has the same effect as XO's proposed language must be rejected.

Moreover, the *TRO* unequivocally "declassified" certain network elements, including OCn loops, OCn dedicated transport, and enterprise switching, holding that these facilities are no longer UNEs. These new rules were either not challenged on appeal, or were not disturbed on appeal. SBC Illinois' proposed contract language appropriately implements the *TRO* [*111] by classifying these facilities as "declassified" rather than "lawful UNEs," thus making clear SBC Illinois is no longer required to provide these elements as UNEs under the parties' contract.

Finally, XO's attempt to add section 271 checklist items to the parties' contract as items SBC Illinois must provide as section 251 UNEs must be rejected. Pursuant to the *TRO*, determination of the rates, terms, and conditions for section 271 checklist items is a matter for the FCC under sections 201 and 202 of the 1934 Communications Act. And even if this Commission did have jurisdiction to address the issue, XO's proposal must be rejected because the FCC unequivocally held that section 251 rates, terms, and conditions do *not* apply to section 271 checklist items, and the D.C. Circuit unequivocally approved that determination. TRO, PP 655-59; *USTA II, 359 F.3d at 589.*

b.) XO

(SBC/XO-1a). As an initial matter (and as previously noted in XO's prior filings), XO does not believe that SBC's proposed language associated with SBC Issue 1 should be considered in this arbitration or that it belongs in the Amendment, because the proposed language would make changes [*112] to the Agreement that are not required to implement the *TRO*, is beyond the scope of parties' negotiation, and is beyond the scope of this arbitration.

XO and SBC agreed to negotiate conforming changes to their Agreement to implement the *TRO* and that is the subject of this arbitration. The *TRO* expressly required parties to negotiate changes pursuant to existing "change-of-law" provisions in parties' underlying Agreements. The change of law provisions of the XO/SBC Agreement require that parties agree and negotiate mutually acceptable new terms. n39 SBC's proposed language, however, does not implement the *TRO* and would instead make sweeping changes to the Agreement's underlying change-of-law provisions by defining broadly and preemptively those UNEs that SBC may in the future unilaterally decide no longer to provide.

n39 XO/SBC Interconnection Agreement, § 28.2.

Specifically, an overarching problem with SBC's proposed language is that it gives SBC too much subjective power to determine when it will discontinue [*113] providing a UNE to requesting carriers. For example, SBC's proposed language defines a lawful UNE as that required under Section 251(c), as determined by lawful and effective FCC rules and associated lawful and effective FCC and judicial orders, and effective orders and rules of the state commission "that are not inconsistent with the [Act] or the FCC's regulations." *See* SBC proposed language at Section 1.1. Under this proposed language, SBC could unilaterally disregard state decisions or requirements, to the extent that SBC deems them to be inconsistent with the FCC's rules, which would be contrary to the intent of the Act and the FCC's orders.

Moreover, SBC does not limit the scope of its unilateral authority to discontinue providing UNEs to changes of law effected by the *TRO*, or state decisions implementing the *TRO* and instead would modify the change of law provision itself to make any favorable changes of law self-effectuating upon 30-day notice (as discussed below in SBC Issue 2). For example, SBC's proposed language could potentially permit SBC unilaterally to discontinue providing UNEs upon any event that it argues is a "change of law" (including, for example, [*114] the issuance of the D.C. Circuit decision in USTA II -- without negotiating such changes of law, as required by the Agreement and the *TRO*. SBC could improperly assert that, based on USTA II, certain UNEs are no longer required to be unbundled, or provided at cost-based TELRIC rates. Such an action would, however, be contrary to the Act and the FCC's intent. Section 251(c) establishes the requirement that ILECs provide UNEs at cost-based rates and even in the absence of FCC rules, such UNEs must be provided at TELRIC (which is the FCC-established standard for UNE prices). Indeed, the FCC has noted that it will issue very shortly interim UNE rules in light of USTA II; thus any decision by SBC to discontinue providing UNEs on the grounds that USTA II vacated certain FCC rules would be premature.

In contrast to such broad and subjective language, XO's proposed language accurately and objectively implements the *TRO* and provides that SBC may only discontinue offering a network element to the extent that SBC is no longer required to provide UNEs under applicable law, which would include Sections 251, 271, FCC's orders and rules, *and orders of this Commission. See* [*115] XO proposed language, Section 1.1. Moreover, the PUA mandates the unbundling of network elements where technically feasible. *220 ILCS 5/13-801(a)*. The Commission has pre-existing authority under Section 13-801 to require unbundling to the fullest extent possible to maximize competition among telecommunications providers. *Id.* As elucidated by this Commission, its authority is not limited to the jurisdiction of the FCC or the Act; the Commission has the power to consider and include any appropriate provisions and terms. *See* Sage Arbitration Decision in Docket 03-0570, Order, December 9, 2003, at 6 (asserting the Commission has the power to address "many matters outside federal purview"). This Commission has already rejected SBC's claim that Section 13-801 is inconsistent with the federal Act and thus preempted. As noted by the Commission in Docket 01-0614: "In our view the legislature has determined that, in Illinois, it is appropriate that [SBC] be required to bear additional

2004 Ill. PUC LEXIS 675, *115

obligations as the price to pay for being the only ILEC being regulated under an alternative form of regulation." *See* Illinois Bell Telephone Company, [*116] Filing to implement Tariff Provisions related to 13-801 of the Public Utility Act, Docket 01-0614, Order, June 11, 2002, at P41 ("01-0614 Order"). In other words, by deciding to take advantage of alternative rate regulation under the PUA, SBC has chosen to be subject to the additional requirements of Section 13-801.

In addition, XO's proposed language would not override existing change of law provisions by making such changes of law automatically self-effectuating.

(SBC/XO-1b). As discussed above, SBC's proposed language would modify the existing change of law provisions, by allowing SBC unilaterally to discontinue providing UNEs upon any event that it considered a change of law without undergoing the required negotiations. Nothing in the *TRO*, orders of this Commission, the FCC, or the law gives SBC the right to modify the underlying change of law provisions of the existing Agreement. Instead, the FCC rejected the ILECs' request to override the Section 252 process and "unilaterally change all interconnection agreements to avoid any delay associated with renegotiation of contract provisions." *See TRO* at P 701. The FCC specifically noted "voluntary negotiations for binding [*117] interconnection agreements are the very essence of section 251 and section 252." *Id.* Thus, it would thwart the purpose of the Act to permit SBC, under the guise of implementing substantive changes resulting from the *TRO*, to modify the underlying change of law language so that SBC may automatically implement any future changes of law regarding UNEs.

This Commission has previously identified a provision as "superior" when it provides for negotiation between the parties as opposed to "immediately disrupt[ing] the working relationship created by the ICA." n40 An SBC provision was undesirable in that it allowed for "immediate disability" and "immediate invalidation in the event of regulatory change." *Id.* The Commission realized a smooth transition implementing a change in law would be elusive with a provision allowing immediate paralyzation of any agreements. "The Commission does not want ICA's, which are intended to provide stability among interconnected competitors, to rest on such a precarious foundation." *Id.*

n40 Sage Petition For Arbitration, December 9, 2003, Decision in Docket 03-0570 at p. 26.

[*118]

XO's proposed language does not modify the underlying change in law language. XO's proposed Section 1.1 provides that SBC should provide UNEs to the extent required by Section 251(c)(3), Section 271(c), the FCC rules, and/or other applicable law (including orders and rules of this state commission). Such language merely establishes the applicable law that governs SBC's obligations. As discussed further below in SBC Issue 2, XO's proposed language would - consistent with the change-of-law provisions of the Agreement - require parties to negotiate and mutually agree to amend their Agreement when additional changes of law occur.

Moreover, XO's proposed language requiring a "final and nonappealable" order of the FCC or a state commission before SBC may discontinue providing access to DS1 or DS3 loops or transport at a specific customer location does not, contrary to SBC's contentions, modify the underlying change of law provisions of the Agreement, as SBC contends. See XO Section 3.5.2.3 and 3.5.3.7. XO/SBC Interconnection Agreement, § 28.2 XO's proposed language reflects and is consistent with the underlying language in the parties' Agreement regarding changes of law. Finally, in contrast [*119] to SBC's proposed language, XO's language does not broadly and preemptively implement *all* future changes of law without negotiation, and would instead implement specific provisions of the *TRO* by recognizing that a final and nonappealable state decision pursuant to the *TRO* would relieve SBC of a UNE obligation.

c.) Staff

SBC's proposed "Lawful" UNEs language reflects a position that goes beyond the TRO requirements. First, as the Staff noted above in XO Issue No. 2, SBC appears to be positioning itself, in its proposed contract provisions, to

unilaterally withdraw UNEs when some court or tribunal determines that they no longer need be offered on an unbundled basis. Under its contract proposals, SBC appears to reserve to itself the right to determine -- and, indeed, from time to time *re*-determine -- what constitutes a "Lawful UNE." *See* SBC Issues Matrix at 1 *et seq.*, Contract Provisions 1.1, 2.2, 6 (SBC only required to provide UNEs as required by law, as it changes from time to time, notwithstanding contract provisions to the contrary).

In fact, SBC asks this Commission to do what SBC previously requested of the FCC, and which BOC request was specifically [*120] rejected by the FCC. n41 SBC's proposed language would have the effect of granting to SBC, alone, the authority to unilaterally implement any arguable Section 251(c)(3) changes of law based solely upon SBC's interpretation of any such potential change of law. The FCC directly declined to permit such unilateral implementation.

> n41 See TRO, P 701, n. 2085, which cites a Letter from Michael K. Kellog, Counsel for SBC, Qwest, and BellSouth, to Marlene H. Dortch, Secretary, FCC, CC Docket 01-338 at 3-5 (filed Jan. 21, 2003)(arguing that the FCC may "negate" certain contract terms under the Mobile-Sierra doctrine).

This Commission, like the FCC, should be loath to take the "extraordinary step" of "interfering with [the] contract process," which is the "very essence" of sections 251 and 252. XO, moreover, correctly perceives SBC's proposal to be an attempt to use a change of law to negotiate an alteration in the existing "change of law" provision, in a manner that would permit SBC to unilaterally abrogate UNE unbundling obligations. [*121] The *TRO* specifically contemplates the use of existing change of law provisions to negotiate conforming changes pursuant to the TRO. In other words, the TRO is itself a change of law, but not one that has any effect upon change of law provisions. SBC's attempt to bootstrap a change in the change of law provision should be rejected. Staff, accordingly, recommends that the Commission reject SBC's proposed language that would override the Section 252 process and allow SBC to unilaterally change the ICA to reflect its interpretation of any potential change of law regarding its obligations to provide requesting CLECs UNEs.

SBC's proposed language also limits SBC's obligations to provide CLECs with UNEs solely to any obligations formulated under Section 251(c)(3). In the TRO, the FCC stated, "we continue to believe that the requirements of Section 271(c)(2)(B) establish an independent obligation for BOCs to provide access to loops, switching, transport, and signaling regardless of any unbundling analysis under section 251." It is the Staff's position, consequently, that SBC continues to be obligated to provide UNEs under both Section 251 and under any independent obligation it has to [*122] provide UNEs under Section 271.

Further, although SBC's proposed language references orders and rules of the applicable state commission, SBC's proposed language is heavily qualified with vague limitations.

Staff recommends that the Commission reject SBC's unreasonably vague language.

Regarding the issue of whether "the issuance of USTA II means that through this proceeding SBC may no longer make certain UNEs available under section 251", the ALJ explained that:

> Regarding USTA II, although XO personnel did decline negotiations concerning that decision, the inescapable fact is that USTA II modifies and nullifies portions of the TRO. The latter cannot be properly interpreted or implemented without reference to the former. Therefore, even if USTA II, qua USTA II, were excluded from negotiations, its impact on the TRO would have to be incorporated in the Commission's analysis of the issues properly presented for arbitration. Except insofar as there may be some practical distinction between consideration of USTA II in its own right and consideration of the TRO as modified by USTA II (and the ALJ can perceive none), the instant Motion cannot be granted.

[*123]

ALJ Ruling, June 23, 2004, at 2.

It is the Staff's position that, at least as far as applying the proposed language at issue in this issue is concerned, the ALJ's perception that there is likely no difference between the TRO and USTA II is accurate. The stated FCC preference for negotiations, over language that would allow the BOC to over-ride section 252 negotiations, can address TRO related issues as modified by USTA II. Staff, accordingly, recommends that the Commission adopt XO's proposed language for all of the reasons articulated in detail above.

The Staff, moreover, takes the position that SBC is also obligated to provide UNEs to CLECs under the applicable state law, including the orders and rules of this Commission but also under the applicable requirements of the PUA.

2. Analysis and Conclusions

SBC-1. The Commission rejects SBC's proposal to insert the term "lawful" in the sections of the amended ICA that SBC discusses in connection with SBC-1, and in connection with any other disputed issue in this arbitration as well. Such language is unnecessary, likely to trigger future disputes between the parties, and could be readily abused to delay XO's access to SBC services. [*124] Since XO cannot hope to successfully demand access to "unlawful" UNEs, inclusion of this term serves no constructive purpose. Indeed, if such inclusion were necessary to the identification of what is permissible under the ICA, the "lawful" modifier would have to be inserted before every material noun in the ICA.

Similarly, SBC proposes to place the "lawful" modifier before references to the orders and/or rules of the FCC, the courts and this Commission. Unless they are under stay by a superior authority, such orders and rules are inherently lawful and effective. In effect, SBC's proposed language would empower SBC to implement the ICA by second-guessing - outside regular appellate processes - the viability of regulatory and judicial rulings.

SBC compounds its error by proposing, in SBC Section 1.1, to add the condition that "lawful" and "effective" orders and rules must also be "necessary to further competition in the provision of telephone exchange service or exchange access and that are not inconsistent with the [Federal Act] or the FCC's regulations to implement the [Federal Act]." Thus, within the operation of the ICA, administrative and judicial decisions will be judged SBC for [*125] their consistency with SBC's view of the Federal Act and associated FCC regulations. At the logical extreme, nothing in SBC's proposed language would preclude SBC from holding that a conclusion in an administrative or judicial decision affronted the Federal Act, even when that decision expressly held to the contrary.

It is entirely reasonable for SBC to propose ICA language that will assure that SBC is not obligated to provide services at TELRIC prices unless those services, and the carriers requesting them, are entitled to such prices. It is entirely unreasonable to achieve the objective by empowering SBC to unilaterally adjudge the content, validity and viability of non-stayed judicial and administrative authorities n42. Moreover, by arrogating such power, SBC will elicit disputes with XO and delay XO's access to competitive services. The far better course is to employ language providing that when SBC is relieved of the obligation to furnish a UNE under federal and state law, its corresponding obligation under the ICA will also be relieved (by the process discussed in relation to SBC-2, below).

> n42 SBC itself objects, in the context of SBC Issue 13, that "XO cannot unilaterally determine the effect of...change in law, including whether that change in law will be give any effect at all." SBC Init. Br. at 89.

[*126]

The answer, then, to SBC-1 is that SBC is not obligated to continue providing UNEs under the ICA when no such obligation exists under federal or state law. However, SBC's "unlawful" UNE scheme is ill-suited to excluding that obligation from the ICA.

SBC-1 & SBC/XO-1a. Section 271 of the Federal Act creates an unbundling obligation to which SBC must adhere,

irrespective of its duties under Section 251 and the associated impairment analysis n43. "[T]he requirements of section 271(c)(2)(B) establish an independent obligation for BOCs to provide access to loops, switching, transport, and signaling regardless of any unbundling analysis under section 251." TRO, P 653. However, the FCC also held that Section 271 "does not require TELRIC pricing" for elements unbundled pursuant to that statute. TRO P 659. Instead, prices for Section 271 UNEs must be just, reasonable and non-discriminatory, per Sections 201 and 201 of the Federal Act. TRO P 656.

> n43 SBC asserts that this Commission lacks "jurisdiction" to "require the parties to include in the contract language governing access to section 271 network elements." SBC BOE at 6. We disagree. Our detailed discussion of this claim appears in our analysis of SBC Issue 4, below. That discussion fully applies with respect to SBC Issue 1, and to all the other open issues for which SBC makes the same assertion.

[*127]

The parties' disagreement respecting 271 UNEs is reflected in so many provisions throughout their respective proposed TRO Attachments that we cannot address them individually. Nevertheless, certain principles should be adhered to throughout the parties' ICA. Language relieving SBC of its obligation to unbundle elements under Section 271 is prohibited; correspondingly, language authorizing such unbundling (e.g., XO proposed Section 3.1.4.1) is permissible. Language requiring SBC to offer 271 UNEs, qua 271 UNEs, at TELRIC prices, is prohibited; correspondingly, language authorizing SBC to offer 271, qua 271 UNEs, at prices determined per the criteria Sections 201 and 201 of the Federal Act is permissible.

SBC contends, however, that the *Status Quo* Order precludes incorporation into the ICA of provisions pertaining to Section 271 (or state law), on the ground that such provisions would impermissibly expand the XO's contract rights, thereby altering the status quo. SBC Supp. Br. at 5. Since the ICA is not in the record, the Commission cannot assess the factual support for this claim by comparing current ICA text with XO's proposed language. In any event, the Status Quo Order addresses [*128] and "freezes" only an ILEC's unbundling obligations under Section 251. The Section 271 obligations confirmed in the TRO are not addressed and, indeed, did not need to be, since (unlike Section 251 obligations) they were not vacated by USTA II. Furthermore, Section 271 unbundling rights are not an "expansion" upon Section 251 rights. They are lesser rights, involving higher prices to the CLEC and no right to demand combinations.

This state has also established unbundling requirements, characterized in Section 13-801 of the Act n44 as "additional" to federal unbundling requirements. When the pertinent ILEC is subject to an alternative regulation plan under Section 13-506.1 of the Act n45, as SBC is, such additional obligations may exceed or be more stringent than Section 251 obligations. *Id.* We have held that we lack authority to declare that Section 13-801 is preempted by federally authority, insofar as that statute authorizes unbundling in excess of federal requirements. Docket 01-0614, Order, June 11, 2002, P 42.

> n44 *220 ILCS 5/13-801.*

> n45 *220 ILCS 5/13-506.1.*

[*129]

The FCC does have the power to preempt, as subsection 13-801(a) expressly acknowledges. That power is codified in Section 253(d), and the FCC observed in the TRO that "[p]arties that believe that a particular state unbundling obligation is inconsistent with the limits of section 251(d)(3)(B) and (C) may" request preemption under that section. TRO P 195. SBC has apparently not done so. XO Init. Br. at 28.

2004 Ill. PUC LEXIS 675, *129

The FCC also explained in the TRO that:

> If a decision pursuant to state law were to require the unbundling of a network element for which the Commission has either found no impairment - and thus has found that unbundling that element would conflict with the limits in Section 252(d)(2) - or otherwise declined to require unbundling on a national basis, we believe it unlikely that such decision would fail to conflict with and "substantially prevent" implementation of the federal regime, in violation of section 251(d)(3)(C). Similarly, we recognize that in at least some instances existing state requirements will not be consistent with our new framework and may frustrate its implementation. It will be necessary in those instances for the subject states to amend their rules and to alter [*130] their decisions to conform to our rules.

TRO P195. Consequently, this Commission has reopened our Docket 01-0614 "to determine whether the Commission's unbundling decisions in this case are in conflict with federal law, and, if so, to determine the appropriate unbundling provisions to be established consistent with Illinois and federal law." Docket 01-0614, Order on Reopening, June 23, 2004, at 9.

Thus, this Commission is presently reconsidering its unbundling power and associated decisions under, *inter alia*, state law, while the FCC is simultaneously reconsidering its own unbundling decisions under federal law, after the remand in USTA II. Within this state of flux, we must nevertheless determine how *presently existing* state authority and regulatory decisions are to be reflected in the parties' ICA, without speculating about (or prejudging, with respect to Docket 01-0614) future developments. We conclude that our unbundling decisions, as well as the Section 13-801 authority on which they are premised, *presently* determine the state-based unbundling obligations of SBC (and XO's corresponding rights of access to unbundled elements). Therefore, ICA provisions that [*131] reflect these obligations and rights (e.g., XO proposed Section 1.1) should be included in the SBC-XO amended ICA.

Moreover, for purposes of the ICA, our presently effective rulings must be taken at face value. Although SBC may believe that we have required unbundling under Section 13-801 (including TELRIC-priced unbundling) that exceeds what Section 251 would allow, that belief is irrelevant at present. Similarly irrelevant is the argument that our rulings are inconsistent with Section 261(c) of the Federal Act, which would contravene Section 13-801. Our currently viable unbundling rulings were based on our judgment that they are consistent with Section 261(c). Such judgment would have to be overturned on appeal or preempted through Section 253(d), not collaterally challenged in arbitration (or worse, unilaterally by SBC, within the context of the ICA). Put simply, our unbundling mandates are effective today, and unless or until they are altered (whether by us or by superior authority) they must be incorporated in the parties' ICA. Future unbundling developments should be accommodated through change-of-law provisions.

In view of the foregoing principles and conclusions, the Commission [*132] rejects XO's recommendation that only "final and non-appealable" non-impairment decisions will terminate an SBC unbundling obligation. The terms of a non-stayed regulatory order must be obeyed.

SBC/X0-1b. The Commission concurs with XO and Staff that SBC's proposals would essentially replace the change-of-law provisions in the parties' existing ICA with unilateral powers for SBC. XO Init. Br. at 29; Staff Init. Br. at 62. Those provisions contemplate bilateral negotiations between the signatories. In contrast, SBC's amendatory contract language (e.g., SBC proposed Section 1.1) would empower SBC to decline to provide UNEs, based upon, first, its unilateral assessment of the ramifications of regulatory and judicial authorities, and, second, its unilateral judgment of the efficacy of those authorities themselves, based on criteria we rejected above. Such provisions do not belong in the parties' ICA, whether to incorporate changes already compelled by the TRO or any future changes associated with the TRO and USTA II.

### 2. What is the appropriate transition and notification process for declassified UNEs?

**XO re-characterizes this issue as follows:**

(a) Whether SBC may [*133] attempt to modify the "Change of Law" provisions in the Agreement, in order to implement automatically any future changes in law to the agreement.

(b) What are the circumstances under which SBC may no longer be required to make certain UNEs available?

(c) May SBC unilaterally discontinue providing a UNE after a 30-day transitional period if the parties have not mutually agreed to negotiate terms and conditions regarding such UNE?

1. Parties' Positions and Proposals

a). SBC

In order to properly implement the *TRO*, the parties' contract must be amended to provide a clear, orderly, and definite process for the transition of network elements that are no longer UNEs. XO's proposed language does not provide for any real transition plan at all to implement the *TRO's* declassifications, and thus does not appropriately implement the requirements of the *TRO*. (*See* XO Section 3.13.1.1.) In particular, XO's proposed language would allow for a transition only if the parties were able to agree on a "transition schedule." In the event the parties could not agree on a transition schedule, the Commission would have to step in.

If that sounds familiar, it is because [*134] that is precisely where we are today. The parties were unable to agree on a transition schedule, and thus the Commission has been forced to step in to arbitrate the matter. XO's proposal to delay the creation of any transition schedule for many more months, pending more negotiation and after the Commission is forced to step in again, is unreasonable.

It is also contrary to the FCC's direction in the *TRO*. The FCC stated that, if the parties could not agree on "transition timing," state commissions should "conclude their consideration of such disputes within nine months of the effective date of this Order." *TRO*, P 703. Under XO's proposal, however, the Commission's "consideration" of the transition timing dispute has not even begun. Thus, XO's proposed language, and SBC Illinois' should be adopted.

SBC Illinois' proposed transition plan language provides for a final, concrete, and well-defined transition period for those facilities that XO is no longer entitled to access as UNEs. That language appropriately defined "declassified" facilities and expressly identified network elements declassified by the *TRO* and USTA II (Sections 1.3, 1.3.1, 1.3.1.1, 2.20), and specifies [*135] that such facilities are subject to the transition procedures of the contract (Sections 1.3.1.3, 1.3.2, and 1.3.3). The transition procedures provide for written notice of a declassification, followed by a 30-day transition period where the CLEC can issue disconnect orders or agree upon an alternative arrangement (*e.g.*, resale or special access). (Section 1.3.4.) If the parties cannot agree, SBC Illinois may convert the facilities to resale or special access. (Section 1.3.4.)

XO's assertion that SBC Illinois' language would somehow inappropriately modify the parties' change in law language rather than implement the *TRO* should be rejected. As an initial matter, XO's proposed language too applies to certain future "declassifications," and to that extent would appear to supplement the parties' existing change of law process. XO cannot object merely because SBC Illinois' language might have the same effect.

In any event, SBC Illinois' proposed language appropriately implements the *TRO's* new impairment standard and the *TRO's* new approach to unbundling. Under this new regime, network elements are subject to frequent "de-listing," and may be delisted at different times and [*136] in different places. XO's suggestion that each such future declassification should be followed by another round of negotiations, and likely another proceeding before this

2004 Ill. PUC LEXIS 675, *136

Commission, is unreasonable and inappropriate.

b.) XO

(SBC/XO-2a). To the extent that certain UNEs are no longer required by the *TRO*, XO proposes a specific mechanism for transitioning from these UNEs. Subsequent to the effective date of the Amendment, in the event that there is a change in the status of certain UNEs pursuant to applicable law, XO proposes to incorporate these changes to the Agreement through the parties' mutual agreement.

For example, XO's proposed language in Section 3.13.2 provides that, as to network elements that the state commission determines (after the effective date of this amendment) to be no longer required to be unbundled (or "nonconforming facilities"), the parties "agree to amend the Agreement promptly to reflect the change and establish a mutually acceptable transitional mechanism if no transitional mechanism has been previously agreed upon or specifically dictated by the state commission." n46 As noted in SBC Issue 1, this is consistent with the *TRO* as it specifically  [*137] requires the parties to negotiate changes to their agreements, consistent with underlying change of law provisions of their ICAs. *TRO* at P 701. XO/SBC Interconnection Agreement, § 28.2.

> n46 Similarly, as noted above, to the extent that a change in applicable law requires SBC to provide UNE, combination, or commingling that is not offered under the amended agreement, XO's proposed language similarly states "the Parties shall *negotiate* an appropriate amendment to the Agreement that will contain the rates, terms and conditions for such UNE, Combination, or Commingling." Joint Matrix, XO Position, Section 1.4.

In contrast, SBC proposes a 30-day transition period for discontinuing its provision of certain UNEs that are no longer required to be provided pursuant to events that SBC deems to be changes of law. The effect of adopting SBC's language may not only be confusion but violation of the Act, the FCC's orders and rules, and this Commission's rules and requirements. For example, any attempt by SBC to discontinue [*138] providing UNEs based on USTA II would be premature and conflict with interim rules that the FCC has stated that it will promulgate within the next few weeks in the wake of USTA II. An attempt by SBC to abruptly discontinue providing UNEs is also contrary to Illinois law, which established rights to access network elements if technically feasible wherever competition would be promoted. *220 ILCS 5/13-801*.

(SBC/XO-2b). Neither party may modify the underlying change of law provisions, as that is beyond the scope of the negotiations and this arbitration. However, SBC proposes unilaterally to discontinue providing UNEs, alone, or combined, upon 30 days notice to the CLEC. SBC Section 1.3.4. For the same reasons discussed above in SBC Issue 1, SBC's proposed language regarding declassified and unlawful UNEs is overly broad and improper and effectively constitutes an attempt to modify the change of law provisions, by eliminating the negotiation process specified in the change of law language in the Agreement. Thus, upon the issuance of USTA II, SBC's proposed language could potentially allow it to discontinue provision of certain UNEs, [*139] after the 30-day notice. This is inconsistent with the *TRO* and other applicable law, including past Commission decisions. Sage Telecom Arbitration, Docket No. 03-0570, Order, December 9, 2003, at 26 (preservation of parties' existing contractual rights.)

c.) Staff

The ALJ addressed the issue of future declassifications in his June 23, Ruling. In his Ruling, the ALJ found:

> Regarding future declassifications, a forward-looking process is not unrelated to implementation of the TRO (as modified by USTA II), to the extent that such process is designed to apply the modified TRO's principles and conclusions to future activity. Moreover (and as concluded above), the fact that amendatory provisions associated with implementation of the modified TRO may affect the operation of