2004 Ill. PUC LEXIS 675, *139

existing COL provisions does not mean that SBC Issue 2 exceeds the scope of the parties' pre-petition negotiations.

On the other hand, future declassifications that are not based on the provisions of the modified TRO are beyond the scope of those negotiations. Accordingly, any proposed SBC text that purports to account for future declassifications required by authorities other than the modified TRO [*140] (e.g., SBC proposed section 2.20(e)) is hereby stricken.

ALJ Ruling, June 23, 2004, at 2-3.

In a footnote to the last sentence cited above, the ALJ further explained that:

SBC may believe that the stricken text is inherently arbitrable because it concerns SBC's rights and duties under Section 251. It is not. It is inherently *negotiable*, and had it been negotiated (or even offered for negotiation), it would now be arbitrable. However, non-TRO related future rulings by, for example, any "judicial body," were not negotiated (or offered for negotiation) by the parties. *Id.*

Assuming that the language pertaining to "non-TRO related future rulings by, for example, any 'judicial body,' were not negotiated (or offered for negotiation) by the parties" is properly stricken, it is the Staff's position that the FCC has clearly articulated its preference for the parties to negotiate language to accommodate TRO related modifications. A process for future UNE declassifications could be negotiated at the same time as the current TRO related modifications, if, as the ALJ explained, it had been a subject of the parties negotiations. Staff, accordingly, recommends that the Commission [*141] adopt XO's proposed language for all of the reasons above and articulated in detail above in SBC Issue 1.

2. Analysis and Conclusions

SBC-2 is another over-broad request for guidance on a general subject matter, rather than a proper framing of specific open issues. SBC/X0-2b is similarly deficient, as well as substantively duplicative of SBC-1. Accordingly, we will specifically resolve SBC/XO-2(a) and (c), and those related disputes concerning UNE "declassification" that we view as impediments to amending the ICA.

SBC/XO-2a & 2b. Important elements in the parties' discussion of SBC-1 more logically belong here. For instance, Staff maintains that "the TRO is itself a change of law, but not one that has any effect upon change of law provisions." Staff Init. Br. at 62. If that assertion is correct, the parties cannot establish a new "transition and notification process" in this arbitration. As Staff observes, the ALJ ruled that future UNE declassifications that are not based on the TRO (as modified by USTA II) are beyond the scope of arbitration here, because they were beyond the scope of the parties' limited negotiations. *Id.*, at 66.

SBC posits, however, that modification of [*142] the parties' existing change-of-law provisions is "consistent with implementing the requirements of the *TRO*. In other words, to the extent the *TRO* created a new legal landscape which the parties' existing change of law language is insufficient to reasonably and properly implement, then invoking the existing change of law process to negotiate a new change in law process that will accommodate the new legal landscape is perfectly appropriate." n47 SBC Init. Br. at 45. SBC's argument is conceptually valid. If modification of the parties' present change-of-law provision were necessary to proper incorporation of the TRO into the existing ICA, then such modification would be within the scope of this proceeding.

n47 To be clear, the Commission does not find that either party invoked the change of law process in their ICA in this instance. As we stated in Section II of this Decision, the ALJ ruled that this arbitration was compelled by TRO P 703.

However, that is not the case here. To the extent that the TRO (as modified [*143] by USTA II and superceded by the *Status Quo* Order) has determined that specific network elements no longer need to be unbundled (or offered at TELRIC prices) - and to the extent that such unbundling is not required under presently applicable state law - there is no need to establish a process for *identifying* those elements and *incorporating* them into the ICA. The FCC has already identified them. They can be incorporated by simply listing them in the parties' amendment as elements that will not be unbundled (or TELRIC priced). Indeed, one of the apparent purposes of this arbitration was to reflect such "declassifications" in the ICA.

On exceptions, SBC insists that it has indeed propounded contract language that directly identifies services that the modified TRO exempts from unbundling (SBC proposed subsections 1.3.1.1 and 1.3.1.2). SBC BOE at 25-26. There are several flaws in SBC's proposed text, however. First, subsection 1.3.1.2 has been overtaken by the Status Quo Order. All of the listed items must remain unbundled (assuming they presently are in the parties existing ICA) during the time periods specified in that order. That is also true for several listed [*144] items in subsection 1.3.1.1 (ii, iv).

Second, several enumerated items in Section 1.3.1.1 are infected by SBC's insertion of the counter-productive term "lawful," which we rejected in our discussion of SBC Issue 1. Third, several items in that same section (e.g., subsections (i), (ii), (iv), (xv)) would accommodate general, and future, regulatory directives from any source. These improperly bypass the ICA's change-of-law processes (see below). Fourth, SBC's lists contain items for which state law requirements have not been taken into account (e.g., subsections (i) & (ii) (dark fiber), (iv) and (viii)). Fifth, we have not determined that SBC is free of unbundling obligations regarding certain enumerated items in Section 1.3.1.1 (e.g., subsections (x), (xi)), or we have attached modifications and conditions that are not reflected in their bare enumeration (e.g., viii).

If the foregoing deficiencies are corrected, however, SBC's proposed Sections 1.3.1.1 and 1.3.1.2 can be included in the ICA (presumably as a single, combined section). The Commission has no preference between SBC's preferred term, "declassified," and XO's preferred term, "non-conforming." SBC's proposed Section 1.3.1.3, [*145] which is predicated on the concept of "lawful UNEs, should not be included in the ICA.

Regarding *future* identification of elements that must be "declassified" under rules and principles established in the TRO (as modified by USTA II), SBC has not demonstrated that the parties' existing change-of-law provisions are inadequate. SBC emphasizes that the TRO injected considerable granularity into the impairment analysis, so that unbundling may be discontinued for specific elements on specific routes. SBC Init. Br. at 45-46. SBC also stresses that, first, the FCC was responding to the finding in USTA I that the FCC's impairment analysis had been insufficiently granular, and, second, that USTA II did not "disturb" the FCC's revised impairment analysis in the TRO. *Id.* at 44. SBC concludes that the parties' existing change-of-law mechanism is not suitable for addressing the volume and frequency of "declassifications" that are likely to flow from the TRO's more granular analysis. *Id.*, at 45-46.

However, SBC's assessment of the TRO impairment standards, and of the impact of USTA II on them, is too literal, too narrow and, in this context, self-serving. It is too literal [*146] because, although the Court of Appeals did not remand the impairment standard, it did characterize an "important" element of that standard as "vague almost to the point of being empty," and noted that "the issue of whether the standard is too open ended is likely to arise again." *USTA II, 359 F.3d at 572.* Consequently, while the impairment standard remains viable in its present form (at least until the release of interim rules by the FCC), its usefulness in SBC's predictions regarding the future volume and frequency of "declassifications" is placed in doubt.

More substantively, in the TRO, the FCC found *national* impairment for certain UNEs. That finding could only be overcome with an evidentiary presentation related to specific criteria provided by the FCC. There was no guarantee that any particular ILEC would prove up any non-impairment. Moreover, the FCC established the process for proving non-impairment with the expectation of significant state commission involvement. Since USTA II has overturned that process, it cannot be assumed that the FCC would have included the same level of granularity in its impairment analysis, or that the granularity [*147] it would have required - without the findings of the state commissions - would

have produced the volume and frequency of "declassifications" SBC predicts. Accordingly, we do not adopt SBC's selective assessment of the impact of USTA II on the TRO, which treats the remanded elements of the TRO as if they were dissociated from, rather than integrated with, other elements that were not expressly reversed by the court. It follows that we do not agree that the TRO is likely to generate a future quantum of legal changes that will overwhelm the parties' change-of-law processes n48.

> n48 Similarly, the Status Quo Order also suggests that the parties will not be inundated by frequent and piecemeal changes in unbundling requirements. That order posits the withdrawal of certain unbundling duties on a *national* basis, presumably supported by a blanket non-impairment finding.

Additionally, neither SBC nor any other participant in this proceeding created an evidentiary record that would enable us to compare the volume, frequency [*148] and pace of "declassifications" before the TRO with what SBC predicts will occur under the modified TRO. Thus, an appraisal of the sufficiency of the present ICA change-of-law provisions would be based, to an uncomfortable extent, on guesswork.

For the foregoing reasons, we cannot conclude that the parties' present change-of-law provisions would be inadequate for identifying and incorporating "declassified" UNEs (either the UNEs expressly "declassified" in the TRO or UNEs "declassified" in the future pursuant to the principles of the modified TRO) into the parties' ICA. It follows that future disputes regarding the identification of network elements that must be unbundled (or sold at TELRIC prices) per the modified TRO should be subject to existing ICA change-of-law and dispute resolution provisions. It also follows that the amended ICA should reflect the modified TRO's explicit identification of those network elements that must, or need not, be unbundled n49. However, any such elements that must be unbundled pursuant to presently valid state law or order should not be exempted from unbundling in the ICA.

> n49 For example, the TRO expressly finds that OCn loops and OCn dedicated transport need not be unbundled. That finding should be incorporated into the ICA, through the amendment that is the subject of this arbitration.

[*149]

SBC-2 and SBC/X0-2C. Once it has been determined that the unbundling obligation associated with a network element has been altered (either because the TRO has already altered that status or because the principles of the modified TRO so require in the future), practical steps must be taken by the parties to effectuate that change. Those practical measures are not a change of law, but a consequence of such change. That is, a change of law re-determines what must be unbundled; practical measures implement that change.

Each arbitrating party understandably proposes an implementation process that favors its own business case. Neither is satisfactory. XO would handle implementation on a "project basis," with resort to dispute resolution if the parties cannot agree, in a period of no less than 90 days, on implementation. Given our conclusion, above, that the identification of network elements with altered unbundling obligations will be subject to ICA change-of-law and dispute resolution provisions, the Commission sees no reason to delay commencement of implementation for at least three months, with the likelihood of additional dispute resolution concerning implementation itself.

SBC's proposal [*150] is flawed in two respects. First, its proposed 30-day "transition" period is too short to serve the public interest. Irrespective of the impact of change on XO, the Commission's first concern is the welfare of XO's customers. Unless XO seamlessly absorbs the additional costs associated with the loss of unbundling, its customers (depending upon the available options in their agreements with XO) will likely need time to assess the effect of change on their own telecommunications budgets and to confer with XO (and, perhaps, SBC or other providers). Second, SBC's transition procedure is linked to other proposed SBC provisions (discussed above) that allow SBC to make unilateral

and inappropriate judgments regarding the content and validity of federal and state laws, orders and regulations.

Accordingly, we will articulate certain conclusions. First, the amended ICA should have a standard procedure for implementing TRO-related changes in unbundling obligations. Second, as previously discussed, any such future changes must be identified through the current change-of-law and dispute resolution procedures in the ICA. Third, if it is determined through those procedures that an unbundling obligation [*151] has been changed, no such change can be implemented in less than 60 days after service of written notice by the party demanding implementation (unless otherwise agreed by the parties). Fourth, upon expiration of the 60-day interval (or any shorter interval agreed to by the parties), the party serving such notice may either implement change unilaterally or request a Commission order requiring implementation. Fifth, the "disputed" texts of the arbitrating parties pose dozens of additional issues for resolution. Yet those issues have not been properly framed -- or, in most instances, even mentioned - for resolution. The Commission will not resolve disputes that have not been framed as open issues, and cannot do so without briefing by the parties.

**3. (a) Does a subloop include "house and riser cable and insider wire?"**

**(b) When SBC retires copper loops or subloops must it provision an alternative service over any available facility?**

**(c) Should the ICA include terms and conditions related to the loop "caps" set forth in *47 CFR 51.319(a)(5)(iii)*?**

**(d) Should the pricing appendix contain pricing for declassified subloops?**

1. Parties' [*152] Positions and Proposals

a). SBC

The parties have several disputes regarding the proper contract language governing access to unbundled loops. However, sub-issue SBC-2a has been settled.

*First*, the parties disagree regarding network disclosure requirements in the event of certain loop retirements. (Section 3.3.1.5.) In the *TRO*, the FCC promulgated new rules that require certain disclosures before an ILEC retires copper loops that are replaced with fiber-to-the-home ("FTTH") loops. *TRO*, PP 281-83. While SBC Illinois' proposed language properly tracks these rules, XO proposes additional language that finds no support in the *TRO* or the FCC's rules. In particular, XO proposes that SBC Illinois be required to "provision an alternative service" before making any retirement. But the FCC's rules, by their plain terms, only require an ILEC to make certain disclosures before effecting such retirements. Similarly, section 251(c)(5) of the Federal Act, upon which the FCC's network disclosure rules are based, only requires public notice of certain network changes. Neither the Act nor the FCC's rules require an ILEC to first make alternative service arrangements before retiring [*153] copper loops, as XO proposes.

*Second*, the parties disagree regarding implementation of the *TRO's* DS3 loop cap, which provides that a CLEC may obtain a maximum of two DS3 loops at any single customer location. *TRO*, P 324. While XO does not object to reflecting the *TRO's* DS3 loop cap in the parties' contract, it does oppose some additional language proposed by SBC Illinois that more clearly spells out how that cap would be implemented if the FCC were to require the unbundling of DS3 loops at some point in the future. XO, however, has not explained its objection to this additional language, and SBC Illinois' language is reasonable and appropriate. As the FCC itself recognized, carriers may sometimes need to "negotiate specific terms and conditions necessary to translate our rules into the commercial environment." *TRO*, P 700.

SBC Illinois notes that the FCC's rules requiring the unbundling of high-capacity loops have been vacated. Accordingly, SBC Illinois' language would come into play only if the FCC were to re-institute such an unbundling requirement. Nevertheless, it is reasonable to adopt SBC Illinois' language, because that language clearly defines how

the DS3 [*154] loop cap would be calculated (by making clear that it applies to each end user customer premises location) and applied in a commercial environment if the FCC were to require DS3 loop unbundling at some point in the future.

*Third*, XO opposes SBC Illinois' proposal to delete from the parties' pricing schedule the prices for three fiber feeder subloops identified by SBC Illinois. In the *TRO*, the FCC held that ILECs are not required to unbundle fiber feeder subloops. *TRO*, P 253. Thus, SBC Illinois is not required to unbundle the three fiber feeder subloops it identified, and those prices may appropriately be deleted.

b.) XO

(SBC-3b). XO's proposed language, which would require SBC to provision alternate service over any available facility when SBC retires a copper loop or subloop, is consistent with the *TRO*. The *TRO* provides that competitors will continue to have access to loop facilities when copper loop is retired because of the installation of fiber-to-the-home. Specifically Paragraph 281 provides that "[s]uch notification [of retirement of copper loops] will ensure that incumbent and competitive carriers can work together to ensure that competitive LECs *maintain* [*155] *access to loop facilities*." (Emphasis added.) Further, 47 C.F.R. § 52.319(a)(3)(ii)c provides that upon retirement of a copper loop, the ILEC "shall provide non-discriminatory access to a 64 kilobits per second transmission path capable of voice grade service over the fiber-to-the-home loop on an unbundled basis." XO's proposed language simply ensures that XO will have access to loop facilities consistent with the requirements of the *TRO*.

The TRO also contemplated this Commission's role in evaluating copper loop retirement, stating "that many states have their own requirements related to discontinuance of service, and our rules do not override these requirements." *TRO* at P 284. The threat to access is subject to the state review process, which should "address the concerns...regarding the potential impact of an incumbent LEC retiring its copper loops." *Id.* This analysis must recognize that "the retirement of copper loop plant is a network modification that affects the ability of competitive LECs to provide service." *Id.* at P 281.

(SBC-3c). XO agrees that the ICA should state that SBC is not required to provide more than two DS3 UNE local loops per requesting carrier [*156] to any single customer location, consistent with *47 C.F.R. § 51.319(a)(5)(iii)* and XO's proposed language acknowledges that SBC has no obligation to provide XO more than two DS3 UNE local loops to any single customer location. However, the additional language SBC adds regarding how it may handle orders that may exceed two DS3 UNE local loops per requesting carrier to any single customer location is not necessary to implement the DS3 loop cap in *47 C.F.R. § 51.319(a)(5)(iii)*.

(SBC-3d). There is no basis, in light of the FCC's finding that SBC must make subloops available, for SBC to delete the pricing provisions for a wide range subloops. Paragraph 253 of the *TRO* only finds an ILEC should not be required to make feeder plant available as a subloop UNE where (1) the feeder is provided over fiber facilities and (2) where it is not necessary to provide a complete transmission path between the central office and the customer premises when ILECs provide unbundled access to the TDM-based capabilities of hybrid loops. SBC's proposed deletion of subloop pricing is not limited to subloops that meet these conditions. [*157] Thus, SBC is attempting to grant itself greater relief than the FCC granted it in the *TRO*.

c.) Staff

(SBC-3a). Staff agrees with SBC that the TRO and its accompanying implementing rules only defined the subloop to include inside wire "owned or controlled" by the SBC.

XO's proposed language, however, appears to posit that the FCC defined inside wire as facilities owned or controlled by SBC. Since the parties appear to be in agreement that a subloop includes inside wire only if SBC owns or controls such facilities, this is a non-issue and, accordingly, the Staff takes no position other than to acknowledge that it concurs with the proposition that a subloop includes inside wire only if SBC *owns or controls* such facilities.

2004 Ill. PUC LEXIS 675, *157

Consequently, the issue remaining is whether House and Riser Cable are included in the FCC's definition of inside wire. As noted above, inside wire is defined as all loop plant owned or controlled by the incumbent LEC at a multiunit customer premises between the minimum point of entry as defined in § 68.105 of this chapter and the point of demarcation of the incumbent LEC's network as defined in § 68.3 of this chapter. Sections 68.105 and 68.3 provide [*158] an analysis that is fact specific.

Without the benefit of the specific facts, including the defined parameters of house and riser cable, required to determine whether house and riser cable are included in the FCC's definition of inside wire, the Staff is unable to offer an opinion on this issue.

(SBC-3b). The FCC clearly requires SBC to provide an alternative service when it retires copper loops or subloops. The Staff, accordingly, recommends that the Commission adopt language reflecting the FCC's requirements in *47 C.F.R. § 51.319(a)(3)(ii)(C)*.

(SBC-3c). This issue appears to the Staff to be a non-issue. The Staff agrees with SBC that XO's proposed language fails to reflect the FCC's cap on unbundling DS3 circuits. XO acknowledges the DS3 cap and also recommends that the ICA should contain language reflecting the DS 3 CAP. See Joint Issues Matrix, at 67. Staff agrees with both parties that the ICA should contain language reflecting the DS3 cap found in *47 C.F.R. § 51.319(A)(3)(iii)*.

(SBC-3d). Because XO has not taken issue with SBC's proposed language for § 3.10 (HFPL), the Staff takes no position on SBC's [*159] proposed language because it does not appear to be an issue in dispute. Staff, however, reserves the right to comment on SBC's proposed language in § 3.10 (HFPL) should XO object to it in XO's Initial Brief.

2. Analysis and Conclusions

SBC-3a. The parties settled this sub-issue during briefing.

SBC-3b. SBC's proposed Section 3.1.3.2.3 literally tracks the FCC's requirement in *47 CFR 51.319(A)(3)(II)(c)* and should be included in the parties' ICA. XO's demand for "an alternative service over any available, compatible facility (e.g., copper or fiber)," XO proposed Section 3.3.1.5, exceeds the directives in the TRO and FCC regulations and should be excluded from the ICA.

SBC's briefings suggest that this is also a *timing* dispute n50. If that is so, the Commission notes that customer welfare is paramount. A compliant voice-grade circuit must be available in a manner that makes the transition from copper to fiber as seamless to the customer as is technically feasible under current systems and processes. Narrowband service must not be interrupted unless, given current systems and processes, such interruption is necessary to effectuate the transition, [*160] or unless the customer requests interruption. Where service interruption is necessary, SBC shall minimize such interruption to the extent practicable.

> n50 "[N]othing in the *TRO* or the FCC's rules requires that an ILEC actually provision alternative service *before*, and as a pre-condition to, a retirement. SBC Illinois is required only to make unbundled access to a voice-grade circuit *available*; the CLEC may or may not wish to actually take advantage of that offer." SBC Reply Br. at 43 (emphasis in original).

SBC-3c. XO's principal concern with SBC's treatment of the DS3 loop cap is that SBC would be empowered to unilaterally convert an excess loop request to a special access request, without giving XO notice or an opportunity to "opt out or...challenge the cap assessment." XO Init. Br. at 37. SBC's countervailing concern is that its rights, when XO appears to have exceeded the cap, should be clearly delineated in the ICA. SBC Init. Br. at 53. Both parties' concerns are reasonable and can be accommodated in [*161] the amended ICA. Therefore, SBC's proposed Section 3.1.2.2.1

2004 Ill. PUC LEXIS 675, *161

should be modified to provide written or electronic notice to XO, and a fair and specific time interval in which XO can object or select alternative treatment for an excessive DS3 loop request. Objections should be resolved through the ICA dispute resolution mechanism, and the status quo should not be altered pending such resolution.

XO's recommendation to address this issue through "industry discussions," XO Reply Br. at 37-38, is rejected. As we said in relation to XO Issue 4, *this* proceeding was initiated (by XO) for the purpose of incorporating TRO requirements, including the DS3 cap, into the parties' ICA. The Commission perceives no benefit in delaying that process, particularly for something as vague as "industry discussions." n51

> n51 Although XO cautions that, absent industry-wide discussions, SBC is likely to "make system changes and procedures [regarding the DS3 loop cap] that it will apply to all other CLECs," XO BOE at 6, the Commission does not perceive how SBC (or any ILEC) can unilaterally alter existing ICAs or determine the terms of new ICAs.

[*162]

SBC's proposal to clarify the identity of the DS3 loop "customer," in SBC 3.1.2.2.1 is reasonable on its face, and XO does not support its objection to it. It should be included in the amended ICA.

SBC-3d. In the TRO, the FCC states that "the rules we adopt herein do not require [ILECs] to provide unbundled access to their *feeder* loop as stand-alone UNEs, thereby limiting [ILEC] subloop unbundling obligations to their *distribution* plant." TRO P 254 (emphasis added). SBC asserts, without contradiction from XO, that the subject subloops are each part of SBC's feeder plant, not its distribution plant. SBC Init. Br. at 54. Therefore, SBC can delete subloop pricing for the three pertinent loops. However, XO will still have access to SBC's fiber feeder plant "as necessary to provide a complete a transmission path between the central office and the customer premises" under the circumstances set forth in TRO P 253. However, such access does not require that the subloop component be available as a stand-alone UNE, but as part of the complete transmission path described in TRO P 296.

**4. (a) Must SBC provide loop conditioning free of charge?**

**(b) Is SBC required to provide unbundled** [*163] **access to the packet switched features, functions and capabilities of its hybrid loops?**

**(c) What terms and conditions should apply to line conditioning?**

**(d) What terms and conditions should apply to the high frequency portion of a copper loop ("HFPL")?**

1. Parties' Positions and Proposals

a). SBC

With respect to hybrid loops, SBC Illinois proposes to precisely track the detailed new rules promulgated by the FCC in the *TRO* regarding hybrid loops. XO's proposed language, on the other hand, states that SBC Illinois shall provide access to hybrid loops on an unbundled basis, and vaguely refers to "applicable law" and section 271. That language is unreasonable, because it fails to specify the parties' rights and obligations with respect to hybrid loops. The purpose of an interconnection agreement is to translate applicable law into the commercial environment, and spell out the parties' respective rights and obligations. SBC Illinois' proposed language does just that, closely following the FCC's hybrid loop rules. Moreover, the Commission should reject XO's attempt to invoke section 271 to require SBC Illinois to provide access to hybrid loops at section 251 rates, terms, [*164] and conditions, for the reasons explained above under Issue SBC-1.

With respect to line conditioning, the Commission should approve SBC Illinois' proposed contract language. That language properly implements the FCC's line conditioning rule (FCC Rule 319(a)(1)(iii)(A)), and XO has not explained its objection to SBC Illinois' proposed language.

With respect to access to the HFPL (line sharing), the Commission should adopt SBC Illinois' proposed language. In the *TRO*, the FCC conclusively held that ILECs are not required to unbundle the HFPL, and held that such a requirement would contravene Congress' goals in the Federal Act. *TRO*, PP 258-63. Thus, the FCC established detailed rules to govern the phase-out of the HFPL. FCC Rule 319(a)(1)(i). Moreover, the D.C. Circuit upheld the FCC's findings and rules in USTA II. Therefore, the parties' contract should be amended to precisely track and implement these new FCC rules, as SBC Illinois' proposed contract language does.

XO's proposed language, on the other hand, falls far short of implementing the *TRO's* new line sharing rules. For instance, XO would define "grandfathered" line sharing arrangements in a manner different than [*165] the definition contained in the FCC's actual rules; would require SBC Illinois to provide the HFPL under section 271, even though the HFPL is not a section 271 checklist item (and even if it were, the Commission lacks jurisdiction over section 271 checklist items, and in any event could not require the provision of a checklist item at section 251 UNE rates, terms, and conditions, as explained above); and suggests that SBC Illinois might be required to provide the HFPL under state law, even though the FCC (and NARUC and several other state commissions) made clear that any such requirement would be preempted.

Finally, the Commission should not address the additional language that XO inserted into the parties' joint issues matrix that does not relate the any of the issues raised by XO in its arbitration petition or by SBC Illinois in its response to that petition (*e.g.*, language relating to line splitting). Section 252(b)(4)(A) of the Federal Act expressly limits the issues to be considered in this arbitration to "the issues set forth in the petition and in the response," and XO's attempt to introduce new issues is thus contrary to the Act.

b.) XO

(SBC-4a & c). The Parties have [*166] settled these sub-issues with the exception of the use of the "lawful" FCC rules. As stated in the context of other issues, SBC improperly attempts to amend the existing Agreement's change of law provision to automatically incorporate SBC's interpretation of future events.

(SBC-4b). XO's proposed language establishes that SBC shall be required to provide nondiscriminatory access to hybrid loops on an unbundled basis, including narrowband and/or broadband transmission capabilities pursuant to *applicable law*, including but not limited to Section 271 of the Act and state law. The *TRO* states that "competitive LECs have [the right] to obtain unbundled access to hybrid loops capable of providing DS1 and DS3 service to customers." *TRO* at P 294. In addition, the FCC requires ILEC to provide an entire non-packetized transmission path capable of voice-grade service on a hybrid loop for a requesting carrier to provide narrowband service. *TRO* at P 296. XO's proposed language also identifies applicable law as including, but not limited to Section 271 and Illinois law.

XO shares the goal of the *TRO* to "prohibit incumbent LECs from engineering the transmission capabilities of [*167] their loops in a way that would disrupt or degrade the local loop UNEs" (including hybrid loops); the TRO also labels any ILEC practice that disrupts or degrades access to hybrid loops "prohibited under the section 251(c)(3) duty to provide unbundled access to loops on just, reasonable and nondiscriminatory terms and conditions." *TRO* at P 294. SBC does not propose any language related to hybrid loops.

(SBC-4d). XO's proposed language regarding access to the HFPL is consistent with the TRO and should be adopted.

c.) Staff

Although SBC raises a number of sub-issues here, XO, apparently, only takes issue with SBC's proposed language

2004 Ill. PUC LEXIS 675, *167

for line conditioning. More specifically, XO objects to SBC's line conditioning charges and its restrictive definition of line conditioning

The Staff agrees with SBC that "[t]he TRO specifically contemplates that an ILEC may seek compensation for line conditioning." On the other hand, the Staff also agrees with XO that line conditioning is a routine network modification and line conditioning is an intrinsic part of the local loop.

It appears to the Staff, that network modifications that are only provided upon request, such as line conditioning, are [*168] network modifications for which costs would not already have been recovered by SBC in its Local Loop UNE charges. Staff, accordingly, recommends that the Commission adopt SBC's proposed language for § 3.2.1 regarding line conditioning costs.

Regarding SBC's definition of line conditioning, the Staff agrees with XO that SBC's definition is overly restrictive, based upon the FCC's definition of line conditioning.

SBC's proposed language is overly restrictive in that it limits line conditioning to removing "bridge taps, load coils, and/or repeaters." Clearly, the FCC's definition of line conditioning in FCC Rule 51.319(a)(1)(iii)(A) is not as restrictive and its list of devices that must be removed in line conditioning goes beyond SBC's proposed language and, moreover, specifically states that such devices are not limited to the devices listed.

Staff, accordingly, recommends that the Commission adopt ICA language that properly reflects the FCC's definition of line conditioning in *47 C.F.R. § 51.319(a)(1)(iii)(A)*. In Staff's opinion, XO's proposed language regarding line conditioning more appropriately reflects the FCC's definition of line conditioning [*169] and should, thus, be adopted by the Commission.

XO also objects to alleged limitations that SBC's proposed language imposes on *when* it will provide line conditioning. SBC's proposed language states that it will provide line conditioning "upon CLEC's request." The Staff is hard-pressed to understand why XO would object to SBC providing line conditioning when XO requests it. The Staff, nonetheless, reserves its right to address any objection XO may have regarding when SBC will provide line conditioning if XO more fully articulates its position in its Initial Brief.

Likewise, Staff reserves the right to comment on SBC's proposed language at issue in SBC Issue No. 5 should XO articulate objections in its Initial Brief that are not contained in its preliminary position.

2. Analysis and Conclusions

SBC-4a & c. The arbitrating parties appear to have settled these sub-issues.

The Commission notes that SBC-4c was improperly framed as an open issue. Furthermore, to the extent that the parties belatedly attempted to modify the many discrete disputes residing under this over-broad question, those disputes were presented as dueling texts, not as properly framed open issues. Moreover, SBC avers [*170] that we *cannot* address issues posed outside of the Petition and Response, SBC Init. Br. at 65, and we agree. Therefore, even if those disputes have not been settled, the Commission will not address them.

SBC-4b. SBC's proposed text would essentially incorporate the language of *47 CFR 51.319(a)(2)* into the ICA. Despite XO's claim to the contrary, XO Reply Br. at 41, that text includes the degree of access to broadband capabilities required by the FCC. Such language is unobjectionable and the Commission approves it.

The parties' real disagreement concerns XO's demand (in XO proposed Section 3.1.4.1) for access to the broadband transmission capabilities of hybrid loops to the extent such access is required under Section 271 of the Federal Act or under state law. SBC argues, first, that this Commission lacks authority to address the terms and conditions of access to Section 271 UNEs and, second, even if we do have such authority, the modified TRO precludes the conclusion that 271

2004 Ill. PUC LEXIS 675, *170

UNEs must be offered at TELRIC prices. SBC Reply Br. at 47.

Regarding our authority, SBC contends that "the states only have authority under [S]ection 252 to arbitrate [*171] issues arising under [S]ection 251," and that issues concerning Section 271 do not arise under Section 251. SBC BOE at 9. SBC's premises are incorrect. While subsection 251(c)(1) establishes an ILEC *duty* to negotiate the items enumerated in subsection 251(b), subsection 252(a)(1) empowers the parties to "negotiate and enter into a binding contract... *without regard to the standards set forth in subsections (b) and (c) of section 251*." (Emphasis added.) Thus, although SBC *had to* negotiate the subsection 251(b) items if XO so requested, the parties *could* negotiate anything pertaining to their interconnection, including the impact of the TRO on obligations arising under Section 271.

The foregoing analysis is entirely congruent with *Coserv Limited Liabililty Corp. v. Southwestern Bell Telephone Co., 350 F. 2d 482* (5<th> Cir. 2003). There, the court stated:

> An ILEC is *required* by the [Federal] Act to negotiate about those duties listed in § 251(b) and (c). During negotiations, however, the parties are free to make any agreement they want without regard to the requirements of § 251(b) and (c). To that extent, the parties are free to [*172] include interconnection issues that are not listed in § 251(b) and (c) in their negotiations....
>
> * * *
>
> ...That is, Congress contemplated that voluntary negotiations might include issues other than those listed in 251(b) and (c) and still provided that *any issue* left open after unsuccessful negotiation would be subject to arbitration by the [state commission].

*350 F. 3d 487* (emphasis in original).

SBC also emphasizes that subsection 252(c)(1) directs us to resolve open arbitration issues in a manner that "meet[s] the requirements of section 251." SBC BOE at 8. In SBC's view, this provision precludes us from arbitrating (or even approving) "obligations other than those set forth in section 251." *Id.*, at 9. The principles from Coserv refute this argument. The "requirements of section 251" mandate compliance with "the requirements...of section 252," including the requirement that we assess an ICA that has been negotiated, as subsection 252(a)(1) states, "without regard to the standards set forth in subsections (b) and (c) of subsection 251."

Furthermore, with specific regard to unbundled access (here, access to hybrid loops), subsection 251(c)(3) [*173] requires an ILEC to provide such access on rates, terms and conditions "that are just, reasonable, and nondiscriminatory *in accordance with the terms of the agreement* **and** the requirements of this section and section 252." (Emphasis added.) Thus, Section 251 allows incorporation, into the ICA, of standards other than those explicitly set forth in Sections 251 and 252. Within the Federal Act, the "just and reasonable" standard is imposed by Section 201, while the nondiscrimination standard derives from Section 202. These two sections apply to the rates, terms and conditions for Section 271 UNEs.

Moreover, SBC's objection to the presence of 271 UNEs in this arbitration appears newly minted. In *Indiana Bell Telephone Co. v. Indiana Utility Regulatory Commission, 359 F.3d 493* (7<th> Cir. 2004), cited by SBC, the court observed that SBC itself had negotiated a Section 271 performance assurance plan "as *an amendment to its [ICA]*." *359 F.3d at 496* (emphasis added). We note that the court's holding had nothing to do with that plan, however. Rather, the court overturned a separate, "standalone" order establishing a different [*174] performance plan created by the IURC, which was available to any CLEC outside the ICA process. Significantly, the court did do on the ground that the IURC had thus "interfere[d] with...the process for [ICAs] for local service under Sections 251 and 252." *Id.*, 497. The court thus concluded that a Section 271 performance plan was properly addressed in the Section 252 ICA negotiation and arbitration process (as well as in a Section 271 application for long distance authority).

2004 Ill. PUC LEXIS 675, *174

Additionally, the nature and extent of the "authority" we are exerting over Section 271 UNEs must not be exaggerated here. The only purpose of this arbitration is to incorporate into the ICA, at the FCC's direction, federal requirements set forth in the modified TRO. To resolve the parties' open issues that fall within that limited scope, we are, *inter alia*, directing the parties to incorporate is their ICA *the FCC's* substantive provisions pertaining to Section 271 UNEs. We are not altering those FCC rulings, nor are we attempting to define the extent to which Section 271 governs the parties' conduct. We are simply saying, in effect, "incorporate what the FCC said about 271 [*175] UNEs into your ICA, and it will have whatever effect the FCC said it will have." Indeed, if we permitted the parties to ignore the FCC's directives regarding 271 UNEs, *then* we would be contravening both the FCC and the Federal Act. Moreover (and in addition to the Sections 251 and 252 authority discussed above), we can impose regulatory requirements under the power reserved to us by Section 261(c) of the Federal Act n52, so long as they are not inconsistent with FCC requirements.

> n52 "Nothing in this part precludes a State from imposing requirements on a telecommunications carrier for intrastate services that are necessary to further competition in the provision of telephone exchange service or exchange access, as long as the State's requirements are not inconsistent with this part of the [FCC's] regulations to implement this part." *47 USC 261*(c).

Concerning the substantive content of the FCC's directives regarding Section 271 UNEs, we have already noted the FCC's view that Section [*176] 271 does contain unbundling requirements that are independent of Section 251. TRO P 653. As for pricing, XO's proposed text does not request UNE access at TELRIC prices. Thus, XO's references to Section 271 and "state law" would give XO no more than whatever those authorities would provide. Since SBC correctly interprets the TRO (e.g., P 656) and USTA II, TELRIC pricing is not accorded to 271 UNEs under federal law.

Therefore, we conclude that XO's references to Section 271 and state law are permissible. However, to prevent over-reaching, and to keep XO's text within the boundaries of this arbitration, we revise XO's proposed Section 3.1.4 as follows: "SBC Illinois shall provide nondiscriminatory access to hybrid loops on an unbundled basis, including narrowband and/or broadband transmission capabilities, to the extent required by *47 CFR 51.319(4)(2)*, Section 271 of the Act and state law."

SBC-4d. For the most part, SBC's proposed text pertaining to XO's access to the HFPL (also referred to as "line sharing") accurately mirrors the FCC's mandates in the TRO and in *47 CFR 51.319(1)(i)*. To that extent, [*177] it should be included in the amended ICA. However, we agree with XO that SBC proposed Section 3.10.1.2 alters the terms of subsection *47 CFR 51.319(1)(i)(A)*. That subsection refers to disconnection *by the customer*, not to the broader category of disconnection *of the service* (xDSL). Consequently, SBC's text should be revised to more accurately track *47 CFR 51.319(1)(i)(A)*. XO also appropriately complains that SBC's text automatically incorporates changes of law. Such changes should be specifically incorporated into the ICA through its existing change-of-law provisions and SBC's text must be revised accordingly.

On the other hand, the Commission agrees with SBC that XO's proposed Section 1.19.1.4 contains an "intent" provision that is not supported by the TRO, and is, in our view, unworkable. XO's text is therefore rejected, and the language in SBC proposed Section 3.10.1.1 should be placed in the ICA instead.

As for XO's contention that the ICA should reflect line-sharing obligations under Section 271 and state law, the Commission notes that the HFPL is not a 271 checklist item. SBC Init. Br. at 61; [*178] Staff Reply Br. at 27. Patently, no reference to Section 271 obligations belongs in the ICA. Regarding state law, Staff explains that:

> Unlike hybrid loops and dark fiber, the Commission did not implement a state law requirement that SBC provide HFPL under mandatory statutory language found in the PUA, but, rather, the Commission

exercised its prerogative authority under the discretionary language found in Section 13-506.6 of the PUA, which exercise of authority was then consistent with existing federal law. The Commission, moreover, reopened ICC Docket No. 00-0393 because subsequent to the FCC issuing the TRO "changes to the federal scheme indicates several areas which implicate the need for a reapplication of Illinois and federal law to the issues addressed by this Commission in earlier orders in this docket."

Staff Reply Br. at 27.

However, no new final order has yet been issued in Docket 00-0093. Nor has our authority over the HFPL been preempted by the FCC pursuant to Section 253(d) of the Federal Act. Therefore, reference to state line sharing obligations can be placed in the amended ICA (although, depending on the final outcome of Docket 00-0093, XO may derive little [*179] benefit from that reference).

**5. (a) What are the appropriate definitions of dark fiber loop and dark fiber transport?**

**(b) What terms and conditions should apply to SBC's provision of dark fiber loop and dark fiber transport?**

1. Parties' Positions and Proposals

a). SBC

SBC Illinois' proposed language properly reflects the scope of SBC Illinois' obligation to provide unbundled dark fiber. In particular, SBC Illinois is required to provide unbundled dark fiber only where dark fiber is lawfully a UNE under section 251 of the Act. XO's proposed language, on the other hand, would unlawfully require SBC Illinois to provide unbundled dark fiber whether it was lawfully a UNE or not. (Section 3.5.3.1.) XO's proposed language must be rejected, and SBC Illinois' adopted, for the same reasons discussed above under Issue SBC-1.

The FCC's rules requiring the unbundling of high-capacity loops and dedicated transport (including dark fiber) have been vacated. Accordingly, SBC Illinois' language would come into play only if the FCC were to re-institute such unbundling requirements. Nevertheless, it is reasonable to adopt SBC Illinois' proposed language, because that language would [*180] most appropriately define SBC Illinois' obligations should the FCC require the unbundling of dark fiber in the future, while XO's language would not.

XO's proposed language regarding the declassification of dark fiber loops by this Commission must be rejected. (Section 3.1.6.) That language appears intended to implement an FCC Rule (the FCC's dark fiber loop rule, Rule 319(a)(6), which provides for state commission non-impairment determinations) that has been vacated.

XO opposes SBC Illinois' proposed contract language providing that, to the extent SBC Illinois is required by an FCC rule to unbundle dark fiber, unbundled dark fiber will be provided only where a CLEC is collocated. (Sections 3.1.6 and 3.5.3.1.) In the *TRO*, the FCC explained that a CLEC purchasing unbundled dark fiber must also collocate and provide optronics to light the dark fiber. *TRO*, PP 313, 381-82. SBC Illinois' proposed language is consistent with the FCC's language, and thus should be included in the parties' *TRO* amendment.

Finally, the Commission should approve SBC Illinois' proposed description of dark fiber dedicated transport, and reject XO's. (Section 3.5.3.1.) In the *TRO*, the FCC redefined [*181] dedicated transport to *include* only transmission facilities between ILEC switches and to *exclude* transmission facilities outside the ILEC's network, such as transmission facilities connecting the ILEC's network to a CLEC's network. *TRO*, P 366. XO proposes to include only the first half of this new definition in the parties' contract. But XO has not identified any basis for excluding the second half of the FCC's definition from the parties' contract, and there is none. Rather, the parties' contract should be revised to make clear that dedicated transport now excludes transmission facilities between SBC Illinois' and a CLEC's network, as SBC Illinois' proposed language does.

2004 Ill. PUC LEXIS 675, *181

b.) XO

SBC's proposed language would impermissibly limit the availability of dark fiber EELs (combination of dark fiber loop and dark fiber transport). For dark fiber loops, SBC would require XO to have collocation space in the central office where the dark fiber loop terminates. Similarly for dark fiber transport, SBC's proposal would require that XO have collocation space in each SBC central office where the requested dark fiber transport terminates. These requirements would not allow XO to order [*182] dark fiber EELs because XO would not have a collocation at the central office where the dark fiber loop terminates in the case of a dark fiber EEL (which is of course why an EEL would be used). There is no basis in the *TRO* or elsewhere for this restriction.

The TRO actually emphasizes *not* limiting the availability of dark fiber, declaring "we recognize the hard work of the state commissions to make dark fiber meaningfully available and endorse such efforts here." *TRO* at P 385. Illinois' efforts to promote competition and provide unbundled elements are further supported by the directives of Section 13-801 of the PUA. *220 ILCS 5/13-801.*

In fact, SBC's attempt to limit the availability of dark fiber EELs is inconsistent with the FCC's findings regarding the pro-competitive benefits of EELs. At P 576, the FCC states: "[b]ased on the record before us, we conclude that EELs facilitate the growth of facilities-based competition in the local market. The availability of EELs extends the geographic reach for competitive LECs because EELs enable requesting carriers to serve customers by extending a customer's loop from the end office serving [*183] the customer to a different end office in which the competitive LEC is already located. In this way, EELs also allow competitive LECs to reduce their collocation costs by aggregating loops at fewer collocation locations and then transporting the customer's traffic to their own switches." By imposing collocation requirements to obtain dark fiber loops, SBC is attempting to increase XO's costs and prevent it from realizing the economies of using dark fiber EELs to aggregate its traffic.

SBC's proposed language, providing for the provision of Dedicated Transport Dark Fiber only "when CLEC has collocation space in each SBC-12STATE CO where the requested dark fiber(s) terminate" creates another possible problem in addition to the inability to access the dark fiber UNE for EELs. XO may wish to order Dedicated Transport Dark Fiber that is routed through multiple SBC central offices. XO may not, and need not, have collocations in those intermediate central offices. Although XO would maintain that the dark fiber does not "terminate" in those intermediate central offices, SBC could interpret its proposed language as imposing such a collocation requirement and improperly refuse to provision [*184] Dedicated Transport Dark Fiber along the desired route.

SBC's proposed language contains yet another incorrect limitation on the provision of Dedicated Transport Dark Fiber, illustrating why its language must be rejected. The language provides that "Lawful UNE Dedicated Transport Dark Fiber does not include transmission facilities between the SBC-12STATE network and the CLEC network *or the location of CLEC equipment.*" XO should certainly be entitled to order Dedicated Transport Dark Fiber from SBC which connects to XO's collocations. Yet, an XO collocation is certainly a "location of CLEC equipment." Indeed, Dedicated Transport Dark Fiber would be useless if it did not connect at some point to a "location of CLEC equipment." Yet, SBC's proposed language improperly attempts to impose precisely that limitation.

SBC objects to XO's proposed language requiring that SBC provide dark fiber on an unbundled basis until a "final and nonappealable" order is issued. However, XO's proposed language is consistent with the terms of the underlying change in law provisions in the XO/SBC ICA -- as discussed above in SBC Issue 2. SBC is improperly attempting to short-cut the existing change [*185] in law procedures and allow any changes favorable to SBC to be enacted without delay.

c.) Staff

(SBC-5a). SBC alleges that XO's proposed definition of a dark fiber loop is not the definition of a dark fiber loop, but rather the definition of dark fiber contained in P 311 of the TRO. SBC also claims that using the defintion of dark

fiber instead of a specific definition of a dark fiber loop "is illogical and potentially confusing." Joint Issues Matrix, at 77.

SBC's proposed language defines "Loop Dark Fiber" as "Loop dark fiber is an existing dedicated transmission facility between a distribution frame (or its equivalent) in a SBC State Central Office and the loop demarcation point at an End User customer premise that has not yet been activated through optronics to render it capable of carrying communications services." See SBC's proposed section 2.6 (Loop Dark Fiber). Furthermore, SBC's proposed language would limit its provisioning of dark fiber loops to a "CLEC when CLEC has collocation space in each SBC-12STATE CO where the requested dark fibers terminate." See SBC proposed section 3.1.6.

Staff finds no support for SBC's proposed limitations on dark fiber loops in the TRO. [*186] Although the FCC has defined dark fiber and dark fiber loops essentially the same (compare P 311 of the TRO with *47 CFR § 51.319(a)(6)(i)*), XO's proposed definition of a dark fiber loop closely tracks the FCC's definition of a dark fiber loop in *47 CFR § 51.319(a)(6)(i)* ("Dark fiber is fiber within an existing fiber optic cable that has not yet been activated through optronics to render it capable of carrying communications services."). Moreover, in P 202 of the TRO, n. 632, the FCC found no reason to distinguish dark fiber from its general unbundling analysis for loops. In light of the FCC's determination that there is no reason in its unbundling analysis to treat dark fiber loops differently from copper loops, Staff recommends that XO's proposed definition of a dark fiber *loop* be adopted.

SBC's proposed language would define dark fiber *transport* as "unactivated fiber optic interoffice transmission facilities are dedicated to a particular CLEC that are within SBC-Illinois' network, connecting SBC-Illinois switches or wire centers within a LATA." See SBC's proposed section 2.7 (Dark Fiber Transport). [*187] Paragraph 365 of the TRO provides support for SBC's definition of dark fiber transport. See TRO, P 365 ("We limit our definition of dedicated transport under section 251(c)(3) to those transmission facilities connecting incumbent LEC switches and wire centers within a LATA."). Furthermore, SBC's proposed language would limit its provisioning of dark fiber *transport* to a "CLEC when CLEC has collocation space in each SBC-12STATE CO where the requested dark fibers terminate." See SBC proposed section 2.7.

(SBC-5b): SBC also objects that "even after a state commission finds that a carrier is not impaired without access to it", that under XO's proposed language SBC must continue to provide dark fiber on an unbundled basis until there is a "final and non-appealable" order issued. Joint Issue Matrix, at 78-79. As noted above under SBC Issue No. 1, the Staff recommends replacing any such "final and non-appealable order" language with a "lawful order."

2. Analysis and Conclusions

SBC-5a. The parties have settled this sub-issue.

SBC-5b. This sub-issue is not properly framed as an open issue. It is an invitation to the Commission to discourse on the subject of dark fiber, and to devise rules [*188] from the ground up, rather than the presentation of a dispute. We will nonetheless address those apparent disputes that we perceive to be impediments to amending the parties' ICA.

The court of appeals vacated and remanded the TRO's national impairment finding with respect to dedicated transport elements, including dark fiber. *USTA II, 359 F.3d at 594.* However, as we noted above, the FCC's subsequent *Status Quo* Order requires an ILEC to continue providing unbundled access to dedicated transport on "the same rates, terms and conditions that applied under their [ICAs] as of June 15, 2004" for a six-month period. *Status Quo* Order, PP 1 & 16. That directive also applies to enterprise loops, including dark fiber loops n53.

n53 The Commission does not agree with SBC and Staff that USTA II had overturned the TRO's loop unbundling requirements. When the Court of Appeals vacated the FCC's subdelegation to state commissions, the rationale of that ruling applied generally to subdelegation concerning any UNE, including loops. However, the rejection of subdelegation did not, by itself, overturn the FCC's national

impairment findings. (Indeed, the purpose of subdelegation was to locate exceptions to those findings.) Thus, in a separate ruling, the USTA II court vacated the FCC's national impairment determinations regarding mass market switching and dedicated transport. It did not vacate the FCC's loop impairment findings.

[*189]

XO says that its "primary concern" with SBC's proposed text is that SBC's collocation requirement (in the SBC central office(s) where the pertinent fiber terminates) would prevent XO from obtaining dark fiber EELs n54. XO Reply Br. at 44. XO acknowledges that a collocation requirement is generally valid, but avers that collocation need not be at every SBC central office where a dark fiber EEL terminates. Id., 44-45. We agree, and find SBC's rationale for its proposed provisions unpersuasive. The TRO passage on which it relies (P 382) does refer to "necessary...collocations" but does not address - much less establish a rule about where EEL collocation must occur.

> n54 We disagree with SBC's assertion that dark fiber EELs were not "contemplate[d]" in the TRO. SBC Reply Br. at 49. A dark fiber EEL is simply a combination of separate elements, as described by the FCC. TRO P575. DS1 and DS3 are merely capacity designations for the same facilities that can be "lit" or left "dark."

We agree with XO that the FCC concluded [*190] that EELs facilitate competition, innovation and efficient deployment of resources. TRO P 576. Accordingly, the Commission holds that, with respect to EELs, collocation within the pertinent LATA can constitute the "necessary collocations" referred to in the TRO. We note that XO will still be subject to the eligibility criteria promulgated by the FCC in the TRO, as incorporated into the parties' ICA.

The *Status Quo* Order requires a caveat to that directive, however. Since the *Status Quo* Order states that ILECs must provide dedicated transport and enterprise market loops under the rates, terms and conditions contained in an applicable ICA as of June 15, 2004, the Commission concludes that it cannot alter any existing terms and conditions in the SBC/XO ICA pertaining to those network elements, even when they are combined as an EEL, and even when they are collocated. We do not know what present contract terms in fact exist, because the parties did not offer their present ICA for the record. Therefore, all we can require now is that the EEL collocation directive in the preceding paragraph (and in our resolution of XO Issue 6 (sec. IV.A.6.2 (pp. 34-35) of this Decision)) should [*191] be incorporated in the ICA and, to the extent it is consistent with existing ICA provisions, should become operative when the parties' amended ICA is approved. However, to whatever extent there is inconsistency, the existing ICA terms shall prevail and continue in force until the Interim Period described in the Status Quo Order (and in section V. of this Decision) terminates.

Regarding state law, XO is correct that this Commission held in Docket 01-0614 that Section 13-801 of the PUA does not countenance a collocation requirement for termination of EELs. It certainly follows that state law does not require collocation *at a specific central office* for dark fiber EELs. Additionally, although SBC charges that XO presented no "evidence" that SBC's proposed collocation requirements would fail to implement the maximum development of competitive service offerings, as Section 13-801 mandates n55, the FCC has concluded that EELs reduce a CLEC's collocation costs, thereby (as noted above) "facilitat[ing] the growth of facilities-based competition in the local market." TRO P 576. That is sufficient refutation of the competition-enhancing potential in SBC's collocation requirement. Therefore, [*192] we conclude that SBC's dark fiber EEL collocation requirement should be modified so that collocation at an SBC central office *within the LATA* satisfies the requirement n56.

> n55 For that matter, SBC has not presented "evidence" that its collocation provisions would meet the statutory standard. The simple fact is that both parties waived evidentiary hearings and adduced no evidence.

n56 As requested by SBC, SBC BOE at 27, this collocation requirement does not apply to stand-alone dark fiber loops. We exempt stand-alone loops for the technical reasons explained by Staff, Staff BOE at 6-7.

The Commission rejects the requirement, in XO proposed Section 3.1.6, of a "final and non-appealable" non-impairment order before SBC can be relieved of an unbundling obligation. As we have said elsewhere in this Decision, a judicial or administrative order is effective from the time it is issued unless and until it is rendered otherwise by the authority that issued it or by a superior authority.

**6. (a) Does dedicated transport [*193] include transmission facilities that connect SBC's switches or wire centers to those of another ILEC?**

**(b) Does dedicated transport include transmission facilities that connect SBC's switches or wire centers to the CLEC's premises or POP?**

**(c) Is SBC obligated to provide TELRIC-based transmission facilities for interconnection and the exchange of traffic pursuant to Section 251(c)(2)?**

**(d) What terms and conditions should apply to the DS3 dedicated transport caps?**

**(e) Should the pricing schedule include pricing for and entrance facilities, OC3, OC12 and OC48 dedicated transport, cross connects and multiplexing?**

**XO re-characterizes this issue as follows:**

**Did the FCC distinguish between interconnection facilities and other types of entrance facilities or dedicated transport such that interconnection facilities must be provided at cost?**

1. Parties' Positions and Proposals

a). SBC

SBC Illinois' proposed dedicated transport language appropriately limits the provision of dedicated transport to instances where dedicated transport is a lawful UNE. XO's proposed language, on the other hand, would require SBC Illinois to provide dedicated transport on an [*194] unbundled basis whether it is lawfully a UNE or not. XO's proposed language must be rejected, and SBC Illinois' adopted, for the same reasons discussed above under Issue SBC-1.

XO also proposes to continue to require SBC Illinois to provide entrance facilities at TELRIC rates. That proposal is unlawful. In the *TRO*, the FCC redefined dedicated transport to *exclude* facilities outside the ILEC's network, which the FCC held include entrance facilities. *TRO*, P 366. Thus, the *TRO* "eliminates 'entrance facilities' as UNEs." *Id.* n. 1116. SBC Illinois' proposed definition of dedicated transport is necessary to implement this new law. While the FCC's rule requiring the unbundling of dedicated transport has been vacated, the D.C. Circuit did not vacate the FCC's determination that entrance facilities are no longer UNEs, and are no longer within the definition of "dedicated transport." Thus, SBC Illinois' proposed language is appropriate, in the event that the FCC adopts new rules requiring the unbundling of dedicated transport.

The Commission should also reject XO's attempt to turn the section 251(c)(2) duty to interconnect into some kind of duty on the part of ILECs to transport [*195] traffic for a CLEC from the CLEC's network to the point of interconnection, at TELRIC-based rates. Section 251(c)(2), by its plain terms, requires an ILEC to interconnect with a

—

CLEC at a point *within* the ILEC's network. It does not require an ILEC to provide a transmission facility from that point within the ILEC's network to the CLEC's premises (e.g., an entrance facility). Indeed, in the *TRO* the FCC explicitly contrasted "transmission facilities connecting incumbent LEC networks to competitive LEC networks for the purpose of backhauling traffic" with "the facilities that incumbent LECs explicitly must make available for section 251(c)(2) interconnection." *TRO*, P 365. In short, XO itself is responsible for delivering its traffic from its premises to the point of interconnection within SBC Illinois' network. Moreover, because entrance facility terms and conditions are outside section 251(b) and (c), and because SBC Illinois refused to negotiate the entrance facility issue, that issue is not subject to state commission arbitration. *Coserv LLC v. SWBT, 350 F.3d 482* (5<th> Cir. 2003).

Finally, the Commission should approve SBC Illinois' proposed [*196] language regarding the cap on DS3 dedicated transport, required by FCC Rule 319(e)(2)(iii), and reject XO's proposed language. The FCC's rules requiring the unbundling of dedicated transport have been vacated, so the DS3 dedicated transport cap language would come into play only if the FCC were to re-institute such an unbundling requirement. Nevertheless, it is reasonable to adopt SBC Illinois' language, because that language clearly defines how the DS3 dedicated transport cap would be calculated and applied in a commercial environment if the FCC were to require DS3 dedicated transport unbundling at some point in the future. XO's language finds no support anywhere in the FCC's Rule or its discussion of the cap, and thus must be rejected.

5 b.) XO

(SBC-6a). XO's position is that it may obtain interconnection facilities from SBC at cost-based TELRIC rates. The FCC specifically distinguished in the *TRO* between interconnection facilities that ILECs "explicitly must make available for section 251(c)(2) interconnection" (which are required) and those transmission facilities connecting ILEC networks to CLEC networks for the purpose of backhauling traffic, which the FCC stated were [*197] not required to be unbundled. *See TRO* at P 365. The FCC explicitly reemphasized that "to the extent that requesting carriers *need facilities* in order to 'interconnect[] with the [incumbent LEC's] network,' section 251(c)(2) of the Act expressly provides for this and we do not alter the Commission's interpretation of this obligation." *TRO* at P 366 (emphasis added).

Moreover, SBC incorrectly contends that XO may not arbitrate the issue of whether it is required to provide interconnection trunk entrance facilities; this issue is explicitly within the scope of Section 251(c) as discussed above; the FCC has held that ILECs are *required to provide such interconnection trunk entrance facilities*; and thus, this issue falls squarely within the scope of this arbitration.

(SBC-6b). Section 251(c)(2) of the Act requires ILECs to provide interconnection to requesting carriers at just and reasonable rates in accordance with Section 252. Section 252(d), moreover, provides that state commissions shall determine the just and reasonable rates for *interconnection* of facilities and equipment for purposes of Section 251(c)(2), based on cost. *47 U.S.C. Section 252* [*198] (d)(1). The FCC has established that cost-based rates are to be set on TELRIC standards. Accordingly, SBC is incorrect that interconnection facilities do not need to be provided at TELRIC.

(SBC-6c). XO disagrees with the manner in which SBC proposed to implement the caps on DS3 transport as inconsistent with the *TRO* and unreasonable. XO's language is consistent with the *TRO*.

(SBC-6d). SBC should not delete all prices for entrance facilities, because SBC is required to provide interconnection trunk entrance facilities at cost-based rates, as discussed above. Only non-interconnection trunk entrance facility rates should be deleted from SBC's pricing sheet.

c.) Staff

(SBC-6a-c). The outcome of sub-issues (a), (b), and (c) found in SBC Issue 6 are dependant upon determining whether the FCC distinguished between (i) dedicated transport and (ii) interconnection facilities and other types of

2004 Ill. PUC LEXIS 675, *198

entrance facilities. As Staff pointed out above in SBC Issue 5, in light of the FCC's determinations in PP 365 and 366 of the TRO, it is clear that the dedicated transport UNE is "only those transmission facilities *within* an incumbent LEC's transport network." TRO, P 366. XO does not appear [*199] to dispute this conclusion. XO, however, proposes language referencing the "incumbent LEC's" facilities. SBC proposes that the phrase "incumbent LEC" be replaced with "SBC ILLINOIS" facilities to avoid any confusion that SBC Illinois needs to unbundled transmission facilities outside of its network, including those facilities that may be owned by SBC affiliate LECs. It is the Staff's position that SBC's proposal to replace the term "incumbent LEC's" facilities with "SBC ILLINOIS" facilities is reasonable and a failure to clarify "incumbent LEC" could result in some confusion. Staff, accordingly, recommends that SBC's proposal to replace "incumbent LEC" with "SBC ILLINOIS" be adopted by the Commission.

Replacing "incumbent LEC" with "SBC ILLINOIS", however, does not answer the question whether the FCC distinguished between (i) dedicated transport and (ii) interconnection facilities and other types of entrance facilities. In this regard, the FCC stated:

> We find that transmission facilities connecting incumbent LEC switches and wire centers are an inherent part of the incumbent LECs' local network Congress intended to make available to competitors under section 251(c)(3). On the [*200] other hand, we find that transmission links that simply connect a competing carrier's network to the incumbent LEC's network are not inherently a part of the incumbent LEC's local network. Rather, they are transmission facilities that exist *outside* the incumbent LEC's local network.

TRO, P 366 (emphasis in original).

Accordingly, it would appear that entrance facilities "that simply connect a competing carrier's network to the incumbent LEC's network" are not required to be unbundled by SBC and provided (at TELRIC rates) under section 251(c)(3). The FCC, however, continued to note that:

> In reaching this determination we note that, to the extent that requesting carriers need facilities in order to "interconnect[] with the [incumbent LEC's] network," section 251(c)(2) of the Act expressly provides for this and we do not alter the Commission's interpretation of this obligation. *Id.*
>
> * * *
>
> However, all telecommunications carriers . . . will have the ability to access transport *within* the incumbent LEC's network, pursuant to section 251(c)(3), and *to interconnect for the transmission and routing of telephone exchange service and exchange access, pursuant to section* [*201] *251(c)(2).*

TRO, P 368 (emphasis added; internal citations omitted).

It is Staff's position, accordingly, that transmission facilities that connect SBC switches or wire centers to XO's premises or point of presence ("POP") are not required to be unbundled and provided by SBC to XO at TELRIC rates under section 251(c)(3), but, rather, SBC is required to provide XO such facilities under its obligations to provide interconnection under 251(c)(2), at cost-based rates.

(SBC-6d). It does not appear that XO has any dispute with SBC'S proposed language regarding the DS3 cap, with the following two exceptions: (1) XO's proposal includes the additional clarifying phrase "or DS3-equivalents (e.g., 336 DS1s)"; and (2) XO's proposed language labels any circuit capacity above the 12 circuit cap a "Nonconforming Facility" in lieu of SBC's proposal language clarifying what would happen should XO exceeded the 12 circuit DS3 cap. Regarding XO's proposed "DS3 equivalent" phrase, it is unclear to Staff at this time whether SBC objects to this seemingly innocuous additional phrase.

Regarding which parties' proposed language on what happens if XO should exceed the 12 circuit DS3 cap, the Staff recommends [*202] that the Commission adopt XO's proposal to label any circuit capacity above the DS3 Cap a "Nonconforming Facility" as it appears to be both more reasonable and appropriate than SBC's proposed language.

(SBC-6e): SBC's requests a determination of whether the pricing schedule should include pricing for an entrance facilities, OC3, OC12, and OC48 dedicated transport, cross connects and multiplexing. Joint Issues Matrix, at 80. XO "agrees that TELRIC rates for OCn loops and transport should be deleted" from the pricing schedule. *Id.* Which leaves open the issues of whether SBC should provide XO entrance facilities, cross connects, and multiplexing at TELRIC or cost based rates. As noted above in sub-issue (a), it is Staff's position that transmission facilities that connect SBC switches or wire centers to XO's premises or its POP are not required to be unbundled and provided by SBC to XO at *TELRIC rates* under section 251(c)(3), but, rather, SBC is required to provide XO such facilities under its obligations to provide interconnection under 251(c)(2), at *cost-based* rates. The Staff, accordingly, recommends that the Commission find that any XO requested entrance facilities, cross [*203] connects, and multiplexing are to be provided by SBC, under its interconnection obligations under 251(c)(2), at cost-based rates.

2. Analysis and Conclusions

SBC 6a-c. Initially, the Commission rejects SBC's argument that the USTA II decision effectively mooted this issue by overturning the FCC's dedicated transport rules. SBC Reply Br. at 50-51. SBC Issue 6 presents disputes concerning what *constitutes* unbundled dedicated transport. USTA II did not address that question. Rather, it vacated the FCC's *impairment* finding.

Staff correctly observes that the fundamental question posed by sub-issues (a) through (c) arises from the FCC's distinction, in the TRO, between an ILEC's obligations under, respectively, subsections 251(c)(2) and 251(c)(3) of the Federal Act. Staff Init. Br. at 88. The arbitrating parties agree that the latter subsection does not require an ILEC to unbundle, and offer at TELRIC prices, any ILEC facilities beyond the ILEC's own network. However, XO maintains that subsection 251(c)(2), as viewed by the FCC, imposes a separate obligation on the ILEC to provide "transport facilities" for the purpose of interconnection, including ILEC facilities residing [*204] on the CLEC side of the parties' interconnection point. Staff initially agreed with XO, but retreated to a neutral position in its Reply Brief, on the ground that there is no record evidence identifying the facilities at issue. SBC strongly disagrees with XO's contentions.

The Commission concludes that SBC's position is correct. First, nothing in subsection 251(c)(2) itself mentions ILEC facilities, much less creates an obligation to provide them. Second, the FCC's analysis of ILEC duties under that subsection does not create such an obligation either. The TRO language on which XO relies (in PP 365, 366 and 368) simply does not support XO's claims to the contrary.

TRO P 365 refers to "the facilities that [ILECs] explicitly must make available for section 251(c)(2) interconnection." Since the only facilities explicitly mentioned in 251(c)(2) are *CLEC* facilities, we must infer that the FCC is alluding to the facilities that an ILEC must have ready to receive those CLEC facilities. We cannot infer more, given the definition of "interconnection" in FCC rules as "the linking of two networks for the mutual exchange of traffic," and the specific exclusion of "the transport and termination [*205] of that traffic" from that definition. *47 CFR 51.5.*

TRO P 366 refers to the facilities needed by CLECs to interconnect with an LECs network. Once more, we construe this reference to pertain to the facilities an LEC must have ready to accommodate the CLEC's own facilities used in interconnection. Again, the only facilities identified in 251(c)(2) are CLEC facilities, and the above-cited FCC rule excludes transport and termination from the definition of interconnection. Thus, the ILEC's obligation is to provide connection to the *CLEC facilities*, including transport and termination facilities, that the CLEC employs to interconnect with the ILEC's network.

TRO P 368 says this: "all telecommunications carriers...will have the ability to access transport facilities *within the*

2004 Ill. PUC LEXIS 675, *205

incumbent LEC's network, pursuant to section 251(c)(3), and to interconnect for the transmission and routing of telephone exchange service and exchange access, pursuant to section 251(c)(2)." (Emphasis in original.) The FCC thus uses the term "facilities" only in connection with 251(c)(3), not in connection with 251(c)(2). That is entirely consistent with the language and [*206] titles of the respective statutory provisions. As SBC states, 251(c)(2) obliges an ILEC to accommodate interconnection, but not to "provide the 'facilities and equipment' *for* the requesting telecommunications carrier." SBC Reply Br. at 51 (emphasis by SBC).

SBC 6-d. This is another improperly framed general question, rather than an appropriate open disputed issue. Nevertheless, the Commission will furnish essentially the same resolution we provided for SBC-3c, for essentially the same reasons. Thus, SBC's proposed language should be modified to provide written or electronic notice to XO, and a fair and specific time interval in which XO can object or select alternative treatment for an excessive circuit request. Objections should be resolved through the ICA dispute resolution mechanism, and the status quo should not be altered pending such resolution.

As for the parties' quarrel regarding "DS3 equivalents," the Commission notes that the cap will limit XO to the same number of circuits in either case. Nonetheless, since the TRO did not mention "DS3 equivalents," we will not speculate on what the FCC would have said about them. XO's proposal is rejected.

SBC 6-e. XO agrees that [*207] pricing for OC facilities (of any capacity) can be deleted. Given our conclusions regarding SBC 6a-c, we hold that entrance facility prices can also be deleted.

### 7. Should the ICA include the TRO's modifications to the rules regarding the provision of unbundled local switching and transport?

1. Parties' Positions and Proposals

a). SBC

The *TRO* created a new regime to govern the provision of unbundled switching. Most fundamentally, pursuant to the D.C. Circuit's direction in *USTA I* to take specific markets into account, the FCC defined two classes of switching, (1) switching used to serve enterprise customers (enterprise switching) and (2) switching used to serve mass market customers (mass market switching). The FCC defined enterprise customers to include all customers served by DS1 or higher capacity facilities, as well as customers served at a single location by multiple DS0s higher than the "DS0 cutoff," and defined mass market customers as customers served by a number of DS0s below the DS0 cutoff. *TRO*, PP 451, 497. XO's proposed language, however, unlike SBC Illinois', fails to reflect even this basic definitional distinction created by the FCC.

XO's proposed [*208] language also fails to reflect the law regarding enterprise switching -- in particular the FCC's holding that enterprise switching is not a UNE. The FCC held, and promulgated a rule stating, that an ILEC is required to provide unbundled access to enterprise switching only where the FCC grants a waiver of its finding of non-impairment. XO's proposed language, unlike SBC Illinois' language, fails to clearly reflect this holding, but instead refers to section 271 and other "applicable law." But the applicable law is clear: pursuant to the *TRO*, (and *USTA II*, which upheld the FCC's rules regarding enterprise switching and its conclusions regarding section 271), SBC Illinois is not required to provide unbundled access to enterprise switching, and is not required by section 271 to provide such access on section 251 UNE rates, terms, and conditions. This law must be reflected in the parties' *TRO* contract amendment, as SBC Illinois' proposed language does.

XO's proposed language also violates federal law regarding a waiver of the FCC's non-impairment finding with respect to enterprise switching. The FCC held that, while state commissions may investigate impairment with respect [*209] to enterprise switching and petition the FCC for a waiver of its non-impairment finding, an ILEC is not required to provide unbundled access to enterprise switching unless "the [FCC] grants such waiver." FCC Rule 319(d)(3). XO's

proposal that the state commission investigation itself, and the FCC's consideration of any state commission petition, act as a waiver of the FCC's non-impairment finding is unlawful, and must be rejected. (XO's proposed language regarding the transition for enterprise switching arrangements where enterprise switching is no longer required to be unbundled should be rejected for the same reasons discussed above under Issue SBC-2.) SBC Illinois' proposed contract language, on the other hand, properly tracks and implements the FCC's waiver rule, and thus should be adopted.

XO's proposed mass market switching contract language should also be rejected, because that language is unsupported by the FCC's rules. XO's proposed language fails to recognize that the FCC's rules requiring the unbundling of mass market switching have been vacated. SBC Illinois' proposed mass market switching language appropriate accounts for this fact, and would come into play only if the [*210] FCC were to re-institute such an unbundling requirement. Thus, SBC Illinois' proposed mass market switching language should be adopted. Moreover, as explained above, the Commission should reject XO's unlawful suggestion that the Commission should require SBC Illinois to continue providing non-UNEs at the same rates, terms, and conditions as UNEs pursuant to section 271.

XO's proposed definition of tandem switching also violates federal law, by failing to recognize that SBC Illinois is required to provide unbundled tandem switching only where it is required to provide unbundled switching. SBC Illinois' proposed language, on the other hand, properly reflect this federal law.

Finally, the Commission should adopt SBC Illinois' proposed language regarding the provision of unbundled shared transport. That language properly implements FCC Rule 319(d)(4) by providing, like FCC Rule 319(d)(4), that SBC Illinois is required to provide unbundled shared transport only where it is required to provide unbundled switching.

b.) XO

While XO is predominately a facilities based carrier in Illinois and generally does not use unbundled switching and shared transport, it does not object to including [*211] language that reflects changes made by the *TRO* to the provision of unbundled switching and shared transport. XO's proposed language has several advantages over SBC's proposed language. First, XO's proposed language explicitly recognizes that unbundling obligations for these elements may exist under Section 271 of the Act or state law provisions, not just Section 251 of the Act, and that these obligations continue even when unbundling is no longer available under Section 251. Second, XO's proposed language would ensure that customers that could not be migrated from UNE-P to a UNE loop serving arrangement for technical reasons would continue to have competitive options.

In addition, XO's proposed language, consistent with existing change of law procedures, starts the clock for the time period for the transition away from Section 251 unbundled switching upon a final and non-appealable finding of non-impairment. Further, XO's proposed language would allow the parties to mutually agree on whether the interconnection agreement should be modified to reflect the implementation plan to transition away from Section 251 unbundled local switching or shared transport. In contrast, SBC's proposed [*212] language would bar amending the interconnection agreement to reflect the implementation plan.

Finally, SBC's proposed language has a number of provisions that are unnecessary and objectionable. For instance Section 3.7.3.4 and 3.7.3.5.2 would obligate XO to "disclose information, including customer account information sufficient for SBC to make determinations under, and apply, the Enterprise Market Customer provisions." It is not clear why such a provision is necessary. SBC would be providing the switching and loops, so it should have all the information it needs to determine whether the CLEC's customer is an enterprise customer and subject to the enterprise market provisions.

c.) Staff

XO finds SBC's proposed language regarding when ULS becomes unavailable for mass market switching to be "confusing." XO has failed to identify specifically which SBC proposed language it finds confusing. Thus, not knowing exactly what SBC proposed language XO finds objectionable, Staff nonetheless offers the following comments. First,

the Staff finds all of SBC's proposed language regarding "Lawful UNEs" objectionable for all of the reasons articulated above in XO Issue 2 and SBC's Issues 1 and [*213] 2. Second, SBC's proposed language seems to be entirely based upon TRO related determinations, ignoring any independent obligations SBC may have under Section 271 (at cost-based rates) or under Illinois law. The Staff hopes that this issue is further fleshed out in the parties' respective Initial Briefs; in which case Staff will respond with further comments.

2. Analysis and Conclusions

The purpose of this arbitration is to incorporate the viable provisions of the TRO into the parties' ICA. Regarding mass market local switching and dedicated transport, the *Status Quo* Order directs the ILECs to continue supplying those UNEs under the rates, terms and conditions in their existing ICAs. Accordingly, TRO modifications concerning mass market local switching and dedicated transport should not be included in the ICA.

Regarding enterprise switching and shared local transport, which are not addressed by the *Status Quo* Order, XO identified four areas of dispute in the "Summary XO Illinois, Inc., Arbitration Positions n57" ("Position Summary") filed in conjunction with XO's Initial Brief as Attachment 1, pursuant to a directive of the ALJ. The ALJ had advised the parties that only positions [*214] included in their Position Summaries would be considered in this proceeding. Accordingly, we will consider only the matters raised in XO's Position Summary regarding SBC Issue 7 n58.

> n57 This document was subsequently revised, with the ALJ's permission. With respect to SBC Issue 7, the versions are identical.

> n58 The parties, in fact, adopted opposing stances on several other matters generally related to SBC Issue 7, in most instances on a gradual basis as briefing proceeded. We will not address those disputes, which were neither properly framed as open issues in the Petition or Response, nor even necessarily implied by SBC Issue 7 as framed.

First, we agree with XO that the amended ICA should recognize any unbundling obligation imposed by Section 271 of the Federal Act. As we held previously in this decision, the TRO declares that Section 271 creates an unbundling requirement that is distinct from the Section 251 requirement, TRO P 653, although 271 UNEs need not be TELRIC priced. TRO P 659. Any state-required [*215] unbundling should also be accounted for in the ICA.

Second, XO's concern for customers that cannot be migrated from UNE-P due to "technical reasons," XO Init. Br. at 45, must be balanced against SBC's concern that XO might take advantage of the general term "impediment" (the term in XO proposed Section 3.7.2.3) to improperly retain TELRIC pricing. SBC Reply Br. at 55. "Impediment" should either be replaced with specifically identified "technical difficulties" or deleted altogether. We observe that this issue concerns circumstances that will arise only after this Commission has made a non-impairment finding regarding mass market switching under Section 251 of the Federal Act. To the extent that it would be inconsistent with the Status Quo Order (whether during the Interim Period or the Transition Period described in that order) we cannot make such a finding

Third, regarding enterprise switching, we reject XO's proposal to begin the transition from Section 251 unbundled switching only after a final, non-appealable finding of non-impairment. As SBC states, its obligation to unbundle such switching arises only after a finding of *impairment. 47 CFR 51.319(d)(3)* [*216] . Furthermore, the "final, non-appealable" requirement is unsupportable in its own right, for reasons articulated previously in this Decision.

Fourth, the Commission rejects SBC's demand for "customer account information" for the purpose of identifying enterprise market customers. That would compromise customer privacy and cause XO to disclose competitively sensitive information. The parties are free to agree on another means for assuring that enterprise market customers are being lawfully served.

**8. What terms and conditions should apply to call related databases, LIDB and CNAM?**

1. Parties' Positions and Proposals a).

SBC

Issue SBC-8 concerns the provision of call-related databases. The language to which XO objects is this: "Access to call-related databases LIDB [line information database] and CNAM [Caller Name with ID database], for SBC-Illinois will be provided as described in the following Appendices: LIDB and CNAM-AS, LIDB, and CNAM Queries." SBC Ill. Section 3.9.1. XO has not articulated any objection to this language, which merely specifies that SBC Illinois will provide access to LIDB and CNAM as provided for in the relevant appendices of the agreement, and SBC [*217] Illinois can discern none. SBC Illinois' language is reasonable and appropriate, and should be adopted.

Further, while XO did not originally designate this issue for arbitration, XO subsequently presented its own competing language for arbitration (in its response to SBC Illinois' response to the arbitration petition). XO's language should be rejected. XO proposes that SBC Illinois be required to continue providing call-related databases at sections 251 UNE rates, terms, and conditions as an obligation under section 271 of the Act. XO Sections 3.9.2.1, 3.9.2.2. As SBC Illinois explained previously, that proposal violates the FCC's holding that section 271 checklist items do *not* have to be provided on such terms, and, in any event, this Commission lacks jurisdiction to address the issue of section 271 rates, terms, and conditions.

b.) XO

XO does not use SBC's call related databases in conjunction with the provision of facilities-based services. However, XO does not object to including the *TRO* requirements regarding the ILEC provision of access to its call related databases in connection with the provision of UNE-P. As such, XO proposes language consistent with the *TRO* [*218] for access to call related databases for UNE-P.

c.) Staff

The Staff offers no opinion or comment on this issue, as it appears that XO does not object to SBC's proposed language. Joint Issues Matrix, at 94.

2. Analysis and Conclusions

This is another improperly framed issue. Again, the Commission is not presented with an open and two-sided dispute, but, instead, SBC's request to consider the general subjects of call-related data bases, LIDB and CNAM.

Additionally, XO's Position Summary merely refers the Commission to its proposed text, and identifies no disputed questions and stakes out no positions. This presumably reflects the fact that XO does not use SBC's call-related databases in connection with its facilities-based operations. In any event, XO's proposed text does not "speak for itself" with respect to identifying disputes or supporting arguments, and it is not the Commission's responsibility to cull that text to discern what the disputed language might be. Therefore, pursuant to the directions of the ALJ regarding Position Summaries, there are no XO arguments for us to consider.

Accordingly, the Commission will make no ruling with respect to SBC Issue 8, except to hold, [*219] for the sake of consistency, that principles and conclusions articulated elsewhere in this Decision are applicable here as well. Specifically, Section 271 obligations should be accounted for in any amended ICA provisions pertaining to call-related data bases, LIDB and CNAM, with the understanding that TELRIC prices are not associated with Section 271 under federal law.

**9. What terms and conditions should apply to SS7?**

1. Parties' Positions and Proposals

a). SBC

Issue SBC-9 concerns implementation of the *TRO's* new requirements with respect to unbundled access to signaling networks. While in the *UNE Remand Order* the FCC had concluded that CLECs are entitled to unbundled access to signaling networks, it modified that conclusion in the *TRO*. The FCC found that "competitive LECs are no longer impaired without access to such networks," except where the ILEC must "provide access to switching as a UNE," because "there are sufficient alternatives in the market." *TRO*, P 544. Thus, except for where an ILEC must provide switching as a UNE, the FCC "reject[ed] the claims of competitive carriers that signaling networks should remain available as UNEs," and held that "we are [*220] no longer requiring incumbent LECs, pursuant to section 251(c)(3), to provide unbundled access to their switching networks." *Id., PP 546, 548.* The FCC codified its new requirements in FCC Rule 319(d)(4)(i).

To implement this new FCC rule, SBC Illinois proposes language stating that it "will provide SS7 signaling on interswitch calls originating from a Lawful UNE ULS port," but that "[a]ll other use of SS7 signaling is pursuant to the applicable Access tariff." SBC Ill. Section 3.11.1. XO has not articulated its objection to this language, which is clearly necessary to implement the new requirements of the *TRO*, and thus SBC Illinois' proposed language should be adopted. The FCC held that CLECs are entitled to access signaling networks as a UNE only where an ILEC is required to provide switching as a UNE, and this holding must be reflected in the parties' *TRO* contract amendment.

While XO did not originally identify this as an issue for arbitration, XO subsequently presented competing contract language to govern the provision of unbundled access to signaling networks. XO's language is unlawful, and must be rejected. In particular, XO proposes that [*221] SBC Illinois be required to continue providing signaling networks at sections 251 UNE rates, terms, and conditions as an obligation under section 271 of the Act. XO Section 3.11.2.1. As SBC Illinois explained previously, that proposal violates the FCC's holding that section 271 checklist items do *not* have to be provided on such terms, and, in any event, this Commission lacks jurisdiction to address the issue of section 271 rates, terms, and conditions.

b.) XO

XO does not use SBC's SS7 in conjunction with its provision of facilities-based services. However, XO does not object to including the *TRO* requirements regarding the ILEC provision of access to SS7 in connection with its provision of UNE-P. As such, XO proposes language consistent with the *TRO* for access to SS7 for UNE-P.

c.) Staff

SBC contends that its proposed language for SS7 signaling for interswitch calls originating from a lawful UNE ULS port tracks the TRO requirements. Again, as noted repeatedly above, Staff objects to SBC's entire "Lawful" theory and SBC's proposed accompanying language implementing the SBC "Lawful" theory. Staff, however, does acknowledge that the TRO, as SBC contends, found that [*222] CLECs are no longer impaired without unbundled access to an ILEC's signaling networks, unless they are purchasing switching as a UNE.

XO, apparently, does not take specific issue with SBC's proposed language as it is primarily a facilities-based carrier and, thus, does not use SBC's call-related databases. XO, nonetheless, offers its own proposed language, which it contends is consistent with the TRO requirements. In addition to the language XO proposes its section 3.11.2.1 (Signaling Networks), which would obligate SBC to provide access to signaling under its switching unbundling obligations (if any), the Staff points out that SBC is also required "to provide for interconnection between their signaling networks and the signaling networks of alternative providers" under its obligations "pursuant to Sections 251(a), 251(c)(2) and our [FCC] rules implementing these requirements." TRO, P 548.

2. Analysis and Conclusions

2004 Ill. PUC LEXIS 675, *222

The Commission's comments and conclusions regarding SBC Issue 8 are fully applicable here. Therefore, they will constitute our comments and conclusions respecting SBC Issue 9 as well.

### 10. What terms and conditions should apply to the Advanced Intelligent Network [*223] (AIN)?

1. Parties' Positions and Proposals

a). SBC

Issue SBC-10 concerns implementation of the *TRO's* new requirements with respect to unbundled access to the Advanced Intelligent Network ("AIN"). In the *TRO*, the FCC modified its rules regarding unbundled access to AIN. In the *UNE Remand Order*, the FCC had found that ILECs "were required to provide unbundled access to AIN platform and architecture," but not "AIN service software." *TRO*, P 556. In the *TRO*, however, the FCC "conclude[d] that the market for AIN platform and architecture has matured since the [FCC] adopted the *UNE Remand Order* and we no longer find that competitive LECs are impaired without unbundled access to those databases." *Id.* Thus, the FCC "no longer require[s] incumbent LECs to unbundle access to the AIN databases for carriers not using the incumbent LEC's switching capabilities." *Id.* n.1724. The FCC codified this holding in FCC Rule 319(d)(4)(i).

To implement this new FCC rule, SBC Illinois proposes new contract language that states that the provisions of the agreement relating to the provision of AIN apply only when the CLEC is providing service using unbundled switching. [*224] SBC Ill. Section 3.12.1. XO has not articulated any objection to SBC Illinois' proposed language, which is clearly necessary to implement the new requirements of the *TRO*, and thus SBC Illinois' proposed language should be adopted. n59

> n59 XO proposes language under SBC Issue-9 to the effect that SBC Illinois is required to provide unbundled access to all call-related databases (including AIN) on section 251 rates, terms, and conditions pursuant to section 271. XO Section 3.9.2.1. As SBC Illinois has explained, that proposal is both unlawful and beyond this Commission's jurisdiction.

b.) XO

XO does not use SBC's call related databases including its AIN databases in conjunction with its provision of facilities based services. XO does not object to including the *TRO* requirements regarding the ILEC provision of access to AIN provided in connection with its provision of UNE-P. As such, XO proposes language consistent with the TRO for access to AIN for UNE-P.

c.) Staff

Again, because XO is primarily a facilities-based [*225] carrier, it has not objected specifically to SBC's proposed language for AIN services, but instead proposes the same language that it proposes for SBC Issue 9 that it contends is consistent with the TRO. The Staff, again not knowing exactly what SBC proposed language XO takes issue with, offers just a few comments. First, Staff, notes that the TRO, as SBC contends, found that CLECs are no longer impaired without unbundled access to its AIN platform. TRO, P 566. Second, as noted repeatedly above, Staff objects to SBC's entire "Lawful" theory and SBC's proposed language implementing the SBC "Lawful" theory. Finally, the Staff would agree with XO that SBC could have independent obligations (*e.g.*, under section 271) to provide access to its AIN platform.

2. Analysis and Conclusions

The Commission's comments and conclusions regarding SBC Issue 8 are fully applicable here. Therefore, they will

constitute our comments and conclusions respecting SBC Issue 10 as well.

**11. (a) Does the TRO provide that a CLEC may pick and choose between its ICA and any SBC tariff?**

**(b) Should the ICA terms and conditions, including those of the TRO Amendment, prevail over SBC's tariffs?**

1. [*226] Parties' Positions and Proposals

a). SBC

XO inappropriately proposes to give itself a unilateral right to pick and choose between provisions of the parties' interconnection agreement and any SBC Illinois tariffs, at its sole option. SBC Illinois does not have the right to unilaterally decide that it will ignore the parties' interconnection agreement and instead provide service pursuant to the terms of a tariff, and XO should not have such a right either. The Federal Act provides that interconnection agreements are to be the "binding" statement of the parties' respective rights and obligations, and both parties should be held to the terms of their binding interconnection agreement. Moreover, the Seventh Circuit (and other courts) has held that state commissions may not "create an alternative method by which a competitor can obtain interconnection rights" through tariffs outside the section 252 process. *Wisconsin Bell, Inc. v. Bie, 340 F.3d 441, 442-45* (7<th> Cir. 2003). *See also Indiana Bell Tel. Co. v. Indiana Util. Reg. Comm'n, 359 F.3d 493, 496-98* (7<th> Cir. 2004). The Commission should reject XO's proposal to [*227] bypass the detailed, comprehensive interconnection agreement scheme created by Congress by establishing a right to unilaterally evade its interconnection agreement rights and obligations.

b.) XO

(SBC-11a). In general, it is well established that, to the extent that a CLEC orders from a tariff or SGAT, the terms and conditions of that tariff or SGAT apply. SBC proposes here to prohibit a CLEC from its right to order from a tariff or SGAT, where the CLEC has an interconnection agreement with SBC.

Nothing in the law restricts a CLEC from ordering out of a tariff if a CLEC has an agreement with the ILEC. Although courts have held that a state commission may not ignore the detailed process for negotiation and arbitration of interconnection agreements in the Act by requiring ILECs to offer network elements and services through published tariffs, the courts have *not* prohibited CLECs from, at their option, ordering services or elements out of tariffs, which would effectively "amend" existing interconnection agreements. *See US West Communications, Inc. v. Sprint Communications Co., 275 F.3d 1241* (10<th> Cir. 2002). Moreover, to the extent that a provision [*228] in an interconnection agreement allows a CLEC to purchase services out of a tariff, courts have recognized that the "challenged provision does not eliminate interconnection agreements, but rather is part of one. A decision by [the competitor] to purchase services at the rates and terms set forth in one or more of [the ILEC's] tariffs does not result in abandonment of the interconnection agreement between itself and [the incumbent]." *Id. at 1251.* Thus, where a provision in an agreement allows a CLEC to opt-into tariff services or elements in addition to the agreement, such provision is not unlawful; nor inconsistent with the Act. *Id. at 1252.*

(SBC 11-b). As discussed above, XO's position is that the terms and conditions of its interconnection agreement with SBC should govern -- unless XO orders a facility or service out of the tariff, in which case the tariff governs. SBC's proposed language would have the tariff terms and conditions take precedence over the Parties' Agreement, even with respect to terms and conditions that are not specific to tariffed services. Such a proposal would undermine the effectiveness of Commission-approved [*229] interconnection agreements and is wholly improper.

c.) Staff

This issue appears to have been overtaken by a recent FCC order which abolishes the FCC's pick and choose" rule.

2004 Ill. PUC LEXIS 675, *229

While the change to the so-called "pick and choose" rule applies specifically to a carrier's right to opt into some or all of another carrier's interconnection agreement with an ILEC, the same essential logic holds. A carrier may not "pick and choose" individual provisions out of another carrier's interconnection agreement.

XO claims that it "is not asserting that it can pick and choose between an ICA or a tariff, but simply asserting that if it orders from a tariff or SGAT, the terms and conditions of the tariff or SGAT apply." XO further "does not agree that SBC may restrict or prohibit a CLEC from ordering out of any SBC tariff." The XO proposal appears to permit XO to "at [its] option, order from a [sic] SBC-13STATE tariff or SGAT."

The Staff does not endorse XO's argument. It is true that several carriers have concluded interconnection agreements pursuant to which they may order certain UNEs at tariffed rates, but such provisions are incorporated into the interconnection agreements, not in derogation [*230] of them. XO's proposal would entitle XO to take services under its interconnection agreement, or from the tariff, at its election. This proposal cannot be reconciled with the existing law, and Staff recommends its rejection.

2. Analysis and Conclusions

In a June 3, 2004 Ruling, at page 7, the ALJ determined that the scope of this arbitration was limited by the scope of the parties' negotiations, per *Coserv Limited v. Southwestern Bell Telephone, 350 F.3d 482* (5<th> Cir. 2003), and that their negotiations had been limited to amending the ICA "to incorporate changes necessitated by the TRO." The Commission concurs with SBC that the disputed language in XO's proposed Section 1 to the Cover Amendment "has nothing to do with the TRO." SBC Init. Br. at 84. XO is seizing an opportunity presented by the amendment process to seek a contract provision that it presumably believes advantageous. That provision, however, is unrelated to the contents (much less the requirements) of the TRO. Moreover, XO's supporting arguments do not address the actual issue framed by SBC ("Does *the TRO provide...*[for a pick-and-choose regime]"). (Emphasis added.) Our ruling, therefore, [*231] is that because XO's proposed text is outside the boundaries of this arbitration, we can neither require nor preclude its inclusion in the ICA.

Similarly, some of SBC's proposed contract language is also outside the scope of this proceeding. Specifically, the reference to SBC tariffs and SGAT in the second sentence of SBC's proposed Section 1 neither addresses incorporation of the TRO into the ICA, nor the effect of that incorporation, through the TRO amendment, on the preexisting provisions of the ICA. Rather, that language addresses the relationship between the ICA and SBC's public offerings to qualified buyers of its services. Accordingly, SBC's proposed language is approved, but without the words "SBC tariff or an SBC-13STATE Statement of Generally Available Terms and Conditions ('SGAT')" in the second sentence.

**12. (a) Should the cover amendment clarify how the terms and conditions of the amendment replace the terms and conditions of the underlying agreement?**

**(b) Should the cover amendment reserve both parties' rights with respect to "remedies and arguments with respect to any orders, decisions, legislation or proceedings?"**

1. Parties' Positions and Proposals

a). [*232] SBC

Sub-issue 12(a) concerns additional language proposed by SBC Illinois that provides examples of how particular conflicts between the parties' original contract and the *TRO* amendment should be resolved. XO claims that this language is "confusing." But this language is not confusing at all, and appropriately sets forth the proper resolution of conflicts between the original agreement and the *TRO* amendment. For instance, XO should not be able to nullify the parties' *TRO* amendment by asserting that conflicting provisions of the original contract still apply merely because they still physically appear in the parties' contract. Moreover, XO has raised no objection to the substance of SBC Illinois' proposed language, in that XO does not disagree with SBC Illinois' explanation of how various conflicts should be

2004 Ill. PUC LEXIS 675, *232

resolved. Thus, SBC Illinois' proposed language should be adopted.

Sub-issue 12(b) concerns certain reservation of rights language proposed by SBC Illinois. Non-waiver of rights clauses are common in interconnection agreements, and even XO has proposed such provisions for the parties' *TRO* amendment. XO has not explained its objection to SBC Illinois' proposed [*233] language, which equally protects both parties. SBC Illinois' language is reasonable, and should be adopted.

b.) XO

(SBC-12a). XO's proposed language unambiguously provides how the terms and conditions of the amendment amend or replace the terms and conditions in the underlying Agreement. SBC's proposed language, however, is confusing, inappropriate, and in conflict with the *TRO*. As discussed above, to the extent that SBC proposes language in the Amendment that would replace or modify change in law provisions of the XO/SBC ICA and/or condition SBC's obligation to provide UNEs to those that it defines as "Lawful UNEs," or "declassified UNEs," it conflicts with the *TRO*.

(SBC-12b). There is no need for parties to reserve their rights with regard to remedies and arguments. As a matter of law, both parties have such rights and the proposed language by SBC is simply superfluous, as well as ambiguous.

c.) Staff

(SBC-12a). This sub-issue essentially boils down to a rehashing of SBC Issue No. 1. For the reasons articulated under SBC Issue 1, Staff recommends that the Commission reject SBC's proposed language that would override the section 252 process and allow SBC to unilaterally [*234] change the ICA to reflect its interpretation of any potential change of law regarding its obligations to provide requesting CLECs UNEs. Moreover, XO correctly perceives SBC's proposal to be an attempt to use a change of law to negotiate an alteration in the existing "change of law" provision, in a manner that would permit SBC to unilaterally abrogate UNE unbundling obligations. The *TRO* specifically contemplates the use of existing change of law provisions to negotiate conforming changes pursuant to the TRO. *See, e.g.*, TRO, PP700, 704 (FCC recognizes existing change of law provisions). In other words, the TRO is itself a change of law, but not one that has any effect upon change of law provisions. SBC's attempt to bootstrap a change in the change of law provision should be rejected. On balance, Staff favors XO's proposal.

(SBC-12b). Sub-issue (b) appears to be a non-issue as XO has not objected to it, at least in its Preliminary Position. Joint Issues Matrix, at 97-98. Because there appears to be no issue here, Staff will refrain from commenting but, rather, reserves its right to respond to the parties' respective Initial Briefs.

2. Analysis and Conclusions

SBC-12a. The Commission [*235] concurs with Staff and XO that all of the examples included in SBC's proposed Section 2 should be excluded from the Cover Amendment n60. Staff Init. Br. at 103; XO Reply Br. at 65. We have already rejected SBC's proposed use of the term "lawful" with respect to UNEs, for the reasons previously explained. Moreover, we also find that the examples are superfluous, since the general - and undisputed - language that precedes them clearly states that the amendment supercedes provisions of the original ICA.

n60 So that there is no ambiguity about our ruling here, we note that the pricing example in the last sentence of Section 2 must be excluded with the other examples in the section.

On exceptions, SBC requests that this decision "should be clarified to avoid any suggestion that the parties must continue to adhere" to pre-existing ICA provisions that no longer reflect the new requirements mandated by the modified TRO. SBC BOE at 2. The Commission does not perceive the need for such clarification. As we said in the

2004 Ill. PUC LEXIS 675, *235

preceding [*236] paragraph, SBC's proposed Section 2 unequivocally declares that the amendment both revises and trumps the present content of the ICA. SBC's proposed Section 1, discussed in connection with SBC Issue 11, above, similarly establishes the primacy of the amendment. Additionally, we have now approved, in connection with SBC Issue 2, a (properly modified) list of specific SBC services that the TRO has freed from a federal unbundling requirement. Nothing more is needed.

The penultimate sentence of SBC's proposed Section 3, which would obviate physical removal or replacement of portions of the original ICA, is reasonable and neutral. XO articulates no rationale for opposing it. It should be included in the Cover Amendment. We reach the same conclusion with respect to SBC's proposed Section 10, for the same reasons.

SBC-12b. Although the Commission shares XO's and Staff's doubts about the necessity of SBC's proposed non-waiver provision, we find the initial portion of the first sentence n61 in SBC's proposed Section 11 is an acceptable mechanism for emphasizing the absence of waiver. The remainder of Section 11 is disapproved. The lengthy list of "Government Actions" is unnecessary, and the [*237] declaration that those actions have not yet been fully incorporated into the ICA only creates contract ambiguity - in contradiction to SBC's purported intention to provide "commercial certainty" for the parties via the agreement. SBC Init. Br. at 82.

> n61 That is, from the beginning of the first sentence ("In entering...) through the end of the first substantive parenthetical ("...this Amendment").

### 13. What will happen if the TRO is stayed, reversed or vacated?

1. Parties' Positions and Proposals

a). SBC

SBC Illinois' proposed language appropriately specifies what should occur upon a remand (but not a reversal) of portions of the *TRO*. Specifically, in the case of such an event, it is appropriate to maintain the affected portions of the parties' agreement in effect, unless those portions are otherwise rendered invalid or modified by a change of law or UNE declassification event. XO's contrary proposal to simply freeze the contract without regard to changes in law or UNE declassifications is improper, and should [*238] be rejected.

XO's proposed language regarding a stay, or reversal and vacatur, of the *TRO* should be rejected. XO's proposal would appear to give XO unilateral authority to determine the legal effect of such an event upon the parties' contract, and unilateral authority to determine which parts of the contract it will comply with, and which it will not. That proposal is unreasonable.

b.) XO

As a practical matter, it is premature to adopt any language related to USTA II. As XO noted in its Motion to Withdraw the Petition ("Withdrawal Motion"), the FCC recently announced that it would, within the next few weeks, promulgate interim rules in the wake of the issuance of the D.C. Circuit's decision in USTA II. It would be a waste of the parties and the Commission's resources to arbitrate this issue because the FCC's interim UNE rules will soon supersede the vacated *TRO*.

SBC's proposed language would maintain provisions of the Amendment in the event of a vacatur of the *TRO*, including its proposed Section 1.3, which provides that it will not provide UNEs that are not "Lawful UNEs" or "declassified UNEs." Thus, SBC could potentially argue that the issuance of USTA II [*239] allows it no longer to provide certain UNEs. Such a proposal would be improper and inconsistent with the Act, the FCC's rules and orders, the

2004 Ill. PUC LEXIS 675, *239

FCC's intention to issue interim rules soon, and this Commission's past decisions. As discussed above, SBC has the obligation as a matter of federal and state law to provide UNEs, and cannot unilaterally discharge itself of this obligation. Accordingly, XO believes that, in the event of a stay, reversal or vacatur of the *TRO*, consistent with the law and the FCC's intent to issue interim rules, SBC should continue to provide UNEs under the Agreement.

In addition, SBC's proposed language would authorize SBC to discontinue provisioning of UNEs upon vacatur of the *TRO*. As discussed in the context of other issues, such a proposal is wholly improper. The unavailability of any UNE should be the result only of negotiations and arbitration specific to that UNE, not a generic provision that automatically incorporates SBC's interpretation of future events. The *TRO* condemns unilateral action by any party, and holds that, "as contemplated in the Act, individual carriers will have the opportunity to negotiate specific terms and conditions necessary [*240] to translate our rules into the commercial environment." *TRO* at P 15. When rules are issued, as opposed to the opportunistic and self-effectuating provisions SBC seeks, both parties are entitled to negotiate to interpret the rules. "[M]odification of existing agreements...cannot be accomplished overnight" and future rules that affect the interconnection agreement must be negotiated or arbitrated prior to implementation. *Id.* at P 700.

c.) Staff

There appears to be no real difference between the parties' positions. However, SBC's "Lawful UNEs" list, which it proposes it should be permitted to change unilaterally, might, if adopted, affect this issue. Moreover, SBC's proposed contract provisions appears to result in changes of law as defined becoming effective without subsequent negotiation. For this reason, the Staff favors XO's proposal.

2. Analysis and Conclusions

The Commission finds that this issue, as worded, has been mooted by the termination of the stay of vacatur in USTA II, and by the FCC's choice to issue interim rules pertaining to specified UNEs in the *Status Quo* Order. Wherever it has been pertinent, our findings and conclusions in this Decision have [*241] incorporated the fact that portions of the TRO have been reversed or vacated. Accordingly, we have given effect to those elements of the TRO that have not been vacated, and not given effect to vacated elements. Thus, nothing in SBC's proposed Section 5.b needs to be included in the amended ICA.

XO's proposed text is similarly unnecessary. Its proposed "option" would arise only after vacatur, and vacatur has already been taken into account in our analysis and rulings here. With regard to the non-waiver language in XO's prefatory text (which, ironically, would be "superfluous" under XO's arguments respecting SBC Issue 12), having found SBC's similar provision acceptable (under SBC Issue 12), we reach the same conclusion here n62.

n62 If it chooses, XO is free to abandon this provision in the final text of the parties' amended ICA.

We note that the proposed texts of the arbitrating parties account for the possibility that U.S. Supreme Court action could affect USTA II and, by extension, the TRO. In our view, any such [*242] action by the Supreme Court would now constitute a change of law that would have to be incorporated into the ICA, as appropriate, through the existing change-of-law provisions.

**14. Should SBC be required to report and pay performance measures when a UNE is declassified?**

1. Parties' Positions and Proposals

a). SBC

SBC Illinois' performance measures plan and remedies, previously approved by the Commission, is intended to

ensure that SBC Illinois satisfies its obligations regarding the provision of UNEs to competitors. To the extent a network element is no longer a section 251 UNE, that plan and those remedies no longer apply. SBC Illinois' proposed language, which makes this consequence of UNE declassification expressly clear, is thus reasonable and appropriate, and should be adopted. Moreover, as explained above, the Commission should reject XO's unlawful suggestion that the Commission should require SBC Illinois to continue providing non-UNEs at the same rates, terms, and conditions as UNEs pursuant to section 271.

b.) XO

As an initial matter, for the same reasons discussed above, XO disagrees with SBC's definition of "declassified" UNEs and "lawful UNEs." Furthermore, [*243] nothing in the *TRO* relieves SBC of its obligation to meet performance measures and pay penalties, simply because a UNE is no longer required to be unbundled under Section 251. SBC still must provide nondiscriminatory service under the Act, and comply with its Section 271 requirements, which include performance measures and penalties. Accordingly, SBC's proposed language is inappropriate and XO's language should be incorporated into the Amendment.

c.) Staff

SBC's characterization of this issue is almost completely inaccurate. SBC is obliged, under the Commission's Section 271 Order, to continue to pay performance remedy penalties. The whole purpose of a performance remedy plan is to make certain that a regional Bell operating company (hereafter "RBOC") continues to keep its market open after it receives authority to provide interexchange service under Section 271 of the federal Telecommunications Act of 1996. SBC is obligated by its existing performance remedy plan, approved by the Commission in its Section 271 Orders.

2. Analysis and Conclusions

The Commission rejects SBC's proposed Section 7. It is an attempt to remove Section 271 network elements from the operation of the [*244] performance remedy plan adopted in connection with SBC's long distance approval under Section 271 (insofar as that plan is identified in the parties' ICA). As Staff aptly states, the performance remedy plan is a "Commission-approved bulwark against SBC's potential failure to honor its market-opening obligations after receiving Section 271 authority." Staff Reply Br. at 39.

SBC's contention, at SBC Reply Br. at 65, that network elements are fundamentally different under, respectively, Sections 251 and 271, is incorrect in the context of the performance remedy plan. That plan is intended to create disincentives to SBC failure to perform its pro-competitive obligations, irrespective of the specific statute, regulation or order that imposes any particular such obligation.

## V. GENERAL APPLICATION OF THE STATUS QUO ORDER

In addition to its specific impact on certain issues in this arbitration, the Status Quo Order is also generally applicable to the parties and must be reflected in their ICA. Its salient provisions are associated with the Interim Period and Transition Period previously discussed here, and with a "Post-Transition Period" also defined in that order. The Interim Period [*245] will last for six months, unless the FCC issues final unbundling rules before that time. During that six-month period, existing ICA terms for mass market switching, dedicated transport and enterprise loops can only be superseded by voluntarily negotiated agreements, FCC orders specifically addressing those UNEs, or state commission orders raising UNE rates. Either of the latter two events would constitute a change of law that should be addressed by the ICA's change-of-law processes.

The Transition Period covers the six months immediately following termination of the Interim Period. However, there will be no Transition Period for any of the aforementioned UNEs that the FCC determines should continue to be available under Section 251 of the Federal Act. But without such a determination, the following directives apply:

First, in the absence of a Commission ruling that switching is subject to unbundling, an incumbent LEC shall only be required to lease the switching element to a requesting carrier in combination with shared transport and loops (*i.e.*, as a component of the "UNE platform") at a rate equal to the higher of (1) the rate at which the requesting carrier leased that [*246] combination of elements on June 15, 2004 plus one dollar, or (2) the rate the state public utility commission establishes, if any, between June 16, 2004, and six months after Federal Register publication of this Order, for this combination of elements plus one dollar. Second, in the absence of a Commission ruling that enterprise market loops and/or dedicated transport are subject to section 251(c)(3) unbundling in any particular case, an incumbent LEC shall only be required to lease the element at issue to a requesting carrier at a rate equal to the higher of (1) 115% of the rate the requesting carrier paid for that element on June 15, 2004, or (2) 115% of the rate the state public utility commission establishes, if any, between June 16, 2004, and six months after Federal Register publication of this Order, for that element. With respect to all elements at issue here, this transition period shall apply only to the embedded customer base, and does not permit competitive LECs to add new customers at these rates. As during the interim period, carriers shall remain free to negotiate alternative arrangements (including rates) superseding our rules (and state public utility commission rates) [*247] during the transition period. Subject to the comments requested in response to the above NPRM, we intend to incorporate this second phase of the plan into our final rules.

*Status Quo* Order, P 29.

The foregoing transitional unbundling and pricing requirements should be incorporated into the SBC/XO ICA through the instant amendment. As a result, these requirements will not constitute changes of law when they occur. Similarly, it would not be a change of law if the FCC, in its final rules, determines that its unbundling requirements for a pertinent UNE will remain as they are presently. Any other future FCC or state requirement affecting the relevant switching, loop and transport UNEs may constitute a change of law to be addressed by ICA change-of-law mechanisms.

Additionally, we note that the transitional unbundling and pricing requirements apply only to a CLEC's "embedded customer base" and not to new customers. *Id.* Therefore, the law applicable to new customers may change before the law applicable to existing customers, and that change could trigger the ICA change-of-law provisions.

In the Post-Transition Period, the FCC's final rules will determine which UNEs must be [*248] unbundled and establish the terms and conditions for unbundling. "The specific process by which those rules shall take effect will be governed by each [ILEC's ICAs] and the applicable state commission's processes." *Id.* Presumably, if the substantive provisions of the ICA are inconsistent with the FCC's final rules, ICA change-of-law processes will apply.

## VI. ARBITRATION STANDARDS

Under subsection 252(c) of the Federal Act, the Commission is required to resolve open issues, and impose conditions upon the parties, in a manner that comports with three standards. The Commission holds that the analysis in this arbitration decision satisfies that requirement.

First, subsection 252(c)(1) directs the state commissions to "ensure that such resolution and conditions meet the requirements of section 251, including the regulations prescribed by the [FCC] pursuant to section 251." In this arbitration, the Commission has directed the parties to include provisions in their interconnection agreement that fully comport with Section 251 requirements and FCC regulations.

Second, subsection 252(c)(2) requires that we "establish any rates for interconnection, services or network elements according [*249] to subsection [252(d)]." Here, most of the pertinent rates were already established by the parties through mutual agreement. Insofar as the Commission's resolution of open issues will affect those or other rates in the parties' interconnection agreement, we require, and expect the parties to establish, rates that are in accord with subsection 252(d) of the Federal Act.

2004 Ill. PUC LEXIS 675, *249

Third, pursuant to subsection 252(c)(3), the Commission must "provide a schedule for implementation of the terms and conditions by the parties to the agreement." Therefore, the Commission directs that the parties file, within 25 calendar days of the date of service of this arbitration decision, their complete interconnection agreement for Commission approval pursuant to subsection 252(e) of the Federal Act.

By Order of the Commission this 28<th> day of October, 2004.

EDWARD C. HURLEY

Chairman

107D92

********** Print Completed **********

Time of Request: Wednesday, November 29, 2006  13:32:20 EST

Print Number:     1841:132375462
Number of Lines: 3016
Number of Pages: 73

Send To:   ECKERT, JOEL
           BOULT CUMMINGS CONNERS & BERRY PLC
           1600 DIVISION ST STE 700
           NASHVILLE, TN 37203-2755