LEXSEE 2005 MICH. PSC LEXIS 309

In the matter, on the Commission's own motion, to commence a collaborative proceeding
to monitor and facilitate implementation of Accessible Letters issued by SBC
MICHIGAN and VERIZON

Case No. U-14447

MICHIGAN PUBLIC SERVICE COMMISSION

2005 Mich. PSC LEXIS 309

September 20, 2005

**PANEL:** [*1]  PRESENT: Hon. J. Peter Lark, Chairman; Hon. Laura Chappelle, Commissioner; Hon. Monica Martinez, Commissioner

**OPINION:** At the September 20, 2005 meeting of the Michigan Public Service Commission in Lansing, Michigan.

### ORDER

On May 17, 2005, the Commission issued an order in this case modifying the process to be used to bring current interconnection agreements into compliance with the Federal Communications Commission's (FCC's) Triennial Review Order n1 *(TRO)* and its Triennial Review Remand Order n2 *(TRRO)*. In place of the original process, the parties proposed the following:

1. By May 31, 2005, the parties will file a joint disputed issues list, which will reflect the issues the parties need to resolve. The parties will attempt to phrase each issue in an informative and neutral manner.

2. The disputed issues list will refer to contract language proposed by each party. The contract language should be written so that regardless of the combination of choices made for resolution of the disputes, the contract in its entirety is consistent. In other words, if option B is chosen on issue 1 and option A is chosen on issue 3, the related amendment language is not inconsistent. If [*2]  such a result would occur, both issues 1 and 3 should be presented as one issue and the related amendment language changed. The parties will file a baseline document differentiating language that has been agreed-upon, disputed language SBC Michigan (SBC) proposes, and disputed language one or more of the competitive local exchange carriers (CLECs) want. If the accompanying baseline language related to this issue can be conveniently inserted into the disputed issues list, it should be so inserted. If on any particular issue the accompanying baseline language cannot easily be inserted in the disputed issues list, the list will reference the baseline language at issue.

3. By June 14, 2005, each party may file in this docket all affidavits, exhibits, briefs, or other material or information upon which that party relies to support its position on each issue on the disputed issue list. Parties are not required to file support of every issue. If no party files in support of any particular issue, that issue will be decided in favor of SBC. Similarly, if SBC does not file in support of any particular issue, then the issue will be decided in favor of the CLECs.

4. By June 24, 2005, each [*3]  party may file a response to the June 14, 2005 submissions.

5. The Commission will rule on the disputed issues without need for further submissions or hearing, unless the Commission determines otherwise. The Commission will also set a schedule for filing the amendments that conform to the Commission's ruling for approval. All parties reserve their rights to appeal any Commission ruling.

n1 Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers, Implementation of the Local Competition Provisions of the Telecommunications Act of 1996, Deployment of Wireline Services Offering Advanced Telecommunications Capability, CC Docket Nos. 01-338, 96-98, 98-147, Report and Order and Order on Remand and Further Notice of Proposed Rulemaking, 18 FCC Rcd. 16978, 16984 (2003), vacated in part, *United States Telecom Assn v FCC*, 359 F3d 554 (DC Cir 2004).

n2 In the Matter of Unbundled Access to Network Elements, Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers, WC Docket No. 04-313, CC Docket No. 01-338, FCC 04-179 (rel'd August 20, 2004).

[*4]

In the May 17 order, the Commission adopted the process proposed by the parties, while urging them to continue to narrow issues and negotiate resolutions to as many issues as possible before submitting the disputed issues list to the Commission.

On June 3, 2005, the Commission Staff (Staff) filed, on behalf of the active participants in the collaborative, a joint list of 29 disputed issues. Along with that disputed issues list, the Staff submitted a double-redlined version of the contract language at issue, marked according to whether the disputed language was proposed by a competitive local exchange carrier (CLEC) or SBC Michigan (SBC).

On June 14, 2005, SBC and the Joint CLECs n3 submitted briefs and testimony and other evidence in support of their respective positions concerning the appropriate resolution of the issues placed before the Commission. On June 24, 2005, the parties submitted reply briefs.

n3 The parties referred to as the Joint CLECs include the following companies: American Farm Bureau, Inc., AT&T Communications of Michigan, Inc. (AT&T), CMC Telecom, Inc., Climax Telephone Company, GRID 4 Communications, Inc., Easton Telecom Services, L.L.C., LDMI Telecommunications, Inc., MCImetro Access Transmission Services LLC, McLeodUSA Telecommunications Services, Inc., Neutral Tandem -- Michigan, LLC, NOW Communications, Inc., PNG Telecommunications Inc., Quick Communications, Inc., d/b/a Quick Connect USA, Superior Technologies, Inc., d/b/a Superior Spectrum, Inc., Talk America Inc., TCG Detroit, TelNet Worldwide, Inc., Trinsic Communications, Inc., XO Communications Services, Inc., and Zenk Group, Ltd., d/b/a Planet Access.

[*5]

On June 14, 2005, Verizon North Inc. and Contel of the South, Inc., d/b/a Verizon North Systems (Verizon) filed its submission concerning the joint disputed issues list. On June 24, 2005, responses to Verizon's submission were filed by TC3 Telecom, Inc. (TC3), TelNet Worldwide, Inc. (TelNet), and XO Communications Services, Inc. (XO). Thereafter, on June 30, 2005, Verizon filed a motion to strike those responses to its submission. By July 18, 2005, TelNet, TC3, and XO had filed responses to Verizon's motion.

On July 7, 2005, the parties filed notice that they had resolved Issue 15. On August 5, 2005, the parties filed a joint notice that they had resolved Issues 25 and 26 and part of Issue 23.

SBC/CLEC Issues

Issue 1. Definition of Buildings

SBC explains that in the *TRRO* the FCC has restricted the ability of CLECs to purchase unbundled DS1 and DS3 loops to a maximum of ten DS1 loops and one DS3 loop for any single building. *Id.* PP 177 and 181, 47 CFR 51.319(a)(4)(ii) and (a)(5)(ii). SBC proposed language for Section 0.1.1 of the amendment which would define a building as a "structure under one roof." With respect to campus [*6] environments, SBC proposes that the definition provide that an educational, industrial, governmental, or medical premises or campus shall constitute a single building for

purposes of the DS1 and DS3 limitation. SBC states that in such campus environments, SBC is not permitted to provision loops to each separate structure. Rather, SBC must deliver all loops to a single structure, and the campus owner or administrator connects the loop to facilities serving additional structures. Thus, SBC argues, logic dictates that the loop volume caps must be based on the volume of loops provisioned to that structure.

In contrast, SBC argues, the Joint CLECs' proposed definition of a building would be virtually impossible to administer and would effectively eviscerate the FCC's limitations on the unbundling of DS1 and DS3 loops. SBC complains that it would have to perform a title search to determine whether a building is a building for purposes of these limitations. It argues that the effect of the Joint CLECs' definition would be to permit a CLEC to obtain scores of unbundled DS3 loops in a single building that happens to have a large number of suites -- a result, it argues, that the *TRRO* does [*7] not permit.

The Joint CLECs argue that many CLECs focus their marketing efforts on the needs of small and medium sized businesses, generally using DS1 loops, which are rarely economical to construct. The Joint CLECs assert that their definition of a building should be adopted because it properly balances the complexities arising when dealing with multi-tenant property. They argue that SBC's definition would make the entire Michigan State University campus one single building, which, they argue, ignores any plain meaning of the FCC's chosen term "single building."

Moreover, the Joint CLECs argue, SBC's overly expansive definition appears to be designed to restrict to the greatest extent possible the ability of CLECs to serve certain customers. On the other hand, they argue, the Joint CLECs' proposed definition applies a common sense and reasonable interpretation to the term "single building," which is consistent with the FCC's underlying analysis of what may not be economic to serve without the availability of unbundled loops.

The Commission finds that the SBC-proposed definition of a building is the closest of the two to the commonly understood meaning of "single building," with one [*8] exception. The Commission finds that the portion of the definition that would require considering an entire campus or set of government or medical buildings to be a single building for purposes of the caps on the availability of DS1 and DS3 facilities should be deleted. The Commission is not persuaded that the fix proposed by the Joint CLECs actually takes care of the problem. Therefore, the Commission concludes that the entire last two sentences of Section 0.1.1 should be deleted.

Issue 2. Fiber to the Home (FTTH), Fiber to the Curb (FTTC), and Hybrid Loops

a. Obligations to other than Mass Market Customers

SBC contends that the Joint CLECs' proposals on this issue are an attempt to revive unbundling requirements for large business customers eliminated by the FCC, and should be rejected. SBC argues that the FCC eliminated most unbundling requirements for FTTH and FTTC, citing 47 CFR 51.319(a)(2) and (3). SBC points out that there is no language in the FCC's rules that supports reading in a limit to the definition of FTTH or FTTC as to those loops that serve the mass market customers, defined as those customers served by less than four [*9] DS0s. SBC argues that in the *TRO*, the FCC eliminated any requirement to unbundle enterprise market loops, while generally maintaining unbundling requirements for mass market loops, except FTTH. It argues that in the *TRO*, the FCC has now extended the same unbundling framework applicable to FTTH loops to FTTC loops. 47 CFR 51.319(a)(3). SBC argues that its proposed language for defining FTTH loops in Section 0.1.4 virtually quotes verbatim the FCC's definition in the related rule.

The Joint CLECs argue that the FCC's unbundling relief for FTTH, FTTC, and hybrid loops, as delineated in the *TRO*, is limited to those loops serving the mass market. They state that the FCC has repeatedly affirmed this position in its orders and cites supporting statements of then-Chairman Powell. Although admitting that SBC's position on the issue is supported by an "unexplained ambiguity in the FCC's adopted rules," they argue that the FCC's orders and their stated purpose demonstrate that the Joint CLECs' position should be adopted.

The Joint CLECs argue that the only discussion in the *TRO* with respect to limiting the unbundling obligations of incumbent [*10] local exchange carriers (ILECs) for FTTH, FTTC, and hybrid loops occurs in the mass market loop section of the order. The Joint CLECs state that the FCC's explicit intent in limiting the requirement to provide these elements was to encourage the construction of facilities by CLECs to provide broadband to the mass market. Thus, the Joint CLECs argue, the FCC never intended these limits to apply to the enterprise market, and the Commission should approve the Joint CLECs' proposed language.

The Commission finds that the Joint CLECs' proposal to include a limitation for the definition of FTTH, FTTC, and hybrid loops should be rejected. First, the Commission notes that there is no language within the FCC rule defining

these loops that would so limit the definitions. Further, the Commission notes that in the *TRO*, the FCC stated that although it was adopting rules specific to each loop type, its determination concerning unbundling obligations and limitations for such loops do not vary based on the customer to be served. *TRO*, P 210. Therefore, the Commission is persuaded that the FCC did not create an ambiguity in its rules by not including the "mass market customer" limitation proposed [*11] by the Joint CLECs. The language as proposed by SBC should be adopted with respect to this sub-issue.

b. Mass Market Definition

The Joint CLECs state that the FCC did not precisely define the line between a mass market customer and an enterprise customer. The Joint CLECs propose that the line should be drawn to include all residential customers and those business locations served by telecommunications capacity of less than four DS0s. It states that SBC would extend the definition to include all business locations served with a capacity of less than 24 DS0s. The Joint CLECs argue that their proposal is more consistent with the FCC's orders and has even been argued by SBC in other contexts as an appropriate set point for determining a mass market customer versus an enterprise customer.

SBC did not present argument on this sub-issue.

The Commission finds that the language proposed by the Joint CLECs should be adopted for Section 0.1.6, although given the finding above, it is unclear what the definition will accomplish for the Joint CLECs.

c. Predominantly Residential Definition

The parties disagree on the appropriate definition of predominantly residential as that term is used to denote [*12] a multi-dwelling unit, which is served consistently with rules for residential service. SBC would prefer that no definition be established for predominantly residential, because the FCC did not adopt one, stating that a determination would be obvious on the facts of the nature of a particular building. As an alternative, SBC proposes that the section should define a predominantly residential building as one that allocates more than 50% of its rentable square footage to residential use. The Joint CLECs desire to define residential building as one using 75% or more of the rentable space allocated to residential use.

The Commission finds that to be predominantly residential, a multiple dwelling unit should have greater than 50% of its rentable space allocated to residential use. Therefore, the Commission adopts SBC's proposal for this sub-issue.

d. The parties have agreed to remove Section 8.1.5 to resolve this dispute.

Issue 3. Definition of Business Lines

The issue presented by the parties is whether standalone unbundled network element (UNE) loops used to serve residential customers should be counted as business lines for purposes of the wire center non-impairment determinations [*13] for high-capacity loops and transport. SBC argues that in the *TRRO*, the FCC determined that CLECs are not impaired without access to DS3 high capacity loops in wire centers with at least 38,000 business lines and 4 or more unaffiliated fiber-based collocators, and that CLECs are not impaired without access to DS1 loops in wire centers with at least 60,000 business lines and 4 or more unaffiliated fiber-based collocators (Tier 1 wire centers). SBC further argues that the FCC held that CLECs are not impaired without access to DS3 UNE dedicated interoffice transport or interoffice dark fiber transport on any route between wire centers that are either Tier 1 or non-Tier 1 wire centers that contain at least 24,000 business lines or 3 or more unaffiliated fiber-based collocators (Tier 2 wire centers). SBC states that the definition of business line is found in 47 CFR 51.5, which provides:

A business line is an incumbent LEC-owned switched access line used to serve a business customer, whether by the incumbent LEC itself or by a competitive LEC that leases the line from the incumbent LEC. The number of business lines in a wire center shall equal [*14] the sum of all incumbent LEC business switched access lines, plus the sum of all UNE loops connected to that wire center, including UNE loops provisioned in combination with other unbundled elements. Among these requirements, business line tallies (1) shall include only those access lines connecting end-user customers with incumbent LEC end-offices for switched services, (2) shall not include non-switched special access lines, (3) shall account for ISDN and other digital access lines by counting each 64 kbps-equivalent as one line. For example, a DS1 line corresponds to 24 64 kbps-equivalents, and therefore to 24 "business lines."

2005 Mich. PSC LEXIS 309, *

SBC argues that its proposed definition of business lines quotes verbatim the definition set out in Rule 51.5. It argues that the manner in which Michigan defines a business customer for rating purposes is irrelevant to the appropriate definition to be used in the interconnection agreement. According to SBC, the FCC has definitively resolved this issue in the *TRRO* and its rules. SBC argues that the Commission is not free to substitute another definition for the one adopted in the FCC's rules.

The Joint CLECs respond that SBC's definition attempts to [*15] turn a residence into a business, while the definition proposed by the Joint CLECs merely uses common sense and plain English to limit the definition of business lines to lines purchased by business customers, as required by the first sentence of the FCC's definition.

The Commission finds that the first sentence of the FCC's rule defining business lines requires that, to be counted as a business line, the line must serve a business customer. The remaining portion of the definition presumes serving a business customer and clarifies that any loop, whether UNE-P, n4 UNE-L, n5 leased line will be counted when it serves a business customer. Therefore, the Commission concludes that the language proposed by the Joint CLECs should be adopted for purposes of the amendment to the interconnection agreements.

> n4 UNE-P refers to the unbundled network element platform, which includes the loop, unbundled local switching, and transport.

> n5 UNE-L refers to an unbundled loop.

## Issue 4. Definition of SBC Affiliate

The parties [*16] disagree as to whether a party that has entered into a binding agreement, which, if consummated, would result in its becoming an affiliate of SBC should be counted as an SBC affiliated, fiber-based collocator for purposes of the non-impairment determinations for high-capacity loops and transport prior to the consummation of the agreement. SBC states that its definition of fiber-based collocator is identical to that set out in Rule 51.5, 47 CFR 51.5, which refers to the definition of affiliate in 47 USC 153. That section provides:

> The term "affiliate" means a person that (directly or indirectly) owns or controls, is owned or controlled by, or is under common ownership or control with another person. For purposes of this paragraph, the term "own" means to own an equity interest (or the equivalent thereof) of more than 10 percent.

SBC argues that the Joint CLECs proposed definition would redefine the term to include "any entity that is currently subject to a binding agreement that, if consummated, would result in it becoming an affiliate of SBC as so defined." SBC argues that the proposal is contrary to the [*17] FCC's rules. SBC argues that the proposed language targets the proposed merger between itself and AT&T, since it is limited to potential affiliates of SBC, rather than potential affiliates of other parties for whom mergers may be planned. SBC argues that if the FCC had intended to include inchoate mergers, it could have, and presumably would have said so. Moreover, for purposes of determining non-impairment, SBC argues, it is only relevant to understand that AT&T became a fiber collocator when it was not an affiliate of SBC. On that basis lies the inference that revenue opportunities exist for CLECs at that wire center.

The Joint CLECs respond that because classification of a wire center as non-impaired is one that cannot be reversed, reasonable safeguards should be adopted to prevent basing that determination on temporary facts or circumstances. One such circumstance, the Joint CLECs argue, is when one of the competitive fiber-based collocators at a wire center is imminently subject to a binding agreement to become affiliated with SBC. The FCC's determination in the *TRRO* that when tallying fiber-based collocators for purposes of the transport impairment analysis, parties shall [*18] only count multiple collocations at a single wire center by the same or affiliated carriers as one fiber-based collocation. They argue that it makes no sense to close a wire center to unbundling on Monday, if running the test on Friday would yield a different result.

The Joint CLECs argue that the FCC based its determination in part on the theory that when there are multiple fiber-based collocators, CLECs would have alternative providers for obtaining the facilities. However, they argue, if the competitive alternative is about to become an affiliate and make no facilities available to CLECs except on terms con-

sistent with the ILEC, there are no real competitive alternatives and the CLECs are impaired without access to UNEs. They argue that adoption of the Joint CLECs' proposed language is dictated by common sense, fairness, and the public interest.

The Commission finds that the language as proposed by SBC should be adopted without the language proposed by the Joint CLECs. In the Commission's view, the federal rules do not support the Joint CLECs' position. Contrary to their arguments, the Commission is not free to rewrite the FCC's rules, to improve upon them, or ignore them when [*19] arbitrating interconnection terms. Rather, the Commission is bound by state statute to perform the duties delegated to it under the federal Telecommunications Act of 1996, 47 USC 251 *et seq.*, (federal Act), in a manner that is consistent with that act and the FCC's orders and rules. *See*, MCL 484.2201.

Issue 5. Entrance Facilities and Rates

SBC explains that an entrance facility is a form of dedicated transport that provides a transmission path between a SBC wire center and a switch owned by a requesting carrier. SBC states that in the *TRO*, the FCC held that CLECs are not entitled to unbundled access to entrance facilities, and reaffirmed that finding in the *TRRO*. SBC argues that it makes various transport facilities available that CLECs may use as "entrance facilities." It asserts that it will make entrance facilities available, but not at total element long run incremental cost (TELRIC) pricing that is required for UNEs.

SBC argues that this is a correct conclusion based on the FCC's determination that entrance facilities are less costly to build, are more widely available from alternative [*20] providers, and have greater revenue potential than dedicated transport between ILEC central offices. SBC points out that the FCC noted the entrance facility may be the point of greatest aggregation on a CLEC's system. Moreover, SBC argues, CLECs have a unique degree of control over the cost of entrance facilities because they can choose the location of their own switches.

SBC urges the Commission to reject the Joint CLECs' attempt to require SBC to continue to provide entrance facilities at TELRIC-based rates, as violating the FCC's rules. SBC argues that the FCC views entrance facilities as distinct from interconnection facilities.

The Joint CLECs argue that SBC's proposal rests on the ILEC's assumption that it is no longer required to provide unbundled interoffice facilities to connect the CLEC premises or point of presence on the ILEC's network at TELRIC rates. Further, the Joint CLECs argue, SBC's argument confuses the ILEC's limited obligations under Section 251(c)(3) and those required by Section 251(c)(2) of the federal Act. They argue that in both the *TRO* and the *TRRO*, the FCC affirmed that CLECs have a right to interconnect at TELRIC rates with the ILEC's network [*21] for the transmission and routing of telephone exchange service and exchange access, pursuant to Section 251(c)(2). Further, the Joint CLECs argue that 47 CFR 59.319(e), which SBC relies upon for its argument that it is no longer obligated to provide interconnection facilities at cost based rates, is limited by its terms to the ILEC's obligations under Section 251(c)(3) of the federal Act, and does not limit a CLEC's right to obtain interconnection facilities at TELRIC rates.

The Commission finds that the language proposed by the Joint CLECs should be adopted as reflective of the FCC's finding that CLECs still have a right to entrance facilities to the extent required for interconnection pursuant to Section 251(c)(2) of the federal Act. SBC's language would eliminate any responsibility to provide those facilities at TELRIC rates, contrary to the FCC's specific findings. *See*, *TRRO*, P 140.

Issue 6. SBC's Section 271 Obligations

The parties dispute whether and at what rate SBC's obligations pursuant to 47 USC 271 should be included in the amendment to the interconnection agreement required by the FCC's decisions in the *TRO* and the *TRRO* [*22] . SBC argues that the parties should negotiate mutually agreeable terms for Section 271 obligations outside the context of this Section 251 amendment. It argues that the Joint CLECs have proposed language that would obligate SBC to continue to provide elements required by obligations under Section 271 at TELRIC rates to meet the "just, reasonable, and non-discriminatory price" required by statute.

SBC argues that the Joint CLECs' proposed language is so poorly written as to be virtually unintelligible, and suffers from fundamental flaws. SBC states that the Joint CLECs' proposed language misstates SBC's obligations under Section 271, and then seeks to import both real and imaginary obligations under Section 271 into an interconnection agreement amendment offered pursuant to Sections 251 and 252. SBC takes the position that Section 271 obligations do not belong in an interconnection agreement reached pursuant to Sections 251 and 252. Moreover, SBC argues, there are

2005 Mich. PSC LEXIS 309, *

important distinctions between obligations under the different sections of the federal Act. It argues that rate requirements differ: elements provided pursuant to Section 271 are provided at market-based rates that are "just [*23] and reasonable" prices, while elements that are required to be unbundled under Sections 251 and 252 are priced at TELRIC. Moreover, SBC argues, the FCC has exclusive jurisdiction to enforce or determine satisfaction of, or compliance with, Section 271 obligations. SBC asserts that the FCC also has jurisdiction over the prices governed by Sections 201 and 202. Moreover, SBC argues, only the FCC may determine to forbear enforcing the requirements of Section 271. In sum, SBC argues, there is no provision in the federal Act granting state commissions authority over determinations with regard to Section 271 in an arbitration pursuant to Sections 251 and 252. Thus, SBC concludes, there is no basis for attempting to impose Section 271 obligations into the parties' interconnection agreements, and such obligations are beyond the scope of this case.

The Joint CLECs argue that because Congress required that Section 271 rates and terms be included in Section 252 interconnection agreements, and because only the Joint CLECs have proposed such rates and terms, the Commission's "baseball" arbitration approach requires that the Joint CLECs' position be adopted. They argue that SBC may not refuse to [*24] include rates and terms for Section 271 elements in interconnection agreements. Citing Section 271(c)(1) and (2), the Joint CLECs argue that the federal act requires that SBC implement the checklist items through its interconnection agreements approved pursuant to Section 252. Moreover, the Joint CLECs argue, the FCC has stated that a Bell Operating Company (BOC) must satisfy its checklist obligations pursuant to state-approved interconnection agreements that set forth prices and other terms and conditions. The Joint CLECs urge the Commission not to confuse the approval and enforcement of Section 271 provisions, which belong to the FCC, with the state's role in establishing rates and terms in interconnection agreements approved pursuant to Section 252.

The Joint CLECs point out that the Commission has established rates for SBC's Section 271 obligations in the past, including those relied upon by SBC to obtain relief under that section from the interLATA n6 proscription. They argue that merely because the FCC has exercised authority over Section 271 rates by prescribing a "just and reasonable" standard does not preempt the state's authority to implement that standard.

n6 LATA refers to local access and transport area.

[*25]

The Joint CLECs further argue that they have proposed rates, terms, and conditions for Section 271 elements that are just and reasonable. SBC on the other hand, has not proposed any terms and conditions. Therefore, the Joint CLECs insist, the Commission must adopt the Joint CLECs' proposed terms and conditions, which provide for obtaining elements available under Section 271 at TELRIC rates, at least temporarily.

However, the Joint CLECs note that they recognize that TELRIC rates are not required for elements obtained solely under Section 271 obligations. Accordingly, they state, their proposal leaves the door open for SBC to propose new rates that, if later approved by the Commission, would immediately replace the TELRIC rates. In their reply brief, the Joint CLECs state that they are withdrawing the request for their proposed language in Section 1.5. That does not completely resolve the issue, however, because they have proposed language for Sections 5.9 and 13 that are also involved in this issue.

The Commission is persuaded that the disputed language proposed by both parties should not be included in the amendment. The *TRO* and the *TRRO* did not affect SBC's Section 271 [*26] obligations. Those obligations may be argued and decided at a different time and in a more appropriate proceeding. Moreover, to grant the Joint CLECs' position would essentially require SBC to provide the UNE-P at TELRIC rates, which the Commission has already found would be inconsistent with the *TRO* and the *TRRO*. However, to approve SBC's proposed language in its entirety would exclude provisions for obtaining facilities pursuant to SBC's obligations under Section 271 from inclusion in the interconnection agreement and avoid the approval process required under Section 252. The Commission is still convinced that obligations under Section 271 should be included in interconnection agreements approved pursuant to Section 252. However, the Joint CLECs must negotiate with SBC concerning terms and conditions, seeking Commission arbitration if necessary. If the CLECs experience problems with obtaining items available pursuant to Section 271, they may take appropriate enforcement action.

Issue 7. Disconnect or Conversion of High Capacity Loops, Transport, and Dark Fiber

SBC objects to a proposal by the Joint CLECs to include, as Section 4.4 of the amendment, the following language: [*27]

> SBC will process orders for DS1/DS3 High Capacity Loops, DS1/DS3 Dedicated Transport or Dark Fiber Transport conversion or disconnection consistent with the end of the applicable transition period identified in Section 4.1.1.4. SBC will not convert or disconnect these services prior to the end of the applicable transitional period unless specifically requested by the CLEC.

SBC argues that the proposed language is vague and its purpose is not clear. SBC muses that it may be that the Joint CLECs desire to create an inference that CLECs need not transition their high capacity loops until the last day of the transition period. SBC argues that such a result would be the antithesis of a transition period. SBC argues that if a CLEC has not submitted the necessary orders to transition from elements or combinations that SBC is no longer required to provide as UNEs before the end of the transition period, SBC must be able to convert those elements or combinations to an analogous service.

The Joint CLECs initially note that the reference within the proposed language needs correction to Section 4.1.1.5 rather than 4.1.1.4. They state that the issue here is that CLECs should be entitled [*28] to keep their UNE arrangements to the extent allowed for by the agreement through the transition period. They contend that, should a CLEC desire to discontinue a UNE arrangement earlier, it can issue an appropriate disconnect order to SBC. The Joint CLECs note that SBC has limitations on the number of conversions that can be made in a narrow time frame. However, the Joint CLECs take the position that SBC's limitations for conversion should not affect the Joint CLECs' right to UNE pricing up to the last minute.

The Commission finds the Joint CLECs' argument persuasive. At the conclusion of the transition period, all CLECs should be operating without reliance upon elements no longer required to be provided at UNE pricing. However, during the transition period, SBC may not disconnect these services without the CLEC's prior authorization or request. The Commission therefore adopts the Joint CLECs' proposed language for Section 4.4. The Commission expects the CLECs to work with SBC to ensure an orderly transition that minimizes disruption to customer service.

Issue 8. Charges for Transition

SBC proposed Section 2.1.3.3 of the amendment to require CLECs to pay non-recurring charges [*29] associated with the transition of their embedded customer base from *TRO* affected enterprise market unbundled local switching (ULS) and UNE-P. SBC asserts that it will only charge CLECs the applicable service charges set out in the interconnection agreement's pricing schedule, unless physical work is necessary. In the event that physical work is required, SBC argues that non-recurring charges provided for in the interconnection agreement should apply.

SBC urges the Commission to reject the Joint CLECs' proposed language which would prohibit SBC from imposing "any termination, reconnection, disconnection, or other nonrecurring charges, except for an Electronic Service Order (Flow Through) Record Simple charge" and would require that "any discontinuance of any *TRO* Remand Declassified Element and the conversion shall take place in a seamless manner that does not affect the customer's perception of service quality." CLEC proposed language Section 2.1.3.3.

In short, SBC argues, the Joint CLECs' proposed language would require SBC to perform massive amounts of work without compensation. Thus, it would violate SBC's statutory and constitutional rights to just compensation and must [*30] be rejected.

The Joint CLECs state that when they have sought to convert customers from UNE-P to UNE-L, SBC has attempted to bill a port disconnect fee for a stand alone port ($ 7.60) and a service order charge for the port disconnect ($ 1.77), even though the CLEC did not request a port disconnect or issue an order requesting a port disconnect. The Joint CLECs insist that disconnection charges are improper and should not be permitted.

Further, the Joint CLECs argue that MCL 484.2301(1)(m) prohibits SBC from bundling unwanted services or products for sale or lease to another provider. They argue that SBC violates that section when it bundles a port disconnect and related service order charge with a CLEC's order for loop connection.

In its reply brief, SBC argues that when a CLEC orders conversion of a UNE-P to UNE-L, that conversion requires a port disconnect in order to perform the requested task. Thus, it argues, it is justified in charging the port disconnect fee. Beyond that, however, SBC states that if a CLEC has a dispute concerning whether SBC's billing is appropriate, it

may use the dispute resolution procedures in the interconnection [*31] agreement. SBC argues that this case is not a proper forum for resolving billing disputes.

The Commission is persuaded that the Joint CLECs' proposed language should be adopted. The Commission is concerned that SBC impose only the appropriate charges for these conversions. The process will be costly enough without the addition of charges for which there is no justification. Where no physical work is required there should be no charges other than the service order record simple charge. If SBC charges for work not done or imposes charges inconsistent with the interconnection agreement, the affected CLEC may object to that through the dispute resolution provisions in their respective interconnection agreements. Further, the Commission finds that a port disconnect fee is not appropriate when transitioning off of UNE-P to a UNE-L for this transition period.

Issue 9. Post Transition Period Rates for ULS or UNE-P

The parties dispute the appropriate charge for ULS or UNE-P if the CLECs fail to submit orders to transition their respective embedded base of ULS/UNE-P customers to an alternative serving arrangement in a timely manner. n7 SBC has proposed that it charge market-based rates, [*32] which it defines as the Local Wholesale Complete(tm) rate, which it argues is available in the market and is service closest to the UNE-P.

n7 Language to which the parties have agreed states that a delay in transfer past the end of the transition period caused by SBC will result in a price for ULS or UNE-P in the pricing schedule plus $ 1.00.

SBC argues that the Joint CLECs' position, that SBC should convert lines for which the CLEC has failed to request alternative arrangements to "Total Service Resale" rates, is not appropriate. First, SBC argues that, as the wrongdoer, the CLEC should not be permitted to choose its own consequences. If the CLEC desires to convert its embedded customer base to resale, it is free to do so, submitting the necessary orders to accomplish that before the end of the transition period. Second, SBC argues, the Joint CLECs' proposal is unworkable. SBC states that it cannot convert all of the features on a UNE-P account to a resold account, because resold lines can only contain those offerings [*33] or features that SBC offers on a retail basis. CLECs may offer features to their retail customers that SBC does not offer, and are thus not available on a resold basis. SBC asserts that its market-based UNE-P replacement alternative does not have this problem.

The Joint CLECs argue that SBC's proposal would allow the company to unilaterally implement "market pricing" -- an ambiguous term that creates risk and uncertainty in business planning. They argue that the FCC balanced the economic impact of the transition for CLECs and ILECs and created economic impacts that would be predictable and unaffected by gamesmanship on either side. The Joint CLECs contend that their proposed language is consistent with the FCC's objectives as well as public policy.

The Joint CLECs state that if, for whatever reason, a CLEC's embedded base of ULS/UNE-P arrangements have not been fully migrated to alternative arrangements or disconnected at the end of the 12-month transition period, SBC should restate those in-place arrangements at Total Service Resale, the retail price of the service minus the wholesale avoided cost discount, rather than market-based rates that SBC proposes. The Joint CLECs argue that [*34] it is appropriate to reject the market-based pricing because it is SBC that implements the final steps necessary to complete the migration of the CLEC's customers to an alternative service arrangement. They argue that providing SBC an economic reward for not completing a migration in a timely fashion provides the wrong incentives.

Moreover, the Joint CLECs argue, because there is no market for UNE-P or mass market ULS, the concept of a market-based rate is fiction. Thus, adopting SBC's proposal, the Joint CLECs argue, would adopt an unknown rate based on a non-existent market. In fact, the Joint CLECs argue, SBC has not proposed a rate, while the resale rate has been established by the Commission.

The Joint CLECs argue that their proposal will fully compensate SBC for the service provided. They argue that there is no dispute that the components of the service the customer receives before March 11, 2006 are the same service components the customer would receive on and after March 12, 2006, unless the customer is migrated to an alternative service arrangement. They argue that if SBC had completed the migration to resale service, it would be entitled only to the resale rate established [*35] by the Commission.

The Commission finds that the parties should diligently work to achieve the transition required by the FCC's orders on time. To that end, the Commission directs all CLECs to provide SBC with a transition plan no later than October 20, 2005. SBC shall file a report by November 21, 2005, listing the CLECs for which they have worked out a transition plan consensus. Unreasonable delay on any party's part may be considered a dispute that may be brought before the Commission after any interconnection agreement dispute resolution procedures have been completed. However, should the transition not be completed by the transition period end date, the Commission is persuaded that the process and billing proposed by SBC should be implemented. SBC has every incentive to expeditiously transition the CLECs away from UNEs. Its language does not interfere with that incentive in the least. If SBC causes a delay past the end of the transition period, although the CLEC has submitted a timely order, a much lower rate will apply, as provided in the agreed language. If a CLEC fails to provide the required plan and to facilitate transition, SBC may charge that CLEC for local wholesale complete [*36] (LWC) at the end of the transition period should the transition not be completed on time.

Issue 10. Rates for Converted Loops During the Transition Period

The Joint CLECs proposed language for Section 2.1.4, which provides that, unless the CLEC requests or agrees otherwise, the FCC-established transition rate for UNE-P should apply to the CLEC's entire embedded base of UNE-P customers until the end of the transition period, even after those lines are converted to a new arrangement prior to the end of the transition period. In this manner, the Joint CLECs argue, the conflict between the CLEC's desire to retain the transition rate during the entire 12-month period and the ILEC's desire to begin the UNE-P transition sooner than the end of the transition period may be resolved. In the Joint CLECs' view, this proposal would support accomplishing an orderly transition envisioned by the FCC, because it would eliminate financial incentives for either party to push the limits.

The Joint CLECs argue that the FCC carefully delineated the functional from the financial aspects of the transition. By eliminating dysfunctional incentives on both sides, the Joint CLECs argue, the FCC promoted [*37] its goal of encouraging the parties to reach commercial agreements expeditiously.

Moreover, the Joint CLECs argue, the FCC's rules support the existence of a full 12-month transition period for rate purposes. They argue that in 47 CFR 51.391(d)(2)(ii) and (iii), the FCC broke the nexus between the operational and economic aspects of the transition, by the phrase ". . . notwithstanding paragraph (d)(2)(i) of this section. . . ." They argue that SBC's proposal to charge a different, higher rate for a functionally equivalent service arrangement prior to the end of the transition period is "directly at odds with" the FCC rule and the FCC's stated intent to foster an orderly transition process.

SBC argues that under the Joint CLECs' proposed Section 2.1.4, the FCC's prescribed transition rate for the embedded base of UNE-P/ULS would continue to apply through March 11, 2006, even if the transition to a different configuration should occur sooner, unless the CLEC requests otherwise. SBC takes the position that the Joint CLECs want to pick and choose what rates they pay after the "unlawful UNE-P service has been discontinued." SBC brief, p. 26.

SBC points out that the FCC adopted a transition [*38] plan providing over a year to enable CLECs to move from ULS/UNE-P to alternative serving arrangements. It states that many CLECs have taken their obligations to transition seriously and have either already converted their embedded base to other arrangements or have plans in place to do so. It asserts that the FCC's intention was not to create an opportunity for CLECs to wait until March 10, 2006, before seeking to flash cut their UNE-P lines to other arrangements. Equally, SBC asserts, the FCC did not intend that the parties pretend that all conversions will take place on March 10, 2006 for purposes of applying rates, assuming that those conversions are to alternatives offered by SBC. In SBC's view, the Joint CLECs' proposal would disadvantage those CLECs that have already transitioned their customers to lawful serving arrangements and would "favor those CLECs who want to play games." SBC brief, p. 27. Moreover, SBC argues, the proposal would be impossible to administer and is inconsistent with the *TRRO* transition mechanism.

Additionally, SBC argues, the proposal would require SBC to bill different rates to a single CLEC for exactly the same offering. If a CLEC determined to transition [*39] its embedded customers to resale, for example, SBC would be charging that CLEC the UNE-P transitional rate or the resale rate for the same services, dependent only upon whether the line was transitioned to resale rather than a new connection. SBC asserts that this proposal would require manual billing adjustments for every transitioned line.

The Commission is persuaded that SBC should continue charging CLECs the transition charge until the end of the transition period, once the CLEC has converted its lines to another service, unless other terms have been negotiated be-

tween those parties. The Commission emphasizes that it is in the interest of all industry participants to manage their affairs in such a manner as to contribute to the orderliness of the transition. The Commission finds that a balanced reading of the *TRRO* justifies the requirement proposed by the Joint CLECs. Therefore, the Commission concludes that the language proposed by the Joint CLECs should be adopted.

Issue 11. This issue has been resolved by the parties.

Issue 12. Limit on Obtaining DS1s as UNEs

The Joint CLECs state that the parties agree that CLECs are limited to 10 DS1 transport circuits on [*40] a route for which DS3 transport is not available, and to 12 DS3 transport circuits on any route. However, the Joint CLECs argue, SBC's language fails to restrict these limitations to wire centers where CLECs are deemed to be non-impaired without access to DS3 transport. They state that the intent of the limit on DS1s is to prevent a CLEC from evading the elimination of DS3 transport UNEs by ordering large numbers of DS1 circuits instead. They argue that where DS3 transport is available, there would be no rule to evade, and any CLEC request for DS 1 circuits rather than DS3 circuits should be presumed legitimate. The Joint CLECs quote from paragraph 128 of the *TRRO* as follows:

> *Limitation on DS1 Transport.* On routes for which we determine that there is no unbundling obligation for DS3 transport, but for which impairment exists for DS1 transport, we limit the number of DS1 transport circuits that each carrier may obtain on that route to 10 circuits. This is consistent with the pricing efficiencies of aggregating traffic. While a DS3 circuit is capable of carrying 28 uncompressed DS 1 channels, the record reveals that it is efficient for a carrier to aggregate traffic at approximately [*41] 10 DS1s. When a carrier aggregates sufficient traffic on DS 1 facilities such that it effectively could use a DS3 facility, we find that our DS3 impairment conclusions should apply.

*Id.*

The Joint CLECs argue that paragraph 128 of the *TRRO* clarifies that the cap only applies when DS3 transport is not available as a UNE. It argues that notwithstanding the omission of that explanation in the FCC's rules, the FCC order has the force and effect of law, and the rules must be read in conjunction with the rest of the *TRRO*. It urges the Commission to adopt the position of the New York Public Service Commission on this issue and adopt the Joint CLECs' proposed language for Section 3.1.4.1.

SBC argues that the Joint CLECs' proposal is inconsistent with the *TRRO* and the FCC's rules. It states that 47 CFR 51.319(e)(2)(ii)(B) provides:

> A requesting telecommunications carrier may obtain a maximum of ten unbundled DS1 dedicated transport circuits on each route where DS1 dedicated transport is available on an unbundled basis.

*Id.*

SBC argues that this cap is not dependent upon whether DS3 transport is available as a UNE. It states [*42] that the FCC determined that a CLEC should purchase DS3s or comparable facilities once it reaches the cap on DS1 circuits. SBC argues that the manner in which the DS3 facility is offered is irrelevant.

Furthermore, SBC argues, the Joint CLECs' proposal would permit a CLEC to obtain the DS3 from SBC at TELRIC rates, rather than access rates, whenever DS3 is available as a UNE. In SBC's view, the Joint CLECs' proposal would lead to subversion of the FCC's non-impairment determinations by allowing a CLEC to order an unlimited number of DS1 transport circuits in order to avoid hitting the DS3 dedicated interoffice transport cap.

The Commission finds that SBC has the more persuasive argument. In the Commission's view, the Joint CLECs' argument ignores the meaning of the last sentence of paragraph 128 of the *TRRO*, and fails to take into account P 181 and fn 489 of the *TRRO*. When DS3s are available, the CLEC may not purchase more than ten DS1s. DS3s are available for transport between wire centers of which one must be a Tier 3, the least competitive classification of wire center. If in

the wire centers in which DS3s are available, a CLEC has traffic requiring more than ten DSls, [*43] it may efficiently employ DS3 transport. Therefore, the Commission concludes that the provisions of 47 CFR 51.319(e)(ii)(B) are consistent with the discussion in the *TRRO* on this issue, without the Commission inserting additional, limiting language as suggested by the Joint CLECs.

Therefore, the Commission finds that the Joint CLECs' proposed language should be rejected for Section 3.1.4.1.

Issue 13. Charges to Transition the Embedded Base of High Capacity Loops.

SBC points out that this dispute is essentially the same as the dispute in Issue 8, addressed earlier. The Joint CLECs state that this issue is essentially the same as Issue 29. The Commission finds that this issue is similar to both Issues 8 and 29, and concludes that these issues should be resolved consistently with one another. In Issue 8, the Commission adopted the Joint CLECs' proposed language, and admonished SBC not to impose charges for work that is not necessary to complete the conversion. As noted by the FCC, much of the change is merely a billing function. The language proposed by the Joint CLECs is adopted.

Issue 14. Updating List of Non-Impaired Wire Centers [*44]

SBC proposes language for Section 4.1.1.1 that SBC contends will permit it to update the list of non-impaired wire centers as relevant changes occur. It argues that the Commission should reject the Joint CLECs' proposal to limit SBC's ability to update to once every six months. SBC argues that the only purpose served by the Joint CLECs' proposal is to prevent SBC from obtaining relief to which it is entitled under federal law.

Moreover, SBC argues, as a practical matter, SBC cannot update its non-impaired wire center list based on business line counts more frequently than once annually, because the business line counts depend upon ARMIS 43-08 data that is only produced on an annual basis. On the other hand, SBC states, the count of fiber-based collocators may change more frequently, and, it argues, there is no basis to prevent SBC from reflecting those new collocators. It states that given the cost to update the fiber-based collocator counts, SBC would not likely perform this more frequently than once per quarter.

SBC complains that an arbitrary six-month limitation would enable CLECs to game the system by turning up new fiber-based collocations immediately after an update in order [*45] to obtain an additional six months of access to unbundled high capacity circuits to which they should not be entitled.

The Joint CLECs argue that the *TRRO* did not discuss a time frame for additional wire center updates. They contend that it is important that the updates occur in a structured manner so as not to unduly disrupt end users and to permit CLECs to develop and follow business plans in an appropriate manner.

The Commission finds that the Joint CLECs' proposed language should be adopted. There is no requirement in the *TRRO* concerning this issue, but as SBC has conceded that it would not be updating the list any more frequently than once per quarter, the Commission finds that once in a six-month period should be not be unduly burdensome to the ILEC. The Commission is not persuaded that the tactics SBC envisions are likely to occur. Certainly, there are more important factors for considering when to implement a fiber-based collocation than when the last update to the count was done.

Issue 15. Issue 15 has been resolved by the parties.

Issue 16. Time Limits on Self-Certification

SBC states that Sections 4.1.1.4, 4.1.1.6, and 4.1.1.0 address the process by [*46] which impairment decisions are made with respect to any wire center that may be currently listed as impaired, but may become unimpaired. It states that the FCC was silent as to the process by which future additions to the list of unimpaired wire centers should be accomplished. SBC argues that it has proposed a straightforward process that begins with its notifying CLECs of additional designations of unimpaired wire centers by Accessible Letter and by posting on line. For the next 30 days, SBC states, it will continue to accept and process orders for the affected high capacity loops or transport even without CLEC self-certification. Its proposal further provides CLECs 60 days after issuance of the Accessible Letter to self-certify that it is entitled to obtain the affected loops or transport as a UNE. If it does not self-certify, the CLEC will be required to transition the affected high capacity loops or transport. If the CLEC does self-certify within 60 days, the parties will follow the dispute resolution process set forth in the Commission's March 29, 2005 order.

In contrast, SBC argues, the Joint CLECs' proposed language would impose no time limits on their ability to self-certify. [*47] Because, SBC argues, any CLEC self-certification would effectively permit all CLECs to order high capacity circuits in that wire center, the possibilities for abuse are obvious. This is particularly evident, SBC argues, in the self-certifications that were later withdrawn without the Commission having an opportunity to rule on the issue. SBC argues that such a provision would result in a complete frustration of the self-certification process.

The Joint CLECs argue that the FCC did not limit when self-certification should be provided by the CLEC. They contend that a CLEC may have a valid business reason to self-certify only at some time after 60 days from issuance of the Accessible Letter.

The Joint CLECs further contend that SBC will not be prejudiced by permitting self-certifications more than 60 days after the issuance of an Accessible Letter. They state that if a CLEC does not self-certify within 60 days, the CLEC would have to transition the circuits it then has off of UNEs, regardless of a subsequent self-certification. However, a CLEC might still self-certify for new loop and transport orders in a wire center for which SBC had issued an Accessible Letter more than 60 days prior. [*48] In this manner, the Joint CLECs argue, the Commission will preserve a CLEC's ability to self-certify at a later date, when it might have a business reason sufficiently significant to justify the time and expense of self-certification and defending SBC's challenges to that self-certification. Moreover, the Joint CLECs point out that such later self-certifications would be available only for wire centers for which the Commission has not made a prior determination that the wire center is unimpaired.

Finally, the Joint CLECs argue that the Commission should adopt their proposal because it would prevent unnecessary litigation that will arise should the CLECs be forced to litigate matters where their present business needs do not economically justify the resources necessary to do so.

The Commission is persuaded that there should be no express time period after which a CLEC may not challenge the ILEC's designation of a wire center as unimpaired by self-certification. To establish such a deadline would encourage the ILEC to designate wire centers as unimpaired prior to there being significant activity within the wire center. Without significant activity, there is small likelihood that a CLEC [*49] would consider spending the time or resources to challenge the designation. Should the abuse of process that SBC fears occur, SBC could object to granting the withdrawal and dismissing the proceeding. At that juncture, the Commission could choose not to permit the withdrawal of the issue of whether a particular wire center is unimpaired. Thus, SBC need not be unduly prejudiced by this resolution.

Moreover, the Commission notes the Joint CLECs' assertion that SBC will not endure the negative results it fears because when a CLEC has failed to self-certify within 60 days, it must transition its lines away from UNEs despite any future self-certification. The Joint CLECs do not cite the language that they believe requires this result, but the Commission agrees that that result should occur. The parties are directed to include language that reflects the Joint CLECs' assertions in this respect.

Issue 17. Transition Time for Subsequent Unimpaired Designations

This issue concerns the appropriate amount of time within which a CLEC must transition from UNEs to other arrangements once a wire center has been designated as unimpaired and the period for self-certification has expired without [*50] any CLEC submitting a self-certification to obtain high capacity loops and transport. The resolution of this issue will determine the appropriate language for Section 4.1.1.5.

SBC proposes that CLECs have 90 days after SBC designates an office as unimpaired (assuming no self-certification is made). In contrast, the Joint CLECs propose 12 months for high capacity loops and DS1 and DS3 dedicated transport and 18 months for dark fiber dedicated transport.

SBC argues that the Joint CLECs' proposal violates the *TRRO* and maintains that there is no rational basis for allowing CLECs to continue to purchase high capacity loops and transport as UNEs for up to 18 months after a determination that they are not impaired without access to such loops and transport. SBC argues that CLECs have alternative means to serve their customers, including access services. In SBC's view, the CLECs should not be entitled to the lengthy periods adopted by the FCC for post transitional period designations. SBC argues that these later determinations will not create the same "significant changes to the regulatory framework for high capacity loops and dedicated transport," because the CLECs have now had ample [*51] notice of the coming change. SBC brief p. 33.

The Joint CLECs take the position that the FCC's analysis and conclusions in the *TRRO* should apply to any subsequent wire center designation to support setting 12- and 18-month time frames for transitioning off UNEs in a newly designated wire center. They argue that the FCC determined that "the twelve-month period provides adequate time for

2005 Mich. PSC LEXIS 309, *

both [CLECs] and [ILECs] to perform the tasks necessary to an orderly transition, including decisions concerning where to deploy, purchase, or lease facilities." *TRRO*, P 144.

The Joint CLECs argue that SBC has not presented any reason to justify its proposed greatly shortened transition time frame. In fact, the Joint CLECs argue, they still consider the FCC's time line to be too short, but are willing to compromise to offer its proposed contract term. Moreover, they argue that they have offered to pay a 15% increase for UNEs during the transition period to mirror the transition terms imposed by the FCC in the *TRRO*. They contend that the FCC has repeatedly found that sufficient transition periods are necessary to avoid "flash cuts," which are disruptive to carriers and their customers. They [*52] insist that the 12- to 18-month time periods are necessary, because the CLECs will have to make the same types of adjustments when loop and transport UNEs are eliminated in the future as they do for the current transition. They note that the work that must be performed to self provide or lease facilities are the same as for wire centers that were the subject of the *TRRO*. The Joint CLECs state that weather uncertainties and unforeseen delays in available facilities make it hard to believe that conversions for multiple CLECs in a given office, can take place 30 days from the end of a 60-day notice period as SBC proposes.

The Commission is persuaded that the Joint CLECs' proposed language should be adopted after modification to provide 9 months for transitioning high capacity loops and transport and 12 months for transitioning dark fiber transport. In the Commission's view, this renders the Joint CLECs' proposal reasonable. The Commission finds that SBC's proposal is not reasonable, because it creates a time frame that is too tight for conducting an orderly transition away from UNEs. Further, although the Joint CLECs state in their brief that they are willing to pay a 15% increase [*53] during the transition period, they do not cite the contract language that would include that offer. The Commission finds that the parties should agree on language that will provide for the CLECs to pay a 15% surcharge on those services during the transition period. Moreover, the Commission finds that the parties should develop language to which they can agree that does not require SBC to provision new (not ordered prior to the transition period) high capacity loops and transport or dark fiber transport during the transition period. The language proposed by the Joint CLECs appears ambiguous.

Issue 18. Transition for High Capacity Loops and Transport

SBC argues that the language proposed by the Joint CLECs suggests that SBC may not charge for cross connects until the date of conversion of the high capacity loop. The Joint CLECs argue that their proposed language is intended to require minimizing the disruption to customers during the transition. SBC says it will minimize disruption to customers without the Joint CLECs' language. The arguments in the parties' briefs seem to miss each other.

In their reply brief, the Joint CLECs argue that if SBC's reading of the agreed to language [*54] in Section 4.3 is consistent with SBC's statement on page 35 of its brief, then the Joint CLECs no longer insist on their chosen wording.

The Commission concludes that the language proposed by SBC should be adopted, with the understanding that the contract language will not be interpreted in a manner inconsistent with SBC's statement on page 35 of its brief in this case.

Issue 19. Redundancy

In certain circumstances, customers desire redundant facilities for the sake of reliability. The dispute in this issue is how to price the facilities for service to a building served by two wire centers, only one of which is impaired, when the building is physically located in the serving area of the unimpaired wire center.

SBC argues that its proposed language actually imposes obligations on SBC beyond those required by the current unbundling rules. SBC cites the requirement that it must provide unbundled "access to DS1 and DS3 loops to any building not served by a wire center' meeting the FCC's non-impairment thresholds." SBC brief, p. 35. Thus, SBC reasons, it is not required to provide such access to any building that is served by a wire center that meets the applicable standard for [*55] an unimpaired wire center, despite whether that building is served by another wire center as well. SBC states that it offered to permit CLECs to obtain unbundled access to DS1 or DS3 loops to any building that is physically located in the serving area of an impaired wire center. SBC states that although its offer goes beyond the strict requirements of the rules, SBC believed it to be consistent with the intent of the rules and with the FCC's loop impairment determinations, which are based in part on the likelihood that fiber facilities will be deployed in a geographic area served by a particular wire center.

However, SBC argues, the Joint CLECs' proposed language is contrary to both the rules and the loop impairment analysis in the *TRRO*. It argues that the FCC has determined that CLECs are not impaired without access to high capacity loops when a building is served by a wire center that is not impaired.

The Joint CLECs argue that their proposed language would permit a customer to retain redundant service when the building is located in a serving area of an unimpaired wire center, but is served using both an impaired and an unimpaired wire center.

The Commission finds that the [*56] language as proposed by SBC should be adopted for the interconnection amendment. The FCC's orders and the rules identify the serving wire center as the determinant for whether unbundled high capacity loops are available. The Commission approves of SBC's proposal to permit that access where the building is located in the serving area of the impaired wire center. However, it cannot and will not require SBC to provide unbundled high capacity loops to a building located in the serving area of the unimpaired wire center. Contrary to the Joint CLECs' assertions in its reply brief, this finding does not prevent customers from obtaining redundancy, although it may affect the method and cost for the CLEC to provide it.

Issue 20. Advance Notice for Wire Centers Approaching FCC Thresholds

The Joint CLECs propose language for Section 4.8 that would require SBC to post on a quarterly basis information advising when it believes a wire center has reached 90% of the number of business lines needed for the wire center to be classified as a Tier 1 or Tier 2 wire center, and to specify which wire centers it considers to have 2 or 3 fiber collocators. The Joint CLECs argue that because SBC certainly [*57] keeps track of this information, it is reasonable for SBC to share the information with CLECs for planning purposes.

SBC argues that the Joint CLECs' proposed language would impose a significant and impossible burden on SBC, and would require SBC to divulge highly confidential, competitively sensitive information. Moreover, SBC argues, it cannot provide business line information on a quarterly basis because it uses ARMIS data that is available on an annual basis.

Moreover, SBC argues, it incurred significant expense to physically inspect wire centers to determine the locations that met the FCC's threshold for non-impairment. It did not inspect all of its wire centers, only those that it believed were substantially likely to meet that threshold. SBC states that it has not performed the work necessary to determine the number of fiber-based collocators present in each wire center. Thus, it argues, the Joint CLECs would require a substantial amount of work without any offer to compensate SBC for its trouble.

The Commission is not persuaded that the Joint CLECs' proposed language should be adopted. There is no requirement that SBC provide this information, it does not have the information [*58] on the timing that the Joint CLECs seek, and SBC should not be required to gather it without compensation to support the planning activities of the CLECs. Moreover, the result reached on Issue 17 should provide the CLECs with sufficient time to deal with newly declared unimpaired wire centers.

Issue 21. Commingling

The Joint CLECs proposed language for Section 5.1 that would require SBC to provide a commingling arrangement if SBC or any "SBC RBOC" n8 affiliate provides the commingled arrangement to a CLEC anywhere in the United States. The Joint CLECs argue that if an SBC affiliate provides a particular commingled arrangement, that would demonstrate the technical feasibility of that arrangement, and Michigan CLECs should be able to purchase the same. n9

n8 RBOC refers to "regional Bell operating company."

n9 Commingling refers to instances in which a CLEC wishes to connect a UNE or combination of UNEs with a facility or service that SBC offers at wholesale.

The Joint CLECs argue that SBC has provided similar [*59] lists of available commingled arrangements in states such as Texas and Missouri. Also, the Joint CLECs assert, SBC has indicated its desire to use the Michigan baseline document as a baseline for negotiations and discussions in Illinois and Ohio. Thus, they argue, SBC is capable of having

processes or developing similar processes across its RBOC operating areas. In its reply brief, the Joint CLECs state that any SBC claim to differences between RBOCs is not based on any testimony and is, therefore, unfounded and speculative.

The Joint CLECs argue that if their proposed language is not approved, they will be required to use the bona fide request (BFR) process, which they argue is time-consuming and expensive, in situations in which BFRs should not be needed. Unnecessary use of the BFR process, they argue, will increase costs for CLECs and impose time barriers, both of which will impede competition.

SBC argues that commingling is available in instances where a CLEC wishes to connect a UNE with a facility or service that SBC offers at wholesale. In SBC's view, the Joint CLECs' proposed language would require SBC to offer commingling even if SBC does not offer the particular facility [*60] or service that the CLEC wishes to commingle. SBC asserts that there can be no duty to offer commingling if SBC does not offer the wholesale service that a CLEC seeks to commingle.

The Commission is not persuaded that the Joint CLECs' position must be adopted. In its reply brief, SBC states it initially announced the available processes for commingling that were consistent across all of the states in the Midwest region (Illinois, Indiana, Michigan, Ohio, and Wisconsin). However, there were regional differences between the processes that were available because those processes had to account for the regional differences between the various SBC affiliates. SBC commits that it will not develop a process that supports offerings available to CLECs in Michigan and declines to offer it to Michigan CLECs. Additionally, should SBC fail to honor that commitment, the CLECs may challenge a refusal in an appropriate case. Therefore, the Commission finds that SBC should be able to provide in Michigan any commingling available within SBC's midwest region, consistent with the ILEC's own assertion. The parties shall include language to reflect this finding.

Issue 22. Special Access Tariffs

a. [*61] Termination Penalties

The dispute for this issue manifests itself in the Joint CLECs' proposed language for Sections 4.9 and 5.8 of the amendment. The Joint CLECs note that for situations in which a CLEC is forced off of DS1 and DS3 high capacity loops, a CLEC may incur early termination penalties for disconnecting related special access or collocation arrangements that are no longer useful without the high capacity loops. They argue that any termination penalties SBC may impose on the disconnecting CLEC in such a situation must be limited to a reasonable amount. In Section 4.9, the Joint CLECs propose language that limits any early termination penalty to the price differential between the tariff term and the actual term of the service or facility, except for special construction collocation and transport. n10 In the Joint CLECs' view, this proposal is a compromise between no termination penalties and the penalties that might be imposed pursuant to tariff provisions.

n10 For example, the CLECs state, if the tariff term is 48 months, was billed at $ 300 per month, the circuit was working for 24 months, and the 24-month rate is $ 200 per month, the CLEC would pay $ 2400 (months remaining times rate for shorter period). Any partial months would be paid at the lower tier rate.

[*62]

SBC argues that the Joint CLECs have proposed abrogating SBC's rights under tariff and contract for access services by eliminating or reducing termination liabilities under those agreements or tariffs in the event a wire center is determined to be non-impaired for high capacity loops or transport. Further, SBC argues that this proceeding is to resolve interconnection disputes arising out of Section 251 and Section 252 of the federal Act, the *TRO*, the *TRRO*, and related FCC orders. In SBC's view, there is no basis to interject into this proceeding issues concerning services that are provided under SBC's tariffs or contracts for access services. It explains that SBC's access tariffs mirror its federal tariffs. Thus, SBC argues, the Joint CLECs are attempting by arbitrated contract to alter the ILEC's federal access tariffs. SBC argues that the Commission has no authority to grant the CLECs' request. Moreover, SBC argues, the Commission has no authority to modify contractual termination charges arising out of term contracts for interstate access service.

Furthermore, SBC argues, the Joint CLECs' proposal is effectively a collateral challenge to the Commission's June 26, 2004 order [*63] in Cases Nos. U-13977 and U-14175. SBC further states that Section 310 of the Michigan Telecommunications Act (MTA), MCL 484.2310 permits the parties to enter into arrangements that differ from the tariffs. If

the parties cannot agree, SBC argues, an application must be filed pursuant to Section 204 of the MTA, MCL 484.2204, which has not happened in this case.

In its reply brief, SBC responds to the Joint CLECs' argument that SBC is the cause of the wasted facilities, and therefore, should not be permitted to profit from early termination penalties. SBC argues that the Joint CLECs' position is absurd. In SBC's view, the federal Act imposed on SBC the obligation to provide UNEs. What is actually required under the act has been litigated by many parties, determined by the FCC, and adjusted in the courts. SBC argues that the CLECs were aware of the possibility that the FCC would determine that CLECs are not impaired without access to certain UNEs when they made the business decision to enter into long term agreements, and receive the consequent benefits. SBC asserts that there is no factual or legal basis [*64] for the Commission to void those contractual commitments. Moreover, to permit CLECs to avoid the consequences of their decision to enter into long term agreements, would discriminate against every other CLEC that did not agree to a longer term in order to minimize their potential exposure.

The Commission concludes that it should adopt SBC's position on this issue. Special access is not a service generally covered by interconnection agreements, because it is not required or provided pursuant to 47 USC 251(c)(3). Further, the Commission is not aware of any FCC determination that CLECs should be relieved of contract terms for special access, based on the changes wrought to the industry in the *TRO* and the *TRRO*. If a CLEC needs assistance with obtaining agreeable terms for access services, they may pursue that desire using the appropriate channels. However, the Commission is not in a position to void long term contractual commitments the CLECs made. Therefore, the Commission rejects the language proposed by the Joint CLECs on this issue.

b. Notice of Access Tariff Changes

In Section 5.8 of the amendment, the Joint CLECs propose additional language [*65] that would require SBC to provide 60 days' prior notice of any proposed change to its access tariffs that eliminates the availability of a product "that would restrict or impact the availability or provisioning of commingled arrangements under this attachment or the Agreement." Section 5.8. The Joint CLECs seek to add to that requirement a requirement that SBC "grandfather in place commingled arrangements that have been ordered prior to the access tariff effective date." *Id.*

SBC's brief argument references its response to the Joint CLECs' proposal for Section 4.9, and essentially relies upon its argument that the Michigan tariffs mirror the FCC tariffs in all respects. In its reply brief, however, SBC argues that the CLECs should receive the same notice that every other access customer receives in accordance with the FCC's rules and SBC's federal access tariffs. It argues that the Joint CLECs' request for preferential treatment is discriminatory and beyond the scope of this proceeding. It notes that all customers using an access service would be affected if it were phased out, not just a CLEC.

The Commission is persuaded that SBC's position should prevail on this issue for the [*66] same reasons that the Commission reached its conclusion in subsection a. of this issue.

Issue 23. Audit Procedures -- Challenge

In order to obtain certain elements and combinations of elements, a CLEC must self-certify that it meets the appropriate criteria to obtain those elements. To police the self-certification, the ILEC has the right to employ an independent auditor. In Section 6.3.8.4 of the amendment, the parties dispute whether the CLECs should pay disputed amounts into escrow if an auditor determines that a CLEC is not in compliance and the CLEC disagrees with the conclusions of an auditor's report.

The Joint CLECs propose that the parties should resolve disputes concerning the auditor's report, without requiring the CLEC to pay the disputed amount, until the Commission has had an opportunity to rule on the issue.

In their brief, the Joint CLECs state that no payment should be required until after a decision approving the audit result. They state that without the ability to withhold payment pending dispute resolution, the financial responsibility for invalid charges would rest upon the disputing party, which they say is contrary to the underlying interconnection agreements. [*67] They argue that no automatic payment should be required, but rather the actual damages provisions of the underlying interconnection agreement should control.

SBC takes the position that there is no basis for withholding payment once an independent auditor has determined noncompliance, even if the affected CLEC disputes the findings. It argues that noncompliance is a matter of the CLEC's misrepresentation as to its eligibility to obtain the EEL. Further, the noncompliance has not been voluntarily disclosed as inadvertent error, but has been discovered through an audit, initially paid for by SBC.

SBC argues in its reply brief that whatever the merits of permitting a CLEC to withhold payment pending a dispute, there is no basis for doing so once an independent auditor has determined noncompliance. That this places certain financial responsibility on the disputing party is, in SBC's view, appropriate and a common manner of handling a billing dispute.

The Commission is persuaded that the SBC's proposed language should be adopted for Section 6.3.8.4. At the point of an independent auditor's determination of noncompliance, SBC has already invested significant resources into determining noncompliance. [*68] It appears to the Commission that payment of disputed amounts into escrow is a reasonable method to ensure prompt payment upon Commission determination.

Issue 24. Audit Procedures -- Reimbursement

In Section 6.3.8.5, the disputed language relates to when and how much of the audit costs the CLECs must pay SBC if the CLEC has been found to have falsely self-certified its eligibility for EELs. SBC proposes that if the CLEC is found to have 10% or more of the circuits investigated noncompliant with FCC requirements, it must pay 100% of the audit costs. If noncompliance is limited to less than 10%, SBC would have the CLEC reimburse the ILEC in an amount that is in direct proportion to the number of circuits found to be noncompliant.

The Joint CLECs, on the other hand, would prefer to reimburse SBC for audits only to the extent (pro-rata) that their circuits are found to be noncompliant, as compared to the total number of all circuits leased by the CLEC which were the subject of the audit.

The Commission finds that the language as proposed by SBC should be adopted for this provision. In the Commission's view, it is a CLEC's responsibility to ensure that its circuits are in compliance [*69] with the FCC's requirements. Failure at a level of 10% or more justifies SBC's concerns and should require the CLEC to pay for the audit. A level of less than 10% failure should not result in 100% payment, but payment of costs in relation to the number of circuits found to be noncompliant, as SBC's language provides.

Issue 25 and 26. These issues have been resolved by the parties.

Issue 27. Cost Recovery for Routine Network Modifications

Routine network modifications are those modifications that SBC regularly undertakes for its own customers. SBC argues that those activities are only required where the loop or transport facility has already been constructed. Thus, SBC asserts, routine network modifications do not include the construction of new facilities, such as trenching or placing new aerial or buried cable or constructing new manholes, conduits, or terminal, or obtaining new rights of way for a requesting carrier.

SBC argues that its proposed language will permit it to impose charges for routine network modifications at the rates, terms, and conditions in the agreement's pricing schedule in instances where such charges are not included in the Commission's approved TELRIC-based [*70] recurring or nonrecurring charges. SBC argues that in its current nonrecurring charges, it does not recover costs of (1) adding an equipment base, (2) adding a doubler or repeater, including associated line cards, and (3) installing a repeater shelf, to the extent such equipment is not present on the loop or transport facility when ordered.

SBC argues that the Joint CLECs' proposal would not permit SBC to impose any charge for routine network modifications until such time as the Commission specifically authorized a charge, presumably after a contested case hearing.

The Joint CLECs argue that SBC's proposed language generally assumes that costs it will incur in undertaking routine network modifications on behalf of a CLEC are not recovered in the monthly recurring or nonrecurring charges already approved by the Commission in Case No. U-13531 for UNEs. SBC proposes to impose charges for these modifications on an individual case basis. The Joint CLECs state that, on the other hand, their proposed language assumes that because these network modifications are by definition routine, the network maintenance and re-arrangement expenses are already recovered by SBC in the monthly recurring [*71] rates it assesses for UNEs. Thus, they argue, there is no need for further charges.

The Joint CLECs acknowledge that it is difficult to envision all potential routine network modifications and state that "it is possible that some rare modification will require activities or materials other than those already accounted for in SBC's TELRIC-based rates." Joint CLECs brief, p. 76. The Joint CLECs argue that they, therefore, included the option to further negotiate, or arbitrate, rates for those circumstances in which SBC believes its costs will not be recov-

ered. The Joint CLECs state that their proposed language is intended to permit SBC to recover its costs, but prevent it from double recovery.

Moreover, the Joint CLECs argue, in previous Commission orders addressing like arguments, the Commission has found that the costs for which SBC sought to impose additional charges were already included in the approved nonrecurring and recurring charges, without need to impose additional charges. Further, the Joint CLECs state, the Commission determined that if there were any costs that were not likely to be recovered, SBC should pursue altering its methodology for its cost studies to include those [*72] unrecovered costs. The Joint CLECs go on to state that in the *TRO*, the FCC indicated that the Commission had taken the right approach.

The Joint CLECs further argue that SBC identifies three specific network modifications that it believes will require additional charges. Those activities, the Joint CLECs argue, are either routinely undertaken in the construction of a loop or transport circuit, with associated materials; is equipment routinely added to existing network infrastructure, with associated expenses recovered in maintenance or other expense factor in the annual charge factors, or recovered as a result of some other comparable equipment given that SBC's forward looking design assumed in the TELRIC studies may rely upon a technology that does not require this specific equipment. Therefore, the Joint CLECs argue, permitting SBC to impose additional charges would permit it to double-recover its costs, which the FCC prohibits. *TRO*, P 640.

The Commission finds that the language proposed by the Joint CLECs should be adopted for this issue. The costs for which SBC seeks to impose additional charges should be recovered through the charges approved in Case No. U-13531. If the [*73] charges approved in that case do not sufficiently recover SBC's costs, it may seek modification of its cost studies in an appropriate case. SBC is not permitted to unilaterally establish charges for costs that it asserts must be recovered for UNEs. The Commission notes that the record was not closed until after the *TRO* was issued, after which the Commission specifically invited SBC to modify its cost studies if necessary in light of that FCC decision. SBC chose not to modify its cost studies. The Commission will not now permit SBC to circumvent Commission review and approval of costs that should be included in the approved cost studies. The Commission has repeatedly stated that an arbitration proceeding is not the appropriate forum for review of cost studies. This proceeding has evolved into an arbitration proceeding, and fits within the rule.

Issue 28. Batch Hot Cuts

The Joint CLECs propose as essential, the inclusion of terms and conditions for batch hot cuts in this amendment. They state that the proposed language was sent to SBC on June 10, 2005, updating the language proposed on May 31, 2005, to make it closer to the language and terms the Commission approved in its [*74] June 7, 2005 order in Case No. U-14463. Those revisions, the Joint CLECs state, include an increase in the rate for batch hot cuts.

The Joint CLECs argue that the provisions for batch hot cuts should be included in the interconnection agreement because the FCC based its *TRRO* ruling that CLECs are not impaired without local switching as a UNE on the availability of batch hot cut processes. They state that the FCC recognized that the states could further refine these processes. They further argue that United States District Court Judge Marianne O. Battani's January 6, 2005 order in *Michigan Bell v Lark et al*, United States District Court for the Eastern District of Michigan, Southern Division, Case No. 04-60128 (*Batch Order*), should not prevent the Commission from arbitrating batch hot cut provisions for this amendment. In that order Judge Battani enjoined the Commission from enforcing its order in Case No. U-13891, related to batch hot cuts.

Unlike the situation in the *Batch Order*, the Joint CLECs argue, the FCC has now made the determinations concerning impairment, and no impairment determinations have been impermissibly left to the states to consider. In the Joint [*75] CLECs' view, the Commission now has ample authority to address the batch hot cut issues without seeking to enforce the enjoined order in Case No. U-13891.

The Joint CLECs argue that because batch hot cuts are required under 47 USC 251 and 271, it is appropriate that terms and conditions for providing batch hot cuts be made a part of the interconnection agreement. Otherwise, the Joint CLECs argue, SBC will argue that it has no obligation to provide batch hot cuts. Moreover, the Joint CLECs claim that SBC has a duty to provide batch hot cut processes beyond the current time of transition. In the Joint CLECs' view, this is an appropriate proceeding to address the terms and conditions with respect to an amendment for batch hot cuts. Because the Joint CLECs have proposed the only language for batch hot cuts, they argue that the Commission must adopt their proposed language and incorporate it into the amendment.

SBC argues that issues surrounding batch hot cut arrangements are already being addressed in Case No. U-14463. SBC points out that in the March 29, 2005 order in that case, the Commission directed that all filings and actions re-

garding hot cuts [*76] should be determined in Case No. U-14463. To interject hot cut issues into this proceeding, SBC argues, would be counterproductive, waste resources of the Commission and the parties, and would call into question the Commission's compliance with the *Batch Order*.

The Commission finds that it should not use this proceeding to make determinations concerning terms and conditions for batch hot cuts. Those issues are specifically relegated to being resolved in Case No. U-14463, which remains open for further mediations of hot cut issues. Therefore, the Commission adopts SBC's position on this issue and rejects the language proposed by the Joint CLECs on this issue.

Issue 29. Conversion Charges

This issue is resolved consistently with Issue 8 and 13. For the reasons stated in those issues, the Commission adopts the Joint CLECs' proposed language, and once again admonishes SBC concerning its charges.

Verizon Issues

On June 14, 2005, Verizon filed a submission concerning the joint disputed issues list. On June 24, 2005, replies to Verizon's submission were filed by TC3, TelNet, and XO. Thereafter, on June 30, 2005, Verizon filed a motion to strike the responses to its submission. [*77] By July 15, 2005, TelNet and XO had filed responses to Verizon's motion.

In its motion to strike, Verizon states that it supplied its proposed *TRO* amendment on October 26, 2004. Thereafter, Verizon states, the Commission ordered the parties to produce *TRO* amendments through a collaborative process. It notes that in the Commission's May 17, 2005 order, the Commission adopted a schedule that provided for parties to file their disputed issues list by May 31, 2005. On June 14, 2005, the parties were to file support for their positions, and on June 24, 2005, the parties could file responses to the positions of other parties. Verizon argues that the only permissible filing on June 24 were responses to other parties' June 14 statements in support of their positions on previously identified disputed issues. Further, Verizon states, TC3, XO, and TelNet were all parties to the collaborative that designed the process adopted by the Commission.

Verizon states that on May 31, the collaborative members filed their joint disputed issues list, choosing to propose changes only to SBC's proposed *TRO* amendment. No issues were filed concerning Verizon's proposed amendment. Verizon states [*78] that the Commission Staff (Staff) and Verizon repeatedly questioned whether these CLECs had any issues with Verizon's *TRO* amendment, with no responsive identification of any issues.

Now, Verizon argues, after the collaborative process is over, these CLECs want to derail Verizon's amendment. Verizon argues that the June 24 filings by the three CLECs do not respond to any material about any issue in the disputed issues list. As a result, Verizon argues, they must be stricken.

Verizon further states that TC3 correctly states that it is in the process of negotiating a *TRO* amendment with Verizon. However, Verizon states, TC3 omits the fact that Verizon has addressed TC3's desired change and that TC3 has simply not signed the revised amendment. Verizon suggests that perhaps TC3 wanted to stall to see if the collaborative process produced a better deal, but that explanation fails to identify any issue for the Commission to resolve.

Further, Verizon states, XO and TelNet argue that Verizon's amendment should not be adopted because Verizon never filed a baseline document. Verizon states that the argument makes no sense. Verizon affirms that it provided its proposed *TRO* amendment [*79] on October 26, 2004. The Commission order directing the filing of "a baseline document differentiating the language that has been agreed-upon, disputed language SBC proposes, and disputed language one or more of the [CLECs] want." May 17 order in Case No. U-14447, p. 3. Verizon asserts that before a baseline document can be created there must be issues or changes proposed to the amendment. However, Verizon states, there were no issues raised with respect to Verizon's proposed amendment, and thus, no baseline document needed to identify any disputes.

Verizon goes on to state that the reason XO opposes Verizon's amendment is the perception that it might affect negotiations in other states with Verizon affiliates. Verizon notes that XO raised no issues here because it has no issues with Verizon's amendment in Michigan.

As to TelNet, Verizon argues, the CLEC's opposition relates to Case No. U-13931, its arbitration proceeding with Verizon. Verizon alleges that TelNet hoped that a different amendment might be worked out for Verizon by the parties to the collaborative, so that it could substitute it for the amendment it negotiated with Verizon. But the collaborative did

not propose any [*80] changes to Verizon's amendment. It states that Verizon stood ready to work on any proposals the collaborative made, but none were offered.

Verizon further states that it should not be faulted for failing to propose changes to SBC's amendment. That amendment applies, by its terms only to interconnection agreements with SBC.

Finally, SBC argues, none of these CLECs identify any particular issue to be addressed by changes to the Verizon amendment. Verizon states that the consensus of the collaborative was that no changes were required to Verizon's amendment, and no disputed language issues were raised for Commission resolution. Verizon asks the Commission to confirm that the collaborative made no changes to Verizon's amendment and adopt it as the product of the collaborative. However, if the Commission is reluctant to do so, Verizon requests that the Commission should find that there is no Verizon amendment as a result of the collaborative and permit Verizon to continue negotiating with CLECs that may still require one.

XO responds that Verizon's motion to strike should be denied because the June 24 filings were responsive to Verizon's June 14 filing and properly bring to light important [*81] issues for the Commission's consideration.

TelNet argues that the Commission should deny the motion to strike. It states that Verizon's motion misleads the Commission to believe that the parties in the collaborative agreed that there would be one *TRO/TRRO* amendment for SBC and another one for Verizon. TelNet argues that the Commission should not strike the CLECs' filings on that erroneous premise, which is supported by neither the filings in Case No. U-14447 nor logic.

TelNet points out that Verizon's filing of an amendment on October 26, 2004, could not address the *TRRO*, which was not issued until February 4, 2005. TelNet states that in the Commission's March 29, 2005 order in Cases Nos. U-14303, U-14305, and U-14327, the Commission closed those dockets and directed interested parties to address the change of law resulting from the *TRO* and *TRRO* in the Case No. U-14447 collaborative. Case No. U-14327 was the docket in which Verizon filed its proposed October 24, 2004 amendment. Given the Commission's direction in the March 29 order for the parties to create four amendments from which to choose, TelNet states, there can be no illusion that Verizon's amendment remained [*82] on the table. According to TelNet, Verizon did not offer an amendment as part of that collaborative.

Moreover, TelNet argues, Verizon was a participant in the Joint Status Report filed on May 10, 2005, in which the parties to the collaborative requested a change in procedure to include submission of a joint disputed issues list, not one list for each ILEC. TelNet states that because SBC was the only ILEC that placed amendment language on the table, there is a reference to SBC's language in the request for change of procedure.

Further, TelNet asserts that there is no indication in the Commission's May 17, 2005 order that the Commission had been advised or intended that separate amendments would be approved for Verizon and SBC. TelNet argues that there is no reason that the amendment that results from the collaborative should not be applied to Verizon. TelNet reasons that the *TRO* and *TRRO* requirements are the same for both. It states that the CLEC participating in the collaborative have very divergent business plans, more divergent, TelNet argues, than the business plans of SBC and Verizon. TelNet argues that Verizon's "sandbagging and silence" should not be permitted to derail [*83] the efforts of the parties to the collaborative.

TelNet asserts that Verizon's assertion that the Staff and Verizon repeatedly asked if anyone had issues with Verizon's amendment, is an overstatement. TelNet asserts its belief that the limited discussion of Verizon's amendment occurred prior to the Commission's March 29, 2005 order in Cases Nos. U-14303, U-14305, and U-14327, in which the Commission clarified its intent that the collaborative parties should address the *TRRO* in addition to the *TRO*. TelNet goes on to state that Verizon did not urge adoption of its October 26, 2004 proposed *TRO* amendment to the collaborative after March 29, 2005. From that point forward, TelNet states, the assumption was that the collaborative was addressing specific issues raised by the *TRO* and *TRRO*, and that these issues were not carrier specific. There were no issues raised specific to Verizon because there were no issues specific to Verizon. Rather, TelNet argues, the issues being raised in the collaborative were applicable to all ILECs and CLECs in the state. It states that the fact that SBC was the only ILEC commenting on these issues should not result in the *TRO* and *TRRO* [*84] issues being decided differently for Verizon.

Accordingly, TelNet argues, the Commission should not approve Verizon's outdated amendment that does not address the *TRRO*, but rather should apply the amendment that comes out of this collaborative to all ILECs and CLECs in the state.

TelNet states that although Verizon submitted its proposed amendment in a timely fashion for submission of a joint disputed issues list, the Commission should not deem that filing to be a request for approval, as the document itself did not expressly request such approval. Moreover, XO argues, Verizon never submitted its proposed amendment for consideration by the collaborative. During the collaborative sessions, XO states, Verizon never objected to language in the baseline amendment and never expressed disagreement with any of the language contained in that baseline agreement.

It appears to the Commission that, at best, there has been a fundamental misunderstanding between Verizon and the CLECs. It appears that Verizon believed that the CLECs had no problem with Verizon's proposed amendment (its October 2004 version) and the CLECs believed that Verizon would be held to whatever the collaborative agreed [*85] to with SBC.

The Commission is not persuaded that it should impose on Verizon an amendment that was drafted with the relationship between the CLECs and SBC in mind. The language of the amendment approved today specifically refers to SBC providing facilities or billing customers, etc. Verizon is not mentioned in the amendment and the more generic term ILEC also was not used. Therefore, imposing the amendment approved for use with SBC's interconnection agreements on Verizon's interconnection agreements would present some problems.

However, the Commission is likewise unwilling to impose Verizon's proposed amendment on the CLECs who believed that they were negotiating in the collaborative for both agreements with both ILECs.

Therefore, the Commission finds that it should construct an abbreviated process for the parties to work out an amendment that can satisfy as nearly as possible, all concerned. The abbreviated process is justified because the Commission has now ruled on many issues related to the *TRO* and *TRRO*, which should make agreement easier. The Commission is not likely to reject what it has already approved or approve what it has already rejected. The Commission directs [*86] the parties to schedule collaborative meetings with the Director of the Commission's Telecommunications Division, Orjiakor Isiogu, to negotiate provisions to bring their interconnection agreements into compliance with the requirements of the *TRO* and the *TRRO*. Those meetings should begin immediately. Within 60 days, the parties shall submit to the Commission either a joint application for approval of an amendment in the docket for their respective interconnection agreements, or a double red-lined version of an amendment, with supporting briefs and documentation. If the submission is the latter, the Commission will determine which of the competing language should be approved in baseball-style arbitration.

The Commission FINDS that:

a. Jurisdiction is pursuant to 1991 PA 179, as amended, MCL 484.2101 *et seq.*; the Communications Act of 1934, as amended by the Telecommunications Act of 1996, 47 USC 151 *et seq.*; 1969 PA 306, as amended, MCL 24.201 *et seq.*; and the Commission's Rules of Practice and Procedure, [*87] as amended, 1999 AC, R 460.17101 *et seq.*

b. The interconnection agreements between SBC and the CLECs operating in Michigan should be amended as provided in this order.

c. Within 30 days of the date of this order, the parties shall submit fully executed copies of the amendment that complies with the findings of this order.

d. The parties should agree to and follow an orderly process for transition as described in this order.

e. Verizon should be permitted to negotiate with affected CLECs to come to an agreement on an appropriate amendment to their interconnection agreements pursuant to the process described in this order.

THEREFORE, IT IS ORDERED that:

A. Within 30 days of the date of this order, SBC Michigan shall submit to the Commission fully executed copies of the amendment that complies with the findings and conclusions of this order. The parties shall agree to and follow an orderly transition process, as provided in this order.

B. Within 60 days of the date of this order, Verizon North Inc. and Contel of the South, Inc., d/b/a Verizon North Systems and TC3 Telecom, Inc., TelNet Worldwide, Inc., XO Communications Services, Inc., and any other competitive local exchange carrier [*88] that has an interconnection agreement with Verizon shall file a fully executed copy of an amendment for approval in the appropriate dockets or follow the alternative process outlined in this order.

The Commission reserves jurisdiction and may issue further orders as necessary.

2005 Mich. PSC LEXIS 309, *

Any party desiring to appeal this order must do so in the appropriate court within 30 days after issuance and notice of this order, pursuant to MCL 462.26.

MICHIGAN PUBLIC SERVICE COMMISSION

J. Peter Lark

Chairman

Laura Chappelle

Commissioner

Monica Martinez

Commissioner

By its action of September 20, 2005.