<u>**2005 Tennessee 271 Order,**</u>
**2005 Tenn. PUC LEXIS 332, at \*55-77**

LEXSEE

IN RE: PETITION FOR ARBITRATION OF ITCDELTACOM COMMUNICATIONS, INC. WITH BELLSOUTH TELECOMMUNICATIONS, INC. PURSUANT TO THE TELECOMMUNICATIONS ACT OF 1996

DOCKET NO. 03-00119

Tennessee Regulatory Utility Commission

2005 Tenn. PUC LEXIS 332

October 20, 2005

**CORE TERMS:** customer, interconnection, arbitrator, billing, switching, telecommunications, direct testimony, listing, network, loop, deliberations, carrier, fiber, collocation, arbitration, tariff, traffic, voted, directory, required to provide, rebuttal testimony, deposit, dark, unbundled, post-hearing, unanimously, regulation, pricing, incumbent, negotiation

**PANEL:** [*1] Deborah Taylor Tate, Chairman; Pat Miller, Director; Ron Jones, Director

## OPINION: FINAL ORDER OF ARBITRATION AWARD

This matter came before Chairman Deborah Taylor Tate, Director Pat Miller and Director Ron Jones of the Tennessee Regulatory Authority (the "Authority" or "TRA"), the Arbitrators assigned to this docket, following hearings held Augusts 27-28, 2003 and September 12, 2003. The Arbitrators deliberated the issues in this docket on January 12, 2004, March 22, 2004, April 12, 2004 and June 21, 2004.

## FACTUAL AND PROCEDURAL HISTORY AND SUMMARY OF DELIBERATIONS

On February 7, 2003, ITCDeltaCom ("DeltaCom") filed a petition pursuant to Section 252(b) of the Telecommunications Act of 1996 (the "Act") requesting that the Authority arbitrate the interconnection agreement between DeltaCom and BellSouth Telecommunications, Inc. ("BellSouth") n1 BellSouth filed a response to the petition on March 4, 2003. At the regularly scheduled Authority Conference on March 3, 2003, the Arbitrators appointed General Counsel or his designee to serve as mediator for the purpose of narrowing the issues. n2 On May 12, 2003, the Arbitrators accepted the petition for arbitration, appointed the Chief [*2] of the Telecommunications Division or his designee to act as Pre-Arbitration Officer and adopted the list of 71 issues contained in the original petition. n3 As a result of mediation and continuing negotiations, the parties resolved many issues, leaving the following twenty-nine (29) issues open for resolution: 2(a), 2(b), 2(c), 9, 11(a), 21, 25, 26(a), 26(b), 26(c), 26(d), 36(a), 36(b), 37, 44, 46, 47, 56(a), 56(b), 57(a), 57(b), 59, 60(a), 60(b), 62, 63, 64, 66 and 67.

n1 *Petition for Arbitration of ITCDeltaCom Communications, Inc with BellSouth Telecommunications, Inc Pursuant to the Telecommunications Act of 1996* (February 7, 2003). The petition contained seventy-one (71) issues

n2 *Order Appointing Mediator* (May 5, 2003)

n3 Transcript of Authority Conference, pp 49-59 (May 12, 2003)

Following a round of discovery, the parties filed direct testimony on August 4, 2003 and rebuttal testimony on August 11, 2003. An up-to-date revised joint issues matrix was filed on August 15, 2003 listing all [*3] settled and unresolved issues. A hearing in this matter was held on August 27 and 28 and September 12, 2003 before Chairman Deb-

orah Taylor Tate, Director Pat Miller and Director Ron Jones acting as Arbitrators. Participating in the Hearing were Mr. Henry Walker, Ms. Nanette Edwards, Mr. David Adelman and Mr. Clay Jones representing DeltaCom and Mr. Guy Hicks, Ms. Joelle Phillips and Mr. E. Earl Edenfield representing BellSouth. During the Hearing, the Arbitrators heard testimony from the witnesses relating to all open issues.

Following the hearing, post hearing briefs were filed on October 27, 2003. On January 12, 2004, the Arbitrators ruled on all of the outstanding issues except Issues 2, 26(d), 46, 47 and 62. As to these issues, the Arbitrators ordered the parties to file Final and Best Offers ("FBOs") by January 26, 2004. Additionally, the Arbitrators requested Bell-South to provide cost data associated with Issue 46, along with its FBOs. DeltaCom was given 10 days in which to re-spond to BellSouth's cost data filing. The parties requested, and were granted, two filing extensions and filed the FBOs on February 20, 2004. DeltaCom filed its response to BellSouth's Issue 46 cost data [*4]  on March 2, 2004.

On March 22, 2004, the Arbitrators deliberated Issues 2, 46, 47 and 62, deferring consideration of Issue 26(d) until April 12, 2004 at the request of BellSouth. On April 12, 2004, the panel reconvened to rule on Issue 26(d). The Arbitra-tors deferred a decision on Issue 26(d) until 45 days after the 60 day stay of the Federal Communications Commission's ("FCC") *Review of the Section 251 Unbundling Obligations of the Incumbent Local Exchange Carriers* ("Triennial Re-view Order" or "TRO") n4 which would be June 15, 2004. On June 21, 2004, the Arbitrators reconvened and deliber-ated Issue No. 26(d).

n4 *Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers, Implementation of the Local Competition Provisions of the Telecommunications Act of 1996, Deployment of Wireline Services Offering Advanced Telecommunications Capability*, CC Docket 01-338, Report and Order and Order on Re-mand and Further Notice of Proposed Rulemaking, 18 FCC Rcd 16,978 (2003), as modified by *Errata*, 18 FCC Rcd 19020 (2003), vacated in part, *US Telecom Ass'n v FCC*, 359 F.3d 554 (D C. Cir 2004) ("Triennial Review Order" or "TRO")

[*5]
## ISSUE 2: DIRECTORY LISTINGS

**(a) Is BellSouth required to provide DeltaCom the same directory listing language it provides AT&T?**

**(b) Is BellSouth required to provide an electronic feed of the directory listings of DeltaCom customers?**

**(c) Does DeltaCom have the right to review and edit its customers' directory listings?**

### A. Position of the Parties

DeltaCom opines that it should have access to its end user customer listings in a reasonable time prior to publica-tion in the BellSouth Directory. Since BellSouth sends the listings to BellSouth Advertising and Publishing Company ("BAPCO"), DeltaCom should be able to verify that the listings have been accurately submitted. DeltaCom insists that listings of competitive local exchange carriers ("CLECs") are commingled with the BellSouth listings but distinguished by the company code. n5 These listings should be extracted prior to the release of the white page book for review. An electronic comparison of what was submitted versus what is being printed is in the best interest of both parties. Delta-Com should also be allowed to review and edit its customers' directory listings. n6

n5 Transcript of Proceedings, v 1, pp. 240-246 (August 27, 2004)

[*6]

n6 Mary Conquest, Pre-Filed Direct Testimony, p 3 (August 4, 2003)

According to DeltaCom witness Mary Conquest, DeltaCom wants to obtain an electronic file of its customer directory listing so that the listing can be automatically electronically validated. n7 DeltaCom avers that it needs to be able to validate its customer listing information electronically in order to avoid extended time and labor charges associated with manual validation. According to Ms. Conquest, BellSouth "has testified in other states that for a $ 30,000 fee that perhaps we could get these listings. We've submitted the bona fide business request. That request has been denied to us." n8

n7 Transcript of Proceedings, v I, p 225 (August 27, 2003)

n8 *Id* at 226

Ms. Conquest also states that DeltaCom would consider receiving all CLEC listings in the state and would be willing to sign a contract stating that the listings would not be used for any marketing [*7] purposes. Ideally, DeltaCom would like the listing to be filtered by an operating company. n9 DeltaCom would be willing to pay a reasonable cost based rate for that service. BellSouth has provided no supporting documents for its suggested price. n10

n9 Transcript of Proceedings, v. I, p 240 (August 27, 2003).

n10 *Id*

BellSouth asserts that DeltaCom can adopt rates, terms, and conditions for network elements, services, and interconnection from any interconnection agreement filed and approved pursuant to 47 U.S.C. § 252. BellSouth proposes that the language adopted out of an interconnection agreement be incorporated into DeltaCom's agreement for the original term of the adopted agreement. In other words, any language adopted from AT&T's interconnection agreement would only be valid for the term of AT&T's agreement. Once AT&T's agreement expires, the language in DeltaCom's interconnection agreement would revert to BellSouth's proposed language. n11 DeltaCom asserts that the [*8] BellSouth/AT&T language should apply for the entire term of DeltaCom's agreement with BellSouth. n12

n11 John A Ruscilli, Pre-Filed Direct Testimony, pp 5-6 (August 4, 2003)

n12 Mary Conquest, Pre-Filed Rebuttal Testimony, p 2 (August 11, 2003)

BellSouth avers that directory listings are not a Section 251 requirement subject to Section 252(i) and further argues that while it is required to provide access to its directory assistance database by both its agreement and its tariff, it is not required to provide an electronic feed of directory listing for DeltaCom customers. BellSouth maintains that DeltaCom has the right to review and edit its customers' listings through access to customer service records and that this issue is between DeltaCom and BAPCO, not between DeltaCom and BellSouth. Nevertheless, BellSouth witness John Ruscilli stated that BellSouth has offered to provide an electronic feed to DeltaCom for a fee. n13

n13 Transcript of Proceedings, v. III, pp. 614-615 (September 12, 2003)

[*9]

**B. Deliberations and Conclusions**

DeltaCom witness Conquest testified that the language in the AT&T contract was insufficient to satisfy DeltaCom's needs. n14 Although DeltaCom wants BellSouth to furnish an electronic listing of directory listings, AT&T does not receive such a listing currently from BellSouth. The Arbitrators found that DeltaCom has not availed itself of and does not intend to utilize language from AT&T's interconnection agreement; therefore, Issue 2(a) is moot. n15

n14 Transcript of Proceedings, v. I, pp 237, 239 (August 27, 2003)

n15 Transcript of Proceedings, p. 4 (January 12, 2004)

DeltaCom has stated that it would be willing to pay BellSouth for an electronic listing of DeltaCom customers provided that the rate is cost-based. n16 While an electronic feed of the directory listings is not a specific requirement set forth in the 47 U.S.C. § 251 or 47 U.S.C. § 252, it is related to checklist item eight in 47 U.S.C. § 271 [*10] (c)(2)(B) requiring BellSouth to provide white page listings. Ensuring the accuracy of end users' directory listings is an important customer service activity because directory books are only published once a year, and any errors may have long-term ramifications. While BellSouth affirmed that the electronic listing is technically feasible, it requested that the Authority order DeltaCom to continue negotiations regarding the appropriate rate, because the electronic listing is not an Unbundled Network Element ("UNE") required to be priced at Total Element Long Run Incremental Cost ("TELRIC") rates. n17

n16 Transcript of Proceedings, v I, p 241 (August 27, 2003)"

n17 BellSouth states, "now that DeltaCom has finally recognized its obligation to pay BellSouth to develop and provide [an] electronic feed solely for DeltaCom, the Authority should order that DeltaCom continue its negotiations with BellSouth to establish a market-based price for this new service" *See BellSouth Telecommunications, Inc Post-Hearing Brief, p* 17 (October 27, 2003)

[*11]

The Arbitrators found that it is technically feasible for BellSouth to provide an electronic feed of directory listings of DeltaCom and that DeltaCom should be able to review the listings of their customers and edit those listings for accuracy and completeness. Therefore, the Arbitrators adopted DeltaCom's position on Issue 2(b) and (c) and ordered BellSouth to provide an electronic feed of the directory listings of DeltaCom customers and allow DeltaCom to review and edit such listings of its customers. n18 Because no rate had been established, the Arbitrators ordered the parties to submit final best offers on the appropriate rate for providing the electronic listing along with the supporting basis and calculations for the rates proposed. n19

n18 Transcript of Proceedings, p. 4 (January 12, 2004).

n19 Transcript of Proceedings, pp. 4-5 (January 12, 2004)

**C. Final Best Offers**

The parties submitted FBO's for this issue on February 20, 2004. In its filing, BellSouth estimates a cost of $ 42,230 to develop a [*12] CLEC-specific product to extract directory listings from its Listing Information System ("LIST") database. In addition to this development cost, it proposes to charge DeltaCom $ .04 per listing for each listing extracted, which it states is consistent with existing BellSouth tariffs. n20

n20 *BellSouth Telecommunications, Inc's Best and Final Offers*, pp 2-3 (February 20, 2004)

In its FBO, DeltaCom offers to pay $ .04 per listing for the initial "load" of the base file of DeltaCom subscribers and $ .06 for updates (those listings which have changed). n21 DeltaCom maintains that BellSouth has the ability to withhold DeltaCom's listings from third party publishers; therefore, it should be able to carve out DeltaCom's listings to send to DeltaCom. Alternatively, it proposes to accept all directory listings subject to a limited use, non-disclosure agreement similar to that which it has executed with another Incumbent Local Exchange Company ("ILEC"). n22

n21 DeltaCom proposes that the State Commission rates found in tariff pages A 38 2 (Directory Publishers Database Service) be applied, as this is a comparable service. *See BellSouth Telecommunications, Inc's Best and Final Offers*, p 1 (February 20, 2004).
[*13]

n22 *Id*

Although there is some cost associated with providing a service that does not currently exist, BellSouth's FBO in the amount of $ 42,230 for a CLEC-specific LIST extract is not properly supported. Though BellSouth provided a break-down of costs, this break-down was limited to estimated hours converted to dollars for Accenture Expense and Accenture Softcap. n23 Accenture is a vendor that provides the text software to BellSouth. No other supporting information was provided.

n23 *Id* at 2 and Attachment No 1 (February 20, 2004).

While both parties agree on a rate of $ .04 for each listing, the tariffs BellSouth references do not contain an update rate. DeltaCom proposed a rate of $ .06 for updates. The cost BellSouth quotes to develop a CLEC-specific LIST extract can be avoided by obtaining from BellSouth all directory listing information subject to a limited use, non-disclosure agreement as DeltaCom suggests. Based on [*14] these facts, on March 22, 2004, the Arbitrators voted non-unanimously to adopt DeltaCom's FBO on the pricing issue of $ .04 per subscriber listing and $ .06 per each directory listing change update and reaffirmed that BellSouth is to provide all listings subject to a nondisclosure agreement. n24

n24 Transcript of Proceedings, p 12 (March 22, 2004).

## ISSUE 9: OSS PARITY

### IS BELLSOUTH REQUIRED TO PROVIDE INTERFACES FOR OSS TO DELTACOM WHICH HAVE FUNCTIONS EQUAL TO THAT PROVIDED BY BELLSOUTH TO BELLSOUTH'S RETAIL DIVISION?

#### A. Position of the Parties

DeltaCom states that BellSouth is required by the Act to provide Operational Support Systems ("OSS") in a non-discriminatory manner. DeltaCom avers that delays due to lack of OSS support result in DeltaCom appearing inefficient and unreliable to its customers. DeltaCom alleges that twenty defects exist in OSS, fourteen of which will not be cor-

rected until 2004 or later. n25 Meanwhile, BellSouth has reduced spending on OSS enhancements over the last three years. [*15] DeltaCom, therefore, proposes the following language in the interconnection agreement.

> BellSouth will provide to ITCDeltaCom access to all functions for pre-order that are provided to the BellSouth retail groups. Systems may differ, but all functions will be at parity in all areas, i.e., operational hours, content performance. All mandated functions, i.e., facility checks, will be provided in the same timeframes in the same manner as provided to BellSouth retail centers. n26

> n25 Mary Conquest, Pre-Filed Direct Testimony, p 4 (August 4, 2003)

> n26 *Post-Hearing Brief of ITCDeltaCom Communications, Inc*, p. 5 (October 27, 2003).

BellSouth responds that DeltaCom's proposed language is excessive and unnecessary and has the potential for abuse. n27 BellSouth asserts that the FCC and the nine state regulatory authorities in BellSouth's region have determined in all of BellSouth's 271 applications that BellSouth provides nondiscriminatory access to its OSS. The language proposed by DeltaCom exceeds the language [*16] defining nondiscriminatory access as defined by the FCC and the Authority. n28

> n27 Ronald Pate, Pre-Filed Rebuttal Testimony, p 4 (August 11, 2003).

> n28 Ronald Pate, Pre-Filed Direct Testimony, pp 9-10 (August 4, 2003)

## B. Deliberations and Conclusions

In its *Local Competition Order*, the FCC concluded that ILECs are required to provide OSS in a nondiscriminatory manner. n29 The FCC adopted a definition that includes loop qualification information as part of the ILEC OSS in the *UNE Remand Order*. n30 As such, the ILEC must provide unbundled access to OSS including loop qualification. In the Authority's review of BellSouth's Section 271 application, n31 as well as subsequent service quality measurement ("SQM") filings, BellSouth has and continues to provide access to its OSS in a nondiscriminatory manner. n32 Delta-Com's proposed language has the potential for abuse. For example, the term "operational hours" could be construed to mean that OSS must be available whenever the retail equivalent is available, [*17] ignoring a Change Control Process ("CCP") decision to the contrary. During the deliberations on January 12, 2004, the Arbitrators voted unanimously to reject DeltaCom's proposed language and determined that BellSouth's language will suffice, provided that BellSouth provides OSS in accordance with the FCC's TRO which includes loop qualification and a continuing obligation to make modifications. n33

> n29 *Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, CC Docket No 96-98, First Report and Order, 11 FCC Rcd 15499, 15514 (1996)* ("Local Competition Order")

> n30 *Implementation of the Local Competition Provisions of the Telecommunications Act of 1996, CC Docket No 96-98, Third Report and Order and Fourth Further Notice of Proposed Rulemaking, 15 FCC Rcd 3696, 3884 (1999)* ("UNE Remand Order")

> n31 *See In re BellSouth Telecommunications Inc's Entry Into Long Distance (InterLATA) Service in Tennessee Pursuant to Section 271 of the Telecommunications Act of 1996*, TRA Docket No 97-00309

n32 *See In re BellSouth Telecommunications Inc's Entry Into Long Distance (InterLATA) Service in Tennessee Pursuant to Section 271 of the Telecommunications Act of 1996*, TRA Docket No 97-00309, *Advisory Opinion to the Federal Communications Commission*, pp 27-32 (October 10, 2002)

[*18]

>

n33 Transcript of Proceedings, pp. 6-7 (January 12, 2004)


## ISSUE 11: ACCESS TO UNEs


**(a) Should the interconnection agreement specify that the rates, terms and conditions of the network elements and combinations of network elements are compliant with state and federal rules and regulations?**

### A. Position of the Parties

BellSouth asserts that the interconnection agreement should specify that the rates, terms and conditions of network elements and combinations of network elements should be compliant with federal and state rules promulgated pursuant to 47 U.S.C. § 251. If a state commission orders BellSouth to provide access to network elements pursuant to any authority other than 47 U.S.C. § 251, then, according to BellSouth, those elements should not be included in a 47 U.S.C. § 251 agreement. BellSouth suggests that those elements could be tariffed or offered pursuant to a separate agreement between the parties. n34


n34 John A Ruscilli, Pre-Filed Direct Testimony, pp 8-9 (August 4, 2003)

[*19]

While BellSouth promises to abide by any rule issued by the Authority as long as such rule is consistent with 47 U.S.C. § 251, it is concerned that the Authority might issue requirements that are outside the authority granted to it by 47 U.S.C. § 251. Because any carrier can opt into arbitrated agreements, and because these requirements could continue into perpetuity, BellSouth does not want to continue to negotiate on the state compliant issue. Nevertheless, BellSouth states that it would comply with any order issued by the Authority. BellSouth does not want interconnection agreements, whether arbitrated or negotiated, to include references specific to state law that are generated outside of 47 U.S.C. § 251. n35 BellSouth admits that references to state law may exist in some of its other interconnection agreements, but that it wants to remove them from future agreements. n36 BellSouth's post-hearing brief asserts that the TRO clarifies and reiterates that state law may not be used to impose additional unbundling requirements, and that any state action must be consistent with [*20] 47 U.S.C. § 251 and must not "substantially prevent" its implementation. n37 Furthermore, the TRO states that

In at least some instances existing state requirements will not be consistent with our new framework and may frustrate its implementation. It will be necessary in those instances for the subject states to amend their rules and alter their decisions to conform to our rules." n38


BellSouth states, "To the extent the Authority is addressing unbundling under Section 251 of the 1996 Act or pursuant to directives of the FCC, then BellSouth is amenable to adding language to that effect to the interconnection agreement." n39

n35 Transcript of Proceedings, v. III, pp 618-621 (September 12, 2003)

n36 *Id* at 625

n37 *BellSouth Telecommunications, Inc Post-Hearing Brief*, p 20 (October 27, 2003) (quoting from *TRO*, P 194)

n38 TRO, 18 FCC Rcd at 17101

n39 *BellSouth Telecommunications, Inc Post-Hearing Brief*, p 21 (October 27, 2003)

[*21]

DeltaCom believes that the interconnection agreement should specify that BellSouth's rates, terms and conditions for network elements and combinations of network elements are compliant with both state and federal rules and regulations. It argues that the Act explicitly preserves the authority of state commissions to enforce state-created interconnection obligations that are not inconsistent with the Act. DeltaCom cites 47 U.S.C. § 261(c) to support its position:

nothing in this part precludes a State from imposing requirements on a telecommunications carrier for intrastate services that are necessary to further competition in the provision of telephone exchange service or exchange access, as long as the State's requirements are not inconsistent with this part or the Commission's regulations to implement this part. n40

n40 Jerry Watts, Pre-Filed Direct Testimony, pp 11-13 (August 4, 2003) (quoting 47 U.S C § 261(c) (2001))

DeltaCom points [*22] out that the Act empowers the Authority to decide "any open issue" during arbitration, and as long as the provisions in question are not inconsistent with Section 251 and the FCC's regulations implementing that Section, the Authority has the discretion to incorporate these issues into the interconnection agreement. n41 DeltaCom states that it is hard to understand BellSouth's resistance to DeltaCom's desire to incorporate terms concerning other legitimately related services or requirements into the agreement by reference given BellSouth's desire to incorporate unilateral amendments to the interconnection agreement by reference. The terms of these services or requirements are not set by DeltaCom, but by the Authority. n42 DeltaCom takes issue with BellSouth's contention that the agreement should not reference state authority, because the TRO charges the states with establishing UNE rates and conducting the upcoming impairment analysis. n43 DeltaCom contends that BellSouth's opposition to inclusion of language requiring compliance with state law is dismissive of the TRA's authority and hypocritical in light of BellSouth's reliance on state law with regard to its position on back-billing [*23] (Issue No. 62). n44

n41 Jerry Watts, Pre-Filed Rebuttal Testimony, p 7 (August 11, 2003) (quoting 47 U S C § § 252(c)(1) (2001) and 252(e)(2)(b) (2001) in support of this position)

n42 Jerry Watts, Pre-Filed Rebuttal Testimony, pp 7-8 (August 11, 2003)

n43 Transcript of Proceedings, v I, pp 57-58 (August 27, 2003)

n44 BellSouth cites Tenn Code Ann § 28-3-109 to support its position on Issue 62

DeltaCom argues that the TRO reaffirms state authority to engage in arbitration hearings or other proceedings to ensure that UNEs are available to competitive carriers. n45 DeltaCom contends further that

Section 252(e)(3) of the Telecommunications Act clearly preserves states' authority to establish or enforce other requirements of state law in its review of an agreement, including requiring compliance with intrastate telecommunications service quality standards or requirements. n46

n45 *Post-Hearing Brief of ITCDeltaCom Communications, Inc,* p. 7 (October 27, 2003) (citing 385 and 638 of the TRO to support its position that the TRO reaffirms state commission authority).

[*24]

n46 *Post-Hearing Brief of ITCDeltaCom Communications, Inc,* pp 6-8 (October 27, 2003).

## B. Deliberations and Conclusions

The FCC has reserved for the states the authority to enforce state-created interconnection obligations as long as those obligations are not inconsistent with the Act. BellSouth implies that the Authority might create requirements that are in conflict with the Act, and it cites to the TRO in support of its position that states may not impose additional unbundling requirements that are inconsistent with 47 U.S.C. § 251. Nevertheless, the TRO specifically addresses state authority as follows:

191. Section 252(e)(3) preserves the states' authority to establish or enforce requirements of state law in their review of interconnection agreements. Section 251(d)(3) of the 1996 Act preserves the states' authority to establish unbundling requirements pursuant to state law to the extent that the exercise of state authority does not conflict with the Act and its purposes or our implementing regulations. Many states have exercised their authority [*25] under state law to add network elements to the national list.

192. We do not agree with incumbent LECs that argue that the states are preempted from regulating in this area as a matter of law. If Congress intended to preempt the field, Congress would not have included section 251(d)(3) in the 1996 Act. We likewise do not agree with those that argue that the states may impose any unbundling framework they deem proper under state law, without regard to the federal regime. These commenters overlook the specific restraints on state action taken pursuant to state law embodied in section 251(d)(3), and the general restraints on state actions found in sections 261(b) and (c) of the Act. Their arguments similarly ignore long-standing federal preemption principles that establish a federal agency's authority to preclude state action if the agency, in adopting its federal policy, determines that state actions would thwart that policy. Under these principles, states would be precluded from enacting or maintaining a regulation or law pursuant to state authority that thwarts or frustrates the federal regime adopted in this Order. n47

n47 TRO, 18 FCC Rcd at 17098-17099

[*26]

The FCC acknowledges that the Act specifically grants to the states the duty to establish access and interconnection obligations of local exchange carriers, as long as such policies do not frustrate the implementation of the Act. n48 BellSouth has alleged no specific policy of the Authority that frustrates the implementation of the Act. The FCC has rejected the ILECs' arguments for preemption of state authority and has preserved state authority to establish obligations for local exchange carriers. n49

n48 47 USC § 251(d)(3)

n49 TRO, 18 FCC Rcd at 17098.

During the deliberations on January 12, 2004, the Arbitrators voted unanimously to adopt DeltaCom's position on this issue and ordered that the interconnection agreement should state that the rates, terms and conditions of the network elements are compliant with both state and federal rules and regulations. n50

n50 Transcript of Proceedings, pp. 7-8 (January 12, 2004).

[*27]
## ISSUE 21: DARK FIBER AVAILABILITY

**Does BellSouth have to make available to DeltaCom dark fiber loops and transport at any technically feasible point?**

### A. Positions of the Parties

DeltaCom argues that it should be able to access dark fiber loops at areas other than the collocation site. Also, DeltaCom states that it may want to interconnect with another CLEC and, as such, DeltaCom would pick up the dark fiber loop at the other CLEC's collocation site. n51

n51 Steve Brownworth, Pre-Filed Direct Testimony, p 10 (August 4, 2003)

DeltaCom's witness Steve Brownworth testified

ILECs regularly deploy fiber in segments with planned "breaks" in the path. These planned breaks also occur at points where larger backbone cable meets smaller distribution or lateral cables that connect to specific customer locations or remote terminals. In order to build maximum flexibility in how it uses its deployed fiber, the ILEC will place splice cases at these mid-span breaks. At these splice cases the ILEC can splice [*28] strands of fiber together in order to complete a path from one location (usually and ILEC central office) to another location, (usually a customer premises, remote terminal or with interoffice fiber another central office). Deployed fiber is also frequently left unconnected when that fiber path ends at a customer premises or remote terminal. . . . Further, the current NewSouth/BellSouth Tennessee interconnection agreement, . . . contains language whereby BellSouth has agreed to make dark fiber available to NewSouth at any technically feasible point. n52

n52 *Id* at 10-11

DeltaCom also cites other state commission findings in support of its request. DeltaCom cites the California Public Utilities Commission, which rejected SBC Communications' ("SBC's") position that it was not obligated to splice and terminate dark fiber because it unreasonably limits the amount of dark fiber available for CLECs. n53 Likewise, the

Texas Public Utilities Commission found that Southwestern Bell Telephone n54 had misinterpreted the [*29] FCC's intention in the *UNE Remand Order*. The Texas Public Utilities Commission distinguished dark fiber that was already in place as opposed to spooled in the warehouse and determined that deployed fiber constituted connectivity. n55

n53 *Id* at 12-13, referencing *Application by Pacific Bell Telephone Company (U 1001 C) for Arbitration of an Interconnection Agreement with MCImetro Access Transmission Services, L L C (U 5253 C) Pursuant to Section 252(b) of the Telecommunications Act of 1996*, A.01-01-010, Final Arbitrator's Report Cal. PUC, July 16, 2001 at 139

n54 Southwestern Bell Telephone is part of SBC that serves the five-state region of Arkansas, Kansas, Missouri, Oklahoma and Texas.

n55 Steve Brownsworth, Pre-Filed Direct Testimony, pp 13-14 (August 4, 2003), referencing Docket 23396, *Petition of CoServ, Inc for Interconnection Agreement with SWBT*, Arbitration Award at 139, TX PUC, April 17, 2001

BellSouth defines dark fiber under the FCC rules at 47 C.F.R. 51.319(a)(1) [*30] and 47 C.F.R. 51.319(d)(1). Accordingly, BellSouth states that it will make dark fiber loops available at the demarcation point associated with Delta-Com's collocation arrangements within BellSouth's central office. n56 BellSouth further explains that DeltaCom's request to have dark fiber available at any technically feasible point ignores the definitions of those UNEs established by the FCC and would result in the creation of a new UNE. n57 BellSouth also disagrees with the application of the findings of the Texas and California commissions. BellSouth explains that the issue in other states dealt with "un-terminated" fiber, and BellSouth currently makes no claim that un-terminated fiber strands are not subject to unbundling. n58

n56 Keith Milner, Pre-filed Direct Testimony, p 18 (August 4, 2003)

n57 *Id* at 19.

n58 Keith Milner, Pre-Filed Rebuttal Testimony, p. 9 (August 11, 2003).

## B. Deliberations and Conclusions

The FCC rules are clear that an ILEC has a responsibility [*31] to provide unbundled network elements at any technically feasible point and that previous access to an unbundled element at a particular point in a network is evidence that access is technically feasible. n59 DeltaCom recounts that BellSouth not only provided dark fiber through a man-hole but also provided access to dark fiber in its interconnection agreement n60 with NewSouth. n61 Both instances provide evidence that it is technically feasible to provide dark fiber per DeltaCom's request. Nevertheless, DeltaCom is requesting a specific unbundled network element-dark fiber loop and transport-as such there are specific rules that control an ILEC's unbundling responsibility.

n59 47 C.F.R. § § 51 311(d) (2003), 51 321(a)-(c) (2003) and 51 309 (2003)

n60 Steve Brownsworth, Pre-Filed Direct Testimony, Exhibit A (August 4, 2003)

n61 *Post-Hearing Brief of ITCDeltaCom Communications, Inc*, p 11 (October 27, 2003)

Pursuant to FCC Rule <u>47 C.F.R. § 51.319(a)</u>:

> The local [*32] loop network element is defined as a transmission facility between a distribution frame (or its equivalent) in an incumbent LEC central office and the loop demarcation point at an end-user customer premises. This element includes all features, functions, and capabilities of such transmission facility, including the network interface device. It also includes all electronics, optronics, and intermediate devices (including repeaters and load coils) used to establish the transmission path to the end-user customer premises as well as any inside wire owned or controlled by the incumbent LEC that is part of that transmission path. n62

A local loop can also be a dark fiber loop. n63 The dedicated transport network element is defined as including

> incumbent LEC transmission facilities between wire centers or switches owned by incumbent LECs, or between wire centers or switches owned by incumbent LECs and switches owned by requesting telecommunications carriers, including, but not limited to DS1-, DS3-, and OCn-capacity level services, as well as dark fiber, dedicated to a particular customer or carrier. n64

n62 47 C.F.R. § 51 319(a) (2003).

[*33]

n63 *Id*

n64 47 C F R § 51 319(e)(1) (2003)

DeltaCom wants to connect dark fiber at locations other than its collocation site, including other CLEC collocation sites and at splice cases located at planned breaks in the fiber path. DeltaCom's request ignores the FCC's definition of UNEs and amounts to the creation of a new UNE. DeltaCom did not specifically request and offered no evidence or testimony to enable the Arbitrators to apply the necessary and impairment standard required to create a new UNE. Existing FCC rules allow DeltaCom to purchase dark fiber loops, transport or both from BellSouth in every configuration with the exception of connecting to customer locations. n65 The Arbitrators found that in this configuration it is possible and appropriate for DeltaCom to order this service from the FCC tariff, and BellSouth should provide it, but not at UNE rates. There are additional maintenance costs, plant rearrangements and splicing costs associated with this type of special application that are outside those encountered in the course of normal daily network activity. n66

n65 47 C F R § 51 319(a)(1) (2003)

[*34]

n66 Transcript of Proceedings, p 8-9 (January 12, 2004)

During the deliberations on January 12, 2004, the Arbitrators voted unanimously that BellSouth is required to make available to DeltaCom dark fiber loops and transport at technically feasible points but is only required to provide dark fiber loops and transport at UNE rates in those instances that conform to the FCC loop and transport definition found in <u>47 C.F.R. § 51.319</u>. n67

n67 *Id* at 9

## ISSUE 25: PROVISION OF ASYMMETRIC DIGITAL SUBSCRIBER LINE ("ADSL")

**Where DeltaCom is the UNE-P local provider should BellSouth continue providing the end-user ADSL service where DeltaCom provides UNE-P local service to that same end-user on the same line?**

### A. Positions of the Parties

BellSouth maintains that it is not obligated to provide digital subscriber line ("DSL") n68 services for customers served by a CLEC over the Unbundled [*35] Network Elements Platform ("UNE-P"). BellSouth argues that the FCC's conclusion in its *Line Sharing Order* n69 supports its position and goes on to cite the Order in support of its position that ILECs are not required to provide xDSL n70 service when they are not the voice provider. n71 BellSouth advocates that DeltaCom could enter into a line splitting arrangement with another carrier to provide DSL services. Further, Bell-South asserts that there are significant operational issues that would make it extremely burdensome for BellSouth to provide DSL service over a UNE-P loop purchased by a CLEC to provide voice service. The reasons given for this assertion include BellSouth's lack of access to the high frequency portion of the loop ("HFPL") as well as the incapability of BellSouth's systems to track different arrangements with different CLECs. n72 In its post-hearing brief, BellSouth, citing the TRO at length, claims "the FCC reconfirmed its conclusion that an ILEC is not required to provide DSL service over UNE lines." n73

n68 A generic name for a group of enhanced speed digital services provided by telephone companies. DSL services operate on twisted-pair wires, which can carry both voice and data

[*36]

n69 *Deployment of Wireline Services Offering Advanced Telecommunications Capability*, Third Report and Order, CC Docket No 98-147, CC Docket No. 96098, 14 FCC Rcd 20912 (1999) vacated, United States Telecom Ass'n v FCC, 290 F 3d 415 (D.C Cir. 2002) ("Line Sharing Order")

n70 xDSL refers collectively to all types of digital subscriber lines, the two main categories being ADSL and SDSL.

n71 John A Ruscilli, Pre-Filed Direct Testimony, pp 12-13 (August 4, 2003)

n72 *Id* at 13

n73 *BellSouth Telecommunications, Inc Post-Hearing Brief*, p 32 (October 27, 2003) (quoting from *Triennial Review Order, P 259*)

DeltaCom asserts that no technical reasons exist for BellSouth's unwillingness to serve DeltaCom's UNE-P end-users with wholesale or retail DSL service. n74 DeltaCom's witness, Mary Conquest, alleges that this policy by Bell-South is a "tying arrangement" designed to forestall competition. Ms. Conquest goes on to explain that such a "tying policy" by BellSouth has the undesirable effect of forcing competitors to [*37] enter two markets (hence raising the cost of entry), allowing a monopoly such as BellSouth to "cherry pick" the most lucrative customers, and limiting consumer choice by locking customers into long term DSL contracts. n75 In her rebuttal testimony, Ms. Conquest states, "ITCDeltaCom has offered BellSouth the use of the high frequency portion of UNE-P loops that serve ITCDeltaCom customers for free so that BellSouth can continue providing its DSL service to its customers." n76 DeltaCom's witness

2005 Tenn. PUC LEXIS 332, *

also mentions the decisions of the Louisiana, Kentucky, and Georgia commissions on this issue as favorable to CLECs. Moreover, in its post-hearing brief addressing the TRO, DeltaCom claims that BellSouth is required to perform functions necessary to commingle a UNE-P line with its wholesale DSL service, if requested by a CLEC. n77

n74 Mary Conquest, Pre-Filed Direct Testimony, p 5 (August 4, 2003)

n75 *Id* at 4-6

n76 Mary Conquest, Pre-Filed Rebuttal Testimony, p 5 (August 11, 2003)

n77 *Post-Hearing Brief of ITCDeltaCom Communications, Inc*, p 21 (October 27, 2003).

[*38]

In rebutting DeltaCom's testimony that its policy amounts to "tying arrangements" and hence is anti-competitive, BellSouth points out that the FCC has rejected this assertion in its Memorandum Opinion and Order, *In re Joint Application by BellSouth Corporation, BellSouth Telecommunications, Inc. and BellSouth Long Distance, Inc. for Provision of In-Region, InterLATA Services in Florida and Tennessee*, WC Docket No 02-307 (December 19, 2002). n78 Further, BellSouth argues that there is no evidence to support the assertion that BellSouth's DSL policy is an unlawful tying arrangement and therefore constitutes an anti-competitive practice. n79 BellSouth witness John A. Ruscilli also points out that CLECs such as DeltaCom have multiple choices for broadband service providers; the choices mentioned include wireless, cable modem and satellite. n80 Regarding the decisions of the Louisiana and Kentucky commissions, which were favorable to the CLECs, BellSouth indicates that it is appealing those decisions and further states that the commissions of North Carolina and South Carolina have ruled in BellSouth's favor on this issue. n81

n78 *BellSouth Telecommunications, Inc Post-Hearing Brief*, p 39 (October 27, 2003)
[*39]

n79 *Id* at 38-49

n80 John A Ruscilli, Pre-Filed Rebuttal Testimony, pp. 5-6 (August 11, 2003)

n81 *Id* at 8-10

**B. Deliberations and Conclusions**

The refusal by BellSouth to provide xDSL services -- retail or wholesale -- on a UNE-P line could theoretically or potentially have an adverse impact on the further development of competitive local exchange markets in Tennessee. Nevertheless, the existing federal laws and regulations do not obligate BellSouth to provide DSL services when it is not the voice provider. BellSouth cites the FCC's *Line Sharing Order* as well as the *Line Sharing Reconsideration Order* n82 to support is position. BellSouth points out that the FCC ruled in these orders that an ILEC is not required to provide xDSL service when it does not provide the voice service. n83 DeltaCom did not dispute this characterization of the *Line Sharing Order* and the *Line Sharing Reconsideration* Order, and DeltaCom's witness conceded that the FCC did not require BellSouth to provide DSL over UNE-P. n84 Nevertheless, in its post-hearing brief, DeltaCom argues that [*40] the FCC has come up with "new rules" in its TRO requiring BellSouth to allow CLEC UNE-P voice customers to obtain DSL services from BellSouth. n85 DeltaCom cites paragraph 579 of the *Triennial Review Order* to conclude that BellSouth is required to perform functions necessary to commingle a UNE-P line with its wholesale DSL service, if requested by a CLEC.n86 That paragraph states, "Thus, an incumbent LEC shall permit a requesting telecommunications carrier to commingle a UNE or a UNE combination with one or more facilities or services that a requesting carrier has obtained at wholesale . . . ." n87 Although this paragraph does not specifically address the issue of DSL and is ar-

2005 Tenn. PUC LEXIS 332, *

guably vague, DeltaCom ignores specific statements made by the FCC indicating that an ILEC is not required to provide DSL service over UNE-P lines. In paragraph 259 of the TRO, the FCC states, "since some incumbent LECs have thus far refused to provide xDSL service [over UNE-P] . . . customers served by competitive LECs who seek xDSL service would have to obtain that service from a competing carrier." n88 The FCC clearly does not obligate BellSouth to provide DSL service to the end user where DeltaCom provides [*41] that end-user with local service over UNE-P.

n82 _Deployment of Wireline Services Offering Advanced Telecommunications Capability, Third Report and Order on Reconsideration and Third Further Notice of Proposed Rulemaking, 16 FCC Rcd 2101 (2001)_ ("Line Sharing Reconsideration Order")

n83 John A Ruscilli, Pre-Filed Direct Testimony, pp 12-13 (August 4, 2003).

n84 Transcript of Proceedings, v I, p 250 (August 27, 2003)

n85 _Post-Hearing Brief of ITCDeltaCom Communications, Inc_, p 21 (October 27, 2003)

n86 _Post-Hearing Brief of ITCDeltaCom Communications, Inc_, p. 21 (October 27, 2003)

n87 TRO, 18 FCC Rcd at 17342

n88 TRO, 18 FCC Rcd at 17134

Both BellSouth and DeltaCom cite various state commissions' decisions in support of their respective positions. The North Carolina and South Carolina state commissions have ruled that BellSouth has no obligation to provide DSL service over UNE-P. n89 On [*42] the other hand, the Kentucky, Louisiana and Georgia commissions have ruled in favor of the CLECs on this issue. n90 Nevertheless, DeltaCom has not proven that BellSouth's policy of refusing to provide DSL over UNE-P is an anticompetitive practice.

n89 _See In re South Carolina Public Service Commission_, Docket No. 2001-19-C (April 3, 2001), _see also North Carolina Utilities Commission Consultative Opinion to the FCC in BellSouth's Application for Alabama, Kentucky, Mississippi, North Carolina and South Carolina_, WC Docket No 01-0150, p 204 (July 9, 2002).

n90 _See In the Matter of Petition of Cinergy Communications Company for Arbitration of an Interconnection Agreement with BellSouth Telecommunications, Inc_, Kentucky Public Service Commission, Case No. 2001-00432, _Appendix to Order of the Order of the Kentucky Public Service Commission_ (February 28, 2003), _In re Georgia PSC_, Docket No. 11901-U, _Louisiana Order U-22252-E_, Order No R-26173, Docket No R-26173 (January 24, 2003)

The Kentucky [*43] Commission has not indicated any federal law or public policy rationale for such a decision; if it has any justifications, they are not apparent from the order released on this matter. n91 On the other hand, the Louisiana Commission, based on the Louisiana State Constitution, its own "Local Competition Regulations" and policy considerations, ruled the anti-competitive effects of BellSouth's [DSL] policy are at odds with the Commission's policy to support competition in all telecommunications markets. n92 The Louisiana Order does not state how the Commission arrived at the conclusion that BellSouth's DSL policy is anticompetitive, other than re-iterating the CLEC's allegations. n93 Allegations of anticompetitive practices must be supported by verifiable evidence, not just mere assertions.

n91 *See In the Matter of Petition of Cinergy Communications Company for Arbitration of an Interconnection Agreement with BellSouth Telecommunications, Inc,* Kentucky Public Service Commission, Case No 2001-00432, *Appendix to Order of the Order of the Kentucky Public Service Commission* (February 28, 2003).

[*44]

n92 *See In re Louisiana Public Service Commission, Clarification Order*, Order R-26173-A (January 24, 2003)

n93 *Id* at 5

During the deliberations on January 12, 2004, a majority of the Arbitrators found no basis in the record that BellSouth's policy constitutes a tying arrangement and voted not to require BellSouth to provide DSL where DeltaCom provides the UNE-P local services. n94

n94 Transcript of Proceedings, pp 9-14 (January 12, 2004) Director Jones did not vote with the majority and filed a dissent.

## ISSUE 26: LOCAL SWITCHING-LINE CAP AND OTHER RESTRICTIONS

**(a) Is the line cap on local switching in certain designated MSAs only for a particular customer at a particular location?**

**(b) Should the Agreement include language that prevents BellSouth from imposing restrictions on DeltaCom's use of local switching?**

**(c) Is BellSouth required to provide local switching at market rates where BellSouth [*45] is not required to provide local switching as an Unbundled Network Element (UNE)?**

**(d) What should be the market rate?**

### A. Position of the Parties

DeltaCom opines that the existing language in the contract states that the four line cap only applies to a single physical end user location with four or more DS0 (Digital Signal, Level 0) equivalent lines. The current contract language also includes language that prevents BellSouth from imposing restrictions on DeltaCom's use of local switching. DeltaCom requests that this language continue in the new agreement. n95

n95 Jerry Watts, Pre-Filed Direct Testimony, pp. 14-15 (August 4, 2003)

Joseph Gillan, witness for DeltaCom, recommends that the Authority reject BellSouth's market-based switching rates subject to the three line rule and that the existing TELRIC UNE rate of $ 1.89, established by the Authority, should remain in effect for all analog switch ports since those are the rates the Authority has found to be just and reasonable. n96 Finally, DeltaCom argues [*46] that to the extent that BellSouth is allowed to price a service at market rates, those rates must be approved by the Authority and supported by relevant market analysis. n97

n96 Joseph Gillan, Pre-Filed Direct Testimony, p. 4 (August 4, 2003)

2005 Tenn. PUC LEXIS 332, *

n97 *Id* at 2-5

BellSouth witness, Kathy Blake, states that BellSouth is only required to provide local switching as set forth in 47 C.F.R. § 51.319(c)(2) and the interconnection agreement should not include language that prevents BellSouth from imposing restrictions on DeltaCom's use of local switching. The current FCC rules impose restrictions on DeltaCom's use of local switching and set forth criteria under which BellSouth may avail itself of the local switching exemption. Ms. Blake says that BellSouth will provide local switching at the market-based rate where it is not required to unbundle local switching. BellSouth maintains that its rates for local switching are not appropriate for consideration in an arbitration proceeding [*47] because local switching is not required by the Act or the FCC's rules implementing the Act and such rates are not governed by 47 U.S.C. §§ 251 or 252. n98 BellSouth points out that the Arbitrators voted in the AT&T arbitration to "permit BellSouth to aggregate lines provided to multiple locations of a single customer to determine compliance with FCC Rule 51.319(c)(2)," n99 and that the Authority clarified that "although BellSouth can aggregate lines of a customer running from multiple locations for the purpose of determining if BellSouth is obligated to provide unbundled local switching pursuant to FCC Rule 51.319(c)(2), this aggregation must be based on each location within the Nashville Metropolitan Statistical Area served by AT&T." n100

n98 Kathy Blake, Pre-Filed Direct Testimony, pp 3-4 (August 4, 2003)

n99 *Id* at 4-5 (quoting from *Final Order of Arbitration Award*, TRA Docket No 00-00079, p 20 (November 29, 2001))

n100 *Id* at 5 (quoting from *Order Granting Requests in Part for Reconsideration and Clarification*, TRA Docket No 00-00079, p. 5 (April 22, 2002))

[*48]

**B. Deliberations and Conclusions -- January 12, 2004**

With respect to Issue 26(a), it was noted by a majority of the panel that the four-line carve out per customer should reflect the Authority's previous decision in the AT&T arbitration, in which the Authority has permitted BellSouth to aggregate lines provided to multiple locations of a single customer. n101 Furthermore, the majority stated that the four-line carve out and the language regarding line count per customer should continue unless altered as a result of TRA Docket No. 03-00491, the TRA's nine month proceeding to determine the availability of UNE switching. n102 As a result, a majority of the Arbitrators voted that the line cap on local switching in certain designated metropolitan statistical areas ("MSAs") permits BellSouth to aggregate lines provided to multiple locations of a single customer. n103

n101 Transcript of Proceedings, p 16 (January 12, 2004); *see also In the Matter of the Interconnection Agreement Negotiations Between AT&T Communications of the South Central States, Inc, TCG MidSouth Inc, and BellSouth Telecommunications, Inc, Pursuant to 47 U S C § 252*, TRA Docket No. 00-00079, *Final Order of Arbitration Award*, p 20 (November 29, 2001).

[*49]

n102 Transcript of Proceedings, p. 16 (January 12, 2004).

n103 *Id* at 49. Director Jones disagreed with the majority on this part of Issue 26 Director Jones concluded that the local switching exemption should be applied on a per location basis In support of this conclusion, Director Jones cited the FCC's decision in CC Docket No. 00-251. *Petition of Worldcom, Inc Pursuant to Section 252(e)(5) of the Communications Act for Preemption of the Jurisdiction of the Virginia State Corporation Commission Regarding Interconnection Disputes with Verizon Virginia Inc, and for Expedited Arbitration, CC*

Docket No 00-218, CC Docket No 00-249, CC Docket No 00-251, Memorandum Opinion and Order, 17 FCC Rcd 27,039, 27212 (2002) (concluding "that the local switching exemption applies on a per location' basis"). *See* Transcript of Proceedings, pp 16-17 (January 12, 2004)

As to Issue 26(b), DeltaCom asserted that the panel should adopt language from the parties' current interconnection agreement. The specific language states, "except as otherwise provided herein, BellSouth [*50]  shall not impose any restrictions on ITCDeltaCom regarding the use of Switching Capabilities purchased from BellSouth." n104 The Arbitrators disagreed with DeltaCom and stated that the proposed language from DeltaCom attempts to thwart prevailing rules. n105 The FCC rules, particularly as set forth in the TRO, specify how and when an ILEC may restrict the use of local switching. n106 DeltaCom's proposed language does not reference any state or federal rules or proceedings. As such, the Arbitrators disagreed with DeltaCom, and voted that the Agreement not include language that prevents BellSouth from imposing any restrictions on DeltaCom's use of local switching. n107

n104 *Post Hearing Brief of ITCDeltaCom Commission, Inc,* p 24 (October 27, 2003) (citing parties' current approved interconnection agreement, Attachment 2, section 9 1 2)

n105 Transcript of Proceedings, p 16 (January 12, 2004)

n106 47 C.F R § 51 319(d) (2003).

n107 Transcript of Proceedings, p. 15 (January 12, 2004)

As to Issues  [*51]  26(c) and (d), n108 to the extent that the rate for a particular element has not been ordered in a generic proceeding and the rate is proposed in the context of negotiating an interconnection agreement, a party should not be precluded from litigating the issue before the Authority in an arbitration. Section 252(c)(2) of the Act states that in an arbitration a state that in an arbitration a state commission shall establish any rates for interconnection, services, or network elements. As a result, the Arbitrators rejected BellSouth's claim that market based rates for switching are not appropriate for an arbitration proceeding and found that BellSouth is required to provide local switching at market rates where BellSouth is not required to provide local switching as a UNE. n109

n108 Chairman Tate did not agree with the majority decision on Issue 26(d) as deliberated June 21, 2004

n109 *Id* at 16.

The Arbitrators observed that the record in this docket was not sufficient to allow the development of an appropriate [*52]  rate for unbundled local switching. n110 While both parties proposed a rate, the $ 14 rate proposed by BellSouth was not presented with cost studies. n111 Therefore, it could not be determined that the $ 14 rate was just and reasonable as required by FCC rule. Additionally, TELRIC rate proposed by DeltaCom could not be supported since by law, and in this instance, switching is not a UNE under Section 251. It would be inconsistent with FCC rules to price non-251 network elements the same as 251 UNEs, i.e. at TELRIC. For these reasons, the Arbitrators did not support the rate proposed by either party and voted unanimously to require the parties to submit final and best offers as to the appropriate interim rate for local switching. n112

n110 *Id* at 15

n111 Transcript of Proceedings, v II pp 479-483 (August 27, 2003)

n112 Transcript of Proceedings, p 16 (January 12, 2004).

## C. Final Best Offers

The parties submitted FBOs on February 20, 2004. In its filing, BellSouth argued that the Authority lacks the [*53] jurisdiction to consider or mandate the pricing of network elements that BellSouth will provide under 47 U.S.C. § 271 (not 47 U.S.C. § 251) and that the FCC has subsequently determined that a checklist element that does not have to be unbundled (such as switching) is subject to the "just and reasonable" pricing standard set forth in 47 U.S.C. § § 201 and 202. Furthermore, it avers that the jurisdiction to enforce 47 U.S.C. § § 201 and 202 is vested with the FCC, not with state commissions. BellSouth agreed that it is required to provide switching pursuant to § 271 of the Act, and in satisfaction of that obligation, it offers a Wholesale Local Platform DS0 Service priced at $ 26.48 for Zone 1, $ 30.31 for Zone 2 and $ 35.32 for Zone 3. BellSouth explains that this rate includes the port, features and TELRIC-based analog Service Level 1 ("SL1") loop. As an alternative, BellSouth requested another thirty days to negotiate a rate acceptable to both parties. n113 BellSouth provided no cost justification for the rates proposed.

n113 *BellSouth Telecommunications, Inc's Best and Final Offers*, pp 2-5 (February 20, 2004).

[*54]

DeltaCom proposes to pay BellSouth a flat rate of $ 5.08 per month per analog switch port, with no additional usage or feature charges. In support of this proposed rate DeltaCom uses the embedded cost for central office switching, plus a contribution equal to the average contribution of BellSouth's services in Tennessee in 2002. The rate development for the charge of $ 5.08 is based on BellSouth's reported central office switching expenses for 2002 and includes an estimated share of its depreciation costs for switching plant in service. This expense is directly available in ARMIS n114 43-08 (row 6210). The portion of its depreciation expense attributed to central office switching is estimated by applying the ratio of central office switching plant in service to Total Plant in Service to the annual depreciation of plant.

n114 ARMIS is an acronym for Automated Reporting Management Information System, which is maintained by the FCC's Industry Analysis and Technology Division

## D. Deliberations and Conclusions -- Issue [*55] 26(d)

Following three continuances, on June 21, 2004, the Arbitrators deliberated the final and best offers submitted by the parties regarding Issue 26(d). The majority of the panel adopted DeltaCom's FBO of $ 5.08 as an interim rate. n115

n115 Chairman Tate proposed a $ 14 interim rate on grounds that (1) TELRIC rates are not market-based, (2) the FBOs submitted by the parties did not constitute negotiated market-based rates; (3) one or more CLECs had entered into agreements that provided for the $ 14 rate and these CLECs operated under these agreements for three years, and (4) the $ 14 rate represented the only marked-based rate in the record Chairman Tate proposed that the $ 14 rate be adopted as an interim rate unless and until the FCC or the Authority set a different rate or the parties negotiate a different rate

Notwithstanding BellSouth's assertions that the Authority lacked jurisdiction, the Arbitrators deliberated the switching issue as an open issue presented in a § 252 arbitration proceeding.

The Act [*56] expressly provides for state commission jurisdiction to arbitrate all open issues presented pursuant to Section 252(b)(4)(C). In addition, the Federal Act makes it clear that state commissions must arbitrate all open issues in interconnection agreements. Section 252(b)(4)(C) states:

> (C) The State commission shall resolve each issue set forth in the petition and the response, if any, by imposing appropriate conditions as required to implement subsection (c) upon the parties to the agreement, and shall conclude the resolution of any unresolved issues not later than 9 months after the date on which the local exchange carrier received the request under this section. n116

In addition, Section 252 contains no exception for Section 271 elements presented as an open issue in an arbitration.

n116 47 U.S.C. § 252(b)(4)(C) (2001)

The TRA has broad statutory authority to arbitrate any open issue submitted in a Section 252 arbitration. Section 252(b)(4)(C) provides that "the State commission [*57] shall resolve each issue set forth in the petition" for arbitration "and the response" thereto. The scope of open issues presented for arbitration under Section 252 includes "issues on which incumbents are mandated to negotiate." n117 Switching is an element of access and interconnection which Bell operating companies are mandated to negotiate pursuant to Section 271(c)(2)(B)(vi).

n117 MCI v BellSouth, 298 F 3d 1269, 1274 (11th Cir 2002)

Beyond those issues that are mandated for negotiation, "the parties are free to include interconnection issues that are not listed in § 251(b) and (c) in their negotiations" and may "petition for compulsory arbitration of any open issue." n118 The Court of Appeals for the Fifth Circuit, in Coserv Ltd Liability Corp. v. Southwestern Bell:

> There is nothing in § 252(b)(1) limiting open issues only to those listed in § 251(b) and (c). By including an open-ended voluntary negotiations provision in § 252(a)(1), Congress clearly contemplated that the [*58] sophisticated telecommunications carriers subject to the Act might choose to include other issues in their voluntary negotiations, and to link issues of reciprocal interconnection together under the § 252 framework. In combining these voluntary negotiations with a compulsory arbitration provision in § 252(b)(1), Congress knew that these non-251 issues might be subject to compulsory arbitration if negotiations fail. That is, Congress contemplated that voluntary negotiations might include issues other than those listed in § 251(b) and (c) and still provided that any issue left open after unsuccessful negotiation would be subject to arbitration by the PUC. We hold, therefore, that where parties have voluntarily included in negotiations issues other than those duties required of an ILEC by § 251(b) and (c), those issues are subject to compulsory arbitration under § 252(b)(1). The jurisdiction of the PUC as arbitrator is not limited by the terms of § 251(b) and (c); instead, it is limited by the actions of the parties in conducting voluntary negotiations. It may arbitrate only issues that were the subject of the voluntary negotiations. The party petitioning for arbitration may not use [*59] the compulsory arbitration provision to obtain arbitration of issues that were not the subject of negotiations. . . . An ILEC is clearly free to refuse to negotiate any issues *other than those it has a duty to negotiate* under the Act when a CLEC requests negotiation pursuant to § 251 and 252. [Emphasis added.] n119

n118 Coserv Ltd Liability Corp v Southwestern Bell, 350 F 3d 482, 487 (5th Cir. 2003)

2005 Tenn. PUC LEXIS 332, *

n119 *Id.* at 487-488

BellSouth has a duty and cannot refuse to negotiate the price for the switching element pursuant to Section 271(c)(2)(B)(vi). The price for the switching element was presented as an open issue in DeltaCom's petition for arbitration. Upon the failure of the parties to reach agreement of this non-251 issue, DeltaCom properly presented the price for switching as an open issue in the arbitration. As an open issue in the arbitration, the issue was properly before the TRA for resolution under Section 252 of the Federal Act. Further, [*60] BellSouth did not include this issue (Issue No. 26(d)) in its July 2, 2003 motion to remove certain issues from the arbitration.

Further, there is no language contained in the Federal Act that expressly prohibits state jurisdiction over Section 271 elements that are included in issues required to be arbitrated pursuant to Section 252. Rather, there is language that indicates that Congress gave states a role in determining Section 271 elements through state approval of both SGAT conditions and interconnection agreements. Under Section 271(c)(1) of the Federal Act, an incumbent telephone company must offer network elements either through a statement of generally available terms and conditions or an interconnection agreement. Each must be filed with and approved by the state commission. n120 Section 271 of the Federal Act requires an incumbent telephone company to satisfy its competitive checklist obligations through interconnection agreements. n121 These interconnection agreements are required to be approved by a state commission under Section 252. n122

n120 47 U S C. § 252(e) and (f) (2001)

[*61]

n121 47 U.S C § 271(c)(2)(A) (2001)

n122 47 U.S.C § 271(c)(1)(A) (2001)

BellSouth must provide switching pursuant to the requirements of Section 271. In its *Final Best Offer* BellSouth argued that the TRA does not have jurisdiction to establish the rate for switching. BellSouth argued that, because Section 271 elements are regulated under Sections 201 and 202 of the Federal Act, state commissions are precluded from setting a rate for a Section 271 switching element. BellSouth cites to P 664 of the TRO as standing for the proposition that ". . . the jurisdiction to enforce Sections 201 and 202 of the Act is vested with the FCC, not with state public service commissions." Paragraph 664 of the TRO, in its entirety, states:

> Whether a particular checklist element's rate satisfies the just and reasonable pricing standard of section 201 and 202 is a fact-specific inquiry that the Commission will undertake in the context of a BOC's application for section 271 authority or in an enforcement proceeding brought pursuant to [*62] section 271(d)(6). We note, however, that for a given purchasing carrier, a BOC might satisfy this standard by demonstrating that the rate for a section 271 network element is at or below the rate at which the BOC offers comparable functions to similarly situated purchasing carriers under its interstate access tariff, to the extent such analogues exist. Alternatively, a BOC might demonstrate that the rate at which it offers a section 271 network element is reasonable by showing that it has entered into arms-length agreements with other, similarly situated purchasing carriers to provide the element at that rate.

Paragraph 664 offers two examples of situations where the FCC will make determinations of fact regarding whether a rate for a Section 271 element is just and reasonable. There is nothing, however, in the above-quoted language, to preclude a state commission from setting the rate for a Section 271 element.

Congress explicitly charged state commissions with the responsibility to arbitrate Section 252 disputes, and this charge includes arbitrating the rates, terms and conditions of Section 271 elements. Further, the fact that the FCC has the authority to enforce Section 271 [*63] does not diminish or cut off the obligations of the state commissions to arbi-

trate interconnection agreements required by Section 271 which also includes establishing rates for elements required by the competitive checklist.

Section 271(c)(2)(A) links BellSouth's obligations under the competitive checklist to its providing that access through an interconnection agreement (or SGAT):

(A) AGREEMENT REQUIRED -- A Bell operating company meets the requirements of this paragraph if, within the State for which the authorization is sought-

(i) (I) such company is providing access and interconnection pursuant to one or more agreements described in paragraph (1)(A) [Interconnection Agreement], or

(II) such company is generally offering access and interconnection pursuant to a statement described in paragraph (1)(B) [an SGAT], and

(ii) such access and interconnection meets the requirements of subparagraph (B) of this paragraph [the competitive checklist]. n123

n123 47 U S C § 271(c)(2)(A) (2001).

[*64]

By directly tying interconnection agreements to Section 271(c)(1)(A) and (B), the Act explicitly ties compliance with the competitive checklist to the review process described in Section 252. As Section 271(c)(1) states:

(1) AGREEMENT OR STATEMENT-A Bell operating company meets the requirements of this paragraph if it meets the requirements of subparagraph (A) or subparagraph (B) of this paragraph for each State for which the authorization is sought.

(A) PRESENCE OF A FACILITIES-BASED COMPETITOR-A Bell operating company meets the requirements of this subparagraph if it has entered into one or more **binding agreements that have been approved under section 252** specifying the terms and conditions under which the Bell operating company is providing access and interconnection to its network facilities for the network facilities of one or more unaffiliated competing providers of telephone exchange service (as defined in section 3(47)(A), but excluding exchange access) to residential and business subscribers. n124

This language demonstrates that Section 271 network elements must be offered pursuant to the same, identical review process as Section 251 network elements.

n124 47 U.S C. § 271(c)(1)(A) (2001) (Emphasis added)

[*65]

The FCC's TRO determined that pricing of Section 271 elements must be more liberal than TELRIC prices but produce just and reasonable prices. n125 The TRO states:

Thus, the pricing of checklist network elements that do not satisfy the unbundling standards in section 251(d)(2) are reviewed utilizing the basic just, reasonable, and nondiscriminatory rate standard of sections 201 and 202 that is fundamental to common carrier regulation that has historically been applied under most federal and state statutes, including (for interstate services) the Communications Act. Application of the just and reasonable and nondiscriminatory pricing standard of sections 201 and 202 advances Congress's intent that Bell companies provide meaningful access to network elements. n126

Thus, the FCC recognized that the pricing standards of Section 271 elements must be the same as the pricing standards used before the Federal Act such as those standards in Sections 201 and 202. Nevertheless, it is significant that the FCC did not change the division of pricing responsibility defined in the Federal Act. While the FCC will continue to set the pricing standards, it continues to be incumbent upon state [*66] commissions to apply those standards in the process of establishing rates. n127 The FCC did not change the process utilized to resolve pricing disputes of Section 271 elements. There is no indication that the FCC intended to remove Section 271 elements from state arbitrations or from approval of interconnection agreements consistent with Section 252.

n125 This does not mean that TELRIC prices are not just and reasonable On the contrary, TELRIC prices must first meet the just and reasonable definition of the Act

n126 TRO, 18 FCC Rcd at 17389

n127 The United States Supreme Court affirmed this division of responsibility in _AT&T Corp. v. Iowa Utilities Bd., 525 U S 366, at 384 (1999)_, emphasis added

"252(c)(2) entrusts the task of establishing rates to the state commissions . . The FCC's prescription, through rulemaking, of a requisite pricing methodology no more prevents the States from establishing rates than do the statutory Pricing standards' set forth in 252(d). It is the States that will apply those standards and implement that methodology, determining the concrete result in particular circumstances."

[*67]

In the regulatory scheme set up by the Federal Act, state commissions are directed by provisions of the Federal Act and FCC regulations in making decisions, which are subject to federal court review. n128 Thus, cooperative federalism is a statutory framework in which there is both state and federal regulation of telecommunications services. The parameters of both federal and state regulation within this statutory framework are determined by the Federal Act and the state statutes establishing regulatory authority.

n128 _Id_ at 352

In construing the reach of the TRA's authority, the Tennessee Supreme Court has held:

Any authority exercised by the Public Service Commission must be as the result of an express grant of authority by statute or arise by necessary implication from the expressed statutory grant of power. _Pharr v. Nashville, Chattanooga and St. Louis Railway, 186 Tenn. 154, 208 S.W.2d 1013 (1948); Nashville, Chattanooga and St. Louis Railway v. Railroad and Public Utilities Commission et al, 159 Tenn. 43, 15_

S.W.2d 751 (1929). [*68]  In either circumstance, the grant of power to the Commission is strictly construed. n129

The Tennessee Court of Appeals has echoed this interpretation of the TRA's authority:

> The Commission, like any other administrative agency, must conform its actions to its enabling legislation. It has no authority or power except that found in the statutes. While its statutes are remedial and should be interpreted liberally, they should not be construed so broadly as to permit the Commission to exercise authority not specifically granted by law. n130

n129 *Tennessee Pub Serv Comm'n v Southern Ry Co*, 554 S W 2d 612, 613 (Tenn 1977).

n130 *BellSouth Telecommunications, Inc v Greer*, 972 S W.2d 663, 680 (Tenn Ct App 1997) (internal citations omitted)

The TRA must exercise its authority in accordance with legislative limitations, directives and policy. In other words, "its actions must be harmonious and consistent with its statutory authority." n131 Chapter [*69] 4 of Title 65 sets forth the statutory framework for the TRA's authority to regulate public utilities. Pursuant to Tenn. Code Ann. § 65-4-104, the statutory grant of authority over public utilities given to the TRA is extensive:

> The authority has general supervisory and regulatory power, jurisdiction, and control over all public utilities, and also over their property, property rights, facilities, and franchises, so far as may be necessary for the purpose of carrying out the provisions of this chapter [Chapter 4].

Tenn. Code Ann. § 65-4-106 provides:

> This chapter [Chapter 4] shall not be construed as being in derogation of the common law, but shall be given a liberal construction, and any doubt as to the existence or extent of a power conferred on the authority by this chapter or chapters 1, 3, and 5 of this title shall be resolved in favor of the existence of the power, to the end that the authority may effectively govern and control the public utilities placed under its jurisdiction by this chapter.

n131 *Tennessee Cable Television Ass'n v Tennessee Pub Serv Comm'n*, 844 S.W 2d 151, 159 (Tenn Ct App. 1992)

[*70]

In addition to the general powers described in the above referenced statutes, the TRA has been given specific authority or power by Tenn. Code Ann. § 65-5-201(a) "to fix just and reasonable individual rates, joint rates, tolls, fares, charges or schedules thereof," by Tenn. Code Ann. § 65-4-117(3) "to fix just and reasonable standards, classifications, regulations, practices or services to be furnished, imposed, observed and followed thereafter by any public utility," and by Tenn. Code Ann. § 65-4-114(1) to require every public utility to "furnish safe, adequate, and proper service."

With the passage of the Tennessee telecommunications act in 1995 (the "Tennessee Act"), the Tennessee General Assembly changed regulation of telecommunications companies in Tennessee and established a new direction for the

State and a new mandate to the TRA. The expressed goal of the Tennessee Act is articulated at <u>Tenn. Code Ann. § 65-4-123</u>:

> The general assembly declares that the policy of this state is to foster the development of an efficient, technologically advanced, statewide [*71] system of telecommunications services by permitting competition in all telecommunications services markets, and by permitting alternative forms of regulation for telecommunications services and telecommunications services providers. To that end, the regulation of telecommunications services and telecommunications services providers shall protect the interests of consumers without unreasonable prejudice or disadvantage to any telecommunications services provider; universal service shall be maintained; and rates charged to residential customers for essential telecommunications services shall remain affordable.

The Tennessee Act also recognizes and imposes certain requirements on providers of telephone services:

> All telecommunications services providers shall provide non-discriminatory interconnection to their public networks under reasonable terms and conditions; and all telecommunications services providers shall, to the extent that it is technically and financially feasible, be provided desired features, functions and services promptly, and on an unbundled and non-discriminatory basis from all other telecommunications services providers. n132

n132 <u>Tenn Code Ann § 65-4-124(a)</u>.

[*72]

In *Mich. Bell Tel. Co. v. MCImetro Access Transmission Servs*, the Sixth Circuit Court of Appeals stated:

> When Congress enacted the federal Act, it did not expressly preempt state regulation of interconnection. In fact, it expressly *preserved* existing state laws that furthered Congress's goals and authorized states to implement additional requirements that would foster local interconnection and competition, stating that the Act does not prohibit state commission regulations "if such regulations are not inconsistent with the provisions of [the FTA]." <u>47 U.S.C. § 261.</u> Additionally, Section 251(d)(3) of the Act states that the Federal Communications Commission shall not preclude enforcement of state regulations that establish interconnection and are consistent with the Act. <u>47 U.S.C. § 251</u>(d)(3). n133

The Tennessee statutes and the relevant provisions of the Federal Act together form the basis of the authority of the TRA to set an interim rate for switching in the context of an arbitration proceeding and to convene a generic proceeding for the purpose of determining a permanent rate for switching. [*73] While Section 271 establishes the enforcement authority of the FCC regarding Section 271 issues, it does not strip the TRA of its authority to set rates for Section 251 or Section 271 elements. The TRA is exercising its authority provided by the General Assembly prior to the enactment of the federal act as the legal foundation for its actions. Additionally, the TRA's decision is consistent with the requirement that its actions not conflict with any current federal requirements.

n133 *Mich Bell Tel Co v MCImetro Access Transmission Servs*, 323 F 3d 348, 358 (6th Cir 2003)

2005 Tenn. PUC LEXIS 332, *

According to FCC rules, in situations where unbundled switching is not required under Section 251, the element must still be offered to competitors in order to comply with the requirements of Section 271; however, the rate does not have to comply with TELRIC pricing methodology. Instead, the FCC requires that rates for unbundled elements offered pursuant to Section 271 must be "just and reasonable." n134 The reason for [*74] requesting FBOs in this case was to determine a just and reasonable rate for unbundled switching.

n134 TRO, 18 FCC Rcd at 17389

In its FBO on Issue No. 26(d), DeltaCom proposed a rate of $ 5.08 (usage included) which was based on Bell-South's ARMIS 43-08 (row 6210) reported central office switching expenses for 2002 and an estimated share of its depreciation costs for switching plant in service.

BellSouth's FBO was based on the price it charges for wholesale local platform DS0 service. n135 The proposed rates were $ 26.48 in Zone 1; $ 30.31 in Zone 2; and $ 35.32 in Zone 3. Inclusive in these rates are the port, features, and an analog SL1 loop. These rates did not include usage, which was an additional per-minute charge.

n135 *See In Re Petition for Arbitration of ITCDeltaCom Communications, Inc with BellSouth Telecommunications, Inc Pursuant to the Telecommunications Act of 1996*, TRA Docket No. 03-00119, BellSouth's Best and Final Offers, p 5 (February 20, 2004)

[*75]

During the deliberations it was noted that BellSouth failed to demonstrate that its proposed switching rate is at or below the rate at which BellSouth offers comparable functions to similarly situated purchasing carriers under its interstate access tariff or that the rate is reasonable by showing that it had entered into arm's length agreements with other similarly situated purchasing carriers to provide the switching element at the rate proposed in its final best offer. n136 It was also noted that BellSouth's FBO did not contain a stand-alone rate for switching. Additionally, the Arbitrators noted that existing case law holds that a just and reasonable rate includes a utility's operating expenses as well as a fair return on investments and concluded that DeltaCom's proposed rate of $ 5.08 contained those elements. n137 Thereafter, a majority of the Arbitrators voted to adopt DeltaCom's Final Best Offer of $ 5.08 as an interim rate subject to true up. n138 The Arbitrators voted unanimously to have the Chair open a generic docket to adopt a rate for switching outside of 47 U.S.C. § 251 requirements. n139 The Arbitrators unanimously found that the [*76] interim rate should be trued up to the earlier of establishment of: 1) a switching rate in the generic docket; 2) a commercially negotiated switching rate; or 3) FCC rules regarding switching rates outside of 47 C.F.R. § 251.

n136 Transcript of Proceedings, p. 4 (June 21, 2004) The *Triennial Review Order* states

> Whether a particular checklist element's rate satisfies the just and reasonable pricing standard of section 201 and 202 is a fact-specific inquiry that the Commission will undertake in the context of a BOC's application for section 271 authority or in an enforcement proceeding brought pursuant to section 271(d)(6). We note, however, that for a given purchasing carrier, a BOC might satisfy this standard by demonstrating that the rate for a section 271 network element is at or below the rate at which the BOC offers comparable functions to similarly situated purchasing carriers under its interstate access tariff, to the extent such analogues exist Alternatively, a BOC might demonstrate that the rate at which it offers a section 271 network element is reasonable by showing that it has entered into arms-length agreements with other, similarly situated purchasing carriers to provide the element at that rate.

*Triennial Review Order*, P 664

[*77]

n137 Transcript of Proceedings, p. 4 (June 21, 2004), *see* <u>Farmers Union Central Exchange v FERC, 734 F 2d 1486, 1502 (D C Cir 1984)</u>; *see also* <u>FPC v Hope Natural Gas Co, 320 U S 591, 596-598, 605, 64 S.Ct 281, 88 L.Ed 333 (1994)</u>

n138 See supra n 115, Chairman Tate did not vote with the majority with respect to the rate for local switching

n139 Transcript of Proceedings, pp. 2-9 (June 21, 2004)


## ISSUE 36: UNE/SPECIAL ACCESS COMBINATIONS

**(a) Should DeltaCom be able to connect UNE loops to special access transport?**

**(b) Are special access services being combined with UNEs today?**

### A. Positions of Parties

DeltaCom states that the parties' current interconnection agreement provides for the combination of loop and transport, that similar language exists in other interconnection agreements and that DeltaCom believes the issue may be addressed in the TRO. n140 BellSouth cites FCC rules regarding combinations, including <u>47 C.F.R. § 51.315</u>, which [*78] contains requirements for an ILEC to combine UNEs with tariffed services. BellSouth admits that this issue is being addressed in the TRO proceedings, n141 but it suggests that since commingling elements will depend on further state proceedings to identify loops that will remain UNEs, it would be premature to address this issue now. BellSouth asserts that the Authority should defer any final resolution of this issue until concluding the state TRO proceedings. n142

n140 Steve Brownworth, Pre-Filed Direct Testimony, p 15 (August 4, 2003)

n141 Kathy Blake, Pre-Filed Direct Testimony, p. 6 (August 4, 2003)

n142 *BellSouth Telecommunications, Inc Post-Hearing Brief*, p. 58 (October 27, 2003)


### B. Deliberations and Conclusions

During the deliberations on January 12, 2004, the Arbitrators voted unanimously to allow DeltaCom to commingle UNE loops and special access services consistent with the TRO. The new rules in the TRO, <u>47 C.F.R. § 51.309(e)</u> and (f), state that except [*79] as provided in <u>47 C.F.R. § 51.318</u>, an ILEC shall permit "a requesting telecommunications carrier to commingle an unbundled network element or a combination of unbundled network elements with wholesale services obtained from an incumbent LEC." Furthermore, upon request, an ILEC "shall perform the functions necessary to commingle an unbundled network element or a combination of unbundled network elements with one or more facilities or services that a requesting telecommunications carrier has obtained at wholesale from an incumbent LEC." n143 The FCC does not make this rule contingent on the outcome of the nine-month proceedings in the states.

n143 47 C F R § 51 309(e) and (f) (2003)

2005 Tenn. PUC LEXIS 332, *

The Authority rejects BellSouth's assertion that this issue should be deferred until the end of the state proceedings. TRA Docket No. 03-00527, *Triennial Review Order -- 9 Month Proceeding -- Loop and Transport*, n144 was commenced to address which loops, on a location and route specific basis, will [*80] continue to be available as UNEs. The TRO requires the Authority to conduct further granular reviews, n145 which may become more frequent as more locations meet the necessary triggers to remove the UNE requirement. Therefore, now is the most appropriate time to address this issue.

n144 *See In re Implementation of the Federal Communications Commission's Triennial Review Order -- 9 Month Proceeding -- Loop and Transport*, TRA Docket No 03-00527.

n145 TRO, 18 FCC Rcd at 17237

## ISSUE 37: CONVERSION OF A SPECIAL ACCESS LOOP TO A UNE LOOP THAT TERMINATES TO DELTACOM'S COLLOCATION SPACE

**Where DeltaCom has a special access loop that goes to DeltaCom's collocation space, can that special access loop be converted to a UNE loop?**

### A. Positions of Parties

DeltaCom states that in some instances, it has special access loops that go to its collocation space, and that in such instances DeltaCom should be allowed to convert those circuits to UNE loops. DeltaCom adds that language [*81] exists currently in the interconnection agreement of AT&T Communications of the South Central States, Inc. ("AT&T") and BellSouth in other states that allows AT&T to convert special access loops to UNE loops. DeltaCom requests the same treatment. n146

n146 Steve Brownworth, Pre-Filed Direct Testimony, p 16 (August 4, 2003)

BellSouth opines that per the requirements of the FCC in the *Supplemental Order Clarification*, n147 special access conversions only apply to Enhanced Extended Loops ("EELs"). If a CLEC wants to roll its traffic from a special access service to a UNE loop, then the CLEC must order a UNE circuit, roll the traffic and then disconnect the special access circuit. n148

n147 *Local Competition Provisions of the Telecommunications Act of 1996, Supplemental Order Clarification, 15 FCC Rcd 9587, 9602 (2000)* ("Supplemental Order Clarification")

n148 Kathy Blake, Pre-Filed Direct Testimony, pp 7-8 (August 4, 2003).

[*82]

BellSouth asserts that further state proceedings should ultimately decide whether such conversion is allowed. If the TRO is stayed, then BellSouth wants the Authority to reject DeltaCom's position and direct DeltaCom to avail itself of and pay for other options that are available. If the TRO is not stayed, then BellSouth wants the Authority to direct the parties to utilize the change of law provisions in the interconnection agreement. n149

n149 *BellSouth Telecommunications, Inc Post-Hearing Brief*, pp 58-59 (October 27, 2003)

**B. Deliberations and Conclusions**

This issue should not be deferred until the end of the state proceedings. TRA Docket No. 03-00527 n150 has been commenced to address which loops, on a location and route specific basis, will continue to be available as UNEs. Pursuant to the TRO, the state commissions are expected to conduct further granular reviews, and these reviews may become more frequent as more locations meet the necessary triggers to remove the UNE requirement. n151 Now is the most [*83] appropriate time to address the issue.

n150 *See In re Implementation of the Federal Communications Commission's Triennial Review Order -- 9 Month Proceeding -- Loop and Transport*, TRA Docket No. 03-00527.

n151 TRO, 18 FCC Rcd at 17237

The Arbitrators rejected BellSouth's proposal to address this issue through the change of law provision as an unnecessary delay. n152 The Arbitrators found that the TRO is clear on this issue and that upon request the ILEC shall convert a wholesale service to the equivalent UNE service. n153 The conversion process shall have no adverse effects on service quality, and, except as agreed to by the parties, an ILEC shall not impose any untariffed termination charges or any disconnect fees. n154

n152 Transcript of Proceedings, p. 19 (January 12, 2004)

n153 *Id* at 19, *see also* TRO, 18 FCC Rcd at 17348-17350.

n154 *See* TRO, 18 FCC Rcd at Appendix B, p 5

[*84]

Furthermore, a similar process already exists for converting special access service to EELs. This process is handled as a project with a project manager. The conversions consist of identifying and verifying the circuits and the renaming of the circuit identification numbers. This would indicate that the implementation of a process to convert special access circuits to UNEs, as now required by the TRO, should be a simple modification to an existing process. n155

n155 *See Id*, P 593

During the deliberations on January 12, 2004, the Arbitrators voted unanimously to allow DeltaCom to convert special access circuits to UNE loops in accordance with the new rules promulgated by the FCC in the TRO.

**ISSUES 44 AND 46**: n156

n156 Issues 44 and 46 are listed separately in the Joint Issues Matrix that was filed August 15, 2003, but DeltaCom addressed them together in Steve Brownworth's Direct Testimony filed on August 4, 2003 (pp 18-23) John

Ruscilli's Direct Testimony filed on behalf of BellSouth on August 4, 2003 addressed the issues separately (pp 15-16), but his Rebuttal Testimony filed on August 11, 2003 addresses neither issue Issue 44 addresses trunk groups, and Issue 46 addresses services that are provided over the trunk groups.

[*85]
## ISSUE 44: ESTABLISHMENT OF TRUNK GROUPS FOR OPERATOR SERVICES, EMERGENCY SERVICES AND INTERCEPT

**Should the interconnection agreement set forth the rates, terms and conditions for the establishment of trunk groups for operator services, emergency services, and intercept?**

## Issue 46: BUSY LINE VERIFICATION/BUSY LINE VERIFICATION WITH INTERRUPT

**Does BellSouth have to provide Busy Line Verification/Busy Line Verification with Interrupt (BLV/BLVI) to ITCDeltaCom consistent with the language proposed by ITCDeltaCom?**

### A. Positions of the Parties

BellSouth contends that the rates, terms and conditions for the establishment of trunk groups for operator services, directory assistance, emergency services and intercept should not be included in the interconnection agreement, because these services are no longer UNEs. BellSouth argues that these trunk groups are provided under the access tariff, not the agreement. BellSouth states that it will provide BLV/BLVI in a nondiscriminatory manner and at parity with the manner it provides such functionality to its retail customers. n157 Nevertheless, in Tennessee, the Operator Services and Directory Assistance elements [*86] currently must be unbundled, and available at UNE rates and are handled in Attachment 2 of the interconnection agreement. n158

n157 *Revised Joint Issues Matrix*, pp. 14-15 (August 15, 2003).

n158 John A Ruscilli, Pre-Filed Direct Testimony, p 15 (August 4, 2003)

BellSouth admits that trunks connecting the operator services platforms of BellSouth and DeltaCom do exist today and that there is no technical reason why BellSouth could not provide DeltaCom with the services that it seeks. Nevertheless, BellSouth argues that, although these trunks exist, a manual process is required for it to provide BLV and BLVI services to DeltaCom and that BellSouth is not required by law to offer to its retail customers a product that it chooses not to offer. BellSouth has made the business decision not to provide these services on switches where it cannot provide the process electronically. BellSouth will, however, provide the services for UNE-P customers of DeltaCom or any other customer who is served from BellSouth's own [*87] switches. n159 BellSouth claims that in order to verify the status of a non-BellSouth line, the BellSouth operator would have to determine which CLEC serves the customer, but that its operators do not have access to this information. Furthermore, BellSouth argues that its operator would also need to determine if BellSouth had an agreement with the CLEC to allow such inquiries, and that in order to query the CLEC operator, BellSouth would have to install additional equipment.

n159 Transcript of Proceedings, v III, pp. 649-658 (September 12, 2003)

Finally, BellSouth contends that, for the service to be effective, it would have to have such operator service interconnection with every CLEC in Tennessee and that every CLEC in Tennessee would have to have such arrangements with every other CLEC in Tennessee. n160 BellSouth argues that BLV and BLVI are tariffed services, not UNEs, and, therefore, are not appropriate issues for a Section 251 arbitration. BellSouth also states that DeltaCom can obtain BLV and BLVI pursuant [*88] to the rates, terms and conditions in BellSouth's tariff. n161

2005 Tenn. PUC LEXIS 332, *

n160 *BellSouth's Response to Inquiries, Late-filed Hearing Exhibit No 3* (October 13, 2003)

n161 John A Ruscilli, Pre-Filed Direct Testimony, p. 16 (August 4, 2003).

DeltaCom disagrees with BellSouth's decision to exclude rates, terms and conditions for the interconnection of the companies' operator services platforms. DeltaCom explains that, unlike most other CLECs, it has its own Operator/Directory Assistance ("DA") center and claims that it must be able to interconnect its Traffic Operator Position System ("TOPS") platform with BellSouth's operator service platform. DeltaCom argues that the parties' platforms are connected today, fully paid for by DeltaCom at tariffed access rates, and that there is no technical reason the parties cannot provide BLV and BLVI services to one another. n162 DeltaCom takes the position that this arrangement mutually benefits BellSouth's and DeltaCom's operator services centers, and it has proposed language that [*89] exists in the parties' current interconnection agreement. n163

n162 *Post-Hearing Brief of ITCDeltaCom Communications, Inc*, p 32 (October 27, 2003)

n163 *Revised Joint Issues Matrix*, pp 14-15 (August 15, 2003)

DeltaCom contends that BellSouth's new position changes an understanding that the companies have had for many years without a reasonable business explanation and that BellSouth's position treats DeltaCom as a retail customer rather than a carrier. DeltaCom cites a hypothetical example of a BellSouth customer who needs to reach a DeltaCom customer on an emergency basis. The BellSouth customer would dial 0 to reach a BellSouth operator, who could reach a DeltaCom operator who can either intercept, verify busy or otherwise reach the DeltaCom customer. The example would also work in reverse for the DeltaCom customer who needs to reach a BellSouth customer. DeltaCom argues that the operator centers would have no reasonable way to communicate with one another without the trunks that connect the two companies' [*90] operator services platforms.

DeltaCom quotes from BellSouth's response to its *First Set of Interrogatories*, in which BellSouth stated that "BellSouth does not subscribe to busy line interrupt or busy line verification service from ITCDeltaCom and BellSouth operators have no provision to contact ITCDeltaCom operators for this service." n164 DeltaCom expects that interconnection between the companies' operator services platforms will increase over time. It wants to ensure that traffic (including operator calls) is exchanged on a reciprocal basis, and it wants the Authority to require the parties to interconnect such that emergency operator services and BLV will continue for the benefit of both DeltaCom and BellSouth customers. n165

n164 Steve Brownworth, Pre-Filed Direct Testimony, Exhibit C (August 4, 2003).

n165 *Id* at 18-23

DeltaCom also claims that it provides operator services on a wholesale basis to ILECs and other CLECs and argues that if BellSouth denies DeltaCom's customers the ability to receive [*91] important (and perhaps emergency) calls from BellSouth customers, it is not treating DeltaCom customers at parity with its own similarly situated customers. DeltaCom offers the following language from the AT&T Tennessee interconnection agreement that it believes may be appropriate for its own interconnection agreement:

3.13 Each party shall establish procedures whereby its operator bureau will coordinate with the operator bureau of the other Party in order to provide Busy Line Verification/Busy Line Verification Interrupts ("BLV/BLVI") services on calls between their respective line side and users for numbers that are not ported. n166

n166 DeltaCom admits that it does not fully understand the limitations of not being able to provide these services to ported number customers. *See* Steve Brownworth, Pre-Filed Rebuttal Testimony, pp. 19-20 (August 4, 2003)

DeltaCom opines that BellSouth's policy discriminates against facilities-based DeltaCom customers and presents safety concerns for Tennessee customers trying [*92] to reach loved ones in times of potential emergency. DeltaCom complains that BellSouth's policy requires customers to call 911 if they cannot get through to a loved one and that this wastes precious and limited emergency services resources. DeltaCom argues that BellSouth will perform BLV/BLVI for its own customers if they are calling customers on BellSouth's network but not customers on DeltaCom's network. DeltaCom contends that BellSouth's position on this issue suggests that BellSouth will not query a database to improve the safety of Tennessee consumers. DeltaCom also cites 47 C.F.R. § 51.305(a)(1) that requires ILECs to interconnect for the "transmission and routing of telephone exchange traffic, exchange access traffic, or both." DeltaCom complains that BellSouth is asking DeltaCom to order the services from its access tariff, but it points out that BellSouth's access tariff does not address local traffic. DeltaCom takes issue with BellSouth's complaint that DeltaCom's request is insincere because DeltaCom has not made its request to apply generally to the industry instead of just to DeltaCom. DeltaCom offers to participate in a generic [*93] TRA effort to interconnect all operator services platforms if the TRA deems such a proceeding appropriate. n167

n167 *Post-Hearing Brief of ITCDeltaCom Communications, Inc*, pp. 32-36 (October 27, 2003).

Neither party submitted evidence or testimony regarding the costs associated with creating the databases necessary to provide a BLV and BLVI. Therefore, the Arbitrators unanimously agreed to hold Issue 46 in abeyance, regarding BellSouth's provision of BLV and BLVI, until additional information is provided by the parties. The Arbitrators directed BellSouth to provide the costs associated with creating a database, and directed DeltaCom to respond to the filing of these costs. Upon receipt of this requested information, Issue 46 would be deliberated with the other FBOs.

Before providing the cost estimates, BellSouth clarified that because its verification network does not include all 10 digit numbers, its current retail BLVI service does not allow the operator to verify or interrupt a call. This is further complicated [*94] by local number portability because it has to be determined which switch and/or CLEC owns the number. To accomplish this query, the BellSouth operator would require access to the local number portability database in order to determine the CLEC owner. Also, an additional database would be required in order to identify all CLECs and their NPA-NXXs along with the associated Toll Test Code so BellSouth operators can reach the appropriate CLEC Operator Service Provider. These databases would require BellSouth to develop new methods and procedures for its operators along with new network trunking, service order procedures and a mechanized billing program to enable CLECs and BellSouth to bill end users. BellSouth provided two network descriptions and configurations for providing BLVI on CLEC numbers to Bellsouth end users. For either option Bellsouth estimates a total cost of approximately $ 900,000 to $ 1,100,000 and six to nine months to complete. n168

n168 *BellSouth Telecommunications, Inc's Best and Final Offers*, p. 8 (February 23, 2004).

[*95]

DeltaCom responded that the trunking facilities are in place and available for this service. Additionally, DeltaCom claimed that BellSouth provided no justification for the cost estimates, and DeltaCom should not be responsible for paying for BellSouth to deliver a service to its end users. DeltaCom asserts that BellSouth maintains the local number portability ("LNP") database and can query this database to determine whether to all the DeltaCom operator or transfer the call. BellSouth currently charges other carriers $ .000123 to query this database. DeltaCom is willing to provide BellSouth with a telephone number to DeltaCom's operator services center to enable the BellSouth operator to call and/or transfer a customer over to DeltaCom. This would enable the DeltaCom operator to perform the query for $ 1.00 charge to BellSouth. BellSouth could then pass this charge on to its end user.

## B. Deliberations and Conclusions

BellSouth is required by 47 C.F.R. § 51.305(a)(1) to interconnect with DeltaCom for the "transmission and routing of telephone exchange traffic, exchange access traffic, or both." While BellSouth argues that DeltaCom should order [*96] operator services from its access tariff, such does not alter the fact that if a BellSouth customer needed to reach a non-UNE DeltaCom customer in an emergency, the BellSouth operator would instruct its customer to hang up and dial 911 instead of connecting the BellSouth customer with the DeltaCom customer. Thus, the interchange of operator services traffic between the parties for the Purposes of BLV and BLVI can potentially enhance the safety of Tennessee consumers and avoid the unnecessary use of scarce emergency resources. Additional, BellSouth's proposal essentially treats DeltaCom like a retail customer rather than like a carrier, and, as such, precludes DeltaCom from providing to its customers the same services that BellSouth provides to its own retail customers.

BellSouth protests that if it is required to provide these facilities and services to DeltaCom then it would be required to provide them to all CLECs. Nevertheless, this should not present a problem, as long as BellSouth is compensated for the costs it incurs in providing these facilities and services. Furthermore, as DeltaCom points out, BellSouth has been providing these facilities and services to DeltaCom for some [*97] time without additional requirements. Requiring BellSouth to continue this arrangement should not impose any additional obligations on it than are imposed under the parties' current arrangement. Further, BellSouth does not dispute DeltaCom's argument that it could recover its costs through the rates that DeltaCom pays for these trunks.

In TRA Docket 00-00079 the Directors, acting as arbitrators, determined that BellSouth should be required to continue offering Operator Services/Directory Assistance ("OS/DA") as a UNE until BellSouth demonstrate the existence of a sufficient customized routing solution. n169 The Final Order in Docket 00-00079 required that a customized routing solution be fully tested in the applicable service area before BellSouth would be relieved of its obligation to provide OS/DA services as a UNE. Such testing is necessary given the FCC's observation that some ILEC offices may have equipment dated to the point that it cannot provide customized routing.

n169 See In re Petition for Arbitration of the Interconnection Agreement Between AT&T Communications of the South Central States, Inc., TCG MidSouth, Inc, and BellSouth Telecommunications, Inc Pursuant to 47 U S C § 252, TRA Docket No 00-00079, (Final Order of Arbitration Award) pp 27-28 (November 29, 2001).

[*98]

BellSouth has submitted no evidence that it has implemented a sufficient customized routing solution in Tennessee. BellSouth made a business decision not to provide the trunk groups to DeltaCom's operator services platform over which the parties currently interconnect to provide BLV/BLVI services to their customers. BellSouth states that manual operations are required to provide these services, but it does not argue that it cannot recover its expenses for providing these manual functions through the rates that it charges DeltaCom

Therefore, the Arbitrators adopted DeltaCom's position and required BellSouth to include in the interconnection agreement rates, terms and conditions for the establishment of trunk groups for operator services, emergency services and intercept as well as to provide BLV and BLVI until such time as BellSouth has furnished the evidence that it has implemented a sufficient customized routing solution in Tennessee. n170

n170 Transcript of Proceedings, pp. 22-23 (January 12, 2004), *see also* Transcript of Proceedings, pp. 12-13 (March 22, 2004) Director Jones commented that it is "in the public interest for all telephone subscribers in Tennessee to have the same type of services regardless of their telephone provider and not pursue any type of policy that may inadvertently devalue one provider's service-services compared to another." Transcript of Proceedings, pp 12-13 (March 22, 2004)

[*99]

## ISSUE 47: COMPENSATION FOR THE USE OF DELTACOM'S COLLOCATION SPACE ("REVERSE COLLOCATION")

**Should BellSouth be required to compensate DeltaCom when BellSouth locates in DeltaCom's collocation space? If so, should the same rates, terms and conditions apply to BellSouth that BellSouth applies to DeltaCom?**

### A. Positions of the Parties

BellSouth acknowledges that it has installed equipment at various DeltaCom Points of Presence ("POPs"), but claims that the equipment is not for the purpose of interconnecting with DeltaCom's network and/or accessing unbundled network elements in the provision of telecommunications service to the end users. n171 Rather, BellSouth contends such equipment at DeltaCom POPs is for the sole purpose of providing special and switched access services ordered by DeltaCom and/or DeltaCom's end user customers. According to BellSouth, this equipment is not being used for collocation purposes. n172 BellSouth further states that it has installed additional equipment that uses some of the spare capacity to exchange local traffic with DeltaCom, with the qualification that this was done "only because Delta-Com requested it or it was to the parties' mutual [*100] benefit." n173 Therefore, BellSouth is requesting that "all of the existing POPs and any other locations in which BellSouth has placed equipment, including any augments to the equipment already placed at these sites, should be exempted from any future collocation agreement." n174

n171 John A. Ruscilli, Pre-Filed Direct Testimony, pp. 17, 19 (August 4, 2003).

n172 *Id* at 17

n173 *Id* at 22

n174 *Id* at 23.

DeltaCom maintains that it should be compensated by BellSouth for the processing, preparation and use of Delta-Com space at the same rates BellSouth charges for ts collocation spaces. n175 According to DeltaCom, to allow Bell-South to use DeltaCom space without payment is confiscatory. The main reasons given by DeltaCom for the position it has taken on this issue are: 1) the equipment that BellSouth places into the DeltaCom network supports the products that BellSouth sells to other carriers; 2) BellSouth delivers its own DS service (Digital Signal, Level 3) n176 for BellSouth-originated traffic [*101] on this equipment; and 3)BellSouth has asserted its willingness to compensate DeltaCom when it collocates within a DeltaCom-owned POP in other arbitrations. n177

n175 Steve Brownworth, Pre-Filed Direct Testimony, p 24 (August 4, 2003)

n176 DS3 describes digital transmission at 45 megabits per second.

n177 Steve Brownworth, Pre-Filed Direct Testimony, p 25 (August 4, 2003).

### B Final Best Offers

During the January 12, 2004 deliberations, the Arbitrators voted unanimously to require the parties to submit FBOs on this issue. n178

n178 Transcript of Proceedings, p 35 (January 12, 2004)

BellSouth proposes the following contract language for reverse collocation:

BellSouth should not be required to pay collocation charges when such collocation is for the benefit of, and at the request of, DeltaCom. BellSouth should pay collocation charges [*102] when voluntarily collocating in a DeltaCom premise whereby BellSouth derives benefit from the collocation space. Consequently, the existing Points of Presence ("POPs"), including, but not limited to NVSMTN30AMD and CHTHTNDNH00, as well as any other locations in which BellSouth has placed equipment, including any augments to the equipment already place at these sites, should be exempted from any future collocation agreement.

For any POPs or other DeltaCom locations that are established after the effective date of the new collocation agreement ("future sites"), BellSouth would agree to pay mutually negotiated collocation charges for BellSouth equipment located and used solely for the purposes of delivery of BellSouth's originated local interconnection traffic, and only if BellSouth voluntarily requests to place a point of interconnection ("POI") for BellSouth's originated local interconnection traffic in a particular POP or other DeltaCom location. In those instances in which DeltaCom requests that the DeltaCom POP or other location be designated as the POI for DeltaCom's originating traffic and where BellSouth must place equipment in order to receive this traffic, the POP or other [*103] location will NOT be deemed to be a location at which BellSouth has voluntarily chosen to place a POI for BellSouth's originated local interconnection traffic.

Further, if DeltaCom has the right under the new Interconnection Agreement to choose the POI for both Parties' originated traffic and DeltaCom chooses to have the POI for BellSouth's originated traffic at a DeltaCom POP or other location, then such POP or other location will NOT be deemed as a location at which BellSouth has voluntarily chosen to place a POI for BellSouth's originated local interconnection traffic. The provisions of BellSouth's tariffs would control if BellSouth locates equipment in DeltaCom's premises pursuant to such tariffs. n179

n179 BellSouth Telecommunications, Inc's Best and Final Offers, pp 8-9 (February 20, 2004)

DeltaCom submits this language:

Where BellSouth places equipment on ITCDeltaCom space and uses that equipment to serve entities other than ITCDeltaCom, BellSouth derives a benefit and shall abide by the same [*104] terms and conditions applied to ITCDeltaCom for collocation and pay ITCDeltaCom pursuant to the same rates, terms and conditions for collocation that BellSouth applies to ITCDeltaCom. n180

n180 Final Best Offer, p 8 (February 23, 2004).

2005 Tenn. PUC LEXIS 332, *

DeltaCom explains that because this language will be included in an interconnection agreement that is effective upon the TRA's approval going forward for the term of the new agreement, this language cannot be applied on a retroactive basis. It will charge the same applicable non-recurring and recurring charges BellSouth charges DeltaCom on a going forward basis for those locations where BellSouth has placed equipment in DeltaCom's space that is being used by BellSouth to sell to other entities. n181

n181 *Id*

**C. Deliberations and Conclusions**

BellSouth admits n182 that it has equipment located in DeltaCom's [*105] POPs and that the equipment uses some of the spare capacity to exchange local traffic with DeltaCom. At the hearing, BellSouth further conceded that it derives revenues from services it provides to competitors using such equipment it has placed in DeltaCom's collocation space. n183 Nevertheless, BellSouth maintains that such collocation was needed only because DeltaCom requested it, or it was found to be beneficial to both parties. n184 As a result, BellSouth insists that it should not be deemed to have voluntarily chosen DeltaCom's premises as the POI for BellSouth's originated local interconnection traffic. n185 Moreover, although BellSouth has in the past agreed to pay reverse collocation charges, its witness testified "BellSouth had no intention of electing to collocate its equipment." n186

n182 John A. Ruscilli, Pre-Filed Direct Testimony, p. 22 (August 4, 2003)

n183 Transcript of Hearing, v. III, p 667 (September 12, 2003).

n184 John A Ruscilli, Pre-Filed Direct Testimony, p 22 (August 4, 2003)

n185 *BellSouth Telecommunications, Inc, Post-Hearing Brief*, p 64 (October 27, 2003).
[*106]

n186 John A Ruscilli, Pre-Filed Rebuttal Testimony, p 13 (August 11, 2003).

During the deliberations on March 22, 2004, a majority n187 of the Arbitrators voted to adopt DeltaCom's FBO with one exception and require BellSouth to compensate DeltaCom when BellSouth locates in DeltaCom's collocation space at the rates, terms and conditions that BellSouth applies to DeltaCom. Reverse collocation charges should be paid on a going-forward basis for existing as well as future collocations at DeltaCom locations. Nevertheless, BellSouth should not be required to pay any nonrecurring charges associated with existing collocations. n188

n187 Director Miller did not vote with the majority

n188 Transcript of Proceedings, pp. 13-14 (March 22, 2004). Chairman Tate reaffirmed her previous motion *See* Transcript of Proceedings, pp 30-31 (January 12, 2004)

**ISSUE 56: CANCELLATION CHARGES**

**(a) May BellSouth charge a cancellation [*107] charge which has not been approved by the Commission?**

**(b) Are these costs already captured in the existing UNE approved rates?**

**A. Positions of Parties**

DeltaCom asserts that there has not been a proceeding to establish a cost-based rate for cancellation charges and that no Authority-approved rate exists for such charges. n189 Additionally, the Authority has consistently treated such rates as subject to the same pricing requirements as the recurring rates for UNEs. BellSouth must therefore demonstrate that the rates it seeks to charge are cost-based and consistent with 47 U.S.C. § 252. n190 BellSouth proposes that DeltaCom pay for any costs incurred by BellSouth in conjunction with the provisioning of such requests in accordance with BellSouth's Private Line FCC Tariff No. 1. DeltaCom avers that the Authority does not regulate interstate rates nor investigate the reasonableness of those rates and insists that BellSouth must prove that its proposed rates comply with 47 U.S.C. § 252. n191

n189 Transcript of Proceedings, pp. 170-171 (August 27, 2003).
[*108]

n190 Don J Wood, Pre-Filed Direct Testimony, pp. 6-7 (August 4, 2003).

n191 *Id* at 8

BellSouth's witness testified that BellSouth is entitled to recover its costs for the provision of UNEs:

> When a CLEC cancels an LSR, n192 cancellation charges apply on a prorated basis and are based upon the point within the provisioning process that the CLEC cancels the LSR. The applicable percentages at different points in the provisioning process are included in BellSouth's FCC No. 1 Tariff. Any costs incurred by BellSouth in conjunction with the provisioning of that request will be recovered in accordance with BellSouth's Private Line Tariff, Section B2.4.14 (applicable for UNEs that are billed by BellSouth's CRIS n193 system) or BellSouth's FCC No. 1 Tariff, Section 5.4 (applicable for UNEs that are billed by BellSouth's CABS n194 system). n195

n192 LSR is an acronym for Local Service Request

n193 CRIS is an acronym for Customer Record Information System

n194 CABS is an acronym for Carrier Access Billing System
[*109]

n195 John A Ruscilli, Pre-Filed Direct Testimony, p 25 (August 4, 2003) (footnotes 189-191 added for Clarification of acronyms).

The rate associated with the cancellation charge equals a percentage of the applicable installation nonrecurring charge. Since the Authority has already approved the rates for the nonrecurring charges, the cancellation rates are appropriately cost-based. n196

n196 *Id*

## B. Deliberations and Conclusions

It is reasonable for BellSouth to recover some of the cost of provisioning a service in the event that the request for service is cancelled. As BellSouth witness John Ruscilli testified, the rate varies based on the point in the process that the service order is cancelled and is a percentage of the nonrecurring installation charge associated with that UNE. n197 The percentage is determined in accordance with the FCC No. 1 Tariff. n198 If the order is cancelled soon after it is submitted, or the order [*110] is electronically submitted and does not fall out for manual handling, no cost is incurred. n199

n197 John A Ruscilli, Pre-Filed Direct Testimony, p. 25 (August 4, 2003)

n198 *Id*

n199 *BellSouth Telecommunications, Inc Post-Hearing Brief*, p. 66 n 40 (October 27, 2003)

DeltaCom asserts that BellSouth is pulling rates out of the FCC tariff, n200 and that adopting rules in this manner could create a worrisome precedent. Nevertheless, the language in the FCC tariff specifies at which point in the provisioning process a fee should be levied, not what rate should be charged.

Certain Telephone Company critical dates are associated with an Access Order provisioning interval, whether standard or negotiated. These dates are used by the Telephone Company to monitor the progress of the provisioning process. At any point in the Access Order interval the Telephone Company is able to determine which critical date was last completed and can thus determine what percentage of the Telephone Company's provisioning [*111] costs have been incurred as of that critical date. n201

n200 *Post-Hearing Brief of ITCDeltaCom Communications, Inc*, p. 40 (October 27, 2003).

n201 BellSouth FCC Tariff Section 5 4(B)(4)(a)

It is common business practice to charge for services rendered in the event of a cancellation. In this instance BellSouth is proposing to utilize a prorated percentage of nonrecurring installation rates. As long as these rates can be tied back to Authority approved cost-based rates (nonrecurring UNE installation rates), then BellSouth should be entitled to charge them. Finally, BellSouth's Tennessee Statement of Generally Accepted Terms and Conditions ("SGAT") includes cancellation language that references back to the FCC No. 1 Tariff. n202

n202 Tennessee SGAT, Attachment 2, Section 1 6 2, states, "If<<customer name>> cancels an order for Network Elements, Combination or other services, any costs incurred by BellSouth in conjunction with the provisioning of that order will be recovered in accordance with FCC Tariff No 1 Section 5 "

[*112]

Therefore, the Arbitrators voted unanimously to allow BellSouth to charge cancellation fees based on the nonrecurring installation rates approved by the Authority. n203 BellSouth proposes to utilize a prorated percentage of the nonre-

curring installation rates that have been approved by the Authority, and it is reasonable for Bellsouth to recover some of the cost of provisioning a service when the service order is cancelled.

n203 Transcript of Proceedings, pp. 35-36 (January 12, 2004)

**ISSUE 57: RATES AND CHARGES FOR CONVERSION OF CUSTOMERS FROM SPECIAL ACCESS TO UNE-BASED SERVICE**

**(a) Should BellSouth be permitted to charge for DeltaCom conversions of customers from a special access loop to a UNE loop?**

**(b) Should the conversion be completed such that there is no disconnect and reconnect (i.e. an outage to the customer)?**

**A. Positions of Parties**

BellSouth maintains that it is not obligated to convert special access circuits to stand alone UNEs; nor does it have a process that converts access [*113] services to stand alone UNEs. n204 According to BellSouth, DeltaCom must compensate BellSouth for making the conversion. Otherwise, to minimize service outage for the end user, DeltaCom must order a new UNE circuit, roll the traffic to the UNE circuit and then disconnect the special access service. n205

n204 Kathy Blake, Pre-Filed Direct Testimony, p 9 (August 4, 2003).

n205 *Id*

DeltaCom asserts that the conversion of customers from special access to a UNE loop is simply a billing change. In other words, DeltaCom claims there is no change in the physical makeup of the loop and the only applicable charge is administrative. n206 Therefore, DeltaCom asks that it be permitted to convert the special access loop to a UNE loop without taking the customer out of service and to pay only administrative charges. n207

n206 Steve Brownworth, Pre-Filed Direct Testimony, p. 17 (August 4, 2003)

n207 Steve Brownworth, Pre-Filed Rebuttal Testimony, p 19 (August 4, 2003).

[*114]

**A. Deliberations and Conclusions**

In the Triennial Review Order, the FCC recognized the "[existence] of a risk of wasteful and unnecessary charges, such as termination charges, re-connect and disconnect fees, or non-recurring charges," which "could deter legitimate conversions from wholesale services to UNEs or UNE combinations, or could unjustly enrich an incumbent LEC," and concluded that "such charges are inconsistent with an incumbent LEC's duty to provide nondiscriminatory access to UNEs and UNE combinations on just, reasonable, and nondiscriminatory rates, terms and conditions." n208 Further, the FCC concluded that the conversions, which should be performed in an expeditious manner, are largely a "billing function." n209

n208 TRO, 18 FCC Rcd at 17349.

n209 *Id*

During the deliberations on January 12, 2004, the Arbitrators echoed the FCC's conclusions. Thereafter, based upon the conclusions and evidence in this proceeding, the Arbitrators found that DeltaCom should only be [*115] required to pay the appropriate billing charges for the conversion of customers from special access to UNE-P. These charges should not include termination charges, reconnect or disconnect charges or nonrecurring charges associated with establishing service for the first time. Further, the conversion should take place without any service outage to the customer. n210

n210 Transcript of Proceedings, pp 37-38 (January 12, 2004)

## ISSUE 59: PAYMENT DUE DATE

**Should the Payment Due Date be thirty days from receipt of the bill?**

### A. Positions of the Parties

DeltaCom maintains that BellSouth has a history of rendering bills late or in error. According to its witness, that DeltaCom receives thousands of invoices from BellSouth and generally the bills arrive up to seven days after the billing date. n211 Moreover, DeltaCom has found numerous errors and received credits from BellSouth in the millions of dollars due to such inaccuracies. DeltaCom argues that it should be permitted at least thirty days from the date [*116] of receipt of the bill to review the bill and make payment and/or lodge a dispute regarding any erroneous portion of the bill. DeltaCom states, "BellSouth's position appears to be that ITCDeltaCom must meet the due date,' which is the next bill date' (again, the time the bill is generated within BellSouth), regardless of when ITCDeltaCom actually receives the bill." n212 DeltaCom avers that utilizing the received date as the starting point for the thirty days is critical, because BellSouth has an extensive record of late or delayed billing, n213 and that DeltaCom needs every day of that time period to analyze the bills for accuracy and to dispute bills that are not correct. n214

n211 Jerry Watts, Pre-Filed Rebuttal Testimony, pp 9-10 (August 11, 2003)

n212 *Post-Hearing Brief of ITCDeltaCom Communications, Inc*, p. 45 (October 27, 2003)

n213 Jerry Watts, Pre-Filed Direct Testimony, p. 18 (August 4, 2003)

n214 Jerry Watts, Pre-Filed Rebuttal Testimony, p. 10 (August 11, 2003).

BellSouth argues [*117] that payment should be due by the next bill date, that BellSouth invoices DeltaCom every thirty days and that to the extent that DeltaCom has questions about its bills, BellSouth cooperates with DeltaCom to provide responses in a prompt manner to resolve any issue. n215 BellSouth also maintains that it is reasonable for payment to be due before the next bill date.

n215 John A Ruscilli, Pre-Filed Direct Testimony, p 29 (August 4, 2003)

BellSouth claims that there is no legitimate reason to allow DeltaCom a full thirty days after receiving its bill to make payments. The bill date is the same each month and DeltaCom knows the date its bills will be due each month. n216 BellSouth argues that DeltaCom, like every other CLEC that does business with BellSouth, has a set bill date for every invoice BellSouth sends to DeltaCom. BellSouth states that based on that bill date, DeltaCom knows exactly what date the payment is due for each of those invoices. n217 In addition, BellSouth states that DeltaCom can dispute invoices long [*118] after the payment due date and, in fact, DeltaCom files such disputes. BellSouth states that "the current billing practice in no way prejudices DeltaCom's ability to dispute charges that it believes are improper." n218

n216 *Id*

n217 *BellSouth Telecommunications, Inc Post-Hearing Brief*, p 72 (October 27, 2003)

n218 *Id* at 73

**B. Deliberations and Conclusions**

It is undisputed that most of BellSouth's bills to DeltaCom are transmitted electronically. This method of billing essentially renders the bill receipt date the same as the bill rendered date, in other words, the customer receives the bill as soon as it is sent. n219 Both parties also agree that the time between the bill date and the bill rendered date ranges from two to seven days. n220 Therefore, it is this time period, from the bill date to the bill rendered date, that is crucial to DeltaCom's ability to review the bill and which is with in BellSouth's control. Any delay by BellSouth in assembling DeltaCom's bills during this time period [*119] reduces the amount of time DeltaCom needs to process its bills and BellSouth presently has no incentive to become more efficient in this area.

n219 DeltaCom's witness Mr Watts stated the figure of 95% *See* Jerry Watts, Pre-Filed Rebuttal at 10 (August 11, 2003) BellSouth's Post-Hearing Brief stated "well over ninety percent" *BellSouth Telecommunications, Inc Post-Hearing Brief*, p. 73 (October 27, 2003)

n220 The bill is assembled and printed during this time period

A majority n221 of the Arbitrators found that 25 days from the bill receipt date to the payment due date would give DeltaCom sufficient time to review its bills from BellSouth, and accordingly determined that the due date of bills should be 25 days from the date of receipt. n222

n221 Director Miller did not vote with the majority.

n222 Transcript of Proceedings, pp 38-39 (January 12, 2004).

[*120]
**ISSUE 60: DEPOSITS**

**(a) Should the deposit language be reciprocal?**

**(b) Must a party return a deposit after generating a good payment history?**

**A. Positions of the Parties**

2005 Tenn. PUC LEXIS 332, *

DeltaCom supports language consistent with the FCC policy on deposits, including the basic principles of reciprocity, non-discrimination, transparency, payment history for timely billed undisputed charges and third party review. Additionally, DeltaCom maintains that the parties disagree whether a deposit should be assessed at all. According to DeltaCom, BellSouth is seeking more stringent deposit requirements than exist in the parties' current interconnection agreement. Furthermore, DeltaCom has proposed language that more accurately reflects DeltaCom's years of timely payments to BellSouth. n223

n223 Jerry Watts, Pre-Filed Direct Testimony, pp 25-28 (August 4, 2003)

DeltaCom maintains that the deposit language should be reciprocal. n224 DeltaCom argues that "the FCC recently, and correctly, rejected the requests of BellSouth [*121] and other ILECs to demand increased deposit requirements under their interstate services tariffs." n225 "In its Policy Statement, the FCC concluded that the risk posed by uncollectibles may not be as great as alleged by certain carriers.'" n226 "While certain factors may reasonably precipitate accelerated billing and collection cycles, the FCC nonetheless maintained the status quo with respect to deposit requirements, explaining, we do not believe, however, that additional deposit requirements are warranted at this time.'" n227

n224 *Id* at 19

n225 *Id* at 20

n226 *Id* at 20 (quoting from *In the Matter of Verizon Petition for Emergency Declaratory and Other Relief*, WC Docket No. 02-202, Policy Statement, P 14 (2002) ("Policy Statement"))

n227 Jerry Watts, Pre-Filed Direct Testimony, pP 20-21 (August 4, 2003) (quoting from Policy Statement, P 14 (Released December 23, 2002))

DeltaCom states that if a party has a good payment history, no deposit should be required. n228 DeltaCom supports [*122] this claim based on the fact that although BellSouth uncollectible revenues have increased by 2 million, revenues for all Tennessee interstate specials access services have increased by 72 million. DeltaCom also asserts that BellSouth faces no extraordinary risks other than those borne by other market participants. n229

n228 Jerry Watts, Pre-Filed Direct Testimony, p. 19 (August 4, 2003)

n229 Jerry Watts, Pre-Filed Rebuttal Testimony, p 13 (August 11, 2003)

BellSouth argues that because BellSouth is not similarly situated with a CLEC provider it should not be subject to the same creditworthiness and deposit requirements/standards. BellSouth further states: "If BellSouth is buying services from a CLEC provider's tariff, the terms and conditions of such tariff will govern whether BellSouth must pay a deposit. Thus, the interconnection agreement is not an appropriate location for a deposit requirement to be placed on BellSouth." n230 Additionally, BellSouth maintains that it should not be required to return a deposit [*123] after a CLEC generates a good payment history, because payment history alone is not a measure of credit risk. n231

n230 John A. Ruscilli, Pre-Filed Direct Testimony, p 30 (August 4, 2003)

2005 Tenn. PUC LEXIS 332, *

n231 *Id* at 31

BellSouth counters that the FCC acknowledged the concerns of the ILECs. "Although it did not agree to the broadly crafted' tariff changes requested by Verizon and other ILECs, the FCC recognized that narrower protections, including shortened intervals for discontinuance of service, may be appropriate." n232 BellSouth claims that its experience in negotiating with CLECs demonstrates that they want more time, not less time; therefore, the accelerated and advanced payments suggested by the FCC would not help protect the ILECs. n233

n232 John A. Ruscilli, Pre-Filed Rebuttal Testimony, p. 19 (August 11, 2003)

n233 *Id*

**B. Deliberations** [*124] **and Conclusions**

As to Issue 60(a), the Arbitrators found that the two companies are not similarly situated. Therefore, the panel unanimously conclude that the deposit language should not be reciprocal.

As to Issue 60(b), it was noted during deliberations that there is a significant disparity between the monetary value of the services rendered by each party and that the deposits offer some indemnification against default in the rendering of those services. n234 For example, the record indicated that BellSouth bills DeltaCom approximately $ 8 million monthly, whereas DeltaCom bills BellSouth about $ 700,000 per month. n235 For these reasons, a majority of the Arbitrators found that deposits should be in place for the 36-month length of the agreement. n236

n234 Transcript of Proceedings, p 41 (January 12, 2004).

n235 BellSouth Telecommunications, Inc Post-Hearing Brief, p. 75 (October 27, 2003)

n236 Transcript of Proceedings, pp 39-42 (January 12, 2004). Director Tate did not join with the majority in finding that the deposit requirement should be in place for the length of the agreement

[*125]
**ISSUE 62: LIMITATION ON BACK BILLING**

**What is the limit on back billing for undercharges?**

**A. Positions of the Parties**

BellSouth takes the position that limitations for back billing should be governed by the state's applicable statute of limitations and/or any applicable regulations. BellSouth cites Tenn. Code Ann. § 28-3-109, which sets the statute of limitations at six years for contract claims that are not otherwise expressly provided for in a statute, such as contracts for services. n237 BellSouth argues with DeltaCom's position that ninety days is sufficient time for BellSouth to retrieve data and program its systems to support the back billing of under billing charges. BellSouth contends that DeltaCom has cited no legal authority to support its position that back billing should be precluded after ninety days from the date the service was rendered. BellSouth stated that the Authority would commit error if it were to impose a new statute of limitation that is inconsistent with Tenn. Code Ann. § 28-3-109. n238

n237 John A Ruscilli, Pre-Filed Direct Testimony, pp. 32-33 (August 4, 2003)

[*126]

n238 *BellSouth Telecommunications, Inc Post-Hearing Brief*, p. 79 (October 27, 2003)

BellSouth disputes DeltaCom's claim that it is unreasonable to bill it for the per-record ADUF n239 record charge for the period of February 2000 through November 2001. BellSouth maintains that it has been providing DeltaCom with the ADUF records necessary to bill its customers for these charges and the fact that DeltaCom has not passed these charges onto its customers is not the fault of BellSouth. n240

n239 ADUF is an acronym for Access Daily Usage File

n240 John A. Ruscilli, Pre-Filed Rebuttal Testimony, pp 21-22 (August 11, 2003).

DeltaCom believes that back billing between carriers should be limited to ninety days. DeltaCom argues that this provides ample time for the rendering of correct invoices, and proposes this as a reciprocal requirement. DeltaCom contends that allowing back billing for an extended period of time prevents both [*127] companies from establishing accurate cost structures with which to price retail services.

In addition, back billing based on revisions in policy or changes in interpretation of rules makes it difficult for the billed party to challenge the new or increased charges. Furthermore, DeltaCom claims that data that is readily available during the ninety day period may no longer be available over extended back billing periods. DeltaCom cites an instance in which it expects BellSouth to bill it $ 550,000 for ADUF record charges provided from February 2000 through November 2001. It complains that it has limited ability to charge its customers based on back-billed invoices for services and that such a potential liability severely jeopardizes its ability to compete against BellSouth. n241 DeltaCom suggests that the Authority should set different terms for carriers seeking recovery of carrier-to-carrier back-billed charges, as opposed to end user back-billed charges.

n241 Jerry Watts, Pre-Filed Direct Testimony, pp 28-29 (August 4, 2003)

[*128]

DeltaCom argues that BellSouth limits DeltaCom to thirty days from the billing date to analyze the accuracy of its bill, but that it wants six years to discover and bill for any errors that BellSouth commits. Furthermore, DeltaCom claims that due to the high rate of churn in the competitive market, many of its retail customers may no longer be with DeltaCom after the six year time period proposed by BellSouth. DeltaCom maintains that BellSouth has no incentive to improve its billing accuracy without a reasonable back billing window. It claims that BellSouth's agreements with other carriers have limits on back billing and that BellSouth has entered into contracts with multiple vendors where the back billing periods are limited to ninety or 180 days. n242 DeltaCom admits that it had agreed earlier to a back billing arrangement for the market-based rate, but it explains that at the time, it was under "operational duress" because its only alternative was to risk delays in BellSouth processing its orders while the dispute was settled. n243 DeltaCom reports that the North Carolina Utilities Commission Staff recently recommended a ninety day limit for back billing. DeltaCom states that limiting [*129] back billing to ninety days would accomplish two important public policy goals: (1) it would provide incentives to BellSouth to clean up its billing system, and (2) it would ensure stability and reasonable expectations between the parties regarding the costs of doing business. n244

n242 Jerry Watts, Pre-Filed Rebuttal Testimony, pp 14-17 (August 11, 2003)

n243 Transcript of Proceedings, v. I, pp 136-139 (August 27, 2003)

n244 *Post-Hearing Brief of ITCDeltaCom Communications, Inc*, pp 49-51 (October 27, 2003)

### B. Final Best Offers

During the January 12, 2004 deliberations, the Arbitrators noted that this was a timing issue with six years being the longest period proposed for back billing and ninety days being the shortest period. The panel determined that the ninety day time period appears to be short considering the volume of bills, yet six years appears to be excessive. Therefore, a majority of the Arbitrators n245 voted to require the parties to submit FBOs on the appropriate limit on back billing [*130] for undercharges. n246

n245 Chairman Tate did not vote with the majority to require FBOs, but rather proposed a ninety day limit on back billing, which is essentially what was unanimously adopted two months later on March 22, 2004

n246 Transcript of Proceedings, pp 42-44 (January 12, 2004)

The parties filed their FBOs on February 20, 2004. BellSouth proposes the following language:

With the exception of charges for which BellSouth does not have billing capability yet developed and services for which either party relies on records from a third party for billing of charges, all charges under this Agreement shall be considered final two (2) years after such charges were either billed or should have been billed. n247

DeltaCom proposes a back billing limit not to exceed three billing cycles. n248

n247 *BellSouth Telecommunications, Inc's Best and Final Offers*, p 9 (February 20, 2004)

n248 *Final Best Offer*, p 9 (February 20, 2004).

[*131]

### C. Deliberations and Conclusions

BellSouth should not penalize its customers for its failure to bill for services in a timely manner. Two years is not a reasonable amount of time for a company to have to carry such liabilities on its books. Therefore, during the March 22, 2004 deliberations, the Arbitrators voted unanimously to accept DeltaCom's Final Best Offer to limit back billing to three billing cycles. n249

n249 Transcript of Proceedings, pp 14-15 (March 22, 2004)

## ISSUE 63: AUDITS

**Is it appropriate to include language for audits of the parties' billing for services under the Agreement?**

2005 Tenn. PUC LEXIS 332, *

## A. Positions of the Parties

DeltaCom maintains that it is appropriate to include language for audits of the parties' billing for services under the interconnection agreement and offers the language from AT&T's interconnection agreement. Additionally, DeltaCom argues that the pick and choose rule applies to all contract provisions and specifically, in the case of billing language. DeltaCom maintains that [*132] regardless of whether BellSouth is required by law to provide DeltaCom with the opportunity to pick and choose audit language from other carriers' interconnection agreements, DeltaCom should have the right to audit BellSouth's billing. n250 DeltaCom avers that the FCC has consistently held that access to OSS functionalities (of which billing is one) is a critical element of providing nondiscriminatory access to UNEs under 47 U.S.C. § 251© (3) and that deploying the necessary OSS functions that allow competing carriers to order network elements and combinations of network elements and receive the associated billing information is critical to provisioning of those network elements. n251

n250 Jerry Watts, Pre-Filed Direct Testimony, pp 29-31 (August 4, 2003)

n251 *Id* at 30

BellSouth argues that 47 U.S.C. § 252(i), the pick and choose provision, only requires an ILEC to make available "any interconnection, service, or network element" under [*133] the same terms and conditions as the original interconnection agreement n252 and that billing audits are not required pursuant to 47 U.S.C. § 252(i). Additionally, BellSouth maintains that audits of BellSouth's billing for services under the interconnection agreement are not necessary, because performance measurements addressing the accuracy and timeliness of BellSouth's billing provide sufficient mechanisms for monitoring BellSouth's billing. Thus, BellSouth contends inclusion of audit language for billing in the agreement would be duplicative. n253

n252 John A Ruscilli, Pre-Filed Direct Testimony, pp 33-34 (August 4, 2003)

n253 *Id* at 33

## B. Deliberations and Conclusions

The inclusion of audit language in the parties' interconnection agreement is not necessary, because performance measurements addressing the accuracy and timeliness of BellSouth's billing provide sufficient mechanisms for monitoring. The agreement contains mechanisms to resolve billing disputes, n254 [*134] which include an escalation (if necessary) to the fourth level of management for each of the respective parties. Generally, this process should resolve a billing dispute within 120 days, following which either party would have the right to appeal to the Authority. n255

n254 *Revised Joint Issues Matrix*, Attachment 7, Para. 3 (August 15, 2003)

n255 Transcript of Proceedings, v I, p. 152 (August 27, 2003)

The parties' interconnection agreement contains specific language to ensure billing quality for all billing elements covered by the Agreement. n256 This language calls for the parties to

. . . mutually agree upon a billing quality assurance program for all billing elements covered in this Agreement that shall eliminate the need for post-billing reconciliation. Appropriate terms for access to

any BellSouth documents, systems, records and procedures for the recording and billing of charges shall be part of that program. n257

n256 *Petition for Arbitration of ITCDeltaCom Communications, Inc with BellSouth Telecommunications, Inc Pursuant to the Telecommunications Act of 1996*, Exhibit A, Attachment 7, p 4, Section 2 (February 7, 2003)

[*135]

n257 *Id*

A majority of the Arbitrators n258 voted to reject DeltaCom's position that language for audits of the parties' billing for services be included in the parties' interconnection agreement. n259

n258 Director Jones did not vote with the majority Instead, he expressed his opinion that there is nothing in the FCC's orders or the Act that prevent the application of 47 U.S C. § 252(i), the pick and choose statute, to language related to audits of billing records *See Triennial Review Order*, P 715, *In the Matter of Global Naps South, Inc Petition for Preemption of Jurisdiction of the Virginia State Corporation Commission Regarding Interconnection Dispute with Bell Atlantic-Virginia, Inc*, CC Docket No 99-178, Memorandum Opinion and Order, 15 FCC Rcd 23,318, 23,322 at n 25 & 27 (1999) Therefore, he moved that Issue 63 be answered in the affirmative His motion failed for a second

n259 Transcript of Proceedings, pp. 44-45 (January 12, 2004)

[*136]

### ISSUE 64: ACCESS DAILY USEAGE FILE (ADUF)

**What terms and conditions should apply to Access Daily Usage File ("ADUF")?**

#### A. Positions of the Parties

When DeltaCom purchases unbundled local switching, BellSouth provides DeltaCom with the ADUF record, which allows DeltaCom to bill for access charges. Currently DeltaCom receives both local and toll records via the ADUF tape. Since access charges do not apply to local calls, DeltaCom opines that it should not be billed for those records. n260 DeltaCom asserted during the hearing that it should only pay for those ADUF messages that DeltaCom could use for billing. n261

n260 Mary Conquest, Pre-Filed Direct Testimony, p. 8 (August 4, 2003)

261 Transcript of Proceedings, v I, p. 291 (August 27, 2003)

BellSouth believes that it is not required to isolate and provide only certain ADUF records. Currently, ADUF messages include toll calls as well as local calls placed with an access code (1010XXX) or local calls made to facilities-based CLECs. n262

n262 *Id* at 292-293

2005 Tenn. PUC LEXIS 332, *

[*137]

BellSouth contends that the FCC orders approving BellSouth's 271 applications have already found that it provides competing carriers with complete, accurate, and timely reports on the service usage of their customers in substantially the same manner as it provides such information to itself. n263 BellSouth avers that if DeltaCom wants a customized report, it should file a New Business Request. n264

n263 *See In the Matter of the Joint Application by BellSouth Corporation, BellSouth Telecommunications, Inc, and BellSouth Long Distance, Inc for Provision of In-Region, InterLATA Services in* <u>Georgia and Louisiana,</u> <u>Memorandum Opinion and Order, 17 FCC Rcd 9018, 9061, P 85, n 292 (2002)</u>

n264 John A Ruscilli, Pre-Filed Direct Testimony, p (August 4, 2003)

### B. Deliberations and Conclusions

During the January 12, 2004 deliberations, the Arbitrators voted unanimously not to require BellSouth to provide specialized or filtered ADUF reports to DeltaCom at no additional cost, but any message [*138] errors or unbillable messages in the ADUF record should not result in a charge to DeltaCom.

BellSouth provides ADUF reports in a timely manner as it is required to do. If DeltaCom would like special report-ing, it should submit a New Business Request. There are legitimate reasons to include some local calls on an ADUF report and it is unreasonable to force BellSouth to distinguish local calls at no cost. n265 However, according to testi-mony, ADUF records currently include errors and non-billable messages, for which DeltaCom should be credited. n266

n265 Transcript of Proceedings, v I, p 293 (August 27, 2003)

n266 *Id* at 295

### ISSUE 66: TESTING OF END-USER DATA

**Should BellSouth provide testing of DeltaCom end-user data to the same extent BellSouth does such testing of its own end user data?**

### A. Positions of Parties

DeltaCom wants BellSouth to provide it with parity in terms of the advanced testing functions that it provides to its own retail arm. DeltaCom complains that BellSouth's existing [*139] test environment can only support the latest ver-sion of TAG n267 and the latest EDI n268 map. n269 The test deck is loaded with a catalogue of cases with expected results, whereas BellSouth is able to test its data "end to end" using the tools and format that will be in its production systems. For example, in order to test using the Operating Customer Number ("OCN"), CLECs must order test accounts and pay the associated rates. n270

n267 TAG is an acronym for Telecommunications Access Gateway.

n268 EDI is an acronym for Electronic Data Interface

n269 BellSouth's existing test environment for CLECs is known as the CLEC Application Verification Environment ("CAVE")

n270 Mary Conquest, Pre-Filed Direct Testimony, p. 9 (August 4, 2003)

BellSouth contends that a two-party arbitration is not the appropriate forum for resolution of this issue, because it affects more than just DeltaCom and therefore would be better suited for the Change Control Process ("CCP"). n271 In addition, BellSouth asserts that CAVE [*140] allows CLECs to perform optional, functional and pre-release testing for multiple versions of EDI as well as all TAG APIs n272 currently in production. These test environments are governed under the CCP. Furthermore, much of the enhanced functionality that DeltaCom is requesting is being addressed as part of the CCP process in change request CR0896 and parts of CR0897. n273

n271 Ronald Pate, Pre-Filed Direct Testimony, pp 19-20 (August 4, 2003)

n272 API is an acronym for Application Programming Interface

n273 Ronald Pate, Pre-Filed Direct Testimony, pp 10-13 (August 4, 2003) According to Mr Pate, CR0896 would be released in May 2004 and part of CR0897 had been implemented, with the remaining part scheduled for implementation in November 2003

## B. Deliberations and Conclusions

During the January 12, 2004 deliberations, the Arbitrators voted unanimously to reject DeltaCom's position. DeltaCom failed to provide any evidence that the testing currently provided by BellSouth is inferior or inadequate. BellSouth [*141] agreed through the regional CCP to enhance testing functionality by May 2004. For the Authority to mandate explicit testing functionality in the interconnection agreement would interfere with the CCP, which is designed to support all CLECs in the BellSouth's region. Mandating language in an interconnection agreement in one state has the potential to put the interests of one CLEC ahead of any other.

## ISSUE 67: AVAILABILITY OF OSS SYSTEMS

**May BellSouth shut down OSS systems during normal working hours (8:00 a.m. to 5:00 p.m.) without notice or consent from DeltaCom?**

### A. Positions of the Parties

DeltaCom asserts that under no circumstances should BellSouth shut down DeltaCom's access to OSS during normal working hours without notice to or consent from DeltaCom. DeltaCom recounts that on December 27, 2002, BellSouth took all interfaces down at noon for a system upgrade. Meanwhile, BellSouth's own internal systems were operational that day. n274

n274 Mary Conquest, Pre-Filed Direct Testimony, p 10 (August 4, 2003)

[*142]

BellSouth asserts that it adheres to the operation and maintenance windows posted for its OSS. BellSouth is aware of a single event in which the system was taken down on a non-posted date. This single event does not support a claim that BellSouth violated its obligation. Unfortunately, systems do go down unexpectedly, and in that regard, the proposed language by DeltaCom is unrealistic.

BellSouth maintains that this issue involves process and system changes that affect all CLECs on a regional basis and should be addressed in the CCP. Most maintenance or upgrades are scheduled for off peak hours, but in the event

2005 Tenn. PUC LEXIS 332, *

that work must be performed during working hours, BellSouth sends a notice in advance to all CLECs. This was also the case in the aforementioned instance in which the system was taken down on an unscheduled date. n275

n275 Ronald Pate, Pre-Filed Direct Testimony, pp 20-21 (August 4, 2003)

**B. Deliberations and Conclusions**

During the January 12, 2004 deliberations, the Arbitrators voted unanimously that [*143] BellSouth may shut down OSS during normal working hours with consent and notification through the CCP. Since OSS is regional and used by all CLECs, it would be unfair to grant such power to only one CLEC. All situations, including the one example in December, were communicated and negotiated through the CCP. Furthermore, DeltaCom failed to provide any evidence that this was anything other than a one time occurrence. If this had been a compulsive act on the part of BellSouth, the appropriate course of action would have been for DeltaCom to file a complaint, as this would have been in violation of BellSouth's continued responsibilities under Section 271.

**ORDERED**

The foregoing *Final Order of Arbitration Award* reflects the Arbitrators' resolution of Issue Nos. 2, 9, 11, 21, 25, 26, 36, 37, 44, 46, 47, 56, 57, 59, 60, 62, 63, 64, 66 and 67. All resolutions contained herein comply with the provisions of the Telecommunications Act of 1996 and are supported by the record in this proceeding.

TENNESSEE REGULATORY AUTHORITY, BY ITS DIRECTORS ACTING AS ARBITRATORS

Deborah Taylor Tate, Chairman n276

n276 Chairman Tate dissented in whole or in part as to Issues 26(d), 60(b) and 62

[*144]

Pat Miller, Director n277

n277 Director Miller dissented in whole or in part as to issues 47 and 59

Ron Jones, Director n278

n278 Director Jones dissented in whole or in part as to Issues 25, 26(a) and 63