**2006 Tennessee 271 Order,**
**2006 Tenn. PUC LEXIS 170, at \*9-13**

LEXSEE

IN RE: PETITION FOR ARBITRATION OF ITC¬DELTACOM COMMUNICATIONS, INC. WITH BELLSOUTH TELECOMMUNICATIONS, INC. PURSUANT TO THE TELECOMMUNICATIONS ACT OF 1996

DOCKET NO. 03-00119

Tennessee Regulatory Utility Commission

2006 Tenn. PUC LEXIS 170

May 18, 2006

**CORE TERMS:** collocation, switching, billing, reconsideration, space, voted, arbitration, carrier, interconnection, unbundled, deliberations, customers, similarly situated, zone, deliberated, unanimously, negotiation, negotiate, telecommunications, reconsider, purchasing, compensate, arbitrate, two-year, Telecommunications Act, arbitration proceeding, market rate, arms-length, interstate, ambiguous

**PANEL:** [*1] Ron Jones, Chairman; Deborah Taylor Tate, Director; Pat Miller, Director

**OPINION: ORDER ON RECONSIDERATION**

This matter came before Chairman Ron Jones, Director Deborah Taylor Tate and Director Pat Miller of the Tennessee Regulatory Authority (the "Authority" or "TRA"), the Arbitrators assigned to this docket, for reconsideration of their decisions on Issues 26(d), 47 and 62 in the *Final Order of Arbitration Award* ("*Final Order*") issued by the Arbitrators on October 20, 2005.

**TRAVEL OF THE CASE**

On February 7, 2003, ITC¬DeltaCom Communications, Inc. ("DeltaCom") filed a petition pursuant to Section 252(b) of the Telecommunications Act of 1996 (the "Act") requesting that the Authority arbitrate the interconnection agreement between DeltaCom and BellSouth Telecommunications, Inc. ("BellSouth"). n1 BellSouth filed a response to the petition on March 4, 2003. On May 5, 2003, the Arbitrators accepted the petition for arbitration and adopted the list of 71 issues contained in the original petition. As a result of mediation and continuing negotiations, the parties resolved many issues, leaving only twenty-nine issues open for resolution, including Issues 26(d), 47 and 62. A hearing [*2] in this matter was held on August 27 and 28 and September 12, 2003 before the Arbitrators. During the Hearing, the Arbitrators heard testimony from the witnesses and received evidence relating to all open issues.

> n1 *Petition for Arbitration of ITC¬DeltaCom Communications, Inc. with BellSouth Telecommunications, Inc. Pursuant to the Telecommunications Act of 1996* (February 7, 2003). The petition contained seventy-one (71) issues.

On January 12, 2004, the Arbitrators deliberated all of the outstanding issues except Issues 2, 26(d), 46, 47 and 62. As to these issues, the Arbitrators ordered the parties to file Final and Best Offers ("FBOs") by January 26, 2004. On March 22, 2004, the Arbitrators deliberated Issues 2, 46, 47 and 62, deferring consideration of Issue 26(d) until April 12, 2004 at the request of BellSouth. Later the Arbitrators deferred a decision on Issue 26(d) until 45 days after the 60 day stay of the order of the Federal Communications Commission ("FCC") in the FCC docket, *Review of the Section* [*3] *251 Unbundling Obligations of the Incumbent Local Exchange Carriers* ("Triennial Review Order" or "TRO"). n2 On June 21, 2004, the Arbitrators reconvened and deliberated Issue No. 26(d).

n2 *Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers; Implementation of the Local Competition Provisions of the Telecommunications Act of 1996; Deployment of Wireline Services Offering Advanced Telecommunications Capability*, CC Docket 01-338, *Report and Order and Order on Remand and Further Notice of Proposed Rulemaking, 18 FCC Rcd. 16,978 (2003),* as modified by *Errata, 18 FCC Rcd. 19020 (2003),* vacated in part, *U.S. Telecom. Ass'n v. FCC, 359 F.3d 554 (D.C. Cir. 2004)* ("Triennial Review Order" or "TRO").

The Authority issued the *Final Order* on October 20, 2005 reflecting the decisions of the Arbitrators on all open issues. On November 4, 2005, BellSouth filed a motion for reconsideration ("*Motion* [*4] ") of three issues contained in the *Final Order*: Issue Nos. 26(d), 47 and 62. On November 14, 2005, DeltaCom filed its response to the *Motion*. At a regularly scheduled Authority Conference held on November 21, 2005, the Arbitrators asked BellSouth to clarify its *Motion* with respect to Issue 26(d). In response, BellSouth asked that the Authority reconsider its decision mandating a switching rate, stating that the rate "should be a market rate and that any enforcement or complaints with respect to it should be left to the FCC." n3 Based upon a review of the filings of BellSouth and DeltaCom and after receiving clarification regarding Issue 26(d), the Arbitrators voted unanimously to grant BellSouth's *Motion* and set this matter for deliberations on the merits of the *Motion* on December 12, 2005.

n3 Transcript of Authority Conference, p. 36 (November 21, 2005).

**ISSUE 26: LOCAL SWITCHING-LINE CAP AND OTHER RESTRICTIONS**

**(d) What should be the market rate?**

***Final Order* Determinations** [*5]

In the *Final Order*, the Arbitrators determined that they have jurisdiction to deliberate the switching issue as an open issue presented in a Section 252 arbitration proceeding. The Arbitrators found,

> The TRA has broad statutory authority to arbitrate any open issue submitted in a Section 252 arbitration. . . . Further, there is no language contained in the Federal Act that expressly prohibits state jurisdiction over Section 271 elements that are included in issues required to be arbitrated pursuant to Section 252. n4

n4 *Final Order of Arbitration Award*, pp. 29-30 (October 20, 2005) ("*Final Order*").ENDFN>

The *Final Order* set forth the Arbitrators' deliberations as follows:

> In its FBO on Issue No. 26(d), DeltaCom proposed a rate of $ 5.08 (usage included) which was based on BellSouth's ARMIS 43-08 (row 6210) reported central office switching expenses for 2002 and an estimated share of its depreciation costs for switching plant in service.
>
> BellSouth's FBO was based on the price it charges for wholesale local platform DS0 service. The proposed rates were $ 26.48 in [*6] Zone 1; $ 30.31 in Zone 2; and $ 35.32 in Zone 3. Inclusive in these

rates are the port, features, and an analog SL1 loop. These rates did not include usage, which was an additional per-minute charge.

During the deliberations it was noted that BellSouth failed to demonstrate that its proposed switching rate is at or below the rate at which BellSouth offers comparable functions to similarly situated purchasing carriers under its interstate access tariff or that the rate is reasonable by showing that it had entered into arm's length agreements with other similarly situated purchasing carriers to provide the switching element at the rate proposed in its final best offer. It was also noted that BellSouth's FBO did not contain a stand-alone rate for switching. Additionally, the Arbitrators noted that existing case law holds that a just and reasonable rate includes a utility's operating expenses as well as a fair return on investments and concluded that DeltaCom's proposed rate of $ 5.08 contained those elements. Thereafter, a majority of the Arbitrators voted to adopt DeltaCom's Final Best Offer of $ 5.08 as an interim rate subject to true up. n5

>FTNT

n5 *Id.* at 37-38 (footnotes omitted). Director Tate did not vote with the majority with respect to the rate for local switching.

[*7]

**Positions of the Parties**

In its *Motion*, BellSouth argues that the Authority's decision as to Issue No. 26(d) provides competing local exchange carriers ("CLECs") with hope that they may establish cost-based rates, pursuant to Section 271, for de-listed unbundled network elements ("UNEs") and therefore, affects BellSouth's ability to negotiate market based rates for these elements. n6 BellSouth maintains that the same Section 271 argument DeltaCom uses to support its position on this Issue was properly rejected by the panel in the Generic Docket (TRA Docket No. 04-00381) when raised to delay or extend the FCC's "No New Adds" deadline. n7 BellSouth argues that parties should be allowed to contract Section 271 elements freely without state regulatory interference, consistent with the intent of Congress to reduce regulation. n8 BellSouth avers that rate setting by state commissions, as in this case, is rewarding the CLECs with the out-dated regime rejected by the FCC. n9

n6 *BellSouth Telecommunications, Inc's Motion for Reconsideration of Final Order of Arbitration Award*, p. 2 (November 4, 2005) ("*BellSouth's Motion for Reconsideration*").

[*8]

n7 *Id.*

n8 *Id.* at 4.

n9 *Id.* at 6.

BellSouth maintains that its offered rate does not need to be supported by cost data, as DeltaCom argues, and that BellSouth's costs are not relevant to a market rate. n10 BellSouth adds that if the Authority allows DeltaCom to pay a cost-based TELRIC rate for a de-listed UNE, no CLEC will ever agree to negotiate. n11 Finally, BellSouth argues, if the only difference in market rates and TELRIC rates is the name, the FCC's decisions will be meaningless and nothing will have changed. n12

n10 *Id.*

n11 *Id.* at 7.

n12 *Id.*

In the *Response of ITC DeltaCom to BellSouth's Motion for Reconsideration* ("*Response*"), DeltaCom argues that the $ 5.08 interim switching rate contained in its FBO is based on BellSouth's historic costs and is 26% to 50% higher than the rate originally proposed by DeltaCom. n13 DeltaCom contends that BellSouth, in its FBO, did not [*9] include any rate for stand alone switching or demonstrate that the rates proposed are reasonable. n14 Instead, BellSouth merely repeated its standard commercial offer for its Voice Platform Service and did not demonstrate how it arrived at that rate. n15 DeltaCom maintains that the FBO process is intended to force the parties to be more reasonable in their final offers and while DeltaCom offered a compromise, BellSouth did not. n16

n13 *Response of ITC¬DeltaCom to BellSouth's Motion for Reconsideration*, p. 1 (November 14, 2005) ("*Response*").

n14 *Id.* at 2.

n15 *Id.* at 1-2.

n16 *Id.* at 3.

**Findings and Conclusions**

As justification for their findings in the *Final Order*, the Arbitrators relied upon the FCC rules, which state that in situations where unbundled switching is not required under Section 251, the element must still be offered to competitors in order to comply with the requirements of Section 271; however, the rate does not have to comply with TELRIC pricing methodology. [*10] Instead, the FCC requires that rates for unbundled elements offered pursuant to Section 271 must be "just and reasonable." n17 The FCC has stated,

> [A] BOC might satisfy the "just and reasonable" standard by demonstrating the rate for a section 271 element is at or below the rate at which the BOC offers comparable functions to similarly situated carriers under its interstate access tariff, to the extent such analogues exist. Alternatively, a BOC might demonstrate that the rate at which it offers a section 271 network element is reasonable by showing that it has entered into arms-length agreements with other, similarly situated purchasing carriers to provide the element at that rate. n18

n17 *Final Order*, p. 37. *See also TRO* at P 656.

n18 *TRO* at P 664.

The rate BellSouth provided in its FBO for unbundled Section 271 switching is the rate for its wholesale local platform DS0 service in three rate zones. None of the rates in the three rate zones is the stand alone unbundled 271 switching rate the [*11] Arbitrators asked the parties to provide. Instead, the rates BellSouth provided include the switch port and switch features combined with an analog SL1 loop. Additionally, such rates are not located in BellSouth's interstate access tariff. The rates BellSouth proposed were found, however, in BellSouth's current interconnection agreement with DeltaCom that was approved by the Authority on June 26, 2001 in Docket No. 99-00430. The fact that BellSouth's FBO

rates exist in BellSouth's current interconnection agreement with DeltaCom is not sufficient to show that BellSouth has entered into arms-length agreements with other, similarly situated purchasing carriers to provide the element at the same rate. In short, BellSouth did not fulfill either criteria the FCC has stated might be used to satisfy the "just and reasonable" standard for a Section 271 element rate.

The request for reconsideration of Issue 26(d) is essentially a request to reconsider the majority's decision to adopt a rate proposed by DeltaCom in its FBO rather than the rate proposed by BellSouth in its FBO. After reviewing the arguments and the decision of the majority as to the adoption of DeltaCom's rate, the Arbitrators [*12] found no argument of sufficient weight to cause an alteration in the majority's decision. The rate to be set pursuant to Issue 26(d) is the unbundled 271 switching rate.

BellSouth, in the underlying case, failed to provide a rate for the stand alone switching element in its FBO. DeltaCom furnished a rationale and justification for its FBO rate of $ 5.08 for unbundled Section 271 switching. In the absence of such data from BellSouth and in view of the failure of BellSouth to provide a stand alone switching rate, or provide proof of other arms-length agreements containing the same rate, the Arbitrators decided this Issue properly. Additionally, BellSouth introduced no new arguments in its *Motion* that would warrant the Arbitrators reversing the decision of the majority.

To the extent that BellSouth is seeking the adoption of a rate other than that contained in its FBO, the granting of such relief would irreparably weaken the FBO process by permitting a party an opportunity to present a second or "remorse" offer. The integrity of the FBO as a tool in resolving complex and vigorously contested issues and arbitrations must be preserved to allow the Authority to continue to place reasonable [*13] levels of assurance that final best offers are in fact the best offers.

For these reasons the majority of the Arbitrators n19 voted that the majority's decision as to Issue 26(d) stand as decided in the *Final Order*.

n19 Director Tate did not vote with the majority as to the reconsideration of Issue 26(d).

**ISSUE 47: COMPENSATION FOR THE USE OF DELTACOM'S COLLOCATION SPACE ("REVERSE COLLOCATION")**

**Should BellSouth be required to compensate DeltaCom when BellSouth locates in DeltaCom's collocation space? If so, should the same rates, terms and conditions apply to BellSouth that BellSouth applies to DeltaCom?**

*Final Order* **Determination**

The Arbitrators deliberated Issue 47 on March 22, 2004 and in reaching a decision a majority of the Arbitrators,

> Voted to adopt DeltaCom's FBO with one exception and require BellSouth to compensate DeltaCom when BellSouth locates in DeltaCom's collocation space at the rates, terms and conditions that BellSouth applies to DeltaCom. Reverse collocation charges [*14] should be paid on a going-forward basis for existing as well as future collocations at DeltaCom locations. Nevertheless, BellSouth should not be required to pay any nonrecurring charges associated with existing collocations. n20

n20 *Final Order*, p. 55 (footnote omitted).

**Positions of the Parties**

As to Issue 47, BellSouth argues that the majority of the Arbitrators n21 committed a legal error by creating a right of "reverse collocation" which is not supported by the Act and asserts that it raised this issue of law in its testimony and post-hearing briefs. n22 Additionally, BellSouth claims that the contract language adopted by the majority is ambiguous and subject to gaming by DeltaCom. n23 BellSouth contends that DeltaCom has no obligation under the law to allow BellSouth to "reverse collocate" and therefore can deny BellSouth's request if it does not agree to BellSouth's proposed terms. n24 Finally, BellSouth argues that the discussions of the parties surrounding "reverse collocation" should take place [*15] outside of interconnection negotiations. n25 BellSouth requests that the majority reconsider its order and adopt the Georgia Public Service Commission's analysis of this issue which is consistent with the position taken by Director Miller. n26

n21 Director Miller did not vote with the majority of the Arbitrators.

n22 *BellSouth's Motion for Reconsideration*, pp. 7 and 8.

n23 *Id.* at 8.

n24 *Id.* at 9.

n25 *Id.* at 10.

n26 *Id. See also* Transcript of Proceedings, pp. 32-33 (January 12, 2004). During deliberations, Director Miller took the position that BellSouth not be required to pay collocation fees under any circumstance where BellSouth is required to collocate for the benefit of DeltaCom. Director Miller maintained this position even in instances where BellSouth derives a benefit and explained that BellSouth would not be located in DeltaCom space if it were not for the benefit of DeltaCom.

BellSouth contends that the topic of reverse collocation is not appropriate for resolution [*16] in a Section 252 arbitration proceeding because the concept of reverse collocation is not discussed in Sections 251 or 252. BellSouth also asserts that the language of DeltaCom's FBO adopted by a majority of the Arbitrators is ambiguous.

DeltaCom argues that 47 U.S.C. § 251(a)(1) requires all telecommunications carriers to interconnect directly or indirectly with the facilities and equipment of other carriers and, therefore, covers the terms and conditions under which BellSouth interconnects with DeltaCom, including reverse collocation. n27 As a result, DeltaCom maintains, reverse collocation is not outside the scope of this proceeding as BellSouth claims. n28 DeltaCom argues that BellSouth's suggestion that the Authority adopt the position of the Georgia Commission on this issue is a further attempt by BellSouth to offer a new FBO after the deadline for such offers has past. n29 Finally, DeltaCom states that BellSouth failed to demonstrate how the Authority's decision on this issue is ambiguous and vulnerable to gaming by CLECs. n30

n27 *Response*, p. 4.

n28 *Id.*

[*17]

n29 *Id.*

n30 *Id.*

**Findings and Conclusions**

Case 2:06-cv-00577-WKW-TFM   Document 35-14   Filed 11/29/2006   Page 8 of 11

2006 Tenn. PUC LEXIS 170, *

The Act expressly provides for state commission jurisdiction to arbitrate all open issues presented, pursuant to Section 252(b)(4)(C), which states:

> (C) The State commission shall resolve each issue set forth in the petition and the response, if any, by imposing appropriate conditions as required to implement subsection (c) upon the parties to the agreement, and shall conclude the resolution of any unresolved issues not later than 9 months after the date on which the local exchange carrier received the request under this section. n31

n31 47 U.S.C. § 252(b)(4)(C) (2001).

In addition, Section 252 contains no exception for "reverse collocation," as BellSouth terms it, being presented as an open issue in an arbitration. The TRA has broad statutory authority to arbitrate any open issue submitted in a Section 252 arbitration. The [*18] scope of open issues presented for arbitration under Section 252 includes "issues on which incumbents are mandated to negotiate." n32 Beyond those issues that are mandated for negotiation, "the parties are free to include interconnection issues that are not listed in § 251(b) and (c) in their negotiations" and may "petition for compulsory arbitration of any open issue." n33 Having reviewed this issue, the Arbitrators determined that the issue of reverse collocation was properly decided as an issue for arbitration.

n32 MCI v. BellSouth, 298 F.3d 1269, 1274 (11th Cir. 2002).

n33 Coserv Ltd. Liability Corp. v. Southwestern Bell, 350 F.3d 482, 487 (5th Cir. 2003).

An interconnection agreement provides for the linking of two parties' networks. In the instance of reverse collocation, BellSouth is using equipment provided to DeltaCom at DeltaCom's expense as part of the fulfillment of BellSouth's collocation obligation under Section 251(c)(6) in a way that [*19] allows BellSouth to provision services to customers other than DeltaCom and to receive revenues therefrom. This is a benefit that inures to BellSouth wholly out of fulfillment of its 251(c)(6) obligation. Therefore, it is only reasonable that the terms and conditions under which BellSouth derives this benefit be treated just as the terms and conditions of the obligation and thus subject to arbitration. Moreover, to the extent that the parties engaged in negotiations including reverse collocation in advance of the arbitration proceeding, the issue of reverse collocation is a proper issue for arbitration.

BellSouth has a duty and cannot refuse to negotiate the rates, terms and conditions for "reverse collocation." The rates, terms and conditions for "reverse collocation" were presented as an open issue in DeltaCom's petition for arbitration upon the failure of the parties to reach agreement of this non-251 issue and as such, the issue was properly before the TRA for resolution under Section 252 of the Act. Further, BellSouth did not include this issue in its July 2, 2003 motion to remove certain issues from the arbitration. Therefore, for the above reasons, the majority found that BellSouth's [*20] argument that the Arbitrators committed a legal error by creating a right of "reverse collocation" is without merit.

Further, the majority of the Arbitrators found that the language in Delta CoM's FBO and the majority's decision is clear. DeltaCom submitted the following language in its FBO as to this Issue:

> Where BellSouth places equipment on ITC¬DeltaCom space and uses that equipment to serve entities other than ITC¬DeltaCom, BellSouth derives a benefit and shall abide by the same terms and conditions applied to ITC¬DeltaCom for collocation and pay ITC¬DeltaCom pursuant to the same rates, terms and conditions for collocation that BellSouth applies to ITC¬DeltaCom. n34

n34 DeltaCom's *Final Best Offer*, p. 8 (February 20, 2004).

The above language clearly conveys the intent of the majority of the Arbitrators for BellSouth to abide by the same terms and conditions it applies to DeltaCom for the use of BellSouth collocation space when BellSouth collocates its equipment or facilities in DeltaCom space and [*21] uses the equipment collocated in that space to serve entities other than DeltaCom, e.g. another CLEC or one of BellSouth's own customers.

Based on the foregoing, the majority of the Arbitrators n35 voted that Issue 47 should stand as decided in the *Final Order*. Nevertheless, to address BellSouth's concern, the majority provided the following clarification: Pursuant to this decision, BellSouth is not obligated to compensate DeltaCom when BellSouth locates in DeltaCom's collocation space at the rates, terms, and conditions that BellSouth applies to DeltaCom if the BellSouth equipment and facilities located in such DeltaCom space are used solely to serve DeltaCom or DeltaCom customers. In the situation where BellSouth derives a benefit from such placement of its facilities or equipment in DeltaCom's collocation space, BellSouth must compensate DeltaCom for the use of the space at the same rates, terms, and conditions BellSouth applies to DeltaCom for the use of BellSouth's collocation space.

n35 Director Miller did not vote with the majority as to the reconsideration of Issue 47.

[*22]
### ISSUE 62: LIMITATION ON BACK BILLING

**What is the limit on back billing for undercharges?**

*Final Order* **Determination**

The Arbitrators deliberated Issue 62 in favor of DeltaCom, stating:

> BellSouth should not penalize its customers for its failure to bill for services in a timely manner. Two years is not a reasonable amount of time for a company to have to carry such liabilities on its books. Therefore, during the March 22, 2004 deliberations, the Arbitrators voted unanimously to accept Delta-Com's Final Best Offer to limit back billing to three billing cycles. n36

n36 *Final Order*, p. 70.

**Positions of the Parties**

As to Issue No. 62, BellSouth maintains that the need to back bill can arise from a simple mistake on the part of BellSouth, the requirement for the substantial resources and time necessary to program new billing functions into its billing systems, or other circumstances beyond BellSouth's control. n37 For whatever reason, BellSouth argues, its customers should not [*23] be permitted to receive BellSouth's services for free. n38 BellSouth maintains that the net effect of the Authority's decision to limit back billing to 90 days enables DeltaCom to avoid paying for services it receives from BellSouth in some cases and is simply too short a period of time to allow for back billing in such cases. n39 Finally, BellSouth states that limiting back billing to three billing cycles, as ordered by the Authority, results in the shortest back billing period that has been ordered by any state commission in BellSouth's region. n40 BellSouth notes that

the Georgia and North Carolina Commissions rejected the 90-day limitation proposed by DeltaCom and ordered a 12-month back billing period and that the Florida Commission ruled that a five-year statute of limitation applied to back billing. n41 BellSouth requests the Authority to reconsider its previous decision and order that the parties' interconnection agreement provide for a two-year limitation on back billing or at a minimum allow one year. n42

n37 *BellSouth's Motion for Reconsideration*, pp. 10 and 12.

n38 *Id.* at 12.

[*24]

n39 *Id.*

n40 *Id.* at 11.

n41 *Id.*

n42 *Id.* at 12.

DeltaCom posits that if BellSouth had proposed one year in BellSouth's FBO instead of two years, the Authority's decision on this Issue might have been different. n43 DeltaCom maintains that BellSouth's one-year proposal now comes too late and the FBO process is intended to discourage parties from using this kind of tactic. n44

n43 *Response*, p. 3.

n44 *Id.* at 4.

**Findings and Conclusions**

In the *Final Order* the Arbitrators determined that BellSouth should not penalize its customers for its failure to bill for services in a timely manner and that "two years is not a reasonable amount of time for a company to have to carry such liabilities on its books." n45 Therefore, during the March 22, 2004 deliberations, the Arbitrators voted unanimously to accept DeltaCom's FBO to limit back-billing to three billing cycles. n46

n45 *Final Order*, p. 70.

[*25]

n46 Transcript of Proceedings, pp. 14-15 (March 22, 2004).

The Arbitrators based their decision on the finding that a two-year period is an unreasonable amount of time. BellSouth does not address this reasoning in its *Motion*. Instead, BellSouth supports its two-year proposal with the same arguments it proffered throughout the arbitration process. Next, BellSouth proposes a new offer of one year and attempts to support the validity of this offer by referencing decisions from other state commissions. After reviewing BellSouth's request, the Arbitrators voted unanimously not to alter their decision rejecting the two-year limitation. Further, as to the one-year proposal, BellSouth did not present the Arbitrators with this option in its FBO when requested to do so. The Arbitrators found that it is not productive in the FBO process for a party to withhold its best offer that may have

been deemed reasonable by the Arbitrators and that may have been adopted had that offer been properly presented. BellSouth, of course, is free during the time before the interconnection agreement is due to be filed to [*26] further negotiate this point with DeltaCom.

For these reasons the Arbitrators voted unanimously that the decision as to Issue 62 stand as decided in the *Final Order*.

**IT IS THEREFORE ORDERED THAT:**

1. The decisions of the Arbitrators as to Issues No. 26(d), 47 and 62 shall remain as stated in the *Final Order of Arbitration Award*.

2. The Arbitrators' decision in the *Final Order of Arbitration Award* as to Issue 47 is clarified as set forth herein.

**TENNESSEE REGULATORY AUTHORITY, BY ITS DIRECTORS ACTING AS ARBITRATORS**

Ron Jones, Chairman

* * *

Deborah Taylor Tate, Director n47

  n47 Director Tate did not vote with the majority as to Issue 26(d), voted with the majority as to Issue 47 and voted with the other Arbitrators as to Issue 62, but resigned her position as director before the issuance of this order.

Pat Miller, Director n48

  n48 Director Miller did not vote with the majority as to the reconsideration of Issue 47.

[*27]