LEXSEE 2005 N.H. PUC LEXIS 24

VERIZON NEW HAMPSHIRE SEGTEL, INC.
Proposed Revisions to Tariff NHPUC No. 84
(Statement of Generally Available Terms and Conditions)
Petition for Declaratory Order re Line Sharing

DT 03-201; DT 04-176; ORDER NO. 24,442

New Hampshire Public Utilities Commission

2005 N.H. PUC LEXIS 24; 241 P.U.R.4th 409

March 11, 2005

**PANEL:** [*1] Thomas B. Getz Chairman; Graham Morrison, Commissioner; Michael Harrington, Commissioner

**OPINION: Order Following Briefing**

**I. PROCEDURAL HISTORY**

**A. Docket No. DT 03-201**

On October 17, 2003, Verizon New England d/b/a Verizon New Hampshire (Verizon) filed with the New Hampshire Public Utilities Commission (Commission) certain proposed revisions to the Company's Statement of Generally Available Terms and Conditions (SGAT), as reflected in Tariff NHPUC No. 84 (Tariff 84), which sets forth the terms of interconnection Verizon offers competitive local exchange carriers (CLECs) as well as the network elements Verizon makes available to CLECs on an unbundled (*i.e.*, individual) basis. These SGAT changes were occasioned by the issuance of the Federal Communications Commission's (FCC's) Triennial Review Order, *In re Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, 18 F.C.C.R. 16,978 (2003) *(TRO)* which evaluated and rewrote the FCC's rules regarding local exchange competition in compliance with the Telecommunications Act of 1996, Pub. L. 104-104, Feb. 8, 1996, 110 Stat. 56, and subsequent amendments, codified as [*2] 47 U.S.C. § 151 *et seq.*

An Order of Notice was issued on October 31, 2003, scheduling a prehearing conference and establishing a deadline for intervention petitions. On November 11, 2003, Verizon provided a confidential list of customers with existing services affected by the proposed tariff revisions.

The prehearing conference took place as scheduled on December 2, 2003. Parties granted intervenor status were Biddeford Internet Corporation d/b/a Great Works Internet (GWI), Conversent Communications of New Hampshire (Conversent), Covad Communications Company (Covad), Freedom Ring Communications LLC d/b/a BayRing Communications (BayRing), New Hampshire Internet Service Providers Association (NHISPA), Otel Telekom Inc. d/b/a G4 Communications (G4), Revolution Networks (RevNets), segTEL Inc. (segTEL), and WorldCom Inc. (MCI). The Office of the Consumer Advocate (OCA) entered an appearance on behalf of residential ratepayers. A technical session followed the prehearing conference, at which the participants agreed on a briefing schedule and three questions that would be addressed by the briefs. The schedule was adopted by Secretarial Letter issued [*3] on December 19, 2003.

On December 12, 2003, Verizon filed a motion seeking relief from certain provisions in the Order of Notice entered by the Commission in DT 03-201. On the same date, Verizon filed a summary description of each of the terms and conditions Verizon believed would represent changes to its SGAT, the list of unbundled network elements (UNEs) that Verizon believed might be subject to future impairment proceedings in New Hampshire in accordance with the *TRO*, and a copy of Verizon's proposed amendment to interconnection agreements eliminating provisions relating to line sharing pursuant to the *TRO*. n1 Objections to Verizon's Motion for Relief were filed on December 22, 2003, by BayRing, NHISPA, segTEL, and RevNets. GWI concurred with BayRing's objection. Briefs were timely filed by Covad, GWI, MCI, segTEL and Verizon. BayRing and the OCA concurred with segTEL's brief. Conversent filed a brief on December 30, 2003. Reply briefs were timely filed by Covad, GWI, segTEL, and Verizon. BayRing concurred with the reply briefs filed by segTEL and GWI.

n1 "Impairment" refers to the standard, enumerated in section 252(d)(2) of the Telecommunications Act, with respect to when an Incumbent Local Exchange Carrier (ILEC) such as Verizon must make its network elements available on an unbundled basis pursuant to section 251 to Competitive Local Exchange Carriers (CLECs). Impairment exists when lack of unbundled access to the network element in question would impair a CLEC's ability to provide services to the public on a competitive basis.

[*4]

On January 30, 2004, the Commission issued Order No. 24,268 on the pending Verizon motion, which concerned the determination in the Order of Notice that Verizon would be required to offer all UNEs contained in the SGAT, at then-current prices, pending review of the proposed tariff revisions. The Commission rejected Verizon's contention that section 3.3.2 of the SGAT required that the proposed revisions go into effect without Commission review. While the Commission denied Verizon's request without prejudice, pending a final ruling in DT 03-201, the Commission granted in part Verizon's request for alternative relief. Specifically, the Commission allowed Verizon to discontinue provisioning new orders for certain UNEs during the pendency of DT 03-201. These UNEs were (1) dark fiber feeder subloop, (2) interoffice transmission facilities (IOF) consisting of OCn (Optical Carrier number) and STS1 (Synchronous Transport Service) transport, and (3) transmission facilities that connect CLEC central offices or switches to CLEC collocation sites in Verizon central offices (dark fiber channel terminations). The Commission reasoned that such a determination appeared to comport with the *TRO*, [*5] did not harm existing customers, and did not amount to a prejudgment of the outcome of DT 03-201. The Commission also directed Verizon to file revised SGAT pages to reflect the line sharing transition requirements of 47 C.F.R. § 51.319(a)(1)(i), n2 emphasizing that no separate agreement should be necessary for parties to avail themselves of line sharing consistent with the FCC's rules.

n2 In the *TRO*, the FCC determined that incumbent local exchange carriers (ILECs) were no longer required to offer line sharing to CLECs on an unbundled basis pursuant to section 251, given a lack of section 252 impairment. But the FCC recognized that some CLECs had relied on a previous FCC order reaching the opposite result in order to provide broadband services to consumers. Accordingly, the FCC mandated a three-year transition period with respect to new line sharing arrangements, with the price gradually approaching that of a full, stand-alone local loop, which remains a section 251 UNE. *See TRO* at PP 264-65.

In response, [*6] Verizon filed modified revisions to its SGAT on February 9, 2004, which were accepted as compliant by the Staff of the Commission (Staff) on March 25, 2004. On February 26, 2004, Covad requested that the Commission consider a recently-released decision of the Maine Public Utilities Commission (PUC) hearings examiner. Verizon responded on March 9, 2004.

In the meantime, the *TRO* was the subject of numerous appeals which were consolidated by the U.S. Court of Appeals for the District of Columbia Circuit. In its decision, *United States Telecom Association v. FCC*, 359 F.3d 554 (D.C. Cir. 2004) (*USTA II*), the Court of Appeals vacated a number of the FCC *TRO* determinations, remanded some, and affirmed others. In general, the appellate tribunal vacated decisions that maintained unbundling obligations of incumbent local exchange carriers (ILECs) such as Verizon and affirmed decisions that reduced ILEC unbundling obligations pursuant to section 251. In addition, the Circuit Court was silent on some parts of the *TRO*. On August 20, 2004, the FCC issued an order that required Verizon and other ILECs to continue providing, until February 20, 2005, unbundled [*7] access to switching, enterprise market loops, and dedicated transport under the same rates, terms and conditions that applied under valid interconnection agreements as of June 15, 2004, and established transitional measures through August 20, 2006, in the absence of an FCC ruling on any particular UNE. *See In re Unbundled Access to Network Elements*, 19 F.C.C.R. 16,783. On October 12, 2004, the Supreme Court declined to hear the appeal of the Court of Appeals' *USTA II* decision, thus allowing it to stand. On February 5, 2005, the FCC issued its *In re Unbundled Access to Network Elements*, 2005 WL 289015 (*TRO Remand Order*). On February 18, 2005, Verizon filed revisions to Tariff 84 with the Commission in response to the FCC's *TRO Remand Order*.

Supplemental briefs were filed on February 18, 2005, by Verizon and segTEL. Lightship Telecom (Lightship) filed a letter in support of segTEL's brief. The Association for Local Telecommunications Services, or ALTS, filed comments on February 18 as well.

### B. Docket No. DT 04-176

On September 19, 2004, GWI and segTEL jointly filed a Petition seeking an order on an expedited [*8] basis that Verizon remains obligated to provide line sharing. On October 8, 2004, segTEL and Verizon jointly filed a pleading in which segTEL withdrew its request for expedited relief and both parties asked the Commission to hold the underlying dispute in abeyance until November 15, 2004. On November 5, 2004, GWI and Verizon filed a similar notice and motion in regard to GWI.

On November 22, 2004, the Commission issued a secretarial letter asking the Parties in Docket No. DT 04-176 to advise the Commission of the status of their ongoing negotiations, and requesting that Verizon advise the Commission regarding its intentions with respect to filing the interim agreements it had reached with GWI and segTEL. Verizon filed comments in response to the secretarial letter on December 6, 2004. GWI and segTEL separately informed the Commission that no permanent agreement regarding line sharing had been reached.

On January 12, 2005, the Commission issued an Order of Notice scheduling a prehearing conference in Docket No. DT. 04-176 for January 26, 2005. The OCA entered an appearance on behalf of residential ratepayers and Lightship sought intervenor status. At the prehearing conference, GWI [*9] indicated that it had reached agreement with Verizon on line sharing but wished to remain a party to the docket. On January 28, 2005, Verizon filed changes to its Tariff 84, to comply with Commission Order No. 24,268 in Docket No. DT 03-201. That same day, segTEL filed a letter requesting the Commission suspend the effective date of Verizon's tariff filing. Verizon filed an objection to segTEL's request on January 31, 2005. Also on January 31, the Commission issued a Secretarial Letter consolidating DT 03-201 and DT 04-176, and setting out a briefing schedule, as described *supra*.

### C. SGAT and Tariff 84

As noted, *supra*, the SGAT set out the general terms and conditions Verizon offers to competitors for interconnection and UNEs. The Commission, pursuant to 47 U.S.C. § 252(f), found Verizon's SGAT compliant with sections 251 and 252(d) of the Telecommunications Act on July 6, 2001. *See Bell Atlantic*, 86 NH PUC 419 (2001).

ILECS such as Verizon that were formerly entities of the regulated telephone monopoly broken up in 1984, n3 were precluded from offering so-called interLATA n4 long-distance service, *i.e.* [*10] , long distance service that crosses LATA boundaries. However, section 271 of the Telecommunications Act authorizes the FCC to grant an RBOC authority to offer interLATA long distance service upon satisfaction of certain conditions. In considering such a request from an RBOC, the FCC is obliged to "consult" with the relevant state utility commission concerning whether the RBOC meets the conditions, referred to in the statute as the "competitive checklist."

n3 These ILECs are generally referred to as RBOCs (regional Bell operating companies) or simply BOCs (Bell operating companies).

n4 LATA, or Local Access Transport Area, defines the service areas of the RBOCs. In New Hampshire, the LATA is approximately contiguous with the area designated by the 603 area code, making New Hampshire a single-LATA state. Therefore, in New Hampshire, interLATA and interstate long distance are interchangeable terms.

On June 14, 2002, by letter from the Commission in Docket No. DT 01-151 (opened to consider Verizon's request for [*11] a favorable section 271 recommendation from the Commission to the FCC), the Commission set out ten conditions for a determination by the Commission that Verizon was in compliance with the requirements of section 271. Condition 1 stated:

> To avoid confusion, Verizon will explicitly convert the existing SGAT into a CLEC tariff from which competitors may directly order anything contained in the SGAT, without the need to negotiate an interconnection agreement or amend an interconnection agreement. The tariff may contain a standard

form for competitors to complete which would provide Verizon with the information it needs about the competitor in order to interconnect, such as the location of the point of interconnection or identification for billing purposes. The tariff must reflect the SGAT rates, terms and conditions ordered by this Commission in Docket DE 97-171, except to the extent further reductions or changes are required below as a condition of Verizon's receipt of a favorable recommendation on its section 271 petition.

Accordingly, Verizon filed a revised Tariff 84 and a new Tariff NHPUC No. 86 (Tariff 86). These tariffs were approved by Commission Order No. 24,337 on June 18, [*12] 2004. Tariff 84 is now a wholesale tariff of UNEs, interconnection and collocation available to CLECs; Tariff 86 is a resale tariff of retail products available at discount to CLECs. Order No. 24,337 says, "Staff recommends adoption of the Tariffs, and states that any variations between the two documents are not intended to reflect a change in the terms and conditions as established in the SGAT." Verizon's January 28, 2005 filing to amend Tariff 84 brings Tariff 84 into agreement with the SGAT as it existed on June 18, 2004, the date the tariff was approved.

The *TRO* prompted Verizon to file revisions to its SGAT as reflected in Tariff 84. According to Verizon, its revisions affect three UNEs: (a) line sharing, (b) certain dark fiber, and (c) interoffice transmission facilities (IOF) consisting of OCn (Optical Carrier number) and STS1 (Synchronous Transport Service) transport. The *TRO*, however, discusses the UNEs in a manner that makes classification of the UNEs into four categories more useful. Therefore, this order will discuss the revisions in terms of four categories: (a) line sharing; (b) dark fiber feeder subloop; (c) IOF at the OCn and STS1 level; and (d) dark fiber [*13] channel terminations.

According to Verizon, the tariff revisions are made pursuant to section A. 1.4.3.B of Tariff 84 n5 which authorizes Verizon to cease offering, with 30 days' written notice, any network elements that the FCC finds should be removed from the national list of UNEs required to be unbundled by ILECs. A number of CLECs objected to the proposed revisions as being inconsistent with the FCC's findings in the *TRO*.

n5 Previously section 3.3.2 of the SGAT, Tariff section A.1.4.3.B reads, "Notwithstanding anything herein to the contrary, if, as a result of any decision, order or determination of any judicial, regulatory or other governmental authority with jurisdiction over the subject matter hereof, it is determined that the Telephone Company is not required to furnish any service, facility or arrangement, or to provide any benefit required to be furnished or provided to the TC hereunder, then the Telephone Company may discontinue the provision of any such service, facility, arrangement or benefit to the extent permitted by any such decision, order or determination by providing thirty (30) days prior written notice to the TC."

[*14]
## II. BACKGROUND

### A. Line Sharing

Line sharing is defined by the FCC as "the process by which a requesting telecommunications carrier provides digital subscriber line service over the same copper loop that the incumbent LEC uses to provide voice service, with the incumbent LEC using the low frequency portion of the loop and the requesting telecommunications carrier using the high frequency portion of the loop. The *TRO* provided that "the high frequency portion of a copper loop shall no longer be required to be provided as an unbundled network element," subject to a three year transition, and provided access to line sharing for an additional year for those CLECs currently utilizing line sharing. Availability of line sharing as a section 251 element expired by the terms of the *TRO* on October 2, 2004.

### B. Dark Fiber Feeder Subloop

A loop is a facility that connects from a customer's premises to a central office. Loops are composed of feeder, which extends out from the central office, and distribution, which branches out from the feeder to customer premises. Any portion of a loop can be called a subloop. The FCC defined subloops for the purposes of unbundling in its [*15] *Third Report and Order and Fourth Further Notice of Proposed Rulemaking in the Matter of Implementation of The Local Competition Provisions of the Telecommunications Act of 1996*, 15 F.C.C.R. 3696 (1999), which states that subloops are "portions of the loop that can be accessed at terminals in the incumbent's outside plant. An accessible ter-

2005 N.H. PUC LEXIS 24, *; 241 P.U.R.4th 409

minal is a point on the loop where technicians can access the wire or fiber within the cable without removing a splice case to reach the wire or fiber within." A hybrid loop consists of copper distribution plant plus fiber feeder facilities between the central office and locations at or near the serving area interface or remote terminal. Verizon's revisions propose eliminating the availability of the feeder portion of a subloop that consists of dark fiber.

### C. IOF at the OCn and STS1 level

Unbundled interoffice facilities consist of dedicated transport. In the *TRO*, the FCC redefined the dedicated transport network element as those transmission facilities that connect incumbent LEC switches or wire centers, which we discuss further in section D, Dark Fiber Channel Terminations. The FCC determined that high-speed [*16] interoffice transmission facilities at OCn and STS speeds would no longer be section 251 elements. In its impairment analysis the FCC stated, "we find that dark fiber and multiple DS3 circuits provide reasonable substitutes for OCn interface circuits at these capacities and find that requesting carriers are not impaired without OCn or SONET interface transport." *TRO* P 389. Verizon's revisions propose eliminating the availability of interoffice transport (IOF) at OCn and STS levels.

### D. Dark Fiber Channel Terminations

Verizon seeks to eliminate what it calls dark fiber channel terminations, which are also sometimes referred to as "entrance facilities." In response to the Commission's directive to identify the applicable cross references between each proposed tariff revision and the *TRO*, Verizon cited to *TRO* paragraphs 359, 365-369 and 381-385 as justification for eliminating dark fiber channel terminations. The cited paragraphs refer to dedicated transport and dark fiber transport. In paragraphs 359-369, the FCC explains that CLECs use dedicated interoffice transmission facilities to carry traffic from their end users' loops (in collocation arrangements) to the CLEC's [*17] switch (central office) or point of presence and named this type of circuit "entrance facilities." In the *TRO* the FCC found that the Telecommunications Act does not require ILECs to unbundle entrance facilities, and it excluded entrance facilities from the definition of dedicated transport. Dedicated transport, therefore, was limited only to those transmission facilities connecting ILEC switches and wire centers. Paragraphs 381-385 found, on a national basis, that CLECs were impaired without access to unbundled dark fiber; The paragraphs noted do not specifically reference dark fiber channel terminations.

*USTA II*, however, held that the FCC's exclusion of entrance facilities from the definition of dedicated transport was at odds with the definition of network element, which is "a facility or equipment used in the provision of a telecommunications service." *TRO Remand Order* P 136 and n. 380. In the *TRO Remand Order*, the FCC reinstated its original definition of dedicated transport, to the extent it included entrance facilities, and found that CLECs are not impaired without access to entrance facilities, *TRO Remand Order* P 137.

Verizon's proposed revisions would [*18] eliminate the availability of dark fiber channel terminations between CLEC collocation arrangements and the CLEC's central office or point of presence.

## III. POSITIONS OF THE PARTIES

### A. Verizon

#### 1. General Argument

Verizon contends that the *TRO* eliminated unbundling requirements for certain specified network elements, and that its proposed revisions reflect what it is authorized to do by the *TRO*. Verizon states that since its proposed modifications accurately reflect the FCC's rules and incorporate them by reference, the Commission should approve Verizon's filing as written. Verizon argues that there is no lawful basis for retaining these UNEs in its tariff, either permanently or on a transitional basis. According to Verizon the Commission lacks the authority to add to the list of UNEs established by the *TRO*, and is preempted from reimposing unbundling requirements on UNEs specifically eliminated by the FCC in the *TRO*. The *TRO* made specific findings of non-impairment and, in Verizon's view, the state has no lawful prerogative under the Supremacy Clause of the U.S. Constitution to frustrate or disregard the federal policy established by the FCC. Verizon [*19] makes reference to instances where the FCC has exercised its authority and preempted attempts by states to override its decision to remove certain network elements from the national list of UNEs.

Verizon contends that the Commission has no independent authority under state law to ignore the FCC-ordered elimination of UNEs. According to Verizon, the FCC's decision may not be challenged collaterally by ignoring the *TRO* in favor of plenary authority conferred by state statute. Arguments that the Commission may conduct its own impairment analysis are also flawed, in Verizon's view, as the FCC did not authorize state commissions to conduct granular analysis where it has made national determinations. Further, Verizon argues, nothing in the Commission's rules or any

state law sets forth any standard for unbundling beyond the sole applicable standard that unbundling obligations must comply with the Telecommunications Act.

Verizon characterizes claims that the Commission has separate authority under section 271 of the Telecommunications Act to determine UNEs, particularly line sharing, as seriously flawed. First, Verizon argues, the section 271 checklist item requiring unbundling of the [*20] local loop does not encompass separate access to the high frequency portion of the loop used to provide line sharing. Second, the terms of any required section 271 offerings, including "scope" and price, are governed by Federal law and will be determined by the FCC itself, according to Verizon. Verizon contends that the *TRO* reserves to the FCC the ability to determine whether a checklist element's rate satisfies the just and reasonable pricing standard of sections 201 and 202, through a fact-specific inquiry that the FCC would undertake in the context of an enforcement proceeding brought pursuant to section 271. Verizon expands on this in its reply brief, stating that the FCC sets the general pricing methodology for interconnection and unbundled access while the states are limited to applying that FCC-prescribed methodology in setting rates. Verizon maintains that there is no basis for CLEC claims that the Commission has authority under section 271 to establish its own prices for line sharing. Further, Verizon contends that Covad's support for TELRIC (Total Element Long-Run Incremental Cost) pricing for section 271 elements is weak, stating that even if TELRIC pricing could be [*21] found to be just and reasonable under section 271 (and Verizon believes that it could not) that would not preclude Verizon from charging a higher rate that is also just and reasonable, giving the Commission no grounds to insist on a lower TELRIC rate.

Verizon contends that its proposed tariff revisions recognize the fact that, in some cases, Verizon may have a continuing obligation to provide certain UNEs pursuant to existing interconnection agreements. In that instance, Verizon says, it stands ready to negotiate individual agreements with CLECs for the continued availability of those elements. That process, according to Verizon, is independent of the obligations created by its tariff, and there is no reason for generic tariff provisions to be left in place in order to recognize or enforce what is a contractual obligation.

Verizon rejects segTEL's arguments against preemption, saying that mandatory unbundling in the absence of an impairment finding undermines the Telecommunications Act's principal goal of promoting facilities-based competition, such that when the FCC determines that an element should not be unbundled, a state may not lawfully override that determination.

In its supplemental [*22] brief, Verizon argues that the Telecommunications Act does not simply create federal rights and obligations that supplement state law requirements, but has unquestionably taken the regulation of local competition away from the states such that states may take no action that is inconsistent with federal legislation and federal policy. Since the FCC eliminated these elements under section 251, Verizon says, the state may not reimpose unbundling obligations. The Commission cannot force Verizon to continue to make delisted UNEs available at TELRIC rates, says Verizon.

### 2. Line Sharing

Verizon argues that its tariff revisions regarding shared loops implement the FCC's rules governing grandfathered and new line sharing arrangements and should be approved as filed. According to Verizon, the FCC eliminated the requirement that ILECs must provide access to the high frequency portion of a loop and preempted the Commission from requiring the unbundling of shared loops. The FCC expressly declined to readopt its line sharing rules, Verizon says, and instead established a three-year transition period for new line sharing arrangements and grandfathered existing line sharing arrangements. Verizon [*23] describes the grandfathered line sharing arrangements as those arrangements over which the CLEC began providing DSL to a particular end user prior to the effective date of the *TRO*, and over which the CLEC has not ceased providing DSL service to that customer. Therefore, Verizon asserts, its tariff revisions properly reflect the FCC's intent that grandfathered line sharing arrangements extend not only to a particular end user customer, but to the exact loop (or subloop) serving that end user at a specific location. CLECs have a limited right to new line sharing arrangements, Verizon contends, for a limited transitional period, at rates which steadily increase toward the price of a standalone unbundled loop.

In its reply brief, Verizon takes issue with the claims of Covad, GWI and segTEL that section 271 imposes additional unbundling requirements for line sharing. Section 271 does not require Verizon to offer the high frequency portion of the loop, says Verizon, as checklist item 4 applies to the local loop transmission from the central office to the customer's premise "*unbundled from local switching or other services*" (emphasis supplied by Verizon). According to Verizon the [*24] question is not whether a CLEC should be allowed access to line sharing, but whether the CLEC must take (and pay for) the entire loop when it orders the high frequency portion of that loop. With that in mind, Verizon avers, Congress's failure to require that the high frequency portion be unbundled from the rest of the loop, while

expressly requiring that the loop itself be unbundled from switching is significant, and an indication that Verizon need not make the high frequency portion available separate from the low frequency portion. The CLECs have failed, in Verizon's view, to cite any decision by the FCC or any court interpreting section 271 as imposing an obligation on an RBOC -- independent of any UNE requirement of section 251 -- to unbundle the high frequency portion of the loop from the remainder of the loop.

Verizon continues this argument in its supplemental brief, updating the legal history of line sharing to show that the D.C. Circuit Court expressly upheld the FCC's determination that the high frequency portion of the loop was not subject to unbundling and that line sharing was therefore eliminated as a UNE. Since the Supreme Court denied *certiorari*, Verizon points [*25] out that the FCC's decision on this issue is binding as a final and unappealable determination. The Commission is preempted from ordering the continued provision of line sharing due to section 251(d)(3) and familiar principles of conflict preemption, according to Verizon. Verizon points out that both the Commission and the FCC share the common goal of promoting broadband deployment and enhancing competition. The FCC has concluded, Verizon contends, that forced line sharing is not necessary to promote broadband deployment, and, in fact, will discourage competition and innovation, contrary to the express goals of the Telecommunications Act.

Verizon cites the Supremacy Clause as the source of the preemption on action by this Commission, saying that it is particularly clear in the area of line sharing since the FCC adopted transitional rules which have preemptive effect and displace inconsistent state law. A U.S. District Court in Wisconsin specifically rejected the notion that state commissions have residual authority under the Telecommunications Act to impose state line sharing requirements, alleges Verizon, citing *Wisconsin Bell v. AT&T*, 2004 WL 2059549 [*26] (W.D. Wis. June 30, 2004), which, according to Verizon, concludes that the Telecommunications Act preserves state authority only to the extent that state requirements are consistent with the FCC's regulations. Verizon goes on to summarize decisions in Massachusetts, Florida, Indiana and Virginia that reject petitions to retain unbundling obligations that the *USTA II* decision vacated.

Verizon also relies on certain language in the TRO pointing out that if section 251 impairment determinations applied only to ILECs that were neither RBOCs nor exempt from unbundling obligations as rural telephone companies, that would leave only 2.5 percent of access lines subject to the impairment determinations. This, according to Verizon, would trivialize the FCC's section 251 impairment determinations.

### 2. Dark Fiber Feeder Subloop

Verizon contends that its proposed revisions eliminate dark fiber feeder subloop arrangements in compliance with the *TRO*. The FCC, according to Verizon, was specific in its determination that ILECs are not required to provide access to their fiber feeder loop plant on an unbundled basis as a subloop UNE.

### 3. IOF

Verizon contends that its tariff revisions [*27] are consistent with the FCC's finding that CLECs were not impaired without OCn or SONET transport facilities. n6 Verizon states that the FCC made a nationwide finding of impairment for dark fiber, DS1 and DS3, however, and requires the Commission to determine whether those findings apply to individual routes based on specific criteria.

n6 Verizon refers to STS as SONET; for purposes of this order, the two terms are interchangeable.

### 4. Dark fiber channel terminations

Finally, Verizon states that its tariff revisions in regard to dark fiber channel terminations are appropriate because the FCC changed the definition of IOF to exclude transport elements that do not connect ILEC switches and ILEC wire centers within a LATA.

### B. segTEL

#### 1. General Argument

SegTEL describes itself as a New Hampshire CLEC that provides broadband services to residential and business customers, using collocation to access line sharing in 25 Verizon central offices. segTEL argues that the Commission is

not preempted from requiring unbundling. [*28] According to segTEL, the Commission derives its legal authority to regulate telecommunications in New Hampshire from two sources: the police power of the State, as delegated to the Commission by the General Court pursuant to RSA 374, *et. seq.*, and the regulatory power delegated to the Commission by the federal government, through the Telecommunications Act and the rules the FCC has promulgated to implement the Act. It is the Commission's role, segTEL claims, to try to harmonize these two sources of power, utilizing both its state authority and its federally delegated authority in a way that does not substantially prevent the implementation of the purposes of the Telecommunications Act. Thus, segTEL concludes, preemption would only occur when Commission actions interfere with overriding Federal interests.

segTEL describes three types of Federal preemption: (a) express preemption, where Congress clearly states it is preempting state action; (b) conflict preemption, where terms of Federal and State laws are in conflict; and (c) occupation of the field preemption, where Congress enacts a scheme so pervasive that there is no room left for State action. Citing section 251(d)(3) of the [*29] Telecommunications Act, segTEL claims that there is no express preemption, nor does the federal regulatory scheme occupy the field. Therefore, segTEL argues, section 251(d)(3) incorporates the standard recitation of conflict preemption. Paragraph 195 of the *TRO* simply offers the FCC's guess, says segTEL, that a State using its power under State law to require unbundling would be unlikely to survive a preemption challenge. Such *dicta*, segTEL argues, does not absolve this Commission of its duty under state law to make its own determination regarding ILEC unbundling. According to segTEL, the Commission's duty under state law requires that the Commission determine whether requiring UNEs would conflict or substantially interfere with the Federal regime.

segTEL further argues that the *TRO* is not a mandate to cease unbundling, but permission to do so. Verizon's proposed tariff revisions, then, segTEL claims, are not a compliance filing made necessary by the *TRO*, but a request by Verizon to change its tariff in order to take advantage of new rules that will back unbundling mandates. In all cases, segTEL avers, Verizon must explain how its proposal is consistent with its ongoing [*30] obligations under section 271 of the Telecommunications Act. According to segTEL, as an RBOC Verizon retains an obligation to provide UNEs that is independent of its section 251 duties. Verizon must, says segTEL, show how it will continue to meet its section 271 obligations through its tariff and its interconnection agreements.

According to segTEL, Verizon is attempting to make far more out of the *TRO* than the law warrants in order to advance Verizon's own interests and to avoid state-level review. segTEL goes on to say that Verizon is forcing a piecemeal review of the *TRO's* provisions which will sap the limited resources of its competitors. Accordingly, segTEL recommends a cumulative review to implement all the provisions of the *TRO*, ensuring that final changes to the tariff comport with Verizon's section 271 obligations and incorporating changes that CLECs may request as a result of the *TRO*.

In its reply brief, segTEL reiterates that there is no preemption of state authority by the FCC in the matter of review of rates, terms and conditions for unbundled elements, as section 252(f)(2) of the Telecommunications Act expressly states that "nothing in [section 252] shall [*31] prohibit a state commission from establishing or enforcing other requirements of state law in its review."

In its supplemental brief, segTEL again explains that the purpose of Tariff 84 and its successors is to ensure maximum participation of competitors by reducing costs of entry on an open basis at published and Commission-approved rates. Verizon is required to offer line sharing and other elements under section 271 of the Telecommunications Act, according to segTEL, because section 271 creates separate and distinct unbundling obligations for RBOCs such as Verizon. According to segTEL, the FCC reiterated the section 271 obligation to provide line sharing in paragraph 653 of the *TRO*, and in subsequent orders where it stated that a section 251 non-impairment finding was not a barrier to continued section 271 requirements to provide access.

This Commission, segTEL argues, recommended approval of Verizon's entry into the interstate long distance market in part on the basis that Verizon was offering line sharing to CLECs, and conditioned its approval on the conversion of the SGAT to a tariff. Therefore, segTEL claims, the items in the SGAT were section 271 elements. As the Maine [*32] Commission found in 2004, segTEL contends, Verizon's unbundling obligations under sections 251 and 252 are synonymous with its section 271 obligations at the time when Verizon sought section 271 approval. Today, segTEL claims, an RBOC's section 251 obligations are narrower in most respects than its section 271 obligations.

Even though the competitive landscape has changed since Verizon's section 271 approval, segTEL continues, Verizon may not change the conditions on which the approval was based by failing to honor one of those underlying commitments.

According to segTEL, the Telecommunications Act makes a clear distinction between sections 251 and 271: section 251, in subsections (d)(1) and (2), requires the FCC to determine what elements should be unbundled and, absent a determination by the FCC that CLECs are impaired without access to those elements, the elements cannot be required to be unbundled. Section 251 preserved the authority of the Commission, segTEL contends, so long as the Commission does not substantially prevent implementation of the Telecommunications Act. Compare this to section 271, segTEL suggests, which sets forth the requirements of an RBOC to enter the interstate [*33] long distance market. Section 271, according to segTEL, is a contractual obligation with no section 251 impairment standard: it is a separate prerequisite and an ongoing commitment.

segTEL goes on to assert that state commissions retain a role in review of an RBOC's continued compliance with the section 271 checklist. According to segTEL, not only does the Telecommunications Act specifically require the FCC to consult with state commissions, *see* 47 U.S.C. § 271 (d)(2)(b), but the FCC views state commissions as having the authority to enforce compliance. segTEL quotes from paragraph 171 of the FCC order granting Verizon section 271 authority in New Hampshire, which refers to the "continuing oversight" of the Commission to reasonably assure "that the local market will remain open after 271 authority is granted." *In re Application by Verizon New England Inc.* 17 F.C.C.R. 18,660 (2002) (*NH 271 Order*) at P 171. segTEL reiterates that Verizon had to meet the section 271 checklist to obtain approval, and must continue to meet the checklist after approval in order to maintain its authority to be in the interstate long [*34] distance market.

*2. Line Sharing*

Verizon's proposed tariff revisions cite CFR section 51.319(a)(1)(i)(A)-(B) and *TRO* paragraphs 255-269 as justification for changes to its line sharing offering. segTEL takes issue with Verizon's reliance on these provisions, taking the position that (a) nothing in the *TRO* requires CLECs to execute a separate agreement for line sharing, and (b) Verizon has not established that the elimination of line sharing complies with the requirements of section 271 of the Telecommunications Act. Further, segTEL argues, the FCC's rules are unclear as to what constitutes a "new" line sharing application. segTEL argues that its installation of line sharing terminations and splitter shelves constitute an existing line sharing application that should enable segTEL to continue to serve additional customers at existing TELRIC rates.

While segTEL concedes that the Commission may be preempted from mandating continued line sharing outside of the grandfathering and transition provisions of the FCC's rules under section 251, segTEL claims that Verizon's obligation to provide line sharing under section 271 is clear, inasmuch as paragraph 105 of the *NH 271 Order* [*35] explicitly states that the FCC's "conclusion that Verizon complies with checklist item 4 [271(c)(2)(B)(iv)] is based on [the FCC's] review of Verizon's performance for all loop types, which include, as in past section 271 orders, voice grade loops, xDSL capable loops, digital loops, high capacity loops, as well as our review of Verizon's processes for hot cuts, line sharing and line splitting." (emphasis added by segTEL.)

In its reply brief, segTEL takes issue with the language of Verizon's revisions, claiming that Verizon's new tariff language is incorrectly line specific when the *TRO* is clearly customer specific. segTEL supports language that would allow customers to take existing line sharing services with them when they relocate.

In its supplemental brief, segTEL argues that the absence of line sharing in Tariff 84 will force CLECs to negotiate interconnection agreements with Verizon to continue to provide line sharing, a process segTEL describes as burdensome. segTEL argues that the promotion of competition and the development of broadband access to the Internet are important public policy goals, consistent with both the federal regime and state law and policy. Allowing [*36] Verizon to eliminate line sharing would thwart these clear public policy goals, according to segTEL, and exacerbate the difference between DSL rates in urban and rural areas due to the disparity in the price of full loops in Tariff 84 ($ 11.97 in urban areas and $ 25.00 in rural areas).

*3. Dark Fiber Feeder Subloop*

In its reply brief, segTEL asserts that Verizon ignores the plain language of the *TRO* in attempting to carve out dark fiber feeder subloops from the list of required UNEs. According to segTEL, the local loop element is designed as the facility between a distribution frame in a central office and the loop demarcation point at a customer premise, and nothing in the applicable regulation supports Verizon's argument that a segment of this element is excluded from the access requirements.

*4. IOF*

Verizon's proposal to terminate, as soon as possible, all current and future service over OC3, OC12, or STS1 transmission facilities except as provided for under an effective interconnection agreement may be consistent with the *TRO's* implementation of the Telecommunications Act, segTEL concedes, but it ignores Verizon's obligations under section 271 of the Telecommunications [*37] Act. Further, segTEL states that a state decision mandating continuation of OCn/STS transport UNEs could not conflict with the FCC's rules, since nothing in the rules addresses such transport. segTEL asserts that although the *TRO* allows Verizon to remove UNEs from the list of available elements, there is nothing in the Telecommunications Act that requires Verizon to do so. Moreover, according to segTEL, there is nothing in the *TRO* to indicate that continued provision of such services would frustrate or substantially prevent an FCC goal, so no preemption of state law can exist for IOF.

*5. Dark Fiber Channel Terminations*

segTEL makes no explicit argument regarding the elimination of dark fiber channel terminations UNEs.

**C. MCI**

*1. General Argument*

MCI contends that the *TRO* does not preempt states from establishing additional unbundling under state law, citing the statement by the FCC at paragraph 191 of the *TRO* that "many states have exercised their authority under state law to add network elements to the national list." Indeed, avers MCI, the FCC rejected Verizon's argument that there is no independent state role in unbundling determinations. The FCC deferred [*38] the issues of preemption to future proceedings, MCI notes, suggesting that a conflict between state and federal law would require a declaratory ruling from the FCC. MCI suggests that any reading of the *TRO* that does not give substantial leeway to the states would itself conflict with the Telecommunications Act, which explicitly recognizes the power of states to order greater unbundling than the FCC at section 251(d)(3) and section 252(e)(3). Withdrawal of the UNEs proposed by Verizon, in MCI's view, would conflict with the Commission's rulemaking authority in RSA 365:8, its power to reject rates that are not just reasonable and in the public interest as set forth in RSA 378:7 and Rule Puc 1311 authorizing the unbundling of ILEC facilities.

Verizon's proposal fails to include adequate transition procedures, MCI asserts, which must be in place in order to prevent disruptions in customer service. In fact, MCI says, Verizon proposed to unilaterally discontinue access to the UNEs at issue on December 6, 2003, without regard to possible service disruptions, an action that MCI contends would fly in the face of FCC policy and the Commission's interest in preventing harm to consumers. [*39] MCI urges the Commission to ensure that Verizon establishes an adequate transition framework before its tariff revisions take effect.

*2. Line Sharing*

MCI takes issue with Verizon's revisions as they apply to line sharing for three reasons. First, MCI argues that Verizon uses the ambiguous term "existing rates" as opposed to the *TRO* language that sets the price to that "charged prior to the effective date" of the *TRO*. Second, according to MCI, Verizon's tariff revisions restrict grandfathering to an "end user customer over that Loop or Subloop at that location," overstating the *TRO's* non-location-specific standard of a "particular end-user customer." Finally, MCI contends that the *TRO* specifically provides for the inclusion of a "successor or assign" to the CLEC, while Verizon is limiting grandfathering to "the TC."

*3. Dark Fiber Feeder Subloop*

MCI contends that dark fiber feeder subloops must be made available on an unbundled basis because they are components of dark fiber loops and the *TRO* did not alter this requirement. MCI states that Verizon's justification for the elimination of dark fiber feeder subloops rests on paragraph 253 of the *TRO* which, [*40] MCI says, address fiber feeder subloops generally. Since the FCC treated dark and lit fiber quite differently throughout the *TRO*, according to MCI, Verizon's lit fiber analogy does not support its argument that the *TRO* bars the unbundling of dark fiber subloops. MCI argues that a proper conflict preemption analysis pursuant to section 251(d)(3) would result in a finding that the unbundling rules challenged by Verizon would stand, particularly with respect to dark fiber feeder subloops.

*4. IOF*

MCI asserts that Verizon has identified no provision or purpose of the Telecommunications Act that would be undermined by the unbundling on state law grounds of the high capacity transport UNEs at issue in this docket, because the question is not whether the state requirements and the *TRO* are identical, but whether state requirements substantially prevent the requirements of the Telecommunications Act itself.

2005 N.H. PUC LEXIS 24, *; 241 P.U.R.4th 409

*5. Dark Fiber Channel Terminations*

MCI did not address dark fiber channel terminations specifically.

**D. GWI**

*1. General Argument*

GWI asserts that Verizon has grossly overstated the purported preemptive sweep of the *TRO*. Citing section 251 of the Telecommunications [*41] Act, GWI argues that a state may require UNEs not unbundled by the FCC so long as the state's action does not undercut the Federal scheme. According to GWI, section 251(d)(3) states that the FCC shall not preclude the enforcement of any regulation, order or policy of a State Commission that (a) established interconnection obligations of LECs, (b) is consistent with the requirements of section 252, and (c) does not prevent implementation of section 252 and the purposes of the Telecommunications Act. Indeed, says GWI, the FCC acknowledged at paragraph 192 of the *TRO* that Congress explicitly declined to preempt states in the field of telecommunications regulation, concluding that "if Congress intended to preempt the field, Congress would not have included § 251(d)(3) in the 1996 Act." Instead, GWI explains, the FCC established a procedure by which aggrieved parties may seek review of a state's decision by the FCC, and subsequently test that review in court, if necessary. Citing action by the Pennsylvania Public Utility Commission (Pennsylvania PUC), GWI argues that the state can differ from the *TRO* if the Commission does not have enough information to forecast the outcome of [*42] FCC and court review of whether its varying requirements substantially prevent the Federal scheme. GWI attached to its brief the Comments of National Association of Regulatory Utility Commissioners (NARUC) to the Court of Appeals that decided *USTA II*. NARUC's brief addresses whether the FCC can remove the states' authority that was preserved in section 251(d)(3). NARUC contended that the FCC's finding was contrary to the reservation of state's rights to set prices that are subject to review by federal district courts under section 252(e)(6).

In its reply brief, GWI characterizes Verizon's argument that New Hampshire is powerless to enforce Verizon's section 271 obligations as disingenuous. GWI points out that the FCC reviewed the pricing procedures at great length during approval of Verizon's petition for section 271 authority in New Hampshire and, although the FCC took issue with some aspects of the Commission's rate setting, the FCC in no way suggested that the Commission's authority to review rates was limited. In fact, according to GWI, the FCC noted that elements germane to the section 271 review might be altered by this Commission in the future if the Commission were to initiate [*43] a new rate proceeding. GWI contends that Verizon supports its position by extracting a quotation from paragraph 664 of the *TRO* which says that the FCC would determine whether section 271 rates were just and reasonable in the course of a section 271 enforcement proceeding. GWI points out that the FCC stated this during a discussion concerning the interplay between sections 251 and 271, noting that (a) an RBOC such as Verizon may be required to make elements available under section 271 that it might not otherwise be required to make available under section 251, and (b) that pricing for such elements would be judged under a "just and reasonable" standard. In further support, GWI cites the *NH 271 Order*, in which the FCC explicitly rejected AT&T's argument that the FCC was required to evaluate the checklist by looking at more than 150 UNE rates on an element-by-element basis. Clearly, according to GWI, the FCC would not now exclude the states from the rate-setting business in connection with section 271 UNEs; rather, the FCC will continue to review state-set rates for those elements required to be unbundled under section 271.

*2. Line Sharing*

Citing paragraphs 255 through 270 [*44] of the *TRO*, GWI contends that the FCC considered economic and operational reasons for reinstating line sharing. Although Verizon's revisions are consistent with the *TRO*, GWI argues, the Commission should independently consider whether line sharing should be offered on an ongoing basis in order to further state policies in support of access to the Internet. GWI encourages the Commission to make an independent assessment, arguing that rural loop rates of $ 25 would make it impossible to deliver DSL at competitive prices, in direct conflict with the best interests of the residents and businesses of New Hampshire.

*3. Dark Fiber Feeder Subloop*

GWI takes the position that Verizon's tariff revisions regarding dark fiber feeder subloop are not consistent with the *TRO*. GWI points out that there is a category of dark fiber subloop that is not covered by the FCC's description of UNEs. This category is an intermediate part of the loop: not distribution, which requires an end point at a user premise; and not feeder, which requires an end point at a central office. According to GWI, this intermediate portion of the loop runs from a hard termination point to another hard termination [*45] point. To the extent that such dark fiber was already offered in the SGAT, GWI asserts, Verizon must continue to provide it. The FCC was careful, GWI avers, to en-

sure that ILECs would eliminate only those UNEs that enable the transmission of packetized information, while Verizon's tariff revisions fail to capture that distinction and deny access to all features, functions and capabilities of the subloop.

*4. IOF and Dark Fiber Channel Terminations*

GWI took no position on IOF or dark fiber channel terminations.

**E. Covad**

*1. General Argument*

Covad asserts that the Commission has the authority to enforce Verizon's continuing obligations under section 271 because the Act preserves a state role in the review of RBOC compliance with its section 271 checklist obligations. Citing the Pennsylvania PUC's decision to retain UNE-P n7 as an unbundled element, Covad argues that the checklist contains an undisputed continuing obligation to unbundle local switching. In similar manner, Covad contends, the FCC anticipates that a state Commission's active oversight and comprehensive review would ensure that competitive markets remain open.

        n7 UNE-P, or unbundled network element -- platform, is the provision of local loop and switching UNEs in combination.

[*46]

Covad further contends that a state may establish its own unbundling, asserting that courts have long held that federal regulation of a particular field is not presumed to preempt state law unless the nature of the regulation permits no other conclusion or Congress has unmistakably ordained that the federal law have preemptive effect. Covad contends that the U.S. Supreme Court has refused to diminish the role of state commissions in overseeing local competition, noting that although the FCC may have plenary authority to implement the Telecommunications Act, the FCC would be precluded from eliminating state review altogether. Thus, Covad argues, the FCC's apparent intent to preclude states from exercising their section 251 and section 252 authority notwithstanding, this Commission should not be dissuaded from requiring Verizon to provide line sharing as a UNE.

Several states have independently required unbundling, says Covad, pointing to California and Minnesota as states that have unbundled line sharing, and to Illinois, Wisconsin, Indiana and Kansas as states that have unbundled hybrid loops. Further, Covad states that the FCC has acknowledged that the availability of UNEs may vary [*47] between geographic regions, thus, if state-specific circumstances exist, state rules requiring unbundling are permissible and would not substantially prevent the implementation of section 251.

Covad states that the Commission is authorized under section 271 to require that checklist UNEs be priced at cost-based, forward-looking rates. Even if an element is no longer a UNE pursuant to section 251, Covad explains, it must nonetheless be priced appropriately in accordance with sections 201, 202 and 271 of the Telecommunications Act. The FCC has neither ordered nor precluded the application of TELRIC prices that were developed under section 251 for these UNEs, says Covad. In fact, Covad claims, the principles of TELRIC must be applied in some form, as Congress has barred the use of traditional rate-base, rate of return methods of utility pricing since enactment of the Telecommunications Act.

The review of such rates is squarely within the jurisdiction of the Commission, Covad asserts, inasmuch as the U.S. Supreme Court has upheld TELRIC methodology on the condition that state commissions retain the authority to use and apply TELRIC in setting final rates for their respective states. The [*48] Pennsylvania PUC determined that rates for UNE-P under section 271 would be existing, approved Pennsylvania UNE rates, according to Covad.

In its reply brief, Covad notes that the *TRO* is not self-executing. Rather, says Covad, the FCC's reiteration of the ILECs' obligations to comply with existing unbundling requirements demonstrates that the *TRO* rules are not immediately effective, but must be implemented in due course and in accordance with the authority granted by the Telecommunications Act. Thus, Covad asserts, this Commission is empowered to suspend, review and amend Verizon's proposed revisions to ensure compliance with federal and state law.

*2. Line Sharing*

Covad maintains that state-specific conditions exist that would allow the continued offering of line sharing in New Hampshire. The primary and deciding factor regarding the finding of non-impairment in the case of line sharing was the ability of competitors to obtain revenue from both the low and high frequency portions of the loop, including voice and data bundles using line splitting (which allows two CLECs to share the loop, with one providing voice service over the low-frequency portion and the other providing [*49] DSL over the high-frequency portion). Covad asserts that Verizon has not made line splitting operationally available in New Hampshire in a manner consistent with what Verizon provides to itself. In support of this claim, Covad contends that: (a) there are limitations on the timing of line splitting order which impact customers; (b) there are discriminatory "versioning" policies for submission of line splitting orders; (c) Verizon recently acted unilaterally to quash a change request that would allow line splitting migrations; and (d) Verizon refuses to provide line splitting with resold voice services. Because of these operational and cost disadvantages, Covad argues, competitors face severe competitive disadvantages in obtaining all potential revenues from using the full functionality of the loop, making the FCC's impairment finding out of line with the facts as they exist in New Hampshire.

Covad asserts that the Commission has independent state law authority to order line sharing as a UNE pursuant to the Commission's independent authority to foster competition in the local telecommunications market. Covad further believes that the Commission should exercise its ratemaking authority [*50] under RSA 378 to require Verizon to provide line sharing at forward-looking, cost-based rates. Again citing to the Pennsylvania PUC, Covad believes that the Commission could set rates equivalent to those UNE rates that the Commission has already approved, as nothing in the Telecommunications Act or *TRO* would prohibit the Commission from determining that those rates remain just and reasonable. It is crucial, in Covad's view, that the Commission not cede its authority to set rates that are pro-competitive, pro-consumer, and which reflect Congress's goals for the Telecommunications Act.

In its reply brief, Covad asserts that the Commission is empowered under section 271 to require Verizon to provide access to line sharing at cost-based rates. Covad disagrees with Verizon, maintaining that line sharing falls squarely within the definition of a loop under checklist item 4, and, as such, must be priced at a rate not above costs that reflect a competitive forward-looking network. Covad claims that such rates are the bedrock of nondiscriminatory, just and reasonable pricing required by the Telecommunications Act and is unquestionably within the Commission's authority to regulate. Covad [*51] points to a Georgia Public Service Commission (PSC) ruling that BellSouth must continue to provide line sharing pursuant to section 271. The Pennsylvania PUC, says Covad, also adopted the concept that section 271 imposes separate and independent obligations upon Verizon, irrespective of any impairment findings that may exist under section 251.

Covad rejects Verizon's argument that the only mechanism by which a competitor can obtain review of Verizon's pricing of line sharing is through an enforcement proceeding in front of the FCC. Such a process contravenes the dual-jurisdictional nature of regulation of telecommunications in the United States, according to Covad. Thus, in Covad's view, there is no cause to doubt the Commission's authority to enforce Verizon's section 271 obligations, including the provision of line sharing.

Finally, Covad takes issue with Verizon's proposed tariff language which denies continued line sharing to those customers whose loops require replacement or who change residences. The *TRO* makes clear, according to Covad, that a line-shared loop is grandfathered until a particular end user customer discontinues DSL service. Verizon has no right, Covad claims, [*52] to terminate line sharing due to a change in the physical loop that serves the customer, and Verizon's focus on "that loop or subloop" violates the FCC's grandfathering scheme. Similarly, Covad contends that if a customer moves from one location to another, Verizon's proposed language would allow it to terminate the grandfathering of that arrangement. That result is not permitted, says Covad, as the FCC rules state that grandfathering ends only when the ends user "cancels or otherwise discontinues its subscription." Covad also objects to Verizon's use of the ambiguous term "existing rates" instead of the *TRO* language setting the grandfathered price to that "charged prior to the effective date" of the *TRO*.

*3. Dark Fiber Feeder Subloop, IOF and Dark Fiber Channel Terminations*

Covad made no argument regarding dark fiber feeder subloop, IOF or dark fiber channel terminations.

**F. Conversent**

*1. General Argument*

Conversent asserts that the Commission is not preempted from requiring the relevant UNEs, as the *TRO* contemplated a joint federal-state role in managing the transition to the new rules. Conversent maintains that, separate and apart from an ILEC's unbundling [*53] obligations under section 251, Verizon has an obligation under section 271 to offer access at just and reasonable rates. Conversent limited its argument to dark fiber transport, which was not one of the elements Verizon is seeking to remove from Tariff 84.

### G. Lightship

Lightship concurs with and supports segTEL's arguments. Lightship contends that states may establish pricing and other terms of section 271 elements. In the *TRO*, according to Lightship, the FCC found that section 271 of the Telecommunications Act imposed separate unbundling obligations from those of section 251 at rates that are just, reasonable, and non-discriminatory. Lightship argues that, unlike sections 251(e) and 276(b) of the Telecommunications Act, section 271 does not unambiguously nor straightforwardly grant the FCC the authority to establish rates, terms and conditions for section 271 elements. Therefore, Lightship continues, it would be unlawful for the FCC to preempt this Commission from exercising its section 152(b) authority to regulate section 271 rates, terms and conditions. In support, Lightship cites the U.S. Supreme Court decision in *AT&T vs. Iowa Utilities Board*, 525.U.S. 366 (1999), [*54] which upheld the determination that no preemption exists so long as state commissions apply the proper just and reasonable standard. Therefore, Lightship continues, the Supreme Court has endorsed state commissions' continuing role in the ratemaking process. Lightship wants the Commission to order Verizon to continue to comply with its section 271 obligations.

### IV. COMMISSION ANALYSIS

The situation presented here is confronted in one form or another by all the states served by Verizon. It is, in point of fact, nearly identical to that confronted by the Maine PUC as described in its September 3, 2004 order in the agency's Docket No. 2002-682 (*Maine Order*). As we did, the Maine PUC proposed in connection with Verizon's request for section 271 authority that the Company's wholesale rates be filed with the state commission in the form of a tariff. As here, the FCC incorporated this commitment into the order granting section 271 authority. And, as with the approval of section 271 authority for Verizon in New Hampshire, the Maine PUC determination antedated the FCC's *TRO* and the *USTA II* decision of the U.S. Court of Appeals for the District of Columbia Circuit. n8 Maine [*55] decided, *inter alia*, (1) that Verizon must include all wholesale offerings in its state wholesale tariff, including UNEs provided pursuant to section 271, and (2) the state commission had authority to approve "just and reasonable" rates for section 271 UNEs in accordance with the standard set forth in Sections 201 and 202 of the Telecommunications Act, 47 U.S.C. § 201-02. We agree for the most part with Maine's approach and reach generally the same conclusions, although we differ on certain specifics, making adjustments as appropriate to circumstances in New Hampshire.

n8 There are also differences between the situations in the two states. Unlike this agency, the Maine PUC did not approve an SGAT prior to its appearance as a wholesale tariff in November 2002. Accordingly, as soon as Verizon filed a wholesale tariff the Maine PUC suspended the tariff. It remained suspended thereafter. Thus, before the Maine PUC when it issued the *Maine Order* was the entirety of the Verizon wholesale tariff, including provisions that are analogous to the tariff revisions that give rise to this proceeding. The legal issues, regarding the role of state commissions subsequent to RBOC receipt of section 271 authority, are identical.

[*56]

In both Maine and New Hampshire, when Verizon obtained section 271 authority the RBOC's unbundling obligations under sections 251 and 271 were identical. *See Maine Order*, slip op. at 4. The intervening events -- issuance of the *TRO* and the *USTA II* decision -- changed this landscape, such that Verizon's section 251 obligations were narrowed because, as to some elements, CLEC ability to provide the corresponding services was not impaired without the ability to purchase section 251 UNEs from the RBOC. Among the obligations no longer within the section 251 ambit are the four UNEs at issue in this case which Verizon seeks to remove from its tariff, *i.e.*, line sharing, dark fiber feeder, interoffice transmission facilities (IOF) consisting of OCn (Optical Carrier number) and STS1 (Synchronous Transport Service) transport, and dark fiber channel terminations.

We address first Verizon's general argument that the FCC's elimination of an element as a section 251 obligation allows Verizon to remove that element from its wholesale tariff altogether. The FCC made clear in the *TRO* that the removal of a UNE from the list of section 251 obligations because of a lack of impairment [*57] did not automatically resolve the question of whether an RBOC must still make that UNE available under section 271. *See TRO* at PP 652-655. The FCC's *TRO* has in fact rejected Verizon's arguments that once the FCC determined that a UNE is not necessary under section 251, the corresponding 271 checklist item should be construed as being satisfied. In rejecting this position, the FCC made it clear in the TRO that "the BOCs have an independent obligation under section 271 (c)(2)(B) to provide access to certain network elements that are no longer subject to unbundling under section 251, and to do so at reasonable rates." The FCC further concludes that RBOC obligations pursuant to section 271 are "not necessarily relieved based on any determination [by the FCC] under the section 251 unbundling analysis." *Id.* at P 655. n9 The FCC's conclusions were reaffirmed in *USTA II. See USTA II*, 359 F.3d at 589-90. Accordingly, determining whether the four elements at issue here remain as Verizon obligations under section 271 requires a case-by-case analysis. At the same time, it is clear as a general matter that, to the extent an obligation persists under section [*58] 271, the pricing standard changes. As a section 271 element, pricing will be based on a "just and reasonable" standard and not on TELRIC. *TRO* at P 656.

n9 In arguing to the contrary, Verizon invokes paragraph 660 of the *TRO*. In paragraph 660, the FCC noted that only 2.5 percent of ILEC switched access lines nationwide were served by LECs that are neither RBOCs nor rural telephone companies exempt from section 251 unbundling obligations. According to Verizon, in light of these facts it "trivializes" the FCC's decision to phase out line sharing as a section 251 obligation to determine, in effect, that the decision applies only to 2.5 percent of ILEC switched access lines. December 6, 2004 Comments of Verizon NH in Docket No. DT 04-176 at 15. Verizon reads too much into paragraph 660. The conclusion actually drawn by the FCC in paragraph 660 is that the agency's section 251 impairment determinations should not apply only to ILECs that are not RBOCs because that would tend to render section 251 "superfluous." Nothing in our decision today is intended to suggest that the FCC's impairment determinations should not apply to Verizon.

[*59]

Before we undertake the case-by-case determinations, however, we examine the extent of our authority, under section 271 or otherwise, to determine whether Verizon must continue to offer delisted section 251 UNEs as section 271 elements. The first step in that examination focuses on Verizon's obligation to file a wholesale tariff.

As the FCC noted in the 271 Order, the Commission initially identified ten separate conditions as necessary for recommending that the FCC grant section 271 authority; Verizon agreed to comply with six of them. *See NH 271 Order* at P 4 n. 10 and P 5 n. 11. Among the conditions agreed to by Verizon was the requirement that Verizon "explicitly convert the existing statement of generally available terms and conditions (SGAT) into a competitive LEC tariff from which competitors may order anything contained in the SGAT without the need to negotiate or amend an interconnection agreement." *Id.* at P 4 n. 10. Ultimately, the Commission recommended that the FCC grant section 271 authority subject to the conditions as set forth in a letter to Verizon dated June 14, 2002. *Id.* at 5. It is undisputed that these conditions, including the wholesale tariff obligation, [*60] form part of the basis for Verizon's receipt of section 271 authority.

The *NH 271 Order* notes that Verizon agreed to submit a wholesale tariff, and the order did not distinguish between section 251 and section 271 obligations. We find it reasonable and appropriate, as did the Maine PUC, to interpret Verizon's tariff filing obligation as embracing the unbundling obligations of both section 251 and section 271. Indeed, in the introduction to Verizon's SGAT Verizon notes that the SGAT is filed under sections 251, 252 and 271 of the Telecommunications Act. (SGAT p.1). Additionally, Verizon committed to "promptly file modifications to its SGAT and tariff to reflect changes in the services and network elements required by the federal Telecommunications Act, as determined by the FCC or the courts" in its letter to the Commission filed in DT 01-151 on March 15, 2002. In other words, Verizon remains obligated to have a wholesale tariff on file with our agency and an FCC decision to remove a UNE as a section 251 requirement does not automatically eliminate it as an unbundled element that Verizon must offer in its wholesale tariff.

Having determined that Verizon is obliged to file a wholesale [*61] tariff, we next examine the implications of that obligation. In granting Verizon section 271 authority in New Hampshire, the FCC made explicit reference to an ongoing role for this agency under section 271 in paragraphs 172 through 174 of the *NH 271 Order*. After affirming that Verizon has continuing obligations under section 271 pursuant to subsection (d)(6), the FCC affirmed its own authority to exact compliance, *NH 271 Order* at P 172. The FCC indicated its readiness to assert such authority while "working in concert" with this Commission. *Id.* at P 173. The FCC also stated that it would not describe the post-approval enforcement framework because it had already done so in prior section 271 approvals, *i.e.*, those covering Kansas and Oklahoma, Texas and New York. *Id.* at P 172.

The FCC's New York 271 approval order, *In re Bell Atlantic New York*, 15 F.C.C.R. 3953 (1999) (*NY 271 Order*), the earliest of those cited, offers the most complete description of the FCC's view of post-approval section 271 enforcement. The FCC noted that by enacting section 271 Congress intended to give RBOCs an incentive to take actions that would tend to [*62] accelerate competition in RBOC-dominated telecommunications markets, observing that the incentive "may diminish" once an RBOC had received section 271 authority. *Id.* at P 446. Therefore, reasoned the FCC, "swift and effective post-approval enforcement of section 271's requirements... is essential to achieve Congress's goal of maintaining conditions conducive to achieving durable competition in local markets." *Id.*

After enumerating the various enforcement remedies in section 271, most particularly the ability to suspend an RBOC's section 271 authority, the FCC indicated that it intended to be active and vigilant in this regard. But the FCC went on to stress that

> in addition to FCC-initiated enforcement actions (such as forfeitures, suspensions, and revocations), Congress provided for the expeditious review of complaints concerning failure by a BOC [*i.e.*, an RBOC] to meet the conditions required for section 271 approval. Such complaints may include requests for damages. The Commission will consider and resolve those complaints alleging violations of section 271 as well as the Commission's rules and orders implementing the statute. Complaints involving a BOC's alleged [*63] noncompliance with specific commitments the BOC may have made to a state commission, or specific performance monitoring and enforcement mechanisms imposed by a state commission, *should be directed to that state commission* rather than the FCC.

*Id.* at P 452 (footnotes omitted, emphasis added).

Given these legal and factual circumstances, we share the view of the Maine PUC that as a state commission we have the authority to determine whether Verizon's wholesale tariff, including any changes proposed by Verizon, remains in compliance with the obligations Verizon voluntarily undertook in exchange for the right to offer interLATA service. Although, as Verizon notes, subsection (d)(6) of section 271 refers specifically to the FCC's role in post-approval section 271 enforcement, the FCC itself has repeatedly recognized that state commissions may receive and evaluate complaints of non-compliance with the conditions to which the RBOC and the state commission have agreed. In this case, like our Maine counterparts, we do not assert independent authority to define the scope of Verizon's section 271 obligations nor its compliance with those obligations under that section. We are performing [*64] our duty as the initial arbiter of disputes over whether Verizon continues to meet the specific commitments previously made to this Commission as a condition for its recommendation that Verizon receive section 271 interLATA authority. *See NY 271 Order* at P 452. n10

n10 In arguing to the contrary -- specifically, in the course of urging the Commission not to require Verizon to offer line sharing to CLECs as part of the wholesale tariff-Verizon relies on a statement in *SBC Communications v. FCC*, 138 F.3d 410 (D.C. Cir. 1998) that "Congress has clearly charged the FCC, not the state commissions," with making certain determinations under section 271. *Id.* at 416. At issue was whether the RBOC was entitled to section 271 authority, notwithstanding certain objections interposed by the relevant state commission, rather than whether the state commission had an enforcement role to play after the FCC allowed the RBOC to enter the interLATA market.

A similar point can be made about *Indiana Bell Telephone Co. v. Indiana Utility Regulatory Commission*, 359 F.3d 493 (4th Cir. 2004), also relied upon by Verizon. At issue in that proceeding was whether, during the long-distance application process, a state regulatory commission had the power to enter an order designed to ensure the RBOC would continue to meet its section 271 obligations. The U.S. Court of Appeals for the Fourth Circuit answered the question in the negative, deciding the case on preemption grounds. The Court held that the state regulatory commission could not "parlay its limited role in issuing a recommendation" to the FCC on whether to grant section 271 authority "into an opportunity to issue an order, ostensibly under state law, dictating conditions on the provision of local service." *Id.* at 497.

[*65]

We now examine each of the four elements, line sharing, dark fiber feeder subloop, IOF and dark fiber channel terminations, in the context of the section 271 checklist, to determine whether Verizon remains obliged to offer them in its wholesale tariff. Subsection (c)(2)(B) of section 271 sets forth the "competitive checklist" of items that RBOCs must offer CLECs in order to meet the "access and interconnection" requirements for interLATA long-distance authority. Two section 271 checklist items are relevant to determining whether Verizon remains obligated to provide the four elements noted above: checklist item 4, "local loop transmission from the central office to the customer's premises, unbundled from local switching or other services;" and checklist item 5, "local transport from the trunk side of a wireline local exchange carrier switch unbundled from switching or other services;" § 271(c)(2)(B)(iv) and (v).

Of the four elements that Verizon seeks to remove from Tariff 84, it is line sharing, which uses the high frequency portion of the local loop, that has engendered the most controversy. We must determine whether checklist item 4, which requires the unbundling of local loops, [*66] includes a requirement for the continued provision of line sharing as a section 271 element. The FCC's regulations define line sharing as "the process by which a requesting telecommunications carrier provides digital subscriber line service over the same copper loop that the incumbent LEC uses to provide voice service, with the incumbent LEC using the low frequency portion of the loop and the requesting telecommunications carrier using the high frequency portion of the loop." 47 C.F.R. 319(a)(1)(i). According to the pleading submitted by ALTS on February 18, 2005, the widespread advent of line sharing in 2002 was largely responsible for creating broadband services that gave consumers high-speed access via DSL (digital subscriber lines) to the Internet, both because consumers could obtain this service from CLECs and because the competition induced ILECs themselves to offer DSL service at a more reasonable rate. Whether or not such an interpretation is a fair assessment, there is no question that the broader availability of line sharing, and therefore DSL, in New Hampshire, particularly in rural areas, is encouraged by this Commission and by state statute. *See* RSA 374:22-j, VI. [*67]

Checklist item 4 refers only to "local loop transmission from the central office to the customer's premises, unbundled from local switching or other services." If the phrase "local loop" can be understood as having been intended to include all the functionalities of a loop on an unbundled basis, then line sharing is required by checklist item 4. We conclude that it is, relying on, among other things, the Statutory Appendix to the *NH 271 Order*. In this appendix, the FCC specifically addressed how RBOCs can establish that they are in compliance with checklist item 4. *Inter alia*, the RBOC "must provide access to any functionality of the loop requested by a competing carrier unless it is not technically feasible to condition the loop facility to support the particular functionality requested." *NH 271 Order*, Appendix F at P 49. We understand the high frequency portion of the loop -- or, more specifically, the use of that portion of the loop to provide DSL service -- to be a "functionality of the loop." The D.C. Circuit has a similar understanding of what "functionality of the loop" means. *See USTA II*, 359 F.3d at 554 (referring, albeit in passing, [*68] to the "full functionality of the loop" as including "voice, data, video, and other services.") The discussion of line sharing in the FCC's *TRO Order* further buttresses the notion that line sharing is an individual "functionality of the loop." *See TRO Order* at P 258 ("Whereas in the Line Sharing Order, the focus was only on the revenues derived from an individual service, our focus is on all the potential revenues derived from using the full functionality of the loop."). n11 Additionally, the FCC specifically included line sharing in its analysis of Verizon's compliance with the competitive checklist, including line sharing as one of the elements it reviewed as part of Verizon's compliance with checklist item 4. *See NH 271 Order*. Also, Verizon itself listed line sharing as one of the items it offers to carriers in its checklist declaration to this Commission in Docket No. DT 01-151 filed on July 31, 2001. Accordingly, we determine that checklist item 4 includes a requirement to provide line sharing.

n11 We acknowledge that the FCC is not necessarily the final arbiter of what Congress meant when it used the phrase "local loop" in checklist item 4. However, we are aware of no federal court that has disagreed with the FCC's construction of this statutory language. A court faced with such a question would be required to grant deference to the FCC under the Supreme Court's *Chevron* doctrine. *See Chevron USA, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984) (concluding that, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute").

[*69]

The next element we consider is dark fiber feeder subloop. Because a subloop is a distinct segment of a complete loop, we must determine whether checklist item 4 includes a requirement that subloops, in particular dark fiber feeder subloops, are required for section 271 compliance. We answer the question in the affirmative, noting that Verizon does not suggest to the contrary. The only argument Verizon makes about dark fiber feeder subloop is that the FCC determined in the *TRO* that ILECs were not required under section 251 to offer unbundled access to fiber feeder loop plant. TRO at P 253 (determining that copper subloops were subject to section 251 unbundling). This is not dispositive of whether Verizon remains obliged to provide such access under checklist item 4. n12 It is clear, however, that the FCC anticipated the provision of dark fiber feeder subloop as a section 271 element, stating, "we expect that incumbent LECs will develop wholesale service offerings for access to their fiber feeder to ensure that competitive LECs have access to copper subloops." *Id.* We therefore determine that checklist item 4 includes dark fiber feeder subloops.

n12 GWI makes an additional, related argument that the intermediate portion of the subloop, i.e., that portion of the subloop connecting a remote terminal to another remote terminal rather than customer premises, is still subject to section 251 unbundling. Because our decision today means that Verizon is still obliged to offer the intermediate portion of the subloop as a checklist item 4 element, the only question implicated by GWI's argument is whether TELRIC pricing still applies to this portion of the subloop. We defer that question until such time as Verizon seeks to deviate from the rates currently reflected in Tariff 84.

[*70]

MCI and segTEL argue that Verizon's proposal to remove dark fiber feeder subloop as a section 251 element is a misreading of the clear language of the *TRO*. While the *TRO* does not specify "dark" fiber in the discussion of dark fiber feeder subloop, this issue is rendered moot by the plain language of the *TRO Remand Order*, which removes all dark fiber loops, and therefore all dark fiber subloops, from Verizon's section 251 unbundling obligations. *See* 47 C.F.R. 51.319 (a)(6).

The third element we consider is IOF. IOF is transport between Verizon locations, and thus we must determine whether checklist item 5 includes IOF at OCn and STS levels. Since IOF was not a matter of any controversy in the New Hampshire 271 proceeding it is not discussed in the *NH 271 Order*. It is noteworthy that, in discussing IOF, Verizon relies exclusively on the contention that IOF is no longer a section 251 obligation. We agree that IOF at the OCn and STS level is no longer a section 251 obligation, but we disagree as to the implications on Verizon's section 271 obligations and commitments to this Commission. We therefore determine that checklist item 5 includes OCn and STS transport.

Next [*71] we turn to dark fiber channel terminations which, if considered as transport, would require a determination as to whether such facilities are required by checklist item 5. As previously noted, there were a series of developments between the FCC and the Courts, after which the FCC declared that dedicated transport included "incumbent LEC transmission facilities dedicated to a particular customer or carrier that provide telecommunications between wire centers owned by incumbent LECs or requesting telecommunications carriers, or between switches owned by incumbent LECs or requesting telecommunications carriers." *TRO* P 365 (footnote omitted). Applying this definition, which appears to include entrance facilities, the FCC found that CLECs are not impaired without access to entrance facilities, thereby eliminating the section 251 obligation. (*TRO Remand Order* P 137).

Because the FCC has included entrance facilities within the elements that fall within the category of dedicated transport, and because dark fiber channel terminations are a form of entrance facilities, we must conclude that they re-

main elements addressed by checklist item 5. Therefore, consistent with our analysis above, [*72] Verizon must make dark fiber channel terminations available to satisfy its section 271 commitments.

Having said that, however, we must make two important observations. First, we are sympathetic to Verizon's arguments (and the FCC's original position on this issue) that these facilities may not truly be the type that must be offered on an unbundled basis. It would not be appropriate for this Commission, however, to countermand the language of the FCC and the courts and simply declare dark fiber channel terminations are no longer required to be offered because we think it makes no sense, any more than it would be appropriate for Verizon to make such a unilateral determination. Until there is clearer guidance from the FCC or the courts on this issue, we find no basis to do other than to conclude that Verizon may discontinue offering this element.

Second, we note that MCI and segTEL argued that Verizon is wrong to state that entrance facilities such as dark fiber channel terminations are no longer section 251 facilities. They argue that Verizon should continue to provide them not as just and reasonable rates under section 271 but at TELRIC rates under section 251. This issue has not been [*73] adequately developed and we decline to rule on the section 251 status of these entrance facilities in this docket. In the event Verizon proposes a tariff change we will evaluate the issue, including what role the Commission should play in the determination.

We have now reviewed Verizon's proposed tariff revisions and find that Verizon must continue to provide line sharing, dark fiber feeder subloop, dark fiber channel terminations and IOF as part of its wholesale tariff. By our actions today, we are not adding UNEs to those Verizon is currently obliged to offer. Neither are we reimposing section 251 unbundling requirements or making any determinations as to impairment. It is more accurate to say that we are continuing our oversight of Verizon's section 271 obligations. n13

n13 The parties make a variety of additional arguments, largely based on section 251 and/or state law. Because we decide the case based on legal principles arising out of section 271, we need not address these additional arguments.

Because our decision [*74] today has the effect of preventing Verizon from discontinuing the provision of certain network elements to CLECs, we must address pricing issues as to those elements. To the extent an element is eliminated by the FCC as a section 251 obligation and it persists as a section 271 obligation, the pricing standard changes from TELRIC to "just and reasonable." Our analysis of Verizon's obligation to file a tariff leads us inexorably to a conclusion analogous to that reached by the Maine PUC. Specifically, it would be a "hollow promise" if Verizon were to file a tariff with the expectation that the state commission has no role in reviewing the rates, terms and conditions contained in that tariff. As did the Maine PUC, we do not foreclose the possibility that Verizon may turn to the FCC regarding rates but we conclude that, unless or until the FCC acts, pricing is an area of concurrent jurisdiction and an example of cooperative federalism. Accordingly, as a state agency and being closest to the issues, if and when Verizon files changes to rates under its wholesale tariff, we will review such proposed changes in the normal course.

Until new rates are established for line sharing, dark fiber [*75] feeder subloop, dark fiber channel terminations and IOF, Verizon shall offer these section 271 elements at existing Tariff 84 rates. Accordingly, Order No. 24,268 (January 30, 2004) granting Verizon's request for relief from a determination in the Order of Notice that existing rates would remain effective pending review of proposed tariff changes is hereby vacated. The result of this determination is that Tariff 84 reverts to the form it took prior to our authorization in Order No. 24,268 of certain tariff revisions on a temporary basis pending the outcome of DT 03-201.

Our decision that line sharing must remain an unbundled network element offered by Verizon pursuant to Tariff 84 is also determinative with respect to the relief requested by segTEL in DT 04-176. Accordingly, we grant the petition in DT 04-176. Our decision today is not intended to express any view as to the just and reasonable rate for any unbundled element offered by Verizon pursuant to Tariff 84 or, indeed, what tribunal would ultimately make such a determination. We simply conclude that Tariff 84 remains unchanged from the version that was applicable at the commencement of DT 03-201, and that the elements therein [*76] must be made available to CLECs.

**Based upon the foregoing, it is hereby**

2005 N.H. PUC LEXIS 24, *; 241 P.U.R.4th 409

**ORDERED**, that the proposed revisions to Tariff No. 84 submitted by Verizon New England in DT 03-201 are rejected, as described fully in the order herein; and it is

**FURTHER ORDERED**, that the petition of segTEL in DT 04-176 for a determination that Verizon New Hampshire remains obligated to provision line sharing pursuant to Tariff No. NHPUC 84 is GRANTED.

By order of the Public Utilities Commission of New Hampshire this eleventh day of March, 2005.

Thomas B. Getz

Chairman

Graham Morrison

Commissioner

Michael Harrington

Commissioner