# Exhibit 1

COMMONWEALTH OF KENTUCKY

BEFORE THE PUBLIC SERVICE COMMISSION

In the Matter of:

| | | |
|---|---|---|
| PETITION OF SOUTHEAST TELEPHONE, INC., | ) | |
| FOR ARBITRATION OF CERTAIN TERMS AND | ) | CASE NO. |
| CONDITIONS OF PROPOSED AGREEMENT | ) | 2006-00316 |
| WITH BELLSOUTH TELECOMMUNICATIONS, | ) | |
| INC. CONCERNING INTERCONNECTION | ) | |
| UNDER THE TELECOMMUNICATIONS ACT OF | ) | |
| 1996 | ) | |

O R D E R

SouthEast Telephone, Inc. ("SouthEast") has petitioned the Commission for arbitration of an interconnection agreement pursuant to 47 U.S.C § 252. SouthEast seeks resolution of multiple issues between itself and BellSouth Telecommunications, Inc. d/b/a AT&T Kentucky ("AT&T Kentucky"). The parties have exchanged data requests and prefiled testimony. A public hearing was held on January 9, 2007. Post-hearing briefs have also been filed. By statute the Commission's decision must be entered no later than March 28, 2007.

The Commission herein addresses each issue pending in this proceeding.

ISSUE A-2: WHAT MONTHLY RECURRING RATE
SHOULD BE ESTABLISHED IN EACH PRICING ZONE
FOR THE VOICE-GRADE LOCAL LOOP ELEMENT?

The Commission, in past proceedings, pursuant to implementation of the Telecommunications Act of 1996 ("Telecom Act") and certain orders of the Federal Communications Commission ("FCC"), established total element long run incremental cost ("TELRIC") based rates for unbundled network elements ("UNEs") and has further

deaveraged those rates in accordance with directives of the FCC. Among those rates that were established were the UNE loop rates; those rates were then deaveraged into three zones by ascending cost of each wire center. The Commission's methodology for deaveraging loop rates was to examine the costs of each wire center from lowest cost to highest cost and then choose breaking points for each of the zones. The Commission examined many proposals and breaking points to determine the zones that would most likely lead to the greatest number of competitors entering the competitive market.

SouthEast has proposed that the Commission reexamine the methodology in which it deaveraged those rates and grouped them into zones. SouthEast has proposed to group the wire centers into zones based on universal service fund high-cost support disbursed to each zone, with Zone 1 comprising wire centers receiving no support per line, Zone 2 comprising wire centers receiving support less than or equal to $2.00 per line, and Zone 3 comprising wire centers receiving more than $2.00 of support per line.[1] SouthEast calculated and proposed that the UNE loop rates would be $15.96 in the new Zone 1, $16.90 in the new Zone 2, and $21.75 in the new Zone 3. These proposed rates were based on the existing averaged loop rate of $17.26 per month, taking into account that federal universal support is available to carriers serving customers at higher cost exchanges.[2]

SouthEast argues that its proposal is consistent with the FCC's orders and TELRIC rules. SouthEast further states that its proposal supports the forward-looking

---

[1] Gillan Direct Testimony at 24.

[2] Id.

cost basis for establishing an ascending ranking of wire centers and grouping them into zones using forward-looking cost-based universal service support amounts distributed among AT&T Kentucky's high-cost zones pursuant to FCC rules.  SouthEast also argues that the proposed rates would promote competition in the most rural area of Kentucky.

AT&T Kentucky believes that the Commission should reaffirm the monthly recurring rates that the Commission established in Administrative Case No. 382[3] because those rates were established within a multi-party proceeding.  Secondly, AT&T Kentucky believes that ordering different rates or a new zone pricing structure in a two-party arbitration proceeding would be discriminatory to other competitive local exchange carriers ("CLECs") in Kentucky.  AT&T Kentucky also argues that the adoption of SouthEast's proposal would ignore the requirement that UNE loop pricing zones be cost-based. Thirdly, AT&T Kentucky believes that the Commission should not reevaluate the UNE loop rates or zone pricing because there has not been any compelling evidence to warrant reopening Administrative Case No. 382.  Finally, AT&T Kentucky argues that to the extent SouthEast is requesting a loop rate under 47 U.S.C. § 271, the Commission should decline, because the Commission does not have jurisdiction to set § 271 rates and there is no basis for setting a rate different from the § 251 rate because loops are still required pursuant to § 251 and those rates are incorporated into § 271.

---

[3] Administrative Case No. 382, An Inquiry into the Development of Deaveraged Rates for Unbundled Network Elements (Ky. PSC December 18, 2001).

Although at the hearing, and in its brief, SouthEast discussed reevaluating the loop rates because of changes to cost inputs, SouthEast is not proposing changes in the average loop rates that were generated based on the comprehensive cost models under review in the 2001 proceeding.[4]  Therefore, the Commission will only address the issue of reevaluating the division of the zones.

The Commission will examine each of the arguments of the parties related to the zone changes.  First, the proposal submitted by SouthEast in concept may meet the requirements of the FCC rules.  47 C.F.R. § 51.507(f) governs the method in which rates must be deaveraged and states:

> State commissions shall establish different rates for elements in at least three defined geographic areas within the state to reflect geographic cost differences. (1) To establish geographically-deaveraged rates, state commissions may use existing density-related zone pricing plans described in Sec. 69.123 of this chapter, or other such cost-related zone plans established pursuant to state law. (2) In states not using such existing plans, state commissions must create a minimum of three cost-related rate zones.

However, while the proposal of SouthEast may satisfy the requirements of the rule, so do many other scenarios.  The Commission evaluated many different proposals in Administrative Case No. 382, some of which were compliant with the rule and some of which were not; however, the Commission ultimately settled on one which extended Zone 1 into all areas of the state to promote competition.[5]  SouthEast's proposal further expands Zone 1 but drives the price higher, which may have a negative effect on competition.  While SouthEast argues that the lower rate proposed by it in Zone 3 would

---

[4] SouthEast Brief at 13.

[5] Administrative Case No. 382, Order dated December 18, 2001 at 34.

enhance competition in the most rural areas of Kentucky, it would certainly have the opposite effect in other areas of the state.

Making adjustments to the zones previously established by the Commission within the context of an arbitration proceeding will result in discriminatory treatment. All the utilities affected by a zone change are not parties to this proceeding. Moreover, zone rates must be set on a statewide basis; otherwise, all CLECs will not pay the same rates, resulting in discrimination. Therefore, it would be improper for the Commission to make changes to the methodology of determining the zones within the context of this proceeding.

ISSUE A-3: WHAT MONTHLY RECURRING RATE<br>SHOULD APPLY TO THE "PORT" COMPONENT<br>OF THE PLATFORM COMBINATION?

SouthEast proposes a monthly rate of $4.32 per port per month for the port component of the loop switching transport group of elements. This rate was developed by SouthEast based on AT&T Kentucky data regarding embedded local switching costs contained in the FCC's automated reporting management information system ("ARMIS").[6] The cost information included central office switching expenses, annual switch-related depreciation expenses, and a contribution toward AT&T Kentucky's common costs, as well as a return on investment in central office switching.[7] SouthEast asserts that it has provided a reasonable basis for this proposed rate.

AT&T Kentucky, on the other hand, argues that the port component of this rate is not an appropriate topic for the Commission to require in arbitration agreements. AT&T

---

[6] SouthEast Direct Testimony at 28.

[7] Id. at 28-30.

Kentucky proffered no response to SouthEast's rate proposal, but asserts that the adoption of any rate for the port component of the elements is outside the Commission's purview.  AT&T Kentucky asserts that elements required by 47 U.S.C. § 271 are within the exclusive jurisdiction of the FCC.  Further, AT&T Kentucky asserts that this Commission has no authority to establish a specific rate pursuant to 47 U.S.C. § 271 as rates for those facilities must be market-based.  AT&T Kentucky also argues that the rate proposed by SouthEast does not meet minimum criteria for establishment of rates pursuant to a just and reasonable standard.

AT&T Kentucky's assertions that this Commission has been deprived of jurisdiction regarding switching and transport elements provided pursuant to 47 U.S.C. § 271 have been addressed in other proceedings.[8]  AT&T Kentucky must provide access to switching and transport elements for SouthEast pursuant to § 271.

Network facilities used by AT&T Kentucky to provide access to its competitors pursuant to § 271 are located within this Commonwealth and are used to provide intra-state service.  The Commission has jurisdiction over these facilities and services.  Nothing in § 271 or in any FCC Order deprives this Commission of jurisdiction over those elements required by AT&T Kentucky to provide as a continuing condition of entry into the in-region long-distance market.  The FCC has not pre-empted this Commission from enforcing the requirements of § 271.  AT&T Kentucky cannot point to any statutory or regulatory language declaring such pre-emption. The Commission's jurisdiction

---

[8] Case No. 2005-00519, BellSouth Telecommunications, Inc. Notice of Intent to Disconnect SouthEast Telephone, Inc. for Nonpayment and Case No. 2005-00533, SouthEast Telephone, Inc., Complainant, vs. BellSouth Telecommunications, Inc., Defendant. (Ky. PSC August 16, 2006) at 11 and 12.

extends to pricing disputes regarding those elements required to be provided by AT&T Kentucky pursuant to § 271.

The port rate in dispute in this proceeding is one such element required pursuant to § 271. The appropriate standard for reviewing pricing proposals for § 271 elements as established by the FCC is whether the rates are just, reasonable and non-discriminatory.[9]  Having reviewed the record, the Commission finds that SouthEast based its proposal on the best information available to it.  AT&T Kentucky made no counter proposal but instead argued that the rate must be market-based.  Given the Commission's determination that pricing disputes for § 271 elements are legitimately within the purview of this Commission and AT&T Kentucky's failure to provide information regarding its market rate proposal, the Commission adopts SouthEast's rate proposal.[10]  If AT&T Kentucky believes that this rate is inappropriately low, then AT&T Kentucky should submit justification to the Commission for rates that it believes are appropriate.  The rate of $4.32 per port per month shall be utilized unless modified by further Commission Order.

### ISSUE A-4: WHAT RATES, TERMS, AND CONDITIONS SHOULD GOVERN AN INTERCONNECTION ARRANGEMENT IN WHICH AT&T KENTUCKY'S OFFERING OF UNE-L INTERCONNECTED TO SOUTHEAST'S NETWORK AT AN "ADJACENT MEET POINT"?

SouthEast has requested that AT&T Kentucky establish an interconnection arrangement where SouthEast's facilities located adjacent to AT&T Kentucky may be

---

[9] 47 U.S.C. § 201 and 202.

[10] 47 U.S.C. § 252(b)(4) authorizes this Commission to proceed with arbitrations on "the basis of the best information available."

connected for the purpose of providing services utilizing UNE loops leased from AT&T Kentucky.

SouthEast has proposed specific terms and conditions, including rates for the requested interconnection arrangement. SouthEast asserts that the proposed arrangement is technically feasible and claims that comparable arrangements are being provided by other Incumbent Local Exchange Carriers ("ILECs"). SouthEast also argues that interconnecting via an adjacent "off-site" meet point, as it has proposed, is considerably less burdensome on AT&T Kentucky than "on-site" collocation which AT&T Kentucky agrees is an acceptable form of interconnection.

AT&T Kentucky argues that SouthEast's request for interconnection at an adjacent meet point is not required by the Telecom Act or FCC rules. AT&T Kentucky claims that an ILEC's obligation to allow interconnection as sought by SouthEast extends only to a point on the ILEC's premises and does not include "collocation" on non-AT&T Kentucky property. AT&T Kentucky asserts that the requirements of "collocation" are limited to areas on the ILEC's premises unless available space has been exhausted.

The Telecom Act clearly establishes the duty of all telecommunications carriers to interconnect with each other.[11] The Telecom Act further requires all ILECs to permit interconnection with the ILEC's network at any technically feasible point within the carrier's network.[12] Even more specific to this case, the Telecom Act also requires ILECs to provide any requesting telecommunications carrier with nondiscriminatory

---

[11] 47 U.S.C. § 251(a)(1).

[12] 47 U.S.C. § 251(c)(2)(B).

access to UNEs "at any technically feasible point on rates, terms, and conditions that are just, reasonable, and nondiscriminatory."[13]  Although collocation of equipment necessary for interconnection or access to UNEs, either physically or virtually, at the premises of the local exchange carrier is a means by which a requesting carrier may interconnect or utilize UNEs,[14] it is not the only method.

According to the FCC, technically feasible methods of obtaining interconnection or access to UNEs include, but are not limited to:

(1) Physical collocation and virtual collocation at the premises of an incumbent LEC; and

(2) Meet point interconnection arrangements.[15]

The FCC rules elaborate that even when physical and virtual collocation are not technically feasible, "the incumbent LEC shall provide other methods of interconnection and access to unbundled network elements to the extent technically feasible."[16]

Based on the evidence before this Commission, the interconnection arrangement sought by SouthEast is permitted and in fact required by both the Telecom Act and FCC rules. SouthEast is proposing to interconnect its facilities with those of AT&T Kentucky for the purpose of accessing UNEs. SouthEast will build and maintain its network to a meet point and requests AT&T Kentucky do the same. AT&T Kentucky has failed to

---

[13]  47 U.S.C. § 251(c)(3).

[14]  47 U.S.C. § 251(c)(6).

[15]  47 C.F.R. § 51.321(b).

[16]  47 C.F.R. § 51.321(e)

offer any arguments or evidence that SouthEast's proposed method of interconnection and access to UNEs is not technically feasible. Furthermore, AT&T Kentucky's assertion that its obligation to permit "collocation" may somehow restrict other methods of interconnection or access to UNEs is without relevance or merit. Even if the proposed method of interconnection were accurately defined as "collocation," the FCC rules clearly contemplate "other methods of interconnection and access to unbundled network elements" in lieu of collocation.[17] Based on the foregoing, the Commission finds that SouthEast's proposed interconnection arrangement should be implemented.

ISSUE A-8: WHAT RATES, TERMS, AND CONDITIONS SHOULD APPLY TO THE PARTIES' RESPECTIVE "DISPATCHED/NO TROUBLE FOUND" CHARGES?

AT&T Kentucky has an obligation to provide operations support services for the elements and services that it provides to CLECs, including nondiscriminatory maintenance and repair of network facilities. When a CLEC customer experiences an outage or other trouble on its line, that customer contacts the CLEC office for repair of the facilities. If that facility is provided to the CLEC by AT&T Kentucky, then the CLEC must contact AT&T Kentucky for repair or maintenance of the facility. When a technician finds no evidence of a problem with the service, this is known as a "No Trouble Found" condition. It is quite common in the telecommunications industry for this to occur due to changes that may occur between the time the technician responds to the problem and the time when it was reported. Changing weather conditions can contribute to problems with telecommunications service.

---

[17] Id.

When a technician reports a "No Trouble Found," AT&T Kentucky will charge a CLEC for "Dispatched/No Trouble Found" charges. If the same problem is reported on the same line within 30 days and the technician identifies and repairs the problem, AT&T Kentucky will then issue a bill credit to the CLEC for the "Dispatched/No Trouble Found" charges.

SouthEast raises this issue in this arbitration because it experiences a high failure rate in addressing problems on the first dispatch; therefore, AT&T Kentucky in turn bills SouthEast for "Dispatched/No Trouble Found." Although SouthEast admits that it does receive bill credits for "Dispatched/No Trouble Found" charges, it has problems verifying the charges and credits. SouthEast does not receive an itemized billing of "Dispatched/No Trouble Found" charges and credits.

SouthEast has proposed two changes to the process. First, SouthEast has proposed that it receive an itemized billing for "Dispatched/No Trouble Found" charges and credits so that it can track and audit the charges and credits. Second, SouthEast has proposed that in the event of a "No Trouble Found" which is later found on AT&T Kentucky's network, then SouthEast will be able to bill AT&T Kentucky an identical "Dispatched/No Trouble Found" charge.

AT&T Kentucky's position on the issue is that the Commission should conclude that the terms and conditions previously approved by the Commission and contained in interconnection agreements with all CLECs in Kentucky should also apply to SouthEast. AT&T Kentucky also has in place the Self-Effectuating Enforcement Mechanism ("SEEM") measurement "Customer Trouble Report Rate and Percent Repeat Customer Troubles Within 30 Days." This SEEM measurement allows SouthEast to receive

SEEM penalty payments should service not be at parity with AT&T Kentucky's service to its own customers. Additionally, AT&T Kentucky contends that this issue is not properly before the Commission for resolution because it was not properly raised in the negotiation period. SouthEast has responded to AT&T Kentucky's allegation that this issue is not properly before the Commission by stating in its brief that the issue was raised in letters dated April 13, 2005 and February 23, 2006 and on other occasions.

Initially, the Commission must determine if the issue is properly before the Commission. SouthEast did raise the issue in the petition for arbitration. AT&T Kentucky responded to the petition and addressed the issue in testimony. AT&T Kentucky did not make a motion to exclude the item from the arbitration. Therefore, the issue is properly before the Commission to arbitrate.

As discussed above, the "No Trouble Found" condition is certainly one that commonly arises in the telecommunications industry. The fact that a technician is unable to find a problem on the first visit to the premises does not indicate a failure of the technician to properly do his job. As explained above, there is a penalty plan in place that would compensate SouthEast should it experience a higher than average failure rate, and this is the proper mechanism to assess liquidated damages.

The 30-day interval that is currently in place has been found to be reasonable in the past, and the evidence in this case doesn't suggest that it should be changed. Additionally, should SouthEast receive substandard service in relation to the service that AT&T Kentucky provides its own customers, then SouthEast would be eligible to receive penalty payments from AT&T Kentucky. Therefore, the Commission will adopt the language of AT&T Kentucky for this item.

ISSUE A-9: MUST AT&T KENTUCKY PROVIDE DATA ON THE
LOCATION AND TYPE OF CERTAIN NETWORK FACILITIES
AND THE NUMBER OF CUSTOMER LINES AND
GEOGRAPHIC SERVICE AREA OF SUCH FACILITIES?
IF SO, AT WHAT RATE?

SouthEast requests AT&T Kentucky provide data on the actual geographic location of AT&T Kentucky's remote terminals ("RTs") along with associated end-user telephone numbers and locations in a format with sufficient detail to allow it to effectively serve SouthEast customers.

SouthEast advises that the requested information is required in order to design its network to reach customer locations. SouthEast admits that AT&T Kentucky makes certain information available regarding RT locations and subtending customers but claims such information is cryptic and lacks sufficient detail to actually locate the facilities in rural areas. SouthEast asserts that AT&T Kentucky must have more comprehensive information on the location of RTs available either from internal database systems or via mapped resources used by AT&T Kentucky technicians. SouthEast demands that AT&T Kentucky provide the technical information about its network facilities consistent with 47 C.F.R. § 51.307(e), regardless of the format, on terms that are just, reasonable and nondiscriminatory.

AT&T Kentucky contends that it is under no obligation to provide the information being sought by SouthEast and further argues that the Commission has no authority to address this matter. Nevertheless, AT&T Kentucky claims that it is currently providing RT location information to SouthEast, as well as other CLECs, at a rate agreed to by those parties. According to AT&T Kentucky, the information currently being voluntarily supplied to SouthEast is in the same form that is available to AT&T Kentucky itself.

Therefore, even if the Commission had jurisdiction over this issue, AT&T Kentucky asserts there is no remedy required.

The Telecom Act requires all local exchange carriers to provide any requesting carrier access to UNEs on rates, terms and conditions that are just, reasonable and nondiscriminatory.[18] Terms and conditions are just, reasonable and nondiscriminatory if they are, at a minimum, no less favorable than the terms and conditions under which the ILEC provides such elements (i.e., functions) to itself.[19] The FCC has identified operations support systems consisting of pre-ordering, ordering, provisioning, maintenance and repair, and billing as specific functions of the network that must be made available by ILECs on an unbundled basis pursuant 47 U.S.C. § 251(c)(3).[20] Pre-ordering and ordering information includes the existence, type and location of any electronic or other equipment on the loop such as digital loop carrier or other remote concentration devices and feeder/distribution devices.[21]

Contrary to AT&T Kentucky's contention, § 251 of the Telecom Act and subsequent FCC rules clearly contemplate ILECs making available the type of information sought by SouthEast in this arbitration proceeding. The Commission finds that it not only has jurisdiction over such matters, it most certainly does have the authority to resolve any interconnection-related disputes pursuant to §§ 251 and

---

[18] 47 U.S.C. § 251(c)(3).

[19] 47 C.F.R. § 51.313(b)

[20] 47 C.F.R. § 51.313(c) and 47 C.F.R. § 51.319(g).

[21] 47 C.F.R. § 51.5, Definition of "Pre-ordering and ordering."

252.[22]  Although it appears that AT&T Kentucky has attempted to supply the type of information sought by SouthEast, it may not have done so to the fullest extent required by the Telecom Act and FCC rules.  If AT&T Kentucky has additional information that more specifically identifies the location of RTs, including mapped resources or geographic coordinates, beyond that currently made available to SouthEast, it should provide such information to SouthEast.  Furthermore, any information supplied to SouthEast should, upon request, be made available for all RTs within a specified wire center or other serving area to the extent acceptable to both parties.

The Commission HEREBY ORDERS that SouthEast and AT&T Kentucky shall file their interconnection agreement no later than 30 days from the date of this Order, incorporating each decision contained herein.

Done at Frankfort, Kentucky, this 28th day of March, 2007.

By the Commission

ATTEST:

_____
Executive Director

---

[22] 47 U.S.C. § 251(c)(3).

Case No. 2006-00316