# EXHIBIT A

Decision No. C06-1280

**BEFORE THE PUBLIC UTILITIES COMMISSION OF THE STATE OF COLORADO**

DOCKET NO. 04M-111T

IN THE MATTER OF THE REVIEW OF CERTAIN WHOLESALE RATES OF QWEST
CORPORATION.

## ORDER ON COMMISSION JURISDICTION

Mailed Date:  October 31, 2006
Adopted Date:  September 27, 2006

## I.    BY THE COMMISSION

### A.    Statement

1.    This matter comes before the Commission to consider briefs filed by several
parties to determine whether the Commission has jurisdiction to issue a decision regarding the
proper category of wholesale rates competitive local exchange carriers (CLECs) are to be
charged by Qwest Corporation (Qwest).  Now, being fully advised in the matter, we find that the
Commission possesses authority to only issue a decision regarding Qwest's wholesale rates for
unbundled network elements (UNEs), interconnection services and resale required under 47
U.S.C. § 251(c) of the Telecommunications Act of 1996, Pub. L. 104-104, 110 Stat. 56 (Telecom
Act).  Consequently, the Commission does not possess authority to set wholesale rates for those
elements and services delisted pursuant to 47 U.S.C. § 271 of the Act.

### B.    Background

2.    On November 30, 1999, U S WEST Communications, Inc., now known as Qwest,
filed its proposed Statement of Generally Available Terms and Conditions (SGAT) pursuant to 47
U.S.C § 252(f).  By Decision No. C99-1329, mailed on December 7, 1999, the Commission
ordered Qwest to send notice of the filing of the SGAT to all CLECs in the state.  A number of

Before the Public Utilities Commission of the State of Colorado

Decision No. C06-1280                                            DOCKET NO. 04M-111T

entities intervened as parties to that case. Qwest's SGAT proposed terms and conditions for interconnection, unbundled network elements (UNEs), and resale services to be offered by Qwest to CLECs under the Telecom Act. Those proposed terms and conditions concern price and non-price elements.

3.    On January 11, 2001, Qwest filed its Motion to Resolve SGAT Issues in its § 271 Proceeding. That motion suggested that non-price terms and conditions in the SGAT be considered and established in Qwest's § 271 proceeding, Docket No. 97I-198T, and that prices (or rates) be considered in Docket No. 99A-577T. By Decision No. C00-968 and Decision No. C00-420 (in Docket No. 97I-198T), the Commission granted Qwest's motion. Thus, Docket No. 99A-577T concerned only costing and pricing issues related to Qwest's SGAT.

4.    The Commission designated Commissioner Raymond L. Gifford to serve as the Hearing Commissioner in Docket No. 99A-577T. Pursuant to that designation, Commissioner Gifford conducted the hearings in this case. Ultimately, the Commission *en banc* issued the initial decision and the decisions on reconsideration.

5.    The Commission adopted a phased hearing approach to Docket No. 99A-577T. *See* Decision No. R00-1487-I. Decision Nos. C01-1302, C02-0409, and C02-0636 represented the conclusion of the Phase I portion of those proceedings. The Commission endeavored to decide as many of the pricing elements within the Phase I portion of the case as possible. However, in some instances, the record remained insufficient or the circumstances were such that pricing determinations could not be made at that time.

6.    The Commission's prior decisions in this case explicitly noted that certain rates would be interim only. Those decisions additionally deferred certain rate and rate-related issues to a Phase II proceeding. For example, the Commission deferred to Phase II the issue of the

2

Before the Public Utilities Commission of the State of Colorado

Decision No. C06-1280                                                    DOCKET NO. 04M-111T

deaveraging of analog loops and the Commission's goal of meshing the Federal Universal Service Fund and the Colorado High Cost Support Mechanism with the deaveraged loop UNE price.    Similarly, interim rates were set for local switching, tandem switching rates, shared transport, and collocation termination rates for DS0, DS1, and DS3 circuits. The Commission's decisions in that docket also stated that rates for services that were approved in Qwest's SGAT and for which no price was established in Decision No. C01-1302 or subsequent reconsideration decisions were to be considered interim and investigated in Phase II. The Commission stated it would set a status conference to establish the procedural schedule for Phase II at an appropriate time.    That status conference would also serve as an opportunity for the parties to catalog elements for which rates need to be set in Phase II.

7.    For reasons of procedural efficiency, the Commission opened this miscellaneous docket to conduct the Phase II proceeding which was referenced in Docket No. 99A-577T (*see* Decision No. C04-0272 mailed March 17, 2004).  It is in this docket that we will establish new wholesale telephone rates as envisioned in Docket No. 99A-577T.

8.    Parties to Docket No. 99A-577T were notified by separate order in that docket that the Commission was opening this docket for the purpose of conducting the Phase II proceeding as contemplated, and that any entity wishing to participate as a party in this docket must comply with the procedural requirements discussed here.

9.    We further determined that this docket was to be conducted as an on-the-record adjudicative proceeding.  Since this docket is a continuation of Docket No. 99A-577T, Qwest was made a party to this proceeding and as such has the burden of proof, including the burden of going forward.

3

Before the Public Utilities Commission of the State of Colorado

10.    In our March 17, 2004 Decision, we set dates for: 1) requests for intervention; 2) initial comments listing the elements for which permanent rates are to be set; 3) responses to other parties' initial comments; and 4) a prehearing conference.

11.    By Decision No. C04-0424 mailed April 23, 2004, we stayed these proceedings due to the issuance by the D.C. Circuit of its decision in *United States Telecom Association v. Federal Communications Commission,* 359 F.3d 554 (D.C. Cir. 2004) (*USTA II*), and its effect on potential issues in this case.

12.    Because of the significant changes that ultimately occurred due to the triennial review of the interconnection and UNEs obligations of incumbent local exchange carriers conducted by the Federal Communications Commission (FCC), we stayed the procedural schedule of this miscellaneous docket.

13.    We further determined that since some time had passed, and Docket No. 04A-411T (the Combined Application of Qwest Corporation for Reclassification and Deregulation of Certain Part 2 Products and Services and Deregulation of Certain Part 3 Products and Services) was concluded, we set a new procedural schedule for this docket.

14.    We allowed any interested persons who had not already intervened 30 days to intervene in this docket. We also gave parties 45 days from the effective date of the Order (September 16, 2005) to file initial comments listing the elements for which rates should be set, and responses to those initial comments were to be filed within 60 days of the effective date of the Order. We set a prehearing conference to establish a procedural schedule for December 21, 2005.

15.    A prehearing conference was held at the designated place and time. At that prehearing conference, the parties in attendance agreed to the scope of this docket, as well as a

desired outcome and a schedule for the filing of briefs. Pursuant to the discussions at that prehearing conference, the following matters were resolved.

16.    The parties in attendance agreed that the scope of this proceeding includes three parts. The baseline issue to be resolved was whether this Commission has jurisdiction to issue a decision regarding the proper category of wholesale rates competitive local exchange carriers (CLECs) are to be charged by Qwest Corporation (Qwest), the matter we decide here.

17.    If it was determined that the Commission does indeed have such jurisdiction, the next issue to be resolved was the methodology for determining which wholesale rates Qwest must make available to CLECs. In other words, must it charge wholesale rates under the "just and reasonable" standard found at 47 U.S.C. § 271 of the Telecommunications Act of 1996 (Act), or must it charge Total Element Long-Run Incremental Cost rates pursuant to 47 U.S.C. §§ 251(b) and (c) of the Act?

18.    Upon a determination of what wholesale rates Qwest may charge CLECs, the final issue to be resolved was whether a new docket should be opened to consider testimony and evidence to set costing and pricing of Qwest's wholesale rates at issue in this docket.

19.    The parties further agreed upon a briefing schedule to address these issues. The first round of briefs were to be due by the close of business on February 10, 2006. Answer briefs were to be due by the close of business on March 23, 2006. Any party to this matter that requested a hearing was required to file a motion requesting a hearing no later than close of business on April 3, 2006. We allowed the customary 14-day response time to any such motion for hearing.

Before the Public Utilities Commission of the State of Colorado

| | |
|---|---|
| Decision No. C06-1280 | DOCKET NO. 04M-111T |

### C.    Briefs

20.    Initial and reply briefs were filed by Qwest, Commission Staff (Staff), the Colorado Office of Consumer Counsel (OCC), a joint brief filed by Cbeyond Communications, LLC, Time Warner Telecom of Colorado, LLC, XO Colorado, LLC, and Xspedius Management Co. Switched Services, LLC and Xspedius Management Co. of Colorado Springs, LLC, both doing business as Xspedius Communications (collectively, Joint CLECs), and by Eschelon Telecom, Inc. and DIECA Communications, Inc., doing business as Covad Communications Company (collectively, Eschelon/Covad). These parties also filed response briefs.

21.    As set out in Decision No. C06-0037, the first issue to be resolved in this matter is whether the Commission has jurisdiction to issue a decision regarding the proper category of wholesale rates CLECs are to be charged by Qwest.

22.    In its analysis, Qwest frames the jurisdictional question as whether "the Commission has jurisdiction to set rates for network elements and services Qwest is no longer required to provide pursuant to 47 C.F.R. § 251(c) of the [Telecom Act]." As part of its brief, Qwest identifies the elements and services it is no longer required to provide under Section 251(c) based on the rulings in the FCC's Triennial Review Order (TRO),[1] the FCC's Triennial Review Remand Order (TRRO),[2] and the decision of the D.C. Circuit Court of Appeals in *United States Telecom Association v. Federal Communications Commission*, 359 F.3d 554 (D.C. Cir. 2004) (*USTA II*). Qwest urges that the Commission should not include those items it identified

---

[1] *Report and Order and Order on Remand and Further Notice of Proposed Rulemaking, In the Matter of Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers; Implementation of the Local Competition Provisions of the Telecommunications Act of 1996; and, Deployment of Wireline Services Offering Advanced Telecommunications Capability*, CC Docket Nos. 01-338, 96-98 and 98-147 (FCC August 21, 2003).

[2] *In the Matter of Unbundled Access to Network Elements; and, Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, WC Docket No. 04-313 and CC Docket No. 01-338 (FCC February 4, 2005).

Before the Public Utilities Commission of the State of Colorado

Decision No. C06-1280                                    DOCKET NO. 04M-111T

as delisted elements and services in the impending wholesale cost proceeding because state commissions no longer have pricing authority over them.

23. According to Qwest, while Congress granted states the authority to set prices for UNEs and interconnection services provided under Section 251(c), it did not give states authority to set prices for any other network elements and services such as Section 271 elements and services, and other elements and services that are no longer within either Section 251 or Section 271.

24. Qwest asserts that federal courts that have interpreted and applied the Telecom Act have repeatedly ruled that the authority of states is limited to that which Congress granted. Citing *USTA II*, Qwest argues that the D.C. Circuit invalidated the FCC's delegation of network unbundling determinations to state commission on the ground that Congress only authorized the FCC to make those determinations. *USTA II*, 359 F.3d at 565-68. As support for this proposition, Qwest also cites *Indiana Bell Telephone Co., Inc. v. Indiana Utility Regulatory Com'n*, 359 F.3d 493, (7th Cir. 2004), which stated that "[w]hile the state utility commission were given a role in carrying out the Act, Congress 'unquestionably' took 'regulation of local telecommunications competition away from the States' on all 'matters addressed by the 1996 Act ...'" *Id.* at 494. As a result, Qwest reasons that state commissions are authorized to establish prices under the Telecom Act only to the extent Congress has clearly and expressly granted pricing authority to the states. According to Qwest, the only pricing authority Congress granted the states is that authority provided in Section 252(d)(1), where states are directed, as part of their Section 252(b) authority to conduct interconnection arbitrations to determine a "just and reasonable rate" for interconnection of facilities and equipment for purposes of Section 251(c)(2), and for network elements for purposes of Section 251(c)(3). Based on this argument,

Qwest concludes that the Commission only has pricing authority over network elements and interconnection services pursuant to Sections 251(c)(2) and (3).

25.    Qwest also argues that the Commission does not possess authority under Section 271 to set wholesale rates for the terms and conditions for network elements and services that Regional Bell Operating Companies (RBOCs) provide under that section. Qwest maintains that Section 271 expressly limits the role of state commission to consulting with the FCC in connection with RBOC applications for entry into the long distance markets. Qwest argues that Section 271(d)(3) expressly confers upon the FCC, not state commissions, the authority to determine whether RBOCs have complied with the substantive provisions of Section 271. Qwest again cites *Indiana Bell*[3] for the proposition that the role of state commissions under Section 271 is merely investigatory and consulting, not substantive in nature.

26.    Qwest points to the decisions of several state commissions that have found that they do not have jurisdiction over Section 271 UNEs. For example, Qwest lists decisions from Idaho, Iowa, Minnesota, Montana, New Mexico, Oregon, South Dakota, Utah and Washington that generally find those state's have no authority to set wholesale rates for Section 271 services and UNEs.

27.    The OCC, Joint CLECs and Eschelon/Covad generally agree that not only does the Commission have authority to determine Qwest wholesale rates for UNEs, interconnection services and resale under Section 251(c), it also has authority to set rates for delisted elements and services under Section 271. For example, the OCC argues that in the TRO Decision, the FCC expressly recognized state authority under the Telecom Act when it stated as follows:

---

[3] *Indiana Bell Tel. Co. v. Indiana Utility Regulatory Commission*, 2003 WL 1903363 at 13 (S.D. Ind. 2003) (state commissions not authorized by section 271 to impose binding obligations), *aff'd*, 359 F.3d 493 (7th Cir. 2004).

Decision No. C06-1280                                    DOCKET NO. 04M-111T

The 1996 Act also preserves the states authority to establish unbundling regulations pursuant to state law as long as the exercise of state authority does not conflict with the Act and its purposes or substantially prevent the Commission's implementation. Section 251(d)(3) requires that, in prescribing and enforcing its regulations to implement the requirements of section 251 – the Commission shall not preclude the enforcement of any regulation, order, or policy of State Commission – (A) establishes access and interconnection obligations of local exchange carriers; (B) is consistent with the requirements of this section; and (C) does not substantially prevent implementation of the requirements of this section and the purposes of this part.[4]

28.    OCC goes on to argue that, according to the TRO, Section 252(e)(3) preserves a state's authority to review interconnection agreements as well as the wholesale rates, which are part and parcel of an ILECs interconnection agreement rates, terms and conditions. Additionally, the TRO holds that Section 251(b) and (c) generally preserve state authority to take action pursuant to state law. The OCC points to language in the TRO that holds that Section 251(d)(3) preserves states' authority to establish unbundling requirements pursuant to state law to the extent the exercise of state authority does not conflict with the Telecom Act and its purposes in implementing regulations. The FCC stated that it did "not agree with incumbent LECs that argue that the states are preempted from regulating this area as a matter of law. If Congress intended to preempt the field, Congress would not have included Section 251(d)(3) in the 1996 Act."[5]

29.    According to the OCC, in the *USTA II* decision, the D.C. Circuit did not disturb the above findings of the FCC in the TRO regarding state authority in interconnection related matters. Further, in the subsequent TRRO, the OCC notes that the FCC reasserted that state commissions have the authority to determine wholesale rates for UNEs to CLECs under interconnection agreements pursuant to Section 252(d)(2).

---

[4] TRRO at ¶ 180.
[5] *See* TRO ¶ 192.

30.    With regard to those certain network elements other than interconnection, UNEs and/or resale services required to be provided to CLECs under Section 251(c)(2)-(4) that have been delisted as UNEs under Section 251 by previous FCC orders, the Joint CLECs, Eschelon/Covad and the OCC agree that these delisted elements are still subject to unbundling requirements pursuant to Section 271 of the Telecom Act, and should be priced at wholesale rates under the "just and reasonable" rate standard.

31.    In support of this argument, the Joint CLECs, Eschelon/Covad and the OCC all refer to the language of the TRO that indicates the FCC believed "that the requirements of Section 271(c)(2)(B) establish an independent obligation for BOCs to provide access to loops, switching, transport, and signaling regardless of any unbundling analysis under Section 251." Consequently, RBOC obligations under Section 271 are not necessarily relieved despite the FCC's determination that unbundled some items under Section 251.[6] The parties conclude that, since Qwest has continuing unbundling obligations under Section 271 to provide unbundled loop, transport, switching and signaling independent of Qwest's unbundling obligations under Section 251, this Commission has jurisdiction and authority to set rates pursuant to Section 271 for delisted elements and services.

32.    Eschelon/Covad argues that federal law is clear that state commissions have the authority to determine rates for certain elements required under Section 271. Eschelon/Covad makes the case that, by enacting the savings clause of Section 251(d)(3), Congress established continuing jurisdiction for state commissions over matters of access and interconnection within their states, so long as state commissions' actions do not stand in the way of the federal regime.

---

[6] *See generally*, TRO ¶¶ 652-655.

Decision No. C06-1280                                                      DOCKET NO. 04M-111T

33.     Eschelon/Covad also indicates that the U.S. District Court of Maine recently upheld state commission rate-making authority over Section 271 UNEs.[7] Eschelon/Covad notes the court there found that "the authority of state commission over rate-making and its applicable standards is not pre-empted by the express or implied content of Section 271." *Verizon New England, supra,* at p. 10.

34.     Eschelon/Covad provides examples of several state commission decisions that have found that states do have jurisdiction and authority to set wholesale rates for Section 271 services and UNEs. Eschelon/Covad cites decisions upholding that proposition from Arizona, New Hampshire, Georgia, California, Maine and Michigan.

35.     The Joint CLECs additionally argue that Qwest's citation of the *Indiana Bell* case and *MCI v. Bell Atlantic,* 271 F.3d 491 (3d Cir. 2001) are misplaced because each case involves different issues than those involved here. The Joint CLECs also argue that Qwest's reliance on the *USTA II* decision is misplaced. According the Joint CLECs, Qwest relies on language in the decision that the FCC could not delegate to state commissions its statutory duty to determine the UNEs RBOCs such as Qwest are required to unbundle and make available to CLECs. The Joint CLECs point out that no party in this matter is attempting to force Qwest to unbundled UNEs beyond that required by the FCC in its TRO and TRRO decisions. Rather, the parties merely address whether the Commission has jurisdiction to determine the wholesale rates Qwest charges CLECs.

36.     In its initial brief, Staff posits that the jurisdiction of the Commission to set wholesale rates is dependent on the legal authority relied upon. According to Staff, certain legal

---

[7] *Verizon New England, Inc. d/b/a Verizon Maine v. Maine Public Utilities Commission,* Civil No. 05 53-B-C, Order Denying Plaintiff's Motion for Preliminary Injunction (November 30, 2005).

authorities provide for broad Commission jurisdiction to set wholesale rates, while other legal authorities provide for more limited authority. Staff identifies three legal authorities it contends could serve to establish jurisdiction to set wholesale rates.

37.     Staff first points to §40-15-501, C.R.S., *et seq.* that requires that Colorado's local telecommunications market should transition to a fully competitive marketplace. Staff indicates that pursuant to the spirit of the legislative intent to transition to a "fully competitive marketplace," the Commission promulgated Rules on Interconnection and Unbundling and Rules for the Resale of Telecommunications Exchange Services. Staff concludes that those rules, coupled with other Commission rules regarding the provision of telecommunications services, set forth all the necessary standards to allow the Commission to set rates on the elements identified in the Modified Statement of Generally Available Terms and Conditions (SGAT) it attached to its initial brief as Attachment A.

38.     Staff next addresses Sections 251 and 252 of the Telecom Act and the limits imposed by the TRO and TRRO. While Staff indicates that states have pricing authority under Section 252, it points out that, pursuant to the findings in *USTA II*, the TRO and TRRO, certain unbundled network element access requirements need no longer be offered because of the existence of sufficient facilities-based competition and, therefore, it is appropriate to begin removing unbundling obligations. Staff generally states that the TRO and TRRO set forth the tests and triggers by which the FCC believes the market opening requirements of the Telecom Act are to be implemented and enforced. Staff goes on to agree with the OCC, Joint CLECs and Eschelon/Covad that, according to *Verizon New England*, the Commission's authority over ratemaking is not preempted by the express or implied content of Section 271.

39.     Staff attached a detailed spreadsheet to its initial brief that it characterizes as its updated effort to sort all the services and network elements listed in the Modified SGAT into "yes" and "no" categories that are response to the determination of whether the Commission has jurisdiction to set wholesale rates for the prices Qwest charges CLECs for certain elements.

40.     In its reply brief, Staff indicates that it believes the Commission has authority over wholesale services in addition to the powers conveyed under Section 252(b).  Further, Staff believes that, while the delisting of an element might have the effect of permitting pricing based on a methodology other than TELRIC, it does not usurp the Commission's authority, either under state law or pursuant to Section 271, to set a price in conjunction with this proceeding.

## II.    FINDINGS AND CONCLUSIONS

41.     The 1996 Telecommunications Act is no model of clarity when it comes to the allocation of federal and state respective jurisdictions.  This imprecision has resulted in a split of decisions among state public utility commissions, as well as federal courts.  Nevertheless, since we must resolve the matter of who has pricing authority over Section 252-52 "delisted" unbundled network elements that must continue to be offered under Section 271, we trudge forward.

42.     The Supreme Court made a general pronouncement about the 1996 Telecommunications Act in *AT&T Corp. v. Iowa Utilities Bd.*, 525 U.S. 366 (1999).  With regard to preemption of state authority, the Court stated:

> [T]he question in these cases is not whether the Federal Government has taken the regulation of local telecommunications competition away from the States.  With regard to the matters addressed by the 1996 Act, it unquestionably has. ...

Before the Public Utilities Commission of the State of Colorado

| Decision No. C06-1280 | DOCKET NO. 04M-111T |

...[I]f the federal courts believe a state commission is not regulating in accordance with federal policy they may bring it to heel.[8]

The Eighth Circuit expounded upon *Iowa Utility Bd.*, stating:

> The new regime for regulating competition in this industry is federal in nature – and while Congress has chosen to retain a significant role for the state commissions, the scope of that role is measured by federal, not state law.[9]

43.     We thus start our analysis with a presumption that the 1996 Act is a federal regime, allowing state regulation only insofar as explicitly provided in the Act. This is the approach that was taken by the Seventh Circuit in *Indiana Bell, supra*. There, the federal district court held that two orders of the Indiana Utility Regulatory Commission were preempted by the 1996 Act. In discussing federal preemption principles, the court found that the scope of the IURC's role in regulating local competition "is measured by federal law and must follow the purposes and objectives of Congress."[10] The court stated that Section 271 of the Act "contemplates an advisory role for the IURC," and "[r]eliance on Indiana law alone cannot alter this federal regulatory scheme."[11] Further, "Section 271 does not contemplate substantive conduct on the part of state commissions."[12] In short, "[t]he IURC's authority to act according to state law, if such authority exists, is found in Section 252, not in 271."[13] [14]

44.     The question before us is whether this Commission has the jurisdiction to price network elements that must be offered by Qwest pursuant to Section 271, but not pursuant to

---

[8] *Id.* at 378 n.6.

[9] *Southwestern Bell Tel. Co. v. Connect Communications Corp.*, 225 F.3d 942, 946-47 (8th Cir. 2000).

[10] 2003 WL 1903363 at *10.

[11] *Id.*

[12] *Id.* at *11.

[13] *Id.* at *12.

[14] The district court's decision was affirmed on appeal. *Indiana Bell. Tel. Co. v. Indiana Utility Regulatory Commission*, 359 F.3d 493, 498 (7th Cir. 2004) ("What the IURC has done is to make an end run around the act").

| Decision No. C06-1280 | DOCKET NO. 04M-111T |
|---|---|

Sections 251 or 252, of the Act. The D.C. Circuit provides a useful summary as to these elements:

> Section 271 of the Act sets conditions for Bell operating companies (the "BOCs") to enter the interLATA long distance market. These conditions include a "competitive checklist," § 271(c)(2)(B), specifying fourteen conditions that a requesting BOC must satisfy before it may provide interLATA service. Checklist item two requires BOCs to provide "[n]ondiscriminatory access to network elements in accordance with the requirements of sections 251(c)(3) and 251(d)(1)," § 271(c)(2)(B)(ii), while checklist items four, five, six, and ten require the BOC to provide unbundled access to, respectively, local loops, local transport, local switching, and call-related databases, §§ 271(c)(2)(B)(iv)-(vi),(x). The FCC reasonably concluded that checklist items four, five, six and ten imposed unbundling requirements for those elements independent of the unbundling requirements imposed by §§ 251-52. In other words, even in the absence of impairment, BOCs must unbundle local loops, local transport, local switching, and call-related databases in order to enter the interLATA market. [Citation omitted]
>
> But the FCC also found that the BOCs' unbundling obligations under the independent checklist items differed in some important respects from those under §§ 251-52. Two such differences are salient here. First, the Commission determined that TELRIC pricing was not appropriate in the absence of impairment; for elements for which unbundling was required only under § 271, the ruling criterion is the §§ 201-02 standard that rates must not be unjust, unreasonable, or unreasonably discriminatory. [Citation omitted] Second, the Commission decided that, in contrast to ILEC obligations under § 251, the independent § 271 unbundling obligations didn't include a duty to combine network elements.[15]

Thus, the Section 271 elements in question must be unbundled by Qwest only pursuant to Section 271, and are to be priced at rates that are not unjust, unreasonable, or unreasonably discriminatory pursuant to Sections 201 and 202 of the Act.

45.    Sections 201 and 202 of the 1996 Act do not mention any state authority over pricing of network elements.  Section 252(c)(2) allows for state commissions to establish rates for interconnection and network elements, but only according to subsection (d) – which in turn

---

[15] *United States Telecom Ass'n v. Federal Communications Commission*, 359 F.3d 554, 588-89 (D.C. Cir. 2004).

Before the Public Utilities Commission of the State of Colorado

| Decision No. C06-1280 | DOCKET NO. 04M-111T |
|---|---|

allows for state commission determination of just and reasonable interconnection charges "for purposes of subsection (c)(2) of section 251 of this title, and the just and reasonable rate for network elements for purposes of subsection (c)(3) of such section . . .." Sections 251(c)(2) and (c)(3) of the Act requires that ILECs provide, *inter alia*, interconnection with its network ((c)(2)) and nondiscriminatory access to network elements on an unbundled basis ((c)(3)) "on rates, terms and conditions that are just, reasonable, and nondiscriminatory, in accordance with the terms and conditions of the [interconnection] agreement and the requirements of this section and section 252 of this title."

46.     Sections 251 and 252 of the Act, then, allow for state pricing authority only over interconnection and network elements required under the same sections of the Act – 251 and 252. All parties to this docket are in agreement that the elements in question (i.e., for which a jurisdictional challenge is made) have been "delisted," and as such are no longer required to be offered by ILECs under Sections 251 and 252 of the Act.

47.     The remaining question is whether Section 271 of the Act permits state commissions to determine just and reasonable prices for elements required to be unbundled solely by Section 271. The only mention of state commissions occurs in subsection 271(d)(2), which requires that the FCC "consult" with state commissions to verify an applicant Bell's compliance with subsection (c) of Section 271. Subsection (c) contains the checklist of requirements to allow a Bell into the long distance toll market. Among these is compliance with the various requirements of Sections 251 and 252 of the Act. Nowhere, however, is there any authority given to state commissions over pricing of Section 271 elements. Nor do we see how Sections 271's mandate that Bells comply with Sections 251 and 252 – which is not at issue in the present determination – allows for state authority over 271 elements. Rather, we see a

Before the Public Utilities Commission of the State of Colorado

Decision No. C06-1280                                                    DOCKET NO. 04M-111T

limited consultation role for state commissions at the time the FCC made its long distance entry

decisions, and the only enforcement authority over Section 271 requirements is given not to

states, but the FCC.    Although the FCC found in the TRO and TRRO that BOCs have an

ongoing 271 obligation, the authority to enforce that obligation lies with the FCC and not the

states.

      48.    We realize that the federal district court in Maine has come to the opposite

conclusion.[16] The court reasoned as follows:

> The central, vital predicate for [Verizon's] argument is that federal law preempts
> state regulation of § 271 obligations. It is clear that the statute is not intended to
> have any such effect. While § 271 states that the approval of an application
> submitted by a BOC to provide InterLATA services shall be by the FCC, *see* §§
> 271(d)(1) and (b)(1), neither that provision nor any other provision in the Act
> confers exclusive jurisdiction on the FCC with respect to rate-making for § 271
> UNEs. A careful reading of § 271 shows that the language of it contains
> absolutely no express provision for rates or any comment on authority to make
> rates. In fact, the word "rate" does not appear at all in § 271. There is simply no
> express consideration of rate-making or rate-making authority set out in § 271.[17]

It thus appears that the court began with the presumption that, if Section 271 does not expressly

preempt state authority over pricing of Section 271 elements, state commissions are free to do so.

We think this ignores the Supreme Court's *Iowa Utility Bd.* decision, and agree with the Eighth

Circuit's view that, "while Congress has chosen to retain a significant role for the state

commissions, the scope of that role is measured by federal, not state law."[18]   Since Congress

chose to give rate authority to states only regarding Section 251-52 elements, we believe that

state commissions are so restricted, and may not seek to extend their authority to Section 271

---

[16] *Verizon New England Inc. v. Maine Public Utilities Com'n*, 403 F.Supp.2d 96 (D. Me. 2005).

[17] *Id.* at 102.

[18] *See* footnote 9, *supra*.

Decision No. C06-1280                                                    DOCKET NO. 04M-111T

elements.[19] Further, we may not attempt to employ Colorado state law to price Section 271

elements, as we agree with the Seventh Circuit that Section 271 contemplates an advisory role

for state commissions, and "[r]eliance on [state] law alone cannot alter this federal regulatory

scheme."[20]

      49.    We also do not view our continuing obligation to arbitrate interconnection

agreement disputes as providing authority to price Section 271 elements. To the extent there are

disagreements as to the pricing of Section 251-52 elements, we may resolve them; but any

disputes over pricing of Section 271 elements will have to be referred to the FCC for resolution.

As noted by U.S. District Court for the Northern District of Florida:

> The procedures set forth in § 252 commence with a request by one carrier to
> another for "interconnection, services, or network elements *pursuant to section
> 251.*" 47 U.S.C. § 252(a)(1) (emphasis added). If the carriers fail to agree, the
> state commission may resolve "any open issues" through "arbitration" and may
> impose conditions on the carriers. Under the law of the circuit, "any open issues"
> means issues arising under § 251. *See MCI Telecomms. Corp. v. BellSouth
> Telecomms. Inc.,* 298 F.3d 1269, 1274 (11th Cir. 2002). And under the plain terms
> of the statute, the state commission's resolution of open issues and imposition of
> conditions must be based on § 251; the statute directs the state commission to
> "ensure that such resolution and conditions meet the *requirements of section 251*
> of this title, including the regulations prescribed by the [FCC] *pursuant to section
> 251* of this title." 47 U.S.C. § 252(c)(1) (emphasis added).[21]

---

[19] As to the assertion that Section 251(d)(3) preserves state authority over unbundling, we note that this
savings clause applies to Section 251, not 271. We agree with the *Indiana Bell* decision that such a savings clause
"is not necessary for Section 271 because the state commissions' role is investigatory and consulting, not
substantive, in nature." 2003 WL 1903363 at *11.

[20] *See* footnote 10, *supra.*

[21] *Dieca Communications, Inc. v. Florida Public Service Com'n,* 2006 WL 2873736 at *4 and *4 n.7 (N.D.
Fla. Sept. 12, 2006) ("[A]ny complaint by Covad that BellSouth's failure to provide line sharing will violate § 271 is
an issue for the FCC, not for the Florida Commission").

Before the Public Utilities Commission of the State of Colorado

Decision No. C06-1280                                              DOCKET NO. 04M-111T

50.    Finally, that agreements addressing Section 271 elements must be filed with state commissions for approval[22] also does not open the door for state commission pricing of these elements.[23]    While Congress required that "any" interconnection agreement must be filed with state commissions for approval, § 252(e)(1), it made no allowance for state commission authority to price Section 271 elements.

51.    For these reasons, we hold that the Commission's jurisdiction is limited to review of wholesale rates for network elements required by Section 251 and 252 of the 1996 Act, but we may not review wholesale rates for Section 271 elements.    The scope of this docket is narrowed accordingly.

## III.    ORDER

### A.    The Commission Orders That:

1.    This Commission does not have authority or jurisdiction to set Qwest Corporation's wholesale rates for those elements and services required to be unbundled solely under Section 271 of the Telecommunications Act of 1996.

2.    Because we find the Commission does not have authority over wholesale rates for elements and services required under Section 271, the wholesale rate cost methodology to be utilized shall be Total Element Long-Run Incremental Cost rates pursuant to §§ 251(b) and (c) of

---

[22] In Decision C04-1349 (Docket No. 96A-366T, Nov. 16, 2004), we held that interconnection agreements that relate to Section 271 elements must be filed with our Commission, citing the plain language of Section 252(e)(1) of the 1996 Act: "Any interconnection agreement adopted by negotiation or arbitration shall be submitted for approval to the State commission. . .." Our decision was upheld by the federal district court in Colorado. *See Qwest Corp. v. Public Utilities Com'n of Colorado,* 2006 WL 771223 (D. Colo. Mar 24, 2006).

[23] This arguably creates a schism in state commission authority. How is it, one could ask, that Section 271 element agreements must be filed for state commission approval, but the same state commissions have no authority to determine the price for such elements? Other than to note that approving an agreement is different from arbitrating a dispute, ours is not to answer this question, but, rather, follow the federal schism created by Congress.

Decision No. C06-1280                                                                DOCKET NO. 04M-111T

the Telecommunications Act of 1996 for those elements and services which are under the authority of this Commission.

3.    A new docket shall be opened to consider testimony and evidence to set costing and pricing of Qwest's remaining § 251 rates at issue in this docket.

4.    The 20-day time period provided by § 40-6-114(1), C.R.S., to file an application for rehearing, reargument, or reconsideration shall begin on the first day after the effective date of this Order.

5.    This Order is effective on its Mailed Date.

**B.    ADOPTED IN COMMISSIONERS' WEEKLY MEETING**
**September 27, 2006.**

(S E A L)

ATTEST: A TRUE COPY

Doug Dean,
Director

THE PUBLIC UTILITIES COMMISSION
OF THE STATE OF COLORADO

GREGORY E. SOPKIN
_____

POLLY PAGE
_____

CARL MILLER
_____
                          Commissioners

G:\Commission draft orders\C06-1280_04M-111T.doc:JEO