**EXHIBIT 2**

# United States Court of Appeals
## For the First Circuit

No. 06-2151

VERIZON NEW ENGLAND, INC.,

Plaintiff, Appellant,

v.

MAINE PUBLIC UTILITIES COMMISSION; STEPHEN L. DIAMOND, in his
official capacity as Commissioner of the Maine Public Utilities
Commission; SHARON M. REISHUS, in her official capacity as
Commissioner of the Maine Public Utilities Commission; KURT W.
ADAMS, in his official capacity as Commissioner of the Maine
Public Utilities Commission,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. Gene Carter, Senior U.S. District Judge]

No. 06-2429

VERIZON NEW ENGLAND, INC.,

Plaintiff, Appellee,

v.

NEW HAMPSHIRE PUBLIC UTILITIES COMMISSION; THOMAS B. GETZ,
in his official capacity as Commissioner of the New Hampshire
Public Utilities Commission; GRAHAM J. MORRISON, in his official
capacity as Commissioner of the New Hampshire Public Utilities
Commission; and MICHAEL D. HARRINGTON, in his official capacity
as Commissioner of the New Hampshire Public Utilities Commission,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Paul J. Barbadoro, U.S. District Judge]

———————————————

Before

Boudin, Chief Judge,

Lynch and Lipez, Circuit Judges.

———————————————

Scott H. Angstreich with whom Kelly P. Dunbar, Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C. and Bruce P. Beausejour, Verizon New England Inc., were on brief for plaintiff.

David S. Rosenzweig and Keegan Werlin LLP on brief for AT&T Inc. and BellSouth Corporation, Amici Curiae.

Andrew B. Livernois, Assistant Attorney General, Department of Justice, with whom Kelly A. Ayotte, Attorney General, State of New Hampshire, was on brief for defendants, appellants.

Andrew S. Hagler with whom Trina M. Bragdon, Maine Public Utilities Commission, was on brief for defendants, appellees.

Thomas F. Reilly, Attorney General, and Jed M. Nosal, Special Assistant Attorney General, General Counsel, Massachusetts Department of Telecommunications and Energy, on brief for the Commonwealth of Massachusetts Department of Telecommunications and Energy, Amicus Curiae.

Russell M. Blau, Philip J. Macres and Bingham McCutchen, LLP on brief for Alpheus Communications, L.P., Biddeford Internet Corporation d/b/a Great Works, Covad Communications Company/DIECA Communications Inc., Freedom Ring Communications, L.L.C. d/b/a BayRing Communications, segTEL, Inc. and XO Communications, Inc., Amici Curiae.

———————————————

September 6, 2007

———————————————

BOUDIN, __Chief Judge__.  Verizon is a major telephone company comprising, among other components, several of the former Bell System operating companies ("BOCs") based in the New England and Mid-Atlantic regions.  In the federal district court in Maine, Verizon challenged rulings of the Maine Public Utilities Commission ("PUC") and lost; Verizon won in a comparable case in the New Hampshire district court directed against the New Hampshire PUC.  The resulting appeals, one by Verizon and the other by the New Hampshire agency, are now before us.

__Background__.  When the Bell System's "substantial domination of the telecommunications industry" was ended by antitrust decree in 1982, __United States__ v. __AT&T Co.__, 552 F. Supp. 131, 163 (D.D.C. 1982), the framers of the decree conceived that telephone service would be separated into two spheres.  In the long-distance market, it was expected that competition would grow between AT&T (now stripped of its local operating companies) and new entrants such as MCI, permitting reduced regulation.[1]

By contrast, the former local Bell System operating companies--initially grouped under the decree into a number of independent regional BOC entities called RBOCs--were expected to continue as local monopolies, providing local service within their

---

[1]Both in the decree and in later legislation that replaced it, the distinction drawn is between "interLATA" service (service between defined LATAs, or local access transport areas) and intraLATA service (service within a LATA).  We use "long distance" and "local" as very crude, but more familiar, approximations.

exclusive local areas as well as local distribution for AT&T and its new long distance competitors. The RBOCs were forbidden, with few exceptions, to provide any service other than a kind of broadly conceived local service. Huber et al., <u>Federal Telecommunications Law</u> 45 (2d ed. 1999).

The retreat from this illusion of wholly separate spheres began in earnest with the 1996 Telecommunications Act, Pub. L. No. 104-104, 110 Stat. 56 ("1996 Act"). The RBOCs, like Verizon, wanted to provide long distance service; other companies, including both new entrants and established long distance carriers like AT&T and MCI, wanted to secure from the RBOCs access to local BOC facilities to use for long distance services, competing local services, or both. The 1996 Act established a complex regulatory regime for both entry and competition in both spheres.

The same set of local facilities--importantly (but not exclusively) traditional connections (called "loops"), usually copper wires, between the customers and the local carrier switching center--are used for <u>both</u> intrastate and interstate service. Pre-break up, when the Bell System provided most telephone service without competition, the principal regulatory issues revolved around rates, and agency authority could be easily divided: the Federal Communications Commission set interstate rates; the state commissions set intrastate rates.

In many cases, it is wasteful to duplicate local facilities, for example, by having each long distance carrier construct a separate loop to the customer's house. Under the 1996 Act, RBOCs and other "incumbent" local carriers are expected to provide access to certain elements of their local facilities to other companies.  The statute also held out to the RBOCs the prospect of eventual entry--provided certain conditions are met-- into the long distance market.  However, regulation of facilities used in common for local and long distance service is less easily divided than was regulation of rates for telephone calls.

Thus, the 1996 Act set up a complicated dual regime. Pertinently, in sections 251-52, the statute divided authority between the FCC and states over the initial sharing of local facilities, whether owned by RBOCs or other independent incumbent carriers.  47 U.S.C. §§ 251-52 (2000).  In section 271, the statute established special sharing requirements for the RBOCs to enter the long distance market and gave the FCC the controlling role in regulation under that section.  Id. § 271(c), (d).  Further complicating matters, the two sets of provisions overlap.

Importantly, sections 251-52 require that the incumbents provide competitors various "network elements" (e.g., local loops), as specified by the FCC from time to time, on an "unbundled" basis

-5-

(such elements are commonly called "UNEs").  47 U.S.C. § 251(c)(3).[2] The pricing for such elements is determined by inter-carrier agreement or, if they fail to agree, by arbitration under state-commission supervision and subject to review in federal courts.  Id. § 252(a).  The FCC, with court backing, ultimately determined that such prices should be based on total long run incremental costs ("TELRIC" rates), which are highly favorable to the competitors. See AT&T Corp. v. Iowa Utils. Bd., 525 U.S. 366, 374 & n.3 (1999).

Section 271 applies only to those incumbents, like Verizon, that are or incorporate former BOCs.  47 U.S.C. § 271(a). Among various conditions for FCC permission to provide long distance service, it requires--by contrast to sections 251-52--that statutorily specified network elements be made available (e.g., "local loop transmission" and "local switching").  Id. § 271(c)(2)(B).  In the past several years, the RBOCs have been applying for and receiving such permissions from the FCC.

Until recently, there was a substantial overlap between what the FCC deemed required UNEs under sections 251-52 and the statutory list in section 271.  But, as a result of FCC orders in

---

[2]UNEs are required only to the extent that "the failure to provide access to such network elements would impair the ability of the telecommunications carrier seeking access to provide the services that it seeks to offer."  47 U.S.C. § 251(d)(2)(A), (B) (2000).  The number of UNEs under section 251 has been in flux, with much back and forth between the D.C. Circuit and the FCC. See, e.g., United States Telecom Ass'n v. FCC, 359 F.3d 554 (D.C. Cir. 2004), cert. denied, 543 U.S. 925 (2004).

2003 and 2005, a number of the UNEs have been "delisted," so that incumbents including RBOCs are no longer required to provide them under sections 251-52. Further, where section 271 still requires network elements by RBOCs who provide long distance service, the FCC has said that TELRIC pricing would be inappropriate and that the traditional "just and reasonable" standard would apply, likely generating higher prices to be paid by the competitors.[3]

It is against this background that the present cases arose. Each case involves an application by Verizon under section 271 to enter the long-distance market--in one case from Maine, in the other from New Hampshire. In each instance, the resulting district court litigation has posed the question whether the state commission can insist (despite delisting) that Verizon continue to provide the disputed network elements and do so at TELRIC pricing. We describe the two cases separately.

Maine. In seeking section 271 approval for interstate service for Maine customers, Verizon solicited support from the Maine PUC. In March 2002, the Maine PUC agreed to recommend that the FCC approve the application, assuming Verizon agreed with the state agency that it would comply with specified conditions,

---

[3]Triennial Review Order ("TRO"), 18 F.C.C.R. 16978 (2003); Triennial Review Remand Order ("TRRO"), 20 F.C.C.R. 2533 (2005). See also Verizon Commc'ns, Inc. v. FCC, 535 U.S. 467, 489 (2002); Iowa Utils. Bd., 525 U.S. at 385 (holding that the FCC has jurisdiction under section 201(b) of the 1996 Act to design a pricing methodology for section 251 UNEs).

including a commitment to file with the Maine PUC a "wholesale tariff" embodying the UNE offerings.

Verizon agreed, the Maine PUC filed its favorable recommendation and in June 2002 the FCC granted Verizon's application. Thereafter, controversy developed between the Maine PUC and Verizon as to just what should appear in the wholesale tariff--a matter complicated by the intervening FCC rulings delisting various UNEs under section 251 and adopting the just and reasonable standard for section 271 elements. Verizon sought to adjust its tariff filings accordingly, and competing carriers complained.

The result was a set of Maine PUC orders in 2004 and 2005 which, among other things, ruled that Verizon was obligated to provide section 271 elements at TELRIC prices until the Maine PUC ordered otherwise. In addition, the Maine PUC determined that several elements that were delisted under sections 251-52 remain required under section 271--which Verizon denies. These included three dark fiber elements (transport, loops, and entrance facilities) and "line sharing."[4]

---

[4]Dark fiber refers to fiber-optic cable, unconditioned by equipment that generates or receives signals, used for intercity (transport), premises connections (loops) and connecting incumbent with competitor switches (entrance). Line sharing involves allowing the competitor to offer DSL service (basically, a broad band connection) using traditional--but specially conditioned-- copper wire loops for this service but without using the loop for ordinary telephone service which it can also handle simultaneously.

Verizon then brought suit in the federal district court in Maine seeking to enjoin the Maine PUC from imposing these obligations. Verizon's basis for its claim to injunctive relief was that the Maine PUC was usurping federal authority under the 1996 Act and acting in conflict with FCC rulings that are controlling under the Supremacy Clause. Such actions have a lineage in federal case law. E.g., Verizon Md., Inc. v. Pub. Serv. Comm'n of Md., 535 U.S. 635, 642 (2002).

In the district court the Maine PUC defended its orders on the ground that the Maine PUC itself has authority to enforce section 271, that its orders are not in conflict with FCC rulings and that Verizon consented to the obligations imposed when it solicited Maine's recommendation for FCC approval under section 271. The Maine PUC also says, but Verizon disputes, that it also rested its order on state law.

In two decisions, one in 2005 (preliminary injunction) and the other in 2006 (permanent injunction), the district court ruled in favor of the Maine PUC. The court determined that under federal law the Maine PUC could set rates for section 271 elements and could, as the Maine PUC proposed to do, adopt TELRIC pricing for interim rates. It also said that state law provided an independent basis for such measures even if section 271 did not.

As for the elements required by the Maine PUC but disputed by Verizon, the court upheld the state agency's conclusion

-9-

that section 271(c)(2)(B) requires Verizon to provide access to line sharing and dark fiber, including dark fiber loops, transport and entrance facilities. The district court also upheld the Maine PUC's interpretation of Verizon's interconnection agreement with a competitor, Great Works Internet ("GWI"), in which the state agency had reached a similar conclusion by interpreting the agreement.

New Hampshire. In 2001, Verizon sought support from the New Hampshire PUC for its section 271 application to provide long-distance service from New Hampshire. In New Hampshire, unlike Maine, Verizon had earlier filed a standardized general offering of UNEs at specified prices (an "SGAT" in the parlance of the statute). 47 U.S.C. § 252(f). The New Hampshire PUC agreed to give support on condition that Verizon agreed to convert its SGAT into a tariff.

Verizon consented, saying that it would convert its SGAT into a tariff by year-end 2002 and would modify the SGAT and the tariff "to reflect changes" as determined "by the FCC or the courts." The New Hampshire PUC recommended that the FCC approve Verizon's section 271 application; the FCC did so in September 2002. After the FCC altered its UNE listing requirements in 2003 and 2005, Verizon sought to revise its SGAT and tariff purportedly in accordance with the new FCC rulings.

The New Hampshire PUC then ruled that Verizon must continue to provide disputed UNEs (e.g., dark fiber, line sharing) and at existing TELRIC prices until the state agency decided

otherwise.  Verizon in turn brought suit in New Hampshire federal district court to enjoin the New Hampshire PUC from conduct allegedly at odds with the 1996 Act and FCC rulings.  On cross motions for summary judgment, the district court ruled in favor of Verizon.

The district court rejected the New Hampshire PUC's main argument, namely, that Verizon had committed itself to submit its section 271 element rates to state agency tariffing in exchange for supporting Verizon's section 271 application. Examining the relevant filings, the court ruled that Verizon's agreement had extended only to UNEs listed under sections 251-52 (now largely delisted) and not to section 271 elements.  The court also said that the state's imposition of TELRIC pricing would be preempted as conflicting with federal policy.

State authority under section 271.  On appeal, the state commissions argue inter alia that they can determine what elements Verizon is required to provide under section 271 and can set rate policy for those elements.  The arguments present on a legal issue, largely subject to de novo review.  Global NAPs, Inc. v. Verizon New England, 396 F.3d 16, 23 (1st Cir. 2005), cert. denied, 544 U.S. 1061 (2005).  We hold that the states' position is at odds with the statutory language, history and policy of section 271 and most relevant precedent.

-11-

Sections 251-52 provide for a dual federal-state regime: the FCC determines what UNE elements must be provided and sets pricing policy; state commissions oversee the adoption of agreements or SGATs providing such UNEs to competitors at prices based on those principles. 47 U.S.C. § 252(a), (b), (e), (f). Disputes as to the adoption of the agreements submitted to state commissions go to federal, rather than state, court for review, id. § 252(e), although implementation issues may arise in state proceedings. In short, the states have a major role under these sections.

By contrast, authority under section 271 is granted exclusively to the FCC. The FCC decides whether to grant section 271 approval; states have no more than a right to express views. 47 U.S.C. § 271(d)(2)(B)(3). The power to enforce the provision falls under the FCC's general powers, id. § 271(d)(6); and the right to set prices for the elements flows from the FCC's power to set just and reasonable rates, id. §§ 201-202; see also TRO ¶ 656, 18 F.C.C.R. 16978, 17386 (2003). The contrast confirms that when Congress envisaged state commission power to implement the statute, it knew how to provide for it.

The state commission's statutory arguments are unconvincing. That the states have an explicit consultative role under section 271 works against, rather than for, their claim of other powers. Russello v. United States, 464 U.S. 16, 23 (1983). So, too, the cross-references in section 271 to sections 251 and

-12-

252, _e.g._, 47 U.S.C. § 271(c)(2)(B), are hardly a delegation of power to the states to implement section 271: the main cross-reference merely provides that one condition precedent to FCC approval under section 271 is that the RBOC have in place a section 251-52 agreement.  _Id._ § 271(c)(1).

Similarly, two savings clauses relied on by the state commissions do not purport to grant states enforcement power under section 271.  Both savings clauses aim to prevent sections 251-52 from negating other powers of state commissions to regulate interconnection or local service.  47 U.S.C. § 252(e)(3), (f)(2). Section 271 has no such clause reserving state power, again underscoring intended federal supremacy and the absence of state power under section 271.

Nor are states helped by repeatedly referring to the facilities in question as "local" or "intrastate" and pointing to their statutory power over intrastate communications.  47 U.S.C. § 251(d)(3).  The loops, central office switches and similar facilities are located in individual communities but have been used for decades to provide both interstate and intrastate service as part of a unified network.  The 1996 Act effectively regulates such facilities, see Iowa Utils. Bd., 525 U.S. at 378 n.6, in respect of interconnection whether for interstate or intrastate service.

Although the statutory language is more than sufficient to resolve the point, the history of section 271 bears out FCC

-13-

primacy.  Section 271, broadly speaking, directly descends from provisions in the AT&T federal court antitrust decree regulating the ability of the RBOCs to offer long-distance service--an initial prohibition coupled with an opportunity to seek entry in due course. When the 1996 Act replaced the decree, Congress aimed to transfer this authority to the FCC--not the states--while recasting and refining the conditions for RBOC entry.[5]

Finally, precedent largely supports Verizon.  Indiana Bell Telephone Co. v. Indiana Utility Regulatory Commission, 359 F.3d 493 (7th Cir. 2004), treats section 271 as within the FCC's exclusive authority; so do several district court decisions.  Ill. Bell. Tel. Co. v. O'Connell-Diaz, 2006 WL 2796488 (N.D. Ill. Sept. 28, 2006); Sw. Bell. Tel. v. Miss. Pub. Serv. Comm'n, 461 F. Supp. 2d 1055 (E.D. Mo. 2006).  Most of the state commissions that have spoken appear to disclaim power to determine section 271 elements or fix pricing principles.[6]

_____

[5]TRO ¶ 655, 18 F.C.C.R. at 17385 n.1986 (citing United States v. AT&T Co., 552 F. Supp. 131 (D.D.C. 1982)); see also BellSouth Corp. v. FCC, 162 F.3d 678, 683 (D.C. Cir. 1998) (characterizing section 271 as "merely a revised version of the [Modification of Final Judgment] restrictions").  See also InterLATA Boundary Order ¶ 18, 14 F.C.C.R. 14392, 14401 (1999) (noting "the exclusive authority that Congress intended that the [FCC] exercise over the section 271 process").

[6]E.g., Arkansas, Docket No. 05-081-U, Order No. 5, 2005 Ark. PUC LEXIS 432, at *3-*4 (Ark. P.S.C. Oct. 31, 2005) ("Although SBC should provide the items specified in section 271 and the TRO, this Commission has no jurisdiction to enforce section 271."); Indiana, Cause No. 42857, 2006 Ind. PUC LEXIS 40, at *88-*89 (Ind. Util. Reg. Comm'n Jan. 11, 2006) ("[S]tate commissions have no

-14-

<u>State law</u>.  Whether state law might independently support the orders is a different question to which we now turn.  In the Maine case, the district court itself invoked state law <u>sua sponte</u>; in the New Hampshire case, the district court said the New Hampshire PUC had not seriously sought to develop a state law argument and refused to consider such a claim.  In this court, both state commissions seek to rely in part on state law.  Verizon objects to state law arguments not adopted in the original agency orders, but the state law argument fails for other reasons.

Neither state agency spends much time identifying pertinent state statutes or rules to support the orders.  But, as already noted, interconnection affects both intrastate as well as interstate services, <u>Iowa Utils. Bd.</u>, 525 U.S. at 379; and state utility statutes tend to be broadly drafted.  Yet even if state utility statutes might otherwise authorize state regulation of facilities that affect intrastate and interstate commerce, the real barrier to the present claims grounded in state law is federal preemption.

State regulation, even when authorized by local law, must give way not only "where Congress has legislated comprehensively"

---

jurisdiction to enforce or determine the requirements of Section 271."); North Dakota, Case No. PU-05-165, 2006 N.D. PUC LEXIS 3, at *22-*23 (N.D. P.U.C. Feb. 8, 2006) ("The FCC has the exclusive authority to determine whether Qwest has complied with the substantive provisions of Section 271 including the checklist provisions.").

in a field with an aim to occupy it, but also "where the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress."  La. Pub. Serv. Comm'n v. FCC, 476 U.S. 355, 368-69 (1986).  In this case both of the specific outcomes that the state agencies seek to dictate are in direct conflict with specific FCC policies adopted pursuant to its authority under the 1996 Act.

One issue is whether the states can require that section 271 elements be priced at TELRIC rates.  The FCC orders provide carriers the authority to charge the potentially higher just and reasonable rates, in order to limit subsidization and to encourage investment by the competitors.[7]  To allow the states to require the lower TELRIC rates directly conflicts with, and undercuts, the FCC's orders.  Under preemption principles the state orders must in this respect give way.  Iowa Utils. Bd., 525 U.S. at 378 n.6; City of New York v. FCC, 486 U.S. 57, 64 (1988).

The other issue is whether the states can require the RBOCs to provide to competitors unbundled elements that have been delisted under sections 251-52 and are not within the list of

---

[7]See TRO ¶¶ 656-64, 18 F.C.C.R. at 17386-90; UNE Remand Order ¶ 473, 15 F.C.C.R. 3696, 3906 (1999) ("[I]t would be counterproductive to mandate that the incumbent offers the element at forward-looking prices.  Rather, the market price should prevail . . . ."); cf. 1 Kahn, The Economics of Regulation: Principles and Institutions 63 (1970) (discussing the provision of rewards and incentives through the imposition of rates in order to spur efficiency and innovation).

elements required under section 271.  (This is a different question than how one defines particular terms in the section 271 list.)  The problem for the states is the FCC's delisting was intended to free the carriers from such compulsion.

Depending on the circumstances, making a monopolist share what used to be called "essential facilities" can promote competition; but it can also retard investment, handicap competition detrimentally, and discourage alternative means of achieving the same result that could conceivably enhance competition in the long run.[8]  This view underlies the delisting order.  UNE Remand Order ¶ 473, 15 F.C.C.R. at 3906.  For a state to require such sharing where the FCC thinks compulsion is detrimental is no different than insistence on TELRIC pricing in contravention of the FCC's mandate for a different pricing scheme.

Verizon's alleged promises.  The question remains whether Verizon has agreed "voluntarily" with the state agencies to provide unbundled elements that have been delisted and are not required under section 271 or agreed to provide TELRIC pricing for section 271 elements.  Both state agencies in this case rely on alleged commitments by Verizon to this effect.  Arguably, the FCC did not

---

[8]See Areeda & Hovenkamp, Antitrust Law ¶771b, pp. 174-76 (1996) ("[T]he right to share a monopoly discourages firms from developing their own alternative inputs" and creates the "problem of loss of competitor incentive[s]."); see also United States Telecom Ass'n v. FCC, 290 F.3d 415, 424-25 (D.C. Cir. 2002), cert. denied, 538 U.S. 940 (2003).

-17-

explicitly forbid the RBOCs from providing more elements than required or charging them lower prices.

A truly voluntary decision by the carrier to do so might be unexceptional; an extortionate demand by the state, perhaps no different than direct compulsion; and, in between and arguably legitimate, is a state's refusal to support a section 271 application unless the RBOC agreed to provide extra elements. The issue need not be decided because Verizon made no such commitments, as to either section 271 elements or their pricing.

Some deference is customarily given to a state agency's interpretation of <u>regulatory</u> filings made with it (<u>e.g.</u>, state tariffs or rate contracts), <u>Sw. Bell Tel. Co.</u> v. <u>Pub. Util. Comm'n of Tex.</u>, 208 F.3d 475, 485 (5th Cir. 2000); <u>cf. Idaho Power Co.</u> v. <u>FERC</u>, 312 F.3d 454, 461 (D.C. Cir. 2002), but Verizon's commitments were merely representations made to obtain state support for a federal filing seeking federal approval under a federal statute. Further, even where an agency interprets a tariff or rate contract, its interpretation must be reasonable. <u>Boston Edison Co.</u> v. <u>FERC</u>, 441 F.3d 10, 13 (1st Cir. 2006).

Here, Verizon agreed to the Maine PUC's demand that it file a tariff with the agency reflecting a general offering of UNEs. Verizon was then providing UNEs under sections 251-52 through interconnection agreements but it had filed no tariff or SGAT making a general offering. The state agency said that its own request for

-18-

a tariff was in response to complaints by competitors that Verizon was abusing the section 251-52 negotiation process by forcing competitors to accept unfavorable or unnecessary terms in order to obtain newly available network elements.

Sections 251-52 do not provide for tariffs--their focus is on individual agreements or a general contractual standard offering; one circuit has held that the agency may not insist on tariffing of UNEs, Wis. Bell v. Bie, 340 F.3d 441, 444 (7th Cir. 2003), cert. denied, 540 U.S. 1142 (2004), but a carrier may be free to make a state tariff offering of UNEs.  If so, an array of state-agency powers to review the tariff, insist on contents and delay alteration might be brought into play (albeit always subject to preemption principles).

In this instance, the relevant UNEs have been delisted and Verizon's current offerings are now made pursuant to section 271.  So far as we can tell the Maine PUC never received any commitment by Verizon to tariff offerings it made under section 271. In its original proposed tariff Verizon made no reference to two elements that are required under section 271 but have never been deemed UNEs under sections 251-52.  The district court was openly skeptical of the commitment claim, and we are unpersuaded by it.

New Hampshire's story is similar with one twist.  As earlier explained, in that state Verizon had a SGAT in place for its UNE offerings; and the New Hampshire PUC insisted--as a condition

-19-

of supporting the company's section 271 application--that the SGAT offering of UNEs be reflected in a state tariff filing.  Thereafter, when the FCC delisted various UNEs, the state agency insisted that Verizon continue such offerings with TELRIC pricing under the state tariff.

Although the SGAT has a single introductory reference to section 271 as well as sections 251-52, the SGAT refers specifically to UNEs and not to elements required by section 271.  Conversely, neither the SGAT nor the subsequent tariff offered the "poles, ducts, and conduits" regulated by section 224 and required through section 271's competitive checklist; rather, access to both elements was available through negotiated contractual arrangements.  Perhaps most important, Verizon's commitment to tariff its offerings referred specifically to UNEs--not to elements under section 271's competitive checklist.

Further, in its commitment Verizon explicitly reserved its right to modify the SGAT "to reflect changes" as determined "by the FCC or the courts."  The FCC did then determine that contested UNEs should be delisted and that TELRIC pricing should  not be used for section 271 elements.  Whether or not some deference is accorded to the state agency, Verizon's commitment cannot reasonably be read as promising to tariff section 271 elements with the state agency or provide them with TELRIC pricing.

Definition of section 271 elements. A final issue concerns the definition of certain of the elements required by section 271. In particular, the Maine PUC ruled that the statutory listing of loops (item 4) and transport (item 5) in section 271 encompasses the provision to competitors of line sharing (allegedly under item 5) and dark fiber (allegedly under items 4 and 5). See note 4, above (explaining these terms). Verizon contends otherwise. The district court in Maine sided with the state agency.

The statutory language is uninformative. "Loop" could mean the whole or it could allow the buyer to pick and choose part of the loop capacity; loop and entrance and transport could include dark fiber or could refer only to a completed communications facility. The Maine district court took the view that all such functions constituted "access" and were therefore required; but the competitive checklist is a subset specifying types of access and other functions and section 271 requires only those contained in the list.

No legislative gloss has been pointed to, and the FCC, responsible for section 271's implementation, has not clearly expressed its view: it has approved several RBOC section 271 applications which do not list line sharing or dark fiber among their offerings, New York Order ¶ 31, 15 F.C.C.R. 3953, 3967 n.70 (1999); Texas Order ¶ 32, 15 F.C.C.R. 18354, 18369 (2000); but it has also made other statements which the Maine PUC interprets as

-21-

endorsing that agency's view that line sharing and dark fiber do fall within section 271's requirements.[9]

The arguments are complicated and technical and, in the first instance, they are matters that ought to be resolved by the expert agency charged with administering section 271, namely, the FCC.  Verizon offers statements from FCC orders that it reads as favoring its position, as well as other arguments; the competitors rely on other evidence.  But these are hardly matters on which we should be reduced to reading tea leaves.

As for the sparse judicial precedent, against the Maine district court can be set a decision of a Florida district court taking the same position as Verizon now advances.  Dieca Commc'ns, Inc. v. Fla. Pub. Serv. Comm'n, 447 F. Supp. 2d 1281 (N.D. Fla. 2006).  Although statutory interpretations are the business of courts, the FCC's view would normally receive Chevron deference, bolstered by its technical expertise and respect for its policy choices in relation to UNEs and element pricing.

Under primary jurisdiction principles, the meaning of items 4 and 5 should if possible be addressed by the FCC in the first instance and before a final court decision.  The doctrine of primary jurisdiction is specifically applicable to claims, as here,

---

[9]E.g., Georgia and Louisiana 271 Order ¶ 132, 18 F.C.C.R. 19024, 19099 (2003);  Maine Order ¶¶ 44-51, 17 F.C.C.R. 11659, 11688-93 (2002); Massachusetts 271 Order ¶ 163, 16 F.C.C.R. 8988, 9079 (2001).

-22-

"properly cognizable in court that contain some issue within the special competence of an administrative agency."[10]  A reference to the agency can easily be ordered in the district court.  <u>Reiter</u> v. <u>Cooper</u>, 507 U.S. 258, 268 (1993).

The arguments for a reference here are stronger than usual.  Section 271 applies nationwide and, as the RBOCs handle most origination and termination of calls, how the statute is read will affect competition and service throughout the nation.  This is not a matter on which divergent state interpretations make sense and the FCC's position can easily be solicited.  <u>See</u> <u>TON Servs., Inc.</u> v. <u>Qwest Corp.</u>, __ F.3d __, 2007 WL 2083744, at *11 (10th Cir. 2007); <u>Davel Commc'ns, Inc.</u> v. <u>Qwest Corp.</u>, 460 F.3d 1075, 1089 (9th Cir. 2006).

Accordingly, unless the Maine PUC and Verizon agree to some other solution, the district court should proceed to refer the matter to the FCC or stay proceedings to allow the parties to seek a reference.  What should be done about Verizon's disputed obligations (provision, not TELRIC pricing) as to line sharing and dark fiber in the interim should be considered in the first instance

---

[10]<u>Reiter</u> v. <u>Cooper</u>, 507 U.S. 258, 268 (1993).  <u>See also</u> <u>U.S. Pub. Interest Research Group</u> v. <u>Atl. Salmon of Me., LLC</u>, 339 F.3d 23, 34 (1st Cir. 2003); <u>Pejepscot Indus. Park, Inc.</u> v. <u>Me. Cent. R.R. Co.</u>, 215 F.3d 195, 205 (1st Cir. 2000); <u>Ass'n of Int'l Auto. Mfrs.</u> v. <u>Comm'r, Mass. Dep't of Envt'l Prot.</u>, 196 F.3d 302, 304 (1st Cir. 1999); Pierce et al., <u>Administrative Law and Process</u> § 5.8 (2d ed. 1992).

by the district court if the parties cannot come to an interim accommodation.

The GWI agreement. Finally, the Maine PUC and Verizon disagree as to the agency's interpretation of a specific interconnection agreement between Verizon and another carrier named GWI. The dispute concerns a refusal by Verizon to fill a request for so-called OCn transport. The Maine PUC's determination in favor of GWI, and its attempted extension of that ruling to other competitors of Verizon, seems to be based on the assumption that it could impose and set rates for section 271 elements--a position we have rejected.

As we read the briefs, both the Maine PUC and Verizon seem to agree that a decision in Verizon's favor on these other issues effectively undercuts the state agency's grounds for its GWI ruling. If so, then the GWI ruling ought to be enjoined on remand along with the Maine PUC's broader effort to require that section 271 elements be offered at TELRIC pricing. If there is anything more to consider as to the GWI ruling, the parties can pursue the issue on remand.

To sum up, neither state agency may require elements that the FCC has delisted and are not enumerated in section 271 nor require that section 271 elements be offered under TELRIC pricing that the FCC has explicitly rejected. As to line sharing and dark fiber, the matter should be resolved after the FCC's views have been

solicited.  The decision of the Maine district court is <u>vacated</u> and <u>remanded</u> for further proceedings consistent with this decision; that of the New Hampshire district court is <u>affirmed</u>.  All parties will bear their own costs.

<u>It is so ordered</u>.