# Exhibit 1

1

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                        FOR THE DISTRICT OF ARIZONA

8

9    Qwest Corporation,                    )    No. CV 06-1030-PHX-ROS
                                           )
10              Plaintiff,                  )    **ORDER**
                                           )
11   v.                                     )
                                           )
12                                          )
     Arizona Corporation Commission, et al., )
13                                          )
                Defendants.                 )
14                                          )
     _____ )

15

16

17          This case involves what is now an interpretation of the Telecommunications Act of

18   1996 adopted by a majority of the courts that have considered it.

19          Section 251 of the Telecommunications Act of 1996 defines the interconnection duties

20   of telecommunications carriers.    47 U.S.C. § 251.    Under that section, every

21   telecommunications carrier has the duty "to interconnect directly or indirectly with the

22   facilities and equipment of other telecommunications carriers." Section 251(c) states that

23   incumbent local exchange carriers (ILECs)[1], must negotiate in good faith with any

24   competitive local exchange carrier (CLEC) the particular terms and conditions of agreement

25

26

27   _____

28          [1] Incumbent local exchange carriers are defined in § 251(h). The parties agree that
     Qwest is an incumbent and Covad is a competitive local exchange carrier.

1   to fulfill the duties listed in paragraphs (1) through (5) of subsection (b).[2]  Further, all ILECs

2   must provide for interconnection with any requesting CLEC's, here Covad's, network and

3   provide to all requesting CLECs nondiscriminatory access to network elements on an

4   unbundled basis.

5        Section 252 of the Act provides the procedures for negotiation, arbitration, and

6   approval of interconnection agreements.  If the ILEC and the CLEC can reach a voluntary

7   negotiated agreement, such agreement may be entered into without regard to the

8   requirements of subsections (b) and (c) of section 251.  If no voluntary agreement has been

9   reached 135 to 160 days after the CLEC's request for interconnection, the CLEC may

10  petition the appropriate state commission, in this case, the Arizona Corporation Commission

11  (ACC), for compulsory arbitration, in which the parties must participate.[3]  Regardless, all

12  interconnection agreements must be submitted to the ACC for approval.  47 U.S.C. §

13  252(e)(1).  Under §252 (b)(4), the ACC must limit its consideration of the petition to the

14  issues set forth in the petition and the response from the ILEC.  Further, the State

15  commission shall resolve each issue set forth in the petition and the response . . . by imposing

16  appropriate conditions as required to

17  _____

18       [2] The five duties listed in subsection (b) are: (1) Resale - The duty not to prohibit, and
    not to impose unreasonable or discriminatory conditions or limitations on, the resale of its
19  telecommunications services; (2) Number portability - The duty to provide, to the extent
20  technically feasible, number portability in accordance with requirements prescribed by the
    Commission; (3) Dialing parity - The duty to provide dialing parity to competing providers
21  of telephone exchange service and telephone toll service, and the duty to permit all such
    providers to have nondiscriminatory access to telephone numbers, operator services,
22  directory assistance, and directory listing, with no unreasonable dialing delays; (4) Access
23  to rights-of-way - The duty to afford access to the poles, ducts, conduits, and rights-of-way
    of such carrier to competing providers of telecommunications services on rates, terms, and
24  conditions that are consistent with section 224 of this title; and (5) Reciprocal compensation -
25  The duty to establish reciprocal compensation arrangements for the transport and termination
    of telecommunications.
26
27       [3] The ACC is required to conclude the resolution of any unresolved issues not later
    than 9 months after the date on which the ILEC received the request for interconnection.  47
28  U.S.C. § 251.

- 2 -

(1) ensure that such resolution and conditions meet the requirements of section 251 of this title, including the regulations prescribed by the Commission pursuant to section 251 of this title;

(2) establish any rates for interconnection, services, or network elements according to subsection (d) of this section; and

(3) provide a schedule for implementation of the terms and conditions by the parties to the agreement.

Section 271 of the Telecommunications Act of 1996 states that no Bell operating companies (BOCs)[4] may provide interLATA[5] services except as provided in that section. Section 271 states that a BOC may provide interLATA services only after an application is filed with and approved by the Federal Communications Commission (FCC). Section 271(d)(2)(B) provides that before a determination is made with respect to a BOC's application, the FCC must consult with the appropriate state commission, in this case the ACC, in order to "verify the compliance of the [BOC] with the requirements of subsection (c) of this section. Section 271(c) lists the requirements for providing interLATA services.

The first requirement under section 271(c) is that all BOCs must have either:

(A)    entered into one or more binding agreements that have been approved under section 252 of this title specifying the terms and conditions under which the Bell operating company is providing access and interconnection to its network facilities for the network facilities of one or more unaffiliated competing providers of telephone exchange service to residential and business subscribers; or

(B)    not entered into one or more binding agreements if no CLEC has requested access and interconnection before the date which is 3 months before the date the BOC makes its application for interLATA, and a statement of the terms and conditions that the company generally offers to provide such access and interconnection has

---

[4]    Bell operating companies are defined in 47 U.S.C. § 153(4). The parties agree that Qwest is a BOC.

[5]    InterLATA is defined in 47 U.S.C. §153(21) as "telecommunications between a point located in a local access and transport area and a point located outside such area." Effectively, this means long-distance calls.

- 3 -

been approved or permitted to take effect by the state commission under section 252(f) of this title.

47 U.S.C. §271(c)(1).

The second requirement under section 271(c) is that access or interconnection provided or generally offered by the BOC to other telecommunications carriers must comply with a checklist.[6]

After consultation with the ACC, the FCC must then issue a written determination within 90 days after receiving the application approving or denying the BOC's request to provide interLATA services. 47 U.S.C. 271(d)(3). After approval, under section 271(d)(6), if the FCC determines that a BOC has ceased to meet any of the interLATA requirements, it may issue an order requiring the BOC to correct the deficiency, suspend or revoke the approval, or impose penalties on the BOC.

Defendant Covad, as a CLEC, pursuant to sections 251 and 252 of the Telecommunications Act requested interconnection with Qwest, as a ILEC. After failing to reach an agreement, the parties underwent compulsory arbitration with the ACC. On February 2, 2006, the ACC issued an Arbitration Order which resolved the disputed issues between the parties regarding their ICA. The parties agree that the only issue of relevance at this point is issue #2: "May Section 271 Elements and Unbundled Elements Under State Law be Included in the Interconnection Agreement?"

In its order, the ACC included provisions in the ICA that defined Qwest's interconnection and access obligations under Section 271. The ACC found that since section 252(e) requires that "[a]ny interconnection agreement adopted by negotiation or arbitration shall be submitted for approval to the [ACC]," it had the authority to monitor and enforce Qwest's obligations under Section 271 and impose Section 271(c)(2) interconnection

---

[6]     The checklist lists 14 requirements, including interconnection in accordance with sections 251(c)(2) and 252(d)(1), nondiscriminatory access to network elements in accordance with sections 251(c)(3) and 252(d)(1), and reciprocal compensation arrangements in accordance with section 252(d)(2). 47 U.S.C. § 271(c)(2)(B).

- 4 -

1  requirements into the arbitrated ICA.  The ACC also found that it had authority under

2  Arizona law to impose unbundling requirements even though they had been eliminated by

3  the FCC under Section 251 and by the D.C. Circuit in U.S. Telecom Ass'n v. FCC, 359 F.3d

4  554 (D.C. Cir. 2004).[7]  Finally, the ACC found that the total element long-run incremental

5  cost (TELRIC) pricing method[8] for unbundled network elements (UNEs) that was in effect

6  when the FCC approved Qwest's entry into the Arizona interLATA market would remain

7  in effect.

8       Qwest argues the three rulings made by the ACC are incorrect and must be

9  overturned.  First, it is argued that the Telecommunications Act does not give the ACC any

10  decision making or enforcement authority relating to Section 271 obligations.  Second,

11  Qwest argues that the ACC has no authority to require unbundling under Arizona law that

12  the FCC has explicitly rejected.  Finally, Qwest argues that the Arbitration Order improperly

13  applies TELRIC prices to Section 271 elements because the TELRIC pricing standard only

14  applies to UNEs that ILECs provide under Section 251(c)(3).  The ACC and Covad disagree,

15  and argue that the ACC was correct in its order for the reasons discussed below.

16  **I.     Standard of Review**

17  _____

18      [7] An UNE is defined as a facility or equipment used in the provision of a

19  telecommunications service that must be given a separate price for equipment and supporting
services.  Such term also includes features, functions, and capabilities that are provided by

20  means of such facility or equipment, including subscriber numbers, databases, signaling
systems, and information sufficient for billing and collection or used in the transmission,

21  routing, or other provision of a telecommunications service.  47 U.S.C. § 153; AT & T Corp.

22  v. Iowa Utilities Bd., 525 U.S. 366, 394 (U.S. 1999) (stating that FCC's definition of
unbundled matches the FCC's interpretation of the word).

23

24      [8] The FCC defines TELRIC as the forward-looking cost over the long run of the total

25  quantity of the facilities and functions that are directly attributable to, or reasonably
identifiable as incremental to, such element, calculated taking as a given the I LEC's

26  provision of other elements.  47 C.F.R. §§ 51.503, 51.505 (1997).  TELRIC pricing is based

27  upon the cost of operating a hypothetical network built with the most efficient technology
available.  AT & T Corp. v. Iowa Utilities Bd., 525 U.S. 366, 375 (U.S.1999).

28

1    Qwest brings this action pursuant to 47 U.S.C. §252(e)(6), which states that "[i]n any

2    case in which a State commission makes a determination under this section, any party

3    aggrieved by such determination may bring an action in an appropriate Federal district court

4    to determine whether the agreement or statement meets the requirements of section 251 of

5    this title and this section."[9]  The scope of review is confined to the administrative record.

6    U.S. West Communications, Inc. v. Jennings, 46 F.Supp.2d 1004, 1008-09 (D.Ariz. 1999),

7    *reversed in part on other grounds*, 304 F.3d 950 (9th Cir. 2002). With regard to the standard

8    of review, this court does not sit as a surrogate public utilities commission to second-guess

9    the decisions made by the state agency to which Congress has committed primary

10   responsibility for implementing the Act in Arizona.  Id.  Rather, this court's principal task is

11   to determine whether the ACC properly interpreted the Act and any implementing

12   regulations, which is a question of federal law that is reviewed de novo.    Id.  In all other

13   respects, review will be under the arbitrary and capricious standard.    Id.

14   **II.    The ACC's Role Under Section 271**

---

17        [9]    The ACC argues that the issues that Qwest presents are not ripe for adjudication.  In effect, the ACC claims that until it actually orders that Qwest provide to Covad a specific Section 271 network element at a specific rate on a non-interim basis, Qwest's challenge to the ACC's Section 271 authority is not ripe. To determine ripeness, the Court must evaluate (1) whether the issues are fit for judicial decision, and (2) whether the parties will suffer hardship if the Court declines to consider the issues. City of Auburn v. Qwest Corp., 260 F.3d 1160, 1171 (9th Cir. 2001).    If a controversy is "essentially legal in nature," W. Oil & Gas Ass'n v. Sonoma County, 905 F.2d 1287, 1291 (9th Cir.1990), it is fit for judicial decision.  This is the case when no "further factual amplification is necessary." City of Auburn v. Qwest Corp., 260 F.3d at1172. Here, Qwest is challenging the ACC's determination that it can enforce and monitor Qwest's Section 271 compliance, arguing that the ACC cannot do so under federal law, which is purely legal in nature. Thus, Qwest's claims are fit for judicial decision.
        Further, Qwest will suffer hardship if the Court declines to consider the issues. Qwest need not wait until the ACC finds that a specific element in required under Section 271, it is enough that the ACC has found that it can enforce Section 271. See id. Further, the ACC's order that TELRIC rates apply on an interim basis is not imaginary or speculative. This is an immediate harm suffered by Qwest, and is ripe for review. Id.

- 6 -

1    Qwest argues that the Telecommunications Act does not give the ACC the authority

2    to ensure compliance with the Section 271 checklist requirements.  Qwest maintains that

3    because there is an absence of specific language in the Act which authorizes the ACC to

4    perform such a function, it is forbidden as preempted by federal law.  Qwest maintains that

5    the only role that the ACC is authorized to perform under Section 271 is to consult with the

6    FCC before the FCC makes a final determination regarding a BOC's interLATA application.

7    Further, Qwest argues the Act does not contemplate that the ACC could impose Section 271

8    requirements into ICAs that the ACC arbitrates under Section 252.  Finally, Qwest contends

9    that the only requirements that the ACC may impose into the ICAs are those in Section 251

10   regarding interconnection.  See 47 U.S.C. § 252(c) (stating that state commissions are to

11   resolve open issues by imposing conditions that meet the requirements of Section 251)

12        The ACC and Covad respond by arguing that under the Act, the ACC plays a major

13   role in implementing Section 271, specifically through the Section 252 ICA arbitration

14   process.  They claim that since the FCC only has a limited 90 days to grant or deny Section

15   271 applications, which are extremely complex, the FCC has placed reliance on state

16   commissions to develop factual records which the FCC uses to make its determinations.

17   These factual records are produced via the Section 252 ICA arbitration process.

18   Accordingly, it is argued that the Act contemplates that the ACC can impose Section 271

19   requirements into arbitrated ICAs and monitor and enforce compliance with those Sections

20   as part of the ICAs.[10]        Further, Defendants point to Section 252(e) claiming that the

21   ACC is given review and approval authority over "*any* interconnection agreement."

22   (Emphasis added.)  Additionally, Section 271(c)(2) is entitled "specific interconnection

23   requirements."  Defendants state that it is nonsensical for Qwest to argue that Congress

24   _____

25        [10] During oral argument, Defendants cited Southwestern Bell Telephone, L.P. v.
     Public Utility Commission of Texas, 467 F.3d 418 (5th Cir. 2006) in support of their position
26   that state commissions can enforce Section 271 of the Act.  Southwestern Bell, however, did
     not deal with the issue of whether a state commission can enforce and monitor a BOC's
27   Section 271 compliance under federal law.  In Southwestern Bell, the Plaintiffs never
     challenged the state commissions' authority under Federal law, unlike the present case.
28

1  intended for the states to arbitrate only Section 251 interconnection requirements while

2  Section 271 requirements are absent from ICAs.

3  In reply, Qwest argues that while there are no Ninth Circuit cases directly on point,

4  there are several opinions from other districts the upshot of which are that state commissions

5  do not have the authority to impose Section 271 requirements into arbitrated ICAs.  See

6  DIECA Communications, Inc. v. Florida Public Service Commission, 447 F.Supp.2d 1281,

7  1286 (N.D.Fla. 2006) (stating under the plain terms of the statute, the state commission's

8  resolution of open issues and imposition of conditions must be based on § 251; the statute

9  directs the state commission to ensure that such resolution and conditions meet the

10  requirements of section 251, including the regulations prescribed by the FCC and that state

11  commissions have no authority to enforce Section 271); Southwestern Bell Telephone, L.P.

12  v. Missouri Public Service Com'n, 461 F.Supp.2d 1055, 1069 (E.D.Mo.2006) (stating that

13  state commissions do not have the jurisdiction and authority to order § 271 unbundling

14  obligations to be included as part of an interconnection agreement arbitration pursuant to §

15  252, where the parties have not agreed to negotiate access to these facilities pursuant to §

16  251); Indiana Bell, 359 F.3d at 497 (state agency cannot "parlay" its limited role as a

17  consultant under Section 271 into an opportunity to issue an order dictating the provision of

18  local service).[11]

19  The Court agrees with Qwest.  The Defendants' interpretation of the Act makes no

20  textual sense.  They offer an interpretation of the Act that confuses the complimentary yet

21  distinct nature of the requirements of Sections 252 and 252 and those of 271.

22  By enacting the Telecommunications Act in 1996, "Congress entered what was

23  primarily a state system of regulation of local telephone service and created a comprehensive

24

25

26  [11] Defendants rely on New England v. Maine Public Utilities Commission, 441 F.
Supp.2d 147 (D.Me. 2006), holding that state commissions do have the authority under the
Act to set rates for Section 271 elements.  The Court declines to follow this case, finding that

27  the reasoning is unpersuasive in light of the analysis in the line of cases cited by Plaintiff,

28  holding that state commissions have no such authority.

- 8 -

1  scheme of telecommunications regulation administered by the Federal Communications

2  Commission." Indiana Bell Tel. Co. v. Indiana Utility Regulatory Comm'n, 359 F.3d 493,

3  494 (7th Cir. 2004). While state utility commissions have a role in carrying out the Act, the

4  Supreme Court of the United States has held that the Act "unquestionably" took "regulation

5  of local telecommunications competition away from the States," and required that the

6  participation of the state commissions in the new federal regime be guided by federal-agency

7  regulations. AT & T Corp. v. Iowa Utilities Bd., 525 U.S. 366, 378 n. 6 (1999); Southwestern

8  Bell Telephone, L.P. v. Missouri Public Service Com'n, 461 F.Supp.2d 1055, 1058 (E.D.Mo.

9  2006); Indiana Bell, 359 F.3d at 494. Regulating local telecommunications competition

10  under the 1996 Act no longer is a lawful or permissible activity for a state. Rather, it is an

11  activity in which states and state commissions are not entitled to engage except by express

12  leave of Congress. MCI Telecommunication Corp. v. Bell Atlantic Pennsylvania, 271 F.3d

13  491, 510 (3rd Cir. 2001).

14       Congressional intent " 'is the ultimate touchstone' of pre-emption analysis." Cipollone

15  v. Liggett Group, Inc., 505 U .S. 504, 516 (1992) (quoting Malone v. White Motor Corp.,

16  435 U.S. 497, 504 (1978)). Courts find Congress' intent either explicit in a statute's language

17  or implicit in a statute's structure and purpose. Id.; Gade v. National Solid Wastes Mgmt.

18  Ass'n, 505 U.S. 88, 98 (1992). Where, like in the Act, Congress has not explicitly

19  commanded preemption, the Supreme Court has recognized two types of implied preemption.

20  National Solid Wastes Mgmt. Ass'n, 505 U.S. at 98. First, there is field preemption, which

21  occurs when the federal law occupies a legislative field so thoroughly "as to make reasonable

22  the inference that Congress left no room for the States to supplement it." Cipollone, 505 U.S.

23  at 516 (quoting Fidelity Fed. Sav. & Loan Ass'n v. De la Cuesta, 458 U.S. 141, 153 (1982));

24  National Solid Wastes Mgmt. Ass'n, 505 U.S. at 98. Second, there is conflict preemption,

25  where compliance with both the state and federal law is physically impossible, or where the

26  state regulation "stands as an obstacle to the accomplishment and execution of the full

27  purposes and objectives of Congress." National Solid Wastes Mgmt. Ass'n, 505 U.S. at 98

28  (quoting Hines v. Davidowitz, 312 U.S. 52, 67 (1941)).

- 9 -

1      Due to conflict preemption, the arbitration orders of the ACC conflict with the Act.

2    "For when the question is whether a Federal act overrides a state law, the entire scheme of

3    the statute must, of course, be considered. . . . If the purpose of the act cannot otherwise be

4    accomplished-if its operation within its chosen field else must be frustrated and its provisions

5    be refused their natural effect-the state law must yield to the regulation of Congress within

6    the sphere of its delegated power." Hines v. Davidowitz, 312 U.S. 52, 67 (1941) (quoting

7    Savage v. Jones, 225 U.S. 501, 533 (1912)).  The scope of the ACC's role in regulating local

8    competition and the ACC's participation in 271 Application proceedings is measured by

9    federal law and must follow the purposes and objectives of Congress.  It is clear from the Act

10    that Section 252 provides the ACC with the authority to enforce ICAs and that Section 271

11    contemplates merely an advisory role for the ACC, where it makes recommendations to the

12    FCC regarding Qwest's compliance.  Indiana Bell, 2003 WL 1903363 at 10.

13      According to the plain terms of the statute, the ACC cannot impose Section 271

14    requirements into an arbitrated ICA under Section 252.  Section 252 clearly states that state

15    commissions are to resolve open issues by imposing conditions that meet the requirements

16    of Section 251.  In Section 252(c) ("Standards for arbitration"), there is no mention of

17    Section 271, and again under Section 271, the ACC's role is defined as only an advisor to

18    the FCC. If a BOC is not complying with the checklist requirements of Section 271, it is not

19    the ACC's role to impose such requirements in an ICA so that they may thereafter be

20    monitored by the state.  Rather, Section 271(d)(6)(B) provides the sole means of enforcement

21    of Section 271(c)'s requirements - a complaint shall be filed with the FCC, which it will rule

22    on within 90 days without uninvited involvement from the state.

23  **III.    The ACC's Authority Regarding Unbundling**

24      Under Section 251(c), ILECs are required to provide to all requesting CLECs

25    "nondiscriminatory access to network elements on an unbundled basis." 47 U.S.C. §

26    251(c)(3). ILECs, however, do not have to provide all network elements on an unbundled

27    basis. Rather, under Section 251(d)(2), only where access to such network elements as are

28    proprietary in nature and the failure to provide access to such network elements would impair

- 10 -

the ability of the CLEC to provide the services that it seeks to offer is it necessary for the ILEC to provide those elements on a unbundled basis.

Qwest argues that Congress explicitly assigned to the FCC the task of "determining what network elements should be made available to CLECs [on a unbundled basis]." 47 U.S.C. §251(d)(2). Further, the D.C. Circuit in U.S. Telecom Ass'n v. FCC, 359 F.3d 554, 568 (D.C. Cir. 2004) confirmed that task must be preformed by the FCC and it cannot be delegated to state commissions.

However, Section 251(d)(3) explains

> In prescribing and enforcing regulations to implement the requirements of this section, the [FCC] shall not preclude the enforcement of any regulation, order, or policy of a State commission that--
>
> (A) establishes access and interconnection obligations of local exchange carriers;
>
> (B) is consistent with the requirements of this section; and
>
> (c) does not substantially prevent implementation of the requirements of this section and the purposes of this part.

Thus, a state commission may impose their own unbundling requirements, but only where such requirements are consistent with the requirements of Section 251 and do not substantially prevent implementation of the requirements of Section 251 and the purposes of the Act. See In the Matter of Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers, hereinafter TRO, 18 F.C.C.R. 16978, 17100 (August 21, 2003).

Qwest states that the ACC adopted Covad's proposed language regarding unbundling, with the language "Qwest will continue providing access to certain network elements as required by Section 271 or state law, regardless of whether access to such UNEs is required by Section 251 of the Act." Qwest argues, however, that the FCC in the TRO stated that it "decline[d] to use section 271 . . . to broaden the unbundling obligations of section 251." 18 F.C.C.R. 16978, 17387 Further, the FCC stated:

> Our recognition that pricing pursuant to section 252 does not apply to network elements that are not required to be unbundled

- 11 -

is consistent with the Commission's general approach in the UNE Remand Order, and has been applied - apparently with no adverse effect - with respect to access to directory assistance and operator services. The Commission removed directory assistance and operator services from the list of UNEs in the UNE Remand Order. These network elements, like loops, transport, switching and signaling databases, are separately listed in the competitive checklist. Accordingly, as explained in subsequent section 271 Orders, access to directory assistance and operator services remains a condition of long distance entry - but the standard applicable to rates and conditions is *not derived* from sections 251 and 252.

Id. at 17388 (Emphasis added).  Qwest argues that those elements without unbundling requirements specifically de-listed from Section 251 and placed into the checklist of Section 271 cannot be required to be unbundled again by state commissions, as under Section 251(d)(3), which would substantially prevent implementation of the purposes of the Act.

The Court agrees. The mine run of elements that were removed from section 251 and placed into Section 271 without unbundling requirements, as described in the TRO, are intended by Congress and the FCC to be outside the scope of unbundling.  State commissions, including the ACC, cannot impose broad sweeping unbundling requirements in ICAs that would require all Section 271 elements to be unbundled.[12]  See Verizon Telephone Companies v. F.C.C., 374 F.3d 1229, 1235 (C.A.D.C. 2004) (stating that the TRO resolved the issue of whether the removal of the section 251 unbundling requirement for a particular element by itself mandates forbearance from the corresponding checklist requirement under section 271); TRO at 17384 (stating BOCs have an independent obligation, under section 271 (c)(2)(B), to provide access to certain network elements that are no longer subject to unbundling under section 251).  Such an outcome would be contrary to the purposes of the Act, namely to promote competition within markets and usurp the authority of the FCC.

---

[12]     At oral argument, the ACC took issue with this ruling by the Court, arguing that there are unbundling requirements in Section 271.  The Court realizes that certain Section 271 network elements must be unbundled, separate from the unbundling requirements of Section 251(d)(3). Nothing in the Court's ruling is intended to hold or is to be interpreted otherwise.

- 12 -

**IV.    TELRIC Prices**

Qwest argues that the Arbitration Order improperly applies TELRIC prices to Section 271 elements because the TELRIC pricing standard only apply to UNEs that ILECs provide under Section 251(c)(3).  Because the Court holds that the ACC does not have the authority or jurisdiction to impose Section 271 requirements into ICAs, it follows that the ACC does not have to authority to set the prices for those Section 271 elements.   Further, even if the ACC did have some sort of authority to set prices for Section 271 elements, it would be inappropriate to use TELRIC pricing for those elements in light of FCC rulings. See TRO, 18 F.C.C.R. at 17386-87; Verizon New England, Inc. v. New Hampshire Public Utilities Com'n, 2006 WL 2433249 at 8 (D.N.H. 2006) (stating that FCC has determined that TELRIC pricing is not appropriate for § 271 UNEs and prices should be based on the just, reasonable, and nondiscriminatory rate standard as codified in Sections 201 and 202 of the Act).

**V.    Conclusion**

Although the briefing was not presented as such because it is undisputed that there are no issues of fact, the Court will treat the briefs as cross-motions for summary judgment, deny Defendants' motion and grant Plaintiff's motion.

Accordingly,

**IT IS ORDERED THAT** Qwest's requests for declaratory and injunctive relief are granted and judgment is granted in Plaintiff's favor.  Plaintiff shall file a proposed form of judgment for declaratory and injunctive relief within 10 days from the date of this order.

DATED this 17ᵗʰ day of July, 2007.

Roslyn O. Silver
United States District Judge

- 13 -