**EXHIBIT 2**

UNITED STATES DISTRICT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHIGAN BELL TELEPHONE COMPANY,
d/b/a AT&T MICHIGAN,

               Plaintiff,

v.                                                                                          Case number 06-11982
                                                                                            Honorable Julian Abele Cook, Jr.

J. PETER LARK, LAURA CHAPPELLE, AND
MONICA MARTINEZ, in their official capacities as
commissioners of the Michigan Public Service
Commissions and not as individuals,

               Defendants,

               and

COVAD COMMUNICATIONS COMPANY,
McLEODUSA TELECOMMUNICATIONS
SERVICES, INC., TALK AMERICA, INC., TDS
METROCOM, L.L.C., and XO
COMMUNICATIONS SERVICES, INC.

               Defendant-Intervenors.

ORDER

This case is an appeal by the Plaintiff, Michigan Bell Telephone Company, doing business

as AT&T Michigan, from an "Opinion and Order" that had been issued by the Michigan Public

Service Commission ("MPSC") on September 20, 2005. These issues, about which the parties have

differences of opinion, were addressed in their respective motions for summary judgment. For the

reasons that have been set forth below, the Court will grant in part the parties' respective

applications for relief.

-1-

## I.

On April 28, 2006, AT&T Michigan filed this lawsuit, contending that the Defendants, in their official capacities as commissioners of the MPSC, had issued an "Opinion and Order" on September 20, 2005[1] which is legally preempted by the Telecommunications Act of 1996. On May of the same year, five entities (namely, Covad Communications Company, McLeod USA Telecommunications Services, Inc., Talk America, Inc., TDS Metrocom, L.L.C., and XO Communications Services, Inc.) filed motions to intervene in the litigation, all of which were granted by the Court. Several months later (January 26, 2007), AT&T Michigan filed a motion for a summary judgment, seeking to obtain the entry of an order that would (1) permanently preclude the MPSC from enforcing the unbundling and cost-based pricing requirements that had been mandated by the MPSC in its September Order; (2) require a "true-up" of the transitional rates that had been issued by this state public service utility commission; and (3) direct the MPSC to establish appropriate rates for routine network modifications. On the same date, Covad Communications Company et al (called "Defendant-Intervenors" hereinafter) filed a cross-motion for summary judgment, in which they collectively asked the Court to uphold the validity of the now-challenged September Order.[2]

## II.

Initially, the Court determines that there are no genuine issues of a material fact which must be explored prior to its examination of the legal issues that have been raised by the parties in their

---

[1] For purposes of simplicity, this MPSC "Opinion and Order" will be identified as the "September Order."

[2] A brief in opposition to the AT&T Michigan motion was also filed by the MPSC.

respective motions. Fed.R.Civ.P. 56. Hence, the Court will now turn to other relevant matters that

the parties have submitted for review.

Section 252 of the Telecommunications Act of 1996, 47 U.S.C. Sec. 252(e)(6), contains the

following language:

> In any case in which a State commission makes a determination under this section [252],
> any party aggrieved by such determination may bring an action in an appropriate Federal
> district court to determine whether the agreement or statement meets the requirements of
> section 251 and this section [252].

In 2002, the Sixth Circuit Court of Appeals reaffirmed the authority of the federal courts to conduct

a *de novo* review of an order from a state public utility commission to determine if it is in

compliance with the requirements of the 1996 Act without giving deference to the commissioners'

interpretation of this statute. *Michigan Bell Tel. Co. v. Strand*, 305 F.3d 580, 586 (6th Cir 2002).

Moreover, a decision by a state public utility commission can be sustained only on those grounds

that have been set forth within its orders. As such, a "reviewing court may not supply a reasoned

basis for the agency's action that the agency itself has not given." *Bangura v. Hanson*, 434 F.3d

487, 502 (6th Cir. 2006).

On the other hand, the Sixth Circuit has declared that "[a]s for the MPSC's findings of fact

made in the course of exercising its enforcement authority, we join our sister circuits in applying

the 'arbitrary and capricious' standard." *Strand,* 305 F.d3d at 586. This arbitrary and capricious

standard is the least demanding form of judicial review of an administrative action. Thus, the

*Strand* court advised the district courts that when it is possible to offer a reasoned explanation for

a particular outcome on the basis of the existing evidence, it is neither arbitrary nor capricious. *Id*.

at 587.

III.

Historically, local telephone service was provided by state-regulated monopolies, each with its own distinct service territory. The rates and duties of such companies were regulated by the public utility commissions in each state. In the early 1990s, Michigan and other states undertook steps to introduce competition into the local market. However, these efforts were largely unsuccessful and competition in local markets remained practically nonexistent for an extended period of time. For this reason and to avoid patchwork regulation among the states, Congress passed the Telecommunications Act of 1996 ("1996 Act"), codified at 47 U.S.C. § 152 *et seq.*

The 1996 Act established a "pro-competitive, de-regulatory national policy framework" that was "designed to accelerate [the deployment of new technology and services and to] open . . . all telecommunications markets to competition." H.R. Conf. Rep. No. 104-4568, at 1. Indeed, the Sixth Circuit Court in *Michigan Bell Telephone Co. v. MCIMetro Access Transition Services, Inc.,* 323 F.3d 348, 352 (6th Cir. 2002), explained that:

> [The 1996 Act] has been called one of the most ambitious regulating programs operating under "cooperative federalism," and creates a regulatory framework that gives authority to state and federal entities in fostering competition in local telephone markets. We have often reiterated the Act's purposes, which are ending local telephone monopolies and promoting competition in local telephone markets.

The objective of the 1996 Act was to ensure that "local service, which was previously operated as a monopoly overseen by the several states, be opened to competition according to standards established by federal law." *MCI Telecom. Corp. v. Bell Atl-Pa.,* 271 F.3d 491, 497 (3rd Cir. 2001). This legislative enactment preempted all previously existing state laws that had restricted local competition, including the exclusive franchises which had been granted to incumbent local

-4-

telephone service carriers by the various state public utility commissions.[3] However, Congress, in recognizing the existence of the practical hurdles to competition posed by requiring competitors to build duplicative stand-alone networks, concluded that the elimination of the historical legal barriers to competition was not enough to guarantee its development in the local markets. Thus, the 1996 Act represented a congressional effort to address this problem by requiring incumbent local telephone service carriers to open their networks to competing local carriers.[4]

To this end, the 1996 Act imposed several duties upon every incumbent carrier. As an example, each incumbent carrier was directed to negotiate or arbitrate agreements with competing local carriers by offering one of three methods of competition; namely, (1) provide an interconnection to its network to a competing carrier that builds or has it own networks, 47 U.S.C. § 251(c)(2); (2) enable a competing carrier that desires to lease all or a part of the incumbent's network – as opposed to building its own – with access to its network elements on an "unbundled basis," 47 U.S.C. § 251(c)(3); or (3) sell its services at wholesale prices to a competing carrier that will resell them at retail prices, 47 U.S.C. § 251(c)(4).

This legislation also directed the Federal Communications Commission ("FCC") to create implementing regulations, while giving oversight responsibilities of the "interconnection agreements" to state public utility commissions. More importantly, the 1996 Act gave the task of determining which network elements must be shared or unbundled by incumbent carriers to the

---

[3]The phrase, "incumbent local exchange carrier," refers to those telephone companies, such as AT&T Michigan, that had held monopolies in local markets prior to the passage of the 1996 Act.

[4] The phrase, "competing local carrier,"is the identification of a new entrant into the deregulated market. Here, the Defendant- Intervenors satisfy this definition for the purpose of this litigation.

FCC. The language within 47 U.S.C. § 251(d)(2) provides that when determining "what network elements should be made available" for unbundling, the FCC "shall consider, at a minimum, whether - (A) access to such network elements as are proprietary in nature is necessary; and (B) the failure to provide access to such network elements would impair the ability of " the competing carrier to offer its services. 47 U.S.C. § 251(d)(2).

The unbundling requirement, as well as the FCC's interpretation of the elements that incumbent carriers must share with every competing local carrier, has evolved and been the subject of continuing litigation over the years. In 1996, the FCC issued its *First Report and Order*,[5] which was immediately challenged by incumbent carriers. In 1999, the Supreme Court determined that some of the provisions within this *First Report and Order* were unlawful, and instructed the FCC to revise its regulations. *AT&T Michigan Corp. v. Iowa Utilities Bd.*, 525 U.S. 366 (1999). As directed, new regulations were issued by the FCC in November 1999 in its *UNE Remand Order*.[6] However, the D.C. Circuit Court of Appeals rendered a decision on May 24, 2002 which held that some of these revised regulations were unlawful. *United States Telecom Ass'n v. FCC*, 290 F.3d 415 (2002).[7] Thereafter, the FCC responded by issuing its *Triennial Review Order* ("TRO") on August 21, 2003, which contained a new set of regulations.[8] An appeal followed. The D.C. Circuit

---

[5]*In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, 11 FCCR 15499 (1996).

[6]*In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, 15 FCCR 3696 (1999).

[7]This case is identified as "*USTA I*."

[8]*In the Matter of Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, 18 FCCR 19020 (2003).

Court of Appeals vacated several portions of the *TRO* regulations in *United States Telecom Ass'n v. FCC*, 359 F.3d 554 (2004).[9] In February 2005, the FCC issued a new set of unbundling rules in the *Triennial Review Remand Order* ("TRRO")[10] which were subsequently affirmed on appeal. *Covad Comms. Co. v. FCC*, 450 F.3d 528 (D.C. Cir. 2006).

The Congress, in its passage of the 1996 Act, also assigned specific responsibilities to the state public utility commissions. Section 252 of this statute establishes the procedural framework by which competing carriers may enter into contracts, called "interconnection agreements," with incumbents to fulfill the obligations that are found in subsections 251(b) and 251(c), including the duty to provide unbundled access to certain network elements, as required by 251(c)(3). The 1996 Act also (1) requires incumbent carriers to negotiate these agreements upon request, and (2) provides for the assignment of a regulatory review of interconnection agreements to state public utility commissions. However, if these negotiations do not produce an agreement, either party to the process may petition the state public utility commission to arbitrate the unresolved issues. 47 U.S.C. § 252(b)(1). If either or both parties disagree with the terms within the interconnection agreement, as arbitrated by the state public utility commission, a review by a federal district court is available to the aggrieved party. 47 U.S.C. § 252(e)(6).

In addition, the 1996 Act has a special provision for those regional "Bell operating companies,"that split off from AT&T as the result of a 1982 antitrust settlement. Prior to the passage of the1996 Act, these companies had been precluded from providing long distance telephone service to their customers. However, Congress, in its enactment of the 1996 Act,

[9]This case is identified as *"USTA II."*

[10]*Order on Remand, In re Unbundled Access to Network Elements*, 20 F.C.C. R. 2533 (2005).

provided these Bell operating companies with an opportunity to enter the long distance market in a state within its service area if certain steps were undertaken to open its local service market to competition. *Sprint Communications Co. L.P. v. F.C.C.*, 274 F.d3d 549, 551 (D.C. Cir. 2001).

Section 271 of the Act specifically deals with the ability of the Bell operating companies to provide long distance services. 47 U.S.C. § 271(d). In order to gain permission to offer long distance services in a state in which a Bell operating company provides local service, the 1996 Act requires it to apply for approval with the FCC. 47 U.S.C. § 271(b)(1). Thereafter, the FCC has a period of ninety days from the date of the application in which to grant or deny the request for approval, based on whether the Bell operating company has satisfied the statutory prerequisites. In order to receive approval from the FCC, a petitioning Bell operating company must meet the fourteen identifiable requirements of a "competitive checklist" in Section 271(c)(2)(B).

IV.

In February 2005, AT&T Michigan notified competing carriers of its intention to modify some of the existing interconnection agreements which, arguably, were no longer in compliance with the FCC regulations. However, some of the competing carriers, including the Defendant-Intervenors, proffered their objections to this proposal with the MPSC, contending that AT&T Michigan should not be allowed to unilaterally modify the interconnection agreements. Thereafter, the MPSC initiated a proceeding (case no. U-14447), in which it initially directed the parties to engage in a collaborative process as a means of resolving their disagreements. Two of the Defendant- Intervenors (i.e., Talk America, Inc., and XO Communications Services, Inc.), added an additional issue to the collaborative process, contending that the interconnection agreements had not adequately implemented some of the rulings by the FCC in the *TRO* that had not been adversely

affected by *USTA II* or the *TRRO*. As a result, the MPSC expanded the collaborative process to include those issues that had been raised by these two competing carriers.

On September 20, 2005, the MPSC rendered the "September Order"which included its decisions relating to twenty-nine of the issues that had been raised by the parties, five of which have been challenged by AT&T Michigan and are the subject of this appeal.

V.

There is a disagreement between the Plaintiff and the Defendant-Intervenors over whether AT&T Michigan's obligations under 47 U.S.C. § 271 should be included in their interconnection agreements and, if so, to what extent. In its September Order, the MPSC declined to adopt the suggested language by either party regarding their respective obligations under Section 271. However, the MPSC, in reasserting its authority to issue the now-challenged directive, ordered the parties to negotiate, stating:

> The Commission is still convinced that obligations under Section 271 should be included in the interconnection agreements approved pursuant to Section 252. However, the Joint CLEC's[11] must negotiate with SBC[12] concerning terms and conditions, seeking Commission arbitration if necessary. If the CLECs experience problems with obtaining items available pursuant to Section 271, they may take appropriate enforcement action.

September Order at 16.

AT&T Michigan challenges the efficacy of this ruling, maintaining that the MPSC did not have the authority to issue such a directive. The Defendant-Intervenors argue that this challenge by AT&T Michigan is not ripe for a decision and should be dismissed. They point out that the September Order only outlined an appropriate method upon which to resolve any potential Section

---

[11]Competing carriers are often referred to as CLECs in the telecommunications industry.

[12]AT&T Michigan Michigan had previously conducted its business operations as "SBC."

271 disputes, claiming that AT&T Michigan had not presented the Court with a justiciable case or controversy.

Contrary to this argument by the Defendant-Intervenors, the September Order does impose a binding duty upon AT&T Michigan that it negotiate and include Section 271 obligations in its Section 252 agreements. Hence, the Court finds that this issue presents a justiciable case or controversy, and that a resolution of this matter by the Court is proper and necessary.

Next, AT&T Michigan argues that the directive in the September Order, which includes Section 271 obligations in its interconnection agreements, is without any justifiable legal basis. AT&T Michigan initially points to the structure of the 1996 Act that established two separate regulatory frameworks in which to govern two distinct markets. In one framework, it established competition for local telephone service. In the other framework, it discussed the entry by the Bell operating companies into long-distance markets. Section 251 is the linchpin of the framework on local telephone service. 47 U.S.C. § 251-261. Whereas, Section 271 appears in the framework of the 1996 Act which relates to Bell operating companies. 47 U.S.C. § 271-276.

Congress gave decision-making authority to the various state public utility commissions, such as the MPSC, in only one of these frameworks; namely, governance over those matters that pertained to competition in local telephone markets. In sharp contrast to the shared federal and state authority for local telephone markets, Congress established a separate framework for those Bell operating companies that are administered solely by the FCC. Approval for the Bell operating companies to provide long distance service under Section 271 is expressly granted by the FCC – not the state utility commission. If an aggrieved party believes that a Bell operating company – like AT&T Michigan – does not satisfy the requirements of Section 271, a complaint may be filed with

the FCC. 47 U.S.C. § 271(d)(6).

The MPSC and the Defendant-Intervenors have a different view of this issue. They point to Section 271(c)(2)(A)(ii), which requires a Bell operating company – as a condition precedent to providing long distance services to its customers – to satisfy the requirements of Sections 251 and 252. By directly referencing these paragraphs within Section 271, the 1996 Act incorporates the obligation of a Bell operating company to comply with the requirements of Section 252. It is also undisputed that approval from the FCC for a Bell operating company to enter a long-distance market under Section 271 initially depends on a review and approval by the state public utility commission. This state approval process acts as a further binder of these two sections. The Defendant- Intervenors also argue that a broadly implied authority exists under Section 252 for the state public utility commissions to undertake the necessary action to effectuate the Act, including Section 271.

Unfortunately, there is no direct case law on this issue within this Circuit. However, AT&T Michigan cites to *Indiana Bell Tel. Co. v. Indiana Util. Reg. Comm'n*, 359 F.3d 493, 497 (7th Cir. 2004), in which the Seventh Circuit Court of Appeals opined that a state public utility commission may not "parlay its limited role in issuing a recommendation under section 271, involving long-distance service, into an opportunity to issue an order, ostensibly under state law, dictating conditions on the provision of local service."

Following its review of the record, the Court concludes that the MPSC does not have the authority to direct the parties to negotiate those terms and conditions which pertain to Section 271 in the interconnection agreement process. Section 271 grants oversight authority to the FCC, but not to the state public utility commissions. Thus, the Court declares the directive by the MPSC, as

-11-

found in the September Order relating to this matter, to have been unlawfully issued and must be set aside.

## VI.

In the dispute resolution process that preceded the issuance of the September Order, the parties debated the issue as to whether AT&T Michigan, as an incumbent carrier, must continue to provide entrance facilities to competing carriers at TELRIC-rates.[13] The MPSC, in its September Order, determined that AT&T Michigan was obligated to provide "entrance facilities to the extent required for interconnection pursuant to Section 251(c) of the 1996 Act." September Order at 13.[14]

As a network element, entrance facilities are subject to an "impairment" analysis under Section 251(d)(2) of the Act to determine whether they must be unbundled (i.e., leased to requesting carriers at TELRIC -based rates) under Section 251(c)(3). *USTA II*, 359 F.3d at 586. In the *TRRO*, the FCC conducted an impairment analysis and concluded that entrance facilities can be procured by competing carriers at a low cost with no impairment to competing carriers. *TRRO* ¶ 138. The FCC declared that competing carriers can readily obtain these facilities from other sources or economically provide them for themselves. The FCC also rendered the following

---

[13]Unbundled network elements (UNEs) must be provided at cost-based rates, 47 U.S.C. 252(d)(1), and the FCC has defined the methodology to set such prices. This methodology is commonly known within the industry as "TELRIC," which stands for Total Element Long-run Incremental Cost. This technical term translates to "cost-based rates," as opposed to "retail rates."

[14]The term "entrance facilities" was defined by the D.C. Circuit Court of Appeals as "dedicated transmission facilities that connect ILEC and CLEC locations." *United States Telecom Ass'n v. FCC*, 359 F.3d 554, 585 (2004). In a layman's term, entrance facilities can be defined as the mechanism that is used to transport traffic between networks. Under the 1996 Act, entrance facilities are defined as a "network element" to which incumbent carriers must provide competing carriers with unbundled access pursuant to 47 U.S.C. § 251(c)(3). *TRRO* at ¶¶136-137.

-12-

declaration in ¶ 140, which is the source of the dispute between the parties in this case, as well as the authority upon which the MPSC relied on in making its finding regarding entrance facilities:

> We note in addition that our finding of non-impairment with respect to entrance facilities does not alter the right of competitive LECs to obtain interconnection facilities pursuant to section 251(c)(2) for the transmission and routing of telephone exchange service and exchange access service. Thus, competitive LECs will have access to these facilities at cost-based rates to the extent that they require them to interconnect with the incumbent LEC's network.

*TRRO*, at ¶ 140. In the next paragraph, the FCC opined that "[t]he evidence described above convinces us that competitive LECs are not impaired without access to entrance facilities." *TRRO* at ¶141.

The Defendant-Intervenors and the MPSC have taken the position that ¶140 represents an acknowledgment by the FCC that entrance facilities can be used by CLECs for different purposes. They maintain that entrance facilities can be used in two ways; namely, (1) to provide a final link in the transmission path between a competing carrier's customer and the carrier's switch, and (2) to serve as interconnection facilities with which to exchange traffic between incumbent and competing carriers' switches. The Defendant-Intervenors claim that the first situation (known in the industry as "backhauling,") is where a competing carrier uses an incumbent's entrance facilities to carry traffic to and from its own end users. However, they acknowledge that a competing carrier in this situation is not entitled to use the entrance facilities at TELRIC-rates. On the other hand, the Defendant-Intervenors submit that, in dealing with the second situation, a competing carrier, which uses entrance facilities to interconnect with the incumbents network, is entitled to cost-based rates.

In a counter-argument, AT&T Michigan asserts that the MPSC's interpretation of ¶ 140 of the *TRRO,* if adopted, would have the practical effect of nullifying the earlier findings by the FCC.

-13-

AT&T Michigan maintains that competing carriers have the right to obtain interconnection facilities pursuant to § 251(c)(2), without any corresponding right to lease such facilities at TELRIC-rates.

The Court agrees with AT&T Michigan and concludes that the September Order which pertains to this issue does not comply with the rules that were adopted by the FCC pursuant to Section 251. It is not reasonable to interpret an explanatory comment, such as the one found in ¶140 of the *TRRO*, in a manner that undermines the plain meaning of the rule. The meaning of ¶140 must be interpreted in light of the FCC rule, which provides that entrance facilities need not be provided by incumbent carriers to competing carriers on an unbundled basis. The *TRRO* conveys the finding by the FCC that entrance facilities should be offered competitively. A review of the ruling by the MPSC reveals that the September Order does not comply with this directive, and, accordingly, must be set aside.

## VII.

AT&T Michigan also challenges the holding by the MPSC in its September Order as it relates to how to define the term "business lines." In its directive, the MPSC rejected AT&T Michigan's position on the definition of business lines serving a wire, and instead incorporated the following language that had been proposed by the competing carriers into its September Order:

> The Commission finds that the first sentence of the FCC's rule defining business lines requires that, to be counted as a business line, the line must serve a business customer. The remaining portion of the definition presumes serving a business customer and clarifies that any loop, whether UNE-P, UNE-L, or leased line will be counted when it serves a business customer. Therefore, the Commission concludes that the language proposed by the Joint CLECs should be adopted for purposes of the amendment to the interconnection agreements.

-14-

September Order at 9.

As explained above, the 1996 Act requires incumbent carriers to share, or unbundle, certain network elements with competing carriers. Section 251(d)(2) states that in determining which network element must be unbundled, the FCC must find that the network element satisfies the "necessary and impair" standard; i.e., that the element must be necessary for a competing carrier, and the competing carrier must be impaired without access to the incumbent's element at issue. Loops and transport circuits are network elements. In the *TRO* and the *TRRO,* the FCC grappled with trying to determine whether and where competing carriers were impaired if they could not obtain loops and transport circuits from incumbent carriers.

An impairment does not exist in those locations in which the economics of the market justify the construction of competitive facilities or where network elements can be obtained from providers other than incumbent carriers. In the *TRRO*, the FCC determined that, in those circumstances involving high-capacity loops and transport wherein it could not cite to conclusive evidence of non-impairment in particular markets or on particular transport routes between wire centers, the presence of multiple fiber-based collocators and a high concentration of business lines in incumbent wire centers provided a reasonable "proxy" for identifying those situations in which an impairment did not exist. *TRRO* at ¶¶78 - 103. Specifically, the FCC stated:

> We have weighed carefully a variety of actual competitive indicia for determining impairment and determine that the best and most readily administered indicator of the potential for competitive deployment is the presence of fiber-based collocators in a wire center. We also determine that business line density in a wire center is a useful tool to infer where carriers are likely to hve collocated with fiber, and thus, a measure of where competitors are capable of duplicating the incumbent LEC's network. Both of these measures constitute proxies for where sufficient revenue opportunities exist to justify the high fixed and sunk costs of transport deployment.

-15-

*TRRO* at § 93.

In accordance with these findings, the FCC established specific numerical thresholds for the number of "business lines" and/or fiber-based collocators in a wire center. Once a wire center exceeds these thresholds, the incumbent is no longer required to unbundle high-capacity loops to transport wire from that center. For example, once a wire center is served by at least 60,000 business lines and at least four fiber-based collocators, no future DS1 loop[15] unbundling will be required in that wire center. For DS3 loops[16], the threshold is met by a wire center with at least 38,0000 business lines and at least four fiber based collocators. 47 C.F.R. § 51.319(a)(5)(I).

Thus, the issue between AT&T Michigan and the Defendant Intervenors is which lines are counted as business lines. The FCC's regulations defined business line in the following manner:

> A business line is an incumbent LEC-owned switched access line used to serve a business customer, whether by the incumbent LEC itself or by a competitive LEC that leases the line form the incumbent LEC. The number of business lines in a wire center shall equal the sum of all incumbent LEC business switched access lines, plus the sum of all UNE loops connected to that wire center, including UNE loops provisioned in combination with other unbundled elements.

47 C.F.R. § 51.5.[17]

AT&T Michigan submits that the MPSC, when declaring in its September Order that "to be counted as a business line, the line must serve a business customer," rendered an interpretation which, in its judgment, was unlawful. Further, it maintains that the number of business lines

---

[15] A DS1 loop is a type of loop that carries that equivalent of 24 voice-grade telephone lines.

[16] A DS3 loop carries the equivalent of 672 individual voice grade telephone lines.

[17]"UNE" stands for "unbundled network element," and refers to those elements which must be unbundled, or shared, with competing carriers.

counted should include all UNE loops, and claims that the MPSC's interpretation only counts "some" UNE loops.

In support of its argument on this issue, AT&T Michigan looks first to the regulatory language which it believes to be clear and unambiguous, noting that it uses the phrase, "all UNE loops." 47 C.F.R. § 51.5. Moreover, the directive to count "all UNE loops" is consistent with the FCC's underlying goal that impairment criteria be simple and easy to administer. Pursuing this issue, AT&T Michigan argues that while counting all loops is a relatively simple task, as this data has already been tracked, a compilation of pertinent data on loops connected to businesses is more complicated. Many states, including Michigan, do not have the ability to determine whether a stand-alone loop is being used to serve a business customer or a residential customer. AT&T Michigan points out that a loop belongs to an incumbent carrier, whereas the customer belongs to its competitor who possesses the knowledge about the use of the loop – not the incumbent.

The Defendant Intervenors defend the MPSC interpretation which, it believes, is correct and reflects the FCC's intention to limit the number of business lines as a proxy for determining where revenue opportunities exist. They also point to ¶103 of the *TRRO*, which explains the FCC's decision to focus on business line density, stating:

> Business line density . . . is an administrable proxy for determining where significant revenues are available sufficient for competitors to deploy transport facilities, despite the fixed and sunk costs of deployment. . . . Further, business lines are a more accurate predictor than total lines because transport deployment largely has been driven by the high bandwidth and service demands of businesses, particularly in areas where business locations are highly concentrated.

*TRRO*, ¶ 103.

The Court disagrees with the Defendant Intervenors, and concludes that the September

-17-

Order improperly confuses the definition of a business line with the procedure that is used for counting it as specified in the governing regulation, 47 C.F.R. 51.5. Unfortunately, the September Order ignores the plain language of the regulation, and transforms an otherwise unambiguous phrase, "all UNE loops," to mean only some UNE loops. Moreover, the Court concludes that the MPSC, in misconstruing the regulation, has violated existing federal law. Accordingly, this part of the September Order must be voided.

VIII.

Prior to the *TRRO*, which was issued in February 2005, local switching was often provided to competing carriers in a combination of unbundled network elements (or "UNEs") known as the "UNE Platform," or "UNE-P." The UNE Platform provided a competing carrier with unbundled access to a package of network elements that are composed of switching, a local loop, and a shared transport of calls between wire centers.[18] The entire platform was provided to competing carriers at cost-based, or TELRIC, rates.

In the *TRRO*, the FCC determined that there was no longer any need for local switching to be unbundled by incumbent carriers to competing carriers. To put it simply, after the holding in the *TRRO*, local switching was no longer a UNE (unbundled network element). As a result, competing carriers are not entitled to use the local switching of the incumbent carriers at cost-based rates, and the original method of providing a group of network elements through the UNE Platform

---

[18]It is understood within the telecommunications industry that a local exchange network is comprised of three elements: (1) local loops, which are the wires connecting telephones to switches; (2) switches, which are the equipment that directs calls to their to their destinations; and (3) transport trunks, which are the wires carrying calls between switches. *AT&T Michigan Corp. v. Iowa Utilities Bd.*, 525 U.S. 366, 371 (1999).

-18-

has been eliminated.

In the *TRRO*, the FCC also determined that rather than require competing carriers to immediately switch from paying cost-based rates to retail rates for local switching, it would allow the participants a period of transition in which to adjust. The purpose of the transition was to provide for an "adequate time for both competing LECs and incumbent LECs to perform the tasks necessary to an orderly transition, which could include deploying competitive infrastructure, negotiating alternative access arrangements, and performing loops cut overs or other conversions." *TRRO* at ¶ 227. To put it simply, the transition was designed to ensure an orderly migration of the UNE Platform and unbundled switching. To that end, the FCC required incumbents to continue to "provide access to local circuit switching on an unbundled basis" to a carrier's "embedded base" of end-user customers for a 12-month period. 47 C.F.R. Section 51.319(d)(2)(iii). It adopted a new rate applicable during the 12 month transition period of the existing UNE Platform rate plus a dollar. The *TRRO* stated that this would:

> help ensure an orderly transition by mitigating the rate shock that could be suffered by competitive LECs if TELRIC pricing were immediately eliminated . . . while at the same time, these price increase, and the limited duration of the transition, provide some protection of the interests of the incumbent LECs in those situations where unbundling is not required.

*TRRO* at ¶ 228.

In the negotiation and arbitration that led up to the September Order, the parties raised the issue of the appropriate rate for competing carrier customers who migrated to a functionally equivalent AT&T Michigan service arrangement (e.g., resale) before the transition period ended on March 11, 2006. The September Order adopted the language provided by the Defendant

-19-

Intervenors, and held that, unless the competing carrier requests or agrees otherwise, the FCC-established transition rate (i.e., the UNE Platform rate plus one dollar) would apply.

In order to phase out the UNE Platform, competing carriers were given a period of one year to transition their customers to a different commercial arrangement. AT&T Michigan contends that once the customer is switched to a new carrier, the transition rate should no longer apply, and a retail rate should apply in its place. AT&T Michigan argues that requiring it to provide local switching at the transition rate after the customer has been "resold" to another carrier constitutes an unlawful unbundling, in violation of the *TRRO*.

The Court disagrees with this argument by AT&T Michigan. On this issue, the September Order provision which calls for a designated transition period is clearly within the framework of ¶228 of the *TRRO*, which specifically gives state public utility commissions the discretion to implement these rates. The method within the September Order for dealing with the transition period is reasonable. Thus, the Court finds that it is in accordance with federal law.

## IX.

FCC regulations require incumbent carriers "to make routine network modifications to unbundled transmission facilities such by requesting carriers where the requested transmission facility has already been constructed." *TRO* at ¶632; 47 C.F.R. Section 51.319(e)(4). For example, an incumbents' loops are not capable of functioning as digital high-capacity loops until the incumbent has modified them by removing certain equipment or adding other equipment. *TRO* at ¶¶633, 634. The same can be true of an incumbent's transport circuits. These technical

-20-

modifications are commonly referred to in the industry as "routine network modifications."[19]

Federal law requires that incumbents be compensated for the costs of making modifications. In the *TRO*, the FCC stated:

> The Commission's pricing rules provide incumbent LECs with the opportunity to recover the cost of the routine network modifications we require here. State commissions have discretion as to whether these costs should be recovered through non-recurring charges or recurring charges. We note that the costs associated with these modifications often are reflected in the recurring rates that competitive LECs pay for loops. Specifically, equipment costs associated with modifications may be reflected in the carrier's investment in the network element, and labor costs associated with modifications may be recovered as part of the expense associated with that investment ( *e.g.*, through application of annual charge factors (ACFs)). The Commission's rules make clear that there may not be any double recovery of these costs ( *i.e.*, if costs are recovered through recurring charges, the incumbent LEC may not also recover these costs through a NRC).

In the September Order, the MPSC rejected the suggested language by AT&T Michigan regarding the recovery of costs for network modifications, and instead, adopted language that had been proposed by the competing carriers. The MPSC stated that costs "for which [AT&T Michigan] seeks to impose additional charges should be recovered through the charges approved in Case. No. U-13531." AT&T Michigan claims that this directive is arbitrary, capricious and violates the cost-recovery mandates of the 1996 Act, in that (1) the September 2004 order in U-13531 (which established new TELRIC rates for UNEs) was issued five months before the *TRRO*, and (2) the MPSC precluded it from seeking an update from September 2004 until September 2006. Therefore, AT&T Michigan concludes, the MPSC's order violates the cost-recovery mandates of the Act, the FFC's implementing orders, and is arbitrary and capricious. The Defendant Intervenors respond

---

[19]The FCC gave the following examples of necessary loop modifications required: "rearrangement or splicing of cable; adding a double or repeater; adding an equipment case; adding a smart jack; installing a repeater shelf; adding a line card; and deploying a new multiplexer or reconfiguring an existing multiplexer." *TRRO* at § 634.

by pointing out that the MPSC gave AT&T Michigan a full opportunity to present its costs and to seek rates that would recover its costs while performing routine network modifications. Finally, they conclude that the decision by the MPSC is neither unlawful nor arbitrary and capricious.

On this issue, the Court finds that the September Order is within the discretion of the MPSC. More importantly, the Court determines that this provision neither violates the 1996 Act nor federal regulations. Hence, the arguments on this issue by AT&T Michigan are rejected.

VIII.

Accordingly, and for the reasons stated above, the Court will grant a summary judgment in favor of AT&T Michigan on the following issues: (1) The September Order ruling that obligations under Section 271 should be included in interconnection agreements under Section 252 is unlawful; (2) the declaration within the September Order ruling, which requires the unbundling of entrance facilities, is invalid; and (3) the definition of business lines in the September Order contravenes federal law. The Court will also grant a summary judgment in favor of the MPSC and the Defendant Intervenors on the following issues: (1) the authority in the September Order which provides for the recovery of transition period rates is within the discretion of the MPSC, and (2) the contested language in the September Order which pertains to AT&T Michigan's recovery of routine network modification costs is lawful.

Dated:  September 26, 2007                    s/ Julian Abele Cook, Jr.
            Detroit, Michigan                      JULIAN ABELE COOK, JR.
                                                   United States District Court Judge

-22-

Certificate of Service

     I hereby certify that on September 26, 2007,  I electronically filed the foregoing with the Clerk of the Court using the ECF system, and I further certify that I mailed a copy to the non-ECF participant(s).

s/ Kay Alford      

Courtroom Deputy Clerk
